**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

APR 2 5 2024

TAMMY H. DOWNS, CLERK

By:_____
DEP CLERK

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
DELTA DIVISION**

STATES OF TENNESSEE, ARKANSAS,
ALABAMA, FLORIDA, GEORGIA,
IDAHO, INDIANA, IOWA, KANSAS,
MISSOURI, NEBRASKA, NORTH
DAKOTA, OKLAHOMA, SOUTH
CAROLINA, SOUTH DAKOTA, UTAH,
and WEST VIRGINIA,

　　　　*Plaintiffs,*

v.

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,

　　　　*Defendant.*

Civil Action No. **2:24-cv-84-DPM**

This case assigned to District Judge **Marshall**
and to Magistrate Judge **Ervin**

---

**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

---

　　　1.　　The Pregnant Workers Fairness Act of 2022, 42 U.S.C. § 2000gg, fills a gap in federal employment law by ensuring pregnant women receive workplace accommodations to protect their pregnancies and unborn children.  A diverse coalition of lawmakers, business groups, and nonprofit organizations supported that pro-family aim and secured the law's bipartisan support and passage.  Yet in a new rule, a bare 3-2 majority of unelected commissioners at the Equal Employment Opportunity Commission (EEOC) seeks to hijack these new protections for *pregnancies* by requiring employers to accommodate workers' *abortions*—something Congress did not authorize. *See* Ex. A, EEOC, *Implementation of Pregnant Workers Fairness Act*, 89 Fed. Reg. 29,096 (Apr. 19, 2024).  If the rule stands, Tennessee, its co-plaintiff States, and many others must facilitate workers' abortions or face federal suit—even those elective abortions of healthy

1

pregnancies that are illegal under state law. Plaintiffs now bring this Complaint to invalidate EEOC's unprecedented and unlawful abortion-accommodation mandate.

## INTRODUCTION

2.       Nationally, about 46.8% of the workforce consists of women,[1] and in Tennessee and Arkansas, more than half of eligible women (54.2% and 53.1%, respectively) participate in the labor force.[2] Each year, millions of employed women will be pregnant. Federal law has long protected women from adverse employment actions related to pregnancy. But until recently, it did not require employers to provide simple, low-cost accommodations to pregnant employees. To protect women who may need accommodations to maintain healthy pregnancies, a bipartisan coalition in Congress passed the Pregnant Workers Fairness Act of 2022 (PWFA or the Act).

3.       The PWFA requires employers to accommodate "known limitations" arising from a worker's "pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000gg-1.

4.       Supporters of the PWFA noted this language would require "commonsense accommodations"—like extra restroom breaks or the ability to work while seated—"to ensure a healthy pregnancy and a healthy baby."[3] The PWFA's pro-family aim garnered support from a spectrum of civic organizations, including pro-life groups such as the United States Conference for Catholic Bishops. One co-sponsor of the PWFA remarked that she could not think of anything "less controversial" than the PWFA's protections for the health of mothers and their unborn babies.[4]

---

[1] Women's Bureau, *Working Women: A Snapshot*, U.S. Department of Labor Blog (Feb. 28, 2022), https://perma.cc/358T-X7RM.

[2] The Economics Daily, *Labor force participation rate for women highest in the District of Columbia in 2022*, U.S. Bureau of Labor Statistics (Mar. 7, 2023), https://perma.cc/WZC9-YVHF.

[3] Bob Casey, *Casey, Cassidy Introduce Bipartisan Pregnant Workers Fairness Act, Propose Protections Against Workplace Discrimination* (Apr. 29, 2021), https://perma.cc/J2NQ-J8AA.

[4] 168 Cong. Rec. S7049 (daily ed. Dec. 8, 2022) (statement of Sen. Murray).

5. Ultimately, the PWFA enjoyed broad bipartisan sponsorship and passage. Congress directed EEOC to issue an implementing rule "provid[ing] examples of reasonable accommodations" by December 2023. 42 U.S.C. § 2000gg-3(a).

6. In response, EEOC proposed a PWFA rule in August 2023. *See* EEOC, *Regulations to Implement the Pregnant Workers Fairness Act*, 88 Fed. Reg. 54,714 (Aug. 11, 2023) (Proposed Rule). In that Proposed Rule, EEOC claimed that the PWFA's reference to "pregnancy, childbirth, or related medical conditions" meant employers must accommodate pregnant workers' abortions—whether or not the procedure was medically related. *Id.* at 54,721. Such accommodations, EEOC noted, could include providing abortion-related leave—even for elective abortions made illegal by state law. *See id.*

7. EEOC's sudden proposal to expand the PWFA to cover abortions encountered substantial resistance. Tens of thousands of commenters opposed EEOC's abortion-accommodation mandate.[5] Many argued that the inclusion of abortion accommodations exceeded the purview of the PWFA, which nowhere mentions abortions. Others noted that the PWFA's drafting history forecloses abortion coverage.

8. Among those objecting was Senator Bill Cassidy, the Republican co-sponsor of the PWFA in the Senate, who accused EEOC of "substitut[ing] its views on abortion for those of Congress."[6] Senator Cassidy cited remarks of Democratic cosponsor Bob Casey, who confirmed on the Senate floor that "under the [PWFA] . . . the EEOC, could not—*could not*—issue any regulation that requires abortion leave . . . [or] require employers to provide abortions in violation of State law."[7] Senator Mike Braun, for his part, noted that EEOC's interpretation of the PWFA

---

[5] Comments on EEOC's Proposed Rule are available at regulations.gov, https://perma.cc/Z4UU-UBS7.

[6] Sen. Bill Cassidy, Comment Letter on Proposed Rule to Implement Pregnant Workers Fairness Act, https://perma.cc/L4F8-K2K6 (Sept. 29, 2023).

[7] 168 Cong. Rec. S7050 (daily ed. Dec. 8, 2022) (statement of Sen. Casey), https://perma.cc/LX9A-BBGV.

raised significant Eleventh Amendment issues as applied to abrogate States' sovereign immunity.[8] Those concerns reiterate legal problems under Section 5 of the Fourteenth Amendment that the Department of Justice flagged in the lead-up to the PWFA's passage.

9.      Tennessee, joined by nineteen co-signing States, filed a comment stressing that EEOC's proposed coverage of abortion violated the PWFA. *See* Ex. B, Tennessee *et al.*, Comment Letter on Regulations to Implement the Pregnant Workers Fairness Act (Oct. 10, 2023) (Tenn. Comment). Elective abortions, Tennessee noted, are not themselves "medical conditions" arising from pregnancy, but instead voluntary procedures that terminate pregnancy. Tennessee pointed out that such procedures end pregnancy and fetal life and are illegal in Tennessee and many other States except in certain circumstances—including as necessary to address or protect against specified risks to maternal life or health. Tennessee also asserted that the Proposed Rule likewise flouted limits of the U.S. Constitution and the Administrative Procedure Act (APA). Tennessee urged EEOC to reconsider its approach.

10.     Despite this outpouring of opposition, EEOC's Final Rule includes a mandate that employers—including States where abortion is generally prohibited—provide abortion accommodations to their workers. *See* Ex. A, 89 Fed. Reg. 29,096 (Final Rule). Like the Proposed Rule, EEOC's Final Rule requires accommodating all abortions—even those performed exclusively to end a healthy pregnancy and terminate an unborn child's life.

11.     The Supreme Court has recognized that States have many legitimate interests in regulating abortion, including "respect for and preservation of prenatal life at all stages of development," "the elimination of particularly gruesome or barbaric medical procedures," and "the prevention of discrimination on the basis of race, sex, or disability," among others. *Dobbs v.*

---

[8] Sen. Mike Braun, Comment Letter on Proposed Rule to Implement Pregnant Workers Fairness Act, https://perma.cc/7YMZ-JXEF (Oct. 10, 2023).

*Jackson Women's Health Org.,* 597 U.S. 215, 301 (2022).  EEOC's Rule vitiates these interests by requiring the Plaintiff States in their sovereign capacity to facilitate elective abortions they have chosen to proscribe or else face federal lawsuits for money damages and injunctive relief.

12.     Plaintiffs now seek preliminary and permanent relief.  They ask the Court to stay the effective date of the Final Rule pending judicial review, *see* 5 U.S.C. § 705, as well as to preliminarily enjoin EEOC's enforcement of the Final Rule's abortion-accommodation mandate against the States.  And Plaintiffs request that this Court declare unlawful, set aside and vacate, and permanently enjoin the Final Rule's abortion-accommodation mandate.

## PARTIES

13.     Plaintiff the State of Tennessee is a sovereign State of the United States of America and an employer subject to the requirements of the challenged EEOC rule.  Tennessee currently employs about 42,000 people, and over 21,000 women, excluding employees at public higher education institutions, in various capacities across every county in the State.[9]

14.     The Tennessee Constitution expressly excludes any personal "right to abortion or [to] the funding of an abortion."  Tenn. Const. Art. 1, § 36.  In Tennessee, the Legislature has declared that Tennessee has an interest in "protect[ing] maternal health" and "preserv[ing], promot[ing], and protect[ing] life and potential life throughout pregnancy."  Tenn. Code Ann. § 39-15-214 (2020).  Tennessee law makes it a felony to provide an abortion with intent other than to increase the probability of a live birth; to preserve the life or health of the child after live birth; to terminate an ectopic or molar pregnancy; or to remove a dead fetus.  *Id.* § 39-15-213(b). Abortion is also permitted if a "physician determined, using reasonable medical judgment, based upon the facts known to the physician at the time, that the abortion was necessary to prevent the

---

[9] *Tennessee 2023 State of the State Employee Annual Report,* https://perma.cc/53EZ-EPR5.

death of the pregnant woman or to prevent serious risk of substantial and irreversible impairment of a major bodily function of the pregnant woman." *Id.* § 39-15-213(c)(1)(A). And "[n]o state funds shall be expended to perform abortions," except for certain exceptions for rape, incest, or to protect the life of the mother. *Id.* § 9-4-5116. The State of Tennessee currently does not provide workplace accommodations to allow employees to seek elective abortions, the provision of which is criminal under state law. Jonathan Skrmetti, the Attorney General and Reporter of Tennessee, is authorized by statute to try and direct "all civil litigated matters . . . in which the state . . . may be interested." *Id.* § 8-6-109(b)(1).

15.     Plaintiff the State of Arkansas is a sovereign State of the United States of America and an employer subject to the requirements of the challenged EEOC rule. Arkansas currently employs roughly 30,200 people in various capacities across every county in the State, more than half of whom are women.[10]   Tim Griffin is the Attorney General of Arkansas. General Griffin is authorized to "maintain and defend the interests of the state in matters before the United States Supreme Court and all other federal courts." Ark. Code Ann. § 25-16-703.

16.     The Arkansas Constitution makes it the "policy of Arkansas . . . to protect the life of every unborn child from conception until birth, to the extent permitted by the Federal Constitution." Ark. Const. amend. LXVIII, § 2. Consistent with that command, Arkansas statutes prohibit "[p]erforming or attempting to perform an abortion" and makes doing so "an unclassified felony" subject to up to a $100,000 fine and ten years' imprisonment. Ark. Code Ann. § 5-61-304(b) (Arkansas Human Life Protection Act); Ark. Code Ann. § 5-61-404(b) (Arkansas Unborn Child Protection Act). That prohibition, however, does not prohibit procedures necessary to save the life of the mother, to remove an ectopic pregnancy, or to remove a deceased unborn child

---

[10] *See Full Employee Salaries Data*, Transparency.Arkansas.gov (Apr. 10, 2024), https://perma.cc/FP6F-AKLY.

caused by spontaneous abortion. *See id.* §§ 5-61-303, 304, 403, & 404. Moreover, the Arkansas Constitution prohibits the use of "public funds . . . to pay for any abortion, except to save the mother's life." Ark. Const. amend. LXVIII, § 3. Arkansas thus does not provide workplace accommodations to allow employees to seek elective abortions and doing so would violate the State's constitution.

17.     Plaintiff the State of Alabama is a sovereign State of the United States of America and an employer subject to the requirements of the challenged EEOC rule. Alabama employs around 30,000 employees, and over half are women.[11] Steve Marshall, the Attorney General of Alabama, is authorized to bring "all civil actions and other proceedings necessary to protect the rights and interests of the state." Ala. Code § 36-15-12.

18.     The Alabama Constitution makes it the State's "public policy" to "recognize and support the sanctity of unborn life and the rights of unborn children, including the right to life" and to "ensure the protection of the rights of the unborn child in all manners and measures lawful and appropriate." Ala. Const. Art. I, § 36.06(a), (b). Similarly, "[n]othing in [the Alabama] constitution secures or protects a right to abortion or requires the funding of an abortion." *Id.* § 36.06(c). In Alabama, intentionally providing an abortion is a felony unless it "is necessary in order to prevent a serious health risk" to the mother. Ala. Code §§ 26-23H-4(b), 23H-6(a). That prohibition does not cover procedures in certain circumstances if done to protect the mother or child or with the intent to remove a deceased unborn child. *See id.* § 26-23H-3(1). Nor does it include procedures involving "an ectopic pregnancy" or an "unborn child" with a "lethal anomaly." *Id.* The legislature has found that Alabamians "oppose the use of public funds … to pay for abortions." *Id.* § 26-23C-2(a)(7). Accordingly, Alabama does not provide workplace

---

[11] Alabama State Personnel Department, *2022 Annual Report* at 13, 18, https://perma.cc/G49N-NBR7.

accommodations to allow employees to seek elective abortions.

19.     Plaintiff the State of Florida is a sovereign State of the United States of America and an employer subject to the requirements of the challenged EEOC rule.   Florida employs over 160,000 people.  Effective May 1, 2024, Florida law prohibits abortions after six weeks, subject to certain exceptions. § 390.0111, Fla. Stat.  Florida law also prohibits using state funds "*in any manner* for a person to travel to another state to receive services that are intended to support an abortion."  § 286.31(2), Fla. Stat. (emphasis added).  The statute, however, allows the expenditure of state funds where "required by federal law."  § 286.31(2)(a), Fla. Stat.  Ashley Moody, the Attorney General of Florida, is authorized by statute to "appear in and attend to" suits in which the State is "a party . . . or in anywise interested." § 16.01(4)–(5), Fla. Stat.

20.     Plaintiff the State of Georgia is a sovereign State of the United States of America and an employer subject to the requirements of the challenged EEOC rule.  Georgia prohibits abortions after a fetal heartbeat has been detected, except in cases of rape, incest, futility, or where a procedure is necessary to protect the health of the mother.  *See* Ga. Code Ann. § 16-12-141.  The State of Georgia does not provide workplace accommodations to allow employees to seek abortions that are criminal under state law.  Georgia brings this suit through its Attorney General, Christopher Carr.   He is the chief legal officer of the State of Georgia and has the authority to represent the State in federal court.

21.     Plaintiff the State of Idaho is a sovereign State of the United States of America and an employer that employs women and that is subject to the requirements of the challenged EEOC rule.  Idaho law generally prohibits elective abortion, as well as the use of public funds for abortion. *See* Idaho Code § 18-8701 *et seq.*  Idaho does not currently provide accommodations for workers

8

to obtain elective abortions. Idaho brings this lawsuit through its Attorney General, Raúl R. Labrador, who has the authority to sue on the State's behalf. *See id.* § 67-1401.

22.     Plaintiff the State of Indiana is a sovereign State of the United States of America and an employer subject to the requirements of the challenged EEOC rule. Indiana currently employs large numbers of women. Theodore E. Rokita is the Attorney General of Indiana. General Rokita is authorized to "represent the state in any matter involving the rights or interests of the state." Ind. Code § 4-6-1-6. By law, Indiana "prefer[s], encourage[s], and support[s]" childbirth "over abortion." *Id.* § 16-34-1-1. It prohibits most abortions, including all elective abortions. *Id.* § 16-34-2-1(a). It also prohibits "the state" and "any political subdivision of the state" from "mak[ing] a payment from any fund under its control for the performance of an abortion" unless necessary to save a woman's life or avert a serious health risk. *Id.* § 16-34-1-2.

23.     Plaintiff the State of Iowa is a sovereign State of the United States of America and an employer subject to the requirements of the challenged EEOC rule. Iowa currently employs about 72,000 people, and tens of thousands of women, in various capacities across the State.[12] Iowa law places various restrictions on the availability of elective abortions. *See*, *e.g.*, Iowa Code §§ 146A, 146B, 146D, 146E. The State of Iowa does not have a policy of providing workplace accommodations to allow employees to seek elective abortions. Brenna Bird is the Attorney General of Iowa. She is authorized by Iowa law to sue on the State's behalf under Iowa Code § 13.2. Iowa sues to vindicate its sovereign, quasi-sovereign, and proprietary interests, including its interests in protecting its citizens. The Attorney General believes Iowa will be harmed by the Final Rule and therefore joins as a Plaintiff in this suit.

24.     Plaintiff the State of Kansas is a sovereign State of the United States of America

---

[12] *All Employees: Government: State Government in Iowa*, *FRED*, *available at* https://perma.cc/T8NR-R7FH (last accessed 04/22/2024).

and an employer subject to the requirements of the challenged EEOC rule. Kansas currently employs tens of thousands of women. Kris Kobach is the Attorney General of Kansas. General Kobach is the chief legal officer of the State of Kansas and has the authority to represent Kansas in federal court. Kan. Stat. Ann. § 75-702(a). Kansas law provides that "[n]o moneys appropriated from the state general fund or from any special revenue fund shall be expended for any abortion." *Id.* § 65-6733(a).

25. Plaintiff the State of Missouri is a sovereign State of the United States of America and an employer subject to the requirements of the challenged EEOC rule. Missouri currently employs tens of thousands of women. The Missouri Constitution recognizes a "natural right to life" for "all persons," including persons who have not yet been born. Mo. Const. art. I, § 2. Consistent with this, Missouri law prohibits elective abortions and does not permit state agencies or employees to facilitate or support abortion. Mo. Rev. Stat. §§ 188.017, .205, .210, .215. Andrew Bailey is the Attorney General of Missouri. General Bailey is authorized to "institute, in the name and on behalf of the state, all civil suits and other proceedings at law or equity requisite or necessary to protect the rights and interests of the state." *Id.* § 27.060.

26. Plaintiff the State of Nebraska is a sovereign State of the United States of America and an employer that employs women and is subject to the requirements of the challenged EEOC rule. Michael T. Hilgers is the Attorney General of Nebraska. General Hilgers is authorized to appear for the State in any civil matter in which the State has an interest. Neb. Rev. Stat. § 84-203. Nebraska law prohibits abortion after 12 weeks' gestation except in cases of medical emergency or a pregnancy resulting from sexual assault or incest. *Id.* § 71-6915. Nebraska law does not currently provide accommodations for workers to obtain elective abortions.

27.    Plaintiff the State of North Dakota is a sovereign State of the United States of America and an employer subject to the requirements of the challenged EEOC rule.  North Dakota currently employs over 15,000 individuals across the state, many of whom are women.[13]

28.    It is the "policy of the state of North Dakota that normal childbirth is to be given preference, encouragement, and support by law and by state action, it being in the best interests of the well-being and common good of North Dakota."  N.D.C.C. § 14-02.3-01(1).  Consistent with this interest in promoting the common good of North Dakota, the State provides an "alternative-to-abortion" program.  *Id.* §50-06-26.  While funds can be used for that alternative program, state law is clear that public funds may not be used for elective abortions, providing that "no funds of [North Dakota], or any agency, county, municipality, or any other subdivision thereof and no federal funds passing through the state treasury or a state agency may be used to pay for the performance, or for promoting the performance, of an abortion."  *Id.* § 14-02.3-01(3).  That includes using those funds as "family planning funds by any person or public or private agency which performs, refers, or encourages abortion."  *Id.* § 14-02.3-02.  Health insurance contracts, plans, and policies are specifically disallowed from providing coverage for elective abortions.  *Id.* § 14-02.3-03.  Additionally, it is a class C Felony for any person to perform an elective abortion in North Dakota.  *Id.* § 12.1-19.1-02.  Mandating that the State of North Dakota provide workplace accommodations for abortion would therefore cause North Dakota to violate its own laws.  North Dakota brings this suit through its Attorney General, Drew H. Wrigley, who has the authority to represent the State in federal court.

29.    Plaintiff the State of Oklahoma is a sovereign State of the United States of America and an employer subject to the requirements of the challenged EEOC rule.  Oklahoma currently

---

[13] *See Team ND Benefits & Extras*, https://perma.cc/W4JN-ZCKL.

employs thousands of women.  Oklahoma criminal law prohibits the provision of abortion except as necessary to preserve a pregnant woman's life.  OKLA STAT. tit. 21, § 861.  Oklahoma does not currently provide workplace accommodations for abortions that are illegal under state law. Oklahoma brings this suit through its Attorney General, Gentner Drummond, who has the authority to represent the State in federal court.

30.     Plaintiff State of South Carolina is a sovereign State of the United States of America and an employer subject to the requirements of the challenged EEOC rule.  South Carolina currently employs almost 60,000 people in various capacities across every county in the State,[14] and over half are women.[15]

31.     "[T]here is no fundamental constitutional right to abortion" under the privacy provision of the South Carolina Constitution.  *Planned Parenthood S. Atl. v. State*, 440 S.C. 465, 481, 892 S.E.2d 121, 130 (2023), *reh'g denied* (Aug. 29, 2023).  And the State of South Carolina has an "interest in protecting unborn life . . . ."  *Id.*, 440 S.C. at 490, 892 S.E.2d at 135.  South Carolina law makes it a felony to provide an abortion after detection of an unborn child's fetal heartbeat, with limited exceptions for "medical emergency" or "to prevent the death of the pregnant woman or to prevent the serious risk of a substantial and irreversible impairment of a major bodily function, not including psychological or emotional conditions;" if the pregnancy is the result of rape or incest "and the probable gestational age of the unborn child is not more than twelve weeks;" or the "existence of a fatal fetal anomaly."  S.C. Code Ann. § 44-41-630(B); *see also id.* at §§ 44-41-640, 650, and 660.  Subject to those same exceptions, "[n]o funds appropriated by the State for employer contributions to the State Health Insurance Plan may be expended to

---

[14]   South Carolina Department of Administration, *Employees by County – Updated April 17, 2024*, https://perma.cc/W7KH-X5GS.
[15]   South Carolina Department of Administration, *Workforce – County, Gender and Ethnic Origin*, March 2024, https://perma.cc/EK95-JGPY.

reimburse the expenses of an abortion . . . ." *Id.* § 44-41-90(A).  Further, "[n]o state funds may, directly or indirectly, be utilized by Planned Parenthood for abortions, abortion services or procedures, or administrative functions related to abortions." *Id.* § 44-41-90(B).

32.     Alan Wilson, the Attorney General of South Carolina, is the chief legal officer of the State of South Carolina and has the authority to represent South Carolina in federal court. *State ex rel. Condon v. Hodges*, 349 S.C. 232, 239–40, 562 S.E.2d 623, 627 (2002) (the South Carolina attorney general "'may institute, conduct and maintain all such suits and *proceedings* as *he deems* necessary for *the enforcement of the laws of the State,* the *preservation of order,* and the *protection* of *public rights*.'" (emphasis in original)) (quoting *State ex rel. Daniel v. Broad River Power Co.*, 157 S.C. 1, 68, 153 S.E. 537, 560 (1929), *aff'd* 282 U.S. 187 (1930)).

33.     Plaintiff the State of South Dakota is a sovereign State of the United States of America and an employer subject to the requirements of the challenged EEOC rule.  South Dakota currently employs tens of thousands of women.  Marty J. Jackley is the Attorney General of South Dakota.  General Jackley is authorized "to appear for the state and prosecute or defend, in any court or before any officer, any cause or matter, civil or criminal, in which the state may be a party or interested."  SDCL § 1-1-1(2).  South Dakota law prohibits elective abortions and does not permit state agencies or employees to facilitate or support abortion.

34.     Plaintiff the State of Utah is a sovereign State of the United States of America and an employer subject to the requirements of the challenged EEOC rule.  Utah currently employs thousands of women.  Sean Reyes is the Attorney General of Utah.  He is authorized to sue on Utah's behalf.  *See, e.g.*, Utah Const. art. VII, sec. 16; Utah Code § 67-5-1(1)(b).  Utah law recognizes that "unborn children have inherent and inalienable rights that are entitled to protection by the state of Utah pursuant to the provisions of the Utah Constitution."  Utah Code § 76-7-

13

301.1(1).  Utah also has a "compelling interest in the protection of the lives of unborn children."
*Id.* § 76-7-301.1(2).  Utah law therefore prohibits abortions subject to three statutorily defined
exceptions. *Id.* § 76-7a-2.  And Utah forbids the use of public funds by the State, its institutions,
or its political subdivisions to directly or indirectly pay for any abortions prohibited by law.  *Id.*
§ 76-7-331(2).

35.     Plaintiff the State of West Virginia is a sovereign State of the United States of
America and an employer subject to the requirements of the challenged EEOC rule.  West Virginia
currently employs thousands of women.  The West Virginia Constitution provides that "[n]othing
in this Constitution secures or protects a right to abortion or requires the funding of abortion."  W.
Va. Const. art. VI, § 57.  West Virginia law prohibits abortion except when the fetus is nonviable,
the pregnancy is ectopic, or a medical emergency exists and in the case of rape or incest.  W. Va.
Code § 16-2R-3.  West Virginia criminal law prohibits the provision of abortion by anyone other
than a licensed medical professional.  *Id.* § 61-2-8.  West Virginia does not provide workplace
accommodations for elective abortions.  West Virginia brings this lawsuit through its Attorney
General, Patrick Morrisey, who has the authority to represent the State in federal court.
*Id.* § 5-3-2.

36.     Defendant EEOC is a federal agency charged with promulgating regulations under
the PWFA, *see* 42 U.S.C. § 2000gg-3(a), and with enforcing the PWFA and related agency
guidelines and rules, *id.* § 2000gg-2.  EEOC also may issue "right-to-sue" letters that allow private
individuals to sue their employers for violating the PWFA or EEOC's final PWFA rule.  *See id.*
§ 2000e-5(b), f(1).  EEOC qualifies as an agency for purposes of the Administrative Procedure
Act.  *See, e.g.*, *Tennessee v. U.S. Dep't of Educ.*, 615 F. Supp. 3d 807, 818 (E.D. Tenn. 2022).

## JURISDICTION & VENUE

37.     This Court has jurisdiction under 28 U.S.C. § 1331 (action arising under the laws of the United States), and 28 U.S.C. § 1346 (agencies and employees of the federal government).

38.     An actual controversy exists between the parties under 28 U.S.C. § 2201(a).

39.     This Court may grant declaratory relief, injunctive relief, and other relief pursuant to 28 U.S.C. §§ 2201-02, 5 U.S.C. §§ 705-06, and its inherent equitable powers.

40.     Venue is proper under 28 U.S.C. § 1391(e)(1) because the State of Arkansas resides in this District for purposes of the venue laws.  In addition, Defendant's challenged actions adversely affect Arkansas's employment operations and would require state officials and employees to engage in conduct specifically prohibited by the State's constitution.  That harm would occur throughout the State.

41.     This Court has the authority to grant Plaintiffs the relief they request under the Administrative Procedure Act, 5 U.S.C. §§ 705-06; the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02; and 28 U.S.C. § 1361.

## FACTUAL ALLEGATIONS

### I.     Lawmakers Pass the PWFA to Promote Safe Employee Pregnancies, Not Abortions.

42.     Over the course of the past decade, a bipartisan coalition of lawmakers has proposed bills that would expressly guarantee pregnant workers the right to seek workplace accommodations.  These efforts prompted the 2022 passage of the PWFA.

### A. Before the PWFA, federal law did not specifically require employers to accommodate pregnant workers.

43.     Before the PWFA's passage, a patchwork of federal employment laws left pregnant workers with limited legal means to seek affirmative workplace accommodations.

44.     Title VII of the Civil Rights Act of 1964 prohibits employment discrimination based on sex, among other protected characteristics. 42 U.S.C. § 2000e, *et seq*. As amended by the Pregnancy Discrimination Act of 1978 (PDA), Title VII's prohibition on discrimination "because of . . . sex" includes actions taken "because of or on the basis of pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e(k). Title VII further specifies that women "affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work." *Id.* EEOC does not have substantive rulemaking authority to implement Title VII, but it has sometimes issued sub-regulatory guidance setting out the agency's position on the statute's reach.

45.     Under Title VII and the PDA, a pregnant worker seeking accommodations for her pregnancy must show that the employer provides the accommodation to comparator workers who are limited in their ability to work for reasons unrelated to pregnancy. *See Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 229-30 (2015). Without this showing, Title VII does not require employers to affirmatively accommodate workers' pregnancies, childbirth, or pregnancy-related medical conditions.

46.     The Americans with Disabilities Act (ADA), for its part, does require employers to offer affirmative accommodations to workers experiencing a qualifying disability. 42 U.S.C. § 12112(a). But only certain pregnancy-related conditions are pervasive or severe enough to qualify for such status. Normal, uncomplicated pregnancies do not constitute a protected disability, leaving many pregnant workers outside the ADA's scope. *See Spees v. James Marine, Inc.*, 617 F.3d 380, 396 (6th Cir. 2010) (collecting cases); *McCarty v. City of Eagan*, 16 F. Supp. 3d 1019, 1027 (D. Minn. 2014) ("reviewing case law in this and other circuits" and concluding

"the fact of pregnancy itself" is not a disability "within the meaning of the ADA"); *Gorman v. Wells Mfg. Corp.*, 209 F. Supp. 2d 970, 975 (S.D. Iowa 2002) (similar).

47.     The Family Medical Leave Act (FMLA) allows eligible employees to take up to twelve weeks of unpaid leave during a twelve-month period "[b]ecause of a serious health condition," such as pregnancy or childbirth.   29 U.S.C. § 2612(a)(1)(D).   But the FMLA only applies to employees who have been employed "for at least 12 months by the employer with respect to whom leave is requested . . . and . . . for at least 1,250 hours of service with such employer during the previous 12-month period."   29 U.S.C. § 2611(2)(A).   Furthermore, an "employer may terminate" an employee who has "exhaust[ed] FMLA leave" and does not return to work after the statutory period.   *Hasenwinkel v. Mosaic*, 809 F.3d 427, 432 (8th Cir. 2015); *accord Hearst v. Progressive Foam Techs., Inc.*, 682 F. Supp. 2d 955, 964 (E.D. Ark. 2010) ("If an employee fails to return, prior to, or immediately upon, the expiration of qualified FMLA leave, the right to reinstatement dissipates." (internal quotation marks omitted)).

48.     In short, before the PWFA, federal employment law did not require employers to affirmatively accommodate limitations and conditions related to many workers' pregnancies. And although many States, including Tennessee, *see* Tenn. Code Ann. § 50-10-101, *et seq.*, and Arkansas, *see* Ark. Code Ann. §§ 16-123-102(1), 16-123-107(a), have enacted laws requiring employers to accommodate worker pregnancies, *see* 89 Fed. Reg. at 29,170-71 tbl.1 (collecting statutes), nearly half have not.

### B.  Lawmakers pass the PWFA to promote safe worker pregnancies while stressing no abortion coverage.

49.     These gaps in consistent employment protections for pregnant workers across the country prompted federal lawmakers to propose, debate, and ultimately pass the PWFA.   As the

debate over the law and enacted text make clear, the PWFA's protections for pregnancy do not authorize EEOC to require employers to accommodate elective abortions.

50.     The statutory history of the PWFA overwhelmingly cuts against EEOC's abortion-mandate position. After years of attempts at advancing pregnancy accommodations, in 2021-2022, the U.S. House and Senate each considered and advanced bipartisan legislation that would later be enacted as the PWFA. These proposals required employers to accommodate limitations related to a worker's pregnancy, childbirth, or related medical conditions. Both likewise tasked EEOC with adopting regulations "providing examples" of reasonable accommodations to help implement the statute. Pregnant Workers Fairness Act of 2021, H.R. 1065, 117th Cong. § 4 (2021); Pregnant Workers Fairness Act of 2021, S. 1486, 117th Cong. § 4 (2021).

51.     Throughout debate on the PWFA, lawmakers expressed agreement on the PWFA's singular intent—to accommodate pregnant workers to ensure healthy pregnancies and childbirth. After the PWFA's advancement from the Senate Health, Education, Labor, and Pensions Committee, Committee Chair Patty Murray stated that "[n]o one should be forced to decide between a healthy pregnancy and staying on the job—so we must pass the [PWFA] without delay."[16] Similarly, PWFA cosponsor Lisa Murkowski expressed her support for the bill's "commonsense accommodations . . . to ensure a healthy pregnancy and a healthy baby."[17]

52.     Sponsoring lawmakers in the House emphasized that the PWFA would help ensure that women would not need to sacrifice continued employment for safe pregnancies. *See, e.g.*,

---

[16] *Senate HELP Committee Advances Bipartisan Bills to Improve Suicide Prevention, Protect Pregnant Workers, and Support People with Disabilities*, S. Comm. on Health, Educ., Labor, & Pensions (Aug. 3, 2021), https://perma.cc/BP7Y-YYD9.

[17] Bob Casey, *Casey, Cassidy Introduce Bipartisan Pregnant Workers Fairness Act, Propose Protections Against Workplace Discrimination* (Apr. 29, 2021), https://perma.cc/J2NQ-J8AA.

167 Cong. Rec. H2346 (daily ed. May 14, 2021) (statement of Rep. Carolyn Maloney) ("No pregnant worker should have to choose between their and their baby's health or their job.").

53.     Lawmakers supporting the PWFA also noted that the accommodations required— like providing a stool, or a water bottle, or additional bathroom breaks—would take little or no effort or expense by covered employers. *See, e.g.*, 168 Cong. Rec. S10081 (daily ed. Dec. 22, 2022) (statement of Sen. Bob Casey); 168 Cong. Rec. E1360 (Dec. 27, 2022) (statement of Rep. Suzanne Bonamici during extension of remarks). Senator Murray described the PWFA's purpose as "to provide basic, common sense, low cost, and even no cost accommodations," indicating that she could not "think of anything less controversial."[18]

54.     Lawmakers' consideration of the PWFA likewise demonstrates that the legislation was *not* intended to accommodate abortions. Senator Bob Casey, the Senate sponsor of the bill, expressly rejected EEOC's current position: "under the Pregnant Workers Fairness Workers Act, the [EEOC] could not—could not—issue any regulation that requires abortion leave, nor does the act permit the EEOC to require employers to provide abortions in violation of State law." 168 Cong. Rec. S7050 (daily ed. Dec. 8, 2022). Senator Steve Daines echoed that statement, adding, "Senator Casey's statement reflects the intent of Congress in advancing the [PWFA] today. This legislation should not be misconstrued by EEOC or Federal courts to impose abortion-related mandates on employers, or otherwise to promote abortions, contrary to the intent of Congress." 168 Cong. Rec. S10081 (daily ed. Dec. 22, 2022). Senator Cassidy likewise "reject[ed] the characterization that [the PWFA] would do anything to promote abortion." 168 Cong. Rec. S7050 (daily ed. Dec. 8, 2022). On the House side, proponents consistently billed the PWFA as giving "pregnant workers basic accommodations like an extra bathroom break and stool to sit on," 168

---

[18] *Republican Senator Blocks Murray-Casey-Cassidy Effort to Pass Pregnant Workers Fairness Act*, S. Comm. on Health, Educ., Labor, & Pensions (Dec. 8, 2022), https://perma.cc/WKP2-H4MS.

Cong. Rec. E1360 (Dec. 27, 2022) (statement of Rep. Suzanne Bonamici during extension of remarks), not forcing employers to accommodate employee abortions.

55.     In debate, some lawmakers expressed concern that the PWFA as proposed lacked any express provisions protecting employers' religious exercise. *See, e.g.*, 166 Cong. Rec. H4512, H4515 (daily ed. Sept. 17, 2020) (statement of Rep. Virginia Foxx); 167 Cong. Rec. H2227 (daily ed. May 12, 2021) (statement of Rep. Guy Reschenthaler). These lawmakers pointed out that other employment laws, like Title VII, included carveouts to permit employers to engage in practices related to their religious beliefs.

56.     In response, the PWFA's chief sponsors questioned how the law's accommodation requirement could implicate religious practice. *See, e.g.*, *H.R. 2547—Comprehensive Debt Collection Improvement Act; H.R. 1065—Pregnant Workers Fairness Act: Hearing before the House Rules Comm.*, 117th Cong. (2021), at 1:12:40-1:13:13 (statement of Rep. Jim McGovern, Committee Chair). Lawmakers emphasized that the PWFA did not and could not be read to require employers to accommodate employees' abortions. The PWFA's inapplicability to abortion could not be clearer from the lead-up to the statute's passage.

57.     The broad spectrum of support that the PWFA received from civic organizations also supports the law's exclusion of elective abortion coverage. During PWFA's consideration in Congress, a wide range of organizations, including not only Planned Parenthood, NARAL, and the ACLU (pro-abortion groups), but also the pro-life U.S. Conference of Catholic Bishops and March of Dimes, supported the PWFA through congressional testimony, public statements, and open letters. *See* 168 Cong. Rec. S10081 (daily ed. Dec. 22, 2022) (statement of Sen. Bob Casey). This commentary generally stressed agreement with the PWFA's core purpose to ensure women

could safely continue working while pregnant.[19]  None of these organizations contended that the PWFA would, or even could, require accommodations for abortion.

58.     Shortly after these debates, in December 2022, the House and Senate passed and President Biden signed the PWFA as part of the year-end consolidated appropriations package. *See* Consolidated Appropriations Act, 2023, div. II, Pub. L. 117-328 (2022), 136 Stat. at 6084.

59.     Tracking the PWFA's drafting history, the enacted text shows that the law does not cover the accommodation of elective abortions.  As enacted, the PWFA requires employers to accommodate any "known limitation[s] … related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions."  42 U.S.C. § 2000gg-1.  The PWFA then defines "known limitation" as a "*physical or mental condition* related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions."  *Id.* § 2000gg(4) (emphasis added).

60.     The PWFA makes it unlawful for "covered" employers to discriminate against an employee with a "known limitation."  Such discrimination includes: (1) refusing to provide reasonable accommodations; (2) forcing an employee to accept an accommodation that is not reasonable; (3) denying employment opportunities because of the employee's need for a reasonable accommodation; (4) forcing an employee to take paid or unpaid leave rather than providing a reasonable accommodation; or (5) taking an adverse employment action against an employee because they requested a reasonable accommodation.  *Id.* § 2000gg-1.  The statute nowhere mentions a need to accommodate elective abortions—let alone when such procedures are illegal within an employer's State.

---

[19] *See, e.g.*, *PWFA Letter to Congress*, United States Conference of Catholic Bishops (Aug. 9, 2021), https://perma.cc/VEK8-MBNH (emphasizing that the PWFA "will make the workplace a safer environment for nursing mothers, pregnant women, and their unborn children").

61.    The purpose of the PWFA is clear from its text: the law is intended to protect pregnant workers and their babies by directing that women receive workplace accommodations for "pregnancy, childbirth, or related medical conditions." *Id.*

## II.    EEOC Proposes a PWFA Rule That Would Require Employers to Accommodate Workers' Elective Abortions.

### A. EEOC construes pregnancy related "medical conditions" to include abortion.

62.    Congress charged EEOC with adopting a rule to implement the PWFA. Contrary to the statute's text and lawmakers' express rejection of the idea that the PWFA could mandate abortion accommodations, EEOC proposed a rule that would require covered employers— including States—to accommodate abortions, including elective abortions illegal under state law. 88 Fed. Reg. 54,714 (Aug. 11, 2023).

63.    The Proposed Rule stated that "having . . . an abortion" constitutes an "example[] of pregnancy, childbirth, or related medical condition[]." *Id.* at 54,774. The implications of mandating abortion accommodations are immense: covered employers would be required to support and devote resources, including by providing extra leave time, to assist employees' decision to terminate fetal life. *Id.* at 54,730.

64.    The PWFA and EEOC's Proposed Rule apply to "covered entities," which include public or private employers with fifteen or more employees, unions, employment agencies, and the Federal Government. *Id.* at 54,719; *see also id.* at 54,754 ("covered entities" under the PWFA and proposed rule "include all employers covered by Title VII and the Government Employee Rights Act of 1991"). That encompasses about 117 million employees of private employers, 18.8 million State and local government employees, and 2.3 million federal employees. *Id.* at 54,755.

65.    Given the PWFA's expansive coverage, EEOC had to acknowledge that the Proposed Rule would increase costs for employers. *Id.* at 54,759. But the agency offered no "data

on the average cost of reasonable accommodations related specifically to pregnancy, childbirth, or related medical conditions." *Id.* Instead, EEOC's estimate of the Proposed Rule's cost rested on two inapt data sets—data about the number of U.S. workers who *give birth* to a child annually (not all workers who become pregnant) and data about the cost of accommodating individuals with disabilities (not including the cost of abortion accommodations). *Id.* at 54,747-59.

66.     EEOC neither identified nor attempted to quantify *any* costs associated with accommodating abortions. Instead, it predicted that compliance obligations would be "simple and no-cost like access to water, stools, or more frequent bathroom breaks"—*i.e.*, costs associated with maintaining a healthy pregnancy, not terminating one. *Id.* Similarly, EEOC speculated that non-zero expenses would "involve durable goods such as additional stools, infrastructure for telework, and machines to help with lifting," with each accommodation costing $60 per year. *Id.*

67.     Based on these underinclusive assumptions, EEOC estimated that annual accommodation costs would amount to between $6 million and $18 million for private employers, between $0.8 million and $2.4 million for state and local governments, and between $0.3 million and $0.8 million for the federal government. *Id.* Those numbers didn't include administrative costs associated with "rule familiarization, posting new equal employment opportunity posters, and updating EEO policies and handbooks," which the Commission estimated would amount to $300.39 million for all covered employers. *Id.* at 54,760-61. And EEOC estimated "one-time" compliance costs, ignoring the continuing costs associated with accommodating abortions. *Id.*

68.     As for the Proposed Rule's application to religious employers, EEOC recognized that "[r]eligious entities *may* have a defense to a PWFA claim under the First Amendment or the Religious Freedom Restoration Act (RFRA)." *Id.* at 54,746 (emphasis added). But EEOC also asserted that RFRA does not apply in suits involving only private parties, read the ministerial

23

exception narrowly, and suggested that the PWFA incorporates Title VII's religious exemption but does "not categorically exempt religious organizations from making reasonable accommodations" under the PWFA. *Id.* at 54,747. The Proposed Rule also failed to acknowledge that First Amendment protections sweep beyond religious organizations to all employers with religious objections, *cf. Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014), creating a potential free-exercise problem.

69.     The Proposed Rule's list of examples of reasonable accommodations only highlighted the proposal's discordance with conscience rights and religious expression, as well as with state laws outlawing or restricting abortions.  A reasonable accommodation could also include "paid" leave "for medical treatment," *id.* at 54,781-82, 54,791, which EEOC's proposal reads to include time off to obtain an elective abortion.  In fact, the Proposed Rule made clear that an employer could not deny the use of paid leave to terminate a pregnancy if it generally allowed employees to use paid leave for reasons unrelated to obtaining an abortion. *Id.* at 54,728 & n.90.

70.     EEOC also failed to acknowledge that abortion is generally illegal in many States that are covered employers.  Instead, it devoted one brief paragraph to addressing the Proposed Rule's "federalism implications," concluding it has *none*. *Id.* at 54,765.

71.     Tracking the statute, EEOC's Proposed Rule subjects States and other covered employers to liability under the same regime that governs Title VII claims. *Id.* at 54,745; *see also id.* at 54,772 (purporting to abrogate States' Eleventh Amendment immunity). Ultimately, an employee may sue and seek money damages from her state employer for failure to accommodate an elective abortion. *Id.* at 54,770-72.

72.     In 2021, the Department of Justice warned that this purported waiver of state sovereign immunity presented "constitutional concerns" because "Congress's authority to

abrogate state sovereign immunity is limited" under Section 5 of the Fourteenth Amendment. Ex. C, Ltr. From U.S. Dep't of Justice, Office of Leg. Affairs, to The Hon. Robert C. Scott, Chairman, Cmte. on Educ. & Labor 1 (May 3, 2021) (DOJ Section 5 Letter). DOJ noted that while the PWFA raised "substantial litigation risk," a focus on "the right against gender discrimination" could help "bolster" the law's "constitutionality." *Id.* at 4. Yet EEOC's Proposed Rule did not explain how subjecting States to suit for failing to accommodate illegal, elective abortions could satisfy Section 5 muster in light of DOJ's warnings. Nor could it, given the U.S. Supreme Court's recognition that "a State's regulation of abortion is not a sex-based classification." *Dobbs*, 597 U.S. at 236.

### B. Commenters point out the Proposed Rule's significant legal defects.

73. The Proposed Rule's inclusion of abortion accommodations generated opposition in over 54,000 comments. 89 Fed. Reg. at 29,104.

74. Plaintiff Tennessee's comment letter, joined by nineteen co-signing States, argued that the Proposed Rule lacked statutory authority, violated the U.S. Constitution, and was arbitrary and capricious in violation of the APA. *See generally* Ex. B, Tenn. Comment. Tennessee later echoed these concerns to the Office of Information and Regulatory Affairs at a March 12, 2024 meeting regarding EEOC's proposed rule.

75. *First*, Tennessee contended that the PWFA's text, structure, purpose, and drafting history made clear that the statute does not authorize EEOC to require employers to accommodate employee abortions. *Id.* at 2-4. Nor could EEOC's interpretation overcome the major-questions doctrine and constitutional avoidance principles. *Id.* at 5.

76. *Second*, Tennessee highlighted three constitutional barriers to EEOC's interpretation. It argued that the Proposed Rule exceeded federalism limits by conscripting state employees and funds to support a pro-abortion agenda that conflicts with state laws. Tennessee further objected that the Proposed Rule threatened to infringe employers' First Amendment rights

by compelling pro-abortion speech and indirect funding of abortion. Third, Tennessee urged that EEOC is unconstitutionally structured because the insulation of its leaders from at-will removal violates Article II. *Id.* at 6-8.

77.    *Finally*, Tennessee argued that EEOC had violated the APA by neglecting several important aspects of the regulatory problem, such as forcing pro-life States that have generally prohibited abortion to affirmatively accommodate it, and by glossing over any costs associated with implementing the abortion-accommodation mandate. *Id.* at 8-9.

78.    Several commenters agreed that the PWFA's text, structure, context, and drafting history did not support the Proposed Rule.[20]

79.    Other commenters focused on religious or conscience-based objections to the Proposed Rule. Democrats for Life of America, for example, argued that the rule could subject it to a host of legal requirements that would "undermine its very existence as a pro-life organization," such as requiring the organization to offer its employees abortion leave.[21] Other organizations, such as the Christian Employers Alliance, highlighted the Proposed Rule's failures to include "any conscience and free-speech exemptions" or to clarify the contours of its religious exemption, predicting that the Proposed Rule could chill speech and religious expression.[22] A group of Catholic medical associations argued the Proposed Rule's use of the "vague phrase, 'related medical condition,'" and "'non-exhaustive'" list of such conditions "extend[ed] far beyond

---

[20] *See, e.g.*, Alliance Defending Freedom, Comment at 4-9 (Oct. 2, 2023) (arguing, for example, that EEOC's interpretation of "related medical conditions" to encompass "any aspect of sexual or reproductive health" would render the term "childbirth" superfluous), https://perma.cc/2C7Q-GH3T; Heritage Foundation, Comment at 3-9 (Oct. 10, 2023) ("Abortion is not a 'medical condition,' rather it is the immoral and intentional ending of an innocent human life[.]"), https://perma.cc/WS2Y-2NRU.

[21] Comment at 3 (Oct. 10, 2023), https://perma.cc/8K8E-JU2Z.

[22] Comment at 2 (Oct. 10, 2023), https://perma.cc/6XAQ-PTQK; *see also* U.S. Conference of Catholic Bishops & The Catholic Univ. of Am., Comment at 8-18 (Sept. 27, 2023) ("[T]he proposed regulations do not adequately implement language in the Act that exempts religious organizations from any obligation to make an accommodation that conflicts with their religious beliefs."), https://perma.cc/P9Y5-7CUY.

medical conditions actually related to pregnancy" to "activities for which there exist [federal] conscience protections."[23]

80.     Still others objected to EEOC's failure to consider the "extensive costs of its proposal," especially the accommodation of an "expansive list of conditions," including abortions and "often complex, lengthy, and unsuccessful" fertility treatments, as well as the cost of providing equivalent benefits for pregnancy and disability if employers offer abortion benefits.[24]

81.     Members of both congressional houses likewise objected that EEOC was exceeding the authority granted to it under the PWFA by imposing an illegal abortion mandate. The PWFA's lead Republican co-sponsor in the Senate, Bill Cassidy, highlighted the pre-passage agreement of his Democrat co-sponsor, Bob Casey, that "under the act, . . . the EEOC, could not— could not—issue any regulation that requires abortion leave" or "require employers to provide abortions in violation of State law."[25]  By acting otherwise, Senator Cassidy commented, EEOC had "ignored the statute and substituted its views on abortion for those of Congress."[26]  Similarly, the U.S. House of Representatives' Committee on Education and the Workforce commented that the "PWFA [d]oes [n]ot [a]pply to [a]bortions" and rebuked EEOC for "issu[ing] regulations contrary to the statute itself."[27]

82.     Senator Braun likewise objected to EEOC's proposed extension of its abortion-accommodation mandate to States.[28]  Noting that the Supreme Court in *Dobbs* "reserve[d] to the States the ability" to regulate abortion, Senator Braun urged EEOC to "harmonize the Eleventh

---

[23] Nat'l Catholic Bioethics Ctr., Catholic Med. Ass'n, & Nat'l Ass'n of Catholic Nurses, USA, Comment at 4 (Oct. 10, 2023) (quoting 88 Fed. Reg. at 54,720), https://perma.cc/TS6N-65HL.

[24] *See* Ethics & Public Policy Ctr., Comment at 37-38 (Oct. 10, 2023), https://perma.cc/35AF-JXCJ.

[25] Comment at 2 (Sept. 29, 2023) (quoting 168 Cong. Rec. S7050 (daily ed. Dec. 8, 2022)), https://perma.cc/L4F8-K2K6.

[26] *Id.* at 1.

[27] The Hon. Virginia Foxx, Comment at 1-2 (Oct. 10, 2023), https://downloads.regulations.gov/EEOC-2023-0004-97966/attachment_1.pdf.

[28] *See* The Hon. Mike Braun, Comment (Oct. 10, 2023), https://perma.cc/7YMZ-JXEF.

Amendment" with its proposal by "revis[ing] any interpretation" that "would compel States or entities within States to violate law that protects life."[29]

### III.    EEOC Finalizes Its Abortion-Accommodation Rule Over Widespread Opposition.

83.    By a divided vote of 3 to 2, EEOC issued its final rule for publication on April 19, 2024. *See* Ex. A, EEOC, *Implementation of Pregnant Workers Fairness Act*, 89 Fed. Reg. 29,096 (Apr. 19, 2024).[30] Despite overwhelming public criticism and disapproval of EEOC's proposal to cover elective abortions, EEOC's Final Rule enshrines a new mandate requiring employers to accommodate employees' elective abortions. *See id.* at 29,104 (discussing "inclusion of abortion in the definition of 'pregnancy, childbirth, or related medical conditions'" (capitalization altered)).

84.    The Final Rule acknowledges that the statute is silent on abortion. *See id.* at 29,111.   It nonetheless sources EEOC's authority to require abortion accommodations in employers' duties to "make reasonable accommodations to the known limitations related to the pregnancy, childbirth, or related medical conditions of a qualified employee." *Id.* at 29,183 (citing 42 U.S.C. § 2000gg-1(1)).  The Final Rule defines "reasonable accommodation" to include an employee's right to use paid or unpaid leave to address a "known limitation under the PWFA," as well as the right to choose "whether to use paid leave ... or unpaid leave to the extent" such leave is available for non-PWFA reasons. *Id.* at 29,185 (29 C.F.R. § 1636.3(i)(3)).

85.    As EEOC notes, the PWFA defines "known limitation" as a "physical or mental *condition* related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions." *See id.* (29 C.F.R. § 1636.3(a) (emphasis added)).  Yet rather than address the plain meaning of the phrase "medical condition," EEOC asserts that the phrase might include "an

---

[29] *Id.* at 4.
[30] Riddhi Setty, *Final EEOC Protections for Pregnant Workers Cover Abortion*, Bloomberg Law (Apr. 15, 2024), https://perma.cc/W52Q-L9Y6.

impediment or problem"—a category EEOC defines to capture an employee who "has a need or a problem related to maintaining their health" or "seek[s] health care related to pregnancy." *See id.* (29 C.F.R. § 1636.3(a)(2)).  With this understanding, the Final Rule asserts that "having or choosing not to have an abortion" is a "medical condition."  *Id.* at 29,101; *see also id.* at 29,183 (29 C.F.R. § 1636.3(b)).  EEOC nowhere addresses how a voluntary procedure that terminates a pregnancy for non-medical reasons could constitute a "medical condition."

86.     Instead, to justify this reading, EEOC states that a few courts in a span of decades have interpreted anti-discrimination language in Title VII, as amended by the PDA, to bar employers' taking adverse actions against employees because they "contemplated having, or chose to have, an abortion."  *Id.* at 29,110, 29,152 n.296.  EEOC also cites informal guidance it has issued interpreting Title VII to prohibit discrimination based on a woman's choice to obtain an abortion. *E.g.*, *id.* at 29,152 n.296.  From there, EEOC reasons that this prior interpretation of Title VII is "settled," such that Congress must have intended to carry it forward in an accommodation statute. *Id.* at 29,106; *accord id.* at 29,191 n.23.

87.     EEOC's prior-meaning argument nowhere grapples with the fact that relevant Title VII language is different—most notably because it goes beyond covering "medical condition[s]" to bar discrimination against any woman "affected by pregnancy." *See* 42 U.S.C. § 2000e(k).  Nor does EEOC dispute that its "settled" judicial consensus comprises only a small handful of pre-*Dobbs* lower court cases or that the agency's prior Title VII guidance was merely informal because EEOC lacks authority to issue substantive rules interpreting Title VII.  Otherwise, EEOC does not cite any support, textual or otherwise, for its view that Congress was aware of and intended to implement EEOC's view about the prior meaning of different language in the PDA to mandate

abortion accommodations in the PWFA.  To the contrary, EEOC acknowledges that multiple sponsors of the bill insisted it would *not* require abortion accommodations.  89 Fed. Reg. at 29,109.

88.     The Final Rule acknowledges the prospect that its abortion-accommodation mandate would conflict with state laws limiting abortion.  But rather than view this as reason to question its expansive reading, EEOC says any such "interaction or conflict between PWFA and State laws … will be addressed on a case-by-case basis." *Id.* at 29,112.  The Final Rule likewise declines to confront the ways in which its abortion-accommodation mandate might infringe employers' and employees' protected religious-liberty or free speech rights, opting instead to relegate constitutional defenses to "a case-by-case analysis." *Id.* at 29,144, 29,148, 29,151, 29,220 n.206.  Yet in predicting how that analysis might proceed, EEOC suggests that enforcing the Final Rule to further accommodations would constitute a "compelling interest" sufficient to override employers' protected rights. *Id.* at 29,150 & n.261.

89.     The Final Rule purports to calculate the costs associated with EEOC's new mandate.  But it declined to account for *any* added expenses in States with existing "PWFA-type statutes." *Id.* at 29,159.  Instead, EEOC simply assumed that the Final Rule would impose *no added costs* on employers in those States. *Id.* at 29,173-74 tbls.3-4.  EEOC dismissed Tennessee's comment that this approach "did not account for the fact that these State statutes do not permit accommodations for abortions" as unsupported "with data or case law." *Id.* at 29,159.  EEOC did not explain what data or case law could have been offered to prove this negative or why the Tennessee Attorney General's comment and state laws prohibiting the funding and provision of abortion were not sufficient bases to substantiate Tennessee's concern.

90.     Because of this accounting, the Final Rule excludes any costs associated with its expansive PWFA mandate as applied to 11.5 million State and local governmental employees

30

(61% of State and local governmental employees in total) and 61.2 million private sector employees (52% of covered private sector employees in total). *Id.* at 29,173-74 tbls.3-4. The result undercounts the Final Rule's coverage costs by many millions. *Id.* And in assessing compliance and implementation costs, the Final Rule presumes that human resource officers in States with "PWFA-type statutes" will need less than an hour to understand the lengthy Final Rule's novel federal requirements. *Id.* at 29,176 tbl.9. The Final Rule further presumes that covered entities will not "need legal advice," *id.* at 29,160, even while acknowledging throughout that the Rule's application could raise particular factual, constitutional and state-law concerns that will require analysis on a "case by case" basis, *supra* ¶¶ 88, 91. Even so, the Final Rule predicts that covered employers will incur total one-time administrative costs of over $450 million. 89 Fed. Reg. at 29,176 tbl.9.

91.     EEOC concluded that the Final Rule "does not have 'federalism implications.'" 89 Fed. Reg. at 29,182. Yet elsewhere, EEOC acknowledges that requiring States to accommodate abortions could create conflicts with state laws that it would address "on a case-by-case basis." *Id.* at 29,112.

92.     EEOC did not address comments questioning its constitutional power to subject States to money damages and other remedies for failing to accommodate elective abortions. *Id.* at 29,113. Instead, the Final Rule states only that "Congress did not vote to remove the section of the PWFA that waives State sovereign immunity." *Id.* EEOC's Final Rule confirms that States "will not be immune under the 11th Amendment to actions brought under the PWFA" and will be liable "both at law and in equity" to "the same extent [as] any other public or private entity." *Id.* at 29,182.

31

93.     EEOC's Final Rule has a 60-day effective date, meaning it will take effect on June 18, 2024. *Id.* at 29,096.

94.     Commissioner Lucas dissented from the issuance of the Final Rule and issued a statement criticizing the Commission majority's "controversial" and "misguided" decision and use of "linguistic gymnastics" to "broaden the scope of the statute in ways that … cannot reasonably be reconciled with the text."   Ex. D, Andrea R. Lucas, Comm'r, Equal Emp. Opportunity Comm'n, Statement re: Vote on Final Rule to Implement the Pregnant Workers Fairness Act (Apr. 15, 2024), at 1, 16.

95.     The Commission erred from the start, Commissioner Lucas stated, by "skipping straight to" selected "interpretive canons instead of first resolving whether any textual ambiguity exists." *Id.* at 5. On the text, Commissioner Lucas pointed out that the "ordinary meaning" of the term "condition" is a "state of health" or "malady or sickness," meaning the PWFA requires only "accommodation of medical conditions—states of health or illness—that are created or aggravated by pregnancy and childbirth." *Id.* at 10-11. "[C]ontrary to the final rule's definition, a medical 'condition' is not the same as medical 'procedures.'" *Id.* at 11. Commissioner Lucas thus disagreed with the Final Rule's interpretation of the term "medical *condition*" to include "specific treatments, medications, or medical procedures," and EEOC's broader "attempt[] to transform the PWFA into an omnibus female reproduction disability statute." *Id.* at 11 n.11.

96.     Separately, Commissioner Lucas rejected EEOC's "misleading[]" characterization of the prior regulatory and judicial interpretations of the phrase "pregnancy, childbirth, or related medical conditions."  *Id.* at 4, 16.  EEOC marshaled only "thin support" for its interpretation, which Commissioner Lucas reasoned was "not sufficient to show a 'settled consensus' such that Congress should be presumed to have known of and endorsed it." *Id.* at 6.

97.     Members of Congress likewise objected to the Final Rule's coverage of abortion accommodations.  Rep. Virginia Foxx stated that "[a]dding this controversial provision into the PWFA is wrong.  Period.  Abortion is not a medical condition related to pregnancy; it is the opposite."[31]  Sen. Bill Cassidy criticized the Final Rule's decision to "inject abortion into a law specifically aimed at promoting healthy childbirth" as "shocking and illegal."[32]

## PLAINTIFFS' IMPENDING IRREPARABLE HARM

98.     With around 42,000 employees, of whom more than half are women,[33] the State of Tennessee regularly has pregnant employees.  Although the State offers many benefits and accommodations to its pregnant workers, including parental leave as well as paid sick leave that may be used for medical reasons, the State does not offer accommodations for employees to pursue elective abortions that are illegal under state law.

99.     The State of Arkansas employs roughly 30,200 people, more than half of whom are women.[34]  Like Tennessee, Arkansas too offers many benefits and accommodations for its pregnant employees and new mothers, including sick and medical leave.  But Arkansas does not offer leave or travel accommodations for employees to pursue elective abortions that are illegal under state law.  Indeed, the Arkansas Constitution specifically prohibits the State from offering leave or travel accommodations for employees to pursue elective abortions.

100.     Other Plaintiff States likewise employ substantial numbers of women; regulate abortion by, among other things, generally prohibiting abortion except in specified medical

---

[31] Breccan F. Thies, *Biden Administration Finalizes Pregnant Workers' Rule with Abortion 'Political Agenda'*, Wash. Examiner (Apr. 15, 2024), https://perma.cc/Z5D4-W5WS.
[32] *Id.*
[33] Tenn. Dep't of Hum. Res., Tenn. State Gov't, *2023 State of the State Employee Annual Report*, https://perma.cc/53EZ-EPR5 (indicating that 21,591 women work in the state executive branch).
[34] *See* Transparency.Arkansas.gov, Ark. Dep't of Fin. and Admin, *Full Employee Salaries Data* (Apr. 10, 2024), https://perma.cc/FP6F-AKLY.

'

circumstances; and either do not provide or prohibit the provision of leave or other accommodations for employees to obtain elective abortions. *See supra* pp. 5-14.

101.    Requiring that States create unprecedented accommodations for women seeking abortions, irrespective of whether a woman has a pregnancy related medical condition, would irreparably harm Tennessee, Arkansas, and their co-plaintiff States.

102.    *First*, EEOC's Final Rule will imminently force the Plaintiff States to incur various costs, including those associated with lost productivity, shift covering, and provision of additional leave days, among others. Additionally, the Plaintiff States would incur human resources and other compliance costs related to managing these accommodations, informing employees about available benefits, and updating employee materials to reflect the accommodation for abortions.

103.    To the extent any of the above costs could be rectified with money damages, the Plaintiff States expect that EEOC will assert sovereign immunity, making such damages unrecoverable and creating "irreparable" harm. *See Commonwealth v. Biden*, 57 F.4th 545, 556 (6th Cir. 2023); *Wages & White Lion Invs., LLC. v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021); *North Dakota v. EPA*, 127 F. Supp. 3d 1047, 1059 (D.N.D. 2015); *see also* 5 U.S.C. § 704.

104.    *Second*, on top of unrecoverable compliance costs, EEOC's abortion-accommodation mandate fundamentally infringes on the sovereignty of the States. The citizens of Tennessee, Arkansas, and several co-Plaintiff States, through their respective elected representatives, have prohibited or limited abortion with rare exceptions. *See, e.g.*, *supra* pp. 5-14. And both Tennessee law and the Arkansas Constitution prohibit using public funds to finance the provision of or otherwise support elective abortions. *See* Tenn. Code Ann. § 9-4-5116; Ark. Const. amend. LXVIII, § 3. The Supreme Court has recognized that States may regulate abortions to further their legitimate interests. Such interests include:

34

respect for and preservation of prenatal life at all stages of development; the protection of maternal health and safety; the elimination of particularly gruesome or barbaric medical procedures; the preservation of the integrity of the medical profession; the mitigation of fetal pain; and the prevention of discrimination on the basis of race, sex, or disability.

*Dobbs*, 597 U.S. at 301.

105. By coercing States to facilitate abortions, the Rule forces Tennessee, Arkansas, and their co-plaintiff States to violate their policies of regulating abortion to protect unborn life and the interests above, creating irreparable harm. *See Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (a state suffers "irreparable injury" where it is prevented "from effectuating statutes enacted by representatives of its people") (quoting *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers)); *Org. for Black Struggle v. Ashcroft*, 978 F.3d 603, 609 (8th Cir. 2020) ("Prohibiting the State from enforcing a statute properly passed . . . would irreparably harm the State."); *Kentucky v. Biden*, 23 F.4th 585, 611 n.19 (6th Cir. 2022) ("[I]nvasions of state sovereignty . . . likely cannot be economically quantified, and thus cannot be monetarily redressed."); *Tennessee v. U.S. Dep't of Educ.*, 615 F. Supp. 3d 807, 840-41 (E.D. Tenn. 2022) (collecting cases recognizing similar sovereignty harms). Indeed, preventing "a state from enforcing laws enacted by the people's representatives—and" particularly preventing Arkansas from enforcing and abiding by "constitutional provisions approved by the people themselves—amounts to a well-recognized variant of irreparable injury." *Sinner v. Jaeger*, 467 F. Supp. 3d 774, 786 (D.N.D. 2020).

106. Additionally, requiring the Plaintiff States to adopt policies facilitating abortions unconstitutionally impairs their interests in protecting their messaging with respect to the primacy of protecting fetal life and the damages caused by abortion. *See Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 766 (2018) (*NIFLA*) ("By requiring petitioners to inform women how

they can obtain state-subsidized abortions—at the same time petitioners try to dissuade women from choosing that option—the licensed notice plainly 'alters the content' of petitioners' speech."); *cf. Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 216 (2015) ("With respect to specialty license plate designs, Texas is not simply managing government property, but instead is engaging in expressive conduct.").

## CLAIMS FOR RELIEF
### CLAIM I
### Violation of APA, 5 U.S.C. § 706(2)(A), (C)
### The Rule Contravenes the Pregnant Workers Fairness Act

107.    Plaintiffs repeat and incorporate by reference the preceding allegations.

108.    EEOC is a federal agency within the meaning of the APA.

109.    The Final Rule is a final agency action within the meaning of 5 U.S.C. § 704, Plaintiff States lack another adequate remedy to challenge the Final Rule in court, and no rule requires that the States appeal to a superior agency authority prior to seeking judicial review.

110.    The APA requires courts to set aside agency action that is "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

111.    The Final Rule contravenes the governing statutory provisions in the Pregnant Workers Fairness Act, Pub. L. 117-328 (2022), 136 Stat. 6084, as well as the structure of the statute, and its drafting history. *See U.S. ex rel. O'Keefe v. McDonnell Douglas Corp.*, 132 F.3d 1252, 1257 (8th Cir. 1998) (setting aside regulations beyond statutory authority).

112.    *First*, on the text, the PWFA requires employers to accommodate any "known limitation[s]," defined as a "physical or mental condition related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions." *See* 42 U.S.C. § 2000gg(4). An elective abortion is neither a known limitation nor a medical condition, but a voluntary, time-limited

36

procedure intended to terminate a pregnancy. Under the *ejusdem generis* canon, moreover, the general term "related medical condition" is best read to refer to conditions like the specific terms— "pregnancy" and "childbirth"—that it follows. Interpreting "related medical condition" to include a procedure that terminates pregnancy and prevents childbirth—*i.e.*, extending coverage to the opposite concept from the specifically listed terms—thus conflicts with the provision's text. *See Ark. Times LP v. Waldrip*, 37 F.4th 1386, 1393 (8th Cir. 2022) (en banc) (applying *ejusdem generis* canon to limit reading of similar general provision).

113.    *Second*, on structure, EEOC's interpretation conflicts with the federal statutory prohibitions on abortion funding—including those passed alongside the PWFA. For instance, in around one dozen provisions that Congress passed with the PWFA, Congress barred appropriated monies and federal entities from supporting, requiring, performing, or facilitating abortions. *See* Ex. B, Tenn. Comment, at 3 n.1 (collecting statutes). Title VII similarly specifies that employers need not offer abortion coverage through their insurance plans. 42 U.S.C. § 2000e(k). The longstanding Hyde and Weldon Amendments likewise limit the federal government's ability to fund or mandate the provision of abortions outside of certain medically related scenarios. *See* Consol. Appropriations Act of 2022, Pub. L. No. 117-103, §§ 506-507, 136 Stat. 49, 496; Consol. Appropriations Act of 2010, Pub. L. No. 111-117, § 508(d)(1), 123 Stat 3034, 3280. These contextual considerations belie the Final Rule's view that EEOC has authority to force States to effectively subsidize abortions sought by their workers. By construing the PWFA to encourage, and even coerce States and private employers to facilitate, abortions, EEOC's Rule conflicts with a clear federal policy of limiting federal involvement in abortions.

114.    *Third*, the PWFA's drafting history forecloses EEOC's attempt to add abortion accommodations to its ambit. As detailed above, key sponsors of the PWFA uniformly rejected

37

any notion that EEOC could require employers to accommodate abortions—let alone do so irrespective of medical need and in States where elective abortion procedures are generally illegal.

115.   Nor, for several reasons, can EEOC permissibly claim deference to its interpretation under *Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984). EEOC does not identify—let alone purport to resolve—any ambiguity with respect to the meaning of "related medical conditions." *Supra* ¶¶ 85-86. And EEOC's interpretation flouts the major-questions doctrine, which requires "clear congressional authorization" before an agency may decide an issue of great "economic and political significance." *West Virginia v. EPA*, 597 U.S. 697, 721, 723 (2022). That rule bars EEOC's interpretation here, as the Supreme Court has recognized that abortion regulations "concern matters of great social significance and moral substance," yet EEOC lacks clear power to enshrine abortion rules. *Dobbs*, 597 U.S. at 300. So too, the Supreme Court's "precedents require Congress to enact exceedingly clear language if it wishes to significantly alter the balance between federal and state power." *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 764 (2021) (per curiam) (citation and quotation marks omitted).   Again, the PWFA lacks the clarity EEOC needs before upending States' traditional prerogative to regulate abortion issues. In addition, "[c]onstitutional avoidance trumps . . . *Chevron*." *Union Pac. R. Co. v. U.S. Dep't of Homeland Sec.*, 738 F.3d 885, 893 (8th Cir. 2013). And here EEOC's interpretation raises a panoply of constitutional problems. *See infra* Claim II.

116.   Even if this Court applied the *Chevron* framework to the PWFA, EEOC still could not smuggle novel abortion-accommodation requirements into employment law nationwide. At so-called Step Two of the *Chevron* inquiry, courts ask if the agency's construction is reasonable. *See City of Arlington v. F.C.C.*, 569 U.S. 290, 296 (2013) (noting that agency construction must

be "within the bounds of reasonable interpretation"). Accordingly, "an agency interpretation that is 'inconsisten[t] with the design and the structure of the statute as a whole' . . . does not merit deference." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 321 (2014) (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 353 (2013)). Here, the PWFA's language and structure, as well as the unrefuted statements of congressional members about its purpose, indicate that Congress designed the PWFA to promote healthy pregnancies, not elective abortions.

117.   Alternatively, to the extent EEOC's abortion-accommodation mandate would survive review under the *Chevron* doctrine, the *Chevron* doctrine should be reconsidered. *Cf. Loper Bright Enters. v. Raimondo* (U.S. No. 22-451) (cert. granted May 1, 2023) (presenting question "[w]hether the Court should overrule Chevron").

118.   In short, EEOC's abortion-accommodation mandate exceeds the agency's statutory authority and is thus invalid under the APA.  Allowing EEOC to enforce this invalid rule would cause irreparable harm to the Plaintiff States.  The abortion-accommodation mandate should be enjoined and ultimately "set aside" on this basis.  5 U.S.C. § 706(2).

## CLAIM II
### Violation of U.S. Constitution and 5 U.S.C. § 706(2)(B)
### The Final Rule Violates Federalism, State Sovereignty, and the First Amendment

119.   Plaintiffs repeat and incorporate by reference the preceding allegations.

120.   EEOC's Final Rule is "contrary to constitutional right [or] power," 5 U.S.C. § 706(2)(B), in at least three independent respects.

121.   *First*, EEOC's Rule transgresses the U.S. Constitution's federalism limits. "[O]ur Constitution establishes a system of dual sovereignty between the States and the Federal Government." *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991). Reflecting this "fundamental principle," *id.*, the Tenth Amendment to the U.S. Constitution provides that "[t]he powers not

delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved

to the States respectively, or to the people," U.S. Const. amend. X.  The federal government "may

not conscript state governments as its agents," *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S.

453, 472 (2018), including by "dictat[ing] what a state legislature may and may not do," *id.* at

474.  And while Congress may regulate the States as employers, it cannot do so in a way "that is

destructive of state sovereignty." *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 554

(1985).  EEOC's Final Rule violates these principles by strongarming States into promoting and

implementing a federal preference for abortions that are illegal under state law.

122.   *Second*, by subjecting States to damages suits for failing to accommodate abortions

contrary to state law, the Final Rule violates Section 5 of the Fourteenth Amendment.  Congress's

Section 5 power to abrogate sovereign immunity "extends *only* to 'enforc[ing]' the provisions of

the Fourteenth Amendment." *City of Boerne v. Flores*, 521 U.S. 507, 519 (1997).  Citing this

limit, DOJ warned lawmakers that the PWFA's abrogation of state sovereign immunity presented

"significant litigation risk" because pregnancy discrimination is not sex discrimination *per se*. *See*

DOJ Section 5 Letter, at 1-2.  That reasoning precludes EEOC's ability to abrogate States'

sovereign immunity for failure to accommodate elective abortions, since neither the Due Process

Clause, nor the Equal Protection Clause, nor any other provision of the Constitution confers

heightened protection of abortion rights. *See Dobbs*, 597 U.S. at 292; *Geduldig v. Aiello*, 417 U.S.

484, 494 (1974).

123.   *Third*, EEOC's Final Rule contradicts the First Amendment's protection of speech

and religious liberty.  The Final Rule's requirement that employers accommodate elective

abortions requires employers and their employees to speak and affirmatively engage in conduct in

a way that facilitates abortion, even if contrary to regulated parties' viewpoints and deeply held

religious beliefs. The Final Rule's anti-interference provisions likewise risk penalizing States for carrying out policies and messaging that aim to protect fetal life and discourage abortion. *See 303 Creative LLC v. Elenis*, 600 U.S. 570, 596 (2023) ("No government . . . may affect a speaker's message by forcing her to accommodate other views." (cleaned up)). EEOC does not dispute this; instead, it shirks its obligation to address these patent concerns in the rulemaking by stating religious-liberty considerations can be addressed later, on a "case-by-case" basis. *See supra* ¶ 88.

124. Plaintiffs therefore seek an order declaring that the PWFA cannot constitutionally be read to authorize the Final Rule's required abortion accommodations as well as an order enjoining and setting aside the Rule's abortion-accommodation mandate and any related anti-interference provisions.

## CLAIM III
### Violation of APA, 5 U.S.C. § 706(2)(A)
### The Final Rule Is Arbitrary and Capricious

125. Plaintiffs repeat and incorporate by reference the preceding allegations.

126. Agency actions are arbitrary and capricious when they "entirely fail to consider an important aspect of the problem or offer an explanation for its decision that runs counter to the evidence before it." *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 682 (2020) (cleaned up) (quoting *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983)). In promulgating the Final Rule, EEOC violated this requirement of reasoned agency decision-making.

127. *First*, EEOC has overlooked several important aspects of the regulatory problem. Among other things, EEOC has not addressed the federalism concerns associated with forcing States to accommodate and effectively fund abortions, including those that are illegal under state law. EEOC concedes that an "action taken by an employer pursuant to the PWFA could

41

potentially implicate State law," and that such conflicts "will be addressed on a case-by-case basis." 89 Fed. Reg. at 29,113. Such case-by-case adjudication of a State's "legitimate interests" in regulating abortion invites courts to "'substitute their social and economic beliefs for the judgment of legislative bodies.'" *Dobbs*, 597 U.S. at 300, 301 (quoting *Ferguson v. Skrupa*, 372 U.S. 726, 730 (1963)). Still, EEOC asserts the Final Rule "does not have 'federalism implications.'" 89 Fed. Reg. at 29,182.

128. *Second*, EEOC has not meaningfully assessed the ways in which its inclusion of abortion in the PWFA's scope would infringe employers' and employees' protected religion and speech rights. EEOC recognizes that the Final Rule could implicate employers' and employees' rights under the First Amendment's Free Exercise Clause or the Religious Freedom Restoration Act. *Supra* ¶ 88. But EEOC sweeps aside such conflicts for resolution later on a "case-by-case basis." *Id.* (collecting citations). And while EEOC at one point disputes that its Final Rule implicates speech at all, 89 Fed. Reg. at 29,152, elsewhere EEOC notes a workplace statement about an employee's requested accommodation could give rise to liability for "harass[ment]," *id.* at 29,148 & 29,218. Blackletter administrative-law principles required EEOC to grapple with these considerations before finalizing the Rule. Yet EEOC failed to do so, and nowhere justified the legality of its proposal in light of the serious constitutional issues it presents.

129. *Third*, EEOC severely underestimates the costs associated with implementing the abortion-accommodation mandate. EEOC's economic analysis assumes that the Final Rule will impose no added costs in the many States, like Tennessee and Arkansas, that already protect pregnant workers. *Supra* ¶¶ 89-90. But Tennessee, Arkansas, and other cited States do not extend their protections to accommodating elective abortions; indeed, in Arkansas's case, the State's constitution specifically prohibits providing such accommodations, while Tennessee law also

forbids the funding of abortion except in limited circumstances.  Nowhere does EEOC attempt to quantify the costs associated with extending pregnancy-accommodation provisions to the number of women who obtain abortions annually—a figure pro-abortion groups have estimated at 860,000 per year. *E.g.*, Br. of *Amici Curiae* Am. College of Obstetricians & Gynecologists *et al.* 9, *Dobbs*, 597 U.S. 215.  Nor does EEOC adequately account for the far different compliance obligations and costs the Final Rule will require of human resources officials in these States.

130.    EEOC's failure to consider these important aspects of the regulatory problem renders the abortion-accommodation mandate arbitrary and capricious under the APA and warrants enjoining and setting aside the Final Rule in relevant part.

## CLAIM IV
### Violation of U.S. Constitution and 5 U.S.C. § 706(2)(B)
### EEOC's Independent Structure Violates Article II and the Separation of Powers

131.    Plaintiffs repeat and incorporate by reference the preceding allegations.

132.    EEOC's putative status as an "independent federal agency"—*i.e.*, whose heads are insulated from at-will removal by the President—violates Article II and the Separation of Powers.

133.    Article II of the Constitution vests "'the executive Power'—all of it"—in the President.  *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2191 (2020) (quoting U.S. Const. art. II, § 1).  As a corollary, the Constitution demands that the President maintain the ability "to remove those who assist him in carrying out his duties." *Id.* (quoting *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 513-14 (2010)).

134.    This requirement of at-will removal applies to all "multimember expert agencies" that "wield substantial executive power." *Id.* at 2199-200 (citing *Humphrey's Ex'r v. United States*, 295 U.S. 602 (1935)). If "an agency does important work," Article II demands its leaders to be removeable by the President—full stop. *Collins v. Yellen*, 141 S. Ct. 1761, 1784 (2021).

135.    Courts and EEOC itself have interpreted the agency's governing statute—which provides for five-year terms for Commissioners, 42 U.S.C. § 2000e-4(a)—as allowing removal only for cause. *See, e.g.*, *Lewis v. Carter*, 436 F. Supp. 958, 961 (D.D.C. 1977).  This means the President lacks power to remove EEOC Commissioners based on policy disagreement; instead, only instances of malfeasance, inefficiency, or neglect of duty would qualify. *See, e.g.*, 12 U.S.C. § 5491(c)(3), *held unconstitutional by Seila Law*, 140 S. Ct. 2183.

136.    EEOC, however, wields an array of "quintessentially executive power[s]," including the authority to issue binding regulations and pursue enforcement actions in federal court on behalf of the United States. *Cf. Seila Law*, 140 S. Ct. at 2200; *see also Collins*, 141 S. Ct. at 1785-86.  EEOC's sweeping abortion-accommodation mandate in the Final Rule, which will bind most of the Nation's employers, is just one example.

137.    EEOC's independent-agency structure thus violates the Constitution, which permits application of removal protections only to those multimember bodies who "perform[] legislative and judicial functions and [are] said not to exercise any executive power." *Seila Law*, 140 S. Ct. at 2199.  Alternatively, as a matter of constitutional avoidance, this Court should declare that EEOC's organic statute, which provides only for a term-of-years appointment, does not implicitly confer for-cause-removal protection. *See, e.g.*, *Calcutt v. FDIC*, 37 F.4th 293, 337-39 (6th Cir. 2022) (Murphy, J., dissenting), *rev'd on other grounds by* 598 U.S. 623 (2023) (per curiam).

138.    EEOC's unlawful structure renders its rules unlawful and requires setting aside the Final Rule as void. *See Seila Law*, 140 S. Ct. at 2196; *see also Axon Enter., Inc. v. FTC*, 598 U.S. 175, 191 (2023) (being subjected to "unconstitutionally insulated" agency decisionmaker is "here-and-now injury").

**CLAIM V**
**Relief Under the Declaratory Judgment Act, 28 U.S.C. § 2201 and 5 U.S.C. § 706**
**Claim for Declaratory Judgment Against EEOC**

139.    Plaintiffs repeat and incorporate by reference the preceding allegations.

140.    The Declaratory Judgment Act provides that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a).

141.    This case presents an actual controversy.  The Final Rule operates on Plaintiff States directly in their capacity as employers, meaning the Final Rule's requirements affect Plaintiffs' legal rights and obligations.  Moreover, the imminent enforcement of the Final Rule against Plaintiffs would subject them to money damages and other relief for failure to provide abortion accommodations that conflict with state law and policy.

142.    This controversy arises in this Court's jurisdiction, as it relates to questions of federal law.  Venue is proper, as Plaintiff the State of Arkansas resides in this District and the Final Rule affects employment operations in this District.  28 U.S.C. § 1391(e).

143.    Through this Complaint, the Plaintiff States have filed an appropriate pleading to have their rights declared.  The Court can resolve this controversy by declaring that the PWFA does not authorize EEOC to impose the Final Rule's abortion-accommodation mandate.

**PRAYER FOR RELIEF**

An actual controversy exists between the parties that entitles the Plaintiff States to declaratory and injunctive relief.  Plaintiffs request that this Court:

a)      Enter a judgment declaring the Final Rule's abortion-accommodation mandate to conflict with the Pregnant Workers Fairness Act and setting aside the Rule as unlawful under 5 U.S.C. § 706;

b)      Enter a judgment declaring the Final Rule's abortion-accommodation mandate to be *ultra vires* and invalid under the U.S. Constitution and the APA and setting aside the Rule as unlawful under 5 U.S.C. § 706;

c)      Enter a judgment declaring the Final Rule's abortion-accommodation mandate to be arbitrary and capricious under the APA and vacating and remanding the Rule to EEOC under 5 U.S.C. § 706;

d)      Enter a judgment declaring the Final Rule to be *ultra vires* and invalid under the U.S. Constitution and the APA because EEOC's independent commission structure violates Article II and the Separation of Powers and setting aside the Rule as unlawful under 5 U.S.C. § 706;

e)      Enter a preliminary injunction enjoining EEOC, and any other agency or employee of the United States, from enforcing or implementing the Final Rule's abortion-accommodation mandate pending this Court's issuance of a Final Judgment on Plaintiffs' claims and/or enter a stay of the Final Rule's effective date under 5 U.S.C. § 705;

f)      Vacate and set aside the Final Rule as unlawful under 5 U.S.C. § 706 and permanently enjoin EEOC, and any other agency or employee of the United States, from enforcing or implementing the Final Rule's abortion-accommodation mandate; and

g)   Grant any other equitable or nominal relief the Court deems just and proper, as well as reasonable attorneys' fees and the costs of this action.

Dated:  April 25, 2024                        Respectfully submitted,

JONATHAN SKRMETTI                             TIM GRIFFIN
Tennessee Attorney General                    Arkansas Attorney General
and Reporter

/s/ *Whitney Hermandorfer*                    /s/ *Nicholas J. Bronni*
WHITNEY D. HERMANDORFER*                       NICHOLAS J. BRONNI (2016097)
  Director of Strategic Litigation              Solicitor General
REED N. SMITH*                                 DYLAN L. JACOBS (2016167)
  Assistant Attorney General                    Deputy Solicitor General
JENNA ADAMSON*                                 ASHER STEINBERG (2019058)
  Strategic Litigation Counsel &                Senior Assistant Solicitor General
  Assistant Solicitor General
JOSHUA D. MINCHIN*
  Honors Fellow, Office of the
  Solicitor General

OFFICE OF THE TENNESSEE                        OFFICE OF THE ARKANSAS
  ATTORNEY GENERAL                               ATTORNEY GENERAL
P.O. Box 20207                                 323 Center Street, Suite 200
Nashville, Tennessee 37202                     Little Rock, Arkansas 72201
(615) 741-8726                                 (501) 682-6302
Whitney.Hermandorfer@ag.tn.gov                 Nicholas.Bronni@arkansasag.gov

*Motion for admission *Pro Hac Vice* under    *Counsel for Plaintiff State of Arkansas*
Local Rule 83.5(d) forthcoming

*Counsel for Plaintiff State of Tennessee*

47

STEVE MARSHALL
  Attorney General

/s/ *Edmund G. LaCour, Jr.*
EDMUND G. LACOUR, JR.*
Solicitor General
OFFICE OF THE ALABAMA
ATTORNEY GENERAL
501 Washington Avenue
P.O. Box 300152
Montgomery, AL 36130
Telephone: (334) 242-7300
Fax: (334) 353-8400
Edmund.LaCour@
  AlabamaAG.gov

*Motion for admission *Pro Hac Vice* under
Local Rule 83.5(d) forthcoming

*Counsel for Plaintiff State of Alabama*

ASHLEY MOODY
  Attorney General

/s/ *Natalie Christmas*
NATALIE CHRISTMAS*
Senior Counselor
OFFICE OF THE FLORIDA ATTORNEY GENERAL
PL-01, The Capitol
Tallahassee, FL 32399
Tel.: (850) 414-3300
Natalie.christmas@myfloridalegal.com

*Motion for admission *Pro Hac Vice* under
Local Rule 83.5(d) forthcoming

*Counsel for Plaintiff State of Florida*

CHRISTOPHER CARR
  Attorney General

/s/ *Stephen Petrany*
STEPHEN PETRANY*
Solicitor General
OFFICE OF THE ATTORNEY GENERAL OF
GEORGIA
Georgia Department of Law
40 Capitol Square SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov

*Motion for admission *Pro Hac Vice* under
Local Rule 83.5(d) forthcoming

*Counsel for Plaintiff State of Georgia*

RAÚL R. LABRADOR
  Attorney General

/s/ *Joshua N. Turner*
JOSHUA N. TURNER*
Chief of Constitutional Litigation and Policy
ALAN M. HURST*
Solicitor General
OFFICE OF THE IDAHO ATTORNEY GENERAL
P.O. Box 83720
Boise, Idaho 83720
Tel: (208) 334-2400
josh.turner@ag.idaho.gov

*Motion for admission *Pro Hac Vice* under
Local Rule 83.5(d) forthcoming

*Counsel for Plaintiff State of Idaho*

THEODORE E. ROKITA
  Attorney General

/s/ *James A. Barta*
JAMES A. BARTA\*
Solicitor General
OFFICE OF THE ATTORNEY GENERAL OF
INDIANA
IGC South, Fifth Floor
302 W. Washington St.
Indianapolis, Indiana 46204
Telephone: (317) 232-0709
James.Barta@atg.in.gov

\*Motion for admission *Pro Hac Vice* under
Local Rule 83.5(d) forthcoming

*Counsel for Plaintiff State of Indiana*


KRIS W. KOBACH
  Attorney General

/s/ *Erin Gaide*
ERIN GAIDE\*
Assistant Attorney General
OFFICE OF THE KANSAS ATTORNEY GENERAL
120 SW 10th Ave.
Topeka, KS 66612
(785) 296-7109
erin.gaide@ag.ks.gov

\*Motion for admission *Pro Hac Vice* under
Local Rule 83.5(d) forthcoming

*Counsel for Plaintiff State of Kansas*


BRENNA BIRD
  Attorney General

/s/ *Eric H. Wessan*
ERIC H. WESSAN\*
Solicitor General
OFFICE OF THE IOWA ATTORNEY GENERAL
1305 E. Walnut Street
Des Moines, Iowa 50319
(515) 281-5164
Eric.Wessan@ag.iowa.gov

\*Motion for admission *Pro Hac Vice* under
Local Rule 83.5(d) forthcoming

*Counsel for Plaintiff State of Iowa*


ANDREW BAILEY
  Attorney General

/s/ *Joshua M. Divine*
JOSHUA M. DIVINE\*
Solicitor General
MISSOURI ATTORNEY GENERAL'S OFFICE
Post Office Box 899
Jefferson City, MO 65102
Tel. (573) 751-1800
Fax. (573) 751-0774
josh.divine@ago.mo.gov

\*Motion for admission *Pro Hac Vice* under
Local Rule 83.5(d) forthcoming

*Counsel for Plaintiff State of Missouri*

MICHAEL T. HILGERS
  Attorney General

/s/ *Lincoln J. Korell*
LINCOLN J. KORELL*
Assistant Solicitor General
OFFICE OF THE ATTORNEY GENERAL OF
NEBRASKA
2115 State Capitol
Lincoln, Nebraska 68509
(402) 471-2682
lincoln.korell@nebraska.gov

*Motion for admission *Pro Hac Vice* under
Local Rule 83.5(d) forthcoming

*Counsel for Plaintiff State of Nebraska*

DREW WRIGLEY
  Attorney General

/s/ *Philip Axt*
PHILIP AXT*
Solicitor General
OFFICE OF NORTH DAKOTA ATTORNEY
GENERAL
600 E. Boulevard Ave., Dept. 125
Bismarck, ND 58505
Telephone: (701) 328-2210
pjaxt@nd.gov

*Motion for admission *Pro Hac Vice* under
Local Rule 83.5(d) forthcoming

*Counsel for Plaintiff State of North Dakota*

GENTNER DRUMMOND
  Attorney General

/s/ *Garry M. Gaskins, II*
GARRY M. GASKINS, II*
Solicitor General
OKLAHOMA OFFICE OF THE ATTORNEY
GENERAL
313 NE 21st Street,
Oklahoma City, OK 73105
405-312-2451
Garry.Gaskins@oag.ok.gov

*Motion for admission *Pro Hac Vice* under
Local Rule 83.5(d) forthcoming

*Counsel for Plaintiff State of Oklahoma*

ALAN WILSON
  Attorney General

/s/ *Joseph D. Spate*
JOSEPH D. SPATE*
Assistant Deputy Solicitor General
OFFICE OF THE ATTORNEY GENERAL
STATE OF SOUTH CAROLINA
1000 Assembly Street
Columbia, SC 29201
(803) 734-3371
josephspate@scag.gov

*Motion for admission *Pro Hac Vice* under
Local Rule 83.5(d) forthcoming

*Counsel for Plaintiff State of South Carolina*

MARTY J. JACKLEY
  Attorney General

/s/ *Grant M. Flynn*
GRANT M. FLYNN\*
Assistant Attorney General
OFFICE OF THE ATTORNEY GENERAL
STATE OF SOUTH DAKOTA
1302 E. Hwy. 14, Suite #1
Pierre, SD 57501
(605) 773-3215
grant.flynn@state.sd.us

\*Motion for admission *Pro Hac Vice* under
Local Rule 83.5(d) forthcoming

*Counsel for Plaintiff State of South Dakota*

PATRICK MORRISEY
  Attorney General

/s/ *Curtis R. A. Capehart*
CURTIS R. A. CAPEHART\*
Deputy Attorney General
OFFICE OF THE WEST VIRGINIA ATTORNEY
GENERAL
State Capitol Complex
Building 1, Room E-26
Charleston, WV 25305
Telephone: (304) 558-2021
Fax: (304) 558-0140
curtis.r.a.capehart@wvago.gov

\*Motion for admission *Pro Hac Vice* under
Local Rule 83.5(d) forthcoming

*Counsel for Plaintiff State of West Virginia*

SEAN REYES
  Attorney General

/s/ *Lance F. Sorenson*
LANCE F. SORENSON\*
Assistant Utah Attorney General
UTAH ATTORNEY GENERAL
160 East 300 South, 6th floor
PO Box 140856
Salt Lake City, UT 84114-0856
Telephone: (801) 366-0100
lancesorenson@agutah.gov

\*Motion for admission *Pro Hac Vice* under
Local Rule 83.5(d) forthcoming

*Counsel for Plaintiff State of Utah*

# Exhibit A

*Implementation of the Pregnant Workers Fairness Act*,

89 Fed. Reg. 29,096 (Apr. 19, 2024)

## EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### 29 CFR Part 1636

**RIN 3046–AB30**

### Implementation of the Pregnant Workers Fairness Act

**AGENCY:** Equal Employment Opportunity Commission.

**ACTION:** Final rule and interpretive guidance.

**SUMMARY:** The Equal Employment Opportunity Commission is issuing this final rule and interpretive guidance to implement the Pregnant Workers Fairness Act, which requires a covered entity to provide reasonable accommodations to a qualified employee's or applicant's known limitations related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions, unless the accommodation will cause an undue hardship on the operation of the business of the covered entity.

**DATES:** This final rule and interpretive guidance is effective on June 18, 2024.

**FOR FURTHER INFORMATION CONTACT:** Sharyn Tejani, Associate Legal Counsel, Office of Legal Counsel at 202–900–8652 (voice), 1–800–669–6820 (TTY), *sharyn.tejani@eeoc.gov.* Requests for this final rule and interpretive guidance in an alternative format should be made to the Office of Communications and Legislative Affairs at (202) 921–3191 (voice), 1–800–669–6820 (TTY), or 1–844–234–5122 (ASL video phone).

**SUPPLEMENTARY INFORMATION:**

### Introduction

The Pregnant Workers Fairness Act (PWFA) [1] requires a covered entity to provide reasonable accommodations to a qualified employee's or applicant's known limitations related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions, absent undue hardship on the operation of the business of the covered entity. The PWFA at 42 U.S.C. 2000gg–3(a) directs the Equal Employment Opportunity Commission (EEOC or Commission) to promulgate regulations to implement the PWFA.

The Commission issued its notice of proposed rulemaking (NPRM) on August 11, 2023, and invited public comment on this proposal from August 11, 2023, through October 10, 2023.[2]

Members of the public submitted approximately 98,600 comments to the EEOC during this 60-day period. Several of those comments were signed by multiple individuals; thus, the total number of comments was over 100,000.[3]

Pursuant to 42 U.S.C. 2000gg–3(a), the Commission is issuing this final regulation and an appendix entitled "Appendix A to Part 1636—Interpretive Guidance on the Pregnant Workers Fairness Act" (Interpretive Guidance). As explained in the NPRM, the Interpretive Guidance (a proposed version of which was included in the NPRM) will become part of 29 CFR part 1636.[4] The Interpretive Guidance represents the Commission's interpretation of the issues addressed within it, and the Commission will be guided by the regulation and the Interpretive Guidance when enforcing the PWFA.[5]

### General Information on Terms Used in the Regulation and Interpretive Guidance

The PWFA at 42 U.S.C. 2000gg(3) uses the term "employee (including an applicant)" in its definition of "employee." Thus, throughout the statute, this preamble, the final regulation, and the Interpretive Guidance, the term "employee" should be understood to include "applicant" where relevant. Because the PWFA relies on Title VII of the Civil Rights Act of 1964 (Title VII), as amended by the Pregnancy Discrimination Act of 1978 (PDA), 42 U.S.C. 2000e *et seq.* for its definition of "employee," that term also includes "former employee," where relevant.[6]

The PWFA defines "covered entity" using the definition of "employer" from different statutes, including Title VII.[7] Thus "covered entities" under the PWFA include public and private employers with 15 or more employees, unions, employment agencies, and the Federal Government.[8] In this preamble,

the final regulation, and the Interpretive Guidance, the Commission uses the terms "covered entity" and the term "employer" interchangeably.

To track the language of the statute more closely and improve readability, the Commission made three global changes from the proposed rule and proposed appendix to the final rule and Interpretive Guidance. First, the Commission removed most instances of the words "applicant" and "former employee" from the regulation and the Interpretive Guidance; based on the statute and Title VII, the term "employee" covers "applicant" and "former employee" when relevant. Second, the Commission replaced the word "worker" with the word "employee" throughout the regulation and the Interpretive Guidance. Third, the Commission removed sections of the proposed rule that pertained solely to employees covered by the Congressional Accountability Act of 1995 because the Commission does not have authority to regulate those employees (former §§ 1636.2(c)(2) and 1636.5(b)).

The Interpretive Guidance contains numerous examples to illustrate provisions in the regulation. The Commission received some comments identifying instances where these examples, in an effort to be simple and short, oversimplified situations related to pregnancy, childbirth, or related medical conditions. For example, the Commission used the term "bed rest" in some examples; that is a colloquialism for several actions that would be better described as "rest and reduced activity."[9] The Commission agrees that in a real situation, there may or may not be more complexity and that describing a restriction may require different or more facts than are in an example. However, the purpose of these examples is to illustrate legal points, to suggest practical actions for covered entities and employees, and to encourage voluntary compliance with the law. Thus, while

---

[1] Consolidated Appropriations Act, 2023, Public Law 117–328, Div. II, 136 Stat. 4459, 6084 (2022) (codified at 42 U.S.C. 2000gg to 2000gg–6).

[2] 88 FR 54714–94 (proposed Aug. 11, 2023) (to be codified at 29 CFR part 1636).

[3] The vast majority of the comments were form comments that were identical or slightly altered versions of a few base form comments.

[4] 88 FR 54719.

[5] *Id.*

[6] *Robinson* v. *Shell Oil Co.,* 519 U.S. 337, 346 (1997).

[7] 42 U.S.C. 2000gg(2)(A), (B)(i), (B)(iii), (B)(iv). The other statutes are the Congressional Accountability Act of 1995 and 3 U.S.C. 411(c).

[8] The statute at 42 U.S.C. 2000gg(2) provides that the term "covered entity" "has the meaning given the term 'respondent'" under 42 U.S.C. 2000e(n) and includes employers as defined in 42 U.S.C. 2000e(b), 2000e–16c(a), and 2000e–16(a). The statute at 42 U.S.C. 2000gg–5(b) provides as a rule of construction that "[t]his chapter is subject to the applicability to religious employment set forth in section 2000e–1(a) of this title [section 702(a) of the Civil Rights Act of 1964]."

[9] Similarly, several examples discuss restrictions on how much an employee can lift. The examples in the Interpretive Guidance generally refer to these restrictions as "lifting restrictions" with a specific pound limit. In some situations, the determination of such restrictions can depend on the frequency of lifting, the height to which the object is lifted, the body position of the person, and the distance between the person and the object. *See, e.g.,* Leslie A. MacDonald et al., *Clinical Guidelines for Occupational Lifting in Pregnancy: Evidence Summary and Provisional Recommendations,* 209 a.m. J. Obstetrics & Gynecology 80–88 (2013), *https://pubmed.ncbi.nlm.nih.gov/23467051/;* U.S. Dep't of Health & Hum. Servs., Ctrs. for Disease Control & Prevention, Nat'l Inst. for Occupational Safety & Health, *Provisional Recommended Weight Limits for Lifting at Work During Pregnancy* (Infographic), *https://www.cdc.gov/niosh/topics/repro/images/Lifting_guidelines_during_pregnancy_-_NIOSH.jpg* (last visited Mar. 18, 2024).

the Commission has made some changes to the examples in response to these comments, it also has retained simple language in many examples to allow for ease of reading and to keep the focus of the examples on the PWFA's legal interpretation. The Commission notes that, depending on the facts in the examples, the same facts could lead to claims also being brought under other statutes that the Commission enforces, such as Title VII and the Americans with Disabilities Act of 1990 (ADA), as amended by the ADA Amendments Act of 2008 (ADAAA or Amendments Act), 42 U.S.C. 12101 *et seq.*[10] Moreover, the situations in specific examples could implicate other Federal laws, including, but not limited to, the Family and Medical Leave Act of 1993, as amended (FMLA), 29 U.S.C. 2601 *et seq.;* the Occupational Safety and Health Act of 1970, as amended (OSH Act), 29 U.S.C. 651 *et seq.;* and the Fair Labor Standards Act of 1938 (FLSA), 29 U.S.C. 201 *et seq.,* as amended by the Providing Urgent Maternal Protections for Nursing Mothers Act (PUMP Act), Public Law 117–328, Div. KK, 136 Stat. 4459, 6093 (2022).[11] Additionally, although some examples state that the described actions "would violate" the PWFA, additional facts not described in the examples could change that determination.

Finally, the Commission notes that the examples are illustrative. They do not and are not intended to cover every limitation or possible accommodation under the PWFA.[12]

---

[10] References to the ADA throughout the preamble, the regulation, and the Interpretive Guidance are intended to apply equally to the Rehabilitation Act of 1973, as all nondiscrimination standards under Title I of the ADA also apply to Federal agencies under section 501 of the Rehabilitation Act. *See* 29 U.S.C. 791(f).

[11] To the extent that an accommodation in an example is required under another law, like the OSH Act, the example should not be read to suggest that such a requirement is not applicable.

[12] In the examples, the preamble, the regulation, and the Interpretive Guidance, the Commission uses the terms "leave" or "time off" and intends those terms to cover leave however it is identified by the specific employer. As stated in the proposed rule, the Commission recognizes that different types of employers use different terms for time away from work, including leave, paid time off (PTO), time off, sick time, vacation, and administrative leave, among others. 88 FR 54715 n.19. Similarly, in the examples, the preamble, the regulation and the Interpretive Guidance, the Commission uses the term "light duty." The Commission recognizes that "light duty" programs, or other programs providing modified duties, can vary depending on the covered entity. As stated in the proposed rule, the Commission intends "light duty" to include the types of programs included in Questions 27 and 28 of the EEOC's *Enforcement Guidance: Workers' Compensation and the ADA* and any other policy, practice, or system that a covered entity has for accommodating employees, including when one or more essential functions of a position are

**1636.1   Purpose**

The Commission made several minor changes to the *Purpose* section of the regulation to follow the language in the statute more closely. Specifically, the phrase "related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions" was added after "known limitations" throughout this paragraph, and the descriptions of the retaliation and coercion provisions were slightly modified.[13]

**1636.2   Definitions—General**

The Commission received numerous comments regarding the proposed general definitions. For example, many comments encouraged the Commission to clarify that restaurant workers are covered by the PWFA. Several comments also suggested the Commission clarify that the requirements for protection under the FMLA (in terms of how long an employee must work for an employer and the number of hours) do not apply under the PWFA and suggested the Commission clarify that employees need not work for an employer for any specific period of time in order to be covered by the PWFA.

The PWFA relies on definitions from Title VII to describe when an employer is covered and who is protected by the law. Employers are covered by the PWFA if they have 15 or more employees, regardless of the industry. Thus, restaurant workers who work for restaurants with 15 or more employees are covered. Because the PWFA's approach to coverage and protection follows Title VII, rather than the FMLA, employees are covered even if they have not worked for a specific employer for a specific length of time.

In the general definitions section of the rule, the Commission added "or the employee of a political subdivision of a State" in § 1636.2(b)(3) and (c)(4) to better describe the employees covered by the Government Employee Rights Act of 1991 (GERA), 42 U.S.C. 2000e–16c(a).

---

temporarily excused. EEOC, *Enforcement Guidance: Workers' Compensation and the ADA* (1996), *https://www.eeoc.gov/laws/guidance/enforcement-guidance-workers-compensation-and-ada;* 88 FR 54715 n.20.

[13] For example, the phrase "Prohibits a covered entity from retaliating" was replaced with "Prohibits discrimination" in the discussion of retaliation, and the phrase "Prohibits a covered entity from interfering with any individual's rights" was replaced with "Prohibits coercion of individuals in the exercise of their rights" in the discussion of coercion.

**1636.3   Definitions—Specific to the PWFA**

*1636.3(a) Known Limitation*

The rule reiterates the definition of "known limitation" from 42 U.S.C. 2000gg(4) and then provides definitions for the operative terms.

*1636.3(a)(1) Known*

The Commission did not change the definition of "known" from the proposed rule. Under that definition a limitation is "known" to a covered entity if the employee, or the employee's representative, has communicated the limitation to the covered entity.

*1636.3(a)(2) Limitation*

The proposed rule restated the definition of limitation from the statute and added that the physical or mental condition may be a modest or minor and/or episodic impediment or problem, that it included when an employee affected by pregnancy, childbirth, or related medical conditions had a need or a problem related to maintaining their health or the health of the pregnancy, and that it included when an employee affected by pregnancy, childbirth, or related medical conditions sought health care related to pregnancy, childbirth, or a related medical condition itself.

The Commission received several comments supporting the definition of "limitation" and suggesting that the word "need" be added to the second sentence (in addition to "impediment" or "problem") so that it would read: "Physical or mental condition is an impediment, problem, or need that may be modest, minor, and/or episodic." The Commission declines to make this change because this sentence as it exists (which uses the term "impediment" or "problem") is sufficiently broad, and the third sentence of the definition of "limitation" covers when the employee has a "need or a problem related to maintaining their health or the health of the pregnancy."

The Commission received a few comments asserting that this definition was too broad and that it should be more restrictive. The Commission disagrees. As discussed in the NPRM, the PWFA was intended to cover all types of limitations, including those that are minor and those that are needed to maintain the employee's health or the health of the pregnancy.[14] Thus,

---

[14] 88 FR 54714–16 (discussing the purpose of the PWFA, including that it helps workers with uncomplicated pregnancies and minor limitations), 54719–20 (explaining that allowing employees to
Continued

creating a higher threshold would not be in keeping with this rationale, would be contrary to congressional intent, and would impede a qualified employee's ability to stay on the job.

A handful of comments asked for clarification as to whether the language in the NPRM required employers to provide reasonable accommodations to an employee when an employee's partner, spouse, or family member—and not the employee themselves—has a physical or mental condition related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions. It does not. To respond to these comments, the Commission has included in the final rule's definition of "limitation" that the limitation must be of the specific employee in question. This is essentially the same language that was in the NPRM with regard to related medical conditions in § 1636.3(b).[15]

The Commission has made one minor change in the language of this provision in the regulation. To track the language of the statute in 42 U.S.C. 2000gg(4), the Commission has changed the last sentence of the definition of "limitation" regarding the ADA so that it now mirrors the language in the statute ("whether or not such condition meets the definition of disability").

In the Interpretive Guidance, the Commission has added information in section *1636.3(a)(2) Limitation* calling attention to the possible overlap between the PWFA and the ADA and noting that in these situations the qualified employee may be entitled to an accommodation under either statute, as the protections of both may apply. The Commission has added information consistent with the changes in the regulation described above to state that the limitation must be of the specific employee in question and that the PWFA does not create a right to reasonable accommodation based on an individual's association with someone else with a PWFA-covered limitation or provide accommodations for bonding or childcare. To make the language in the Interpretive Guidance consistent with the regulation, the Commission has modified language in the Interpretive Guidance regarding accommodations for health care to clarify that accommodations may be needed to attend health care appointments for a variety of reasons.[16] Finally, the Commission has modified language from the proposed appendix regarding the PWFA and the lack of a "severity" requirement to avoid giving the mistaken impression that the ADA has such a requirement.

**Comments and Response to Comments Regarding the Commission's Proposed Description of "Related to, Affected by, or Arising Out of"**

Some comments supported the Commission's reading of the language "related to, affected by, or arising out of," stating that the Commission's reading was textually accurate in that nothing in the statutory language requires that the pregnancy, childbirth, or related medical conditions be the sole or original cause of the limitation. Other comments stated that the language in the NPRM explaining "related to, affected by, or arising out of," especially when combined with the definition of "related medical conditions," could require accommodations for known limitations caused by any physical or mental condition that has any real, perceived, or potential connection to— or impact on—an individual's pregnancy, fertility, or reproductive system. These comments asked the Commission to alter the NPRM language to counter this interpretation. Some comments asked for additional clarification regarding the language "related to, affected by, or arising out of."

The PWFA uses the language "related to, affected by, or arising out of" to explain the connection between the physical or mental condition and pregnancy, childbirth, or related medical conditions.[17] As such, the statute does not require that pregnancy, childbirth, or related medical conditions be the sole, the original, or a substantial reason for the physical or mental condition, and the Commission does not have the authority to change this term.

To help respond to these comments, in the Interpretive Guidance in section *1636.3(a)(2)* under *Related to, Affected by, or Arising Out of,* the Commission has added that "related to, affected by, or arising out of" are inclusive terms and that a pregnancy, childbirth, or related medical condition does not need to be the sole, the original, or a substantial cause of the physical or mental condition at issue for the physical or mental condition to be "related to, affected by, or arising out of" pregnancy, childbirth, or related medical conditions. This is in keeping with the dictionary definition of "related to," which is generally defined as "connected with" or "about" something.[18] It also is consistent with the meaning of "affected by," as the dictionary definition of the word "affect" is "to cause," "to produce," or "to influence" something.[19] Finally, it aligns with the meaning of "arising out of," because the dictionary definition of "arise" includes "to begin to occur or exist" or "to originate from a source."[20]

The Interpretive Guidance in section *1636.3(a)(2)* under *Related to, Affected by, or Arising Out of* further explains that determining whether a physical or mental condition is "related to, affected by, or arising out of" pregnancy, childbirth, or related medical conditions should typically be straightforward, particularly in cases where an individual is currently pregnant, is experiencing childbirth, or has just experienced childbirth. Pregnancy and childbirth cause systemic changes that not only create new physical and mental conditions but also can exacerbate preexisting conditions and can cause additional pain or risk.[21] Thus, a connection between an employee's physical or mental condition and their pregnancy, childbirth, or related medical conditions will be readily ascertained when an employee is currently pregnant or is experiencing or has just experienced childbirth.

The Commission has maintained the list of situations in the Interpretive

---

seek health care related to pregnancy, childbirth, or a related medical condition itself is consistent with the ADA).

[15] 88 FR 54767 (providing that related medical conditions are "as applied to the specific employee or applicant in question").

[16] The proposed appendix stated: "The definition also includes when the worker is seeking health care related to the pregnancy, childbirth, or a related medical condition itself . . . and recognizes that for pregnancy, childbirth, or related medical conditions the proper course of care can include regular appointments and monitoring by a health care professional." 88 FR 54773. The new language in the Interpretive Guidance in section *1636.3(a)(2) Limitation* states: "Similarly, under the PWFA, an employee may require a reasonable accommodation of leave to attend health care appointments or receive treatment for or recover from their pregnancy, childbirth, or related medical conditions." The new language more accurately reflects that accommodations are not limited to "regular appointments" or "monitoring," which is consistent with how leave for health care appointments is described in the regulation and elsewhere in the Interpretive Guidance.

[17] 42 U.S.C. 2000gg(4).

[18] *Relate To, Merriam-Webster.com, https:// www.merriam-webster.com/dictionary/ related%20to* (last visited Mar. 9, 2024).

[19] *Affect, Merriam-Webster.com, https:// www.merriam-webster.com/dictionary/affect* (last visited Mar. 18, 2024).

[20] *Arise, Merriam-Webster.com, https:// www.merriam-webster.com/dictionary/arising* (last visited Mar. 14, 2024).

[21] *See, e.g.,* Danforth's Obstetrics & Gynecology 286 (Ronald S. Gibbs et al. eds., 10th ed. 2008) ("Normal pregnancy entails many physiologic changes . . . ."); Clinical Anesthesia 1138 (Paul G. Barash et al. eds., 6th ed. 2009) ("During pregnancy, there are major alterations in nearly every maternal organ system.").

Guidance in section *1636.3(a)(2)* under *Related to, Affected by, or Arising Out of* that show the connection between pregnancy, childbirth, or related medical conditions and the limitation with some minor changes.[22] The Interpretive Guidance also maintains the discussion that some conditions (like lifting restrictions) can occur whether or not an employee is affected by pregnancy, childbirth, or related medical conditions and that the Commission anticipates that confirming that a physical or mental condition is related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions will usually be straightforward and can be accomplished through the interactive process. The Commission has added information to the Interpretive Guidance explaining that there may be situations where a physical or mental condition may no longer be related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions, and that in those situations, an employee may seek an accommodation under the ADA. The Commission also has added that there may be situations where the physical or mental condition exacerbates an existing condition that is a disability under the ADA, and in those situations, an employee may be entitled to an accommodation under either the ADA or the PWFA.

### 1636.3(b) Pregnancy, Childbirth, or Related Medical Conditions

The NPRM explained that the phrase "pregnancy, childbirth, or related medical conditions" appears in Title VII's definition of "sex," as amended in 1978 by the PDA.[23] Because Congress chose to write the PWFA using the same phrase as in Title VII, as amended by the PDA, and is presumed to have known the meaning given that phrase by the courts and the Commission for over 40 years, the Commission gave the

phrase "pregnancy, childbirth, or related medical conditions" the same meaning under the PWFA as under Title VII.[24] When Congress chooses to "use[ ] the same language in two statutes having similar purposes, . . . it is appropriate to presume that Congress intended that text to have the same meaning in both statutes."[25]

The PWFA's legislative history supports the Commission's reading of the phrase "pregnancy, childbirth, or related medical conditions" to have the same meaning as the phrase in Title VII. The U.S. House of Representatives Report accompanying the PWFA recounts the legislative steps Congress has taken to protect workers affected by pregnancy, childbirth, or related medical conditions. In 1964, Congress passed Title VII, which included protection from discrimination based on sex. In 1972, the EEOC interpreted the prohibition on sex discrimination to include pregnancy, childbirth, or related medical conditions.[26] In 1976, the

Supreme Court determined that pregnancy discrimination was not covered by Title VII.[27] In 1978, responding to that decision, Congress passed the PDA "to codify the EEOC's original interpretation of Title VII."[28] Courts' subsequent interpretations of the disparate treatment standard in the PDA, however, left "[n]umerous [g]aps" in protections, and the Supreme Court's 2015 decision in *Young* v. *United Parcel Service, Inc.*, 575 U.S. 206 (2015), created a standard that did not adequately protect the workers that the PDA covered, according to the PWFA House Report.[29] The House concluded that, "[t]o remedy the shortcomings of the PDA, Congress must step in and act."[30] Congress' discussion of the PDA and identification of shortcomings in the PDA as a reason for enacting the PWFA show that in the PWFA, Congress sought to protect the same workers who are protected by the PDA. By using Title VII's longstanding definition of "pregnancy, childbirth, or related medical conditions" for the PWFA, the Commission is following both the text of the statute and its legislative history.

Comments Regarding Temporal Proximity to a Current or Recent Pregnancy

Some comments requested that the Commission limit the definition of "pregnancy, childbirth, or related medical conditions" under the PWFA to situations that met their definition of close temporal proximity to a current or recent pregnancy. These comments also

---

[22] For example, in the proposed appendix, many of the examples in this paragraph said that the physical or mental condition was "related to" pregnancy. This has been changed to "related to, affected by, or arising out of" to match the language in the statute. The Commission has added that a lifting restriction may be due to lower back pain that may be exacerbated by physical changes associated with pregnancy to connect the lifting restriction to pregnancy in that example. The Commission has added in this paragraph that: "A lactating employee who seeks an accommodation to take breaks to eat has a related medical condition (lactation) and a physical condition related to, affected by, or arising out of it (increased nutritional needs)," in order to include an example about a "related medical condition." The Commission has changed the language in the proposed appendix from "determining whether" to "confirming whether," where relevant, in order to match the language used in § 1636.3(l)(2).

[23] 88 FR 54721.

[24] *See, e.g.,* Tex. *Dep't of Hous. & Cmty. Affs.* v. *Inclusive Cmtys. Project, Inc.,* 576 U.S. 519, 536 (2015) ("If a word or phrase has been . . . given a uniform interpretation by inferior courts . . . a later version of that act perpetuating the wording is presumed to carry forward that interpretation.") (omissions in original) (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 322 (2012)); *Bragdon* v. *Abbott,* 524 U.S. 624, 645 (1998) ("When administrative and judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its administrative and judicial interpretations as well."); *Lorillard* v. *Pons,* 434 U.S. 575, 581 (1978) ("[W]here, as here, Congress adopts a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law, at least insofar as it affects the new statute."); *Hall* v. *U.S. Dep't of Agric.,* 984 F.3d 825, 840 (9th Cir. 2020) ("Congress is presumed to be aware of an agency's interpretation of a statute. We most commonly apply that presumption when an agency's interpretation of a statute has been officially published and consistently followed. If Congress thereafter reenacts the same language, we conclude that it has adopted the agency's interpretation.") (internal citations and quotation marks omitted); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 323 (2012) [hereinafter Scalia & Garner, *Reading Law*] ("[W]hen a statute uses the very same terminology as an earlier statute—especially in the very same field, such as securities law or civil-rights law—it is reasonable to believe that the terminology bears a consistent meaning."); H.R. Rep. No. 117–27, pt. 1, at 11–17 (discussing the history of the passage of the PDA; explaining that, due to court decisions, the PDA did not fulfill its promise to protect pregnant employees; and that the PWFA was intended to rectify this problem and protect the same employees covered by the PDA).

[25] *Smith* v. *City of Jackson,* 544 U.S. 228, 233 (2005); *see Northcross* v. *Bd. of Ed. of the Memphis City Schs.,* 412 U.S. 427, 428 (1973) (per curiam) (observing that "similarity of language" between statutes is "a strong indication that the two statutes should be interpreted pari passu").

[26] H.R. Rep. No. 117–27, pt. 1, at 12 (2021); 29 CFR 1604.10(b) (1972); 37 FR 6835, 6837 (1972)

(addressing Title VII coverage of "[d]isabilities caused or contributed to by pregnancy, miscarriage, abortion, childbirth, and recovery therefrom").

[27] *Gen. Elec. Co.* v. *Gilbert,* 429 U.S. 125, 135–36 (1976).

[28] H.R. Rep. No. 117–27, pt. 1, at 13; *see also* H.R. Rep. No. 95–948, at 2 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 4749, 4750 (providing that the U.S. House of Representatives' version of the PDA "will amend Title VII to clarify Congress' intent to include discrimination based on pregnancy, childbirth or related medical conditions in the prohibition against sex discrimination in employment" and stating that the EEOC's 1972 guidelines—which "state that excluding applicants or employees from employment because of pregnancy or related medical conditions is a violation of Title VII" and "require employers to treat disabilities caused or contributed to by pregnancy, miscarriage, abortion, childbirth and recovery therefrom as all other temporary disabilities"—"rightly implemented the Title VII prohibition of sex discrimination in the 1964 [Civil Rights A]ct"); S. Rep. No. 95–331, at 2 (1977) (explaining that, in implementing Congress' intent in amending Title VII in 1972, the EEOC issued guidelines that "made clear that excluding applicants or employees from employment because of pregnancy or related medical conditions was a violation of [T]itle VII," and "these guidelines rightly implemented the Congress' intent in barring sex discrimination in the 1964 [Civil Rights A]ct").

[29] H.R. Rep. No. 117–27, pt. 1, at 14–16.

[30] *Id.* at 17.

noted that many of the conditions listed in the NPRM as conditions that could qualify as "pregnancy, childbirth, or related medical conditions" also could impact individuals who have never been pregnant or could first arise years before or after pregnancy. Relatedly, several comments suggested that only conditions related to a current or recent pregnancy (which the comments defined as one occurring 6 or fewer months earlier) could be "related medical conditions."

Response to Comments Regarding Temporal Proximity to a Current or Recent Pregnancy

The Commission declines to adopt the changes suggested by these comments, as they seek to create a definition of "pregnancy, childbirth, or related medical conditions" that is not supported by Title VII case law or the Commission's *Enforcement Guidance on Pregnancy Discrimination and Related Issues*.[31] Further, adopting such a bright-line temporal rule would improperly exclude many employees, such as employees with postpartum limitations, who may require pregnancy-related accommodations.[32] That said, "related medical conditions" must be related to the pregnancy or childbirth of the specific employee in question, and whether a specific condition is related to pregnancy or childbirth is a fact-specific determination that will be guided by existing Title VII precedent and prior relevant Commission guidance.

Comments Regarding the List of Conditions Included in the Regulation as Examples of "Pregnancy, Childbirth, or Related Medical Conditions"

Multiple comments supported the Commission's definition of "pregnancy, childbirth, or related medical conditions" and supported the inclusion of the list of numerous possible "related medical conditions" in the regulation. Comments argued that the Commission's reading of "related medical conditions" best effectuates the purpose and goals of the PWFA; is consistent with longstanding law, legislative history, agency interpretation, medical understanding, and common sense; and appropriately supplements the protections currently afforded under the PDA.

By contrast, several comments stated that the language in the NPRM explaining the term "related medical conditions" could require accommodations for any physical or mental condition that has any real, perceived, or potential connection to—or impact on—an individual's pregnancy, fertility, or reproductive system. These comments asked the Commission to alter the language in the proposed rule to counter this interpretation.

Other comments stated that the broad, non-exhaustive list of "related medical conditions" exceeded the Commission's delegated authority as intended by Congress and that such a list would, based on sex, improperly privilege employees with gynecological conditions, or disadvantage other employees with analogous conditions, and thus potentially illegally discriminate under Title VII or the Equal Protection Clause.

Response to Comments Regarding the List of Conditions Included in the Regulation as Examples of "Pregnancy, Childbirth, or Related Medical Conditions"

Generally, the question of whether a condition constitutes "pregnancy, childbirth, or related medical conditions" in a particular case will be fact-specific and guided by existing Title VII precedent and relevant prior Commission guidance. To assist in making that determination, the Commission made clarifying changes and additions to the language in this section of the regulation and has added more information in the Interpretive Guidance in section *1636.3(b) Pregnancy, Childbirth, or Related Medical Conditions*.

First, the Commission removed the phrase "relate to, are affected by, or

arise out of" with regard to "related medical conditions" in the proposed § 1636.3(b) in order to track the language of the statute and reflect more closely language in the Commission's prior enforcement guidance that explains the extent of the PDA and the definition of "pregnancy, childbirth, or related medical conditions."[33] This sentence now says "[r]elated medical conditions are medical conditions relating to the pregnancy or childbirth of the specific employee in question."

Second, the Commission reorganized the list of conditions in § 1636.3(b) to follow more closely the organization of the Commission's *Enforcement Guidance on Pregnancy Discrimination* explaining the definition of "pregnancy, childbirth, or related medical conditions," so that the two resources are consistent.[34]

Third, the Commission addressed concerns raised in the comments that conditions in the list of "related medical conditions" would "always" be "related medical conditions" and thus limitations related to, affected by, or arising out of those conditions would automatically be entitled to coverage under the PWFA. The Commission responded to these concerns and requests by changing the language in § 1636.3(b) so that the list is now explained as conditions that "are, or may be," "related medical conditions."

Fourth, the Commission added that the pregnancy or childbirth must be "of the specific employee in question." This language was already in the NPRM—in that the NPRM made clear that related medical conditions must be related to the pregnancy or childbirth of the specific employee in question—and has been added to the definition of "limitation" as well.[35]

In the Interpretive Guidance in section *1636.3(b) Pregnancy, Childbirth, or Related Medical Conditions*, the Commission has added information

---

[31] EEOC, *Enforcement Guidance on Pregnancy Discrimination and Related Issues*, (I)(A) (2015) [hereinafter *Enforcement Guidance on Pregnancy Discrimination*], *https://www.eeoc.gov/laws/guidance/enforcement-guidance-pregnancy-discrimination-and-related-issues* (providing that the term "pregnancy, childbirth, or related medical conditions" includes current pregnancy, past pregnancy, potential or intended pregnancy, and related medical conditions).

[32] *See, e.g.*, Am. Coll. of Obstetricians & Gynecologists, Comm. Opinion No. 736, *Optimizing Postpartum Care* (reaff'd 2021), *https://www.acog.org/clinical/clinical-guidance/committee-opinion/articles/2018/05/optimizing-postpartum-care* (discussing the importance of postpartum health care, including treatment for disorders arising during pregnancy and chronic medical conditions); Susanna Trost et al., U.S. Dep't of Health & Hum. Servs., Ctrs. for Disease Control & Prevention, *Pregnancy-Related Deaths: Data from Maternal Mortality Review Committees in 36 U.S. States, 2017–2019* (2022), *https://www.cdc.gov/reproductivehealth/maternal-mortality/erase-mm/data-mmrc.html* (30% of pregnancy-related deaths occurred one- and one-half months to one year postpartum).

[33] 42 U.S.C. 2000gg(4); *Enforcement Guidance on Pregnancy Discrimination, supra* note 31, at (I)(A)(4)(a) ("[A]n employer may not discriminate against a woman with a medical condition relating to pregnancy or childbirth.").

[34] *Enforcement Guidance on Pregnancy Discrimination, supra* note 31, at (I)(A).

[35] Additionally, for consistency, the Commission replaced "menstrual cycles" with "menstruation" because menstruation is the term used elsewhere in the NPRM and also replaced "birth control" with "contraception" because that is the term used in *Enforcement Guidance on Pregnancy Discrimination* cited throughout the NPRM. *Compare* 88 FR 54767 (listing "menstrual cycles" in the list of "related medical conditions"), *with* 88 FR 54721, 54774 (explaining that the list in the regulation for the definition of "pregnancy, childbirth, or related medical conditions" includes "menstruation"); *Enforcement Guidance on Pregnancy Discrimination, supra* note 31, at (I)(A)(3).

regarding the Commission's expectation that it will be readily apparent that certain medical conditions (*e.g.*, lactation, miscarriage, stillbirth, having or choosing not to have an abortion, preeclampsia, gestational diabetes, and HELLP (hemolysis, elevated liver enzymes and low platelets syndrome)) have a relation to pregnancy or childbirth; and that, similarly, a connection between a medical condition and pregnancy or childbirth will often be evident when a new medical condition occurs or an existing medical condition is exacerbated or poses a new risk during a current pregnancy, childbirth, or postpartum period.

The Commission disagrees that creating a list of potential "related medical conditions" that are or may be related to pregnancy or childbirth exceeds the Commission's authority. The list includes related medical conditions that courts and the Commission, in its *Enforcement Guidance on Pregnancy Discrimination,* have determined can, but are not always required to be, related medical conditions, as well as a non-exhaustive list of other conditions that, depending on the situation, can be related to pregnancy or childbirth.[36] The list clearly states that it consists of examples that "are or may be" related medical conditions in a specific case. In each case, a determination that a medical condition is related to pregnancy or childbirth is fact-specific and contingent on whether the medical condition at issue is related to the pregnancy or childbirth of the specific employee in question. The Commission notes that regardless of whether pregnancy, childbirth, or related medical conditions are at issue, the provision of 42 U.S.C. 2000gg–5(a)(2) stating that nothing in the PWFA shall be construed "by regulation or otherwise, to require an employer-sponsored health plan to pay for or cover any particular item, procedure, or treatment" applies.

The Commission also disagrees that accommodations under the PWFA will potentially discriminate based on sex. The PWFA only provides accommodations to qualified employees with limitations related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions. This is in keeping with courts that have found that laws and other policies that provide leave for workers affected by pregnancy do not discriminate based on sex.[37]

---

[36] *Enforcement Guidance on Pregnancy Discrimination, supra* note 31.

[37] *See Cal. Fed. Sav. & Loan Ass'n* v. *Guerra,* 479 U.S. 272, 290 (1987) (holding that, without violating Title VII, the State could require employers to

Additionally, in *Young* v. *United Parcel Service,*[38] the Supreme Court found that an employer could be required by the PDA to provide an accommodation for pregnant workers even if the employer's general policy did not provide for accommodations for workers except in certain situations. The accommodations provided under the PWFA are similar in purpose and effect to those that could have been obtained in *Young.* And, just as the accommodations contemplated by the Court in *Young* did not violate Title VII, neither do accommodations under the PWFA.

Moreover, Congress expressly intended that in some cases, the PWFA would require accommodations for a qualified employee's limitations related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions, even if such accommodations are not available to other employees. In fact, Congress observed that the PDA's comparator requirement "is a burdensome and often impossible standard to meet" and thus is "insufficient to ensure that pregnant workers receive the accommodations they need."[39]

Comments and Response to Comments Requesting Deletions, Additions, or Other Modifications to the List of Examples of "Pregnancy, Childbirth, or Related Medical Conditions"

Many comments requested deletions, additions, or other modifications to the list of examples of "pregnancy, childbirth, or related medical conditions" provided in the proposed definition at § 1636.3(b). The Commission declines to modify the provided list. As previously explained, the list of examples of "pregnancy, childbirth, or related medical conditions" is non-exhaustive and includes conditions that are commonly—but not always—associated with pregnancy or childbirth. The list neither requires blanket accommodation for every condition listed nor precludes accommodations for conditions that are not listed. Additionally, because "pregnancy, childbirth, or related medical conditions" has the same definition as in Title VII, as amended by the PDA, this phrase's use in the PWFA

---

provide up to four months of medical leave to pregnant women where "[t]he statute is narrowly drawn to cover only the period of *actual physical disability* on account of pregnancy, childbirth, or related medical conditions") (emphasis in original); *Johnson* v. *Univ. of Iowa,* 431 F.3d 325, 328 (8th Cir. 2005) ("If the leave given to biological mothers is granted due to the physical trauma they sustain giving birth, then it is conferred for a valid reason wholly separate from gender.").

[38] 575 U.S. 206 (2015).

[39] *See* H.R. Rep. No. 117–27, pt. 1, at 11–12.

necessarily will continue to reflect Title VII case law regarding that phrase.

Comments and Response to Comments Regarding Coverage of Specific Conditions—Menstruation

A number of comments argued for or against the inclusion of menstruation in the list of "related medical conditions." While the limited number of Federal courts that have addressed the issue of whether menstruation falls within the Title VII definition of "related medical conditions" have not always held that it does, read together, the majority of these cases illustrate that, at a minimum, menstruation is covered under Title VII when it has a nexus to a current or prior pregnancy or childbirth. Accordingly, as with many conditions that can be "related medical conditions," this determination will be made on a case-by-case basis.[40]

---

[40] *See EEOC* v. *Houston Funding II, Ltd.,* 717 F.3d 425, 429–30 (5th Cir. 2013) (observing, in a case about whether lactation was a "related medical condition," that "as both menstruation and lactation are aspects of female physiology that are affected by pregnancy, each seems readily to fit into a reasonable definition of 'pregnancy, childbirth, or related medical conditions' "); *Flores* v. *Va. Dep't of Corr.,* No. 5:20–CV–00087, 2021 WL 668802, at *4 (W.D. Va. Feb. 22, 2021) (declining to decide whether heavy menstruation due to perimenopause was a "related medical condition," but observing that "there is a strong argument that menstruation is a 'related medical condition' to pregnancy and childbirth under the PDA"); *but see Jirak* v. *Fed. Express Corp.,* 805 F. Supp. 193, 195 (S.D.N.Y. 1992) (stating that menstrual cramps alone were not a medical condition related to pregnancy or childbirth); *Coleman* v. *Bobby Dodd Inst., Inc.,* No. 4:17–CV–00029, 2017 WL 2486080, at *2 (M.D. Ga. June 8, 2017) (stating that the employee's excessive menstruation was "related to pre-menopause, not pregnancy or childbirth").

However, these and other cases suggest that, even if menstruation (or another condition) is not found to be "pregnancy, childbirth, or related medical conditions" in a particular case, discrimination based on that condition could nevertheless violate Title VII's prohibition on sex discrimination. *See, e.g., Harper* v. *Thiokol Chem. Corp.,* 619 F.2d 489, 492 (5th Cir. 1980) (invoking due to policy requiring individuals returning from pregnancy leave to have a normal menstrual cycle violated Title VII because it denied "persons of like qualifications equal employment opportunities because of their sex," as "company rules which single out certain subclasses of women for disparate treatment constitute unlawful sex discrimination"); *Flores,* 2021 WL 668802, at *4 (allowing a Title VII claim to proceed "regardless of applying an expanded definition of 'because of sex' or 'on the basis of sex' under the PDA" where the plaintiff was fired for suspicion of contraband due to her use of tampons while menstruating); *see also Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am., UAW* v. *Johnson Controls, Inc.,* 499 U.S. 187, 198–99 (1991) (providing that a policy excluding women with childbearing capacity from certain jobs was discrimination based on gender under Title VII; this conclusion was "bolstered" by the PDA, which prohibits discrimination "because of or on the basis of pregnancy, childbirth, or related medical conditions"); *Phillips* v. *Martin Marietta Corp.,* 400 U.S. 542, 544 (1971) (per curiam) (opining that an

Continued

Comments and Response to Comments Regarding Coverage of Specific Conditions—Lactation

One comment claimed there was a split between courts on the issue of whether lactation falls within the scope of the PDA, stating that some courts, including the Fourth and Sixth Circuits, found that it does not, while other courts have found that it does. One case cited by the comment, however, does not address coverage of lactation as a related medical condition under Title VII. The case of *Derungs* v. *Wal-Mart Stores, Inc.*, 374 F.3d 428 (6th Cir. 2004), involved a question of whether a store's ban on public breastfeeding was discriminatory under a State public accommodation statute where that statute did not include protection on the basis of "pregnancy, childbirth, or related medical conditions." [41] Another case cited by the comment, *Barrash* v. *Bowen*, 846 F.2d 927 (4th Cir. 1988) (per curiam), is similarly inapposite. In *Barrash*, the Fourth Circuit held that a Federal Government employee who challenged her termination of employment on grounds of unauthorized absence as violative of her constitutional and contractual rights was not entitled to 6 months of leave in order to breastfeed her baby. That court's statement, that "[u]nder the [PDA] . . . , pregnancy and related conditions must be treated as illnesses only when incapacitating," [42] was subsequently recognized by the same court as "*dicta* without any citation of authority." [43] By contrast, *EEOC* v. *Houston Funding II, Ltd.*, held that lactation is a related medical condition of pregnancy for purposes of the PDA because it is the "physiological process of secreting milk from mammary glands and is directly caused by hormonal changes associated with pregnancy and childbirth" and is "a physiological

result of being pregnant and bearing a child." [44] *Hicks* v. *City of Tuscaloosa* agrees with *Houston Funding* that lactation is a related medical condition and therefore covered under the PDA. [45] Thus, *Derungs* and *Barrash* do not foreclose a finding that lactation can be a "related medical condition" under Title VII and do not undercut the Commission's conclusion that lactation can be a related medical condition under the PWFA.

Comments and Response to Comments Regarding Coverage of Specific Conditions—Infertility and Fertility Treatments

Some comments agreed with the Commission's inclusion of infertility and fertility treatments in the list of covered conditions in the regulation. By contrast, other comments stated that the Title VII case law on infertility is inconsistent and thus infertility and fertility treatments should not be included in the list of potentially covered conditions in the regulation. The Commission concludes that, as with other conditions, and consistent with case law and its prior policy, whether infertility and fertility treatments are covered by the PWFA will be based on the particular circumstances of the situation, thus potentially allowing for reasonable accommodations for treatment for infertility when an employee with the capacity to become pregnant is trying to get pregnant.

In *Johnson Controls*, the Supreme Court struck down an employer policy that discriminated between workers based on childbearing capacity and held that the PDA prohibits discrimination based on potential pregnancy. [46] In accordance with *Johnson Controls*, discrimination based on the potential to be pregnant, not only current pregnancy, is covered by Title VII and the PDA. Because Title VII, as amended by the PDA, can cover potential pregnancy, several courts have found that it protects against discrimination for those undergoing in vitro fertilization (IVF) or infertility treatments related to becoming pregnant because these actions are related to the capacity to become pregnant. [47] By

contrast, notably in the insurance context where the challenged restriction excluded all types of infertility treatments from coverage, regardless of the insured employee's capacity to become pregnant, courts have found such policies did not violate the PDA. [48] Those cases do not stand for the proposition that fertility treatments are never covered by the statutory phrase "pregnancy, childbirth, or related medical conditions," but instead hold that the particular claims in those cases fail based on the lack of differential treatment based on sex. The Commission's *Enforcement Guidance on Pregnancy Discrimination* summarizes the law in this regard:

Employment decisions related to infertility treatments implicate Title VII under limited circumstances. Because surgical impregnation is intrinsically tied to a woman's childbearing capacity, an inference of unlawful sex discrimination may be raised if, for example, an employee is penalized for taking time off from work to undergo such a procedure. In contrast, with respect to the exclusion of infertility from employer-provided health insurance, courts have generally held that exclusions of all infertility coverage for all employees is gender neutral and does not violate Title VII. Title VII may be implicated by exclusions of particular treatments that apply only to one gender. [49]

Thus, depending upon the facts of the case, including whether the infertility treatments are sought by an employee with the capacity to become pregnant

employer who refused to take applications from women with preschool-age children but hired men with preschool-age children and other women would violate Title VII, absent a defense).

[41] In its analysis, *Derungs* also discussed Title VII coverage for breastfeeding under a comparator analysis and found that breastfeeding would not be covered because of an absence of comparators (*i.e.*, men who could breastfeed). *Derungs*, 374 F.3d at 438–39. Independent of the soundness of that analysis, the case did not address whether lactation was or could be a "related medical condition" to pregnancy and noted in its description of the Ohio statute regarding employment that parallels Title VII that "[t]he Legislature made a conscious choice to extend the definition of discrimination to include pregnancy even though there cannot be a class of similarly situated males." *Id.* at 436.

[42] *Barrash*, 846 F.2d at 931.

[43] *Notter* v. *North Hand Protection*, 89 F.3d 829, at *5 (4th Cir. 1996) (per curiam) (table) (explaining that "[t]he text of the [PDA] contains no requirement that 'related medical conditions' be 'incapacitating' ").

[44] 717 F.3d at 428.

[45] 870 F.3d 1253, 1259 (11th Cir. 2017).

[46] 499 U.S. at 204–06; *see also Kocak* v. *Cmty. Health Partners of Ohio*, 400 F.3d 466, 470 (6th Cir. 2005) (reasoning that the plaintiff "cannot be refused employment on the basis of her potential pregnancy").

[47] *Hall* v. *Nalco Co.*, 534 F.3d 644, 649 (7th Cir. 2008) (finding an employer's practice of terminating employees who took leave for IVF treatment violated the PDA because only women undergo IVF); *Erickson* v. *Bd. of Governors of State Colls. & Univs.*, 911 F. Supp. 316, 320 (N.D. Ill. 1995)

(finding that a plaintiff who underwent infertility treatment, "although infertile, may have been viewed by her employer as potentially pregnant," and distinguishing between "infertility [that] does not relate to [the] capacity to become pregnant" and that which does relate to the capacity to become pregnant); *Pacourek* v. *Inland Steel Co.*, 858 F. Supp. 1393, 1397, 1403–04 (N.D. Ill. 1994) (finding that infertility or its treatment were conditions that fell under the umbrella of pregnancy (including potential pregnancy), childbirth, or related medical conditions).

[48] *Saks* v. *Franklin Covey, Inc.*, 316 F.3d 337, 346 (2d Cir. 2003) (finding that generally, "[i]nfertility is a medical condition that afflicts men and women with equal frequency," but leaving open the question of whether an individual "would be able to state a claim under the PDA or Title VII for adverse employment action taken against her because she has taken numerous sick days in order to undergo surgical implantation procedures"); *Krauel* v. *Iowa Methodist Med. Ctr.*, 95 F.3d 674, 679–680 (8th Cir. 1996) (finding the benefits policy at issue did not violate Title VII, reasoning that "the policy of denying insurance benefits for treatment of fertility problems applies to both female and male workers and thus is gender-neutral"), *abrogated on other grounds by Bragdon* v. *Abbott*, 524 U.S. 624 (1998). Notably, because of 42 U.S.C. 2000gg–5(a)(2), nothing in the PWFA can require an employer-sponsored health plan to pay for or cover any particular item, procedure, or treatment. Thus, PWFA accommodation claims will not involve coverage by health care plans.

[49] *Enforcement Guidance on Pregnancy Discrimination, supra* note 31, at (I)(A)(3)(c) (footnotes omitted).

for the purpose of becoming pregnant, accommodations for an employee due to physical or mental conditions related to, affected by, or arising out of infertility or fertility treatments may be provided under the PWFA, absent undue hardship.

Comments and Response to Comments Regarding Coverage of Specific Conditions—Contraception

Some comments agreed with the Commission's inclusion of contraception in the regulation. By contrast, some comments stated that the Commission had not properly interpreted Federal case law related to the coverage of contraception and that the Eighth Circuit's holding in *In re Union Pacific Railroad Employment Practices Litigation* [50] forecloses accommodations related to contraception under all circumstances.

The Commission disagrees that reasonable accommodations regarding contraception for an employee who has the capacity to become pregnant are foreclosed in all cases by *In re Union Pacific.* As stated above, the Supreme Court has held that Title VII "prohibit[s] an employer from discriminating against a woman because of her capacity to become pregnant." [51] Consistent with this holding, the Eighth Circuit and other courts, like the Commission, have long recognized that the protections of Title VII extend to employees based on the employees' potential or intent to become pregnant. [52]

As stated in the *Enforcement Guidance on Pregnancy Discrimination,* interpreting *In re Union Pacific* as holding that contraception is never related to pregnancy for purposes of the PDA because it is used prior to pregnancy would be inconsistent with *Johnson Controls* and many other cases.

In the Commission's view, *In re Union Pacific* is best understood as a case about a specific health insurance policy that excluded coverage of both prescription and non-prescription contraceptive methods that were used to prevent pregnancy, regardless of the sex of the employee who used them. [53] The gender-neutral nature of the insurance exclusion was central to *In re Union Pacific's* holding that the insurance policy did not constitute disparate treatment under Title VII. This is similar to the reasoning of courts that have found that denial of insurance coverage for infertility generally, which can affect employees regardless of their capacity to become pregnant, does not violate the PDA, while still leaving open the possibility that the PDA could be violated if an employee was penalized for using leave for IVF treatments. [54] As with infertility, the failure of particular Title VII claims related to contraception based on the lack of gender-based differential treatment does not mean that contraception can never be covered

by the statutory phrase "pregnancy, childbirth, or related medical conditions."

As stated in the *Commission Decision on Coverage of Contraception,* the PDA can cover discrimination regarding contraception when, unlike the facts in *In re Union Pacific,* the challenged restriction regarding contraception coverage is limited to those who have the capacity to become pregnant. [55] Thus, in the *Commission Decision on Coverage of Contraception,* the exclusion of prescription contraception violated the PDA's prohibition on sex discrimination because prescription contraception could only be used by those who have the capacity to become pregnant. [56] Other courts similarly have concluded that an insurance policy's exclusion of contraception coverage that only can be used by those with the capacity to become pregnant violates the PDA. [57]

[55] EEOC, *Commission Decision on Coverage of Contraception* (Dec. 14, 2000), *https://www.eeoc.gov/commission-decision-coverage-contraception.*

[56] *Enforcement Guidance on Pregnancy Discrimination, supra* note 31, at (l)(A)(3)(d) nn.37–38.

[57] *See Cooley* v. *DaimlerChrysler Corp.,* 281 F. Supp. 2d 979, 984–85 (E.D. Mo. 2003) (determining that, although the defendant employer's policy was facially neutral, denying a prescription medication that allows an employee to control their potential to become pregnant is "necessarily a sex-based exclusion" that violates Title VII, as amended by the PDA, because only people who have the capacity to become pregnant use prescription contraceptives, and the exclusion of prescription contraceptives may treat medication needed for a sex-specific condition less favorably than medication necessary for other medical conditions); *Erickson* v. *Bartell Drug Co.,* 141 F. Supp. 2d 1266, 1271–72 (W.D. Wash. 2001) (determining that the selective exclusion of prescription contraceptives from an employer's generally comprehensive prescription drug plan violated the PDA because only people who have the capacity to become pregnant use prescription contraceptives). Additionally, the Commission notes that those who can and cannot get pregnant face different risks in not having access to contraception in that the individual who may actually become pregnant bears the exclusive risk of experiencing pregnancy-related complications, including a variety of life-threatening conditions. U.S. Dep't of Health & Hum. Servs., Ctrs. for Disease Control & Prevention, *Urgent Maternal Warning Signs* (Nov. 17, 2022), *https://www.cdc.gov/hearher/maternal-warning-signs/index.html* (explaining urgent warning signs and symptoms "during pregnancy and in the year after delivery" that "could indicate a life-threatening situation"); U.S. Dep't of Health & Hum. Servs., Ctrs. for Disease Control & Prevention, *Maternal Mortality Rates in the United States, 2021* (March 2023), *https://www.cdc.gov/nchs/data/hestat/maternal-mortality/2021/maternal-mortality-rates-2021.htm* (discussing the high rates of maternal mortality); Am. Coll. of Obstetricians & Gynecologists and Physicians for Reproductive Health, *Abortion Can Be Medically Necessary* (Joint Statement) (Sept. 25, 2019), *https://www.acog.org/news/news-releases/2019/09/abortion-can-be-medically-necessary* ("Pregnancy imposes significant physiological changes on a person's

Continued

[50] 479 F.3d 936, 939, 942 (8th Cir. 2007) (concluding that Union Pacific's insurance policy—which excluded "all types of contraception, whether prescription, non-prescription or surgical and whether for men or women"—did not discriminate against women and therefore did not violate the PDA and distinguishing *Johnson Controls* on the ground that, unlike "potential pregnancy," "contraception is not a gender-specific term").

[51] *Johnson Controls,* 499 U.S. at 206.

[52] *See Walsh* v. *Nat'l Computer Sys., Inc.,* 332 F.3d 1150, 1154, 1160 (8th Cir. 2003) (upholding a judgment and award for a plaintiff claiming pregnancy discrimination where the plaintiff provided evidence that her supervisor's discriminatory behavior was based on the supervisor's belief that she was, or was intending to become, pregnant a second time); *see also Kocak,* 400 F.3d at 470 (reasoning that the plaintiff "cannot be refused employment on the basis of her potential pregnancy"); *Batchelor* v. *Merck & Co.,* 651 F. Supp. 2d 818, 830–31 (N.D. Ind. 2008) (holding that the plaintiff was protected under the PDA where her supervisor allegedly discriminated against her because of her stated intention to start a family); *Cleese* v. *Hewlett-Packard Co.,* 911 F. Supp. 1312, 1317–18 (D. Or. 1995) (concluding that the plaintiff, who claimed that the defendant employer discriminated against her because it knew she planned to become pregnant, fell within the PDA's protections and noting that the court agreed with "*Pacourek* that the purpose of the PDA is best served by extending its coverage to women who are trying to become pregnant").

[53] *See also Newport News Shipbuilding & Dry Dock Co.* v. *EEOC,* 462 U.S. 669, 678–79 & n.17, 683–84 (1983) (noting that the legislative history of the PDA demonstrates Congress' intent that it would be facially discriminatory for an employer to discriminate in insurance coverage between persons who face a risk of pregnancy and those who do not, and concluding that the employer unlawfully gave married male employees a benefit package for their dependents that was less inclusive than the dependency coverage provided to married female employees). In *Newport News,* the Court found that the benefits that a male employee and his dependents could receive were less than what a female employee and her dependents could receive, and thus the plan violated the PDA. This rationale further explains the decisions in *In re Union Pacific* and *Krauel.* In those cases, both of which involved insurance benefits, the benefits received by employees and their dependents were the same; thus, there was not a PDA violation. *See Saks,* 316 F.3d at 344–345 (describing *Newport News* as "focused on whether male and female employees received equal coverage under their health benefits package" and finding that *Newport News* would not allow exclusions based on pregnancy); *id.* at 345 n.2 (describing the decision in *Saks* as looking at "whether the exclusion of surgical impregnation procedures result in [a] less comprehensive benefits package for female employees").

[54] *See Saks,* 316 F.3d at 346 & n.4 (concluding that the insurance coverage plan at issue, which did not cover treatments for infertility regardless of capacity to become pregnant, would not violate the PDA, but stating that "[w]e expressly decline to consider whether an infertile female employee would be able to state a claim under the PDA or Title VII for adverse employment action taken against her because she has taken numerous sick days in order to undergo surgical impregnation procedures").

Finally, Congress chose to write the PWFA using the same phrase as in Title VII, as amended by the PDA, and directed the Commission to issue regulations. Congress is presumed to have known the meaning previously given to "pregnancy, childbirth, or related medical conditions" by courts and the Commission, as well as the established principles of statutory construction.[58] This includes the Commission's interpretation in its 2000 *Commission Decision on Coverage of Contraception* and in its 2015 *Enforcement Guidance on Pregnancy Discrimination.* Therefore, it is reasonable to conclude that Congress expected the Commission to interpret the language in the PWFA consistently with its interpretation of the same language in the PDA.

Thus, under the PWFA, depending on the facts, a limitation related to contraception that affects the individual employee's potential pregnancy can be the basis for a request for an accommodation.[59] Whether a particular set of facts will support the necessary nexus between contraception and an individual employee's potential pregnancy is a determination that will be made on a case-by-case basis.

Comments and Response to Comments Regarding Coverage of Specific Conditions—Other Conditions

Some comments requested that specific conditions be added to the list in the regulation. However, inclusion on the list does not make it more or less likely that a specific condition in a specific situation will be considered pregnancy, childbirth or a related medical condition—it is a fact-specific determination. Some comments requested that the Commission opine on whether specific conditions (including ones on which neither the courts nor the Commission have yet opined) would be covered under "related medical conditions" under the PWFA. Especially in the situations where the courts and the Commission have not yet spoken, the Commission believes that this is something best left to development on a case-by-case basis within specific factual contexts.

Inclusion of Abortion in the Definition of "Pregnancy, Childbirth, or Related Medical Conditions"

Preliminary Considerations

The Commission received approximately 54,000 comments (most of which were form or slightly altered form comments from individuals) urging the Commission to exclude abortion from the definition of "pregnancy, childbirth, or related medical conditions." The Commission also received approximately 40,000 comments (most of which were form or slightly altered form comments from individuals or sign-on letters) supporting the inclusion of abortion in the definition of "pregnancy, childbirth, or related medical conditions." [60]

Many of the comments urging the Commission to exclude abortion from the definition of "pregnancy, childbirth, or related medical conditions" expressed the view that abortion is the destruction of a human life, that it is objectionable for moral or religious reasons, and that it is not health care.[61] The Commission recognizes these are sincere, deeply held convictions and are often part of an individual's religious beliefs. The Commission also received many comments that expressed deeply held beliefs, including religious beliefs, that abortion is a necessary part of health care and that an employer's religious beliefs should not dictate an employee's ability to receive a reasonable accommodation under the PWFA.

In the final regulation, the Commission includes abortion in its definition of "pregnancy, childbirth, or related medical conditions," as proposed in the NPRM and consistent with the Commission's and courts' longstanding interpretation of the same phrase in Title VII. The Commission

responds to comments regarding this issue below. Preliminarily, the Commission provides the following context to clarify the limits of the PWFA.

First, the PWFA is a workplace anti-discrimination law. It does not regulate the provision of abortion services or affect whether and under what circumstances an abortion should be permitted. The PWFA does not require any employee to have—or not to have—an abortion, does not require taxpayers to pay for any abortions, and does not compel health care providers to provide any abortions. The PWFA also cannot be used to require an employer-sponsored health plan to pay for or cover any particular item, procedure, or treatment, including an abortion.[62] The PWFA does not require reasonable accommodations that would cause an employer to pay any travel-related expenses for an employee to obtain an abortion.[63] Given these limitations, the type of accommodation that most likely will be sought under the PWFA regarding an abortion is time off to attend a medical appointment or for recovery. The PWFA, like the ADA, does not require that leave as an accommodation be paid leave, so leave will be unpaid unless the employer's policies provide otherwise.[64]

Second, the PWFA provides a mechanism for a qualified employee with a known limitation related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions to receive workplace accommodations. The term "abortion" is included in the regulation's definition of "pregnancy, childbirth, or related medical conditions" for the limited purpose of determining whether an employee qualifies for a workplace accommodation under the PWFA. As shown in the public comments, beliefs about when an abortion may be morally or religiously permissible, even within religious traditions, are not monolithic.

Third, despite the large number of comments that the Commission received, the Commission's historical experience, in more than four years of enforcing Title VII, is that very few employers have actually faced a situation where an employee is expressly requesting leave for an

---

body. These changes can exacerbate underlying or preexisting conditions, like renal or cardiac disease, and can severely compromise health or even cause death.").

[58] *See supra* note 24.

[59] *See* H.R. Rep. No. 117–27, pt. 1, at 27 ("Throughout the bill's text, the PWFA ensures that workers have access to reasonable accommodations for conditions connected with a pregnancy, not just a pregnancy itself.").

[60] The number of comments does not require the EEOC to adopt a specific view. *U.S. Cellular Corp. vs. FCC,* 254 F.3d 78,87 (D.C. Cir. 2001) ("[T]he Commission has no obligation to take the approach advocated by the largest number of commenters . . . ; indeed, the Commission may adopt a course endorsed by no commenter. The Commission's only responsibilities are to respond to comments, 5 U.S.C. 553, and to choose a reasonable approach backed up by record evidence.") (internal citations omitted).

[61] Some comments also expressed religious and conscience objections to other conditions included in the definition of "pregnancy, childbirth, or related medical conditions," such as infertility treatments and contraception. The Commission has addressed these other issues, *supra,* in the preamble in section 1636.3(b) *Pregnancy, Childbirth, or Related Medical Conditions.* Responses to comments that object to these procedures for religious reasons are addressed *infra* in the preamble in section 1636.7(b) *Rule of Construction* and in the preamble in section 1636.7 under *Religious Freedom Restoration Act.*

[62] 42 U.S.C. 2000gg–5(a)(2) provides that nothing in the PWFA shall be construed "by regulation or otherwise, to require an employer-sponsored health plan to pay for or cover any particular item, procedure, or treatment."

[63] The PWFA does not prohibit an employer from taking these actions, either.

[64] *See infra* in the preamble in section 1636.3(h) under *Particular Matters Regarding Leave as a Reasonable Accommodation.*

abortion and the employer declines to grant the leave on religious or moral grounds. Since 1978, Title VII has required that employers who provide sick leave provide that leave in a non-discriminatory manner to women affected by pregnancy, childbirth, or related medical conditions. This includes, and has included since 1978, allowing employees affected by pregnancy, childbirth, or related medical conditions to use employer-provided leave in order to have time off to have an abortion.[65] Yet the public comments the Commission received did not cite any Title VII cases that ruled against the employer where a request for leave for an abortion was at issue, and the comments did not provide evidence that the Title VII requirement has caused problems for employers in the past. Nonetheless, under the framework of this final rule, accommodations related to abortion—like all accommodations—remain subject to applicable exceptions and defenses, including both those based on religion and undue hardship.

With this background, the Commission responds to the comments it received.

[65] *See* 42 U.S.C. 2000e(k); 124 Cong. Rec. S18,978 (daily ed. Oct. 13, 1978) (statement of Sen. Harrison A. Williams, Jr.) ("The House-passed bill included a provision which would have excluded health insurance benefits, sick leave benefits, and disability leave benefits for abortions altogether, except where the life of the mother would be endangered if the fetus were carried to term, or in case of complications. The legislation which passed this body included no such provision. After lengthy debate, and discussion of this difficult issue, the conferees have adopted a compromise which requires the provision of sick leave and disability benefits in connection with an abortion on the same basis as for any other illness or disabling condition."); *see also* H.R. Rep. No. 95–1786, at 3–4 (Conf. Rep.) (explaining the differences between the Senate bill, the House amendment, and the substitute agreed to in conference).

Since 1979, the Commission's guidelines have provided that "[a]ll fringe benefits other than health insurance, such as sick leave, which are provided for other medical conditions, must be provided for abortions." 29 CFR part 1604, appendix, Question 35 (1979). This has been the EEOC's consistent interpretation for over 40 years.

In 2015, the EEOC reaffirmed that "pregnancy, childbirth, or related medical conditions" includes abortions. *Enforcement Guidance on Pregnancy Discrimination, supra* note 31, at (I)(A)(4)(c); *see, e.g., Doe v. C.A.R.S. Prot. Plus, Inc.,* 527 F.3d 358, 364 (3d Cir. 2008) ("Clearly, the plain language of the statute, together with the legislative history and the EEOC guidelines, support a conclusion that an employer may not discriminate against a woman employee because she has exercised her right to have an abortion. We now hold that the term 'related medical conditions' includes an abortion."); *DeJesus v. Fla. Cent. Credit Union,* No. 8:17–CV–2502, 2018 WL 4931817, at *1 (M.D. Fla. Oct. 11, 2018) (denying the employer's motion to dismiss in a Title VII case where an employee used approved leave to have an abortion and was fired shortly thereafter when her supervisor stated that the abortion was not an appropriate excuse for her absence).

Interpretation of "Pregnancy, Childbirth, or Related Medical Conditions" as Consistent With Its Meaning in Title VII

Comments Regarding the Commission's Proposed Definition of "Pregnancy, Childbirth, or Related Medical Conditions" as Reflected in Statutory Text

Comments regarding the Commission's decision to include "abortion" in the definition of "pregnancy, childbirth, or related medical conditions" made several arguments related to the statutory text of the PWFA and Title VII.

Many comments in favor of the Commission's inclusion of abortion in the proposed definition of "pregnancy, childbirth, or related medical conditions" asserted that its inclusion accurately reflects the statutory text of the PWFA; that the phrase "pregnancy, childbirth, or related medical conditions" is taken directly from Title VII and uses identical language; that the identical language in the PWFA and Title VII must be interpreted consistently; that Congress' drafting the PWFA against the backdrop of Title VII strongly suggests that its use of Title VII's language would require the language to have the same meaning in the PWFA, absent a clear indication to the contrary; and that in enacting the PDA, Congress expressly stated that the statute applied to employees who obtained abortions, confirming its statutory intent to prohibit discrimination against employees for obtaining abortion care, and that Congress' use of the term in the PWFA is consistent with that underlying interpretation.

Other comments favoring the Commission's inclusion of abortion in the definition of "pregnancy, childbirth, or related medical conditions" stated that its inclusion is important for consistency and clarity, noting that both employers and employees have relied on the Commission's longstanding inclusion of this interpretation in guidance to understand what constitutes "pregnancy, childbirth, or related medical conditions"; that applying the same definition under the PWFA provides important consistency when litigation is brought under Title VII and the PWFA simultaneously; and that the PWFA's drafters intentionally drew specific terms from Title VII and the ADA to ensure employees and employers would have a clear understanding of the meaning of those terms.

By contrast, many comments opposing the Commission's proposed

definition stated that abortion could not be included in the definition of "pregnancy, childbirth, or related medical conditions" because the PWFA's text does not mention abortion; that Congress' intent to include abortion in the definition of "pregnancy, childbirth, or related medical conditions" cannot be inferred simply because the PWFA uses the same language as Title VII; that the PWFA does not direct the Commission to construct a broad definition of "related medical conditions"; and that the inclusion of "pregnant workers" in the statute's title should exclude employees who end their pregnancies via an abortion. Comments also stated that, under canons of statutory interpretation, the general term "or related medical conditions" is best read to cover only those concepts akin to the specific terms it follows—and that abortion is not related to "pregnancy" or "childbirth."

Comments opposed to the Commission's inclusion of abortion in the proposed definition of "pregnancy, childbirth, or related medical conditions" also asserted that under the text of the PWFA, employers should be required only to accommodate employees who are currently pregnant or who give birth. For instance, comments asserting that under the PWFA a "related medical condition" must be related to a current or recent pregnancy or childbirth analogized the PWFA's accommodation provision to the accommodation provisions under Title VII and the ADA, which apply when an employee has a sincerely held religious belief or practice, or a disability, respectively.

Comments also asserted that abortion is the opposite of pregnancy and childbirth. For instance, comments stated that an abortion is unlike pregnancy because it is a procedure that ends a pregnancy and the possibility of childbirth from that pregnancy; and that pregnancy is not a medical condition to be treated with an abortion.

Comments opposed to the Commission's inclusion of abortion in the definition of "pregnancy, childbirth, or related medical conditions" also maintained that "related medical conditions" should be construed narrowly under the PWFA. For instance, some comments stated that Congress' inclusion of the term "childbirth" meant that abortion could not be included in the regulation; that a broad definition of "related medical conditions" would render the term "childbirth" superfluous; and that the PWFA's definition should only refer to involuntary, detrimental impacts of pregnancy, childbirth, or related

medical conditions. Comments stated that, in including contraception and abortion, the Commission's definition goes beyond medical conditions to cover medical interventions; these comments argued, for example, that the act of obtaining reproductive health care—including contraception and abortion—is not, by definition, a medical, physical, or mental condition, and thus it cannot be a PWFA limitation.

Response to Comments Regarding the Commission's Proposed Definition of "Pregnancy, Childbirth, or Related Medical Conditions" as Reflected in Statutory Text

The Commission agrees with comments expressing support for inclusion of abortion in the proposed definition of "pregnancy, childbirth, or related medical conditions" for which a qualified employee could receive an accommodation, absent undue hardship.

In interpreting a statute, an agency must start with its text. The PWFA does not define the phrase "pregnancy, childbirth, or related medical conditions." For nearly 45 years, however, consistent with the plain language of the statute, congressional intent, and Federal courts' interpretation of the statutory text, the Commission has interpreted "pregnancy, childbirth, or related medical conditions" in Title VII to include the decision to have—or not to have—an abortion and to prohibit discrimination in employment practices because an employee had or did not have an abortion.[66] Based on well-established rules of statutory interpretation, the Commission properly interprets "pregnancy, childbirth, or related medical conditions" to have the same meaning in the PWFA as it does under Title VII.[67] As the Supreme Court

has stated, "When administrative and judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its administrative and judicial interpretations as well."[68] The Commission concludes that it would not be consistent with Congress' intent, as expressed in its choice of this statutory language for the PWFA, to construct a broader or narrower definition of "pregnancy, childbirth, or related medical conditions" than under Title VII. Rather, following the canons of statutory interpretation, the Commission is using the definition that already exists for this identical phrase under Title VII. Indeed, it is likely that defining this phrase differently than it has been defined in a parallel statute would exceed the Commission's congressionally delegated authority.

As set out in the NPRM, Congress previously used the phrase "pregnancy, childbirth, or related medical conditions" when, in enacting the PDA, it amended Title VII to explicitly state that Title VII's prohibition against sex discrimination includes a prohibition against discrimination on the basis of "pregnancy, childbirth, or related medical conditions."[69] The legislative history of the PDA expressly stated that the PDA's protections applied to situations involving abortions, and, indeed, the statutory text enacted by

Congress explicitly excluded certain abortion procedures from health insurance requirements, since the statute would otherwise have been read to require their coverage, while still requiring coverage in certain limited circumstances.[70]

Congress' express purpose in enacting the PWFA was to supplement Title VII's protections for qualified employees affected by pregnancy, childbirth, or related medical conditions; in other words, the same employees protected by Title VII, as amended by the PDA.[71] To that end, Congress' approach in both laws was to ensure that employers are not required to pay for abortions for their employees but that employees are not discriminated against in the workplace for having them. Further, the Commission agrees with the comments that using the same definition that the Commission and courts have used for the same phrase in Title VII provides important clarity and consistency for employers and employees.

Using the same definition also provides clarity and consistency for courts and harmonizes the two statutory schemes. Title VII and the PWFA cover the same employers and employees. Having two definitions of the same term would cause confusion for courts and potentially require them to reach conflicting decisions. Moreover, as cases under the PWFA may, depending on the circumstances, also be brought under Title VII, courts could be asked to decide cases involving both Title VII's prohibition of discrimination based on "pregnancy, childbirth, or related medical conditions" and the PWFA's reasonable accommodation provision.

Even if the Commission were authorized to ignore the courts' and its own prior longstanding, consistent interpretation of "pregnancy, childbirth, or related medical conditions," the Commission would reach the same conclusion that the 1978 Congress did—that the phrase "pregnancy, childbirth, or related medical conditions" includes choosing to have or not to have an abortion, based on the plain meaning of the phrase "pregnancy, childbirth, or related medical conditions." By definition, individuals who are choosing whether or not to have an abortion are pregnant. And the

---

[66] See 29 CFR part 1604, appendix, Questions 34 & 35 (1979); see also Enforcement Guidance on Pregnancy Discrimination, supra note 31, at (I)(A)(4)(c).

[67] These rules include: (1) the Prior-Construction Canon, which states that when judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute is presumed to incorporate that interpretation; Tex. Dep't of Hous. & Cmty. Affs., 576 U.S. at 536–37 ("If a word or phrase has been . . . given a uniform interpretation by inferior courts . . . a later version of that act perpetuating the wording is presumed to carry forward that interpretation.") (omissions in original) (quoting Scalia & Garner, Reading Law, at 322); Lorillard, 434 U.S. at 581 ("[W]here, as here, Congress adopts a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law, at least insofar as it affects the new statute."); Hall v. U.S. Dep't of Agric., 984 F.3d at 840 ("Congress is presumed to be aware of

an agency's interpretation of a statute. We most commonly apply that presumption when an agency's interpretation of a statute has been officially published and consistently followed. If Congress thereafter reenacts the same language, we conclude that it has adopted the agency's interpretation.") (internal citations and quotation marks omitted); Scalia & Garner, Reading Law at 323 ("[W]hen a statute uses the very same terminology as an earlier statute—especially in the very same field, such as securities law or civil-rights law—it is reasonable to believe that the terminology bears a consistent meaning."); (2) the Related Statutes Canon (In Pari Materia), which states that courts do not interpret statutes in isolation, but rather in the context of the body of law of which they are a part, including later-enacted statutes, so statutes addressing the same subject matter generally should be read as if they were one law; see, e.g., Wachovia Bank v. Schmidt, 546 U.S. 303, 305 (2006); ("[U]nder the in pari materia canon, statutes addressing the same subject matter generally should be read as if they were one law . . . .") (internal citations and quotation marks omitted); and (3) the Presumption of Legislative Acquiescence Canon, which states that statutes adopted after certain prior judicial or administrative interpretations may acquiesce in those interpretations; see, e.g., Johnson v. Transp. Agency, Santa Clara Cnty., 480 U.S. 616, 629 n.7 (1987) ("Congress has not amended the statute to reject [the Court's] construction [of Title VII], nor have any such amendments even been proposed, and we therefore may assume that our interpretation was correct.").

[68] Bragdon, 524 U.S. at 645.

[69] 42 U.S.C. 2000e(k).

[70] See id. ("This subsection shall not require an employer to pay for health insurance benefits for abortion, except where the life of the mother would be endangered if the fetus were carried to term, or except where medical complications have arisen from an abortion . . . ."); H.R. Rep. No. 95–1786, at 4 (1978) (Conf. Rep.).

[71] See supra, preamble section 1636.3(b) Pregnancy, Childbirth, or Related Medical Conditions.

condition of being pregnant does not depend on the ultimate outcome of the pregnancy, as highlighted by Congress extending coverage to "childbirth" separate from "pregnancy." Thus, the term "pregnancy" naturally includes all of those limitations arising out of the pregnancy itself, regardless of whether any particular pregnancy ends in miscarriage, live birth, an abortion, or any other potential outcome. If an employee is denied an accommodation because they are seeking an abortion, or not seeking an abortion, that employee has necessarily been denied an accommodation on account of their current pregnancy. Accordingly, the decision to have or not to have an abortion falls squarely within the ordinary meaning of the phrase "pregnancy, childbirth, or related medical conditions."

Given how courts and the Commission have defined "pregnancy, childbirth, or related medical conditions" in Title VII, the Commission disagrees that the PWFA and its implementing regulation only would apply to qualified employees who are currently pregnant or who recently gave birth, thus implicitly excluding abortion. First, such an interpretation would exclude qualified employees who have had miscarriages or are otherwise no longer pregnant, which appears to be inconsistent with the text of, and does not appear to be the intent of, either the PWFA or the PDA.[72] As stated above, by definition, qualified employees who seek an abortion are either currently or recently pregnant. Finally, the Commission sees no evidence that the inclusion of "childbirth" evinces congressional intent to construct a narrower definition of "related medical conditions" under the PWFA than under Title VII, as both statutes contain this identical language. As stated above, both the legislative history and the explicit exclusion of certain abortion procedures from health insurance requirements under the PDA evince Congress' intent to include abortion in the definition of "pregnancy, childbirth, or related medical conditions" under Title VII.

Comments Regarding the Commission's Proposed Definition of "Pregnancy, Childbirth, or Related Medical Conditions" as Reflected in the Statutory Intent and Structure of the PWFA

Many comments regarding the Commission's proposed inclusion of abortion in the definition of "pregnancy, childbirth, or related medical conditions" made arguments related to the statutory intent and structure of the PWFA.

Comments in favor of the inclusion of abortion in the definition of "pregnancy, childbirth, or related medical conditions," including from Members of Congress, asserted that the Commission's inclusion of abortion in the definition is consistent with the PWFA's statutory intent and structure; that Congress' express purpose in enacting the PWFA was to supplement Title VII's protections; that Congress adopted the PWFA to remedy gaps in existing legal protections, including in Title VII, and it understood how "pregnancy, childbirth, or related medical conditions" is interpreted by the courts; that Congress understood that the PWFA could include possible accommodations related to an abortion, as evidenced by the statements of legislators who opposed the PWFA, showing that they understood it could require accommodations related to an abortion; that Congress recognized the PWFA as an opportunity for Congress to finally fulfill a promise of Title VII; and that Congress intentionally included "related medical conditions" in the PWFA to encompass conditions beyond simply pregnancy and childbirth.

Many comments in favor of the inclusion of abortion expressed that including abortion furthers Congress' policy goal of protecting pregnant workers from harm; that it accurately reflects the range of needs and conditions that workers may experience that require reasonable workplace accommodations in relation to pregnancy; that abortion care is a safe, common, and essential component of reproductive health care; that decisions regarding abortion are private medical matters and should be made by patients in consultation with their clinicians and without undue interference by outside parties; and that providing accommodations for abortion would mean that employees would not have to risk their health, lives, or livelihoods to access care. Many such comments focused on specific positive health and social outcomes that employees would enjoy if they had access to accommodations for abortion, such as

the ability to maintain personal bodily autonomy; to choose when to have or not have children; to receive necessary health care in the event of intimate partner violence, rape, incest, fetal anomalies, and exposure to teratogenic medications; and to receive necessary health care in the event of pregnancy complications that may be so severe that abortion is the only measure that will preserve a pregnant employee's health or save their life—including placental abruption, bleeding from placenta previa, preeclampsia or eclampsia, and cardiac or renal conditions.

Comments opposed to the inclusion of abortion in the definition of "pregnancy, childbirth, or related medical conditions" asserted that including abortion does not reflect Congress' generally expressed intent for the PWFA. For instance, comments stated that the PWFA's intent only is to ensure that pregnant and postpartum women can receive reasonable accommodations to safely work; that the PWFA's intent only is to support mothers during pregnancy and childbirth and only to protect and benefit the health of mothers and their fetuses, as well as to provide accommodations for miscarriage, stillbirth, treatment of an ectopic pregnancy, or emergency treatment intended to preserve the life of the pregnant employee, but not an abortion; that the Commission's interpretation turns the PWFA into a general reproductive health care statute, defying Congress' intent; that the PWFA was intended by its supporters to be like the ADA, which the comments construed not to require accommodations for abortion; that Congress did not intend to make forays into controversial social policy by enacting the PWFA; that including abortion ignores that Congress cited statistics about working mothers in support of the PWFA and talked about the health of the mother and baby; and that Congress does not hide "elephants in mouseholes," and abortion is an elephant in the mousehole of "pregnancy, childbirth, or related medical conditions."

Some comments opposed to the inclusion of abortion also asserted that the definition does not reflect congressional intent as expressed by the PWFA's structure. These comments noted that Congress chose not to amend Title VII by incorporating the PWFA. Such comments inferred from this choice that Congress implicitly declined to import Title VII's definition of "pregnancy, childbirth, or related medical conditions" and its abortion-related requirements into the PWFA. These comments stated that the PWFA

---

[72] See, e.g., H.R. Rep. No. 117–27, pt. 1, at 20 (discussing the need for the PWFA, citing to a case in which an employee's miscarriage was not covered by the ADA, and noting that "[t]here are many cases where courts have found that even severe complications related to pregnancy do not constitute disabilities triggering [ADA] protection").

**29108**     **Federal Register** / Vol. 89, No. 77 / Friday, April 19, 2024 / Rules and Regulations

does not specifically require the same definition of "pregnancy, childbirth, or related medical conditions" as Title VII, as it does with other terms from the ADA and Title VII, and if Congress wanted the Commission to provide examples of "related medical conditions" it would have expressly said so.

Finally, some comments opposed to the proposed definition stated that Title VII's insurance exclusion provision, which addresses abortion and has been used to suggest that Title VII otherwise covers abortion, is different from the PWFA's similar exclusion provision.

Response to Comments Regarding the Commission's Proposed Definition of "Pregnancy, Childbirth, or Related Medical Conditions" as Reflected in the Statutory Intent and Structure of the PWFA

As stated above, the Commission's inclusion of abortion in the definition of "pregnancy, childbirth, or related medical conditions" is supported by the plain text of the statute and by statutory intent and structure and is in keeping with the well-established rules of statutory construction.[73] Congress chose to write the PWFA using an identical phrase, "pregnancy, childbirth, or related medical conditions," from Title VII and did not define the phrase in the PWFA. Nor did it place any limitations or rules of construction on the definition of the phrase in the PWFA. Accordingly, the Commission gives the phrase the same meaning under the PWFA as it has under Title VII for nearly 45 years. The Commission agrees that the PWFA's focus is accommodation, but, as the text of the PWFA and the ADA state and the Supreme Court has reiterated, accommodations are a form of nondiscrimination.[74] Thus, the fact that the PWFA provides accommodations does not make it under either type of statute from Title VII. Additionally, although Congress specifically

incorporated certain definitions into the PWFA from the ADA and Title VII, such as those for "reasonable accommodation," "undue hardship," "employer," and "employee," in those situations, the terms appear in more than one other statute enforced by the Commission, and some of their definitions vary across statutes.[75] In incorporating certain terms, the Commission understands Congress' intent as specifying which definition it chose to adopt in the PWFA to avoid confusion. By contrast, there is only one other statute that the Commission enforces that uses the phrase "pregnancy, childbirth, or related medical conditions," and that is Title VII, as amended by the PDA. Therefore, Congress' intent to use the Title VII definition in the PWFA is clear.

Further supporting the Commission's interpretation of the phrase "pregnancy, childbirth, or related medical conditions" is the fact that the PWFA passed as part of the Consolidated Appropriations Act, 2023 (CAA), in which Congress included several provisions explicitly limiting the use of Federal funds for abortion.[76] Where Congress includes particular language in one section of a law but omits it in another, it is generally presumed that Congress acts intentionally and purposely in including or excluding certain language.[77] Given that Congress explicitly included exclusions regarding abortion in certain sections of the CAA but omitted any such exclusion in the PWFA, the Commission concludes that the omission was an intentional act.

The Commission's interpretation also is consistent with the legislative history of the PDA, the statute that is the source

of the phrase, "pregnancy, childbirth, or related medical conditions." The Congressional Conference Report accompanying the PDA provides: "Because [the PDA] applies to all situations in which women are 'affected by pregnancy, childbirth, and related medical conditions,' its basic language covers decisions by women who chose to terminate their pregnancies. Thus, no employer may, for example, fire or refuse to hire a woman simply because she has exercised her right to have an abortion."[78] By including the same key phrase in the PWFA and not articulating a different meaning than in the PDA, Congress is presumed to know and intend that the same definition will be applied.[79] And given the longstanding and public interpretation of this phrase, by both the Commission and the courts, the Commission disagrees that adopting the same interpretation as Title VII amounts to Congress "hiding" an elephant in a mousehole.

Furthermore, the second sentence of the PDA states that employers do not have to pay for health insurance benefits for abortion, except when necessary to preserve the life of the mother or where medical complications have arisen from an abortion.[80] The inclusion of this limited language regarding abortion coverage, coupled with clear statements in the legislative history, supports the conclusion that Congress intended for Title VII, as amended by the PDA, to protect employees against discrimination based on abortion and that Congress provided an exception, largely motivated by religious freedom concerns, for employers to opt out of providing health benefits to cover the procedure itself.[81] Of note, the PWFA has a similar structure—it requires employers not to discriminate against protected qualified employees by failing to provide them reasonable accommodations, but it does not require, or permit the Commission to

---

[73] *See supra* note 67.

[74] 42 U.S.C. 2000gg–1 (titled "Nondiscrimination with regard to reasonable accommodations related to pregnancy"); 42 U.S.C. 12112(b)(5)(A) ("[T]he term 'discriminate against a qualified individual on the basis of disability' includes . . . not making reasonable accommodations . . ."); *see also* 29 CFR part 1630, appendix, 1630.9 ("The obligation to make reasonable accommodation is a form of non-discrimination."); *US Airways, Inc.* v. *Barnett,* 535 U.S. 391, 396 (2002) ("[T]he ADA says that 'discrimination' includes an employer's *not making reasonable accommodations* to the known physical or mental limitations of an otherwise qualified . . . employee, *unless* [the employer] can demonstrate that the accommodation would impose an *undue hardship* on the operation of [its] business.'") (citing 42 U.S.C. 12112(b)(5)(A)) (emphasis in original) (omission in original).

[75] 42 U.S.C. 2000e(b) (defining "employer" under Title VII), (f) (defining "employee" under Title VII), (j) (defining "religion" with regard to an employer's obligation to "reasonably accommodate" an employee's religious observance or practice absent "undue hardship" under Title VII); 42 U.S.C. 12111(4) (defining "employee" under the ADA), (5) (defining "employer" under the ADA), (9) (defining "reasonable accommodation" under the ADA), (10) (defining "undue hardship" under the ADA).

[76] *See, e.g.,* sec. 613, Public Law 117–328, 136 Stat. 4459, 4699 (2022) (providing that: "No funds appropriated by this Act shall be available to pay for an abortion, or the administrative expenses in connection with any health plan under the Federal employees health benefits program which provides any benefits or coverage for abortions.").

[77] *Keene Corp.* v. *United States,* 508 U.S. 200, 208 (1993) (quoting *Russello* v. *United States,* 464 U.S. 16, 23 (1983)). Of note, in the debate surrounding the PWFA before its passage in the Senate, the Senators discussed abortion. *See* 168 Cong. Rec. S7,049–50 (daily ed. Dec. 8, 2022); 168 Cong. Rec. S10,071, S10,081 (daily ed. Dec. 22, 2022). The House Report also discusses abortion. *See* H.R. Rep. No. 117–27, pt. 1, at 60. Thus, both chambers were seemingly aware of this issue, but the law does not include the type of abortion exclusion found in other parts of the CAA.

[78] *See* H.R. Rep. No. 95–1786, at 4 (1978) (Conf. Rep.).

[79] *See supra* note 67.

[80] *See* 42 U.S.C. 2000e(k).

[81] *See* H.R. Rep. No. 95–948, at 7 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 4749, 4755 ("Many members of the committee were troubled . . . by any implication that an employer would have to *pay* for abortions not necessary to preserve the life of the mother through medical benefits or other fringe benefit programs, even if that employer—a church organization for example—harbored religious or moral objections to abortion; such a requirement, it was felt, could compromise the religious freedom of such employers. The committee, therefore, amended the language of the bill to deal with the problem, by making clear that such employers will not be required to pay for abortions except where the life of the mother would be endangered if the fetus was carried to term." (emphasis in original)).

require, "an employer-sponsored health plan to pay for or cover any particular item, procedure, or treatment." [82]

As a matter of the PWFA's plain text, therefore, the Commission determines that the decision to have, or not to have, an abortion is encompassed within the phrase "pregnancy, childbirth, or related medical conditions." Because this conclusion follows from the statutory text, the Commission does not believe that other concerns raised by commenters are relevant. The Commission's determination is not based on the potential health or social outcomes related to abortion; rather, the Commission's determination is based on the statutory text. Moreover, it bears emphasizing that this rulemaking does not require abortions or affect the availability of abortion; it simply ensures that employees who choose to have (or not to have) an abortion are able to continue participating in the workforce, by seeking reasonable accommodations from covered employers, as needed and absent undue hardship.

Comments Regarding the Commission's Proposed Definition of "Pregnancy, Childbirth, or Related Medical Conditions" and Statements From Members of Congress and the White House About the PWFA

Some comments pointed to statements made by Members of Congress to either support or dispute the idea that the definition of "pregnancy, childbirth, or related medical conditions" in the PWFA includes abortion. Comments also noted the absence of certain statements from Members of Congress and the White House.

First, comments that supported the inclusion of abortion in the definition of "pregnancy, childbirth, or related medical conditions" pointed to statements by opponents of the bill, whose opposition was based on the lawmakers' views that abortion would be covered. [83] Some comments also pointed to an amendment proposed by Senator James Lankford that the Senate rejected, which stated that "[t]his division shall not be construed to require a religious entity described in Section 702(a) of the Civil Rights Act of 1964 to make an accommodation that would violate the entity's religion" [84] as

evidence that Senators knew that abortion would be covered.

Comments that did not support the inclusion of abortion in the definition of "pregnancy, childbirth, or related medical conditions" pointed to statements made during floor debate by two of the co-sponsors of the PWFA in the Senate, Senator Robert P. Casey, Jr.[85] and Senator William Cassidy.[86] These comments also mentioned that, in a statement on the House floor, Representative Jerrold Nadler, lead sponsor of the PWFA, explained that the PWFA should be interpreted consistently with Title VII, stating: "The Pregnant Workers Fairness Act aligns with Title VII in providing protections and reasonable accommodations for 'pregnancy, childbirth, and related medical conditions,' like lactation." [87]

Second, comments that disagreed with the Commission's proposed inclusion of abortion in the definition of "pregnancy, childbirth, or related medical conditions" pointed to statements made by Senator Steven Daines and Senator Cassidy after the Senate voted to add the PWFA to the CAA, both of which stated that accommodations related to abortion should not be covered. In addition, comments that disagreed with the Commission's position pointed to the lack of statements by supporters of the bill in Congress and the White House, and by advocacy groups, regarding its coverage of abortion. Comments stated that the PWFA would not have enjoyed bipartisan support, if the intent of the law were to include abortion, and including abortion as a related medical condition in the rule would make the political parties less likely to work together.

Response to Comments Regarding the Commission's Proposed Definition of "Pregnancy, Childbirth, or Related Medical Conditions" and Statements From Members of Congress and the White House About the PWFA

The PWFA's text, structure, and intent support the Commission's proposed definition. Even if the Commission's interpretation were inconsistent with the cited statements of individual Members of Congress during the PWFA's passage, statements made by individual Members of Congress during floor debate do not justify a departure from an interpretation that Congress, courts, and the Commission have consistently adhered to since the

PDA was enacted more than four decades ago. Again, the Commission's interpretation must start with the text of the statute. Relying on the text, rather than the individual statements of Members of Congress, follows the Supreme Court's requirements when interpreting a statute; as the Court has noted, "[p]assing a law often requires compromise, where even the most firm public demands bend to competing interests. What Congress ultimately agrees on is the text that it enacts, not the preferences expressed by certain legislators." [88]

In addition, the Commission does not agree that the PWFA's legislative history counsels for a different interpretation of "pregnancy, childbirth, or related medical conditions" than in the PDA. For example, according to the House PWFA Committee Report, Members knew that abortion would be covered as a pregnancy-related condition for which some employers would need to provide accommodation.[89] Additionally, the Commission's definition is consistent with the full floor statement of Senator Casey and the comment that the Senator submitted during the public comment period.[90] Consistent with the statutory text and Congress' intent, the PWFA does not impose a categorical mandate on an employer to provide leave for an abortion. Leave, like any accommodation, is subject to applicable exceptions and defenses, including both those based on religion and on undue hardship. Nothing in the PWFA requires an employer to pay for an abortion or provide health care benefits for abortion in violation of State law.[91]

Finally, numerous legislators submitted comments during the public

---

[82] 42 U.S.C. 2000gg–5(a)(2).

[83] See, e.g., 168 Cong. Rec. S7049 (daily ed. Dec. 8, 2022) (statement of Sen. Thomas (Thom) Tillis); 167 Cong. Rec. H2325, H2330, H2332 (daily ed. May 14, 2021) (statements of Rep. Julia Letlow, Rep. Robert George (Bob) Good, and Rep. Mary Miller).

[84] 168 Cong. Rec. S10,069–70 (daily ed. Dec. 22, 2022).

[85] 168 Cong. Rec. S7,050 (daily ed. Dec. 8, 2022).

[86] See, e.g., id. at S7,049–50.

[87] 168 Cong. Rec. H10,527–28 (daily ed. Dec. 23, 2022).

[88] NLRB v. SW Gen., Inc., 580 U.S. 288, 306 (2017) (citations omitted); see also March v. United States, 506 F.2d 1306, 1314 n.31 (D.C. Cir. 1974) (citing NLRB v. Plasterers' Loc. Union, 404 U.S. 116, 129–30 n.24 (1971) (providing that, where congressional debates "reflect individual interpretations that are contradictory and ambiguous, they carry no probative weight")).

[89] H.R. Rep. No. 117–27, pt. 1, at 60 (stating under minority views that "if an employee working for a religious organization requests time off to have an abortion procedure, H.R. 1065 could require the organization to comply with this request as a reasonable accommodation of known limitations related to pregnancy, childbirth, or related medical conditions").

[90] 168 Cong. Rec. S7,050 (daily ed. Dec. 8, 2022); Comment EEOC–2023–0004–98384, Sen. Robert P. Casey, Jr. (Oct. 10, 2023) (stating that in drafting the PWFA, legislators intentionally used terms from other laws, including "pregnancy, childbirth, or related medical conditions," and supporting the definition in the proposed rule).

[91] See 42 U.S.C. 2000gg–5(a)(2); 88 FR 54745 (stating that "nothing in the PWFA requires or forbids an employer to pay for health insurance benefits for an abortion"). Covered entities, however, may separately be subject to the PDA's provisions regarding abortion coverage in certain circumstances. See 42 U.S.C. 2000e(k).

comment period that supported or opposed the inclusion of abortion in the definition of "pregnancy, childbirth, or related medical conditions." As these were statements made by Members of Congress after the passage of a bill, the Commission gave them due consideration as statements of the views of each particular Member who signed them.[92]

In response to the comments regarding the political process, the Commission cannot speculate on counterfactual scenarios such as what might have triggered a filibuster of the PWFA in Congress, nor what would diminish bipartisan support for future legislation. And the Commission cannot reinterpret the definition of "pregnancy, childbirth, or related medical conditions" based on the purported absence of certain statements by Members of Congress, advocates, or the executive branch during the bill's passage.

As explained above, the Commission must rely on the plain text of the statute. Given the meaning of the words that Congress chose to use in the PWFA, and the Commission's and courts' long history of interpreting those identical words to include abortion, the Commission will interpret those words the same way in the PWFA.

Comments Regarding the Commission's Proposed Definition of "Pregnancy, Childbirth, or Related Medical Conditions" and Administrative and Judicial Interpretation

Many comments in favor of the Commission's inclusion of abortion in the definition of "pregnancy, childbirth, or related medical conditions" asserted that the Commission's inclusion of abortion in the definition accurately reflects longstanding judicial and administrative interpretations under Title VII. Comments stated that the Commission's interpretation is correct and consistent with decades of authority under Title VII, including legislative history, Federal case law, and Commission guidance; that existing case law supports the Commission's interpretation that Title VII protects employees from discrimination for contemplating or obtaining an abortion or refusing to submit to an employer's demand that they obtain an abortion; and that the Commission's *Enforcement Guidance on Pregnancy Discrimination* reaffirmed that choosing whether to have or not to have an abortion is covered under the PDA.

Some comments opposed to the Commission's proposed inclusion of abortion in the definition of "pregnancy, childbirth, or related medical conditions" asserted that the Commission's definition is contrary to judicial and administrative interpretations under Title VII.

Some comments disputed the Commission's statement that existing case law under Title VII supports the Commission's definition, claiming that the decisions do not apply to the PWFA and are distinguishable; that there is not a widespread judicial consensus about the meaning of "related medical conditions"; and that the Commission should not rely on lower court decisions.

Some comments took issue with the Commission's reliance on its 2015 *Enforcement Guidance on Pregnancy Discrimination* to interpret the phrase "pregnancy, childbirth, or related medical conditions" under the PWFA, as the *Enforcement Guidance on Pregnancy Discrimination* does not receive binding judicial deference; only addresses pregnancy discrimination, not accommodation; and was issued many years after the PDA's enactment.

Response to Comments Regarding the Commission's Proposed Definition of "Pregnancy, Childbirth, or Related Medical Conditions" and Administrative and Judicial Interpretation

The Commission disagrees with the comments that dispute the case law it cited and its reliance on its *Enforcement Guidance on Pregnancy Discrimination*. The Title VII decisions the Commission cited involve situations where employers discriminated against employees because they contemplated having, or chose to have, an abortion. These include *Doe* v. *C.A.R.S. Protection Plus*, a Third Circuit decision relating to leave holding that an employer may not discriminate against an employee because she had an abortion.[93] As stated above, refusal to provide reasonable accommodation is a form of discrimination.[94] Finally, the Commission's reliance on its *Enforcement Guidance on Pregnancy Discrimination* is appropriate because it represents and demonstrates the consistent position of the Commission. It is immaterial that the guidance was voted on and approved by the Commission years after the passage of the PDA, especially given that the year after the PDA was enacted, the Commission issued its Questions & Answers about the PDA stating that abortion is covered under the PDA and prohibiting discrimination in employment practices because an employee had or did not have an abortion.[95] Thus, the *Enforcement Guidance on Pregnancy Discrimination* reconfirmed and still reflects the Commission's decades-long position.

Comments Regarding the Commission's Proposed Definition of "Pregnancy, Childbirth, or Related Medical Conditions" and Other Laws

Some comments pointed to other laws to dispute the Commission's definition of "pregnancy, childbirth, or related medical conditions." The comments pointed to the provisions in annual appropriations legislation, for example, the Hyde and Weldon Amendments, limiting the use of Federal funds for abortion except in certain circumstances. The comments also stated that Congress has never passed a law explicitly promoting the right to abortion. Similar comments noted that

---

[92] *Cf. Nat'l Woodwork Mfrs. Ass'n* v. *NLRB*, 386 U.S. 612, 639 n.34 (1967) (observing that statements inserted into the record after passage of a bill are regarded as "represent[ing] only the personal views of the[ ] legislators" involved). Senator Patricia Murray, joined by 24 Senators, endorsed the Commission's interpretation regarding the definition of "pregnancy, childbirth, or related medical conditions." Comment EEOC–2023–0004–98257, Sen. Patricia (Patty) Murray and 24 U.S. Senators (Oct. 10, 2023); as did Representative Jerrold Nadler, joined by 82 House Representatives. Comment EEOC–2023–0004–98470, Rep. Jerrold (Jerry) Nadler and 82 Members of Congress (Oct. 10, 2023); and Representative Robert Scott, Comment EEOC–2023–0004–98339, Rep. Robert C. (Bobby) Scott, Ranking Member of the House Committee on Education and the Workforce (Oct. 10, 2023). By contrast, Senator James Lankford's comment, which was joined by 19 Senators, including Senator Bill Cassidy, and 41 House Representatives, disagreed with the Commission's interpretation. Comment EEOC–2023–0004–98436, Sen. James Lankford, 19 U.S. Senators, and 41 Members of Congress (Oct. 10, 2023). Similarly, Senator Michael Braun's comment disagreed with the Commission's interpretation. Comment EEOC–2023–0004–98486, Sen. Michael (Mike) Braun (Oct. 10, 2023).

[93] 527 F.3d at 363–64 (citing, *inter alia*, *Turic* v. *Holland Hosp., Inc.*, 85 F.3d 1211, 1214 (6th Cir. 1996)); *see also DeJesus*, 2018 WL 4931817, at *1 (denying the employer's motion to dismiss in a Title VII case where an employee used approved leave to have an abortion and was fired shortly thereafter when her supervisor stated that the medical procedure was not an appropriate excuse for her absence).

[94] *See supra* note 74.

[95] 29 CFR part 1604, appendix. Question 34 ("Q. Can an employer discharge, refuse to hire or otherwise discriminate against a woman because she has had an abortion?/A. No. An employer cannot discriminate in its employment practices against a woman who has had an abortion."), Question 35 ("Q. Is an employer required to provide fringe benefits for abortions if fringe benefits are provided for other medical conditions?/A. All fringe benefits other than health insurance, such as sick leave, which are provided for other medical conditions, must be provided for abortions. Health insurance, however, need be provided for abortions only where the life of the woman would be endangered if the fetus were carried to term or where medical complications arise from an abortion."); *see also supra* note 28 (noting that in the PWFA Congress was seeking to protect the same employees who are protected by the PDA).

some States such as West Virginia and Louisiana have adopted their own versions of the PWFA, and no court appears to have interpreted State or local PWFAs to include abortion. Comments also stated that the Commission should clarify whether its regulation supersedes abortion funding restrictions in the Hyde Amendment and similar amendments, and how the Federal Government will ensure that Federal agencies do not pay for abortion accommodations and ensure that the same rules that apply to the ADA regarding taxpayer funding for abortion apply to the PWFA.

Response to Comments Regarding the Commission's Proposed Definition of "Pregnancy, Childbirth, or Related Medical Conditions" and Other Laws

In interpreting the identical language from Title VII in the context of the PWFA, the Commission cannot infer congressional intent in a manner contrary to the plain text interpretation, particularly not based on what Congress could have said, but chose not to say. There is no evidence to suggest that the other Federal statutes cited by the comments should be considered by the Commission as interpreting the PWFA, nor is there any persuasive reason to give controlling weight to these statutes (instead of interpreting the PWFA consistently with Title VII, as Congress intended). Rather, the fact that Congress chose to provide express exclusions related to abortion in the cited statutes, including in the CAA, but did not choose to do so in the PWFA, suggests that if Congress wanted to exclude abortion from the definition of "pregnancy, childbirth, or related medical conditions" in the PWFA, it would have done so expressly.

Moreover, the PWFA, as interpreted by the Commission in this rule, does not in any way promote abortion; it simply provides for the possibility of an accommodation related to a qualified employee seeking an abortion, absent undue hardship, and there is only a narrow context in which this protection would likely apply—when an employee is seeking leave—given the prohibitions of 42 U.S.C. 2000gg–5(a)(2).[96] The PWFA also provides for accommodations for employees who

choose not to have an abortion, absent undue hardship.

Further, the interpretation of State laws is not as persuasive as the interpretation of Title VII when Congress used the same words in both Federal statutes. Comments addressing State laws did not address whether cases regarding abortion arose under these PWFA-analogous laws. As stated above, despite the large number of comments on this issue, the Commission's practical experience under Title VII shows that litigation regarding this issue is not common. Finally, as stated previously, the Commission's rule does not require any employer to pay for an abortion.

Comments Regarding the Commission's Proposed Definition of "Pregnancy, Childbirth, or Related Medical Conditions" and the Dobbs Decision

Some comments stated that the Supreme Court's decision in *Dobbs* v. *Jackson Women's Health Org.,* 597 U.S. 215 (2022), which concluded that there is no Federal constitutional right to abortion and overruled *Roe* v. *Wade,* 410 U.S. 113 (1973), and *Planned Parenthood of Southeastern Pennsylvania* v. *Casey,* 505 U.S. 833 (1992), affects the Commission's rulemaking.

First, some comments said that, because the PWFA was enacted soon after the Court issued its *Dobbs* decision, Congress should have stated more clearly in the PWFA any protection for an employee seeking an accommodation related to an abortion, if that was its intent. Second, some comments asserted that, because of the *Dobbs* decision, abortion is a State issue, not a Federal issue, that there is no Federal right to abortion, that including abortion accommodations in the PWFA would circumvent *Dobbs,* and that under *Dobbs,* abortion is not health care. Comments also stated that the Title VII case law cited by the Commission involved substantial reliance on the constitutional right to abortion now undone by *Dobbs.*

Response to Comments Regarding the Commission's Proposed Definition of "Pregnancy, Childbirth, or Related Medical Conditions" and the Dobbs Decision

Given the language that Congress used in the PWFA and the use and interpretation of that same language in Title VII, the *Dobbs* decision does not suggest a different definition of the phrase "pregnancy, childbirth, or related medical conditions." First, Congress is not required to speak directly to a specific issue when it

legislates. "In some cases, Congress intends silence to rule out a particular statutory application, while in others Congress' silence signifies merely an expectation that nothing more need be said in order to effectuate the relevant legislative objective." [97] Congress' choice to use the same phrase in the PWFA as in Title VII, coupled with Congress' decision to enact limitations with respect to abortion in other portions of the CAA but not in the PWFA, supports the Commission's interpretation that "pregnancy, childbirth, or related medical conditions" has the same meaning in the PWFA that it does in Title VII, and it includes abortion. Thus, the conclusion the Commission draws from Congress' lack of an explicit mention of abortion in the PWFA is that Congress did not express its intent for the phrase to have any different meaning than it has under Title VII.

As stated at the beginning of this discussion, the Commission's rule does not regulate abortion or abortion procedures, nor does it require an employer to pay for, promote, or endorse abortion. Additionally, although *Dobbs* held that the U.S. Constitution's Due Process Clause does not provide a right to abortion, that interpretation of the Constitution does not address Congress' authority to regulate potential employment discrimination by providing for reasonable accommodations for pregnancy, childbirth, or related medical conditions absent undue hardship, as Congress has done in the PWFA. *Dobbs* did not involve, and the Court did not discuss, employment protections under Title VII, and *Dobbs* did not purport to interpret the meaning of the phrase "pregnancy, childbirth, or related medical conditions" in Title VII. Ultimately, *Dobbs* concerned a matter of constitutional interpretation and not one of statutory interpretation, and the cases cited by the Commission in support of the inclusion of abortion in the definition of "pregnancy, childbirth, or related medical conditions" may still be relied on. Indeed, Congress enacted the PWFA after the *Dobbs* decision and chose to retain the phrase "pregnancy, childbirth, or related medical conditions" that it had used in Title VII without any modification or instruction. Thus, even if *Dobbs* could be construed as an invitation for Congress to reevaluate that language from Title VII, Congress did not do so.

---

[96] 42 U.S.C. 2000gg–5(a)(2) provides that "[n]othing in this chapter shall be construed . . . by regulation or otherwise, to require an employer-sponsored health plan to pay for or cover any particular item, procedure, or treatment or to affect any right or remedy available under any other Federal, State, or local law with respect to any such payment or coverage requirement."

[97] *Burns* v. *United States,* 501 U.S. 129, 136 (1991), *abrogated on other grounds as recognized by Dillon* v. *United States,* 560 U.S. 817 (2010).

Comments Regarding the Commission's Proposed Definition of "Pregnancy, Childbirth, or Related Medical Conditions" and Policy Arguments Regarding Abortion

Many comments supported the inclusion of abortion in the definition of "pregnancy, childbirth, or related medical conditions" for various policy reasons. As discussed at length above, such reasons included, for example, stating that it would help employees access essential health care and have autonomy about their reproductive decisions.

By contrast, other comments stated that, as a policy matter, the Commission should not include abortion in the definition of "pregnancy, childbirth, or related medical conditions." First, some comments speculated that including abortion in the definition will result in employers encouraging their pregnant workers to have abortions. Some of these comments suggested that employers might even require pregnant workers to take leave to have an abortion instead of another available accommodation. Second, some comments stated that there should be no accommodations for abortion because, according to the comments, abortion causes mental health issues for women.

Response to Comments Regarding the Commission's Proposed Definition of "Pregnancy, Childbirth, or Related Medical Conditions" and Policy Arguments Regarding Abortion

As explained above, the Commission must rely on the plain text of the statute. Given the words that Congress chose to use in the PWFA, and the Commission's and courts' long history of interpreting those identical words to include abortion, the Commission will interpret those words the same way in the PWFA. The Commission disagrees with commenters who argued that excluding abortion from the definition serves the policy goals expressed by Congress in the PWFA. On the contrary, as discussed above, the Commission concludes that including abortion in the definition best serves the policy goals expressed by Congress in the PWFA in that it will allow qualified employees with known limitations related to pregnancy, childbirth, or related medical conditions to obtain accommodations to address their needs, absent undue hardship. While the comments make policy arguments opposed to the inclusion of abortion in the definition of "pregnancy, childbirth, or related medical conditions," these policy objections are not a reason for the Commission to change its interpretation

and deviate from the text of the statute and established rules of statutory construction. Additionally, the Commission notes that some of the claims in the comments that argued against abortion for policy reasons have been disputed by health care professionals.[98]

With regard to concerns that employers will force their employees to have abortions, Title VII prohibits covered entities from taking adverse employment actions against an employee based on their decisions to have, or not to have, an abortion.[99] Consistent with this interpretation, the Commission's definition of "pregnancy, childbirth, or related medical conditions" includes both having an abortion and choosing not to have an abortion, thus protecting pregnant employees who decide to continue their pregnancies.[100]

Comments Regarding the Commission's Proposed Definition of "Pregnancy, Childbirth, or Related Medical Conditions" and the Interaction Between State Laws Regarding Abortion and the PWFA

Some comments asserted that covered entities cannot be required to provide accommodations relating to an abortion because some State laws prohibit abortion under certain circumstances. Some comments also noted that some State laws provide that an individual may sue another individual for conduct that aids in the performance of an abortion in violation of State law. A few

comments stated that the rule will compel State and local governments to provide accommodations contrary to State law, and that doing so transgresses limits of federalism; one comment asserted that certain Senators were concerned about litigation against the States and voted to remove the PWFA's text that waives State immunity to lawsuits.

Response to Comments Regarding the Commission's Proposed Definition of "Pregnancy, Childbirth, or Related Medical Conditions" and the Interaction Between State Laws Regarding Abortion and the PWFA

The Commission does not agree with comments that the inclusion of abortion in the definition of "pregnancy, childbirth, or related medical conditions" requires covered entities, including State and local governments, to violate State laws that limit access to abortion, nor does the rule transgress limits of federalism. The rule does not prescribe when, where, or under what circumstances an abortion can be obtained or what procedures may be used. If the issue of a PWFA accommodation regarding abortion arises, it will likely concern only a request by a qualified employee for leave from work.[101] Accordingly, State laws that regulate the provision of abortions in certain circumstances do not conflict with covered entities' obligations under the PWFA.

Any potential interaction or conflict between PWFA and State laws, including State laws that allow civil suits to challenge actions that private individuals claim aid in the provision of an abortion, will be addressed on a case-by-case basis. Of note, the PWFA does not require an employer to pay for an abortion, and neither does the regulation.[102]

---

[98] For example, the contention that abortion causes mental health issues for women is refuted by major mental health organizations. Am. Psych. Ass'n, *Abortion* (2024), *https://www.apa.org/topics/abortion; see also* Healthline, *Understanding the Relationship Between Abortion and Mental Health* (July 6, 2023), *https://www.healthline.com/health/abortion-and-mental-health;* M. Antonia Biggs et al., *Women's Mental Health and Well-Being 5 Years After Receiving or Being Denied an Abortion: A Prospective, Longitudinal Cohort Study,* 74 JAMA Psychiatry 169 (Feb. 2017), *https://jamanetwork.com/journals/jamapsychiatry/fullarticle/2592320.*

[99] *See, e.g., EEOC v. Ryan's Pointe Houston, LLC,* No. 19–20656, 2022 WL 4494148, at *7 (5th Cir. Sept. 27, 2022); *Velez v. Novartis Pharms. Corp.,* 244 FRD. 243, 267 (S.D.N.Y. 2007) (including a declaration by a female employee that she was encouraged by a manager to get an abortion as anecdotal evidence supporting a class claim of pregnancy discrimination); *Enforcement Guidance on Pregnancy Discrimination, supra* note 31, at (I)(A)(4)(c).

[100] *See, e.g., Ryan's Pointe Houston,* 2022 WL 4494148, at *7; Press Release, EEOC, *Best Western Hotels in Tacoma and Federal Way To Pay $85,000 To Settle EEOC Suit for Harassment* (July 5, 2012) (announcing settlement of a harassment case by the EEOC that included allegations that the harasser belittled the religious beliefs of employees, including telling a pregnant employee she should have an abortion even though she said it was against her religious beliefs).

[101] 42 U.S.C. 2000gg–5(a)(2) provides that "[n]othing in this chapter shall be construed . . . by regulation or otherwise, to require an employer-sponsored health plan to pay for or cover any particular item, procedure, or treatment or to affect any right or remedy available under any other Federal, State, or local law with respect to any such payment or coverage requirement." Some comments speculated that employers, including State and local governments, could violate State laws restricting abortion access if they provided leave to employees who then traveled across State lines to obtain abortion care. The Commission notes that employees can currently use their leave to do so, and the comments did not explain why the leave being a reasonable accommodation under the PWFA would create a different set of circumstances or a different result.

[102] *See* 42 U.S.C. 2000gg–5(a)(2); 88 FR 54745 (stating that "nothing in the PWFA requires or forbids an employer to pay for health insurance benefits for an abortion"). Covered entities may, however, be subject to Title VII's provisions regarding abortion coverage in certain circumstances. *See* 42 U.S.C. 2000e(k).

The Commission agrees that State and local governments are covered employers and are required to provide accommodations under the PWFA, absent undue hardship. As stated above, any potential interaction or conflict between a State law and the PWFA will be addressed on a case-by-case basis. Further, States and local governments that are covered by the PWFA are covered by Title VII, which has protected employees' rights to be free from discrimination in employment for having, or for not having, an abortion for nearly 45 years, and yet comments on this topic did not point to a situation where a State was forced to violate its own laws. Finally, Congress did not vote to remove the section of the PWFA that waives State sovereign immunity; that provision is in 42 U.S.C. 2000gg–4.

Ultimately, whether any particular action taken by an employer pursuant to the PWFA could potentially implicate State law is dependent on the content of each individual State's laws, including how those laws are interpreted by each State's courts. As noted above, commenters did not identify any real-world scenarios in which Title VII's protections for employees' rights with regard to abortion have led to employer concerns about liability under State law. To the extent any such issues arise in connection with the PWFA, the Commission believes they are best addressed on a case-by-case basis, particularly given the State- and fact-specific nature of these issues.

Comments Regarding the Commission's Proposed Definition of "Pregnancy, Childbirth, or Related Medical Conditions" and the Major Questions Doctrine

Some comments argued that to include abortion in the definition of "pregnancy, childbirth, or related medical conditions" implicates the major questions doctrine.[103]

In claiming that the major questions doctrine applies, comments stated that abortion has been a heated political topic or a source of moral controversy;

that the *Dobbs* majority and dissent both found abortion to have important economic consequences; and that the possibility of reasonable accommodations for an abortion meets the threshold of deep political significance, implicating the major questions doctrine. Comments also stated that the Commission must show that the decision to allow for possible reasonable accommodations for an abortion, absent undue hardship, was clear in the text of the PWFA at the time of enactment; that if Congress wanted to put paid abortion leave into the PWFA, it would have done so explicitly; and that the Commission may not issue regulations with vast political significance unless clearly directed by Congress.

By contrast, other comments disputed whether the major questions doctrine applies to the PWFA and the Commission's definition of "pregnancy, childbirth, or related medical conditions." For instance, one detailed comment noted that the Supreme Court has limited the major questions doctrine to a narrow category of extraordinary paradigm cases that are very different from the posture of the PWFA rulemaking.[104] The comment stated that none of the indicia of a major question exist in this rulemaking—the Commission is merely interpreting a phrase the same way it did in Title VII, with no change to the prevailing interpretation of this longstanding statutory text. Additionally, the comment asserted the rule does not address questions of such vast economic and political significance as to raise a presumption against congressional delegation of authority and the comment supported the rule as an exercise of agency authority to interpret and implement a statute, using the same long-established textual interpretation as in a related statute.

Response to Comments Regarding the Commission's Proposed Definition of "Pregnancy, Childbirth, or Related Medical Conditions" and the Major Questions Doctrine

The Commission disagrees that inclusion of abortion in the definition of "pregnancy, childbirth, or related medical conditions" implicates the major questions doctrine. The inclusion of abortion in the definition of "pregnancy, childbirth, or related medical conditions" is for the limited purpose of qualifying for a workplace

accommodation under the PWFA, which is subject to defenses and case-by-case assessment. Moreover, the Commission anticipates that any requests for accommodations related to abortion will typically involve the provision of unpaid leave. Thus, including abortion in the definition of "pregnancy, childbirth, or related medical conditions" is not the type of "extraordinary case[]" that implicates the major questions doctrine.[105] The Commission is simply implementing Congress' intent by confirming that the term "related medical conditions" has the same meaning given to the term in Title VII for over four decades. Thus, the Commission is effectuating a policy decision made by Congress itself, not claiming a "newfound power" that would "represent[] a transformative expansion in its regulatory authority" or "make a radical or fundamental change to a statutory scheme."[106] And no court has applied the major questions doctrine to the Commission's identical interpretation of Title VII's identical text.

The provision of possible reasonable accommodations for known limitations related to an abortion does not have the type of economic impact found in other cases that successfully invoked the major questions doctrine. Because the PWFA prohibits any requirement "by regulation or otherwise . . . [for] an employer-sponsored health plan to pay for or cover a particular item, procedure, or treatment," the Commission anticipates that most requests for accommodations related to an abortion will involve only the provision of leave, which will likely be unpaid.[107] Thus, any economic impact will be minimal.

Further, the Commission's use of the term does not "effec[t] a 'fundamental revision of the statute, changing it from [one sort of] scheme of . . . regulation' into an entirely different kind";[108] rather, it implements a new statute by harmonizing the meaning of "pregnancy, childbirth, or related medical conditions" in Title VII and the PWFA. The "consistency of [an agency's] prior position is significant" when it comes to the major questions doctrine, because "[i]t provides important context" about what Congress "understood" the statute to permit.[109]

---

[103] The major questions doctrine applies to "extraordinary cases that call for a different approach—cases in which the history and the breadth of the authority that [the agency] has asserted, and the economic and political significance of that assertion, provide a reason to hesitate before concluding that Congress meant to confer such authority." *West Virginia* v. *EPA*, 597 U.S. 697, 721 (2022) (internal quotation marks omitted). Under this doctrine, the Court has rejected agency claims of statutory authority when: (1) the underlying claim of authority concerns an issue of "vast economic and political significance," and (2) Congress has not clearly empowered the agency with authority over the issue. *Util. Air Regul. Grp.* v. *EPA*, 573 U.S. 302, 324 (2014) (internal quotation marks omitted).

[104] *See* Comment EEOC–2023–0004–98328, Professors Greer Donley, David S. Cohen, Rachel Rebouche, Kate Shaw, Melissa Murray, and Leah Litman (Oct. 10, 2023).

[105] *See West Virginia,* 597 U.S. at 721.

[106] *Id.* at 723–24 (internal quotation marks omitted).

[107] *See* 42 U.S.C. 2000gg–5(a)(2).

[108] *Biden* v. *Nebraska,* 600 U.S. ___, 143 S. Ct. 2355, 2373 (2023) (quoting *West Virginia,* 597 U.S. at 728).

[109] *FDA* v. *Brown & Williamson Tobacco Corp.,* 529 U.S. 120, 157 (2000).

"Congress must be taken to have been familiar with the existing administrative interpretation." [110] The relevant statutory language—"pregnancy, childbirth, or related medical conditions"—has a well-documented, consistent, and historical definition, and the Commission is within its authority to use that definition in implementing a new statute.

By contrast, were the Commission to stray from Title VII's interpretation of "pregnancy, childbirth, or related medical conditions" for the purpose of adopting a definition that excluded abortion, the Commission would be taking a novel stance, contrary to the language of the PWFA and the intent expressed by Congress in using the language of Title VII.

#### Comment Regarding the Commission's Proposed Definition of "Pregnancy, Childbirth, or Related Medical Conditions" and Separation of Powers Concerns

One comment raised a constitutional objection to the Commission's structure, asserting that the President can remove Commissioners "only for cause."

#### Response to Comment Regarding the Commission's Proposed Definition of "Pregnancy, Childbirth, or Related Medical Conditions" and Separation of Powers Concerns

The Commission disagrees that there is any constitutional defect in the agency's structure, and, in any event, the comment provides no basis to believe that anything about the rule or its implementation would be different if the Commission had a different structure.

#### 1636.3(c) Employee's Representative

Several comments suggested additions to the definition of "employee's representative," including "union representative," "co-worker," and "manager." The Commission has added "union representative" to the list, which is further illustrated in Example #31. The addition reflects an important kind of representative and differs from the other illustrative third parties listed. The Commission has not made further changes to the list. The list in the proposed regulation mirrors that set out in ADA [111] policy and is not exhaustive. Further, the Commission believes that

[110] *McFeely* v. *Comm'r of Internal Revenue,* 296 U.S. 102, 110 (1935).

[111] *See* EEOC, *Enforcement Guidance on Reasonable Accommodation and Undue Hardship under the ADA,* Question 2 (2002) [hereinafter *Enforcement Guidance on Reasonable Accommodation*], *http://www.eeoc.gov/laws/ guidance/enforcement-guidance-reasonable-accommodation-and-undue-hardship-under-ada.*

the addition of "manager" would not add clarity to the definition and would risk confusing management officials about their roles and obligations under the PWFA.

Other comments proposed changing "other representative" to what they believe to be more descriptive language, such as "any other person who communicates." The Commission is maintaining "representative" because it is the language used in the statute.

Several comments recommended that the rule require the employee's representative to have the employee's permission to communicate the employee's limitation. The Commission expects that normally the representative will have the employee's permission but notes that there may be situations, for example when the employee is incapacitated, where that may not be possible. The Commission has added this information in the Interpretive Guidance in section *1636.3(c) Employee's Representative.* The Commission declines to delineate a specific form or manner for an individual to be considered a representative because this would unnecessarily increase the burden on employees and potentially delay the processing of an accommodation request. The PWFA intends to make seeking and obtaining an accommodation efficient and effective. Requiring an employee to submit evidence of their authorization to enable a third party to request an accommodation on their behalf would thwart the PWFA's efforts to make such communication a simple task.

Several comments proposed that once the employee's representative has made the need for an accommodation known, the employer must then engage in the interactive process directly with the employee. Again, the Commission expects that this will be the normal situation but notes, for example, that when the employee is incapacitated or the representative is the employee's attorney, the employer may need to continue to engage with the representative rather than the employee. The Commission has added information to this effect in the Interpretive Guidance in *1636.3(c) Employee's Representative.* Finally, the Commission has removed the word "known" before "limitation" in the Interpretive Guidance for this section because the limitation is not "known" until it has been communicated.

#### 1636.3(d) Communicated to the Employer

The Commission received numerous comments regarding the definition of

"communicated to the employer," what information the employee should have to provide to the employer, with whom the employee should communicate, and what the employer can or cannot require the employee to do after the initial request.

Several comments correctly pointed out that the statutory definition of "communicated to the employer" in the PWFA does not include a description or requirement of how the employee must request a reasonable accommodation. Thus, the Commission has moved the information regarding how an employee requests a reasonable accommodation (formerly in proposed § 1636.3(d)(3)) to the section of the rule regarding reasonable accommodations (§ 1636.3(h)(2)). Although these sections are now separate and therefore follow the statutory text more closely, they have many important commonalities. Specifically, both communicating to the employer regarding the limitation and requesting a reasonable accommodation should be simple processes that do not require any specific language; both can be made to the same people at the covered entity at the same time; and for both there are limitations as to the information the covered entity can require. In practice, the Commission recognizes that in most cases these communications will occur simultaneously: an employee will communicate about their limitation in the process of informing the employer that they need an adjustment or change at work for reasons related to the limitation.

Thus, the final regulation's definition of "communicated to the employer" consists only of § 1636.3(d) introductory text and (d)(1) and (2) from the NPRM. Paragraph (d)(3), with some modifications, has been moved to § 1636.3(h)(2).

Section 1636.3(d) of the proposed regulation stated that "communicated to the employer" means to be made known to the covered entity either by communicating with a supervisor, manager, someone who has supervisory authority for the employee (or the equivalent for an applicant), or human resources personnel, or by following the covered entity's policy to request an accommodation. Several comments suggested that this list include someone "who directs the employee's tasks" in order to better reflect circumstances where a workplace may not use a supervisory structure or specific job titles. The Commission agrees that this additional language will help employees and covered entities better understand that such communication also is appropriately directed to those

individuals whom an employee would normally consult if they had a question or concern. Thus, the final rule includes the addition of "or who regularly directs the employee's tasks." Some comments also suggested that the Commission clarify that the entity with whom the employee may communicate could include any agents of the employer such as a search firm, staffing agency, or third-party benefits administrator. The Commission has included that information in the Interpretive Guidance in section *1636.3(d) Communicated to the Employer and 1636.3(h)(2) How To Request a Reasonable Accommodation* and has covered these entities in the regulation by adding "another appropriate official," a term that also serves to cover other entities with authority for the employee who may not have one of the titles used in the rest of this portion of the regulation.

Paragraph (d)(1) has not changed from the NPRM. In paragraph (d)(2), the Commission has added that the communication regarding the limitation need not use specific words in order for it to be considered "communicated to the employer." The Commission also has changed the structure of this sentence so that it matches that of paragraph (d)(1) and refers to the communication, rather than what a covered entity may or may not require and has slightly changed the wording of the prohibitions. For example, the proposed rule said, "any specific format" and the final rule says, "in a specific format"; and the proposed rule said, "any particular form" and the final rule says, "on a specific form."

In the Interpretive Guidance in section *1636.3(d) Communicated to the Employer and 1636.3(h)(2) How To Request a Reasonable Accommodation,* the Commission has combined the information for § 1636.3(d) and (h)(2) to emphasize that the communication of the limitation and the request for an accommodation will usually happen at the same time, that both should be simple tasks, and that both are governed by the same rules regarding with whom the employee may communicate, and the lack of a requirement for any specific words or forms (§ 1636.3(d)). The Commission also has added information explaining that, because many situations that may qualify for coverage under the PWFA could be classified as either a "limitation" (a physical or mental condition related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions) or "pregnancy, childbirth, or related medical conditions," employees do not need to identify a specific part of the regulation under which they believe they are entitled to coverage in order to make a request. Employers should not decide that an employee is not covered by the PWFA or otherwise restrict an employee's rights under the PWFA because the employer thinks the employee has improperly labeled something a "limitation" when it is better characterized as a "related medical condition," or the reverse. For example, if an employee needs bed rest because they are pregnant and have placenta previa, the placenta previa could be the "physical or mental condition" related to, affected by, or arising out of pregnancy, or the placenta previa could be a "related medical condition" to pregnancy and the physical or mental condition could be the need to limit walking or standing. In either instance, the employee is covered by the PWFA and can request an accommodation.

The Interpretive Guidance in section *1636.3(d) Communicated to the Employer and 1636.3(h)(2) How To Request a Reasonable Accommodation* also has been modified to explain that an employee is not required to identify the statute under which they are requesting a reasonable accommodation (*e.g.,* the ADA, the PWFA, or Title VII). Doing so would require that employees seeking accommodations use specific words or phrases, which the regulation prohibits.

Finally, the Commission has added information to the Interpretive Guidance that explains the types of people with whom the employee may communicate as set out in the final rule. The Commission has moved the examples that were in § 1636.3(d) in the NPRM to section *1636.3(h)(2) How To Request a Reasonable Accommodation* in the Interpretive Guidance and has added an explanation at the start of the list of examples regarding the communications, rather than having an explanation after each example.

### 1636.3(e) Consideration of Mitigating Measures

The Commission received very few comments concerning mitigating measures. The language in the final rule is unchanged from the proposed rule and is the same as the language in the ADA regulation, except that the Commission made a minor edit for accuracy to remove the word "known" from § 1636.3(e)(1). This edit is necessary because the consideration of mitigating measures would only affect the determination of whether an employee has a limitation and not whether that limitation is "known." The Commission further changed language in the Interpretive Guidance in section *1636.3(e) Consideration of Mitigating Measures* slightly to point out that the ameliorative effects of mitigating measures can be considered when determining the appropriate reasonable accommodation.[112]

### 1636.3(f) Qualified Employee

### 1636.3(f)(1) With or Without Reasonable Accommodation

The Commission received very few comments concerning the definition of "qualified employee" as an employee who, with or without reasonable accommodation, can perform the essential functions of the job. The final rule maintains the language from the proposed rule, which uses the language from the ADA.

The Commission also did not receive many comments regarding the definition of "qualified" for the reasonable accommodation of leave and has maintained that definition and the language in § 1636.3(f)(1) and in the Interpretive Guidance in section *1636.3(f)(1)* under *"Qualified" for the Reasonable Accommodation of Leave.* The Commission addresses other comments it received regarding leave as a reasonable accommodation in the preamble in section *1636.3(h)* under *Particular Matters Regarding Leave as a Reasonable Accommodation.*

### 1636.3(f)(2) Temporary Suspension of an Essential Function(s)

The Commission received numerous comments regarding the definition of "qualified" with regard to the temporary suspension of essential function(s), the definition of "temporary," the definition of "in the near future," how different periods of temporary suspension of essential function(s) should be considered, whether more than one essential function can be suspended, and the meaning of "can be reasonably accommodated."

Preliminarily, it is important to emphasize that the definition of "qualified" that includes the temporary suspension of an essential function is taken directly from the text of the statute. It is not a creation of the Commission, and the Commission could not ignore it or read it out of the statute, as some comments suggested. Second,

---

[112] The Commission notes that "mitigating measures" for the purposes of the PWFA are not the same as "mitigation measures" taken as part of occupational safety and health which refer to actions taken by employers. *See, e.g.,* U.S. Dep't of Health & Hum. Servs., Ctrs. for Disease Control & Prevention, Nat'l Inst. for Occupational Safety & Health, *Hierarchy of Controls* (Jan. 17, 2023), *https://www.cdc.gov/niosh/topics/hierarchy/default.html.*

as noted in the NPRM, this definition of "qualified" is relevant only when an employee cannot perform one or more essential functions of the job in question, with or without a reasonable accommodation, due to a known limitation. It is not relevant in any other circumstance. If the employee can perform the essential functions of the position with or without a reasonable accommodation, the first definition of "qualified" applies (*i.e.*, able to do the job with or without a reasonable accommodation). Third, this definition is relevant solely to determining whether an employee is "qualified." An employer may still defend the failure to provide a reasonable accommodation based on undue hardship. Thus, the Commission responds to concerns regarding the possible disruption of production or scheduling or difficulties in accommodating the temporary suspension of an essential function(s) that a certain employer may face in the discussion of undue hardship (in the preamble in section *1636.3(j)(3) Undue Hardship—Temporary Suspension of an Essential Function(s)*) rather than in the discussion of the definition of "qualified."

### 1636.3(f)(2)(i) Temporary

The Commission received several comments regarding the definition of "temporary." Some asserted that the Commission's definition was subsumed by the definition of "in the near future," while others argued that the definitions of "temporary" and "in the near future" should be the same. The Commission has not changed the definition of "temporary." As Congress set out two terms ("temporary" and "in the near future"), the Commission should define both and not assume that they are the same. The definition that the Commission proposed in the NPRM for "temporary" is consistent with the dictionary definition of this term and the legislative history of the provision.[113]

### 1636.3(f)(2)(ii) In the Near Future

The Commission's proposed definition of "in the near future" had four parts: (1) how long this would be for a current pregnancy (generally 40 weeks); (2) how long this should be for conditions other than a current pregnancy (generally 40 weeks); (3) how leave should not count in the determination of the time for which an essential function(s) is temporarily suspended; and (4) how to address successive periods of suspension of essential function(s). As discussed

below, the Commission is maintaining the provisions in the NPRM for issues 1, 3, and 4.

Comments and Response to Comments Regarding the Definition of "In the Near Future"

The NPRM proposed that for both a current pregnancy and conditions other than a current pregnancy it would be presumed that the employee could perform the essential functions of the position "in the near future" if they could do so within generally 40 weeks.

Many comments supported the idea that for a current pregnancy, an employee would be considered qualified if they could perform the essential function(s) generally within 40 weeks of the suspension of the essential function(s). As these comments pointed out, this would allow a pregnant employee the ability to continue working and earning a paycheck during their pregnancy, even if due to a known limitation they had to temporarily suspend an essential function(s). As one comment noted, a shorter time could lead to "dangerous and perverse consequences" such as employees "saving up" their ability to request the temporary suspension of essential function(s), leading to potential risks to their health or the health of their pregnancy early in the pregnancy, or employees being temporarily excused from essential function(s) early in their pregnancy only to have to resume them later in their pregnancy in order to keep earning a paycheck.[114]

Several comments argued against the definition of "generally 40 weeks" for a current pregnancy, stating that such a long time was not within the intent of Congress, was outside the scope of the Commission's regulatory authority, and was not in keeping with how courts have defined this term in cases regarding leave and the ADA.

For conditions other than a current pregnancy, including post-pregnancy, the NPRM also proposed "in the near future" to mean generally 40 weeks. Several comments, based on the health care studies cited in the NPRM, recommended that for post-pregnancy reasons the definition of "in the near future" should be 1 year. These comments also recommended that the definition of "in the near future" for lactation-related accommodations that require the temporary suspension of an essential function(s) be 2 years, based on the recommendation of the American Academy of Pediatrics.

Other comments pointed out that although pregnancy has a generally accepted length, other conditions do not. As a result, these comments asserted, an individualized assessment, akin to when a person with a disability is having surgery and then must go on leave, is more appropriate. Other comments suggested that the definition should be less than 6 months, based on an ADA case cited in the House Report on the PWFA.[115]

In the final rule, the Commission has changed the provision in the regulation defining "in the near future" at § 1636.3(f)(2)(ii) so that the determination will be made on a case-by-case basis. This determination, however, includes the concept from the NPRM's definition of "in the near future," which explained that, if the employee is pregnant, it is assumed that the employee could perform the essential function(s) in the near future because they could perform the essential function(s) within generally 40 weeks of their suspension.

The Commission is retaining "generally 40 weeks" [116] in the final regulation's definition of "in the near future" for pregnant employees for several reasons. First, one of the purposes of the PWFA is to provide pregnant employees with the ability to keep working while they are pregnant in order to protect their economic security as well as their health and the health of their pregnancy. Given the established length of pregnancy, this goal cannot be met if the employee is not considered qualified simply because they have to suspend an essential function(s) for generally 40 weeks. Second, Congress did not provide a definition for "in the near future" but did give the Commission rulemaking authority for the statute.[117] Defining terms within a statute that have not been defined by Congress is well within the rulemaking authority of the agency directed by the law to write rules for it.[118] Furthermore,

---

[113] 88 FR 54777.

[114] Comment EEOC–2023–0004–98298, A Better Balance 29–30 (Oct. 10, 2023).

[115] H.R. Rep. No. 117–27, pt. 1, at 28 (citing *Robert v. Bd. of Cnty. Comm'rs of Brown Cnty.*, 691 F.3d 1211, 1218 (10th Cir. 2012)). However, the Commission notes that the House Report does not assign a definition to "in the near future." Although *Robert* notes an Eighth Circuit case that found that a 6-month leave request "was too long to be a reasonable accommodation," it stated that with respect to the durational element of in the "near future," "this court has not specified how near that future must be" and declined to address whether a more than 6-month accommodation "exceeded reasonable durational bounds." *Robert*, 691 F.3d at 1218.

[116] One comment noted that pregnancy can last 42 weeks or longer. To account for this, the EEOC is using the phrase "generally 40 weeks."

[117] 42 U.S.C. 2000gg–3(a).

[118] *See AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 397 (1999) ("Congress is well aware that the

as explained below, courts have generally determined that indefinite amounts of time cannot be "in the near future." Because pregnancy by definition is not indefinite, defining "in the near future" to be the length of a pregnancy is consistent with the views of courts and with the purpose of the PWFA.

Those who opposed generally 40 weeks as the definition of "in the near future" for pregnant employees did not explain how a shorter definition would impact pregnant employees or why the definition should change from workplace to workplace, given the established length of pregnancy. Given that there is a history of employers failing to provide pregnant employees light duty positions to the severe detriment of those employees, even after the Supreme Court's decision in *Young* v. *United Parcel Service*,[119] and Congress's awareness of this problem,[120] the Commission believes it is necessary to define "in the near future" for the PWFA's second definition of "qualified" as the full length of a pregnancy. The Commission agrees with comments stating that a shorter period of time could create situations where an employee continues to perform an essential function(s) in order to save time when they are not required to perform the essential function(s) for later in their pregnancy or following childbirth, thus imperiling their health or the health of the pregnancy, or where an employee is forced to return to the performance of an essential function(s) later in their pregnancy, despite the health risks. The Commission reiterates that this rule does not mean that a pregnant employee is automatically entitled to the temporary suspension of one or more essential functions for 40 weeks, or that the employee will need the suspension of one or more essential functions for 40 weeks. The temporary suspension must be able to be reasonably accommodated, and the employer retains the ability to establish that the reasonable accommodation causes an undue hardship.

The Commission agrees that there should not be a presumptively consistent measure of the term "in the near future" for issues other than current pregnancy. The physical or mental conditions related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions faced by employees other than those who are currently pregnant certainly may be serious and may, in some cases, mean that an employee may seek to have one or more essential functions of the job temporarily suspended. Unlike a current pregnancy, however, there is not a consistent measure of how long these diverse conditions generally will last or, thus, of what "in the near future" might mean in these instances.

In explaining the inclusion of this additional definition of "qualified," the House Report analogized the suspension of an essential function under the PWFA to cases under the ADA regarding leave.[121] Thus, ADA leave cases provide some helpful guideposts for employers and employees to understand this term in the context of whether an employee is "qualified" under the PWFA in situations not involving a current pregnancy. First, an employee who needs indefinite leave (that is, leave for a period of time that they cannot reasonably estimate under the circumstances) cannot perform essential job functions "in the near future."[122] Similarly, a request to indefinitely suspend an essential function(s) cannot reasonably be considered to meet the standard of an employee who could perform the essential function(s) "in the near future." However, the Commission notes that the temporary suspension of an essential function(s) is not "indefinite" simply because the employee cannot pinpoint the exact date when they expect to be able to perform the essential function(s) or can provide only an estimated range of dates.[123] Nor do these circumstances mean that the employee cannot perform the job's essential functions "in the near future."[124]

Beyond an agreement that an indefinite amount of time does not meet the standard of "in the near future," courts' definitions of how long a period of leave may be under the ADA and still be a reasonable accommodation (thus, allowing the individual to remain qualified) vary.[125] The Commission

---

ambiguities it chooses to produce in a statute will be resolved by the implementing agency."); *Smiley* v. *Citibank (South Dakota), N.A.*, 517 U.S. 735, 740–41 (1996) ("'[T]hat Congress, when it left ambiguity in a statute meant for implementation by an agency, understood that the ambiguity would be resolved, first and foremost, by the agency, and desired the agency (rather than the courts) to possess whatever degree of discretion the ambiguity allows."); *Chevron, U.S.A., Inc.* v. *Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984) ("The power of an administrative agency to administer a congressionally created . . . program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress.") (omission in original) (citation omitted).

[119] 575 U.S. 206; *see, e.g., EEOC* v. *Wal-Mart Stores E., L.P.*, 46 F.4th 587 (7th Cir. 2022); *Legg* v. *Ulster Cnty.*, 820 F.3d 67 (2d Cir. 2016).

[120] H.R. Rep. No. 117–27, pt. 1, at 14–17.

[121] *Id.* at 27–28.

[122] *Id.; see also, e.g., Herrmann* v. *Salt Lake City Corp.*, 21 F.4th 666, 676–77 (10th Cir. 2021); *Cisneros* v. *Wilson*, 226 F.3d 1113, 1129 (10th Cir. 2000), *overruled on other grounds by Bd. of Trs. of Univ. of Ala.* v. *Garrett*, 531 U.S. 356 (2001).

[123] *See, e.g., Randall* v. *Smith & Edwards Co.*, 1:20–CV–00183, 2023 WL 3742818, at *33–*34 (D. Utah May 31, 2023) (determining that the employee, who requested leave to undergo liver transplant surgery, presented enough evidence to allow a reasonable jury to conclude that his leave request was not indefinite where evidence indicated that the employer understood that he could undergo the transplant "any day" and "would return to work within, at most, 12 weeks of his surgery"); *Ellis* v. *Salt Lake City Corp.*, 2:17–CV–00245, 2023 WL

2742756, at *11–*12 (D. Utah Mar. 31, 2023) (concluding that the employee's request to remain on leave until the appeal of her demotion was resolved was not a request for indefinite leave, as she "provided a general timeframe for her return in the near future"). *appeal filed* (10th Cir. May 2, 2023); *Johnson* v. *Del. Cnty. Cmty. Coll.*, 2:15–CV–01310, 2015 WL 8316624, at *1, *5 (E.D. Pa. Dec. 9, 2015) (determining that a custodian, who was on medical leave for nearly 5 months due to a knee injury and requested "a brief extension of medical leave" to undergo surgery and physical therapy, "did not request an indefinite leave"); *Criado* v. *IBM Corp.*, 145 F.3d 437, 443–44 (1st Cir. 1998) (concluding that an employee's request for additional leave to "allow her physician to design an effective treatment program" with no specific return date given could be a reasonable accommodation); *Graves* v. *Finch Pryun & Co.*, 457 F.3d 181, 185–86 (2d Cir. 2006) (reasoning that an employee's request "for 'more time' to get a doctor's appointment" that would take "maybe a couple weeks" was not a request for indefinite leave).

[124] The fact that an exact date is not necessary is supported by the definition in the statute, which requires that the essential function(s) "could" be performed in the near future. 42 U.S.C. 2000gg(6)(B).

[125] *See, e.g., Robert*, 691 F.3d at 1218 (citing a case in which a 6-month leave request was too long to be a reasonable accommodation but declining to address whether, in the instant case, a further exemption following the 6-month temporary accommodation at issue would exceed "reasonable durational bounds") (citing *Epps* v. *City of Pine Lawn*, 353 F.3d 588, 593 (8th Cir. 2003)); *see also Blanchet* v. *Charter Commc'ns, LLC*, 27 F.4th 1221, 1225–26, 1230–31 (6th Cir. 2022) (determining that a pregnant employee who developed postpartum depression and requested a 5-month leave after her initial return date and was fired after requesting an additional 60 days of leave could still be "qualified," as additional leave could have been a reasonable accommodation); *Cleveland* v. *Fed. Express Corp.*, 83 F. App'x 74, 76–81 (6th Cir. 2003) (declining "to adopt a bright-line rule defining a maximum duration of leave that can constitute a reasonable accommodation" and determining that a 6-month medical leave for a pregnant employee with systemic lupus could be a reasonable accommodation); *Garcia-Ayala* v. *Lederle Parenterals, Inc.*, 212 F.3d 638, 641–42, 646–49 (1st Cir. 2000) (reversing the district court's finding that a secretary was not a "qualified individual" under the ADA because additional months of unpaid leave could be a reasonable accommodation, even though she had already taken over year of medical leave for breast cancer treatment, and rejecting per se rules as to when additional medical leave is unreasonable); *Nunes* v. *Wal-Mart Stores, Inc.*, 164 F.3d 1243, 1245–1247 (9th Cir. 1999) (holding that, because extending leave to 9 months to treat a fainting disorder could be a reasonable accommodation, an employee's inability to work during that period of leave did not automatically render her unqualified); *Cayetano* v. *Fed. Express Corp.*, No. 1:19–CV–10619, 2022 WL 2467735, at *1–*2, *4–*7 (S.D.N.Y. July 6, 2022) (determining that an employee who underwent shoulder surgery Continued

believes, however, that depending on the facts of a case "in the near future" may extend beyond the 6-month limit suggested by some comments under the PWFA for three reasons.

First, what constitutes "in the near future" may differ depending on factors including, but not limited to, the known limitation and the employee's position. For example, an employee whose essential job functions require lifting during only the summer months would remain qualified even if unable to lift during a 7-month period over the fall, winter, and spring months because the employee could perform the essential function "in the near future" (in this case, as soon as the employee was required to perform that function). Second, the determination of whether the employee could resume the essential function(s) of their position in the near future is only one aspect of establishing that an employee is qualified despite not being able to perform an essential function(s). If the temporary suspension cannot be reasonably accommodated or if the temporary suspension causes an undue hardship, the employer is not required to provide a reasonable accommodation. Third, as detailed in the NPRM, especially in the first year after giving birth, employees may experience serious health issues related to pregnancy, childbirth, or related medical conditions that may prevent them from performing the essential function(s) of their positions.[126] Accommodating these situations and allowing employees to stay employed is one of the key purposes of the PWFA. To assist employers and employees in making this determination, the Commission has included specific examples in the Interpretive Guidance in section *1636.3(f)(2) Qualified Employee—Temporary Suspension of an Essential Function(s)* regarding "in the near future" and non-pregnancy conditions.

Additionally, the Commission disagrees that the terms "temporary" and "in the near future" should be defined using the definition of "transitory" under the ADA.[127] Congress knew of this definition but decided not to incorporate it into the PWFA and used different terms ("temporary" and "in the near future," not "transitory").

**Comments and Response to Comments Regarding Leave Not Being Part of the Calculation of the Temporary Suspension of an Essential Function(s)**

The Commission did not receive many comments regarding whether leave should be counted as part of the definition of "qualified" for the suspension of an essential function(s). Those comments it did receive supported the Commission's view that it should not be counted; the Commission has maintained that position.

**Comments and Response to Comments Regarding Resetting the Clock for the Temporary Suspension of an Essential Function(s)**

The Commission received several comments regarding the proposal that the clock for determining "in the near future" should reset after childbirth. Some comments supported this for the reasons set out in the NPRM, specifically, that a pregnant employee cannot know whether or for how long they will need the temporary suspension of an essential function(s) after they give birth. Further, not resetting the clock could create the same issues discussed above of creating dangerous or perverse incentives for employees to "save" the temporary suspension of an essential function(s) for later in their pregnancy or post-pregnancy, even when it could lead to potential risks to their health or the health of their pregnancy. Conversely, several comments argued that allowing the clock to reset would permit employees to "stack" the temporary suspension of essential functions to get more than 40 weeks of an essential function(s) suspended. Given that the definition of "in the near future" for non-pregnancy issues has changed, this is less of a concern for the final rule. Additionally, as stated above, employees are not automatically granted 40 weeks of suspension of an essential function(s) during pregnancy under the regulation. Rather, they are merely considered "qualified." Many employees will need less than 40 weeks of a temporary suspension of an essential function(s).

The Commission also received comments recommending that resetting the clock be added to the regulation itself. Because this general rule—that the determination of "qualified" is made at the time of the employment decision[128]—applies to all accommodations, the Commission has not added it to this part of the regulation. The Commission has included this general rule in the Interpretive Guidance in section *1636.3(f) Qualified Employee* and has added a specific reference to when essential functions are being temporarily suspended to state that determining "in the near future" should start at the time of the employment decision in the Interpretive Guidance in section *1636.3(f)(2)(ii) In the Near Future.*

The Commission also received comments interpreting the statute to say that only one essential function could be temporarily suspended in a given pregnancy. The Commission disagrees. First, the Commission notes that in interpreting acts of Congress, "words importing the singular apply to several persons, parties, or things" unless the context indicates otherwise.[129] Further, such a rule would undercut the purpose of the PWFA and lead to lengthy delays for litigation about what specific essential function was being suspended and whether it was the same or a different function. Such a rule also does not reflect that a pregnant employee may need more than one essential function suspended or different essential functions suspended at different times.

*1636.3(f)(2)(iii) Can Be Reasonably Accommodated*

The Commission received a few comments on its proposed definition of "can be reasonably accommodated" that claimed that the NPRM had conflated this provision with undue hardship. Other comments suggested that this provision required a new definition, with a lower standard than "undue hardship," that a covered entity could meet to show that the temporary suspension of the essential function(s) could not be reasonably accommodated. The Commission disagrees with these comments and is retaining the definition of this section set forth in the NPRM. The Commission expects that the language that the temporary suspension of an essential function(s)

---

could be "qualified" because 6 months of leave is not per se unreasonable as a matter of law); *Durrant* v. *Chemical/Chase Bank/Manhattan Bank, N.A.*, 81 F. Supp. 2d 518, 519, 521–22 (S.D.N.Y. 2000) (concluding that an employee who was on leave for nearly 1 year due to a leg injury and extended her leave to treat a psychiatric condition could be "qualified" under the ADA with the accommodation of additional leave of reasonable duration).The Commission is aware of and disagrees with ADA cases that held, for example, that 2 to 3 months of leave following a 12-week FMLA period are presumptively unreasonable as an accommodation. *See, e.g., Severson* v. *Heartland Woodcraft, Inc.*, 872 F.3d 476, 481 (7th Cir. 2017).

[128] *See* Susanna Trost et al., U.S. Dep't of Health & Hum. Servs., Ctrs. For Disease Control & Prevention, *Pregnancy-Related Deaths: Data from Maternal Mortality Review Committees in 36 U.S. States, 2017–2019* (2022), *https://www.cdc.gov/ reproductivehealth/maternal-mortality/erase-mm/ data-mmrc.html* (stating that 53% of pregnancy-related deaths occurred from one week to one year after delivery, and 30% occurred one- and one-half months to one year postpartum).

[127] 42 U.S.C. 12102(3)(B).

[128] *See* 29 CFR part 1630, appendix, 1630.2(m).
[129] 1 U.S.C. 1.

"can be reasonably accommodated" will be interpreted similarly to the idea that an individual is "qualified" if they can do the job with or without a reasonable accommodation. If, under the first definition of "qualified," an employee cannot perform the essential functions of the position without a reasonable accommodation, and there is no reasonable accommodation, the employee is not qualified. Similarly, if the temporary suspension of the essential function(s) cannot be "reasonably accommodated," the employee is not qualified. Thus, the definition of "can be reasonably accommodated" provides suggested means by which the temporary suspension of an essential function(s) can be reasonably accommodated. Whether granting the accommodation would impose undue hardship on the operation of the business of the covered entity is a separate analysis.[130] The Commission has removed the reference to undue hardship from this section in the Interpretive Guidance in order to avoid any confusion.

The Commission made a few changes to the examples in this section in the Interpretive Guidance. The Commission deleted former Example #7 from this section. In former Examples #8 and #9 (now Examples #1 and #2), the Commission added: facts to clarify that there is work for the employees to accomplish; the phrase "affected by, or arising out of" after "related to"; and that the employees need an accommodation "due to" their limitation. The Commission removed the sentences regarding undue hardship in order to focus the examples on the issue of "qualified." The Commission also added three additional examples to this section.

### 1636.3(g) Essential Functions

The NPRM adopted the definition of "essential functions" contained in the ADA regulation and sought comment on whether there were additional factors that should be considered in determining whether a function is "essential" for the purposes of the PWFA. Several comments suggested clarifications or departures from the definition of "essential functions" set forth in the ADA. These suggestions included proposed additions to the overall definition of "essential functions"; a request to add a factor to

§ 1636.3(g)(1) to further explain when a particular function is "essential"; and requests to delete, add, combine, or reorganize the factors in § 1636.3(g)(2) that can establish whether a particular function is "essential."

First, a few comments suggested adding language to § 1636.3(g) that would define essential functions as discrete tasks and clarify that essential functions are not conditions of employment regarding when, where, and how discrete tasks are performed. The Commission declines to adopt this proposal. The term "essential functions" in the PWFA is the same term used in the ADA, and therefore the definition of "essential functions" in the ADA regulation is instructive.[131] The Commission concludes that the suggested departure from the language and definition used in the ADA regulation is not appropriate. Although in the Commission's view, conditions of employment that are completely divorced from any job duties (e.g., a requirement of "regular attendance" or "in-person work") are not essential functions in and of themselves, certain essential functions may need to be performed in a particular manner, time, or location.[132] For example, a neurosurgeon hired to perform surgeries may have to perform those surgeries in a sterile operating room; a receptionist hired to greet clients and answer calls during business hours may need to be available at certain times of day; and a truck driver responsible for transporting hazardous materials may need to use a specific type of vehicle. The final regulation, therefore, maintains the ADA regulatory language from 29 CFR 1630.2(n)(1).[133]

Second, the Commission received comments requesting that it add a factor to those listed in § 1636.3(g)(1) examining whether the function was essential during the limited time for which the accommodation is needed. As described in the next paragraph, the Commission has added this consideration to § 1636.3(g)(2). Because the list of factors in § 1636.3(g)(1) is non-exhaustive, the Commission has retained the factors in § 1636.3(g)(1).

Third, the Commission received comments requesting modification, addition, reorganization, or deletion of factors in § 1636.3(g)(2) that can be used to show a function is "essential." Because the factors in § 1636.3(g)(2) are

not exhaustive, the Commission declines to delete any factors, as this could incorrectly suggest that those factors are not relevant to PWFA accommodations. Additionally, the Commission declines to reorder any factors to emphasize their importance, as the factors in § 1636.3(g)(2) are not set forth in order of importance and the significance of any particular factor will vary by case. However, in response to comments that essential functions may change over time (or even by season), and that variations in essential functions are particularly important where the need for accommodation is temporary (as is the case for most known limitations), the Commission has made changes to § 1636.3(g)(2)(iii) to clarify that seasonal or other temporal variations in essential functions should be considered.

Some comments asked for clarification on whether the employer's judgment on essential functions is given priority and whether an employer's framing of the essential job functions can undermine or limit an individual's right to accommodation under the PWFA. First, as in the ADA, an employer's judgment as to which functions are "essential" is given due consideration among various types of relevant evidence but is not dispositive.[134] Therefore, evidence that is contrary to the employer's judgment may be presented and used to demonstrate the employer's judgment is incorrect. To this point, the Commission also has revised the language in the Interpretive Guidance in section *1636.3(g) Essential Functions* to reinforce that the listed factors in § 1636.3(g)(2) are non-exhaustive and fact-specific, which further underscores that no single factor is dispositive, that not all factors apply in each case, and that additional factors may be considered.

Finally, some comments questioned the effect of a temporary suspension of an essential function(s) as a reasonable accommodation on future determinations of whether the function was essential. Temporary suspension of an essential function(s) as a reasonable accommodation pursuant to the PWFA does not mean that the function(s) is no longer essential. Whether something is an essential function(s) remains a fact-specific determination, and the employer's temporary suspension of a job function(s) does not bar the employer from contending that the function(s) is essential for other accommodation requests in the future.

---

[130] *See, e.g., Barnett,* 535 U.S. at 401–02 (describing ADA accommodations cases where, to defeat summary judgment, a worker must show that the accommodation "seems reasonable on its face"; after such a showing, the employer must show specific circumstances to prove an undue hardship).

[131] H.R. Rep. No. 117–27, pt. 1, at 28.

[132] *See Enforcement Guidance on Reasonable Accommodation, supra* note 111, at Questions 22 & 34.

[133] For completeness, the Commission has added "with a known limitation under the PWFA" after the word "employee" in the regulation.

[134] *See* 29 CFR part 1630, appendix 1630.2(n).

*1636.3(h) Reasonable Accommodation—Generally*

*1636.3(h)(1) Definition of Reasonable Accommodation*

The Commission received very few comments regarding the definition of reasonable accommodation, which uses the language from the ADA with certain changes to account for the differences in statutes. The Commission is retaining the definition of reasonable accommodation from the NPRM, with the following technical edits to § 1636.3(h)(1): insertion of the term "qualified" in the definition of reasonable accommodation relating to applicants;[135] and removal of the term "qualified" and addition of the phrase "as are enjoyed by its other similarly situated employees without known limitations" in the definition of reasonable accommodation related to benefits and privileges of employment.[136] These technical edits are necessary so that the definition of reasonable accommodation parallels the ADA definition, as required by the PWFA.

The Commission also has moved the explanation of how to request a reasonable accommodation, which was formerly part of § 1636.3(d), to § 1636.3(h)(2). As a result, the parts of § 1636.3(h) have been renumbered so that the definition of reasonable accommodation is at § 1636.3(h)(1)(i) through (iv), and information regarding the interactive process is located at § 1636.3(h)(3).[137]

*1636.3(h)(2) How To Request a Reasonable Accommodation*

The final rule contains a new section, § 1636.3(h)(2), that explains how an employee may request a reasonable accommodation. This information was proposed to appear at § 1636.3(d).

The Commission received several comments regarding this section when it

was part of the "Communicated to the Employer" definition in the NPRM. First, comments expressed concern that the Commission's original language (that this was the process to "request" a reasonable accommodation) would add a requirement that employees phrase this as a "request" and that employees may not know that they have the right to make such a request. The Commission declines to change this provision. The examples in the NPRM (now Examples #6 to #11 in the Interpretive Guidance in section *1636.3(h)(2) How To Request a Reasonable Accommodation*) do not require that the communication be phrased as a request. Additionally, "request for accommodation" is the language the Commission uses in its ADA guidance,[138] and the Commission believes that changing the language on this point would create confusion. However, to respond to the comments, the Commission has added in the Interpretive Guidance in section *1636.3(h)(2) How To Request a Reasonable Accommodation* that a request for a reasonable accommodation need not be formulated as a "request."

Second, many comments suggested alternative language to proposed § 1636.3(d)(3)(i) and (ii) (§ 1636.3(h)(2)(i) and (ii) in the final rule), stating that the emphasis should be that the limitation necessitates a change (rather than the employee needing a change), that the rule should require a limitation "or" needing a change (rather than "and"), or that communicating the limitation was sufficient. The Commission declines to make these changes. First, the Commission does not think it is appropriate or accurate to require that the limitation "necessitates" a change; this may increase the burden on what an employee would have to show and would complicate what should be simple communication. Second, while the Commission agrees that the statute provides for accommodations for known limitations, having the process start simply because the employee communicated a known limitation could lead to situations where the accommodation process begins when it was not the employee's intention, or it could lead to covered entities assuming that an accommodation is necessary which could result in violations of 42 U.S.C. 2000gg–1(2).

Finally, some comments recommended including that the employee must connect the need for the change with the limitation. The

Commission agrees with this change and has added that idea to § 1636.3(h)(2) ("needs an adjustment or change at work due to the limitation"). As with the ADA and as shown in Examples #6 to #11, this is a simple communication that does not require specific words.

The Commission also has moved the point that was in § 1636.3(b) in the proposed regulation—that the employee need not mention a specific medical condition from the list in § 1636.3(b), or indeed any medical condition, or use medical terms—to § 1636.3(h)(2)(ii) so that all of the information about requesting an accommodation is in one place.

Many comments addressed with whom the employee must communicate in order to start the process. As with the definition of "Communicated to the Employer" (§ 1636.3(d)), the employer should permit an employee to request an accommodation through multiple avenues and means. Thus, the individuals at the covered entity to whom an employee may communicate to start the reasonable accommodation process are the same as those in § 1636.3(d), and the Interpretive Guidance language for that provision applies to requesting a reasonable accommodation as well. Some comments recommended against allowing for a broad range of individuals at the covered entity who could receive such requests because those who receive such requests require training; other comments stated that an employer should be able through its policy to limit the individuals who can receive such a request. The Commission did not make changes to support these views because the steps to request a reasonable accommodation should not be made more difficult and the individuals identified in § 1636.3(d) should be able to receive and direct the requests if they are not able to grant them independently.

Several comments also addressed whether the employer could require the process to start by the employee filling in a form and whether, if the employer had a process, the employee was required to follow it so that a request would be considered only when made to the entity identified in the employer's policy. The Commission did not adopt either of these views. First, requiring an employee to create a written request or to follow a specific provision to begin the reasonable accommodation process is contrary to the idea that this should not be a difficult or burdensome task for employees. Second, as one comment pointed out, some employees, such as those facing intimate partner violence, may be cautious or afraid of putting into

---

[135] As under the ADA, the term "qualified" in relation to applicants that are entitled to reasonable accommodation under the PWFA refers to whether the applicant meets the initial requirements for the job in order to be considered and not whether the applicant is able to perform the essential functions of the position with or without an accommodation. *See Enforcement Guidance on Reasonable Accommodation, supra* note 111, at Question 13, Example A and B.

[136] As under the ADA, reasonable accommodation to enable employees to enjoy equal benefits and privileges under the PWFA does not turn on whether an employee is qualified but on whether the benefit or privilege is available to those who are similarly situated. *See* 29 CFR 1630.2(o)(1)(iii).

[137] The Commission has not included the section from the proposed appendix "Additions to the Definition of Reasonable Accommodation" in the Interpretive Guidance because its explanation of the PWFA and ADA rule regarding the definition of reasonable accommodation is not necessary for the final Interpretive Guidance.

[138] *See Enforcement Guidance on Reasonable Accommodation, supra* note 111, at Question 1.

writing their need for an accommodation.[139] Third, many of the limitations and accommodations under the PWFA will be small or minor; the Commission expects that most accommodations will be provided following nothing more than a conversation or email between the employee and their supervisor, and there will not be any other forms or processes. If an employer does have a process to confirm what was stated in the initial request and that process uses a form, the form should be a simple one that does not deter the employee from making the request and does not delay the provision of an accommodation.

**Alleviating Increased Pain or Risk to Health Due to the Known Limitation**

First, the Commission received numerous comments recommending that the amelioration of pain or risk be added to the list in § 1636.3(h) for the definition of the term "reasonable accommodation." The Commission is not making this change. The statute at 42 U.S.C. 2000gg(7) states that the term "reasonable accommodation" shall have the same meaning under the PWFA as it has in the ADA and the regulation under the PWFA. Section 1636.3(h) uses the same definition as in the ADA and adds one paragraph regarding the temporary suspension of essential functions, which is necessary pursuant to 42 U.S.C. 2000gg(6). As explained in the NPRM and in the Interpretive Guidance in section *1636.3(h)* under *Alleviating Increased Pain or Risk to Health Due to the Known Limitation,* accommodations to alleviate increased pain or risk fit under the current paragraphs in § 1636.3(h)(1)(i) through (iv).[140] This includes situations where an employee can do the essential functions of the position, and the accommodation is to alleviate increased pain or risk due to the known limitation.[141] This is because the

reasonable accommodations operate to "remove[ ] or alleviate[ ]" a covered individual's "barriers to the equal employment opportunity," which may include making reasonable accommodations that mitigate the increased pain or a health risk a qualified employee experiences related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions when performing their job.[142]

Second, the Commission received several comments suggesting an edit to § 1636.3(i)(2) in the proposed regulation, which listed examples of possible reasonable accommodations. The comments pointed out that "adjustments to allow an employee or applicant to work without increased

pain or risk to the employee's or applicant's health or the health of the employee's or applicant's pregnancy" are the only accommodations listed that are expressly required to be "due to the employee's or applicant's known limitation," even though that is obviously true for any of the other listed accommodations. The Commission agrees and has made this edit.

Third, the Commission received numerous suggestions of additional examples to include in this section to illustrate modifications to alleviate increased pain or risk. The Commission has added additional examples and information in the Interpretive Guidance in section *1636.3(h)* under *Alleviating Increased Pain or Risk to Health Due to the Known Limitation,* including, as suggested by some comments, examples involving exposure to chemicals, commuting, excessive heat, and contagious diseases. The Commission also has deleted one example.

Finally, the Commission received some comments expressing concern that the proposed appendix examples' focus on what was and what was not related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions would lead to employers focusing on this issue, requiring documentation regarding this issue, and denying accommodations. These comments also pointed out that, given pregnancy's effect on the whole body, the situations set out in the examples, especially former Examples #10 and #13 (now Examples #12 and #15 in the Interpretive Guidance in section *1636.3(h)* under *Alleviating Increased Pain or Risk to Health Due to the Known Limitation*), were unrealistic and could cause covered entities and employees to waste time trying to determine whether a limitation was related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions. The Commission appreciates the concerns raised regarding these examples. At the same time, it is important that covered entities and employees understand the principles illustrated in the examples so that voluntary compliance with the PWFA is maximized. The Commission has edited these examples to account for these concerns by, for example, changing or deleting language regarding the limitations that in the example may not have been related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions. Finally, in order to highlight different reasons for accommodations, the Commission has changed one of the examples to include lactation.

[139] Am. Coll. Of Obstetricians & Gynecologists, Comm. Opinion No. 518, *Intimate Partner Violence* (Feb. 2012; reaff'd 2022), *https://www.acog.org/clinical/clinical-guidance/committee-opinion/articles/2012/02/intimate-partner-violence* ("Approximately 324,000 pregnant women are abused each year in the United States. . . . [T]he severity of violence may sometimes escalate during pregnancy or the postpartum period.").

[140] 88 FR 54727 n.85 ("Depending on the facts of the case, the accommodation sought will allow the employee to apply for the position, to perform the essential functions of the job, to enjoy equal benefits and privileges of employment, or allow the temporary suspension of an essential function of the job.").

[141] Many Federal circuit courts have considered this issue have agreed that under the ADA, an accommodation needed to enable an employee to work without pain or risk to health may be required, even if the employee can perform the essential job functions without the

accommodation. *See Burnett* v. *Ocean Props., Ltd.,* 987 F.3d 57, 68–69 (1st Cir. 2021) (observing that the plaintiff's ability to perform the essential functions of his job, albeit at the risk of bodily injury, "does not necessarily mean he did not require an accommodation or that his requested accommodation was unreasonable"); *Bell* v. *O'Reilly Auto Enters., LLC,* 972 F.3d 21, 24 (1st Cir. 2020) ("An employee who can, with some difficulty, perform the essential functions of his job without accommodation remains eligible to request and receive a reasonable accommodation."); *Hill* v. *Ass'n for Renewal in Educ.,* 897 F.3d 232, 239 (D.C. Cir. 2018) (rejecting the argument that no accommodation was required because the plaintiff "could perform the essential functions of his job without accommodation, 'but not without pain'"); *Gleed* v. *AT&T Mobility Servs.,* 613 F. App'x 535, 538–39 (6th Cir. 2015) (rejecting the argument that "if Gleed was physically capable of doing his job— no matter the pain or risk to his health—then it had no obligation to provide him with any accommodation, reasonable or not"); *Feist* v. *La. Dep't of Justice,* 730 F.3d 450, 453 (5th Cir. 2013) ("[T]he language of the ADA, and all available interpretive authority, indicate[s] that" "reasonable accommodations are not restricted to modifications that enable performance of essential job functions."); *Sanchez* v. *Vilsack,* 695 F.3d 1174, 1182 (10th Cir. 2012) (rejecting the argument that the Rehabilitation Act requires accommodation "only if an employee cannot perform the essential functions of her job"); *Buckingham* v. *United States,* 998 F.2d 735, 740 (9th Cir. 1993) (stating that, under the Rehabilitation Act, "employers are not relieved of their duty to accommodate when employees are already able to perform the essential functions of the job"). Even cases that have rejected this idea have done so on a very limited basis. *See Hopman* v. *Union Pac. R.R.,* 68 F.4th 394, 402 (8th Cir. 2023) (refusing to endorse the employer's argument that the ADA "requires employers to provide reasonable accommodations only when necessary to enable employees to perform the essential functions of their jobs" in all cases and observing that the requirement to accommodate will be fact-specific); *Brumfield* v. *City of Chicago,* 735 F.3d 619, 632 (7th Cir. 2013) (holding that "an employer need not accommodate a disability that is irrelevant to an employee's ability to perform the essential functions of her job," but not addressing whether alleviating pain is "irrelevant" to essential job functions).

[142] *See* 29 CFR part 1630, appendix, 1630.9 ("The reasonable accommodation requirement [under the ADA] is best understood as a means by which barriers to the equal employment opportunity of an individual with a disability are removed or alleviated.").

Ensuring That Employees Are Not Penalized for Using Reasonable Accommodations

The Commission received many comments agreeing with the general principle that covered entities must ensure that their workplace policies or practices do not operate to penalize employees for utilizing accommodations under the PWFA. Many of these comments also asked for additional clarification and examples.

First, numerous comments suggested that the Commission explicitly state that the general rule that a covered entity does not have to waive a production standard as a reasonable accommodation does not apply when an employee has received the temporary suspension of an essential function(s) as a reasonable accommodation and the production standard would normally apply to the performance of that function. Applying such a production standard when the essential function(s) is temporarily suspended would penalize the employee for using the reasonable accommodation. The Commission agrees and has made this clarification in the Interpretive Guidance in section *1636.3(h)* under *Ensuring That Employees Are Not Penalized for Using Reasonable Accommodations.*

One comment recommended clarifying that the definition of "production standards" includes not penalizing an employee for lower "productivity," "focus," "availability," or "contributions" if the employee's lower production in those areas is due to the employee's reasonable accommodation. The Commission agrees. For example, if, as a reasonable accommodation, an employee is not working overtime, and "availability" or "contribution" is measured by an employee's working overtime, an employee should not be penalized in these categories. This concept has been added to the Interpretive Guidance in section *1636.3(h)* under *Ensuring That Employees Are Not Penalized for Using Reasonable Accommodations.*

A few comments noted that in addition to potentially violating 42 U.S.C. 2000gg–1(5) and 2000gg–2(f), penalizing an employee for using a reasonable accommodation could violate 42 U.S.C. 2000gg–1(1), because by doing so the covered entity would not be providing an effective accommodation. The Commission agrees and has made this change in the Interpretive Guidance in section *1636.3(h)* under *Ensuring That Employees Are Not Penalized for Using Reasonable Accommodations.*

Several comments suggested examples for this section focusing on no-fault attendance policies and electronic productivity monitoring. The Commission added two examples to this section and moved Example #30 from the NPRM (now Example #22) to this section with some edits. The Commission also added language to the Interpretive Guidance in section *1636.3(h)* under *Ensuring That Employees Are Not Penalized for Using Reasonable Accommodations* about the types of rules that may need to be considered.

One comment stated that allowing employers to not pay for break time was, in effect, penalizing employees for taking those breaks. For the reasons explained in the section on leave, the Commission is adhering to the approach under the ADA that whether or not leave or breaks are paid depends on how the employer normally treats such time away from work and the requirements of other laws.

A final set of comments on this issue requested clarification regarding whether specific situations would be seen as penalizing an employee for using a reasonable accommodation. Specifically, comments asked whether pay could be lowered or whether merit-based incentives tied to the performance of the essential function(s) could be omitted if the employee was not performing an essential function(s). One comment asked whether an employee could be required to work extra time to make up for time spent on breaks.

Whether these situations regarding the temporary suspension of an essential function(s) would be viewed as penalizing a qualified employee in violation of the PWFA depends on certain factors. As stated in § 1636.4(a)(4), if a covered entity is choosing between accommodations, it must select the one that provides the qualified employee with equal employment opportunity, which includes no reduction in pay, advancement, or bonuses. If the only accommodation available for the temporary suspension of the essential function(s) requires the temporary reassignment of the qualified employee to a job that pays less, and the employer's practice in these situations is to lower the pay of employees temporarily assigned to such a position, the employer may make the temporary reassignment and the PWFA does not prohibit the employer from reducing the qualified employee's pay. Both conditions must be true: (1) that there is no other reasonable accommodation that does not pose an undue hardship and (2) that this is the employer's normal

practice in these situations. Similarly, an employer could limit bonuses related to the performance of an essential function(s) that has been temporarily suspended if there is not another accommodation that provides equal employment opportunity, and this is the employer's normal practice in these situations.

For situations where the reasonable accommodation is additional breaks, a qualified employee may be given the opportunity to make up the additional time and may choose to do so. However, if making up the time renders the accommodation ineffective (for example, because the breaks are due to fatigue), the employer may not require the qualified employee to do so.

Personal Use

The Commission received very limited comments on this section. The Commission has made one minor change to the language in the Interpretive Guidance for this section (removing reference to a "white noise machine").

Particular Matters Regarding Leave as a Reasonable Accommodation

The Commission received numerous comments on its discussion of leave as a reasonable accommodation, including requests for clarification regarding the purpose and length of leave as a reasonable accommodation, as well as the application of the undue hardship standard to leave. Other comments recommended changes to the rules for paid leave and the continuation of health insurance while on leave. Some suggested that the PWFA explicitly provide coverage for "extended leave."

As set out in the NPRM, the Commission has long recognized the use of leave as a potential reasonable accommodation under the ADA.[143] Leave as a reasonable accommodation under the PWFA can be for any known limitation and includes leave for health care and treatment of pregnancy, childbirth, and related medical conditions and recovery from pregnancy, childbirth, and related medical conditions. The Commission declines to include the term "extended leave" in the regulation or Interpretive Guidance. The amount of leave under the PWFA depends on the employee and the known limitation and thus the term "extended" in this context does not have a uniform definition. In response to a few comments, the Commission has changed the language in § 1636.3(i)(3)(i) slightly to specifically provide that leave is available to recover

[143] 88 FR 54728.

from any related medical condition. This was implied by the language in the NPRM, which stated that leave for recovery was available and described an explicitly non-exhaustive list of specific conditions. The Commission has also removed the word "receive" before "unpaid leave" in § 1636.3(i)(3)(i) to be consistent with how it refers to unpaid leave.

Two groups of comments sought clarifications regarding leave and undue hardship. First, some comments agreed with proposed § 1636.3(i)(3)(iv), which states that concerns about the length, frequency, or unpredictable nature of leave are questions of undue hardship. However, the comments also suggested that the Commission make clear that it is not merely the fact that leave is long, frequent, or unpredictable that makes it an undue hardship. Rather, those factors may be considered to the extent that they impact the established undue hardship considerations. Thus, the fact that leave is unpredictable is not sufficient—standing alone—to make it an undue hardship; rather, the employer would have to show the unpredictable leave caused significant difficulty or expense on the operation of the business. The Commission agrees with these comments. Because this concept sets out how undue hardship and leave should interact, the Commission has determined that it is more appropriately discussed in the Interpretive Guidance rather than the regulation itself. Section 1636.3(i)(3)(iv) has, therefore, been removed from the regulation and the issue is instead discussed in the Interpretive Guidance in section *1636.3(h)* under *Particular Matters Regarding Leave as a Reasonable Accommodation.*

The other set of comments regarding undue hardship stated that the mere fact that an employee has taken leave should not be determinative in assessing undue hardship, but rather the impact of that leave should be determined by using the undue hardship factors in § 1636.3(j)(2). The Commission agrees and has added this information to the Interpretive Guidance in section *1636.3(h)* under *Particular Matters Regarding Leave as a Reasonable Accommodation* because proposed § 1636.3(i)(3)(iv) has been removed from the regulation.

Many comments recommended that, instead of looking to an employer's policies for individuals in similar situations, paid leave and continuation of health insurance should be designated as possible accommodations under the PWFA. The Commission declines to make this change. The current language in the Interpretive Guidance in section *1636.3(h)* under

*Particular Matters Regarding Leave as a Reasonable Accommodation* is the same as under the ADA. The PWFA at 42 U.S.C. 2000gg(7) provides that the term "reasonable accommodation" should have the same meaning as in the ADA and the PWFA regulations. Thus, the Commission is maintaining this definition.

Finally, a few comments recommended that a short amount of leave (*e.g.,* 2 days) could be a reasonable accommodation while the covered entity determines what other reasonable accommodations are possible or during the interactive process. The response to this suggestion is discussed in the preamble in section *1636.3(h)* under *Interim Reasonable Accommodations.*

All Services and Programs

The Commission received very limited comments on this section. The Commission has added language in the Interpretive Guidance in section *1636.3(h)* under *All Services and Programs* to clarify that the term "all services and programs" includes situations where a qualified employee is traveling for work and may need, for example, accommodations at a different work site.

Interim Reasonable Accommodations

The Commission received numerous comments regarding interim reasonable accommodations, including requests to provide examples of when interim reasonable accommodations are needed, recommendations that the provision be strengthened or made mandatory, discussion of the provision of leave as an interim reasonable accommodation, and suggestions of alternative definitions for "interim reasonable accommodations."

Some comments provided helpful real-world examples of when interim reasonable accommodations are needed. For example, one comment stated that after asking for an accommodation, some pregnant employees are required to "continue to lift, push, and pull heavy objects" and "drive when not fit to do so" in violation of the recommendations of their health care providers as they wait for the decision about their reasonable accommodation from their employer.[144] The same comment noted that some employees have been fired while waiting to hear whether they can receive a reasonable accommodation because the employee cannot do the job without one.[145] Another comment described a situation

where an employee was put on leave after asking for a reasonable accommodation because the request occurred on a Friday afternoon, the employee was scheduled to work on Sunday, and the staff to address the provision of reasonable accommodations were not available until the beginning of the next week.[146] A comment from an organization noted that employees call their hotline after weeks of waiting for a response on a request for an accommodation, and during that time "they must continue to perform duties that put their health or the health of their pregnancy at risk so they can earn a paycheck and maintain their health insurance."[147]

The Commission understands the dilemma facing both employers and employees in circumstances where the accommodation is needed immediately but cannot be provided immediately. Requiring an employee to take leave (whether paid or unpaid) in this situation can be harmful to the employee, either because it will require the employee to exhaust their paid leave or because it will require an employee to go without income. In the face of these reasonable reactions to what is, based on comments received, a common situation, the Commission has added information regarding interim reasonable accommodations to the Interpretive Guidance in section *1636.3(h)* under *Interim Reasonable Accommodations.*

An interim reasonable accommodation can be used when there is a delay in providing the reasonable accommodation. For example, an interim reasonable accommodation may be needed when there is a sudden onset of a known limitation under the PWFA, including one that makes it unsafe, risky, or dangerous to perform the normal tasks of the job, when the interactive process is ongoing, when the parties are waiting for a piece of equipment, or when the employee is waiting for the employer's decision on the accommodation request.

Interim reasonable accommodations are not required. However, providing an interim reasonable accommodation is a best practice under the PWFA and may help limit a covered entity's exposure to liability under 42 U.S.C. 2000gg–1(1) and § 1636.4(a)(1) ("An unnecessary delay in providing a reasonable accommodation to the known limitations related to pregnancy, childbirth, or related medical conditions

---

[144] Comment EEOC–2023–0004–98479, The Center for WorkLife Law, at 11 (Oct. 10, 2023).
[145] *Id.* at 2.

[146] Comment EEOC–2023–0004–34728, Cloquet Area Fire District (Sept. 12, 2023).
[147] Comment EEOC–2023–0004–98479, The Center for WorkLife Law, at 2 (Oct. 10, 2023).

of a qualified employee may result in a violation of the PWFA if the delay constitutes a failure to provide a reasonable accommodation."). Furthermore, depending on the circumstances, requiring an employee to take leave as an interim reasonable accommodation may violate 42 U.S.C. 2000gg–2(f). To help illustrate these principles, the Commission has added additional examples regarding this issue to the Interpretive Guidance in section *1636.3(h)* under *Interim Reasonable Accommodations.*

Finally, in response to several comments, the Commission declines to define "interim reasonable accommodation" differently than "reasonable accommodation." The term "reasonable accommodation" is already defined under the ADA and the PWFA.[148] The Commission declines to create a new definition for such a similar term because it will create confusion.

*1636.3(i) Reasonable Accommodation— Examples*

The Commission received numerous requests for additional examples and suggested edits for existing examples in this section. In response, the Commission has added a few examples to explain specific points, using a variety of employees to illustrate that the PWFA applies to all types of occupations and professions. Further, the Commission has made minor edits to the language in the examples from the NPRM to standardize the language and format used in these examples. For example, the Commission added "affected by, or arising out of" after "related to," added "pregnancy, childbirth, or related medical conditions," and added that the adjustment or change at work is "due to" the limitation.

The Commission did not receive comments related to § 1636.3(i)(1) from the NPRM. Comments the Commission received regarding § 1636.3(i)(2) and (4) from the NPRM are discussed below. Comments regarding § 1636.3(i)(3) from the NPRM (addressing leave as a reasonable accommodation) are discussed *supra* in the preamble in section *1636.3(h)* under *Particular Matters Regarding Leave as a Reasonable Accommodation.* Comments received regarding § 1636.3(i)(5) from the NPRM (regarding the suspension of an essential function(s) as a reasonable accommodation) are discussed *supra* in the preamble in section *1636.3(f)(2) Temporary Suspension of an Essential Function(s)* and *infra* in the preamble in

section *1636.3(j)(3) Undue Hardship— Temporary Suspension of an Essential Function(s).*

*1636.3(i)(2) List of Possible Accommodations*

The Commission received a few comments recommending that in addition to listing telework in § 1636.3(i)(2), the Commission include "remote work" and the ability to change work sites and add that telework is a possible accommodation to avoid heightened health risks, such as from communicable diseases. The Commission has added remote work and change in worksites to the non-exhaustive list of possible accommodations in § 1636.3(i)(2) and to the Interpretive Guidance. The Commission also deleted the word "additional" before "unpaid leave" in § 1636.3(i)(2) because unpaid leave can be an accommodation whether or not it is additional.[149]

In the Interpretive Guidance in section *1636.3(i) Reasonable Accommodation—Examples,* the Commission added within the possible accommodation of "frequent breaks" the situation where the regular location of the employee's workplace makes nursing during work hours a possibility because the child is within close proximity. This concept has also been added to the regulation in § 1636.3(i)(4)(iii). It also is described, in more detail, *infra* in the preamble in section *1636.3(i)(4) Examples of Reasonable Accommodations Related to Lactation* in the Commission's response to the comments for § 1636.3(i)(4).

*1636.3(i)(4) Examples of Reasonable Accommodations Related to Lactation*

As an initial matter, some comments suggested the Commission include additional conditions related to lactation, such as "difficulty with attachment" or "inability to pump milk," in the illustrative, non-exhaustive list of related medical conditions in § 1636.3(b). As explained elsewhere, the Commission has not added or deleted any terms from its non-exhaustive list. The fact that these terms have not been added to the non-exhaustive list in § 1636.3(b) should not be interpreted to deny coverage for those conditions.

With regard to § 1636.3(i)(4), many comments expressed concern over the wording used in proposed § 1636.3(i)(4) which, in describing examples of accommodations related to lactation,

referenced the Providing Urgent Maternal Protections for Nursing Mothers Act (PUMP Act) (Pub. L. 117–328, Div. KK, 136 Stat. 4459, 6093). Specifically, comments cautioned that the existing language could inadvertently create the impression that the PUMP Act does not require certain measures to ensure an adequate lactation space. To clarify this matter, the Commission has incorporated the suggested edits, both removing the introductory phrase in § 1636.3(i)(4)(ii) ("Whether the space for lactation is provided under the PUMP Act or paragraph (i)(4)(i) of this section") and adding the phrase "shielded from view and free from intrusion," which is utilized in the PUMP Act, in an effort to emphasize the PUMP Act's requirements and what can be a reasonable accommodation under the PWFA. For the same reason, the Commission has added the phrase "a place other than a bathroom," also from the PUMP Act, to § 1636.3(i)(4)(ii).

Also related to the PUMP Act, some comments asserted that leave and breaks under the PWFA could improperly exceed those provided under the PUMP Act. The Commission does not agree. The PUMP Act provides covered employees with a reasonable break each time the employee has a need to express milk, for up to 1 year after giving birth.[150] There is not a maximum number of breaks.[151] The frequency, duration, and timing of breaks can vary;[152] thus, there is no defined number of breaks under the PUMP Act.

Another comment suggested that the Commission should not include accommodations related to lactation because the PUMP Act provides for breaks to pump at work and should be the exclusive mechanism for accommodations related to lactation. The Commission declines to make this change. The PUMP Act applies to almost all employees covered under the Fair Labor Standards Act of 1938, as amended (FLSA), 29 U.S.C. 201 *et seq.,* with exemptions created for specifically identified transportation-related jobs, and allows for employers with 50 or fewer employees to seek an exemption based on undue hardship.[153] The PWFA applies to all employers with 15 or more

---

[148] 29 CFR 1630.2(o) (ADA); § 1636.3(h) (PWFA).

[149] These changes are in addition to the change noted in the preamble in section *1636.3(h)* under *Alleviating Increased Pain or Risk to Health Due to the Known Limitation.*

[150] 29 U.S.C. 218d; U.S. Dep't of Lab., *Fact Sheet #73: FLSA Protections for Employees to Pump Breast Milk at Work* (Jan. 2023), *https:// www.dol.gov/agencies/whd/fact-sheets/73-flsa-break-time-nursing-mothers;* U.S. Dep't of Lab., *Field Assistance Bulletin No. 2023–02: Enforcement Protections for Employees to Pump Breast Milk at Work* (May 17, 2023), *https://www.dol.gov/sites/ dolgov/files/WHD/fab/2023-2.pdf.*

[151] *See supra* note 150.

[152] *Id.*

[153] *Id.*

employees.[154] Congress passed both laws at the same time and decided which entities would be covered; the Commission has a responsibility to follow the text of the statute it has been charged with enforcing. Furthermore, an employer that is covered under the PWFA but not under the PUMP Act does not automatically have to provide a reasonable accommodation related to pumping; under the PWFA, the covered entity, regardless of size or industry, does not have to provide the accommodation if it causes an undue hardship in the specific situation. Additionally, while the PWFA provides that it does not "invalidate or limit the powers, remedies, or procedures under any Federal law . . . that provides greater or equal protection for individuals affected by pregnancy, childbirth, or related medical conditions," [155] nothing in the PWFA prohibits it from providing more or additional protections.

Other comments suggested adding a new subsection, § 1636.3(i)(4)(iii), to specify detailed examples of reasonable accommodations related to lactation such as modifications that would remove barriers to breastfeeding or pumping and avoid or alleviate lactation-related health complications. The Commission does not find the proposed additions, which reiterate the broader goals of the law, necessary in the list of accommodations. However, the Commission has added language in a new paragraph (i)(4)(iv) to § 1636.3 to clarify that the types of accommodations listed in this section are not the only ones available for lactation.

Some comments urged the Commission to make clear that it could be a violation of the PWFA to "prohibit an employee from pumping milk in a space where they otherwise have permission to work or to be present" unless it creates an undue hardship, and that coworker discomfort about being in the same room while an employee is pumping is not a valid ground for failing to provide an accommodation. The Commission is not making this addition. While it may be that the situation described in this comment could be a reasonable accommodation, as set out in § 1636.4(a)(4), an employer has the ultimate discretion in choosing between effective accommodations. The Commission agrees that generally coworker discomfort does not establish undue hardship and has added that point in the Interpretive Guidance in

section *1636.3(j)(1) Undue Hardship— In General.*[156]

Another comment suggested that the Commission explicitly state that certain accommodations, such as telework, are not available for lactation. The Commission declines to add which accommodations may cause an undue hardship in a specific situation, as such a determination is fact-specific. Under the PWFA, as under the ADA, employers should conduct an individualized assessment in response to each request for a reasonable accommodation.

Some comments recommended that the Commission also include nursing at work for those circumstances where the employee works in close proximity to their child and can easily nurse during the workday. The Commission agrees that in situations where the regular location of the qualified employee's workplace makes nursing during work hours a possibility because the child is in close proximity, allowing breaks for nursing would be a possible reasonable accommodation (*e.g.*, an employee who regularly works from home and has their child at home or an employee whose child is at a nearby or onsite daycare center). The Commission has added this to the regulation in § 1636.3(i)(4)(iii). The Commission cautions that this provision is intended to address situations where the qualified employee and child are in close proximity in the normal course of business. It is not intended to indicate that there is a right to create proximity to nurse because of an employee's preference. Of course, there may be known limitations that would entitle a qualified employee to the creation of proximity accommodation as a reasonable accommodation, absent undue hardship (*e.g.*, a limitation that made pumping difficult or unworkable).

Some comments sought reassurances that lactation accommodations also may include not only breaks to pump, but also refrigeration to store milk. Section 1636.3(i)(4)(ii) specifically references refrigeration for storing milk.

### 1636.3(j) Undue Hardship and 1636.3(j)(1) Undue Hardship—In General

The Commission did not receive comments regarding § 1636.3(j)(1), which defines "undue hardship" using the language from the ADA. The Commission has not made changes to the regulation on this point. Because undue hardship under the PWFA is defined as in the ADA, the Commission has added information from the

appendix to 29 CFR part 1630 (Interpretive Guidance on Title I of the Americans With Disabilities Act) regarding undue hardship generally to the PWFA Interpretive Guidance in section *1636.3(j)(1) Undue Hardship— In General* so that information is easily available to covered entities and employees.

### 1636.3(j)(2) Undue Hardship Factors

The Commission did not receive comments that disagreed with the Commission's use of the ADA's undue hardship factors in the PWFA and has maintained the proposed language in the final regulation.

The Commission received many comments regarding what facts should and should not be considered when an employer is determining undue hardship.

First, the Commission received many comments discussing how previously granted accommodations should affect the undue hardship analysis. Undue hardship is a broad concept in terms of what may go into determining whether a particular reasonable accommodation imposes a significant difficulty or expense. An employer may consider the current impact of cumulative costs or burdens of accommodations that have already been granted to other employees or the same employee when considering whether a new request for the same or similar accommodation imposes an undue hardship. However, as the comments emphasized, and the Commission has stated, "[g]eneralized conclusions will not suffice to support a claim of undue hardship. Instead, undue hardship must be based on an individualized assessment of current circumstances that show that a specific reasonable accommodation would cause significant difficulty or expense." [157] Additionally, in some circumstances, rather than supporting a possible contention of an undue hardship based on cumulative burden, the fact that an employer has provided the same or similar accommodations in the past can weigh against an argument that granting it will impose an undue hardship. Ultimately, whether a particular accommodation will impose an undue hardship for an employer is determined on a case-by-case basis. This information has been added to the Interpretive Guidance in section *1636.3(j)* under *Undue Hardship— Consideration of Prior or Future Accommodations.*

Second, several comments stated that an employer should not be able to rely

[154] 42 U.S.C. 2000gg(2)(A), (B)(1).
[155] 42 U.S.C. 2000gg–5(a)(1).

[156] *See* 29 CFR part 1630, appendix, 1630.15(d).

[157] *Enforcement Guidance on Reasonable Accommodation, supra* note 111, text at n.113.

solely on the fact that an employee previously received an accommodation to assert undue hardship. The Commission agrees and reiterates that although an employer may consider the impact of prior accommodations granted to the employee currently seeking an accommodation, the mere fact that an employee previously received an accommodation or, indeed, several accommodations, does not establish that it would impose an undue hardship on the employer to grant a new accommodation. This information has been added to the Interpretive Guidance in section *1636.3(j)* under *Undue Hardship—Consideration of Prior or Future Accommodations.*

The Commission received several comments regarding whether or how other employees should play a role in the undue hardship determination. The factors considered in the undue hardship analysis under the PWFA mirror those under the ADA. Accordingly, an employer cannot assert undue hardship based on employees' fears or prejudices toward the individual's pregnancy, childbirth, or related medical condition, nor can an undue hardship defense be based on the possibility that granting an accommodation would negatively impact the morale of other employees. Employers, however, may be able to show undue hardship where the provision of an accommodation would be unduly disruptive to other employees' ability to work.[158] This information has been added to the Interpretive Guidance in section *1636.3(j)(1) Undue Hardship—In General.*

A few comments requested more examples of when an employer does meet the burden of showing undue hardship. An additional example has been added in the Interpretive Guidance in section *1636.3(j)(2) Undue Hardship Factors* and the examples from the proposed appendix have been edited to include additional facts to help better explain why the situation creates an undue hardship.

Undue Hardship and Safety

A few comments asked for clarification on which standard applies when an employee requests an accommodation that the covered entity asserts would cause a safety risk to co-

workers or clients and whether there is a "direct threat" affirmative defense as in the ADA.[159] Congress did not include a "direct threat" defense in the PWFA. Thus, as explained in the NPRM, the undue hardship analysis is the controlling framework for evaluating accommodation requests by employees with limitations related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions, including with regard to considerations of safety.[160] Additionally, as stated in the NPRM, Title VII's bona fide occupational qualification (BFOQ) standard, rather than the PWFA's undue hardship standard, applies to assertions by employers that employees create a safety risk merely by being pregnant.[161] The Commission has included this information in the Interpretive Guidance in section *1636.3(j)* under *Undue Hardship and Safety.*

*1636.3(j)(3) Undue Hardship— Temporary Suspension of an Essential Function(s)*

The Commission received numerous comments describing the potential difficulties that employers may face in providing accommodations to employees who temporarily cannot perform one or more essential functions, pointing to specialized functions in certain industries and the burden of training employees. The Commission understands that in certain situations, providing the accommodation of the temporary suspension of an essential function(s) may cause an undue hardship. The difficulties addressed in the comments can be raised under the undue hardship defense and are all part of the individualized assessment under the PWFA. The Commission notes that employees seeking accommodations under the PWFA are not unlike other employees who are temporarily unable to perform one or more essential functions for various reasons and have received job modifications without a significant difficulty imposed on business operations under similar circumstances.

The Commission received a comment suggesting the deletion of § 1636.3(j)(3)(iv) ("Whether the covered entity has provided other employees in similar positions who are unable to perform the essential function(s) of their position with temporary suspensions of

essential functions") because, the comment asserted, it inappropriately imports a "comparative" approach into the PWFA, which was enacted in part to address similar challenges experienced under Title VII. In the Interpretive Guidance in section *1636.3(j)(3) Undue Hardship— Temporary Suspension of an Essential Function(s)*, the Commission clarifies that under § 1636.3(j)(3)(iv) an employer not having provided an accommodation previously does not tend to demonstrate that doing so now, for the qualified employee with a known limitation, would cause an undue hardship because making a change to a workplace procedure or rule can itself be a reasonable accommodation. Instead, if this factor is relevant, it will tend to demonstrate the lack of an undue hardship. For example, if an employer has consistently provided light duty assignments to those who are temporarily unable to perform a certain essential function(s) for reasons other than pregnancy, it will be difficult for the employer to prove that it is an undue hardship to provide a light duty assignment to a qualified pregnant employee who is similarly unable to perform such an essential function(s). Finally, the Commission also has added to the Interpretive Guidance in section *1636.3(j)(3) Undue Hardship— Temporary Suspension of an Essential Function(s)* that for the undue hardship factor laid out in § 1636.3(j)(3)(ii) (whether there is work for the employee to accomplish), the employer is not required to invent work for an employee.

*1636.3(j)(4) Undue Hardship— Predictable Assessments*

In response to the Commission's directed question regarding the adoption of the predictable assessment approach and whether the list of accommodations should be modified, a large number of comments agreed with the method, and many suggested expanding the list. Several comments specifically requested the addition of: modifications to uniforms or dress codes; minor physical modifications to a workstation (*e.g.,* a fan or a chair); permitting the use of a workstation closer to a bathroom or lactation space, or farther away from environmental hazards (*e.g.,* heat, fumes, or toxins); use of a closer parking space in an employer-provided parking facility; permitting eating or drinking at a workstation or nearby location where food or drink is not usually permitted; rest breaks as needed; and providing personal protective equipment (*e.g.,* gloves, goggles, earplugs, hardhats, or

---

[158] *See* 29 CFR part 1630, appendix, 1630.15(d); *Enforcement Guidance on Reasonable Accommodation, supra* note 111, at text after n.117; *cf. Groff v. DeJoy,* 600 U.S. 447, 472–73 (2023) (opining that, under the Title VII undue hardship standard, the employer may not justify refusal to accommodate based on other employees' bias or hostility).

[159] *See* 42 U.S.C. 12111(3) (defining "direct threat"), 12113(b) (providing that the qualification standard can include a condition that a person not pose a direct threat); 29 CFR 1630.2(r)(1) through (4) (outlining factors to be considered in whether an employee poses a direct threat).

[160] 88 FR 54733.

[161] *Id.*

masks). The Commission acknowledges that several of the recommended additions also are common and simple, and employers should be able to provide these, and, in fact, many accommodations under the PWFA, with little difficulty. However, the Commission declines to make these additions to the list of predictable assessments, because they are not the accommodations frequently mentioned in the legislative history, some may not be easily applied across a broad category of jobs or workplaces, others also are provided under other laws and employee protections,[162] and certain modifications are not so commonly needed. This is not to say that such accommodations should not be granted when requested, but simply that the Commission will not categorize them as the type of change that in "virtually all cases" is a reasonable accommodation that does not create an undue hardship.

In seeking the inclusion of these accommodations as predictable assessments, some comments asserted that other States and localities do not allow employers to assert undue hardship for some of these specific modifications. The Commission acknowledges the similarities between the PWFA and certain State laws, having referenced them in support of the predictable assessment approach.[163] However, given the differences in State laws on this issue, with some having a version of predictable assessments and others having none, the Commission declines to expand the list of predictable assessments.

Some comments recommended that predictable assessments include, specifically, 16 health care appointments. The comments reasoned that this number represents the typical recommended number of prenatal and postnatal care visits for an uncomplicated pregnancy. The Commission is not adding this to the list of predictable assessments because the Commission acknowledges that the timing of an appointment and the length of an appointment may differ for each employee. The Commission also is concerned that setting a number of appointments could erroneously imply that additional appointments would necessarily create an undue hardship. However, the Commission emphasizes

[162] *See, e.g.,* 29 CFR 1910.132(a); U.S. Dep't of Lab., *OSHA Personal Protective Equipment, https:// www.osha.gov/personal-protective-equipment/ standards* (last visited Mar. 18, 2024); U.S. Dep't of Lab., *OSHA Factsheet—Personal Protective Equipment, https://www.osha.gov/sites/default/ files/publications/ppe-factsheet.pdf* (last visited Mar. 18, 2024).

[163] 88 FR 54785–86.

that employers should expect such requests, that such requests are covered by the PWFA, and that granting such requests should be a straightforward process, absent undue hardship.

Another comment suggested that 8 weeks of leave to recover from childbirth be added as a predictable assessment, noting that despite the regularity of such a request, it is routinely rejected by employers. The Commission recognizes it is predictable that pregnant employees will need leave to recover from childbirth. However, given the differences in workplaces and the possibility that the employee has access to leave through the FMLA, State law, or an employer's program, the Commission is not making this change.

Citing the number of pregnancies affected by gestational diabetes, one comment recommended the addition of short breaks to monitor blood glucose levels. As with breaks to hydrate, eat, or use the restroom, the Commission recognizes that these types of breaks should be simple for employers to provide. However, because this is a less universal need and was not repeatedly mentioned in the legislative history of the PWFA, the Commission does not believe it is appropriate to include it in the list of predictable assessments.

The Commission also received numerous comments claiming that the identification of predictable assessments violates the statutory text of the PWFA and is beyond the Commission's authority because, according to these comments, "predictable assessments" create a category of "per se" reasonable accommodations. Comments also stated that predictable assessments undercut the individualized assessment principles of the ADA, that there are differences among various jobs and workplaces, and that Congress intended for individualized assessments to be used. The Commission disagrees with these comments as they are misreading the NPRM. As stated in the NPRM, "the adoption of predictable assessments . . . does not change the requirement that, as under the regulation implementing the ADA, employers must conduct an individualized assessment" and "[t]he identification of certain modifications as 'predictable assessments' does not alter the definition of undue hardship or deprive a covered entity of the opportunity to bring forward facts to demonstrate a proposed accommodation imposes an undue hardship for its business under its own particular circumstances."[164]

In a similar vein, the Commission received comments stating that certain

[164] *Id.*

industries would have a more difficult time providing the accommodations that the Commission has identified as predictable assessments. As the Commission has stated, in those industries (as in any others), an employer may assert that the requested accommodation causes an undue hardship.

Some comments suggested the Commission include additional language in § 1636.3(j)(4)(i) to encompass circumstances where it may not be reasonable for the employee to "carry" water. The Commission agrees and has added "keep water near" to § 1636.3(j)(4)(i). In explaining the predictable assessments in the Interpretive Guidance, the Commission also has clarified that, depending on the worksite, the employee may be able to eat or drink at their workstation without taking a break.

In the regulation, the Commission has removed the following language from the proposed rule (§ 1636.3(j)(4)): "Although a covered entity must assess on a case-by-case basis whether a requested modification is a reasonable accommodation that would cause an undue hardship . . ."; "[g]iven the simple and straightforward nature of these modifications, they will, as a factual matter, virtually always be found to be reasonable accommodations that do not impose significant difficulty or expense (*i.e.,* undue hardship)"; and "[i]t should easily be concluded that the following modifications will virtually always be reasonable accommodations that do not impose an undue hardship." While all of these sentences remain true, including this information in the regulation is repetitive and unnecessary. These concepts have been moved to the Interpretive Guidance in section *1636.3(j)(4) Undue Hardship— Predictable Assessments.*

Finally, the Commission made a few minor changes to the language in § 1636.3(j)(4).[165]

*Formerly Proposed 1636.3(j)(5) Undue Hardship—Future Accommodations*

Several comments recommended that the Commission clarify that the potential for future accommodation requests from other employees cannot serve as a basis for failing to provide an accommodation. The Commission agrees and has added language in the Interpretive Guidance to the effect that an employer may not fail to provide an accommodation based on the

[165] For example, for consistency the Commission added "as needed" to § 1636.3(j)(4)(ii) and (iii); removed "through the workday" from § 1636.3(j)(4)(i); and added "to take" in § 1636.3(j)(4)(ii) and (iv).

possibility—whether speculative or nearly certain—that it will have to provide the accommodation to other employees in the future. Because this point is relevant to how a covered entity should consider other accommodations, it has been added in the Interpretive Guidance in section *1636.3(j)* under *Undue Hardship—Consideration of Prior or Future Accommodations,* which also includes more information about the consideration of prior and future accommodations. Accordingly, § 1636.3(j)(5) of the NPRM has been removed from the regulation.

*1636.3(k) Interactive Process*

The NPRM largely adopted the explanation of the interactive process in the regulation implementing the ADA.

The Commission has made one change in the regulatory language of § 1636.3(k). The final rule states that the adjustment or change at work must be "due to the limitation." This is intended to clarify that there is a connection between the limitation and the requested adjustment or change at work.

Numerous comments suggested that the Commission highlight that in many instances the interactive process may occur in a very abbreviated form, given that most accommodations employees are likely to seek under the PWFA are simple and easy to provide and have little to no cost to covered entities, and because the temporary nature of pregnancy, childbirth, and related medical conditions makes expediency in responding to and providing requested accommodations crucial.

The Commission, in enforcing the ADA, has acknowledged that in many instances both the need for an accommodation and the accommodation required will be obvious, leaving "little or no need to engage in any discussion." [166] In advising Federal agencies on creating their disability reasonable accommodation procedures, the Commission recommends that they process requests "in a manner that imposes the fewest burdens on the individuals . . . and permits the most expeditious consideration and delivery of the reasonable accommodation." [167] The same is true for the PWFA. Where an employee has requested a simple and easy accommodation under the PWFA, such as using a portable fan in the

office, engaging in a lengthy back-and-forth would be unwarranted.

Some comments recommended that the Commission modify its guidance for the interactive process. The modifications, these comments explained, will better ensure that covered entities recognize the differences in the interactive process under the PWFA and the ADA. According to these comments, during the short time the PWFA has been in effect, covered entities have used their ADA policies to process pregnancy-related accommodation requests. Some employers have purportedly required their employees to fill out lengthy forms and medical certifications, which seek unnecessary information, leading to lengthy delays and denials. [168]

The Commission agrees with the suggestions to emphasize that most requests for accommodations under the PWFA can be provided quickly and typically will consist of nothing more than brief conversations or email exchanges and has added language to this effect in the Interpretive Guidance in section *1636.3(k) Interactive Process.* However, the Commission disagrees that this is meaningfully different than the ADA; under both statutes, the interactive process should focus on finding an appropriate reasonable accommodation.

In order to further highlight the flexible, individualized nature of the interactive process, in the Interpretive Guidance in section *1636.3(k) Interactive Process* the Commission has added information about how the process does not have to follow specific steps and has changed the title of the possible steps in the interactive process in the Interpretive Guidance in section *1636.3(k)* to *Recommendations for an Interactive Process,* while maintaining the substance from the ADA guidance. The Commission also has added that information provided by the employee in the interactive process need not be in any specific format, include specific words, or be on a specific form.

The Commission received a few comments regarding the omission of the word "precise" from the description of the interactive process in the proposed appendix. As set out in § 1636.3(a)(2), limitations may be modest, minor, and/ or episodic. A limitation also may be a need or a problem related to maintaining the health of the employee or the health of the pregnancy. A process that tries to determine the "precise" limitation is in tension with

the idea that limitations can be minor impediments.

Another comment questioned whether the absence of the word "precise" limited whether the covered entity could, for example, require information about how many breaks an employee needs and for how long. It does not. The Commission's view is that under such circumstances, the employer could ask such follow-up questions in order to craft an effective accommodation that is not an undue hardship.

One comment suggested that the Commission clarify that to initiate the interactive process the employee does not need to identify what the specific limitation is, but only that they have such a limitation and need an adjustment or change at work. Section 1636.3(h)(2) describes how an employee begins the reasonable accommodation process.

To ensure that employees and covered entities understand that any medical information obtained during the interactive process under the PWFA is subject to the ADA's confidentiality rules and restrictions on disability-related inquiries, the Interpretive Guidance in section *1636.3(k) Interactive Process* includes a brief overview of these topics, with further information provided in the Interpretive Guidance in section *1636.7(a)(1)* under *Prohibition on Disability-Related Inquiries and Medical Examinations and Protection of Medical Information.* Of particular relevance to the PWFA, that an employee is pregnant, has recently been pregnant, or has a medical condition related to pregnancy or childbirth is medical information. [169] The ADA requires that employers keep such information confidential and only disclose it within the confines of the ADA's limited disclosure rules. [170]

---

[166] *Enforcement Guidance on Reasonable Accommodation, supra* note 111, at Question 5.

[167] EEOC, *Policy Guidance on Executive Order 13164: Establishing Procedures to Facilitate the Provision of Reasonable Accommodation,* Question 7 (2000), *https://www.eeoc.gov/laws/guidance/ policy-guidance-executive-order-13164-establishing-procedures-facilitate-provision.*

[168] *See* Comment EEOC–2023–0004–98479, The Center for WorkLife Law, at 23 (Oct. 10, 2023).

[169] 88 FR 54744.

[170] 42 U.S.C. 12112(d)(3)(B); 29 CFR 1630.14(b)(1), (c)(1), (d)(4); EEOC, *Enforcement Guidance on Disability-Related Inquiries and Medical Exams of Employees Under the ADA,* at text accompanying nn.9–10 (2000) [hereinafter *Enforcement Guidance on Disability-Related Inquiries*], *http://www.eeoc.gov/laws/guidance/ enforcement-guidance-disability-related-inquiries-and-medical-examinations-employees* ("The ADA requires employers to treat any medical information obtained from a disability-related inquiry or medical examination . . . as well as any medical information voluntarily disclosed by an employee, as a confidential medical record. Employers may share such information only in limited circumstances with supervisors, managers, first aid and safety personnel, and government officials investigating compliance with the ADA."); EEOC, *Enforcement Guidance: Preemployment Disability-Related Questions and Medical Examinations,* at text accompanying n.6 (1995) [hereinafter *Enforcement Guidance: Preemployment Disability-Related Questions*], *https://www.eeoc.gov/laws/*

Similarly, disclosing that an employee is receiving or has requested a reasonable accommodation under the PWFA usually amounts to a disclosure that the employee is pregnant, has recently been pregnant, or has a related medical condition.[171]

Many comments described the difficulty pregnant employees may experience obtaining appointments with health care providers, especially early in pregnancy. To help address this concern, the Commission has added language to the Interpretive Guidance in section *1636.3(k)* under *Engaging in the Interactive Process*[172] to the effect that when a covered entity is permitted to seek supporting documentation from a health care provider under the parameters outlined in § 1636.3(l), the covered entity should be aware that it may take time for the employee to find a health care provider and provide the documentation. Delay caused by the difficulty faced by an employee in obtaining information from a health care provider in these circumstances should not be considered a withdrawal from or refusal to participate in the interactive process. If there is such a delay, an employer should consider providing an interim reasonable accommodation.

Several comments requested that the Commission specifically address the need for reasonable accommodations in unforeseen, urgent, emergency situations when the employee has not already requested a reasonable accommodation. One comment described instances where employees experienced bleeding or passed out due to their pregnancies and had to immediately leave their worksites to obtain emergency care, only to return to work and find they were charged with violating the covered entities' attendance policy. In response, the Commission has added information and an example in the Interpretive Guidance in section *1636.3(k)* under *Engaging in the Interactive Process*. This example involves a situation where the employee, who has not asked for an accommodation or informed their employer that they are pregnant, experiences an emergency that is a physical or mental condition related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions. The example explains that by informing the employer that they are experiencing an emergency related to

pregnancy, childbirth, or related medical conditions and need leave immediately, the employee has made a request for a reasonable accommodation. The example goes on to explain that, if it is later determined that the employee is entitled to a reasonable accommodation, the employer should not penalize the employee because the emergency required a pause in the interactive process.

In the Interpretive Guidance, the information regarding delay and emergencies explained in the preceding paragraphs has been added to section *1636.3(k)* under the heading formerly titled *Failure to Engage in the Interactive Process*. To reflect these additions, the title of that heading has been changed to *Engaging in the Interactive Process*.

One comment asked that the Commission clarify whether the "interactive process" requirements can be met by using software. There are no required steps or methodology for the interactive process; thus, the Commission has not taken a position on whether such a system will meet the requirements of the interactive process. The Commission does remind covered entities that they are responsible for their part of the interactive process, regardless of how they meet that obligation.

A comment requested that the Commission oversee the interactive process between covered entities and employees, suggesting a system of monitoring and evaluation. While the Commission issues guidance, provides technical assistance, and engages in litigation, the Commission is unable to offer the level of monitoring proposed. Generally, the employee and employer are in the best position to understand the limitations, affected job functions, and possible accommodations involved in the interactive process.

Finally, the Commission has included additional examples in the Interpretive Guidance in section *1636.3(k) Interactive Process* to illustrate how accommodations may be granted through the interactive process.

*1636.3(l) Limits on Supporting Documentation*

The Commission received numerous comments about the NPRM's approach to supporting documentation and the extent to which the final regulation should permit covered entities to seek such documentation in support of an employee's request for a reasonable accommodation under the PWFA. The proposed rule provided that a covered entity could require supporting

documentation that is reasonable under the circumstances for the covered entity to determine whether to grant the accommodation. Further, the rule provided that when it was reasonable under the circumstances, the employer could only require reasonable documentation.

*1636.3(l)(1) Seeking Supporting Documentation Only When Reasonable Under the Circumstances*

Comments and Response to Comments That Were Generally Supportive or Generally Unsupportive of the Commission's Approach

The Commission received many comments that were generally supportive of the approach to documentation set forth in the proposed rule, although most had suggestions for further limiting the ability of employers to seek supporting documentation.

Many comments agreed with the Commission that employees who are pregnant may experience limitations and, therefore, require accommodations before they have had any medical appointments, and that it may be difficult for a pregnant employee to obtain an immediate appointment with a health care provider early in a pregnancy, especially for those living in certain regions of the country where there are limited resources for maternal health. These and other comments also provided numerous additional reasons for limiting the amount of documentation that covered entities may seek under the PWFA, including: the burden and corresponding reduction in quality of care that administrative duties (such as paperwork) place on health care professionals; the possibility that the notes doctors provide are "overprotective" and result in a person who wants to work being placed on leave; the costs in time and money employees face when they must obtain medical documentation;[173] the concern that a doctor may feel uncomfortable certifying that a condition is completely due to pregnancy;[174] the fact that these

guidance/enforcement-guidance-preemployment-disability-related-questions-and-medical ("Medical information must be kept confidential.").

[171] 88 FR 54744.

[172] In the proposed appendix, this heading was entitled "Failure to Engage in Interactive Process." 88 FR 54787.

[173] Some comments that were generally sympathetic to the idea that it is difficult for pregnant employees to obtain supporting documentation in some circumstances argued that rather than limiting employers' ability to seek supporting documentation in those circumstances, employers could provide interim reasonable accommodations while waiting for supporting documentation. The Commission agrees providing interim reasonable accommodations is a possibility and has expanded the section regarding interim reasonable accommodations in the Interpretive Guidance in section *1636.3(h)* under *Interim Reasonable Accommodations*, although providing an interim reasonable accommodation is not required.

[174] This concern is misplaced, as the PWFA requires accommodation for physical or mental
Continued

burdens may deter employees who need accommodations from asking for them; and the possibility that employers will not maintain the confidentiality of medical documentation they obtain, among other reasons. These comments agreed with the overall structure of the proposed rule's documentation provision but also offered suggestions for further limiting the circumstances in which documentation could be sought, as explained in more detail below. Some comments, generally supportive of the proposed rule's approach, urged the Commission to ensure that there is a broad understanding among covered entities and employees of the PWFA's rules limiting the ability of covered entities to seek supporting documentation.

Other comments, however, were generally unsupportive of the proposed rule's approach, arguing that before deciding whether to grant requests for reasonable accommodations, employers need to be able to seek supporting documentation beyond what the proposed rule would allow. Such comments expressed concern about employee fraud, including employees who might seek accommodations with no relation to a PWFA-covered limitation.[175] Others said that the proposed rule did not allow employers to request sufficient justification for a requested accommodation and that this aspect of the proposal violated the spirit of mutually beneficial cooperation that the PWFA represents. Concerns about vague requests, employees who did not know what sort of accommodation they needed, and the absence of a concrete rule also were mentioned in these comments.

In drafting the final rule on supporting documentation, the Commission took these comments into consideration, as well as the more specific suggestions discussed below.

Comments and Response to Comments Suggesting That the PWFA's Rule on Supporting Documentation Should Follow the ADA

Some comments that generally were unsupportive of the proposed rule's

approach to supporting documentation argued that the PWFA regulation should follow the approach employers use under the ADA. Some argued that this approach should be followed because it provides a familiar bright line that is more useful to employers than a general "reasonableness" standard. These comments also asserted that difficulties pregnant employees have obtaining documentation are faced equally by those with disabilities and, therefore, should not be a factor in the drafting of a final rule.

The Commission disagrees with the comments that argued that it automatically can or should apply the ADA's approach to supporting documentation under the PWFA in all circumstances. The ADA's statutory restrictions on disability-related inquiries apply to all disability-related inquiries, whether or not an employee has a disability,[176] including when such inquiries are made in response to a request for an accommodation under the PWFA, as discussed in detail in the Interpretive Guidance in section *1636.7(a)(1)* under *Prohibition on Disability-Related Inquiries and Medical Examinations and Protection of Medical Information*. These restrictions limit an employer's ability to ask employees questions that are likely to elicit information about a disability to situations when doing so is job-related and consistent with business necessity.[177]

The PWFA does not have a similar statutory provision regarding pregnancy-related inquiries.[178] However, the PWFA does make it unlawful for a covered entity not to make reasonable accommodation to the known limitations related to the pregnancy, childbirth, or related medical conditions of a qualified employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship.[179] Adopting a

reasonableness standard for when employers can seek supporting documentation to determine coverage and the need for an accommodation ensures that covered entities can meet the statute's requirements without overly broad documentation requests that could result in the failure to provide accommodations that should be granted or could lead to claims of retaliation. Additionally, the Commission concludes that it is critical to limit inquiries and the supporting documentation that a covered entity can seek when an employee requests an accommodation under the PWFA so that covered entities do not obtain sensitive information that they do not need when making employment decisions and employees are not dissuaded from asking for accommodations out of concern that such requests will lead to probing questions unrelated to their ability to do the job. Thus, the Commission has retained the reasonableness standard from the proposed rule.

The Commission notes that the rule it is adopting about seeking supporting documentation for the PWFA is similar to the Commission's guidance regarding the ADA in some ways. The most important similarity is that a covered entity is not required to seek supporting documentation from an employee who requests an accommodation under the PWFA, as is true under the ADA. For example, if an employee, early in their pregnancy, informs the employer that they are pregnant, have morning sickness, and need a later start time, the employer and the employee can discuss what type of schedule changes are needed and implement them. Because of the difficulty employees may face in finding care, the fact that many health care providers will not see employees until later in their pregnancies,[180] and the fact that many accommodations under the PWFA will be simple and temporary, the Commission encourages employers to engage in this simple type of interactive process to determine appropriate accommodations under the PWFA.

The final PWFA rule contains five examples of when it is not reasonable under the circumstances to seek supporting documentation. Two of these examples build on the Commission's ADA policy guidance (§ 1636.3(l)(1)(i) (obvious) and (ii) (known)); and a third example is based on disparate treatment principles that apply equally under the ADA (§ 1636.3(l)(1)(v)) (it would not be reasonable under the circumstances to seek documentation when the requested

---

conditions "related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions" and not that the physical or mental condition solely be due to pregnancy, childbirth, or related medical conditions. 42 U.S.C. 2000gg(4); *see also* section *1636.3(a)(2)* under *Related to, Affected by, or Arising Out of* in the Interpretive Guidance.

[175] Another comment noted, however, that the fact that covered entities are permitted to request supporting documentation "when necessary" to determine if a limitation is "related to, affected by, or arising out of" pregnancy overcame any concerns that the employer will have to provide an accommodation for a condition not related to a PWFA limitation.

[176] 42 U.S.C. 12112(d). *See also Enforcement Guidance on Disability-Related Inquiries, supra* note 170 ("The ADA's restrictions on inquiries and examinations apply to all employees, not just those with disabilities.").

[177] 42 U.S.C. 12112(d).

[178] However, in the context of Title VII, the Commission has stated, "Because Title VII prohibits discrimination based on pregnancy, employers should not make inquiries into whether an applicant or employee intends to become pregnant. The EEOC will generally regard such an inquiry as evidence of pregnancy discrimination where the employer subsequently makes an unfavorable job decision affecting a pregnant worker." *Enforcement Guidance on Pregnancy Discrimination, supra* note 31, at (I)(A)(3)(b). And, as stated, *supra*, the ADA's restrictions on disability-related inquiries apply to individuals seeking accommodations under the PWFA.

[179] 42 U.S.C. 2000gg–1(1).

[180] 88 FR 54736, 54787.

accommodation is available to employees without PWFA limitations pursuant to a covered entity's policies or practices without submitting supporting documentation.). The two other examples involve pregnancy and predictable assessments, and lactation, nursing, and pumping. They are described in detail below.

*Reorganization of § 1636.3(l) and Changes in the Language Describing the Reasonableness Standard*

The Commission has made several changes in the regulation for § 1636.3(l).

First, the Commission has changed the language in § 1636.3(l)(1) regarding when it is reasonable under the circumstances from "reasonable under the circumstances for the covered entity to determine whether to grant the accommodation" to "reasonable under the circumstances for the covered entity to determine whether the employee has a physical or mental condition related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions (a limitation) and needs an adjustment or change at work due to the limitation." The Commission believes that, given the context, "to determine whether to grant the accommodation" would be understood to mean "to determine whether the employee has a physical or mental condition related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions (a limitation) and needs an adjustment or change at work due to the limitation." However, the Commission also recognizes that there may be other factors involved in an effort "to determine whether to grant the accommodation" that do not involve supporting documentation. Thus, the Commission has changed the language to be more precise.

Second, throughout the regulation and the Interpretive Guidance, references to an employer "requiring" documentation in the proposed rule have been changed to an employer "seeking" documentation. This change was made to account for situations where an employer's request for supporting documentation is effectively a requirement even if it does not contain the word "requirement."

Third, the Commission has moved the information regarding confidentiality from § 1636.3(l)(4) of the proposed regulation to section *1636.7(a)(1)* under *Prohibition on Disability-Related Inquiries and Medical Examinations and Protection of Medical Information* in the Interpretive Guidance. The Commission has made this change because the prohibition on disability-related inquiries and the confidentiality provisions that apply to medical information obtained under the PWFA arise from the ADA, not the PWFA, and therefore are enforceable under the ADA, not the PWFA. Accordingly, they are more appropriately addressed in the Interpretive Guidance's discussion of the application of the ADA's rules and exceptions regarding the confidentiality of medical information than in the PWFA regulation itself.

Fourth, the Commission has moved information regarding how information requests that violate § 1636.3(l) also may be a violation of 42 U.S.C. 2000gg–2(f) (§ 1636.5(f) (prohibition on retaliation and coercion)) to the Interpretive Guidance in section *1636.5(f)* under *Possible Violations of 42 U.S.C. 2000gg–2(f) (1636.5(f)) Based on Seeking Supporting Documentation During the Reasonable Accommodation Process and Disclosure of Medical Information*.

Fifth, the final rule contains a new paragraph (new paragraph (l)(4) of § 1636.3) regarding self-confirmation for the purposes of § 1636.3(l)(1)(i), (iii), and (iv). The NPRM stated that, in certain circumstances, an employer could not request documentation to confirm pregnancy when an employee "states or confirms" that they are pregnant.[181] Some comments discussed the question of what kind of confirmation should be allowed and, in particular, when covered entities should be permitted to seek documentation to confirm that an employee is pregnant. Some argued that self-attestation should always suffice, others argued that covered entities should be allowed to seek supporting documentation confirming pregnancy unless the pregnancy is "obvious," while still others discussed the types of tests that should or should not be allowed to confirm pregnancy. As explained in detail below, the final rule provides two circumstances in which covered entities must accept self-confirmation of pregnancy: when the pregnancy is obvious, or when the request for a change at work involves one of the modifications listed under § 1636.3(j)(4) due to pregnancy. As explained in the Interpretive Guidance in section *1636.3(l)(2) Reasonable Documentation*, when the covered entity is permitted to seek confirmation of pregnancy other than through self-confirmation, it may not require a specific test or method.

Additionally, the Commission has included new subsections in the Interpretive Guidance: in section

---

[181] 88 FR 54737, 54788 ("For example, when an obviously pregnant worker states or confirms they are pregnant and asks for a different size uniform . . . the employer may not require supporting documentation.").

---

*1636.3(l)* under *Interaction Between the PWFA and the ADA;* and in section *1636.7(a)(1)* under *The PWFA and the ADA*.

*Comments and Response to Comments Regarding Examples of When It Is Not Reasonable To Seek Supporting Documentation*

As noted above, the NPRM explained that if an employer decided to seek supporting documentation, it was only permitted to do so if it was reasonable under the circumstances in order for the employer to determine whether to grant the accommodation. The NPRM provided four examples of when it is not reasonable under the circumstances.

The Commission received comments seeking additional factual scenarios illustrating circumstances when it would, as well as when it would not, be reasonable under the circumstances to seek documentation. Some of these comments provided suggestions for desired examples. The Commission agrees that further illustrations would be useful and therefore has added further illustrations to the Interpretive Guidance in section *1636.3(l)(1) Seeking Supporting Documentation Only When Reasonable Under the Circumstances*.

Other comments suggested that the final rule should state that covered entities that seek documentation must provide paid leave for the employee to obtain the documentation, as well as cover any costs incurred to obtain it. To the extent that these comments intended to suggest that it would not be reasonable under the circumstances to seek documentation unless the covered entity provides paid leave for the employee to obtain the documentation and covers any costs incurred, the Commission disagrees and declines to adopt this suggestion.

*Not Reasonable To Seek Supporting Documentation—Obvious*

The first example in the proposed rule of when it would not be reasonable under the circumstances to seek supporting documentation is when: (1) the known limitation and need for reasonable accommodation are obvious; and (2) the employee confirms the obvious limitation and need for reasonable accommodation through self-attestation. This example is retained in the final rule, although the language has been modified to reflect changes in the description of what documentation may be sought.

Thus, the language in the final rule regarding this example has been changed from "when the known limitation and the need for reasonable accommodation are obvious and the

employee confirms the obvious limitation and need for reasonable accommodation through self-attestation" to "[w]hen the physical or mental condition related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions (a limitation) and the adjustment or change at work needed due to the limitation are obvious, and the employee provides self-confirmation as defined in paragraph (l)(4) of this section." The Interpretive Guidance for this section, in section *1636.3(l)(1)(i)—Obvious,* has generally remained the same with some minor language edits.

Many comments expressed concerns with the meaning of the word "obvious." Comments noted, among other things, that a rule that envisions employers making decisions based on whether someone is "obviously" pregnant will lead employers to subject employees' bodies to invasive scrutiny. This, in turn, might lead employers to unilaterally impose restrictions based on gendered and racialized stereotypes about what pregnant and postpartum people need. Other comments argued that it is irrelevant whether a pregnancy is "obvious" because if the individual in question is seeking an accommodation for which the employer is permitted to seek documentation, that documentation will automatically include a confirmation that the person is pregnant. Another comment pointed out that it will be very difficult for covered entities to determine if a pregnancy is "obvious," and that attempting to do so might expose employers to liability if a manager judges incorrectly.

In response to these comments, the Commission first notes that the idea of prohibiting requests for supporting documentation when the condition is "obvious" is similar to the Commission's guidance regarding the ADA although, unlike the ADA, the PWFA regulation includes a self-confirmation requirement. The Commission also has used the concept of "obvious" previously regarding pregnancy discrimination.[182] An "obvious" pregnancy is one where the pregnancy is showing, and onlookers easily notice by observation. Importantly, as several comments noted, not everyone who is pregnant looks the same.

Moreover, the Commission concludes that concerns about this provision encouraging employers to force

employees to accept unnecessary accommodations based on stereotypes are misplaced. Whether a pregnancy is obvious will only be relevant after an employee requests a reasonable accommodation. Other parts of the PWFA prohibit employers from requiring employees to accept reasonable accommodations.[183]

The requirement that obviously pregnant employees must self-confirm that they are pregnant (new § 1636.3(l)(4)) is intended to address the concerns expressed by comments about managers being uncertain whether someone is pregnant. Although there may be circumstances in which a pregnant employee asks for an accommodation and considers themselves to be "obviously" pregnant, but the employer disagrees and requests supporting documentation, the Commission believes such cases will be rare. Finally, although the Commission understands concerns about an employer's possible scrutiny of an employee's body, it is impractical to suggest that an employer in such circumstances should not consider the obvious physical condition of the employee requesting accommodation and instead seek documentation.

Some comments also requested more details about and examples of what would be considered an "obvious" limitation and/or an "obvious" need for accommodation (for example, asking when a limitation would be obvious based on something other than physical appearance). These comments suggested, for instance, that if someone self-attested to pregnancy and then was seen frequently vomiting, the limitation (vomiting due to pregnancy) should be considered obvious, and no documentation would be needed because vomiting is a common symptom of pregnancy.

Under these circumstances, the comments suggested, the need for an accommodation of a temporary relocation of a workstation closer to the bathroom also would be obvious. These comments recommended that the Commission, in the final rule, identify the following conditions as "obvious": morning sickness, edema, fatigue, back pain, medical visits, lifting restrictions, and time to recover from childbirth, among others. Comments additionally recommended that the final rule make clear that the need for accommodation is obvious when a pregnant employee requests removal from exposure to certain harmful chemicals or infectious diseases.

Under the final rule, the first example of when it is not reasonable under the circumstances for an employer to seek supporting documentation is when the employee's limitation (physical or mental condition related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions) and the adjustment or change at work that is needed due to the limitation are obvious and the employee confirms the limitation and the adjustment or change at work needed due to the limitation. As stated in the Interpretive Guidance in section *1636.3(l)(1)(i)—Obvious,* the Commission expects this example will usually apply when the employee is obviously pregnant. "Obvious" means that the condition is apparent without being mentioned. In terms of pregnancy itself, this may depend on physical appearance, *i.e.,* whether the pregnancy is "showing."

In response to comments suggesting that additional circumstances will always fall within the parameters of "obvious" limitations and/or "obvious" accommodations, the Commission does not have enough information to agree with those comments maintaining, for example, that there should be a nationwide standard establishing that it always is obvious that all pregnant employees need accommodations due to lifting restrictions, avoiding certain chemicals, or back pain, such that it would never be reasonable for employers to seek supporting documentation when someone requests accommodation due to those limitations. Although there may be circumstances under which these and other limitations or accommodations are obvious, when accompanied by self-confirmation, the Commission does not view these sorts of limitations or types of accommodations as "obvious" in the way that it is obvious that a pregnant employee late in pregnancy needs a larger uniform or properly fitting safety equipment. Thus, the Commission did not make any changes to the proposed rule based on comments concerning limitations or accommodations that should be considered "obvious."

Not Reasonable To Seek Supporting Documentation—Known

Although fewer comments mentioned the proposed rule's second example of when it would not be reasonable for a covered entity to seek documentation in support of a request for PWFA accommodation, some did suggest that the term "sufficient information" was too vague and asked if "information" was intended to encompass something broader than "documentation."

---

[182] *Enforcement Guidance on Pregnancy Discrimination, supra* note 31, at (I)(A)(1)(a) (discussing the "obviousness" of pregnancy and how that can play into a discrimination claim).

[183] 42 U.S.C. 2000gg–1(2); 29 CFR 1636.4(b).

This example is intended to prevent covered entities from seeking supporting documentation unnecessarily. In the NPRM, the Commission explained that information is sufficient if it substantiates that the employee has a known PWFA limitation and needs a change or adjustment at work. The word "information" was intentionally used to make clear that it does not have to be documentation from a health care provider but can be information provided by the employee or their representative, such as a self-confirmation of pregnancy, when permitted, or confirmation from the employee that the need, explained by previously submitted documentation, has occurred again. The example provided in one of the comments illustrates the need for this provision—in this example, an employee who had already provided documentation from her health care provider was required to provide a new doctor's note for each absence due to morning sickness, an impossible requirement given that no one would be able to see a doctor every time they were too nauseous to go to work. If an employee already has provided documentation that because of morning sickness they need to use intermittent leave as necessary for the next 2 months, the covered entity may not seek new documentation from a health care provider every time the employee needs to use leave due to morning sickness.

To ensure that this example is not misunderstood to be broader than intended, the Interpretive Guidance makes clear in section *1636.3(l)(1)(ii)— Known* that when it is otherwise reasonable under the circumstances to seek supporting documentation, an employer is not prohibited from doing so simply because the employee has stated that they have a PWFA limitation and need an adjustment or change at work.

The language in the final rule about this example has been changed to follow the language in the final rule regarding the supporting documentation that may be sought and to clarify that the example applies whenever the employer has sufficient information to determine that the employee has a PWFA limitation and needs a change or adjustment at work, regardless of how the employer obtains that information. Thus, the Commission changed "When the employee or applicant already has provided the covered entity with sufficient information to substantiate that the employee or applicant has a known limitation and that a change or adjustment at work is needed;" to "When the employer already has

sufficient information to determine whether the employee has a physical or mental condition related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions (a limitation) and needs an adjustment or change at work due to the limitation." Additionally in the Interpretive Guidance for this section, the Commission has added how this provision may apply to episodic conditions.

Not Reasonable To Seek Supporting Documentation—Predictable Assessments

The proposed rule provided a third example of when it is not reasonable for an employer to seek supporting documentation: when an employee at any time during their pregnancy states or confirms that they are pregnant and seeks one of the modifications described as "predictable assessments" under § 1636.3(j)(4)(i) through (iv).

Many comments suggested that this example be expanded to include modifications beyond those recognized as "predictable assessments" under § 1636.3(j)(4)(i) through (iv). Some of these comments argued that the list should be expanded because the principles underlying whether a particular accommodation warrants medical certification differ from concerns related to undue hardship. The Commission declines to expand this example. The recognized "predictable assessments" reflect a small set of simple, inexpensive, commonly sought accommodations that are widely known to be needed during an uncomplicated pregnancy, and where documentation would not be easily obtained or necessary. In the Commission's view, the examples suggested for the possible expansion of the rule do not fall within this same category, although the Commission agrees that in some situations the modifications offered in the comments would not require supporting documentation and reminds employers that they are not obligated to seek supporting documentation.[184] Moreover, because the proposed list of accommodations that fit within this example are limited to modifications already singled out in § 1636.3(j)(4), the example is clear and easy to apply.

One comment, focused more on the proposed regulation's discussion of predictable assessments in an undue hardship context, noted that employers should be able to seek documentation to confirm that the requested "predictable assessments" modifications are needed due to pregnancy, as opposed to some other reason. The Commission agrees that this example is limited to pregnancy. Thus, under the final rule, the employer is not permitted to seek supporting documentation if the employee asks for one of these modifications due to a physical or mental condition related to, affected by, or arising out of pregnancy (a limitation) and provides self-confirmation as defined in § 1636.3(l)(4).[185]

Not Reasonable To Seek Supporting Documentation—Lactation

The fourth example in the proposed rule regarding when it is not reasonable under the circumstances to seek documentation concerns lactation and pumping. A few comments noted that, as written, the example suggests it is not reasonable to seek additional supporting documentation, as opposed to making clear that no supporting documentation may be requested. The Commission has reworded this example for purposes of clarification, in the final rule, as explained below.

Another comment noted that the example as written was overly broad because it prohibits an employer from asking for documentation anytime the requested accommodation relates to lactation. The comment noted that if, for example, an individual requests to work from home while breastfeeding or requests accommodations due to anxiety over a child's difficulties learning to bottle feed, the employer would be prohibited from seeking supporting documentation regarding such requested accommodations.

The Commission agrees that the language in the proposed rule could be interpreted too broadly. The final rule makes clear that it is not reasonable under the circumstances for a covered entity to seek supporting documentation in response to a request for reasonable accommodations involving lactation and a time and/or place to pump at work or any other modification related to pumping at work. In response to comments raising questions regarding nursing during work hours, the final

---

[184] The comments suggested the following additions: time off, up to 8 weeks (or 12 weeks in some comments) to recover from childbirth; time off to attend up to 16 health care appointments while pregnant; flexible scheduling or remote work for nausea or bleeding; modifications to uniforms or dress codes; minor physical modifications to the workstation; relocation of the workstation; reprieve from lifting over 20 pounds; and access to a closer parking space, among others.

[185] A minor edit has been made to the final rule to correctly identify the items listed in § 1636.3(j)(4) as "modifications" and not "reasonable accommodations." As noted in the rule, these modifications will virtually always be determined to be reasonable accommodations that do not impose an undue hardship.

rule also explains that when the regular location of the employee's workplace makes nursing during work hours a possibility because the child is in close proximity, it would not be reasonable to seek supporting documentation in response to a request for reasonable accommodations involving a time to nurse during work hours.[186] This example does not extend, however, to accommodations involving lactation beyond these modifications. Thus, for example, if a lactating employee requests full-time remote work due to a condition that makes pumping difficult, it may be reasonable for the covered entity to seek reasonable documentation about the limitation and need for remote work, although it is not required to do so.

The final rule is, therefore, modified to clarify that when the reasonable accommodation is related to a time and/or place to pump, or any other modification related to pumping at work, and the employee has provided self-confirmation as defined in paragraph (l)(4), it is not reasonable to request supporting documentation. Likewise, it would not be reasonable to seek documentation when the accommodation is related to a time to nurse when the regular location of the employee's workplace makes nursing during work hours a possibility because the child is in close proximity and the employee has provided self-confirmation of the fact, as defined in paragraph (l)(4). The Commission has added information regarding nursing during work hours in the Interpretive Guidance in section *1636.3(l)(1)(iv)— Lactation* and made other minor modifications.

Not Reasonable To Seek Supporting Documentation—Employer's Own Policies or Practices (New § 1636.3(l)(1)(v))

The final rule contains a new example of when it is not reasonable under the circumstances for the employer to seek supporting documentation. New § 1636.3(l)(1)(v) states that seeking supporting documentation is not reasonable under the circumstances when the requested modification is one that employees without known limitations under the PWFA would receive pursuant to the employer's

policy or practice without submitting supporting documentation. For example, if an employer has a policy or practice of only seeking supporting documentation for the use of leave if the leave is for 3 or more consecutive days, it would not be reasonable for the employer to seek supporting documentation from someone who needs leave due to a known limitation under the PWFA when they request leave for 2 or fewer days.[187] The Commission has added information from this paragraph in the Interpretive Guidance in section *1636.3(l)(1)(v)— Employer's Own Policies or Practices.*

Comments and Response to Comments Regarding Self-Confirmation and Concerns About Fraudulent Requests

Several comments requested that the Commission provide a definition of "self-attestation." Others argued that, when it comes to pregnancy itself, self-attestation should always be sufficient to avoid deterring requests for accommodations, stigmatizing those who need accommodations due to pregnancy, or violating rights to privacy. Yet other comments agreed that self-attestation of pregnancy should usually be sufficient but suggested that the final rule allow requests for documentation when the employer has reason to believe that there is "abuse." Some argued that self-attestation of pregnancy should only be adequate when the pregnancy is obvious and, in all other circumstances, documentation of pregnancy should be required. Still others suggested that, while self-attestation was sufficient to establish pregnancy, employers should develop policies to address situations where they have reason to believe an employee who claimed to be pregnant is not being honest.

The Commission agrees that a definition of "self-attestation" is necessary and also has determined that the word "attestation" suggests too formal a requirement. Instead, the final rule uses the term "self-confirmation" and provides a definition at § 1636.3(l)(4). As explained above, the final rule permits self-confirmation of pregnancy when the pregnancy is obvious and at any stage in a pregnancy when the employee is requesting one of the modifications outlined in § 1636.3(j)(4)(i) through (iv) due to pregnancy. When the reasonable

accommodation is related to a time and/or place to pump at work, a time to nurse during work hours (where the regular location of the employee's workplace makes nursing during work hours a possibility because the child is in close proximity), or any other modification related to pumping at work, the final rule permits self-confirmation of the fact that the employee is pumping at work or nursing during work hours.

In addition to comments arguing that self-confirmation of pregnancy should not be allowed when an employer has "reason to believe" there is abuse, several comments expressed fear that limiting an employer's ability to seek supporting documentation will lead to fraudulent requests and prevent employers from punishing those who lie about limitations or the need for accommodations.

In response, the Commission notes that the final regulation permits employers to seek supporting documentation when it is reasonable under the circumstances to determine that the employee has a physical or mental condition related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions (a limitation) and needs an adjustment or change at work due to the limitation. Moreover, the PWFA itself does not prohibit employers from taking disciplinary action against those who make false claims about limitations or the need for accommodations. The Commission urges covered entities to follow the advice of the comment proposing that employers should have clear policies in place regarding how to address fraud, dishonesty, and abuse. It is, of course, also the case that an employee may not be punished for seeking an accommodation even if it is ultimately determined that they are not entitled to one under the law.

The Commission declines to implement the suggestion that the final rule include a provision stating it would not violate the PWFA's anti-retaliation and anti-coercion provisions if a covered entity punished someone who falsely claimed to need a reasonable accommodation. The final rule, like the proposed rule, explains the requirements for establishing that a covered entity has retaliated against or coerced someone in violation of the PWFA. Moreover, it would not violate the PWFA to fail to provide an accommodation to an individual who failed to establish they were entitled to one, assuming the covered entity abided by the requirements and prohibitions of the PWFA. Of course, the Commission cautions that neither those seeking

---

[186] "Nursing during work hours" is where the regular location of the employee's workplace makes nursing during work hours a possibility because the child is in close proximity and could include, for example, when an employee who always teleworks from home has their child at home and takes a break to nurse the child, or when an employee takes a break to travel to a nearby or onsite daycare center to nurse.

[187] Conversely, if regular employer practices would require documentation when the PWFA would not, or would require more documentation than the PWFA would allow, in a situation where the employee is requesting an accommodation under the PWFA, the PWFA restrictions on supporting documentation would apply.

accommodations under the PWFA nor those charged with responding to such requests may lie during their interactions.

## Comments and Response to Comments Suggesting Other Frameworks for the Final Rule on Supporting Documentation

Another documentation framework suggested by comments was that covered entities may seek supporting documentation except when: (1) the need for accommodation is obvious; and (2) the covered entity's requirement conflicts with their stated policy on non-pregnancy-related requests for accommodations. Another comment argued that while covered entities should not typically be able to seek supporting documentation, they should be able to do so if someone claims to be pregnant but never gives birth or supplies a birth certificate or is requesting accommodations for fertility treatments.

The Commission declines to adopt either of these suggestions. The first suggestion appears to be a combination of the proposed rule's example of "obvious" conditions and an acknowledgment that employers already provide accommodations to employees in certain situations without seeking supporting documentation. The Commission declines to make this change, although the first example of when it would not be reasonable under the circumstances to seek documentation in the final rule is based on the "obvious" conditions and accommodations, as explained above.

The Commission declines to make the changes in the other comment because it does not account for many situations, such as where an employer may need details about a lifting restriction or need for remote work during pregnancy or any type of limitation post-partum.

### *1636.3(l)(2) Reasonable Documentation*

The proposed rule explained that when it is reasonable under the circumstances to require supporting documentation to determine whether to grant the accommodation, the covered entity is permitted only to require "reasonable documentation." The proposed rule defined "reasonable documentation" as documentation that is sufficient to describe or confirm: (1) the physical or mental condition; (2) that it is related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions; and (3) that an adjustment or change at work is needed.

Many comments argued that the definition of "reasonable

documentation" should be revised to state that the documentation does not need to identify the nature of, or provide a detailed description of, the physical or mental condition that is the known limitation. These comments suggested that reasonable documentation be limited to documentation that: (1) confirms the individual has a limitation that is related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions, and (2) explains that a change at work is needed due to the limitation. Some comments expressed concern about protecting the privacy of employees and urged that "reasonable documentation" be limited to the "minimum information" necessary to assess the condition's nexus to pregnancy, childbirth, or a related medical condition. The comments noted, for example, that supporting documentation need not state that an employee has to attend a medical appointment related to a miscarriage, but can simply state that the employee needs to attend a medical appointment during work hours due to pregnancy, childbirth, or a related medical condition and thus needs a modified start time on a particular day; or the employee has a prohibition on lifting more than 50 pounds in connection with a condition related to pregnancy and thus needs an accommodation that eliminates the need to lift more than 50 pounds. In support of this suggestion, the comments explained that asking employees to disclose detailed medical information to their employers, especially information related to reproductive and mental health, which can be particularly sensitive or stigmatizing, may deter employees from seeking accommodations.[188] Comments also noted that limiting reasonable documentation to confirming the related medical condition would help protect patient privacy, which the comments

---

[188] Although not directly on point, one comment suggested that allowing employers to request supporting documentation about an employee's anticipated or actual abortion, *i.e.*, information about the specific condition that is the known limitation or the specific related medical condition, would potentially conflict with a proposed rule currently under consideration by the U.S. Department of Health and Human Services concerning the Health Insurance Portability and Accountability Act (HIPAA) and heightened confidentiality requirements for information related to reproductive health care. In response, the Commission notes that HIPAA applies to health care providers, employers are not required to obtain supporting documentation under the PWFA, and any such documentation must be kept confidential, as explained in the Interpretive Guidance in section *1636.7(a)(1)* under *Prohibition on Disability-Related Inquiries and Medical Examinations and Protection of Medical Information.*

said could be especially important for employees obtaining abortions or facing intimate partner violence.

The Commission agrees that protecting patient privacy is an important goal and that covered entities should be limited to seeking the minimum documentation needed to determine if an employee is entitled to a reasonable accommodation under the PWFA. However, the Commission also recognizes that there may be situations when an employer needs documentation to determine whether the employee has a PWFA limitation and the adjustment or change at work is needed due to the limitation.

To take account of these interests, the Commission made several changes to the definition of "reasonable documentation."

First, the Commission modified the proposed definition of "reasonable documentation" to clarify that reasonable documentation means "the minimum that is sufficient," rather than merely stating that reasonable documentation means documentation that is "sufficient."

Second, because all that is required is the minimum documentation that is sufficient, the Commission has changed the language in the regulation to specify that the supporting documentation need only confirm (rather than "describe or confirm") the physical or mental condition. The Commission has included the language from § 1636.3(a)(2) in § 1636.3(l)(2)(i) defining a physical or mental condition (*i.e.*, an impediment or problem that may be modest, minor, and/or episodic; a need or a problem related to maintaining the employee's health or the health of the pregnancy; or an employee seeking health care related to pregnancy, childbirth, or a related medical condition itself). Finally, in the Interpretive Guidance in section *1636.3(l)(2) Reasonable Documentation*, the Commission has explained that this confirmation can be accomplished through a simple statement and that it does not need to include a diagnosis.

Third, again because all that is required is the minimum documentation that is sufficient, the Commission has changed the language in the regulation to specify that the supporting documentation need only confirm (rather than "describe or confirm") that the physical or mental condition is related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions and has explained in the Interpretive Guidance in section *1636.3(l)(2) Reasonable Documentation* that pregnancy, childbirth, or related medical conditions

need not be the sole, the original, or a substantial cause of the physical or mental condition given that the statutory language only requires that physical or mental condition be "related to, affected by, or arising out of" "pregnancy, childbirth, or related medical conditions."

Fourth, the final rule provides that the supporting documentation should describe (rather than "describe or confirm") the adjustment or change needed at work and has added that the adjustment or change needed at work must be "due to the limitation" in order to ensure that the documentation connects the physical or mental condition with the adjustment or change at work.

In the Interpretive Guidance in section *1636.3(l)(2) Reasonable Documentation,* the Commission has added information explaining how seeking more documentation than is set out in § 1636.3(l) can violate 42 U.S.C. 2000gg–1(1) (§ 1636.4(a)(3)) (if the employer fails to provide the accommodation based on lack of documentation) and how seeking additional documentation or information beyond what is permitted in § 1636.3(l) when an employee requests a reasonable accommodation may violate the PWFA's prohibitions on retaliation in 42 U.S.C. 2000gg–2(f) (§ 1636.5(f)).[189]

The Commission has also added examples in the Interpretive Guidance in section *1636.3(l)(2) Reasonable Documentation* to illustrate when documentation from a health care provider is sufficient.

Generally, as explained in the Interpretive Guidance in section *1636.3(l)(2) Reasonable Documentation,* confirming the physical or mental condition requires only a simple statement that the physical or mental condition meets the first part of the definition of "limitation" at § 1636.3(a)(2) (*i.e.,* the physical or mental condition is: an impediment or problem, including ones that are modest, minor, or episodic; a need or a problem related to maintaining the health of the employee or the pregnancy; or that the employee is seeking health care related to pregnancy, childbirth, or a related medical condition itself). Because the physical or mental condition can be something like fatigue or vomiting, there is no need for the statement to contain a medical diagnosis. Thus, as set out in the Interpretive Guidance in section

*1636.3(l)(2) Reasonable Documentation,* documentation is sufficient under § 1636.3(l)(2) even if it does not contain a medical diagnosis, as long as it has a simple statement of the physical or mental condition.

The physical or mental condition must be related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions. The supporting documentation need not state that the pregnancy, childbirth, or related medical conditions are the sole, the original, or a substantial cause of the physical or mental condition at issue, because the statute only requires that the physical or mental condition be "related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions." If relevant, the documentation should include confirmation that the "related medical condition" is related to pregnancy or childbirth.

The documentation should describe what adjustment or change at work is needed due to the limitation. The Interpretive Guidance in section *1636.3(l)(2) Reasonable Documentation* provides examples of these.

Other comments pointed out that reasonable documentation should include information about the duration of the limitation. These comments observed that while some limitations may continue for the entire length of a pregnancy, the duration of other limitations, such as a postpartum limitation that requires leave, may be less definite. The comments also noted that the expected duration of the limitation and corresponding accommodation can be a key factor in determining whether the accommodation would impose an undue hardship, or whether an essential function(s) could be performed "in the near future." The Commission generally agrees with this point but concludes that it would be more useful for covered entities to have information about the expected duration of the needed modification, rather than the duration of the limitation itself. The Commission also believes including information about the duration of the modification could address concerns other comments raised about the need for periodic updates of documentation. If, for example, supporting documentation indicates that a pregnant employee would need an hour of leave every morning due to morning sickness for the first 3 months of the pregnancy, the employer would be permitted to request updated documentation at the end of those 3 months if the employee requested that the accommodation continue. Thus, the Interpretive

Guidance states that an estimate of the expected duration of the modification may be part of the supporting documentation sought by the employer, if necessary.[190]

Numerous comments argued that covered entities may not require employees to use a specific form for supporting documentation, as long as the necessary information is provided. These and other comments also expressed concern about employers who require employees seeking accommodations under the PWFA to submit specific forms that call for extensive medical information. One comment submitted, as attachments, several examples of forms that employees requesting accommodations under the PWFA have been required to use. These forms require information beyond the description of "reasonable documentation" presented in the proposed rule and adopted by this final rule. The forms submitted sought extensive information, including: whether the individual had previously requested an accommodation; validation that the individual could perform a long list of essential functions, irrespective of the accommodation being requested; identification of any diagnoses, impairments, or conditions that might affect the individual's ability to perform essential job functions or major life activities; description of side effects of any treatment received; the length of time the impairment or condition had been treated; the expected duration of each impairment or condition; and whether the health care practitioner considered the condition in question to be a disability. The comments also noted that some covered entities reject supporting documentation based on

[189] The Commission has moved the examples that were in the proposed appendix (formerly Examples #36 and #37) to § 1636.5(f).

[190] The Commission is aware of case law under the ADA indicating that, when determining whether the reasonable accommodation of leave will enable an employee to perform the essential functions of a position "in the near future," the focus should be on the expected duration of the impairment, as opposed to the expected duration of the needed leave. *See, e.g., Punt v. Kelly Servs.,* 862 F.3d 1040, 1051 (10th Cir. 2017); *Aubrey v. Koppes,* 975 F.3d 995, 1010–11 (10th Cir. 2020); *Herrmann,* 21 F.4th at 676–77. In those cases, courts appear to be concerned about situations where the end of the leave and the ability to return to work are not coterminous. Because many accommodations under the PWFA will be for temporary conditions, the Commission expects that this issue will not arise with frequency. For example, if an employee needs an essential function temporarily suspended until the end of their pregnancy, the end of the suspension and the end of their pregnancy are the same time. The Commission also is concerned that using the duration of the limitation could lead to inaccurate information. An employee may, for example, have a limitation that will last for an entire pregnancy, such as an inability to be around certain chemicals, but only needs a change at work for the 2-month period during which the job in question involves proximity to those chemicals.

technical issues, such as use of the wrong form.

Other comments argued that instead of prohibiting the use of specific forms to request documentation, the final rule should create a PWFA certification form, similar to the FMLA certification form, that covered entities could use to request documentation and that would provide what comments called a "safe harbor."

The final rule provides that when a covered entity is permitted to seek supporting documentation under this rule, it may not require that supporting documentation be submitted on a specific form. This is consistent with similar rules under the FMLA [191] and the ADA [192] and recognizes that although employers may seek supporting documentation, they should not burden employees or health care providers with unnecessary technical requirements in their efforts to obtain the information.

Finally, the final rule does not include a "PWFA certification form." Covered entities should comply with the PWFA's rule on supporting documentation by only seeking supporting documentation when it is reasonable under the circumstances and, in those cases, requesting only reasonable documentation, as defined in the final rule. The Commission fears that designing a PWFA certification form will create an assumption that supporting documentation is necessary in every case. It is not, and indeed it is barred in many circumstances. Employers are not required to obtain documentation for any reasonable accommodation under the PWFA and are encouraged to minimize documentation burdens on employees seeking accommodation under the PWFA whenever possible.

The final rule therefore states, at new § 1636.3(l)(2)(i), that when it is reasonable under the circumstances, as established in paragraph (l)(1), to seek supporting documentation, the covered entity is limited to seeking reasonable documentation. Reasonable documentation means the minimum that is sufficient to: (A) confirm the

physical or mental condition (*i.e.*, an impediment or problem that may be modest, minor, and/or episodic; a need or a problem related to maintaining the employee's health or the health of the pregnancy; or an employee seeking health care related to pregnancy, childbirth, or a related medical condition itself) whether or not such condition meets the definition of disability specified in the ADA; (B) confirm that the physical or mental condition is related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions (together with paragraph (l)(2)(i)(A), "a limitation"); and (C) describe the adjustment or change at work that is needed due to the limitation.

Furthermore, new § 1636.3(l)(2)(ii) states that covered entities may not require that supporting documentation be submitted on a specific form.

*1636.3(l)(3) Limitations on a Covered Entity Seeking Supporting Documentation From a Health Care Provider*

The proposed rule explained that if a covered entity decides to seek supporting documentation and meets the requirements set forth in the rule, the covered entity may require that the reasonable documentation come from a health care provider. Comments suggested one additional type of health care provider, an industrial hygienist, and also questioned whether "doula" should be included. The Commission has added "industrial hygienist" to the list and has moved the reference to "doula" to a place on the list closer to health care providers who offer similar services. Many comments also recommended that the Commission affirmatively state that the health care provider could be one that provides services through telehealth; the Commission has made that addition in the regulation. The final rule also slightly reorders the listed health care providers so that those focused on mental health care are listed together, adds "psychiatrist," which was unintentionally left out of the proposed list, and changes the term "providers" in "mental health care providers" to "professionals," to parallel the term used in the Commission's ADA policy guidance.[193]

Some comments focused on the first part of the proposed rule's list of health care providers, *i.e.*, "A covered entity may require documentation comes from an appropriate health care provider, in a particular situation," and suggested that the words "appropriate" and "in a

particular situation" be removed in the final rule. The comments argued that these words give covered entities unnecessary power over the type of health care provider an employee should visit. The Commission concludes that these qualifiers are unnecessary and that it should be up to the employee seeking care and the health care provider providing care to determine what type of health care provider can best serve the person's needs. The final rule therefore removes these words.

Other comments suggested that the final rule make clear that the treating physician does not need to be the one to provide the reasonable documentation, pointing to privacy concerns in relation to certain kinds of medical care; these comments cited the example of abortion care. The comments stated that a health care provider familiar with the employee's circumstances should be allowed to provide the necessary information even if they are not the person treating the condition in question. As noted above, when an employer is permitted to seek supporting documentation, they are only permitted to seek reasonable documentation, which means the minimum that is sufficient to: (A) confirm the physical or mental condition (*i.e.*, an impediment or problem that may be modest, minor, and/or episodic; a need or a problem related to maintaining the employee's health or the health of the pregnancy; or an employee seeking health care related to pregnancy, childbirth, or a related medical condition itself) whether or not such condition meets the definition of disability specified in the ADA; (B) confirm that the physical or mental condition is related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions (together with paragraph (l)(2)(i)(A), "a limitation"); and (C) describe the adjustment or change at work that is needed due to the limitation. Any health care provider familiar enough with the individual's circumstances to provide the described information may do so under the final rule, whether or not they are treating the individual for the condition at issue.

Comments and Response to Comments Regarding Prohibition on Examinations by Employer's Health Care Provider

The NPRM stated that it is not practical or necessary for a covered entity to request or require that an employee be examined by a health care provider of the covered entity's choosing.

---

[191] *See* U.S. Dep't of Lab., Wage & Hour Division, *The Employer's Guide to the Family and Medical Leave Act* 32, *https://www.dol.gov/sites/dolgov/files/WHD/legacy/files/employerguide.pdf* (last visited Mar. 18, 2024) ("The employer must accept a complete and sufficient medical certification, regardless of the format. The employer cannot reject a medical certification that contains all the information needed to determine if the leave is FMLA-qualifying.").

[192] *See Enforcement Guidance on Reasonable Accommodation, supra* note 111, at Question 6 (explaining that employers may only request reasonable documentation).

[193] *See id.*

Most of the comments on this proposal agreed that covered entities should never be able to require individuals requesting accommodation under the PWFA to be examined by a health care provider of the covered entity's choosing. Comments explained that this would cause an unnecessary invasion of privacy, have a chilling effect, burden employees unnecessarily, and cause delay. Some comments noted that such a requirement would have a particularly negative effect on individuals seeking abortion care and women of color who face racism in health care and may be particularly reluctant to go to a new provider selected by their employer. A few comments disagreed with the proposed rule, noting that second opinions should be permitted since they are permitted under the FMLA, that some employees may not have a doctor, and/or that employers who do not want to provide the accommodation supported by the employee's doctor will need to seek the opinion of their own doctor.

The final rule prohibits covered entities from requiring that an employee be examined by a health care provider of the covered entity's choosing. Although such a practice is allowed in certain cases under the ADA and the FMLA, even under those laws the practice is limited.[194] The PWFA covers many common physical or mental conditions for which there will never be a need for a medical diagnosis, and accommodations under the PWFA will usually be temporary. This supports a final rule under the PWFA that prohibits examinations by the employer's health care provider, even in the limited situations in which the practice is permitted under the ADA.

The final rule, for these reasons and to avoid the chilling effect, burdens, and

potential delays outlined in the comments, states that a covered entity may not require that the employee seeking the accommodation be examined by a health care provider selected by the covered entity.

*1636.3(l)(4) Formerly Proposed Confidentiality/New Final Self-Confirmation of Pregnancy or Lactation*

As explained *supra* in the preamble in section *1636.3(l)(1) Seeking Supporting Documentation Only When Reasonable Under the Circumstances,* the final rule at § 1636.3(l)(4) provides a definition for self-confirmation of pregnancy or lactation. The corresponding section in the Interpretive Guidance, *1636.3(l)(4) Self-Confirmation of Pregnancy or Lactation,* explains how this is a simple procedure that can occur in the same conversation where the employee requests an accommodation.

The proposed rule, § 1636.3(l)(4), and the corresponding discussion in the proposed appendix, described the ADA's prohibition on disclosure of confidential medical information, including medical information obtained under the PWFA. Because these legal protections arise from the ADA and not the PWFA, the Commission removed reference to them in the PWFA regulation itself. The relevant protections are now described in the Interpretive Guidance in section *1636.7(a)(1)* under *Prohibition on Disability-Related Inquiries and Medical Examinations and Protection of Medical Information.* This section explains, as did the NPRM, that while the PWFA does not have its own provision requiring the protection of medical information, employees covered by the PWFA also are covered by the ADA, and, under the ADA, covered entities are required to keep medical information confidential, with limited exceptions.[195] The NPRM also stated that intentional disclosure of medical information obtained through the PWFA's reasonable accommodation process may violate the PWFA's prohibition on retaliation and/or coercion.[196] Information regarding how the disclosure of medical information also may violate the reasonable accommodation provision of the PWFA is in the Interpretive Guidance in section *1636.5(f)* under *Possible Violations of 42 U.S.C. 2000gg–2(f) (§ 1636.5(f)) Based on Seeking Supporting Documentation During the Reasonable Accommodation Process and Disclosure of Medical Information.*

**1636.4 Formerly Proposed Prohibited Practices/New Final Nondiscrimination With Regard to Reasonable Accommodations Related to Pregnancy**

The Commission changed the title of § 1636.4 in the regulation and the corresponding section of the Interpretive Guidance to match the title of this section in the statute.

*1636.4(a) Failing To Provide Reasonable Accommodation*

The Commission did not receive comments suggesting changes to § 1636.4(a). The Commission made only one minor change to that part of the regulation, to change the terminology used there (and throughout the preamble, regulation, and Interpretive Guidance) from "denial" of reasonable accommodation to "failure to provide" reasonable accommodation. This better reflects the language in 42 U.S.C. 2000gg–1(1), which makes it "an unlawful employment practice for a covered entity to" "not make reasonable accommodations." Throughout the preamble, regulation, and the Interpretive Guidance, the Commission uses "failure to provide a reasonable accommodation" and "not make reasonable accommodation" interchangeably. In § 1636.4(a)(1) through (4) in the regulation, in addition to the changes described below, the Commission has added language to the effect that these sections apply to "qualified employees" with "known limitations related to pregnancy, childbirth, or related medical conditions" so that they use the same language as 42 U.S.C. 2000gg–1(1) and § 1636.4(a).

*1636.4(a)(1) Formerly Proposed Unnecessary Delay in Responding to a Request for Reasonable Accommodation/New Final Unnecessary Delay in Providing a Reasonable Accommodation*

The Commission received several comments regarding the importance of making delay in the provision of a reasonable accommodation actionable.

First, numerous comments recommended that the Commission clarify that "unnecessary delay in responding to the request for a reasonable accommodation" (the language in § 1636.4(a)(1) in the proposed rule) would cover delay in all parts of the reasonable accommodation process, including delay in responding to the initial request, engaging in the interactive process, or providing the reasonable accommodation. The Commission agrees that the intent of the phrase "delay in responding to the

---

[194] Under the FMLA, an employer can only require a second opinion (at the employer's expense) if it has "reason to doubt the validity of a medical certification." 29 CFR 825.307(b). The employer can choose the health care provider to provide the second opinion but generally may not select a health care provider that it employs or contracts with on a regular basis. For the third opinion (also at the employer's expense), if one is sought, the health care provider must be jointly designated or approved by the employer and the employee. 29 CFR 825.307(c). Under the ADA, the practice is allowed only if the individual provides insufficient information from their own health care provider and, even in those circumstances, ADA guidance explains that the employer should explain why the documentation is insufficient and allow the individual an opportunity to provide the missing information in a timely manner. The ADA also requires the employer to pay all costs associated with the visit and requires that the examination be limited to determining the existence of an ADA disability and the functional limitations that require reasonable accommodation. *See Enforcement Guidance on Reasonable Accommodation, supra* note 111, at Question 7.

[195] 88 FR 54738, 54789.
[196] *Id.* at 54744, 54789, 54793.

request for a reasonable accommodation" encompasses delay in any part of the reasonable accommodation process. To clarify this point, the Commission has changed the language in the rule to "unnecessary delay in providing a reasonable accommodation," has changed the title of this provision in the Interpretive Guidance in section to *1636.4(a)(1) Unnecessary Delay in Providing a Reasonable Accommodation* and has added examples of the different ways this could manifest in the Interpretive Guidance for this section.

Second, one comment recommended clarifying that a delay by a third-party administrator acting for the covered entity is attributable to the covered entity. The Commission agrees and has added that information in the Interpretive Guidance in section *1636.4(a)(1) Unnecessary Delay in Providing a Reasonable Accommodation.*

Third, numerous comments suggested adding that the "urgency" of the need for the accommodation be included as a factor, to account for situations where the need for the accommodation is an emergency. The Commission declines to add this as a factor because defining "urgency" would be difficult and could lead to unnecessary litigation regarding whether or not something was "urgent." However, the Commission has added information regarding emergencies in the Interpretive Guidance in section *1636.3(k)* under *Engaging in the Interactive Process.*

Numerous comments also suggested removing the factor in paragraph (a)(1)(vi) of the proposed rule (the factor in paragraph (a)(1)(vii) of the final rule), which provides that delay in providing a reasonable accommodation is more likely to be excused where an interim reasonable accommodation is offered and that the interim reasonable accommodation cannot be leave, unless certain circumstances apply. Comments argued that the factor in paragraph (a)(1)(vi) of the proposed rule could encourage covered entities to rely on interim accommodations and engage in delay. The Commission recognizes this risk, but, given the numerous comments that argued in favor of requiring employers to provide interim reasonable accommodations, the Commission believes that creating an incentive for the provision of interim reasonable accommodations is important. Responding to the comments, the Commission has limited the use of leave to excuse an unnecessary delay to the situations where an employee requests or selects leave as an interim reasonable accommodation. The Commission also

has removed the sentence, "[i]f an interim reasonable accommodation is offered, delay by the covered entity is more likely to be excused" from proposed § 1636.4(a)(1)(vi) (now § 1636.4(a)(1)(vii)). The language in § 1636.4(a)(1) stating that these are factors to be considered in determining whether there has been unnecessary delay already explains this concept.

The Commission has included an additional factor for determining whether delay is unnecessary—how long the accommodation may be required. This factor accounts for situations where the accommodation is a short-term matter, and, by unnecessarily delaying the response, the covered entity, in effect, fails to provide the accommodation. This factor is in keeping with the discussion of delay in the NPRM, which noted that "[g]iven that pregnancy-related limitations are frequently temporary, a delay in providing an accommodation may mean that the period necessitating the accommodation could pass without action simply because of the delay." [197]

### 1636.4(a)(2) Refusing an Accommodation

The Commission received a few comments regarding § 1636.4(a)(2), which provides that a qualified employee does not have to accept an accommodation. If the employee cannot perform the essential functions of the position without the accommodation, the employee is not qualified. The proposed rule required employers also to consider whether the employee could be qualified with the temporary suspension of an essential function(s). The comments stated that the proposed rule created a situation where the employee could refuse the reasonable accommodation that allowed them to perform the essential functions of the position because the employee would prefer an accommodation that allowed them to suspend an essential function(s) and this, in effect, would remove the employer's "ultimate discretion" in choosing between effective accommodations. In order to address this issue, the Commission changed this paragraph in the final regulation so that it does not give the impression that an employee can reject a reasonable accommodation that allows them to do the essential function(s) of their position in order to have an essential function(s) of the position temporarily suspended.

[197] 88 FR 54739, 54789.

*1636.4(a)(3) Covered Entity Failing To Provide a Reasonable Accommodation Due to Lack of Supporting Documentation*

The Commission has made four changes to this section of the regulation in order to make it align with § 1636.3(l), the provision regarding the limits on supporting documentation, and has reflected these changes in the Interpretive Guidance in section *1636.4(a)(3) Covered Entity Failing To Provide a Reasonable Accommodation Due to Lack of Supporting Documentation.* First, the Commission has added as § 1636.4(a)(3)(i) that the covered entity must have sought the supporting documentation. The Commission has maintained as § 1636.4(a)(3)(ii) that seeking supporting documentation must be reasonable under the circumstances as set out in § 1636.3(l)(1). Second, the Commission has added at § 1636.4(a)(3)(iii) that the supporting documentation sought must be "reasonable documentation" as defined by § 1636.3(l)(2). Third, the Commission has added at § 1636.4(a)(3)(iv) that the employer must provide the employee sufficient time to obtain and provide the supporting documentation. Fourth, the Commission has added the word "unnecessary" before the word "delay" because an employer only has to justify unnecessary delay.

Finally, the Commission has reformatted this section to indicate the different requirements.

*1636.4(a)(4) Choosing Among Possible Accommodations*

The Commission received several comments about this provision. These comments pointed out that "similarly situated" is a term that courts have narrowly construed and that its use here could impede ensuring that employees receive the accommodations that provide equal opportunity. Some comments suggested adding that equal employment opportunity can be determined based on evidence of the opportunities that would have been available to the employee had they not identified a known limitation or sought an accommodation.

The Commission agrees that modifications should be made in this section to protect qualified employees and to minimize the need for litigation. Thus, the regulation provides that the "average employee" who is "similarly situated" without a known limitation can include the qualified employee themselves, and the Interpretive Guidance in section *1636.4(a)(4) Choosing Among Possible*

*Accommodations* contains additional information regarding evidence about possible comparators. Other comments suggested adding that the similarly situated employees should be similar in material respects, not all respects; the Commission agrees that this is true for similarly situated employees in general but did not add this concept to the regulation.

The Commission also received some comments recommending the addition of another standard, requiring employers to choose an option that most effectively meets the employee's needs and provides the employee with equal employment opportunity. The Commission declines to make this change. Employers must provide an accommodation that is effective. The employer does not have to provide the "most effective" accommodation or the accommodation that is the choice of the qualified employee. The Commission also received a comment recommending that the Commission add a provision to the rule stating that employers may not select any accommodation that negatively affects an employee's terms or conditions of employment at any time. The Commission did not add this because adopting a requirement that employers may not select an accommodation that "negatively affects" terms or conditions would be a new standard, and the general concept of this comment is covered by the provision requiring equal employment opportunity.

One comment suggested an employer should provide the employee with a choice of options that are responsive to the employee's needs and allow the employee to choose from the options. This comment asserted that doing so would decrease litigation for the employer. While the Commission agrees that this is a best practice and may help the covered entity avoid litigation, the Commission did not add this idea to the regulation or the Interpretive Guidance.

Finally, the Commission reordered the sentences in this provision in the regulation and removed the phrase "that do not cause an undue hardship" from this section of the regulation because it is redundant. The covered entity does not have to provide an accommodation that causes an undue hardship.

### 1636.4(b) Requiring a Qualified Employee To Accept an Accommodation

The Commission received a few comments regarding this provision. One comment argued that the interactive process is not always necessary. The Commission agrees that for some simple accommodations, the interactive process can be a very quick conversation where the employee provides information to the covered entity and the covered entity provides the accommodation. However, covered entities may not require a qualified employee to accept an accommodation other than one arrived at through the interactive process under 42 U.S.C. 2000gg–1(2). Thus, employers should not provide employees with an accommodation because the covered entity thinks the accommodation is "obvious." Rather, the covered entity should engage the employee in the interactive process, even if it is very abbreviated.

The Commission received a few comments suggesting changes to the description of damages that could be available in Example #39 in the proposed rule. The Commission agrees that the damages suggested by the comments could be available and has made changes to the example, which is now Example #57 in the Interpretive Guidance in section *1636.4(b) Requiring a Qualified Employee To Accept an Accommodation.*

### 1636.4(c) Denying Opportunities to Qualified Employees

The Commission did not receive comments regarding this provision. The Commission maintained the language from the proposed rule for this provision. The Commission also has made minor changes in the Interpretive Guidance in section *1636.4(c) Denying Opportunities to Qualified Employees* for this provision.

### 1636.4(d) Requiring a Qualified Employee To Take Leave

The Commission maintained the language from the proposed rule for this provision. The Commission also has made minor changes in the Interpretive Guidance in section *1636.4(d) Requiring a Qualified Employee To Take Leave* for this provision.

Some comments involving this section raised questions about whether an employer may temporarily require the employee to take leave in situations when the employee cannot work without an accommodation. The Commission has responded to these comments in the preamble in section *1636.3(h)* under *Interim Reasonable Accommodations.* Other comments expressed concerns that this provision would prohibit an employee from requesting leave as a reasonable accommodation. As explained in the proposed rule, the proposed appendix, and the Interpretive Guidance in section *1636.4(d) Requiring a Qualified Employee To Take Leave,* this is incorrect—the prohibition on requiring a qualified employee to take leave does not prohibit an employee from requesting leave as a reasonable accommodation.

### 1636.4(e) Adverse Action on Account of Requesting or Using a Reasonable Accommodation

The Commission received a few comments regarding the definition of "adverse action," including comments that disagreed with the Commission's definition and instead recommended using the definition of "adverse employment action"; comments that suggested that the Commission include its proposed definition in the regulation itself; and a few comments agreeing with its definition of "terms, conditions, or privileges of employment."

The Commission disagrees that "adverse action in terms, conditions, or privileges of employment" should have the same meaning as courts have given the term "adverse employment action." Given the divergent views of the circuits at the time of this writing, adopting the definition of "adverse employment action" in interpreting 42 U.S.C. 2000gg–1(5) would lead to different outcomes in different circuits and could reduce protections for employees covered by the PWFA.[198]

The Commission has retained the language in the proposed regulation, as well as the language from the proposed appendix, with minor changes. Specifically, the Commission has removed language from the proposed appendix about this standard not appearing in Title VII or the ADA, and the reference to the basic dictionary definition "adverse," because it has determined that this information is not necessary to the explanation of this provision. The Commission also has reorganized the paragraphs in the Interpretive Guidance in section *1636.4(e) Adverse Action on Account of Requesting or Using a Reasonable Accommodation* and made a few minor edits to the examples for this section. The Commission has added language to Example #58 in section *1636.4(e) Adverse Action on Account of Requesting or Using a Reasonable Accommodation* (proposed Example #40) to clarify that when an employee receives leave as a reasonable accommodation, production standards such as sales quotas may need to be

---

[198] *Compare, e.g., Muldrow* v. *City of St. Louis,* 30 F.4th 680 (8th Cir. 2022) (concluding that a transfer is not an adverse employment action absent materially significant disadvantage), *cert. granted in part,* 143 S. Ct. 2686 (2023), *with Threat* v. *City of Cleveland,* 6 F.4th 672, 678–79 (6th Cir. 2021) (concluding that an "adverse employment action" may include shift changes and reassignments).

prorated to ensure that leave is an effective accommodation, as discussed *infra* in the Interpretive Guidance in section *1636.3(h)* under *Ensuring That Employees Are Not Penalized for Using Reasonable Accommodations.*

### 1636.5   Remedies and Enforcement

Some comments expressed general concerns regarding enforcement, including a concern that employees would find it too difficult to enforce their rights under the law, a suggestion that the Commission find a way to enforce the law quickly, and a recommendation that the Commission create a safe harbor for small businesses that would allow businesses with 15 to 50 employees the opportunity to fix a violation once it was brought to their attention and that would permit a finding of liability only following repeated or willful violations.

The Commission agrees that it is important that employees be able to enforce their rights; to that end, the Commission conducts outreach with employees on a regular basis. The Commission shares the desire for expeditious compliance; this regulation is one step in furtherance of that goal. The Commission conducts significant outreach to small businesses to help them with compliance; employers can obtain more information about these opportunities at: *https://www.eeoc.gov/ employers/small-business.* Finally, the Commission does not have the authority to create an exemption for small employers; however, the Commission notes that damages in cases regarding the provision of a reasonable accommodation can be limited by the employer's good-faith efforts.[199]

In the final rule, the Commission has removed section § 1636.5(b) because it applies to employees protected by the Congressional Accountability Act. Throughout this section of this regulation, the Commission has replaced references to "this section" with "the PWFA" to clarify that the powers, remedies, and procedures referenced in this section are provided by the statute itself.

### 1636.5(a) Remedies and Enforcement Under Title VII

The final rule at § 1636.5(a) is the same as the proposed rule. The Commission has added information in the Interpretive Guidance in section *1636.5(a) Remedies and Enforcement Under Title VII* to inform employees and covered entities regarding the time limit for filing charges under the PWFA, based on how the Commission enforces

other statutes for which it is responsible.

### 1636.5(e) Remedies and Enforcement Under Section 717 of the Civil Rights Act of 1964

In the Interpretive Guidance in section *1636.5(e) Remedies and Enforcement Under Section 717 of the Civil Rights Act of 1964,* the Commission has added information from the NPRM regarding the application of § 1636.5(e).[200]

#### Damages

In the Interpretive Guidance in section *1636.5* under *Damages,* the Commission has added information regarding the damages available under the PWFA pursuant to 1977A of the Revised Statutes of the United States, 42 U.S.C. 1981a.

### 1636.5(f)(1) and (2) Prohibition Against Retaliation

The Commission received some comments regarding the prohibitions on retaliation and coercion.

First, one comment questioned whether the regulation's prohibition of an employer seeking documentation when it is not reasonable to do so would create a new standard for retaliation that does not require intent; it does not. To minimize any misunderstanding and provide a fuller explanation of when going beyond the regulatory limits on seeking supporting documentation set out in § 1636.3(l) may violate 42 U.S.C. 2000gg–2(f) (§ 1636.5(f)), the Commission removed proposed rule § 1636.5(f)(1)(iv) and (v) and proposed rule § 1636.5(f)(2)(iv) and (v) and, instead, explained the interaction between the limitations on supporting documentation and the PWFA's retaliation provision in detail in the Interpretive Guidance in section *1636.5(f) Prohibition Against Retaliation.*

Second, as part of these changes, the Commission has created a new section in the Interpretive Guidance in section *1636.5(f)* entitled *Possible Violations of 42 U.S.C. 2000gg–2(f) (§ 1636.5(f)) Based on Seeking Supporting Documentation During the Reasonable Accommodation Process and Disclosure of Medical Information* and has moved the explanation of how seeking supporting documentation or disclosing medical information may violate 42 U.S.C. 2000gg–2(f) to this section. The Commission also has added an additional example regarding the unauthorized disclosure of medical information to the examples of

retaliation in the Interpretive Guidance in section *1636.5(f) Prohibition Against Retaliation.*

Third, the Commission removed language that a request for a reasonable accommodation constitutes "protected activity" in the coercion section of the regulation, at proposed rule § 1636.5(f)(2)(ii), because "protected activity" is not a phrase used in the analysis of coercion claims.

The Commission received several comments requesting additional examples involving the prohibition on retaliation. The Commission agrees that more examples could be helpful and has included a few more in the Interpretive Guidance in section *1636.5(f) Prohibition Against Retaliation,* including some related to requests for supporting documentation. Other comments suggested edits to certain examples in the proposal, and the Commission incorporated some of those modifications. For example, in addition to adding descriptive titles to the examples in this section, the Commission has added facts to certain examples to strengthen the connection between the covered entity's actions and the protected activity. The Commission added explanations to clarify how certain actions that may violate this provision of the PWFA, also may violate 42 U.S.C. 2000gg–1(1) (because these actions may make the accommodation ineffective) and 2000gg–1(5) (prohibiting adverse actions), rather than merely including the relevant statutory citation.

The Commission also has included in the Interpretive Guidance in section *1636.5(f) Prohibition Against Retaliation* additional information about retaliation and coercion from its *Enforcement Guidance on Retaliation and Related Issues* so that this information is more easily accessible.

One comment requested that information regarding neutral work rules, such as fixed leave policies, be moved from the Interpretive Guidance to the regulation. The Commission declines to make this change but has added examples regarding this type of policy to the Interpretive Guidance in section *1636.5(f) Prohibition Against Retaliation.*

The Commission received a few comments expressing concern that mission statements, statements regarding religious beliefs of an employer, or statements in employee handbooks would be seen as violating § 1636.5(f)(2). Whether a statement violates 42 U.S.C. 2000gg–2(f)(2) will depend on the language of the statement, but, as the examples provided in the NPRM and the final rule

---

[199] 42 U.S.C. 2000gg–2(g).

[200] 88 FR 54742.

for this provision show, the making of general statements regarding an employer's religious or religious beliefs is not the type of conduct that the Commission previously has determined would be prohibited by this provision.[201]

Additionally, the Commission made minor changes to § 1636.5(f). The proposed rule at § 1636.5(f)(1) referred to "employee, applicant, or former employee" and "individual" to refer to this group; the final rule uses only "employee" as that is the language in the statute. The removal of the words "applicant" and "former employee" and "individual" is a minor change. The statute at 42 U.S.C. 2000gg(3) provides that "employee" in the statute includes "applicant"; the same is true for the regulation and the Interpretive Guidance. The statute at 42 U.S.C. 2000gg(3)(A) refers to the Title VII definition of employee; that definition includes former employees when relevant.[202] Finally, the proposed rule in § 1636.5(f)(2) used the word "because"; this has been changed to "on account of" to match the statute.

*1636.5(g) Limitation on Monetary Damages*

Several comments recommended that the Commission clarify that the good faith defense to money damages is limited to damages for a covered entity's failure to make reasonable accommodations under 42 U.S.C. 2000gg–1(1) (§ 1636.4(a)) only. The Commission agrees that this clarification would be helpful and has added it to the Interpretive Guidance in section *1636.5(g) Limitation on Monetary Damages.*

**1636.6   Waiver of State Immunity**

A few comments recommended that the Commission either exempt State employers from the PWFA or create exceptions in the PWFA for certain State laws to provide States greater protection from the PWFA. The Commission declines to make these changes. The statute at 42 U.S.C. 2000gg–4 provides that "A State shall not be immune under the 11th Amendment to the Constitution from an action in a Federal or State court of competent jurisdiction for a violation of

[the PWFA]." A decision by the Commission to modify this waiver would be in violation of the statute.[203]

**1636.7   Relationship to Other Laws**

*1636.7(a)(1) Relationship to Other Laws in General*

Many comments addressed the PWFA and its relationship to other laws, some suggesting the inclusion of additional laws in the discussion in the Interpretive Guidance and others asking whether accommodations under the PWFA would lead to violations of other laws. The Commission has maintained the rule language from the NPRM and has made changes and additions to the Interpretive Guidance in section *1636.7(a)(1) Relationship to Other Laws in General* in response to the comments. These changes and the Commission's responses to specific comments are discussed below.

Some comments recommended that collective bargaining agreements (CBAs) and workplace safety laws be added to the list of laws in § 1636.7(a)(1), to clarify that the PWFA does not invalidate CBAs or workplace safety laws that provide greater or equal protection for individuals affected by pregnancy, childbirth, or related medical conditions. The Commission agrees with this suggestion and has added language to this effect in the Interpretive Guidance in section *1636.7(a)(1) Relationship to Other Laws in General.*

Other comments asked how the PWFA will interact with the FMLA. The FMLA provides job-protected unpaid leave for serious health conditions, including pregnancy. As set out in 2000gg–5(a)(1), nothing in the PWFA invalidates or limits the powers, remedies, and procedures under other Federal laws that provide greater or equal protection for individuals affected by pregnancy, childbirth, or related medical conditions. Thus, the PWFA does not invalidate or limit the rights of employees covered by the FMLA or State versions of it. The Department of Labor's regulations set out how the FMLA interacts with other civil rights

laws, including leave as a reasonable accommodation under the ADA.[204]

Some comments asked the Commission whether breaks under the PWFA must be paid, either under the PUMP Act or the FLSA.[205] As the Commission explained in the discussion of reasonable accommodations in the NPRM, "Breaks may be paid or unpaid depending on the employer's normal policies and other applicable laws. Breaks may exceed the number that an employer normally provides because reasonable accommodations may require an employer to alter its policies, barring undue hardship."[206]

One comment suggested that the Commission create a safe harbor provision for covered entities similar to one created by the Department of Labor for wage deductions. The PWFA does not provide the Commission with this authority.

The Commission received some comments regarding the requirements for Federal agencies under Executive Order 13164. The Commission will respond to those through its work with Federal agencies.

Comments and Response to Comments Regarding the Relationship With Title VII

The Commission did not receive many comments regarding the discussion in the proposed appendix concerning § 1636.7(a)(1), about the relationship between the PWFA and Title VII. The Commission has maintained the discussion from the proposed appendix with some edits for style and clarity and added it in the Interpretive Guidance in section *1636.7(a)(1)* under *The PWFA and Title VII.*

A few comments questioned whether providing an accommodation under the PWFA would violate Title VII's prohibition on sex discrimination. This issue is discussed in more detail above.[207] The employees covered by the

---

[201] Certain types of employer statements or policies, of course, may violate 42 U.S.C. 2000gg–2(f). *Cf. EEOC v. Morgan Stanley & Co., Inc.,* No. 01–CIV–8421–RMBRLE, 2002 WL 31108179, at *2 (S.D.N.Y. Sept. 20, 2002) (finding that the portion of the employer's code of conduct that required employees to notify the employer before contacting a governmental or regulatory body violated public policy because it chilled employee communications with the EEOC).

[202] *See supra* note 6.

[203] An amendment was introduced and defeated in the Senate that would have eliminated the PWFA's waiver of State immunity. *See Roll Call 415, Bill Number: H.R. 2617,* U.S. Senate (Dec. 22, 2022), *https://www.senate.gov/legislative/LIS/roll_call_votes/vote117/vote_117_2_00415.htm* (setting out the Senate vote tally for S. Amend. 6569 to S. Amend. 6558 to S. Amend. 6552 to H.R. 2617, Consolidated Appropriations Act, 2023) (40 yeas, 57 nays, 3 not voting); 168 Cong. Rec. S10,070 (daily ed. Dec. 22, 2022) (setting out the Senate vote tally for S. Amend. 6569 to the Pregnant Workers Fairness Act).

[204] *See* 29 CFR 825.702.

[205] *See* U.S. Dep't of Lab., *Field Assistance Bulletin No. 2023–02: Enforcement of Protections for Employees to Pump Breast Milk at Work* (May 17, 2023), *https://www.dol.gov/sites/dolgov/files/WHD/fab/2023-2.pdf* (discussing compensability of breaks under the FLSA).

[206] 88 FR 54730 n.102, 54781 n.60.

[207] *See supra, Response to Comments Regarding the Commission's Proposed Definition of "Pregnancy, Childbirth, or Related Medical Conditions" as Reflected in Statutory Text; see, e.g., Enforcement Guidance on Pregnancy Discrimination, supra* note 31, at (I)(C)(3); *Cal. Fed. Sav. & Loan Ass'n,* 479 U.S. at 290 (concluding that the State could require employers to provide up to four months of medical leave to pregnant women where "[t]he statute is narrowly drawn to cover only the period of actual physical disability on account of pregnancy, childbirth, or related medical

PWFA also are covered by Title VII. Title VII, as amended by the PDA, provides for accommodations for employees affected by pregnancy, childbirth, or related medical conditions under certain circumstances, even when all employees do not receive the same accommodations.[208] Providing these accommodations under Title VII does not violate Title VII even if they are not provided to all employees; the same is true under the PWFA.

Comments and Response to Comments Regarding the Relationship With the ADA

The Commission received some comments with questions regarding the interaction between the ADA and the PWFA. One comment recommended that the Commission state that if an employee might be covered by both the ADA and the PWFA, an employer should consider the ADA first. The Commission disagrees that it should make this determination or that employers should necessarily consider the ADA first. While it will depend on the specific facts of the situation, generally, when an employee might be covered by both the ADA and the PWFA, an employer's analysis should begin with the PWFA because the definition of "known limitation" means that under the PWFA an employer is required to provide reasonable accommodations in situations in which it may not be required to do so under the ADA. This is consistent with 42 U.S.C. 2000gg–5(a)(1), which states that when multiple State or Federal laws provide protection, a covered entity should consider all applicable laws and follow the principles that provide the broadest protections and impose the smallest burden on the employee. This has been added in the Interpretive Guidance in section *1636.7(a)(1)* under *The PWFA and the ADA.*

A few comments questioned whether providing an accommodation under the PWFA would result in violations of the ADA if doing so made granting the accommodation to an individual covered by the ADA an undue hardship or because the PWFA provides for accommodations in situations that may not be covered by other laws. As an initial matter, the Commission disagrees that accommodations should be viewed as a zero-sum game. Under both the

ADA and the PWFA, an individualized assessment occurs; there is no guarantee that an accommodation for one employee will result in another employee receiving or not receiving one. As data from the Job Accommodation Network show, most accommodations under the ADA are no-cost or low-cost.[209] If there is truly a situation where there are limits—for example, if there are only 10 parking spaces—the employer can provide the accommodation until the limit is reached on a first-come, first-served or another neutral basis. Further, the fact that an employee is able to receive an accommodation under the PWFA that an employee cannot receive under the ADA does not violate the ADA because in that case, the employer is not refusing the accommodation to the person because of their disability. Rather, the employer is complying with its obligations under a different Federal law.

The Commission has provided additional information and examples regarding the interaction between the PWFA and the ADA, in the Interpretive Guidance in section *1636.7(a)(1)* under *The PWFA and the ADA,* including examples of that relationship.

Within section *1636.7(a)(1)* of the Interpretive Guidance, as set out below, the Commission has included information about two critical ADA protections that apply to employees covered by the PWFA: the rules that limit covered entities from making disability-related inquiries and requiring medical exams and the rules protecting confidential medical information.[210] The information explains how the ADA's provisions that restrict the ability of employers to make disability-related inquiries interact with the PWFA and how the ADA's rules regarding confidential medical information and restrictions on sharing confidential medical information apply to medical information collected under the PWFA.

Comments and Response to Comments Regarding the Confidentiality of Medical Information

As explained in the NPRM, the PWFA does not include a provision specifically requiring covered entities to maintain the confidentiality of medical information obtained in support of accommodation requests under the PWFA. However, applicants,

employees, and former employees covered by the PWFA also are covered by the ADA.[211] Under the ADA, covered entities are required to keep medical information of all applicants, employees, and former employees (whether or not those individuals have disabilities) confidential, with limited exceptions.[212] The Commission has long held that these ADA rules on confidentiality apply to all medical information, whether obtained through the ADA process or otherwise; thus this protection applies to medical information obtained under the PWFA, including medical information voluntarily provided and medical information provided as part of the reasonable accommodation process.[213] Moreover, as a practical matter, in many circumstances under the PWFA the medical information obtained by an employer may involve a condition that could be a disability; rather than an employer attempting to parse out whether to keep certain information confidential or not, all medical information should be kept confidential.[214] Additionally, an employer's disclosure of medical information obtained through the PWFA's reasonable accommodation process beyond what is permitted under the ADA may violate the PWFA's prohibition on retaliation.

Many comments expressed support for the proposed rule's position that the ADA rules regarding medical confidentiality apply to medical information obtained by covered entities under the PWFA. Some of these

---

conditions."); *Johnson,* 431 F.3d at 328 ("If the leave given to biological mothers is granted due to the physical trauma they sustain giving birth, then it is conferred for a valid reason wholly separate from gender.").

[208] *See, e.g., Enforcement Guidance on Pregnancy Discrimination, supra* note 31, at (I)(C)(3); *Young,* 595 U.S. 206.

[209] Job Accommodation Network, *Costs and Benefits of Accommodation* (May 4, 2023) [hereinafter *Costs and Benefits of Accommodation*], *https://askjan.org/topics/costs.cfm.*

[210] The ADA confidentiality rule was included in the NPRM in § 1636.3(l)(4).

[211] *See* 42 U.S.C. 12111(4), (5) (ADA); 42 U.S.C. 2000gg(2)(B)(i), (3) (PWFA).

[212] 42 U.S.C. 12112(d)(3)(B); 29 CFR 1630.14(b)(1), (c)(1), (d)(4); *Enforcement Guidance on Disability-Related Inquiries, supra* note 170, at text accompanying nn.9–10 ("The ADA requires employers to treat any medical information obtained from a disability-related inquiry or medical examination . . . as well as any medical information voluntarily disclosed by an employee, as a confidential medical record. Employers may share such information only with supervisors, managers, first aid and safety personnel, and government officials investigating compliance with the ADA."); *Enforcement Guidance: Preemployment Disability-Related Questions, supra* note 170, at text accompanying n.6 ("Medical information must be kept confidential.").

[213] *See supra* note 212. This policy also appears in numerous EEOC technical assistance documents. *See, e.g.,* EEOC, *Visual Disabilities in the Workplace and the Americans with Disabilities Act,* text preceding n.43 (2023), *https://www.eeoc.gov/laws/guidance/visual-disabilities-workplace-and-americans-disabilities-act#q8* ("With limited exceptions, an employer must keep confidential any medical information it learns about an applicant or employee.").

[214] Requests for accommodation under the PWFA also may overlap with FMLA issues, and the FMLA requires medical information to be kept confidential as well. 29 CFR 825.500(g).

comments urged the Commission to specifically state in the final rule that employers must store an employee's medical information separate from personnel files and may not share it with anyone other than the supervisor implementing the accommodation. Another comment suggested that the final rule require employers to obtain an employee's written consent before disclosing medical information received under the PWFA in all circumstances. Finally, some comments expressed concern that State law enforcement agencies may seek medical information from covered entities regarding abortion care and requested that the final rule address this issue.

Because these confidentiality provisions arise from a statute other than the PWFA, and the violation of these provisions, if one occurred, would be of the ADA and not the PWFA, the Commission has decided not to include them in the regulation itself. Rather, this information has been included in the Interpretive Guidance in section *1636.7(a)(1)* under *The PWFA and the ADA* and under *Prohibition on Disability-Related Inquiries and Medical Examinations and Protection of Medical Information.*

In response to concerns about State law enforcement agencies seeking medical information related to abortion care from PWFA-covered entities, the Commission reminds employers that the PWFA rules do not require employers to seek supporting documentation regarding requested reasonable accommodations. The Commission further reminds employers that when the employer is permitted to seek supporting documentation, it is limited to the minimum that is sufficient to confirm that the employee has a physical or mental condition related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions (a limitation), and describe the adjustment or change at work that is needed due to the limitation. Moreover, as noted above, the ADA's confidentiality provisions and limits on disclosure of medical information, reiterated in the Interpretive Guidance in section *1636.7(a)(1)* under *The PWFA and the ADA* and under *Prohibition on Disability-Related Inquiries and Medical Examinations and Protection of Medical Information,* apply to medical information, including medical information collected by the employer under the PWFA, and thus the ADA prohibits an employer from releasing medical information except in five specified circumstances.

Further, the Commission has reorganized section *1636.5(f)* in the

Interpretive Guidance to highlight the potential retaliation claims that could arise regarding a covered entity seeking or releasing supporting documentation in situations where it would not be permissible under the regulation. These situations are now addressed in the Interpretive Guidance in section *1636.5(f)* under *Possible Violations of 42 U.S.C. 2000gg–2(f) (§ 1636.5(f)) Based on Seeking Supporting Documentation During the Reasonable Accommodation Process and Disclosure of Medical Information.*

### 1636.7(a)(2) Limitations Related to Employer-Sponsored Health Plans

The Commission has not changed the regulation for this provision.

### 1636.7(b) Rule of Construction

The Commission received thousands of comments supporting the Commission's case-by-case approach to considering employer defenses asserting religious or constitutional considerations. The Commission also received tens of thousands of comments asserting that giving certain accommodations for pregnancy, childbirth, or related medical conditions, such as providing leave for abortion, infertility treatments, or contraception, would infringe upon the employer's religious freedom and therefore the employer should not be required to provide such accommodations. As explained below, employers who assert that the provision of such accommodations infringes upon their religious exercise may assert numerous statutory and constitutional defenses. Because the facts of each case will differ, the Commission will apply these defenses using a case-by-case analysis,[215] using the framework provided here and consistent with the Commission's approach to other statutes that the Commission enforces.[216]

Section 107(b) of the PWFA, codified at 42 U.S.C. 2000gg–5(b), provides a "rule of construction" stating that the law is "subject to the applicability to religious employment" set forth in section 702(a) of the Civil Rights Act of 1964, 42 U.S.C. 2000e–1(a). The relevant portion of section 702(a) provides that "[Title VII] shall not apply . . . to a religious corporation, association,

educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities."[217] The final rule reiterates this PWFA statutory language and adds that nothing in the regulation limits the rights of a covered entity under the U.S. Constitution, and nothing in 42 U.S.C. 2000gg–5(b) or the regulation limits the rights of an employee under other civil rights statutes.

### Comments Regarding the Rule of Construction

The Commission received comments that expressed a broad range of interpretations of the PWFA's "rule of construction" provision in section 107(b). Numerous comments agreed with the Commission's proposed rule to consider the provision's application to employers on a case-by-case basis. Many such comments reasoned that the provision should be interpreted consistent with section 702(a) of the Civil Rights Act of 1964 to avoid confusion regarding its application, especially because the same facts may underlie Title VII and PWFA claims. Those comments further observed that section 702(a) strikes the correct balance between the rights of employees and the rights of employers. Other comments focused on one or more of three of section 107(b)'s components: (1) which entities qualify under the provision; (2) the scope of employment decisions to which the provision applies; and (3) the extent to which the provision limits the application of the PWFA's requirements as to qualifying religious entities. The Commission describes the range of comments received as to each component in turn.

Many comments asserted that section 107(b) covers religious entities only if they are qualifying entities under section 702(a). Conversely, many other comments asserted that section 107(b) should apply more broadly to entities owned and operated by religious employers. A few such comments stated that the provision should assess whether entities qualify under section 702(a) using the definition of a "religious" organization articulated in a 2017 Memorandum issued by the U.S. Attorney General.[218] Other comments

---

[215] *See* EEOC, *Compliance Manual on Religious Discrimination,* (12–I)(C) (2021) [hereinafter *Compliance Manual on Religious Discrimination*], *https://www.eeoc.gov/laws/guidance/section-12-religious-discrimination.*

[216] In accordance with the Commission's *Compliance Manual on Religious Discrimination* and the Commission's long-standing polices, the Commission will consider these defenses, when asserted, in all parts of its investigation and enforcement process.

[217] 42 U.S.C. 2000e–1(a).

[218] Memorandum from the Attorney General to All Executive Departments and Agencies, *Federal Law Protections for Religious Liberty* (Oct. 6, 2017), 82 FR 49668, 49670, 49677 (Oct. 26, 2017) [hereinafter *Attorney General Religious Liberty*

said that the provision should be redefined to include employers that object to accommodations on conscience, moral, ethical, scientific, health or medical, or any other secular grounds.

Comments varied regarding their view of the scope of employment decisions to which section 107(b) applies. Some comments asserted that section 107(b) applies only to hiring and firing coreligionists, and other comments asserted that it applies only to providing PWFA accommodations. By contrast, some comments asserted that the provision broadly covers all aspects of the employment relationship.

Furthermore, comments varied regarding the extent to which section 107(b) limits the application of the PWFA's requirements as to qualifying religious entities. Some comments stated that the provision allows qualifying entities to prefer coreligionists only in providing accommodation but does not otherwise exempt qualifying religious organizations from providing accommodations or permit them not to provide accommodations based on religious beliefs. Such comments noted that Congress demonstrated its intent not to broadly exempt religious employers from PWFA compliance when, prior to the law's passage, it rejected an amendment that would have done so.[219] A few such comments maintained that an overly broad religious exemption would permit employers to impede employees' autonomy over decision-making regarding pregnancy, freedom of religion, and freedom from the religious beliefs of others. Further, some comments asserted that the provision, like section 702(a), does not allow a qualifying entity to discriminate on other protected bases, such as sex. Some comments stated that, in their view, when an employer is a qualifying entity under section 702(a), the employer is exempt from all of Title VII's requirements, and the same rule should apply to the PWFA.

Other comments argued that section 107(b) exempts religious organizations more broadly than section 702(a). Some of these comments stated that limiting the exemption only to allow qualifying organizations to prefer coreligionists is at odds with Title VII's text and *Bostock* v. *Clayton County*;[220] that this reasoning does not follow given that the

PWFA does not prohibit religious discrimination; that it ignores the Supreme Court's expressed concerns about such an interpretation; and that it ignores the PWFA's legislative history indicating that Members of Congress were concerned about religious organizations' rights. Such comments therefore concluded that a qualifying organization should be able both to prefer coreligionists and to abstain from making an accommodation that would violate the organization's religion under section 107(b).

Comments urging the Commission to interpret section 107(b) more broadly than section 702(a) recommended that the provision be interpreted consistent with the religious entities provision in Title I of the ADA;[221] those comments asserted that an employer should be permitted to require conformity to its religious tenets but acknowledged that the ADA provision does not allow employers to discriminate on other grounds.

The Commission also received comments that either directly or indirectly responded to five directed questions about how the rule of construction would apply in concrete factual scenarios. These comments offered a few fact patterns and expressed concerns that employers may be required to provide leave for medical procedures to which they have religious objections, and that employers may be liable under the PWFA's retaliation and coercion provisions for objecting to medical procedures for religious reasons. Comments expressed concern that employers would violate the law's coercion provision if they informed their employees of their religious objections to certain medical procedures, or that they would violate the law's retaliation provision if they terminated the employment of an employee who requested or received an accommodation for such a medical procedure.

**Response to Comments Regarding the Rule of Construction**

The Commission will interpret the applicability of the PWFA's rule of construction provision on a case-by-case basis as it does with section 702(a) of the Civil Rights Act of 1964. The Commission's decision is based on several considerations. First, section 107(b) of the PWFA expressly states that the PWFA is "subject to the applicability to religious employment" set forth in section 702(a) of the Civil Rights Act of 1964, 42 U.S.C. 2000e–1(a). Courts and the Commission always

have considered defenses raised under section 702(a) on a case-by-case basis.[222] Second, comments suggesting a different approach provided conflicting recommendations and few concrete factual scenarios as to how the provision would apply under these different rules, thereby creating ambiguity and, as detailed below, failing to provide sufficient justification for deviating from the established case-by-case approach. Third, this case-by-case approach will enable employers, employees, the Commission, and courts to consider the circumstances of each case to the fullest extent under both Title VII—should accommodation claims for pregnancy, childbirth, or related medical conditions be raised under that statute—and the PWFA.[223]

The Commission declines to adopt the religious entities provision set forth in Title I of the ADA because the ADA's provision contains an additional clause not found in section 702(a) of the Civil Rights Act, and Congress explicitly referenced section 702(a)—not the ADA religious entities provision—in enacting the PWFA. As stated above, the Commission must rely on the text of the law that Congress enacted.

In support of the idea that the Commission should adopt a broader interpretation of section 107(b) than section 702(a), many comments cited to the legislative history of the PWFA. Although the Commission's interpretation is driven by the statute's text,[224] given the many comments that cited to the legislative history and the comments submitted by legislators, the Commission reviews the legislative

---

Memorandum], *https://www.justice.gov/opa/press-release/file/1001891/download*.

[219] *See* 168 Cong. Rec. S10,069–70 (daily ed. Dec. 22, 2022) (S. Amend. 6577).

[220] 590 U.S. 644, 682 (2020) (describing section 702(a) of the Civil Rights Act of 1964).

[221] *See* 42 U.S.C. 12113(d).

[222] *See, e.g., Compliance Manual on Religious Discrimination, supra* note 215, at (12–I)(C)(1) (stating that whether an organization is covered by section 702 "depend[s] on the facts"; "Where the religious organization exemption is asserted by a respondent employer, the Commission will consider the facts on a case-by-case basis; no one factor is dispositive in determining if a covered entity is a religious organization under Title VII's exemption."); *id.* at n.60 (discussing court decisions when a defendant has asserted section 702(a) as a defense); *Newsome* v. *EEOC,* 301 F.3d 227, 229–30 (5th Cir. 2002) (per curiam) (addressing a case in which EEOC dismissed a charge where the employer offered evidence that it fell under the religious organization exception).

[223] For example, an employee can bring a failure to accommodate claim under 42 U.S.C. 2000gg–1(1); the same facts could be the subject of a discrimination claim under Title VII. *See generally Young,* 575 U.S. 206 (concerning the Title VII claim of a pregnant employee who was denied a light duty position). Likewise, depending on the facts, an employee who was terminated after requesting or using a reasonable accommodation under the PWFA could have a claim under both the PWFA (42 U.S.C. 2000gg–1(5), 2000gg–2(f)) and Title VII for pregnancy discrimination or retaliation.

[224] *See supra* note 67.

history of section 107(b) and responds to these comments.

The PWFA, as it passed the U.S. House of Representatives, did not include the language now contained in section 107(b). The House also had voted against including similar language in section 107(b) in the definition of "employer." [225] In the U.S. Senate, the language now contained in section 107(b) was first offered as an amendment by one of the bill's principal sponsors, Senator William Cassidy.[226] Senator James Lankford then offered a different amendment that would have provided even broader protection for religious organizations using language that differed from both the ultimately enacted language of section 107(b) and Title VII's section 702(a).[227] Senator Cassidy spoke against that broader amendment, stating that language referring to section 702(a) would be broad enough—he noted the initial section 107(b) language "was drafted by House Republican Virginia Foxx. . . . [and] addresses the issue," and asserted that Senator Lankford's amendment "would increase the likelihood of changing previous [Title VII] jurisprudence." [228] Ultimately, the section 107(b) language offered by Senator Cassidy and adopted in the final bill was added to a rule of construction, rather than to the definition of "employer." [229] Prior to the House vote on the final omnibus bill, Representative Jerrold Nadler, the principal sponsor of the PWFA in the House, and Representative Robert Scott, the Chair of the House committee that had jurisdiction over the PWFA, issued statements regarding the interpretation of section 107(b); both statements interpreted the provision's protections differently than Senator Cassidy had interpreted them.[230]

The Commission also reviewed the post-enactment statements of legislators.[231] After enactment, and during this proposed rule's public comment period, Senator Lankford submitted a comment that included a legal analysis of why he believed the language in section 702(a) applied more

broadly than hiring and firing.[232] Senator Patricia Murray and Senator Robert Casey both submitted comments that agreed with the Commission's proposed case-by-case approach.[233] Representatives Nadler and Scott also submitted comments; Representative Nadler's comment endorsed the Commission's proposed case-by-case approach and restated the views he had expressed earlier about section 107(b)—namely, that section 107(b) allows religious employers to prefer people who practice their religion in hiring and firing, and in making comparable pregnancy accommodations, but it does not otherwise exempt employers from their obligations under the PWFA to provide reasonable accommodations that do not pose an undue hardship; [234] Representative Scott also endorsed the case-by-case approach.[235]

Taken together, the statements prior to the enactment of the PWFA show that some Members of Congress disagreed about the extent of the protection they were conferring on religious organizations. This does not contradict the Commission's decision to apply section 107(b) on a case-by-case basis; in fact, a case-by-case approach will allow employers, employees, the Commission, and courts to evaluate in concrete situations the way in which section 107(b) should apply.

The Commission has made minor changes to the regulation to clarify the rights of covered entities and employees by providing parallel language in each subsection of § 1636.7(b). Specifically, § 1636.7(b)(1) previously stated: "Nothing in this provision limits the rights under the U.S. Constitution of a covered entity"; in the final regulation, it states: "Nothing in 42 U.S.C. 2000gg–5(b) or this part should be interpreted to limit a covered entity's rights under the U.S. Constitution." This language now parallels the language in § 1636.7(b)(2) regarding employees' rights.

The Commission's Interpretation of Section 107(b) of the PWFA Applied

Under the Commission's interpretation of section 107(b) of the PWFA, analogous to the Commission's

interpretation of section 702(a) of the Civil Rights Act of 1964, an employer meets the definition of a "religious corporation, association, educational institution, or society" [236] if its "purpose and character are primarily religious." [237] When a respondent employer asserts that it qualifies as a religious organization under section 107(b), the Commission will use the same factors it uses to make the determination under section 702(a). These factors include, but are not limited to: (1) whether the entity operates for a profit; (2) whether it produces a secular product; (3) whether the entity's articles of incorporation or other pertinent documents state a religious purpose; (4) whether it is owned, affiliated with, or financially supported by a formally religious entity such as a church or synagogue; (5) whether a formally religious entity participates in the management, for instance by having representatives on the board of trustees; (6) whether the entity holds itself out to the public as secular or sectarian; (7) whether the entity regularly includes prayer or other forms of worship in its activities; (8) whether it includes religious instruction in its curriculum, to the extent it is an educational institution; and (9) whether its membership is made up by coreligionists.[238] No one factor is dispositive in making this determination.

Under the Commission's interpretation of section 107(b), the PWFA does not fully exempt qualifying religious organizations from making reasonable accommodations. This is analogous to section 702(a), which likewise does not operate as a total exemption from Title VII's requirements.

Under section 702(a), for example, qualifying religious organizations are exempt from Title VII's prohibition against discrimination on the basis of religion, but, as U.S. courts of appeals have recognized, qualifying religious organizations are still subject to the law's prohibitions against discrimination on the basis of race, color, sex, and national origin, and they

[225] H.R. Rep. No. 117–27, pt. 1, at 11.

[226] *See* 168 Cong. Rec. S10,063, 10,070–71 (daily ed. Dec. 22, 2022) (S. Amend. 6558).

[227] *See* 168 Cong. Rec. S10,069–70 (daily ed. Dec. 22, 2022) (statement of Sen. James Lankford on S. Amend. 6577).

[228] *Id.* (statement of Sen. William (Bill) Cassidy).

[229] *See* 42 U.S.C. 2000gg–5(b).

[230] *See* 168 Cong. Rec. H10,527–28 (daily ed. Dec. 23, 2022) (statement of Rep. Jerrold (Jerry) Nadler); 168 Cong. Rec. E1361–62 (daily ed. Dec. 27, 2022) (statement of Rep. Robert C. (Bobby) Scott).

[231] The post-enactment statements of legislators reflect the personal views of the legislators, not the legislative history of the bill. *See supra* note 92.

[232] Comment EEOC–2023–0004–98436, Sen. James Lankford, 19 U.S. Senators, and 41 Members of Congress (Oct. 10, 2023).

[233] Comment EEOC–2023–0004–98257, Sen. Patricia (Patty) Murray and 24 U.S. Senators (Oct. 10, 2023); Comment EEOC 2023–0004–98384, Sen. Robert P. (Bob) Casey, Jr. (Oct. 10, 2023).

[234] Comment EEOC–2023–0004–98470, Rep. Jerrold (Jerry) Nadler and 82 Members of Congress (Oct. 10, 2023).

[235] Comment EEOC–2023–0004–98339, Rep. Robert C. (Bobby) Scott, Ranking Member of the House Committee on Education and the Workforce (Oct. 10, 2023).

[236] *See* 42 U.S.C. 2000e–1(a).

[237] *See Compliance Manual on Religious Discrimination, supra* note 215, at (12–I)(C)(1) & n.58. Because the Commission has already defined the type of employer that is covered by section 702(a), and the PWFA references section 702(a), the Commission is maintaining this definition rather than adopting the language in the *Attorney General Religious Liberty Memorandum, supra* note 218, which does not have the force of law.

[238] *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n,* 503 F.3d 217, 226 (3d Cir. 2007); *Compliance Manual on Religious Discrimination, supra* note 215, at (12–I)(C)(1).

may not engage in related retaliation.[239] If a qualifying religious organization asserts as a defense to a claim under the PWFA that it took the challenged action on the basis of religion and that section 107(b) should apply, the merits of any such asserted defense will therefore be determined on a case-by-case basis consistent with the facts presented and applicable law.

In response to comments that discussed potential religious defenses to the PWFA's requirements, the Commission notes that its statutory authority to investigate alleged unlawful employment practices under the statutes it enforces, including the PWFA, starts only after an aggrieved individual (or a Commissioner) files a charge of discrimination against a specific covered entity.[240] The PWFA does not provide a mechanism for the Commission to provide legally binding responses to employer inquiries about the potential applicability of religious or other defenses before this point. Moreover, the Commission does not believe it is capable of providing such

responses in the abstract, in the absence of a concrete factual context presented by a specific charge of discrimination.

In the event that a charge alleging one or more violations of the PWFA [241] is filed against a particular employer, the employer can raise religious and other defenses at any time during the Commission's administrative process.[242]—from as early as when the employer first receives a Notice of Charge of Discrimination, pursuant to 42 U.S.C. 2000e–5(b), or even after the EEOC has found reasonable cause and attempted to resolve the matter through conciliation, and is considering potential litigation.[243] Although

defenses can be asserted at any time during the EEOC's administrative process, the Commission encourages employers to raise defenses as early as possible after receiving a notice of a charge of discrimination. This will allow the EEOC to promptly consider asserted defense(s) that, if applicable, would result in dismissal of the charge. The Commission will "take great care" in evaluating the asserted religious or other defense(s) based on the facts presented and applicable law, regardless of when in the administrative process it is raised.[244]

To further assist employers with potential religious defenses in the context of individual charge investigations, the Commission is enhancing its administrative procedures to provide additional information to facilitate the submission of information regarding potential religious defenses.[245] Specifically, the Commission will revise materials accompanying the Notice of Charge of Discrimination letter and related web pages to identify how employers can raise defenses, including religious defenses, in response to the charge. These updates will be public and viewable by any employer with questions or concerns about how to raise a defense, including a religious defense, in the event that one of its employees files a charge of discrimination. In addition, as it is currently the case, the Notice of Charge will continue to direct employers to the EEOC Respondent Portal, where the employer can view and download the underlying charge of discrimination and submit documents to the EEOC

---

[239] *See Kennedy v. St. Joseph's Ministries, Inc.,* 657 F.3d 189, 192 (4th Cir. 2011) (observing that the exemption "does not exempt religious organizations from Title VII's provisions barring discrimination on the basis of race, gender, or national origin"); *Boyd v. Harding Acad. of Memphis, Inc.,* 88 F.3d 410, 413 (6th Cir. 1996) (stating that the exemption "does not . . . exempt religious educational institutions with respect to all discrimination"); *DeMarco v. Holy Cross High Sch.,* 4 F.3d 166, 173 (2d Cir. 1993) ("[R]eligious institutions that otherwise qualify as 'employer[s]' are subject to Title VII provisions relating to discrimination based on race, gender and national origin."); *Rayburn v. Gen. Conf. of Seventh-Day Adventists,* 772 F.2d 1164, 1166 (4th Cir. 1985) ("While the language of § 702 makes clear that religious institutions may base relevant hiring decisions upon religious preferences, Title VII does not confer upon religious organizations a license to make those same decisions on the basis of race, sex, or national origin. . . .") [citations omitted]; *cf. Garcia v. Salvation Army,* 918 F.3d 997, 1004–05, 1011 (9th Cir. 2019) (holding that Title VII retaliation and hostile work environment claims related to religious discrimination were barred by the religious organization exception but adjudicating the disability discrimination claim on the merits). The Commission recognizes that a few judges have recently suggested otherwise. *See Starkey v. Roman Catholic Archdiocese of Indianapolis, Inc.,* 41 F.4th 931, 946 (7th Cir. 2022) (Easterbrook, J., concurring); *Bear Creek Bible Church v. EEOC,* 571 F. Supp. 3d 571, 590–91 (N.D. Tex. 2021). However, this is not a common understanding of Title VII's religious exemption. *See* 88 FR 12852–54.

Typically, courts have accepted an employer's defense under this provision with regard to hiring or firing claims, rather than terms or conditions of employment. *Compare EEOC v. Miss. Coll.,* 626 F.2d 477, 485–86 (5th Cir. 1980) (holding that the college may prefer a Baptist to a non-Baptist in hiring), *with EEOC v. Fremont Christian Sch.,* 781 F.2d 1362, 1365–66 (9th Cir. 1986) (holding that the section 702(a) exemption did not apply where a religious school provided "head of household" health insurance benefits only to single persons and married men).

[240] *See* 42 U.S.C. 2000e–5(b).

[241] The procedures described in this paragraph apply to charges filed under any of the statutes that the Commission enforces.

[242] The Commission's administrative process typically begins when an individual, referred to as the charging party, files a charge of employment discrimination with the Commission. *See* 42 U.S.C. 2000e–5(b). The statute requires that within 10 days of the date a charge is filed, the Commission inform the employer, also referred to as the respondent, that a charge has been filed, *see id.,* and, if appropriate, the parties are invited to participate in the Commission's robust voluntary mediation program. This is an opportunity for the parties to resolve the charge early and before the Commission completes its investigation.

If there is no mediated resolution of the charge, the Commission requests a position statement from the employer and proceeds with the investigation. An employer may raise any applicable defenses in the position statement, including religious defenses. If the Commission determines that further investigation is not warranted, the agency will dismiss the charge and the employee may file suit in Federal court.

Otherwise, the Commission may request additional information from the employer during the investigation. At any point during the investigation, the employer may assert any religious defenses, including under section 107(b). The Commission generally relies on voluntary compliance with its investigation requests, although it does have statutory authority to examine or copy evidence relevant to its investigation. 42 U.S.C. 2000e–8(a); 42 U.S.C. 2000e–9; 29 U.S.C. 161(1)–(2).

Based on the evidence obtained during its investigation, the Commission makes a determination. The agency may dismiss the charge and the employee may file suit in Federal court.

If, however, the Commission makes a determination that there is "reasonable cause" to believe discrimination occurred, it endeavors to resolve the charge through conciliation, which is an informal process through which the Commission works with the parties in an attempt to develop an appropriate remedy for the discrimination and reach a final resolution administratively. *See* 42 U.S.C. 2000e–5(b). Participation in conciliation is voluntary, and it is another step in the statutorily-required administrative procedure where an employer may raise section 107(b) defenses. A finding of "reasonable cause" does not lead to any fines or penalties for the employer. If conciliation is not successful, the Commission either files a lawsuit or issues the charging party a notice of conciliation failure and closes the charge; under the Commission's current procedure, the notice of conciliation failure includes a notice informing the employee of their right to file suit in Federal court. *See generally* 29 CFR part 1601 (Procedural Regulations).

[243] Indeed, the Commission will consider religious defenses even when they are raised for the

first time in the context of an EEOC enforcement action in court. *See, e.g., EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.,* 201 F. Supp. 3d 837, 846 (E.D. Mich. 2016) (noting that the defendant raised its RFRA defense for the first time in answer to the EEOC's amended complaint, which simply corrected a typographical error in the spelling of the aggrieved employee's first name), *rev'd and remanded sub nom. EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.,* 884 F.3d 560 (6th Cir. 2018), *aff'd sub nom. Bostock v. Clayton Cnty., Ga.,* 590 U.S. 644 (2020).

[244] *Compliance Manual on Religious Discrimination, supra* note 215, at (12–I)(C)(3) (counseling EEOC investigators to "take great care" in situations involving the First Amendment and RFRA); *see also Newsome,* 301 F.3d at 229–30 (addressing a case in which the EEOC dismissed a charge where the employer offered evidence that it fell under the religious organization exception).

[245] These enhancements will apply to charges filed under any of the statutes that the EEOC enforces. Covered entities will be able to learn about the PWFA, this rule, and the enhancements outlined in this section at EEOC public outreach events and through the EEOC's website and publications. *See, e.g.,* EEOC, *Outreach, Education & Technical Assistance, https://www.eeoc.gov/outreach-education-technical-assistance* (last visited Mar. 23, 2024).

**29148** **Federal Register** / Vol. 89, No. 77 / Friday, April 19, 2024 / Rules and Regulations

electronically. The Commission will update the Respondent Portal to encourage an employer to raise in its position statement (or as soon as possible after a charge is filed) any factual or legal defenses it believes apply, including ones based on religion. The Portal also will direct employers to the Commission's website, which provides detailed instructions with examples on what a position statement should include, which will allow the employer to easily inform the Commission of a potential defense, including a religious defense. The Commission will update other resources to provide additional, clear instructions about how the employer should submit factual or legal support for any asserted defenses, including religious ones.

As appropriate, the Commission will resolve the charge based on the information submitted in support of asserted defenses, including religious defenses, in order to minimize the burden on the employer and the charging party. The Commission may contact the employer and/or the charging party if it needs additional information to evaluate the applicability of any asserted defenses. The employer or charging party may also voluntarily submit additional information regarding the applicability of any asserted defenses and may request that the EEOC prioritize the consideration of a particular defense that could be dispositive and obviate the need to investigate the merits of a charge. As with the EEOC's reasonable cause determinations, the EEOC's decision to close or continue investigating a particular charge is not entitled to deference in any subsequent litigation, where a religious or other defense will receive *de novo* review if raised by the employer.[246] Thus, regardless of whether the Commission agrees with the employer's asserted defenses, those defenses are entitled to *de novo* review by a court in any subsequent litigation.

Application of Section 107(b) of the PWFA to Retaliation and Coercion Claims

Some comments specifically raised the application of section 107(b) of the PWFA to claims regarding retaliation and coercion. The Commission's application of section 107(b) in this context will be informed by its application of section 702(a) of the Civil Rights Act of 1964 in analogous circumstances.

The Commission notes that the operative language in the PWFA's retaliation provision is the same as the language in Title VII's retaliation provision, and the Commission will interpret it accordingly.[247]

The coercion provision in the PWFA, 42 U.S.C. 2000gg–2(f)(2), is not in Title VII, but similar language is in the ADA's interference provision, and the Commission will interpret it accordingly.[248] As set out in the Interpretive Guidance in section *1636.5(f)(2)* under *Prohibition Against Coercion,* the purpose of this provision is to ensure that employees are free to avail themselves of the protections of the statute. Thus, consistent with the ADA regulation for the essentially identical provision, the rule adds "harass" to the list of prohibitions; the inclusion of the term "harass" in the regulation is intended to characterize the type of adverse treatment that may in some circumstances violate the interference provision.[249] As with the ADA, the provision does not apply to any and all conduct or statements that an individual finds intimidating; it prohibits only conduct that is reasonably likely to interfere with the exercise or enjoyment of PWFA rights.[250] As the Commission stated in the preamble in section *1636.5(f)* regarding the coercion provision, the Commission received a few comments expressing concern that mission statements, statements regarding religious beliefs of an employer, or statements in employee handbooks would be seen as violating § 1636.5(f)(2). Whether a statement violates 42 U.S.C. 2000gg–2 (§ 1636.5(f)(2)) will depend on the language of the statement, but, as the examples provided in the NPRM and in the Interpretive Guidance in section *1636.5(f)(2) Prohibition Against Coercion* show, the making of general statements regarding an employer's mission or religious beliefs is not the type of conduct that the Commission

previously has determined would be prohibited by this provision.

If a claim is raised regarding retaliation or coercion against a religious employer, the Commission will apply the same type of case-by-case analysis it applies to other PWFA and Title VII claims.

*Additional Potential Defenses to the PWFA for Covered Entities*

Religious Freedom Restoration Act

The Religious Freedom Restoration Act (RFRA) provides that the "[g]overnment shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability," except when application of the burden to the person "is in furtherance of a compelling governmental interest" and "is the least restrictive means of furthering that compelling governmental interest."[251] Nondiscrimination laws and policies have been found to serve a compelling governmental interest, including where the Commission has sought to enforce Title VII.[252] As stated in the NPRM, the Commission will carefully consider these matters, analyzing RFRA defenses to claims of discrimination on a case-by-case basis.[253]

---

[246] *Alexander* v. *Gardner-Denver Co.,* 415 U.S. 36, 60 (1974) (providing that private-sector employees have a right to a trial *de novo* for consideration of their Title VII claims).

[247] 42 U.S.C. 2000gg–2(f)(1) (PWFA); 42 U.S.C. 2000e–3(a) (Title VII).

[248] 42 U.S.C. 2000gg–2(f)(2) (PWFA); 42 U.S.C. 12203(b) (ADA).

[249] *See* 29 CFR 1630.12(b); *Enforcement Guidance on Retaliation and Related Issues,* at (III) (stating, with regard to the ADA, that "[t]he statute, regulations, and court decisions have not separately defined the terms 'coerce,' 'intimidate,' 'threaten,' and 'interfere.' Rather, as a group, these terms have been interpreted to include at least certain types of actions which, whether or not they rise to the level of unlawful retaliation, are nevertheless actionable as interference.") (2016) [hereinafter *Enforcement Guidance on Retaliation*], *https://www.eeoc.gov/laws/guidance/enforcement-guidance-retaliation-and-related-issues.*

[250] *See Enforcement Guidance on Retaliation, supra* note 249, at (III).

[251] 42 U.S.C. 2000bb–1(a), (b). If an employer raises RFRA as a defense to the Government's enforcement of a law and meets its burden of showing that the law substantially burdens its religious exercise, the burden then shifts to the Government to show that the challenged law furthers a compelling governmental interest and is the least restrictive means of furthering that compelling governmental interest, as applied to "the particular claimant whose sincere exercise of religion is being substantially burdened." *See Holt* v. *Hobbs,* 574 U.S. 352, 362–63 (2015) (quoting *Burwell* v. *Hobby Lobby Stores, Inc.,* 573 U.S. 682, 726 (2014)) (internal citations and quotation marks omitted).

[252] *See, e.g., Harris Funeral Homes,* 884 F.3d at 581 ("EEOC has established that it has a compelling interest in ensuring the Funeral Home complies with Title VII; and enforcement of Title VII is necessarily the least restrictive way to achieve that compelling interest."); *Hsu* v. *Roslyn Union Free Sch. Dist. No. 3,* 876 F. Supp. 445, 463 (E.D.N.Y. 1995) (concluding that a school district's policy was justified by its "compelling interest in eliminating and preventing discrimination"), *aff'd in part, rev'd in part on other grounds,* 85 F.3d 839 (2d Cir. 1996). *But cf. Braidwood Mgmt., Inc.* v. *EEOC,* 70 F.4th 914, 939–40 (5th Cir. 2023) ("Even if there is a compelling interest as a categorical matter, there may not be a compelling interest in prohibiting all instances of discrimination. . . . [EEOC] does not show a compelling interest in denying Braidwood, individually, an exemption.").

[253] *Compliance Manual on Religious Discrimination, supra* note 215, at (12–I)(C)(3) (counseling EEOC investigators to "take great care" in situations involving the First Amendment and RFRA); *see also Little Sisters of the Poor Saints Peter & Paul Home* v. *Pennsylvania,* 591 U.S. __, 140 S. Ct. 2367, 2383 (2020) ("[T]he [government] must accept the sincerely held complicity-based objections of religious entities.").

Comments Related to RFRA

Some comments agreed with the Commission that RFRA may be a defense to PWFA claims brought by the Commission. Some comments asserted that being required to provide accommodations, absent undue hardship, for certain health care services to which employers may object for religious reasons—such as abortion, IVF, surrogacy, contraception, and sterilization—violates RFRA. These comments argued that being required to provide a workplace accommodation to receive these services would substantially burden some employers' ability to exercise their religious beliefs.

The Commission received several comments stating that the PWFA proposed regulation would impose a substantial burden on employers' religious exercise and that the Commission lacks a compelling governmental interest in enforcing the statute, as implemented by the regulation. In support, comments asserted that: in the Title VII context, the Federal Government must demonstrate a very specific compelling interest when requiring a religious organization to act contrary to its understanding of sex; strict scrutiny applies when there is a threat to religious freedom by the Federal Government; the Commission should acknowledge that the PWFA regulation would substantially burden employers' religious exercise; the Commission should offer its analysis of existing case law and state whether it believes it could ever have a compelling interest in requiring an objecting religious employer to violate its religious convictions regarding abortion; the Commission's case-by-case view does not comport with Title VII's definition of religion, which includes all aspects of religious observance and practice as well as belief; and the Commission does not have a compelling interest in denying an exception under the PWFA to a religious employer because that would force religious parties to violate their sincerely held religious beliefs.

Many comments addressed the application of RFRA in lawsuits that do not involve the Government. These comments asserted that: because the Commission says RFRA may not be an applicable defense in some cases and is no defense at all to private suits,[254] the

Commission needs to clarify how its RFRA process will operate; RFRA should be available in all cases, including all cases where the Government substantially burdens religious exercise through the implementation of Federal law, regardless of whether the Government is a party to the lawsuit; if RFRA is not available in cases in which the Government is not a party, then the Commission could decline to bring a lawsuit where a religious employer could have brought a successful RFRA defense, and the employer would lose its rights to religious exercise; and if a RFRA defense only is available if the Government is a party to the lawsuit, the Commission should describe the steps it will take to ensure it does not intentionally avoid involving itself in litigation with the intent of preventing the employer from raising RFRA as a defense.

The Commission also received comments stating that the Commission must conduct an individualized review of any defense raised under RFRA and ensure that there is a sufficiently strong nexus between the asserted burden and a religious exercise, the religious exercise is based on sincerely held religious beliefs, the burden is substantial, and the requested religious exception is tailored to address the burden. Further, comments asserted that the Commission must conduct an Establishment Clause analysis of any proposed exception.

Response to Comments Related to RFRA

As the Supreme Court has recognized, RFRA requires a fact-sensitive, case-by-case analysis of burdens and interests.[255] The Commission takes the protections of RFRA seriously and has instructed its staff to use "great care in situations involving both (a) the statutory rights of employees to be free from discrimination at work, and (b) the

rights of employers under the First Amendment and RFRA."[256] Consistent with RFRA, as part of that analysis, the Commission will ensure when considering the application of any RFRA defense raised that it assesses whether any religious burden imposed on the employer is substantial and whether enforcement is the least restrictive means of furthering a compelling governmental interest, as applied to that employer. It will further analyze any defense to ensure that any limitation on enforcement is constitutionally permissible under the Establishment Clause.[257]

Here, the Commission generally explains its understanding of the requirements of RFRA and provides some information regarding how RFRA may apply in the context of the PWFA. As stated above, RFRA requires a fact-specific analysis. Thus, in a specific situation, the information provided here may or may not apply.[258]

Although RFRA applies to enforcement by the Government, in order to inform the Commission of possible RFRA defenses and reasons the Government should not bring an enforcement action, an employer may raise a RFRA defense at any point during the Commission's administrative process. Assuming the employer asserted a RFRA defense based on a sincerely held religious belief, the Commission would first assess whether, were the Government to bring a lawsuit to enforce the PWFA against the employer, that enforcement would impose a substantial burden on the employer's religious exercise.[259] The Commission would consider a variety of factors in making that assessment.[260]

---

[254] See, e.g., Listecki v. Off. Comm. of Unsecured Creditors, 780 F.3d 731, 736–37 (7th Cir. 2015); Gen. Conf. Corp. of Seventh-Day Adventists v. McGill, 617 F.3d 402, 409–12 (6th Cir. 2010). The Second Circuit has held otherwise in the ADEA context, Hankins v. Lyght, 441 F.3d 96, 103–04 (2d Cir. 2006) (holding that an employer could raise RFRA as a defense to an employee's Age

Discrimination in Employment Act (ADEA) claim because the ADEA is enforceable both by the EEOC and private litigants), but the Second Circuit has questioned the correctness of Hankins given the text of RFRA, Rweyemamu v. Cote, 520 F.3d 198, 203 & n.2 (2d Cir. 2008).

[255] See, e.g., Gonzales v. O Centro Espírita Beneficente União do Vegetal, 546 U.S. 418, 430–31 (2006) (observing that, when applying RFRA, courts look "beyond broadly formulated interests justifying the general applicability of government mandates and scrutinize[] the asserted harm of granting specific exemptions to particular religious claimants"); cf. Ramirez v. Collier, 595 U.S. 411, 433 (2022) (holding that the Religious Land Use and Institutionalized Persons Act, which applies RFRA's test for religious defenses in the prison context, "requires that courts take cases one at a time, considering only 'the particular claimant whose sincere exercise of religion is being substantially burdened'" (quoting Holt, 574 U.S. at 363)).

[256] Compliance Manual on Religious Discrimination, supra note 215, at (12–I)(C)(3).

[257] See infra in the preamble in section 1636.7 under Response to Comments Related to First Amendment Establishment Clause Considerations.

[258] Initially, the Commission notes that for a RFRA defense to arise in litigation brought by the Commission under the PWFA, there would first have to be a charge of discrimination filed where the employer refused to provide an accommodation based on its religious exercise. Then, prior to filing an enforcement action in court, the Commission would have to investigate the charge, find reasonable cause, and decide to bring litigation. At any point during that administrative process, the employer could assert a RFRA defense.

[259] See Harris Funeral Homes, 884 F.3d at 587 ("Under Holt v. Hobbs . . . a government action that puts a religious practitioner to the choice of engaging in conduct that seriously violates his religious beliefs or facing serious consequences constitutes a substantial burden for the purposes of RFRA.") (internal citations, quotation marks, and alterations omitted).

[260] See, e.g., Hobby Lobby, 573 U.S. at 720–26 (finding that a contraceptive mandate imposed a substantial burden on religious beliefs by forcing employers to choose between providing coverage or
Continued

The Commission also would consider whether, as applied in the specific case, filing a PWFA enforcement lawsuit would further the Government's compelling interest,[261] including as expressed by Congress.[262]

Finally, the Commission disagrees with comments stating that the Commission must file suit against those

employers the Commission believes have a valid RFRA defense so that the covered entities may avoid liability by successfully proving their RFRA defense in court. Imposing such a requirement would infringe on the executive branch's Article II authority to determine which enforcement actions to bring, and the Commission will not interpret the PWFA to impose any unconstitutional requirements.[263] The Commission concludes that the better approach to situations in which it agrees with employers regarding their RFRA defenses raised during the administrative process is to refrain from bringing an enforcement action.[264]

Constitutional Considerations

The Ministerial Exception

As set out in the NPRM, the Supreme Court has recognized a ministerial exception, derived from the religion clauses of the First Amendment, which may provide an affirmative defense to an otherwise cognizable claim of a certain category of employees under certain anti-discrimination laws, including the PWFA. Under the ministerial exception, a religious organization may select those who will "personify its beliefs," "shape its own faith and mission," or "minister to the faithful." [265] The exception applies to discrimination claims involving the selection, supervision, and removal by a religious institution of employees who perform vital religious duties at the core of the mission of the religious institution.[266]

Comments Regarding the Ministerial Exception

A few comments requested that the Commission state or clarify the scope of the First Amendment "ministerial exception" in the final rule, including by: adding language from *Our Lady of Guadalupe School* v. *Morrissey-Berru* to the rule;[267] stating that the exception bars all PWFA claims for qualifying ministerial employees; or stating that the PWFA covers a religious entity's non-ministerial employees.

Response to Comments Regarding the Ministerial Exception

The Commission declines to make changes regarding its interpretation of the ministerial exception, as the Commission's position is consistent with the relevant Supreme Court case law and reflects the policies set forth in this preamble. The Commission will apply the exception on a case-by-case basis in light of the facts,[268] and in determining whether the exception applies to a claim, the Commission follows the Supreme Court's reasoning in *Hosanna-Tabor Evangelical Lutheran Church & School* v. *EEOC*,[269] *Our Lady of Guadalupe School* v. *Morrissey-Berru*,[270] and other applicable decisions, reviewing the factors set out by the Court. For example, if a religious school instructor employed by the Catholic Church as a Catechist (typically the type of teacher who performs vital religious duties) [271] asks her employer for time to attend prenatal appointments and the employer refuses to provide the leave because the teacher is pregnant but not married, and raises the ministerial exception as a defense to the employee's charge of discrimination, the Commission (after gathering relevant facts about the applicability of that defense) will likely apply the ministerial exception and find that the employee is not entitled to the requested accommodation. In making such a determination, the Commission will "take all relevant circumstances into account" and determine whether the "particular position implicate[s] the fundamental purpose of the exception." [272]

paying "an enormous sum of money—as much as $475 million per year" if they did not); *Harris Funeral Homes*, 884 F.3d at 586–90 (holding that the employer's religious exercise would not be substantially burdened by continuing to employ a transgender worker); *Braidwood Mgmt.*, 70 F.4th at 938 (finding a substantial burden by being forced to employ individuals whose conduct violates "the company's convictions").

[261] *See, e.g.*, *Hobby Lobby*, 573 U.S. at 733 ("The Government has a compelling interest in providing an equal opportunity to participate in the workforce without regard to race, and prohibitions on racial discrimination are precisely tailored to achieve that critical goal."); *Harris Funeral Homes*, 884 F.3d at 591–92; *Hosanna-Tabor Evangelical Lutheran Church & Sch.* v. *EEOC*, 565 U.S. 171, 196 (2012) ("The interest of society in the enforcement of employment discrimination statutes is undoubtedly important."); *Rennert Christian Sch.*, 781 F.2d at 1368–69 ("By enacting Title VII, Congress clearly targeted the elimination of all forms of discrimination as a 'highest priority' . . . . Congress' purpose to end discrimination is equally if not more compelling than other interests that have been held to justify legislation that burdens the exercise of religious convictions." (quoting *EEOC* v. *Pacific Press Publ'g Ass'n*, 676 F.2d 1272, 1280 (9th Cir. 1982), *abrogated on other grounds by Emp. Div., Dep't of Hum. Res. of Oregon* v. *Smith*, 494 U.S. 872 (1990)); *Miss. Coll.*, 626 F.2d 477, 488 (5th Cir. 1980) (stating, in a Title VII subpoena enforcement action related to a race and sex discrimination charge, that "the government has a compelling interest in eradicating discrimination in all forms"); *Redhead* v. *Conf. of Seventh-Day Adventists*, 440 F. Supp. 2d 211, 220 (E.D.N.Y. 2006) (rejecting a RFRA defense in a Title VII sex discrimination case and stating, "generally, Title VII's purpose of eradicating employment discrimination is a 'compelling government interest' "); *see also* H.R. Rep. No. 117–27, pt. 1, at 32 ("Although religious employers may claim that a required accommodation is a substantial burden on their free exercise of religion under RFRA, it is the position of the Committee that nondiscrimination provisions are a compelling government interest and the least restrictive means to achieve the policy of equal employment opportunity."); *cf. Bd. of Dirs. of Rotary Int'l* v. *Rotary Club of Duarte*, 481 U.S. 537, 549 (1987) (observing that the State has a compelling interest in eliminating sex-based discrimination) (citing *Roberts* v. *U.S. Jaycees*, 468 U.S. 609, 624 (1984) (explaining that the goal of "eliminating discrimination and assuring [citizens] equal access to publicly available goods and services . . . plainly serves compelling state interests of the highest order") (internal citation omitted))).

[262] *See* H.R. Rep. No. 117–27, pt. 1, at 5 (stating under the report's purpose and summary, "When pregnant workers do not have access to reasonable workplace accommodations, they are often forced to choose between their financial security and a healthy pregnancy. Ensuring that pregnant workers have access to reasonable accommodations will promote the well-being of working mothers and their families and promote healthy pregnancies."); *see also Little Sisters*, 140 S. Ct. at 2392 (Alito, J., concurring) (observing that courts "answer the compelling interest question simply by asking whether *Congress* has treated the [interest] as a compelling interest") (emphasis in original).

[263] *See, e.g.*, *United States* v. *Texas*, 599 U.S. 670, 678 (2023) ("Under Article II, the Executive Branch possesses authority to decide 'how to prioritize and how aggressively to pursue legal actions against defendants who violate the law.'" (citations omitted)); *id.* at 679 ("[T]he Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case") (quoting *United States* v. *Nixon*, 418 U.S. 683, 693 (1974)) (internal quotation marks omitted).

[264] Additionally, under section 706(f)(1) of Title VII, which is incorporated into the PWFA in 42 U.S.C. 2000gg–2(a)(1), an employee may, as a matter of right, intervene in a case brought by the Commission on behalf of that employee. Thus, even if the Commission were required to bring such an action, the employer could still face a claim from the employee.

[265] *Hosanna-Tabor*, 565 U.S. at 188–89.

[266] *Compliance Manual on Religious Discrimination*, *supra* note 215, at (12–I)(C)(2) (citing *Our Lady of Guadalupe Sch.* v. *Morrissey-Berru*, 591 U.S. ___, 140 S. Ct. 2049, 2055, 2066 (2020)). There is some disagreement among courts as to the applicability of the ministerial exception to hostile work environment claims. *Compare Demkovich* v. *St. Andrew the Apostle Par., Calumet City*, 3 F.4th 968, 979 (7th Cir. 2021) (applying the ministerial exception to a hostile work environment claim involving allegations of minister-on-minister harassment), *with Elvig* v. *Calvin Presbyterian Church*, 375 F.3d 951, 962 (9th Cir. 2004) (finding that a hostile work environment claim was not barred by the ministerial exception, because sexual

harassment is not a protected employment decision).

[267] *See generally* 140 S. Ct. at 2049.

[268] *See id.* at 2063 ("In determining whether a particular position falls within the *Hosanna-Tabor* exception, a variety of factors may be important.").

[269] *See* 565 U.S. at 190–94.

[270] *See* 140 S. Ct. at 2063–69.

[271] *See id.* at 2057, 2066.

[272] *See* 140 S. Ct. at 2067.

## First Amendment Establishment and Free Exercise Clause Considerations

The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." [273] Under the Establishment Clause of the First Amendment, the Government's actions cannot establish religion; in other words, "government may not, consistent with a historically sensitive understanding of the Establishment Clause, make a religious observance compulsory." [274]

Under the Free Exercise Clause, the "Government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." [275] Where a law burdens religious exercise and is not neutral or generally applicable, it is subject to strict scrutiny, meaning that it must advance a compelling governmental interest and be narrowly tailored to achieve that interest. [276] By contrast, laws that merely incidentally burden religion are ordinarily not subject to strict scrutiny, and thus do not need to be justified by a compelling governmental interest, to defeat a Free Exercise claim, as long as they are neutral and generally applicable. [277] Laws are not neutral and generally applicable "whenever they treat any comparable secular activity more favorably than religious exercise." [278] In addition, "[a] law is not generally applicable if it invite[s] the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions" that are entirely discretionary. [279]

## Comments Related to First Amendment Establishment Clause Considerations

As noted above, the Commission received comments stating that the Commission must conduct an individualized review of any defense asserted under RFRA and ensure that there is a sufficiently strong nexus between the asserted burden and a religious exercise, the religious exercise is based on sincerely held religious beliefs, the burden is substantial, and the action taken by the government is tailored to address the burden. Further, comments asserted that the Commission must conduct an Establishment Clause analysis of any asserted RFRA defense.

## Response to Comments Related to First Amendment Establishment Clause Considerations

The Commission agrees that when evaluating a religious employer's RFRA defense or any other religious defense, the Commission will consider the Establishment Clause implications as part of its case-by-case analysis. [280]

## Comments Related to First Amendment Free Exercise Clause Considerations

Several comments stated that the rule could violate a covered entity's First Amendment right to the free exercise of religion. Some comments disputed whether the final rule is a rule of general applicability, asserting that the PWFA is not generally applicable, e.g., because it contains religious exemptions and excludes small employers with fewer than 15 employees.

## Response to Comments Related to First Amendment Free Exercise Clause Considerations

The PWFA, like Title VII, is a neutral law of general applicability. [281] Thus, it does not need to be justified by a compelling governmental interest and narrowly tailored to achieve that interest under the First Amendment Free Exercise Clause. [282] The PWFA

does not provide any system of discretionary, individualized exemptions for secular employers, and it does not treat religious exercise any less favorably than comparable secular activities. [283] Congress, in enacting the PWFA, as it did with Title VII, exempted employers (both secular and religious) with fewer than 15 employees. [284] It also provided an exception for religious employers under the rule of construction, which requires the Commission to assess whether an entity is a qualifying religious employer under an established set of factors based in case law. [285] Thus, the PWFA does not provide the Commission with discretion to grant individualized exemptions, for either secular or religious purposes. [286]

[273] U.S. Const. amend. I.

[274] *Kennedy* v. *Bremerton Sch. Dist.*, 597 U.S. 507, 536–37 (2022) (citation and internal quotation marks omitted).

[275] *Fulton* v. *City of Philadelphia*, 593 U.S. 522, 533 (2021) (citations omitted).

[276] *See, e.g., id.* at 541 (citation omitted); *Church of Lukumi Babalu Aye, Inc.* v. *City of Hialeah*, 508 U.S. 520, 531–32 (1993).

[277] *Fulton*, 593 U.S. at 533 (citing *Emp't Div., Dep't of Hum. Res. of Ore.* v. *Smith*, 494 U.S. 872, 878–82 (1990)).

[278] *Tandon* v. *Newsom*, 593 U.S. 61, 62 (2021) (per curiam) (providing that whether two activities are comparable must be judged against the governmental interest that justifies the law at issue and concerns the risks various activities pose); *see also Fulton*, 593 U.S. at 534 ("A law . . . lacks general applicability if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way.").

[279] *Fulton*, 593 U.S. at 533, 535 (citing *Smith*, 494 U.S. at 884 (1990)) (internal quotation marks omitted).

[280] As the Supreme Court has observed, "The First Amendment provides, in part, that Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof. We have said that these two Clauses often exert conflicting pressures, and that there can be internal tension between the Establishment Clause and the Free Exercise Clause." *Hosanna-Tabor*, 565 U.S. at 181 (internal citations and quotation marks omitted).

[281] *See, e.g., Hosanna-Tabor*, 565 U.S. at 190 (stating in dicta that the ADA's anti-retaliation provision, which (like Title VII) exempts certain employers for secular reasons, "is a valid and neutral law of general applicability"); *EEOC* v. *Cath. Univ. of Am.*, 83 F.3d 455, 467 (D.C. Cir. 1996) (stating that Title VII is "a neutral law of general application").

[282] *See Fulton*, 593 U.S. at 533 (citing *Smith*, 494 U.S. at 878–82); *see also Smith*, 494 U.S. at 894 (O'Connor, J., concurring).

[283] *See, e.g., Fulton*, 593 U.S. at 533–34 (citing *Lukumi Babalu Aye*, 508 U.S. at 542–46; *Smith*, 494 U.S. at 884).

[284] *See* 42 U.S.C. 2000gg(2)(B)(i), 2000e(b). The Commission rejects the assertion that simply because the PWFA only applies to businesses with 15 or more employees, the Commission can never make out a compelling interest. *See, e.g., Harris Funeral Homes*, 884 F.3d at 600 ("EEOC has shown that enforcing Title VII here is the least restrictive means of furthering its compelling interest in combating and eradicating sex discrimination."). As the Supreme Court has noted, Congress decided to limit Title VII's coverage to firms with 15 or more employees for the purpose of "easing entry into the market and preserving the competitive position of smaller firms." *Clackamas Gastroenterology Assocs., P.C.* v. *Wells*, 538 U.S. 440, 447 (2003) (quoting the lower court's dissent, that "Congress decided to spare very small firms from the potentially crushing expense of mastering the intricacies of the antidiscrimination laws, establishing procedures to assure compliance, and defending against suits when efforts at compliance fail") (citation and internal quotation marks omitted). The legislative history of Title VII supports this proposition. *See Tomka* v. *Seiler Corp.*, 66 F.3d 1295, 1314 (2d Cir. 1995) (outlining Title VII's legislative history around the factors Congress considered in enacting 42 U.S.C. 2000e(b), including the costs associated with defending against discrimination claims), *abrogated on other grounds as recognized by Eisenhauer* v. *Culinary Inst. of Am.*, 84 F.4th 507, 524, n.83 (2d Cir. 2023). Federal statutes often include exemptions for small employers, and such exemptions do not undermine the larger interests served by those statutes. *See, e.g.*, FMLA, 29 U.S.C. 2611(4)(A)(i) (applicable to employers with 50 or more employees); ADEA, 29 U.S.C. 630(b) (originally exempting employers with fewer than 50 employees, 81 Stat. 605, the statute now governs employers with 20 or more employees); ADA, 42 U.S.C. 12111(5)(A) (applicable to employers with 15 or more employees). The government's generally applicable goal of protecting small businesses from the burdens of regulatory compliance is not comparable to the type of discretionary, individualized exemption that the Supreme Court rejected in *Fulton. See* 593 U.S. at 533–34.

[285] *See supra* in the preamble in section *1636.7(b) Rule of Construction.*

[286] *Cf. Fulton*, 593 U.S. at 536–41 (providing that the inclusion of "a formal system of entirely discretionary exceptions" in the contractual nondiscrimination requirement at issue rendered the requirement not generally applicable and thus subject to strict scrutiny).

First Amendment Free Speech and Expressive Association Considerations

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." [287] To determine whether "particular conduct possesses sufficient communicative elements to bring the First Amendment into play," courts consider whether "[a]n intent to convey a particularized message was present, and [whether] the likelihood was great that the message would be understood by those who viewed it." [288]

The Supreme Court also has recognized a "right to associate for the purpose of engaging in those activities protected by the First Amendment." [289] The freedom of expressive association includes a freedom not to associate. [290] In order for Government action to unconstitutionally burden the right of expressive association, a group must engage in expressive association. [291] If a group does so, then the proper inquiry is whether the Government action at issue, often the forced inclusion of a member, would significantly affect the group's ability to advocate public or private viewpoints. [292] Finally, to determine whether the Government's interest justifies the burden, the Government's interest implicated in its action is weighed against the burden imposed on the associational expression. [293]

Comments Related to First Amendment Free Speech Considerations

Several comments asserted that including infertility treatments, contraception, abortion, sterilization, and surrogacy in the definition of "pregnancy, childbirth, or related medical conditions" would require covered entities to provide accommodations for employees that would violate the entities' freedom of speech. For example, some comments stated that providing an accommodation related to an employee's abortion would chill the speech of covered entities by requiring them to convey a message to employees and the public that abortion is a legitimate medical procedure, contrary to their anti-abortion beliefs or identity, or because maintaining their policies would put them in the position

of violating the PWFA's anti-retaliation and anti-coercion provisions.

Response to Comments Related to First Amendment Free Speech Considerations

The Commission does not agree that the PWFA or the final rule infringes on any covered entity's freedom of speech. The act of making a personnel decision, such as employing or continuing to employ an individual who has engaged in personal conduct with which an employer disagrees, is not protected speech or expressive conduct that communicates the employer's agreement with the individual's personal decisions. [294] In this business context, providing an employee a reasonable accommodation under the PWFA during their employment does not constitute speech or expressive conduct on the part of the employer. [295]

As discussed in relation to the PWFA's rule of construction, whether an employer's policies or actions could implicate the PWFA's anti-retaliation or anti-coercion provision is a highly fact-specific inquiry. For over four decades, the Commission has interpreted Title VII, which contains an anti-retaliation provision, to protect employees from being fired for having an abortion or contemplating an abortion, and courts have affirmed this interpretation. [296] The Commission is not aware of any cases during these past four decades in which an employer has challenged this interpretation on First Amendment free speech grounds. Likewise, the ADA has language similar to the PWFA's anti-coercion provision in its interference provision, and the Commission is similarly unaware of any cases where an employer challenged the interference provision on First Amendment free speech grounds. In addition, the Commission has explained in the preamble and the Interpretive Guidance in section *1636.5(f) Prohibition Against*

*Retaliation* the type of actions that could be violations under the anti-coercion and anti-retaliation provisions; they do not involve protected speech. [297] Nevertheless, should the Commission receive a charge alleging coercion or retaliation, and should the responding employer raise constitutional concerns as a defense to the charge during the administrative charge process, the Commission will evaluate each claim on a case-by-case basis under the process it has outlined above. [298]

Comments Related to First Amendment Expressive Association Considerations

Some comments asserted that including certain pregnancy-related health care services as medical conditions related to pregnancy or childbirth would require covered entities to provide accommodations for employees that would violate the entities' First Amendment right to expressive association. In particular, some comments stated that employers, particularly those whose express mission is to oppose abortion, might be required under the rule to hire, or continue to employ, or promote, employees who have abortions in violation of an employer's policies.

Response to Comments Related to First Amendment Expressive Association Considerations

The Commission does not agree that the PWFA or the final rule infringes on any covered entity's freedom of expressive association. First, the Commission is unaware of any case holding that enforcing Title VII violates the First Amendment's right of free association, and, indeed, the Supreme Court has expressly held to the contrary. [299] Second, assuming that a covered entity can show that it engages in expressive activity, with the possible exception of certain mission-driven organizations, it is unlikely that a covered entity also could show that simply allowing an employee to access an accommodation would significantly affect its ability to advocate public or private viewpoints. [300] The Commission

---

[287] U.S. Const. amend. I.

[288] *Texas* v. *Johnson,* 491 U.S. 397, 404 (1989) (quoting *Spence* v. *Washington,* 418 U.S 405, 410–11 (1974)).

[289] *Jaycees,* 468 U.S. at 618.

[290] *Id.* at 622–23.

[291] *Boy Scouts of America* v. *Dale,* 530 U.S. 640, 648 (2000).

[292] *Id.* at 650.

[293] *Id.* at 658–59.

[294] *See Harris Funeral Homes,* 884 F.3d at 589–90 (providing that "bare compliance" with antidiscrimination laws does not amount to an endorsement of a certain viewpoint).

[295] *See also Rumsfeld* v. *Forum for Academic & Institutional Rights, Inc.,* 547 U.S. 47, 65–67 (2006) (concluding that a law requiring that institutions of higher education allow military recruiters access equal to that provided to other recruiters, or lose certain Federal funds, regulated conduct, not speech, and the regulated conduct was not inherently expressive such that it was protected under the First Amendment).

[296] *Enforcement Guidance on Pregnancy Discrimination, supra* note 31, at (I)(A)(4)(c) & n.58; *Doe,* 527 F.3d at 364 (holding that Title VII, as amended by the PDA, prohibits an employer from discriminating against a female employee because she has exercised her right to have an abortion); *Turic,* 85 F.3d at 1214 (finding the termination of a pregnant employee because she contemplated having an abortion violated the PDA).

[297] *See* § 1636.5(f).

[298] *See supra* note 242.

[299] *Hishon* v. *King & Spalding,* 467 U.S. 69, 78 (1984) (holding that, as applied to a law firm partnership, Title VII did not infringe employer's "constitutional rights of expression or association"); *see also id.* (observing that "[i]nvidious private discrimination may be characterized as a form of exercising freedom of association protected by the First Amendment, but it has never been accorded affirmative constitutional protections") (citation and internal quotation marks omitted).

[300] *Compare Boy Scouts,* 530 U.S. at 655–59 (determining that retaining a gay scoutmaster would significantly affect the organization's expression).

believes its position strikes the correct balance between, on one hand, the Government's interest in ensuring employees affected by pregnancy, childbirth, or related medical conditions are able to remain healthy and in their jobs and, on the other, the employer's ability to express its message to the public, its employees, and other stakeholders such that its advocacy is not significantly affected by providing an accommodation.[301] Nevertheless, should the Commission receive a charge relating to an accommodation for pregnancy, childbirth, or related medical conditions, and should the responding employer raise constitutional expressive association concerns as a defense to the charge during the charge process, the Commission will evaluate each claim on a case-by-case basis under the framework outlined above.[302]

Comments Related to Constitutional Avoidance

A few comments stated that including abortion in the definition of medical conditions related to pregnancy and childbirth creates First Amendment free speech and religion conflicts, and statutes should be interpreted to avoid constitutional concerns; therefore, the Commission should exclude the possibility of an employee receiving an accommodation related to an abortion from the regulation.

Response to Comments Related to Constitutional Avoidance

As explained *supra,* the Commission disagrees that the rule categorically conflicts with the First Amendment, and thus does not agree that the canon of constitutional avoidance applies. The Commission's interpretation of "pregnancy, childbirth, or related medical conditions" is consistent with its interpretation of this phrase for more than four decades in Title VII, as amended by the PDA, a similar statute. In those decades, the Commission's interpretation under Title VII has never been successfully challenged on First Amendment grounds. The comments that raised this issue did not

demonstrate that abortion must be excluded to avoid an unconstitutional interpretation. Moreover, the Commission cannot anticipate whether constitutional issues will arise in future litigation on facts that have not yet occurred.

Comments Regarding Requests for an Exemption for a Covered Entity's Moral Objections

Several comments stated that the final rule should provide an exemption for covered entities that object to abortion and other medical conditions related to pregnancy and childbirth based on conscience, moral, ethical, scientific, health, or medical grounds, or for any other reason that is not associated with a religious belief. A few comments further asserted that, because the PWFA rule of construction provides an exception for certain religious entities, the Commission must provide an exception for similarly situated covered entities that object to accommodations on non-religious grounds.

Response to Comments Regarding Requests for an Exemption for a Covered Entity's Moral Objections

To create a new, stand-alone exemption for secular entities would exceed the Commission's congressionally-provided authority. In enacting the PWFA, Congress restricted coverage for only two categories of employers: (1) certain qualifying religious entities under the rule of construction at section 107(b), "subject to the applicability to religious employment" set forth in section 702(a) of the Civil Rights Act of 1964; and (2) certain entities, regardless of religious affiliation, that have fewer than 15 employees. The Commission notes that an individual's religious beliefs may include moral and ethical beliefs,[303] and thus in individual cases, the Commission will assess asserted accommodation requests and objections based on that longstanding interpretation and applicable law. However, the Commission will not create through rulemaking a new exemption for secular organizations

with certain moral or ethical beliefs, beyond the PWFA's existing exceptions.

Comments Regarding Requests for a Per Se Undue Hardship Exemption

In the alternative, several comments asserted that covered entities that do not qualify for an exemption under the rule of construction, but that nevertheless object to abortion or other medical conditions related to pregnancy or childbirth for religious reasons, reasons related to their mission, or other secular reasons, should receive a per se undue hardship exemption.

Response to Comments Regarding Requests for a Per Se Undue Hardship Exemption

The Commission declines to create a per se undue hardship exemption, for several reasons. First, the PWFA incorporates the ADA's "undue hardship" definition, and under the ADA, employers may assert undue hardship as a defense but must conduct an individualized assessment when determining whether a reasonable accommodation will impose an undue hardship.[304] Creating a per se rule that an employer's beliefs automatically and always create an undue hardship would be fundamentally inconsistent with this requirement that undue hardship be assessed as a defense on a case-by-case basis, and would therefore be inconsistent with the PWFA.[305] This is especially so where, as here, even the religious beliefs of employers that share the same religion are not monolithic, and the specific facts and circumstances in a given situation may affect whether the employer objects to an employee's actions on religious grounds.

Second, nothing in the PWFA provides for an exemption that directly links the undue hardship standard to an entity's religious beliefs, status, or secular beliefs. On the contrary, the statute expressly directs that the term "undue hardship" should "have the meaning[ ] given such term[ ] in [the ADA] and shall be construed as such

---

*and Slattery* v. *Hochul,* 61 F.4th 278, 288 (2d Cir. 2023) (holding that rape crisis pregnancy center stated plausible claim that application of New York law prohibiting discrimination in employment based on reproductive health decisions would severely burden its right to freedom of expressive association given that the statute, if applied, would "forc[e] [the center] to employ individuals who act or have acted against the very mission of its organization"), *with Rumsfeld,* 547 U.S. at 68–69 (explaining that a law that allows military recruiters equal access to law schools does not force the school "to accept members it does not desire").

[301] *See Rumsfeld,* 547 U.S. at 69–70.

[302] *See supra* note 242.

[303] In the context of Title VII's prohibition of discrimination against employees based on religion, the Commission has said that "[c]ourts have looked for certain features to determine if an individual's beliefs can be considered religious." To this end, "[s]ocial, political, or economic philosophies, as well as mere personal preferences, are not religious beliefs protected by Title VII," but overlap between a religious and political view may be protected under Title VII "as long as that view is part of a comprehensive religious belief system." *Compliance Manual on Religious Discrimination, supra* note 215, at (12–I)(A)(1); *see also* 29 CFR 1605.1.

[304] 88 FR 54734.

[305] 42 U.S.C. 2000gg(7). The final rule creates a small category of modifications that will, "in virtually all cases," be reasonable accommodations that do not impose an undue hardship. Importantly, in creating this category, the Commission did not alter the definition of "undue hardship" or deprive a covered entity of the opportunity to bring forward facts to demonstrate that a proposed accommodation imposes an undue hardship for its business under its own particular circumstances, even when one of the four simple modifications in § 1636.3(j)(4) is involved. Given the differences in religious beliefs and the impact of an accommodation that may violate those beliefs, it would not be possible for the Commission to determine that these beliefs would "in virtually all cases" cause an undue hardship.

**29154** **Federal Register** / Vol. 89, No. 77 / Friday, April 19, 2024 / Rules and Regulations

[term is] construed under such Act and as set forth in the regulations required by this division." [306]

Third, the factors used to assess an undue hardship defense typically focus on measurable impacts on business operations. Under the PWFA rule, "undue hardship" means an action requiring significant difficulty or expense, when considered in light of several factors: (i) the nature and net cost of the accommodation needed under the PWFA; (ii) the overall financial resources of the facility or facilities involved in the provision of the reasonable accommodation, the number of persons employed at such facility, and the effect on expenses and resources; (iii) the overall financial resources of the covered entity, the overall size of the business of the covered entity with respect to the number of its employees, and the number, type and location of its facilities; (iv) the type of operation or operations of the covered entity, including the composition, structure, and functions of the workforce of such entity, and the geographic separateness and administrative or fiscal relationship of the facility or facilities in question to the covered entity; and (v) the impact of the accommodation upon the operation of the facility, including the impact on the ability of other employees to perform their duties and the impact on the facility's ability to conduct business. [307] As explained by Congress, "Like the ADA, the PWFA seeks to balance the interests of the employer and employee and, although there may be some costs associated with making a reasonable accommodation, the 'undue hardship' standard limits the employer's exposure both to overly burdensome accommodation requests and lawsuits that would attempt to hold the employer liable for failing to provide a prohibitively expensive accommodation." [308]

The Commission has stated that under the ADA, "the 'undue hardship' provision takes into account the financial realities of the particular employer or other covered entity. However, the concept of undue hardship is not limited to financial difficulty. 'Undue hardship' refers to any accommodation that would be unduly costly, extensive, substantial, or disruptive, or that would fundamentally alter the nature or operation of the

business." [309] Of note, cases interpreting the impact of a reasonable accommodation on other employees or the facility's ability to conduct business have generally been about distribution of workloads, business operational needs, and elemental changes to the day-to-day operations of a business, not the moral views of coworkers or employers. [310] That said, the Commission will, as it currently does, consider all assertions of the undue hardship defense on a case-by-case basis, including whether granting a particular reasonable accommodation would "fundamentally alter the nature of the business."

Additionally, in determining whether there is disruption to the covered entity's business under the ADA, the Commission has stated with regard to disabilities that an employer will be unable to "show undue hardship if the disruption to its employees [is] the result of those employees' fears or prejudices toward the individual's disability and not the result of the provision of the accommodation. Nor [will] the employer be able to demonstrate undue hardship by showing that the provision of the accommodation has a negative impact

on the morale of its other employees but not on the ability of these employees to perform their jobs." [311] As the definition of "undue hardship" under the PWFA follows the ADA, the same rules will apply. An employer will not be able to demonstrate undue hardship under the PWFA if the disruption to its employees was the result of those employees' fears or prejudices. Nor would the employer be able to demonstrate undue hardship by showing that the provision of the accommodation has a negative impact on the morale of its other employees but not on the ability of these employees to perform their jobs.

Ultimately, an employer may assert an undue hardship defense to any PWFA claim. An employer may be able to show undue hardship if the provision of a particular accommodation results in an impact that is unduly costly, extensive, substantial, or disruptive, or that would fundamentally alter the nature or operation of the business. [312] As with all undue hardship assessments, an employer would need to show individualized evidence of undue hardship.

Other Comments and Response to Comments Regarding Religious and Conscience Considerations

Several comments stated that the inclusion of abortion as a related medical condition revealed that the Commission harbored anti-Catholic bias, and others claimed that the Commission would target Catholic employers for enforcement.

As explained above, the Commission interprets the PWFA's provision regarding pregnancy, childbirth, or related medical conditions consistent with the PWFA's text and the Commission's interpretation of identical language in Title VII, an interpretation adopted more than 40 years ago. The Commission disagrees that interpreting the PWFA in a manner consistent with the statutory text and the agency's decades-long interpretation of Title VII is suggestive of any anti-Catholic bias or that the Commission otherwise harbors any bias. The Commission's enforcement decisions are based on whether the facts of the charge show reasonable cause to believe discrimination occurred. Further, the Commission's history under Title VII reflects that the Commission brings cases that protect employees who are being harassed about their decision not to have an abortion and that protect the

---

[306] 42 U.S.C. 2000gg(7).
[307] 88 FR 54769; § 1636.3(j).
[308] H.R. Rep. No. 117–27, pt. 1, at 29.

[309] 29 CFR part 1630, appendix, 1630.2(p) (citing S. Rep. No. 101–116, at 35 (1989); H.R. Rep. 101–485, pt. 2, at 67 (1990)).
[310] See, e.g., Milton v. Scrivner, Inc., 53 F.3d 1118, 1125 (10th Cir. 1995) (providing that an accommodation that would result in other employees having to work harder or longer hours is not required; slowing the production schedule or assigning the plaintiffs lighter loads would fundamentally alter the nature of the defendant's warehouse operation, a change not required by law) (citing 29 CFR 1630.2(p)(2)(v) and 29 CFR part 1630, appendix, 1630.2(p)); Turco v. Hoechst Celanese Corp., 101 F.3d 1090, 1094 (5th Cir. 1996) (determining that, where the employer had no straight day-shift chemical operator positions, moving the plaintiff to such a shift would place a heavier burden on the rest of the operators in the plant and was not required under the ADA); Mears v. Gulfstream Aerospace Corp., 905 F. Supp. 1075, 1081 (S.D. Ga. 1995) (concluding that an accommodation that would require employees from six different departments to deliver invoices to the plaintiff adversely impacted other employees' ability to do their jobs and was an undue burden), aff'd, 87 F.3d 1331 (11th Cir. 1996); Bryant v. Caritas Norwood Hosp., 345 F. Supp. 2d 155, 171 (D. Mass. 2004) (shifting responsibility for an essential function, all heavy lifting, to coworkers would have a deleterious impact on the ability of coworkers to do their own jobs); Fralick v. Ford, No. 2:12–CV–1210, 2014 WL 1875705, at *7 (D. Utah May 9, 2014) (permitting the plaintiff to work fewer than 60 hours per week was found to "fundamentally alter the nature of" the finance manager position and therefore was not a reasonable accommodation); cf. Morrill v. Acadia Healthcare, No. 2:17–CV–01332, 2020 WL 1249478, at *8 (D. Utah Mar. 16, 2020) (determining that the defendant failed to establish that prior equitable distribution of a mopping task amongst all employees, as a reasonable accommodation, impeded functioning of the business or harmed coworkers).

[311] See 29 CFR part 1630, appendix, 1630.15(d).
[312] See 29 CFR part 1630, appendix, 1630.2(p).

religious views of employees who oppose abortion.[313]

Second, some comments asserted that an employer's potential obligation under the PWFA to provide an accommodation for abortion could violate the religious rights of other employees, such as human resources employees, who would have to explain to an employee that a reasonable accommodation is available in these circumstances and process the paperwork. The Commission has addressed steps employers may take to respond to conflicts with religious beliefs in these circumstances in its *Compliance Manual on Religious Discrimination*.[314]

Third, some comments stated that if employees decide to work for a religious employer, then they must abide by the employer's beliefs or risk consequences. The Commission made no changes based on these comments. As explained above, the PWFA provides for defenses for religious organizations and is subject to certain other constitutional and statutory exceptions. But none of those defenses or exceptions remove all rights from employees who are employed by religious employers.

**1636.8   Severability**

In the final rule, the Commission has added that the severability provisions express the Commission's intent as to severability. Further, the Commission clarified that its intent regarding severability applies to the Interpretive Guidance as well and has included this language in the Interpretive Guidance in section *1636.8 Severability*.

As stated in the Interpretive Guidance in section *1636.8 Severability*, pursuant to 42 U.S.C. 2000gg–6, in places where the regulation uses the same language as the statute, if any of those identical regulatory provisions, or the application of those provisions to particular persons

or circumstances, is held invalid or found to be unconstitutional, the remainder of the regulation and the application of that provision of the regulation to other persons or circumstances shall not be affected. For example, if § 1636.4(d) (which uses the same language as 42 U.S.C. 2000gg–1(4) and prohibits a covered entity from requiring a qualified employee to take leave as a reasonable accommodation if there is another reasonable accommodation that can be provided) were to be found invalid or unconstitutional, it is the intent of the Commission that the remainder of the regulation shall not be affected. The Commission would continue to enforce the statute but, in this hypothetical example, would not consider it a violation if an employer required an employee to take leave as a reasonable accommodation when there was another reasonable accommodation available.

Where the regulation or the Interpretive Guidance provides additional guidance to carry out the PWFA, including examples of reasonable accommodations, it is the Commission's intent that if any of those provisions or the application of those provisions to particular persons or circumstances were to be held invalid or found to be unconstitutional, the remainder of the regulation or the Interpretive Guidance and the application of that provision of the regulation or the Interpretive Guidance to other persons or circumstances shall not be affected. For example, if a court were to determine that a certain medical condition such as a pelvic prolapse is not found to be a "related medical condition" in a specific case, the Commission intends other conditions could still be determined to be "related medical conditions," including pelvic prolapse in another case, depending on the facts.

**Preamble to the Final Economic Analysis**

**Executive Orders 12866 (Regulatory Planning and Review), 13563 (Improving Regulation and Regulatory Review), and 14094 (Modernizing Regulatory Review)**

*Summary of the Commission's Preliminary Economic Analysis of Impacts: Costs*

According to the Commission's preliminary economic analysis, the proposed rule would impose two quantifiable costs on employers: the annual cost of providing pregnancy-related reasonable accommodations as a result of the statute and the rule, and the one-time cost of becoming familiar with

the rule. In all cases, the Commission relied on publicly available data for its estimates.[315]

To estimate the annual cost of providing pregnancy-related reasonable accommodations as a result of the statute and the rule, the Commission first estimated the total number of employees who were not independently entitled to PWFA-type accommodations under an analogous State law, which the Commission calculated is 65.11 million employees.

The Commission then estimated the number of such individuals who will be entitled to a reasonable accommodation under the PWFA. To do so, the Commission first assumed that the number of such individuals will be approximately the same as the number of individuals who actually become pregnant during that year. Again, based on publicly available data, the Commission estimated that 33 percent of the 65.11 million employees who are not independently entitled to PWFA-type accommodations under an analogous State law are capable of becoming pregnant, and that of these, 4.7 percent will actually become pregnant in a given year. Applying these percentages yielded a total estimate of one million individuals who (a) were not independently entitled to PWFA-type accommodations under an analogous State law, and (b) will actually become pregnant during a given year. Finally, the Commission estimated that between 23 percent ("lower bound estimate") and 71 percent ("upper bound estimate") of these one million individuals (between 230,000 and 710,000 individuals) will require a pregnancy-related reasonable accommodation.

To calculate the associated costs, the Commission first estimated that the accommodations needed by 49.4 percent of the individuals above will have zero cost, leaving between 116,000 and 360,000 individuals needing accommodations with non-zero cost. It then estimated that each of the accommodations needed by these individuals would cost an average of $300 distributed over 5 years, or $60 annually. Multiplying these numbers together yielded final estimated annual costs of between $6 million and $18 million for private employers; between $800,000 and $2.4 million for State and local government employers; and between $300,000 and $800,000 for Federal employers.

---

[313] *See, e.g., EEOC* v. *Big Lots Stores, Inc.*, No. 9:08–CV–177, 2009 WL 10677352, at *6 (E.D. Tex. Oct. 6, 2009) (alleging, as part of the plaintiff's harassment claim, that the harasser urged the plaintiff to have an abortion). Other suits brought by the EEOC regarding abortion pertained to the EEOC protecting the religious views of employees. *See, e.g., EEOC* v. *Univ. of Detroit*, 904 F.2d 331, 335 (6th Cir. 1990) (suit brought by EEOC on behalf of an employee who did not want to pay union dues because the dues were used to support political action in favor of abortion, which the employee disagreed with on religious grounds); *EEOC* v. *Am. Fed'n of State, Cnty. & Mun. Emps., AFL–CIO*, 937 F. Supp. 166, 167 (N.D.N.Y. 1996) (addressing a lawsuit brought by EEOC on behalf of an employee who did not want to pay union dues because the dues were used to support political action in favor of abortion and the death penalty, which the employee disagreed with on religious grounds).

[314] *Compliance Manual on Religious Discrimination, supra* note 215, at Examples #44 & #45.

[315] For the Commission's preliminary economic analysis, see 88 FR 54754–65.

## Comments and Response to Comments Regarding the Estimated Percentage of Individuals Capable of Becoming Pregnant Who Will Actually Become Pregnant in a Given Year

As explained above, in the NPRM, the Commission estimated that 4.7 percent of individuals who are capable of becoming pregnant will actually become pregnant in a given year.[316] Some comments stated that this estimate is too low because the Commission based its estimate on research that tracked the percentage of women participants who gave birth in a given year. As such, the 4.7 percent estimate did not include individuals who became pregnant in a given year but did not give birth, including individuals who had miscarriages, stillbirths, or abortions. Because this figure was used to calculate the number of reasonable accommodations needed, the comments further reasoned, the cost estimates did not take into account any reasonable accommodations needed by individuals who had miscarriages, stillbirths, or abortions.

The Commission agrees that the research it relied upon did not take account of individuals who became pregnant during a given year but who did not give birth, and therefore that its previous estimate of 4.7 percent was too low. To correct the shortcoming, the Commission has relied upon Centers for Disease Control (CDC) research showing that, between 2015 and 2019, live births in the United States accounted for 67% of all pregnancies among women aged 15–44 years on average.[317] Assuming that the ratio of live births to total pregnancies among women of reproductive age in the labor force is the same as among all 15–44 years old women, the Commission thus estimates that the percentage of individuals capable of becoming pregnant who will actually become pregnant in given year is $0.047 \div 0.67 = 0.071$ (rounded up), or 7.1 percent. This revised estimate is used in the revised economic analysis below.

## Comments and Response to Comments Regarding the Percentage of Pregnant Employees Needing a Reasonable Accommodation Under the PWFA

As explained above, in the NPRM, the Commission estimated that between 23 percent (lower bound estimate) and 71 percent (upper bound estimate) of

individuals who are actually pregnant in a given year will need a reasonable accommodation under the PWFA.[318] The report that the Commission used to arrive at these estimates stated that 71 percent of pregnant individuals surveyed needed more frequent breaks, such as extra bathroom breaks; 61 percent needed a change in schedule or more time off; 53 percent needed a change in duties; and 40 percent needed some other type of workplace adjustment.[319] The Commission chose the highest of these numbers (71 percent) as its upper bound estimate of the percentage of pregnant employees needing accommodations.

The Commission received a comment stating that the report cited by the Commission does not support the use of 71 percent as an upper bound estimate of the percentage of pregnant individuals needing an accommodation because the report established that 71 percent of the pregnant individuals surveyed needed additional breaks, but did not state whether any of the other 29 percent of pregnant individuals surveyed needed a different type of accommodation (such as a change in schedule or a change in duties). If so, then more than 71 percent of pregnant individuals surveyed needed at least one accommodation.

The report the Commission relied upon to set its upper and lower bound estimates did not state whether any of the 29 percent of individuals who did not need additional breaks needed a different sort of accommodation. It was therefore not possible for the Commission to determine, on the basis of this report, the percentage of employees surveyed who needed at least one accommodation. The comment objecting to the Commission's use of the 71 percent estimate did not provide additional data for the Commission to consider, and the Commission could not independently locate any more precise information. The Commission therefore must rely on reasonable assumptions to set its upper bound estimate of the percentage of pregnant employees needing accommodation.

Although it is possible that some of the 29 percent of pregnant individuals who did not need additional breaks needed a different type of accommodation, the Commission continues to assume for purposes of the economic analysis that the individuals who needed a different type of

pregnancy-related accommodation are a subset of those who needed additional breaks. In the Commission's opinion, it is unlikely that a pregnant individual who does not need additional breaks would need a less common type of accommodation such as a change in schedule or a change in duties. Additionally, many of the 71 percent of pregnant individuals surveyed who needed additional breaks may be entitled to them under the ADA, Title VII, or employer policies, and therefore the 71 percent figure likely overstates the number of individuals who will receive those breaks specifically as a consequence of the PWFA. The Commission is therefore confident that 71 percent is a reasonable estimate of the proportion of pregnant individuals needing accommodation under the PWFA given the paucity of data available at the time of this rulemaking.

The same comment objected to the Commission's use of 23 percent as a lower bound estimate of the percentage of pregnant employees who will need an accommodation under the rule. The Commission relied on the same report discussed immediately above to arrive at this estimate. Based on data in this report, the Commission calculated that 32 percent of pregnant individuals surveyed needed, but did not receive, more frequent breaks, such as extra bathroom breaks; 20 percent needed, but did not receive, a change in schedule or more time off; 23 percent needed, but did not receive, a change in duties; and 18 percent needed, but did not receive, some other type of workplace adjustment.[320] The Commission averaged these numbers to arrive at a lower bound estimate of 23 percent.[321]

According to the comment, the Commission's calculations established that at least 32 percent of pregnant employees surveyed needed, but did not receive, at least one pregnancy-related accommodation (specifically, additional breaks). The comment further argued that the Commission failed to offer any justification for the decision to average the four figures.

The Commission agrees with the comment that using the highest of the four figures (32 percent) is the better approach. As explained above, the report establishes that 32 percent of pregnant employees surveyed needed, but did not receive, at least one type of pregnancy-related accommodation. The Commission therefore has raised its lower bound estimate from 23 percent to 32 percent in the analysis below.

[316] *Id.* at 54757.

[317] Lauren M. Rossen et al., U.S. Dep't of Health & Hum. Servs., Ctrs. for Disease Control & Prevention, Nat'l Ctr. for Health Stat., *Updated Methodology to Estimate Overall and Unintended Pregnancy Rates in the United States* 15 (2023), https://stacks.cdc.gov/view/cdc/124395.

[318] 88 FR 54758.

[319] Eugene R. Declercq et al., *Listening to Mothers III: New Mothers Speak Out* 36 (2013), https://www.nationalpartnership.org/our-work/resources/health-care/maternity/listening-to-mothers-iii-new-mothers-speak-out-2013.pdf.

[320] *Id.*

[321] 88 FR 54758.

Comments and Response to Comments Regarding the Estimated Average Cost of an Accommodation

As stated above, in its previous analysis, the Commission estimated that 49.4 percent of needed pregnancy-related accommodations will have no cost, and that the average cost of the remaining 50.6 percent will be $300 distributed over 5 years, or $60 annually.[322]

One comment stated that this estimate was too low because it did not include costs associated with having a vacant position and with looking for new hires, both of which may be necessary when a pregnant employee takes leave. The comment emphasized that these costs affect both customers and other staff members.

The Commission declines to raise the estimated average cost of an accommodation in response to this comment. To estimate costs responsibly, the Commission must rely on existing data. According to the best available data, the average cost of a non-zero-cost reasonable accommodation provided pursuant to the ADA is $300.[323] Leave is an accommodation that is available under the ADA. The costs associated with leave, including the kinds of costs identified by the comment, were therefore presumably included in the data used to generate the $300 average. Additionally, if an employer did not provide leave to the employee and simply terminated the employee, the employer would still face the costs of having a vacant position and looking for new hires. To the extent that an accommodation allows the pregnant employee to stay with the employer, the employer could realize cost savings because it will not have to hire and train new employees.[324]

Comments and Response to Comments Regarding Alleged Additional Costs: Abortion

Many comments stated that the economic analysis should be revised to incorporate not only costs arising from the provision of abortion-related reasonable accommodations, but also the costs of abortions themselves together with some of their alleged downstream consequences.

Some comments suggested adding the costs of abortions to the analysis because they mistakenly understood the proposed rule as requiring employers to bear those costs. For example, some comments stated that the proposed rule required employers to pay for abortion

services or to pay for associated travel and lodging expenses as reasonable accommodations. Because the proposed rule did not, and the final rule does not, require covered employers to bear these costs, the Commission declines to amend the economic analysis to incorporate these costs to employers.

In most cases, however, comments suggesting inclusion of abortion-related costs identified costs that do not apply directly to employers. For example, some of these comments stated that the estimated cost of the rule should be increased by the value of the years of life lost by the individuals who were never born due to abortion. Others stated that the estimated cost of the rule should be revised to include health care costs that the comments alleged would be incurred by individuals who undergo abortion care. Other comments stated that the estimate should include certain large-scale societal costs that they linked to abortion. Several of these comments cited a 2022 report by Joint Economic Committee Republicans.[325]

The Commission declines to change its analysis in response to these comments. The alleged cost of abortion and its downstream consequences cannot properly be attributed to the final rule and statute simply because abortion-related accommodations are available under the PWFA.[326] Neither the statute nor the final rule has an impact on the costs that commenters allege are associated with abortion. Indeed, the comments themselves appear to acknowledge that the purported costs imposed by abortion are independent of the rule.[327]

The Commission recognizes that, under the statute and final rule, some individuals will obtain reasonable accommodations that may not have otherwise obtained, possibly including leave as a reasonable accommodation

related to an abortion.[328] But it does not follow that any of these individuals will have abortions because they were able to obtain an accommodation. It therefore does not follow that the costs associated with the abortions themselves should be included in the economic analysis.

A small number of comments argued that the proposed rule will increase the number of abortions performed, and that the economic analysis should include costs associated specifically with this increase. According to these comments, to calculate the cost of the final rule, the Commission must first determine the proportional economic impact of a single abortion and then multiply that figure by the number of additional abortions performed as a result of the rule.

The Commission declines to take this approach because the comments did not provide any evidence, and the Commission is not aware of such evidence, to support the conclusion that the number of abortions will increase as a consequence of the statute and the final rule.

A few comments asserted that the number of abortions will increase because the rule, by making abortion-related accommodations available, will make pregnant employees "uncomfortable" about bringing their pregnancies to term. These commenters did not provide support for this proposition, however. Other comments stated that the rule will increase the number of abortions because some employers may prefer that their employees terminate their pregnancies rather than bring their pregnancies to term, and, therefore, these employers may pressure their employees into having abortions by refusing to provide any pregnancy-related accommodations other than leave to obtain an abortion. This argument is unpersuasive because such refusal would be unlawful under the PWFA. An employer could not satisfy its PWFA obligations by providing leave to have an abortion to an individual who requests additional bathroom breaks due to pregnancy, for example, because such leave would not be an effective accommodation under those circumstances. In addition, Title VII prohibits employers from coercing

---

[322] *Id.* at 54759.

[323] *Id.*

[324] *Id.* at 54754.

[325] Joint Economic Committee Republicans, *The Economic Cost of Abortion* (2022), *https://www.jec.senate.gov/public/_cache/files/b8807501-210c-4554-9d72-31de4e939578/the-economic-cost-of-abortion.pdf.*

[326] Many of the comments stating that the Commission should account for the cost of abortion and its downstream consequences described the rule as containing an "abortion mandate" or as "encouraging" abortion. This is a mischaracterization of the rule. Rather than requiring or encouraging abortion, this rule simply requires employers to provide reasonable accommodations to the known limitations of employees under some circumstances.

[327] The $6.9 trillion in annual abortion-related costs identified by Joint Economic Committee Republicans in their 2022 report, for example, were said to have occurred in 2019—well before the effective date of the statute or final rule. These costs should therefore be considered part of the pre-statutory baseline, rather than new costs attributable specifically to the statute and final rule.

[328] The Commission notes that it is possible that the availability of abortion-related reasonable accommodations—such as leave—may have additional effects on the circumstances of an abortion, for example by enabling the individual to have the abortion at an earlier time; to elect a different method of abortion; to have the abortion at a nearby clinic instead of traveling to a more distant clinic; or to have the abortion performed by a reputable provider. The Commission was unable to incorporate these cost savings into the quantitative analysis, however, due to lack of data.

**29158**  **Federal Register** / Vol. 89, No. 77 / Friday, April 19, 2024 / Rules and Regulations

employees into having abortions because it prohibits them from taking an adverse action against an individual because of the individual's decision to have—or not to have—an abortion.[329]

Again, the Commission recognizes that, under the statute and the final rule, an employee who has decided to have an abortion may request and receive an abortion-related accommodation, absent undue hardship. But it does not follow from this fact alone that the individual has decided to have the abortion because of the rule. The assumption implicit in comments—that some employees will decide to have abortions because the final rule and statute make abortion-related accommodations available—is speculative.[330] Research shows that individuals who are unable to access abortion care typically are unable to do so for multiple reasons, none of which are determinative.[331] Because the Commission is unaware of any data showing specifically that access to PWFA-type accommodations will increase the number of abortions performed, it declines to add the associated costs to its analysis.[332]

Comments and Response to Comments Regarding Alleged Additional Costs: Litigation

Some comments stated that the rule would increase costs for employers by increasing litigation. Some of these provided only a very brief justification for the claim. Some comments, for example, claimed that the rule would increase litigation because it is "expansive" or because the range of accommodations required is broad. One comment stated that the rule is likely to invite litigation because it is likely that

a different Presidential administration will change this policy. These comments did not include data or cite any supporting research.

One comment, signed by several Attorneys General from States that have PWFA-type statutes, supports the opposite conclusion:

Nor have the PWFA-analogue States experienced a marked increase in litigation following enactment of their PWFA/Break Time law analogues. In Washington State, all but 2 of the 650 pregnancy accommodation intakes received by the Attorney General's Office resolved without the need to file a lawsuit. In New York State, which enacted its PWFA analogue in 2016, the vast majority of discrimination complaints filed with the New York Division of Human Rights involve allegations of employment discrimination, yet complaints relating to reasonable accommodations for pregnancy-related conditions account for at most .03% of all employment discrimination filings. Moreover, 86% of the employment discrimination cases that involve reasonable accommodations for a pregnancy-related condition resolve prior to an agency hearing. The pre-hearing resolution numbers are similar in Connecticut. In Oregon, only about 1.5% of cases filed with the Civil Rights Division of the state's Bureau of Labor and Industries involve pregnancy or post-partum accommodation issues, a good portion of which are voluntarily resolved. . . . And in Illinois, only 1% of charges filed with the Department of Human Rights involved pregnancy-related charges seeking an accommodation. A study in California, which enacted its state PWFA in 2000, showed the total number of pregnancy discrimination charges filed with the state human rights agency actually decreased after the law was enacted.[333]

The Commission also disagrees with the claim that its definition of "pregnancy, childbirth, or related medical conditions" is expansive and will increase litigation, or the characterization of its definition as an example of something that will lead to litigation because another Presidential administration will change it. As explained in the preamble to the final rule, "pregnancy, childbirth, or related medical conditions" is language from Title VII, and the Commission's interpretation of that phrase in the PWFA is consistent with how courts and the Commission have interpreted that phrase in Title VII. Moreover, the interpretation of "pregnancy, childbirth, or related medical conditions" in the PWFA is consistent with the interpretation the Commission has had in many different Presidential administrations. Finally, given the long-standing definition of "pregnancy, childbirth, or related medical

conditions" in Title VII, changing it for the PWFA also would have the potential to create litigation.

Some comments stated more specifically that interpreting the term "related medical conditions" to include abortion will cause litigation because employers that comply with providing abortion-related leave as a reasonable accommodation may be found liable for pregnancy discrimination. For example, one comment stated that if an employer provided an employee sufficient leave to travel out of the State to have an abortion but denied a request by a pregnant employee who did not want an abortion for the same amount of leave to see an out-of-State obstetrician, instead only providing an amount of leave sufficient to visit an in-State obstetrician, the employer could face a claim that it is discriminating against women who do not get abortions.

The Commission disagrees that provision of abortion-related leave as a reasonable accommodation could give rise to liability for pregnancy discrimination under the circumstances described. First, if the employer is providing the leave as a reasonable accommodation, then it is not providing either employee with "benefits." Rather, it is providing them with reasonable accommodations to which they are entitled under the law.

Second, the two kinds of leave are not "unequal." With respect to both individuals, the employer is providing the amount of leave necessary to address the individual's known pregnancy-related limitation. It is often the case that the cash value of one reasonable accommodation is less than that of another. For example, if an employer provides one pregnant individual a reasonable accommodation of drinking water because that is what the individual needs, and provides a second pregnant individual with a chair to sit on because that is what the second pregnant individual needs, the employer is not discriminating against the first individual just because a chair costs more than permission to drink water—both individuals have been given reasonable accommodations appropriate to their known pregnancy-related limitations.

Because the comments discussed above did not provide evidence to support the conclusion that promulgation of the rule will invite increased litigation, the Commission declines to incorporate litigation-related costs into the final economic analysis.

---

[329] Enforcement Guidance on Pregnancy Discrimination, supra note 31, at (I)(A)(4)(c).

[330] To support the assertion that the costs of an abortion are attributable to the final rule and statute, research would need to show that the abortion-related accommodation provided under the rule—in most cases leave—is a but-for cause of the abortion, and that the individual does not have independent access to the leave under a different law or policy.

[331] See, e.g., Jenna Jerman et al., Barriers to Abortion Care and Their Consequences for Patients Traveling for Services: Qualitative Findings From Two States, 49 Persps. on Sexual & Reprod. Health 95, 98–99 (2017).

[332] The Commission notes that, even if data could be found showing that the final rule and statute will increase the number of abortions that are performed, the Commission would still need to engage in considerable speculation in order to estimate the associated costs. Although some comments cited research purporting to measure costs imposed by abortion on individuals who undergo abortion care and on society as a whole, the research did not establish a consensus on this issue. See generally Ushma D. Upadhyay et al., Intended Pregnancy After Receiving Vs. Being Denied a Wanted Abortion, 99 Contraception 42 (2019).

[333] Comment EEOC–2023–0004–98337, New York State Attorney General, at 5 (Oct. 10, 2023).

**Comments and Response to Comments Regarding Additional Costs: Male Employees**

Some comments stated that it was unclear whether the rule entitled men to pregnancy-related accommodations (including, for example, male infertility treatment), but that, if the rule entitled men to such accommodations, these costs should be reflected in the analysis. The Commission declines to incorporate these costs into the analysis because, as explained in the preamble to the final rule, the definition of "pregnancy, childbirth, or related medical conditions" in the final rule only encompasses medical conditions which relate to pregnancy or childbirth, "as applied to the specific employee or applicant in question."

**Comments and Response to Comments Regarding Alleged Additional Costs: Other Costs**

One comment stated that the Commission's economic analysis should account for costs arising from the loss of free speech and free exercise rights. The Commission does not agree that the regulation creates such a loss and has explained in the preamble to the final rule why free speech and religious exercise are not negatively affected by and are, instead, protected by the rule.

A few comments stated that the Commission should account for the reduction in hiring of women based on the "expansive" accommodation requirements. The Commission does not agree that this is a cost it should take into account for the economic analysis. First, discrimination against women because they need an accommodation, or may need an accommodation, under the PWFA violates the PWFA and potentially Title VII. Second, these comments did not provide evidence supporting the conclusion that employers will hire fewer women as a result of the rule and underlying law.

One comment stated that the Commission's economic analysis, which did not consider accommodation costs for States with their own PWFA-type statutes, did not account for the fact that these State statutes do not permit accommodations for abortions. This comment did not support this statement with data or case law, and the Commission was unable to find any independent evidence of any such restriction.[334] Additionally, as noted in

the preamble to the final rule, an employee may need an abortion for a variety of reasons, which could affect the ability of the employee to use the State statute for an accommodation.

One comment stated that the economic analysis should include costs related to severance, retirement, and labor shortages, and, additionally, that it should include costs arising from the decline in private firms' participation in the national economy. The Commission declines to include these costs because the comment provided no data supporting a connection between provision of pregnancy-related reasonable accommodations, on the one hand, and an employee's decision to leave the workforce or to decline to participate in market activities, on the other hand. The Commission further notes that it received countervailing comments on this issue, suggesting that the rule will enable covered entities to prevent individuals from leaving the workforce by making pregnancy-related accommodations available to those who need them.

One comment stated that the Commission should consider the alternative of defining "related medical conditions" to exclude abortion. As explained in the final rule, the Commission's interpretation is consistent with the PWFA's text, and for over 40 years, the Commission and courts have interpreted the phrase "pregnancy, childbirth, or related medical conditions" in Title VII to include abortion. The Commission concludes that it is unnecessary to consider this alternative for the economic analysis.

One comment stated that, in States that have laws like the PWFA, employees are more likely to ask for and receive accommodations, and in States where there are no PWFA-like laws, employees are less likely to ask for or receive accommodations; thus, those who have not received accommodations prior to the PWFA should be overrepresented among those who now have rights. The Commission based its calculations on the data that is available, and this comment did not provide data to support this point or dispute the Commission's calculations.

**Comments and Response to Comments Regarding the Time To Read the Regulation**

Several comments stated that the Commission underestimated the time to

read and understand the regulation, including stating that small businesses without a legal staff would take a long time to read and understand the rule; that the amount of time for compliance should be increased to account for time to read and review the regulation, obtain legal advice, develop a compliance policy, train employees, and implement the rule, including creating systems to collect, retain, and secure protected information; that a specific individual took 2 days to read the regulation and several of the comments; that the cost should account for the hiring of outside counsel; that the Commission should include the cost of processing each request for an accommodation; and that the Commission should account for costs to train new employees and for new businesses in future years. Most of these comments on this topic did not provide either data or evidence to support a revision by the Commission. Those that did so provided estimates that varied greatly, and none were grounded in research.

The Commission has slightly increased its estimate of the amount of time allotted for compliance activities, in part to account for the fact that the final rule and Interpretive Guidance are slightly longer, and therefore would take slightly longer to read, than the proposed rule and Interpretive Guidance contained in the NPRM, and in part in response to comments indicating additional time is needed for covered entities to become familiar with the rule. The Commission estimates that compliance activities for a covered entity will take an average of 135 minutes, or 2.25 hours, in States that do not already have laws substantially similar to the PWFA and an average of 45 minutes in States with existing laws similar to the PWFA. This estimate is consistent with the amount of time the Commission allotted for compliance activities under other recent regulations that it has published in connection with civil rights laws. For example, in publishing a regulation implementing Title II of the Genetic Information Nondiscrimination Act (GINA), the Commission estimated 3 hours for rule familiarization, which was appropriate because GINA involved a new protection against discrimination based on genetic information.[335] Conversely, the Commission did not include a calculation of the cost for rule familiarization in its rule amending its Age Discrimination in Employment Act (ADEA) regulations concerning disparate-impact claims and the reasonable factors other than age

---

[334] Some comments stated more generally that the impact analysis should account for the fact that some State PWFA-type laws may not be identical to the PWFA, and therefore that such States may face slightly additional costs for reasonable accommodations required by the PWFA but not by

the pre-existing State law. These comments failed to identify whether or how the interpretations of the State law differ from the PWFA and to cite or provide data that would support any changes.

[335] 75 FR 68912, 68931 (Nov. 9, 2010).

defense (RFOA)[336] or its rule implementing the ADA Amendments Act (ADAAA).[337]

Here, the Commission has calculated compliance activities under the PWFA regulation in light of the fact that the PWFA is a new civil rights statute, but employers covered by the PWFA already are covered by Title VII and the ADA. Presumably, these employers already have standard procedures to inform their employees and supervisors about their rights and responsibilities under Title VII, the ADA, and other workplace laws. Given the similarities between the PWFA and the ADA and Title VII, employers will be able to use many of their existing procedures and include the PWFA in their training regarding the ADA and Title VII.[338] Further, the Commission offers training and assistance specifically tailored to small businesses.[339] The Commission does not anticipate that covered entities will need legal advice; the PWFA and the regulation draw on well-established concepts and procedures from Title VII and the ADA. For example, as under the ADA, an employer does not have to require supporting documentation to provide a PWFA accommodation; if it does, the documentation under the PWFA, like under the ADA, must be kept separate from the employee's personnel file. Thus, employers will be able to use a compliance mechanism they have already developed for the ADA for the PWFA. Similarly, employers can use the same human resources staff they use to process requests for accommodations under the ADA or Title VII for such requests under the PWFA. Accordingly, the Commission does not anticipate that covered employers will need time in addition to the time provided in the final rule.

Additionally, the Commission received comments that stated that the regulation would provide appropriate guidance and would assist employers in compliance, which would reduce employer costs.

*Summary of the Commission's Preliminary Economic Analysis of Impacts: Nonquantifiable Benefits*

In the NPRM, the Commission identified five primary benefits of the proposed rule and underlying statute that are difficult to quantify: (1)

improvements in maternal and infant health outcomes; (2) improvements in pregnant employees' economic security; (3) non-discrimination and other intrinsic benefits, such as the enhancement of human dignity; (4) clarity in enforcement and efficiencies in litigation; and (5) benefits for covered entities.[340]

Comments and Response to Comments Regarding Non-Quantifiable Benefits

A number of comments agreed with the identified benefits and provided additional research or anecdotal evidence to support the benefits.

Regarding improvements in maternal and infant health outcomes, one comment asserted that the rule will have positive effects on pregnant employees' mental health, stating that even perceived pregnancy discrimination at work has been linked to increased stress and symptoms of postpartum depression.[341] This comment linked stress resulting from workplace discrimination and workplace conditions to increased risk of preterm birth or low birth weight, potentially resulting in serious health problems at birth that may cause long-term health and developmental consequences in children.[342] Such health challenges may result in additional health care costs; accordingly, reducing stress during pregnancy also may reduce heath care costs.[343] Other comments observed that, because research shows that certain workplace conditions, such as lengthy periods of standing or walking, or high risk of chemical exposure or noise, can result in complications for a pregnant employee and their baby, accommodations to alleviate those conditions improve health outcomes for pregnant employees and their children.[344] Additionally, one comment

cited a source that drew from a study that found that, overall, employment during pregnancy is associated with a reduction in the risk of preterm birth, which supports the need to keep pregnant employees in the workforce.[345] Other comments provided anecdotal evidence that employees who received accommodations under the PWFA felt secure in their employment and thus better able to focus on their new babies' needs.

Regarding improvements in pregnant employees' economic security, several comments underscored that many American workers lack a financial cushion and that the proposed rule and underlying law will mitigate short- and long-term negative financial consequences associated with losing a job at a critical time, given increased costs due to childbirth, child rearing, and childcare.[346] At least one comment observed that women of color and Native women are overrepresented in low-paid jobs with few benefits, and that providing accommodations that can help employees stay in the workforce is critical to promoting economic security.[347]

Regarding non-discrimination and other intrinsic benefits, several comments confirmed that non-discrimination and other intrinsic benefits result from the proposed rule and underlying law. For example, one comment stated that the underlying law gives pregnant employees "a strong sense of dignity and belonging in the workforce," reduces stigma and stereotyping regarding pregnancy, and

---

[336] 77 FR 19080, 19090–94 (Mar. 30, 2012).

[337] 76 FR 16978, 16994–95, 16999 (Mar. 25, 2011).

[338] H.R. Rep. No. 117–27, pt. 1, at 26–31 (discussing the similarities between the PWFA and the ADA and the PWFA and Title VII).

[339] EEOC, *Small Business Resource Center*, https://www.eeoc.gov/employers/small-business (last visited Mar. 25, 2024)

[340] 88 FR 54751–54.

[341] *See* Kaylee J. Hackney et al., *Examining the Effects of Perceived Pregnancy Discrimination on Mother and Baby Health*, 106 J. Applied Psych. 774, 777, 781 (2021).

[342] *Id.* at 778, 781; March of Dimes, *Stress and Pregnancy*, https://www.marchofdimes.org/find-support/topics/pregnancy/stress-and-pregnancy (last visited Mar. 25, 2024); March of Dimes, *Long-Term Health Effects of Preterm Birth* (Oct. 2019), https://www.marchofdimes.org/find-support/topics/birth/long-term-health-effects-premature-birth.

[343] March of Dimes, *Premature Birth: The Financial Impact on Business* (2013), https://onprem.marchofdimes.org/materials/premature-birth-the-financial-impact-on-business.pdf.

[344] *See generally* Frincy Francis et al., *Ergonomic Stressors Among Pregnant Healthcare Workers*, 21 Sultan Qaboos Univ. Med. J. 172 (2021), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8219330 (describing ergonomic stressors and pregnancy outcomes); *see also* Louisville Dep't of Pub. Health & Wellness, *Pregnant Workers Health Impact Assessment* 17–19, 23 (2019) [hereinafter *Pregnant*

*Workers Health Impact Assessment*], https://louisvilleky.gov/center-health-equity/document/pregnant-workers-hia-final-02182019pdf (identifying workplace conditions that may impact the health of a pregnant worker and their child and basic accommodations to alleviate those conditions to improve health outcomes).

[345] *Pregnant Workers Health Impact Assessment*, *supra* note 344, at 16–17 (citing a study finding that, overall, employment during pregnancy is associated with a reduction in risk of preterm birth, although certain types of jobs or environments may increase the risk of preterm birth).

[346] *See, e.g.*, Lane Gillespie, Bankrate, *Bankrate's 2023 Annual Emergency Savings Report* (June 22, 2023), https://www.bankrate.com/banking/savings/emergency-savings-report/ (finding that 48 percent of Americans have enough emergency savings to cover 3 months of expenses); Matthew Rae et al., KFF, *Health Costs Associated with Pregnancy, Childbirth, and Postpartum Care* (July 13, 2022), https://www.kff.org/health-costs/issue-brief/health-costs-associated-with-pregnancy-childbirth-and-postpartum-care/ (noting that the average health care costs associated with "pregnancy, childbirth, and post-partum care" total $18,865, and the average out-of-pocket cost is $2,854).

[347] *See* Jasmine Tucker & Julie Vogtman, Nat'l Women's Law Ctr., *Hard Work Is Not Enough: Women in Low-Paid Jobs* 15 (2023), https://nwlc.org/wp-content/uploads/2020/04/%C6%92.NWLC_Reports_HardWorkNotEnough_LowPaid_2023.pdf.

reestablishes pregnancy as an ordinary part of employment. One comment cited a source that stated, "The reasonable accommodation framework relieves individual employees of the burden of proving animus: of showing that an employer's inflexible imposition of workplace standards reflects sex stereotyping that flows from the invidious assumption that pregnant workers are not competent or committed workers." [348] Several comments provided anecdotal accounts of the sense of dignity that receiving pregnancy-related accommodations under the PWFA has given individual employees. Another comment noted that the proposed rule and underlying law will reduce incidents in which pregnant employees experienced humiliation at the hands of supervisors who denied accommodations and singled out pregnant employees for negative treatment.

Regarding clarity in enforcement and efficiencies in litigation, multiple comments confirmed that the proposed rule would provide clarity regarding employees' rights and employers' obligations under the PWFA. One comment stated that the NPRM explains the PWFA in an understandable and accessible way. One comment from a nonprofit observed that "dozens and dozens" of low-wage employees had informed them of the "transformative" effect of the law in their lives; some employees reported that their employers had previously denied or ignored their requests for accommodation but granted them after the PWFA became effective.[349] At the same time, this nonprofit noted that many employees, particularly low-wage women of color, are still denied their rights under the PWFA, demonstrating the need for a clear and comprehensive rule. Finally, as previously noted, the comment from several State Attorneys General observed that States that had enacted laws protecting pregnant employees in the workplace did not experience a marked increase in litigation following the law's enactment, and the vast majority of complaints resolve prior to administrative proceedings or litigation.[350]

Regarding benefits for covered entities, some comments stated that employers benefit from retaining pregnant employees because searching for and training new employees results in costs and stress on an organization,

which can, in turn, negatively affect customers and other employees. Several comments highlighted that laws like the PWFA enable businesses to retain valuable employees, improve productivity and morale, reduce workers' compensation costs and absenteeism, and improve company diversity, and stated that the proposed rule would have the same effects. One comment observed that, for small businesses struggling with worker shortages and seeking to incentivize employee retention, the proposed rule could facilitate incentivizing worker retention.

One comment asserted that the rule would benefit employees in industries that are traditionally male dominated, such as manufacturing and the trades, and are physically demanding. The comment stated that providing pregnancy-related accommodations will reduce occupational segregation by gender, which in turn may affect the pay gap. Although this logically may be a possible benefit, the sources cited did not directly support this proposition. The Commission thus declines to include this as a benefit of the final rule.

The Commission received a few comments asserting that certain factors offset the non-quantifiable benefits identified by the Commission. One comment stated that in its discussion of the benefits to civil rights, the Commission must account for the harm done to the civil rights of religious employers that may have to provide accommodations that conflict with their religious beliefs. The Commission does not agree with this comment; as discussed in the preamble to the final rule, several defenses are available to religious employers.

The Commission also received several comments stating that the proposed rule would create harm to women and families because of its inclusion of abortion in the definition of "pregnancy, childbirth, or related medical conditions." As set out in the economic analysis and the preamble to the final rule, the rule does not require anyone to have an abortion or force employers to pay for abortions. Further, as set out in the response to comments on the quantitative analysis above, there is no evidence that the rule will increase the number of abortions. The Commission does not agree that the considerations raised in these comments should be included here.

The Commission concludes that the benefits articulated in the NPRM are attributable to the rule and the Commission incorporates supplemental evidence of each benefit, as described above, into the final rule.

**Regulatory Flexibility Act and Executive Order 13272 (Proper Consideration of Small Entities in Agency Rulemaking)**

*Summary of the Commission's Certification That the Rule Will Not Have a Significant Economic Impact on a Substantial Number of Small Entities*

In the NPRM, the Commission certified that the rule will not have a significant economic impact on a substantial number of small entities.[351] The Commission reasoned that, although the rule would apply to all small entities with 15 or more employees, and therefore would affect a "substantial" number of small entities, it would not have a "significant economic impact" on a substantial number of small entities.

To justify its decision to certify in the final rule, the Commission again began its analysis by assuming that the rule will impose two quantifiable costs on small entities: the annual cost of providing pregnancy-related reasonable accommodations as a result of the statute and the rule, and the one-time cost of becoming familiar with the rule.

To estimate the one-time cost of becoming familiar with the rule, based on the analysis detailed in the Initial Regulatory Impact Analysis (IRIA), the Commission estimated that small entities in States and localities that have laws substantially similar to the PWFA will be limited to a one-time administrative cost of approximately $56.76, and that small entities that are not already subject to State or local laws substantially similar to the PWFA will face a one-time administrative cost of approximately $170.27.

To estimate the annual cost of accommodation required by the rule, consistent with the IRIA, in the NPRM the Commission assumed that the number of individuals seeking accommodations will be approximately equal to the number of individuals who actually become pregnant during that year; that 33 percent of the employees within each small entity are capable of becoming pregnant, and that, of these, 4.7 percent will actually become pregnant in a given year; that between 23 and 71 percent of pregnant individuals within each small entity will need an accommodation; that 49.4 percent of such accommodations will have no cost; and that the average cost of the remaining 50.6 percent of needed accommodations will be $300 distributed over 5 years, or $60

---

[348] Reva B. Siegel, *The Pregnant Citizen, from Suffrage to the Present*, 108 Georgetown L.J. 167, 220–26 (2020).

[349] Comment EEOC–2023–0004–98298, A Better Balance, at 7 (Oct. 10, 2023).

[350] *See supra* note 333.

[351] 88 FR 54764. The Commission's analysis under the Regulatory Flexibility Act, summarized here, is available at 88 FR 54764–65.

annually. Using these figures, it generated the following cost estimates for small entities of various sizes: [352]

generated the following cost estimates for small entities of various sizes: [352]

#### Table 13 (from the NPRM): Annual Costs for Reasonable Accommodations for Small Businesses Based on Size

| Number of Employees | 33% Women Aged 16–50 | 4.7% Pregnant in a Given Year | Needing Accommodations: 23% (Lower Bound Estimate) – 71% (Upper Bound Estimate) | 50.6% Non-Zero-Cost Accommodations: Lower Bound Estimate – Higher Bound Estimate (Rounded Up) | Total Expected Cost: Lower Bound Estimate – Higher Bound Estimate |
|---|---|---|---|---|---|
| 15 | 4.95 | 0.233 | 0.054 – 0.165 | 1 | $60 |
| 50 | 16.5 | 0.7755 | 0.178 – 0.55 | 1 | $60 |
| 100 | 33 | 1.551 | 0.357 – 1.01 | 1 | $60 |
| 150 | 49.5 | 2.326 | 0.535 – 1.652 | 1 | $60 |
| 200 | 66 | 3.102 | 0.713 – 2.202 | 1 – 2 | $60 – $120 |
| 250 | 82.5 | 3.878 | 0.892 – 2.75 | 1 – 2 | $60 – $120 |
| 500 | 165 | 7.755 | 1.78 – 5.5 | 1 – 3 | $60 – $180 |
| 750 | 247.5 | 11.633 | 2.676 – 8.259 | 2 – 5 | $120 – $300 |
| 1000 | 330 | 15.51 | 3.567 – 11.012 | 2 – 6 | $120 – $360 |
| 1250 | 412.5 | 19.388 | 4.459 – 13.765 | 3 – 7 | $180 – $420 |
| 1500 | 495 | 23.265 | 5.351 – 16.518 | 3 – 9 | $180 – $540 |

Because entities that are already subject to laws substantially similar to the PWFA are already required to provide accommodations consistent with the PWFA, their total costs were estimated to be the one-time cost of $56.75.

Total costs for entities that are not already subject to laws substantially similar to the PWFA were estimated to be the annual cost of providing reasonable accommodations as detailed in Table 13 in the NPRM (between $60 for businesses with 15 employees and $540 for businesses with 1,500 employees), plus $170.27 (the cost of becoming familiar with the rule) in the first year.

*Revisions in Response to Comments That Addressed Both the IRIA and the Commission's Justification for Certifying Under the Regulatory Flexibility Act (RFA)*

As detailed in the discussion of the Regulatory Impact Analysis (RIA) above, in response to comments the Commission made adjustments to its estimate of the percentage of individuals capable of becoming pregnant who actually become pregnant during a given year (revised upward from 4.7 percent to 7.1 percent), and to its lower bound

estimate of the percentage of pregnant individuals who will need a reasonable accommodation (revised upward from 23 percent to 32 percent). The Commission also increased the amount of time it estimated employers would need to familiarize themselves with the rule. Because the Commission's analysis under the Regulatory Flexibility Act (RFA) relied on these same estimates, the Commission has made conforming changes below.

Comments and Response to Comments Pertaining Specifically to Small Entities

In addition to the comments that apply both to the RIA and the analysis under the RFA, the Commission received some comments specifically addressing the rule's effect on small entities.

Many comments made general statements about the rule's effect on small businesses, without addressing specific aspects of the reasoning offered by the Commission in support of its decision to certify.

Some comments stated generally that small entities will have difficulty complying with the rule. A few of these emphasized that small entities may have especial difficulty reading and understanding the rule or hiring

personnel to cover for pregnant employees who take leave as a reasonable accommodation. Some asserted that small entities will hire fewer women in anticipation of added costs arising from the need to provide accommodations.

Other comments stated broadly that the rule will be beneficial to small entities. One such comment noted that many States have laws similar to the PWFA with thresholds even lower than 15 employees; that, in those States, even smaller employers must provide reasonable accommodations absent undue hardship; that providing for accommodations may allow employers to keep employees and thus reduce costs for replacement and retraining; that the PWFA will encourage pregnant employees to stay in the workforce, thereby supporting small businesses; and that in States with PWFA-type statutes, increased costs or adverse economic outcomes either have not been reported or have been so insignificant that they are not easily measurable, likely because the required accommodations tend to be low-cost or no-cost.

On balance, the Commission concludes that the comments discussed above do not provide it with sufficient

---

[352] *Id.* at 54764–65.

reason to withdraw its earlier decision to certify that the rule will not have a significant economic effect on a substantial number of small entities. As detailed above, these comments were not uniformly in favor of withdrawal. Further, the comments stating generally that small entities will have difficulty complying with the rule did not provide data in support of those claims. The Commission also observes that these comments generally appear to overlook the fact that, if a particular reasonable accommodation would impose undue hardship on the employer, neither the PWFA nor the rule require the employer to provide it. To the extent that the above comments predict that the rule will cause small employers to hire fewer women, the Commission notes that such action is independently unlawful pursuant to Title VII's prohibition against refusal to hire women because they may become pregnant.[353]

Some comments addressed the Commission's reasoning more directly. One comment stated that the Commission should retract its certification because over 10 percent of the 33 million small businesses in the United States will be required to comply with the rule. This comment misrepresents the Commission's reason for certifying. As explained above, in the NPRM the Commission agreed that the rule will affect a "substantial" number of small entities but concluded that the economic impact on such entities would, in almost all cases, fail to be "significant."[354] The Commission thus declines to retract its certification in response to this comment.

One comment stated that, in estimating the cost of accommodations on small entities, the Commission should not have relied on the average cost for such accommodations, but rather should have focused on "budget-busting" accommodations that would be especially difficult for small entities to handle. This comment did not cite data establishing how much an accommodation would need to cost in order to qualify as "budget-busting" for small entities of a given size, what sorts of pregnancy-related accommodations were likely to reach that threshold, or how often such an accommodation is likely to be needed. Further, the comment did not account for the fact that the PWFA does not require employers to provide reasonable accommodations that would impose undue hardship; presumably the "budget-busting" accommodations would be likely to meet this standard.

One comment objected to the Commission's method of determining whether a given entity meets the 15-employee threshold for coverage under the PWFA. Specifically, the comment objected to the fact that the Commission counts temporary or seasonal employees toward this total under some circumstances. The Commission declines to change its method for determining whether an entity has 15 employees in response to this comment. The same method has been used consistently for decades under all of the statutes enforced by the EEOC and has been endorsed by the Supreme Court.[355]

One comment objected to the Commission's decision to distribute the average cost of a non-zero-cost accommodation ($300) over 5 years for purposes of the RFA analysis. The Commission distributed the costs over 5 years under the assumption that most accommodations with a cost will involve purchase of durable goods with a life of 5 years.[356] The Commission made this same assumption when it estimated the costs arising from the provision of additional reasonable accommodations as a result of the ADAAA.[357] The comment stated that small employers generally will have no use for these durable goods after they are used by the original requester. The comment provided no data to support this assertion. Further, the comment did not identify a reason why the Commission's estimate of average accommodation costs under the PWFA should differ from its estimate of the same under the ADA. The Commission, therefore, declines to amend its analysis in response to the comment.

Some comments objected to the Commission's method of estimating the percentage of employees within a given small entity who actually become pregnant in a given year. Although the Commission's estimate may be accurate for small entities in certain industries, these comments argued, they may not be accurate for small entities operating in industries that employ disproportionately high numbers of women. One comment identified "education and health; leisure and hospitality; and retail and wholesale trade" as industries that employ disproportionately high numbers of women. The comment offered the hypothetical situation of a preschool with 25 employees, 20 of whom are women of reproductive age. The comment concluded that the preschool

likely will have continuous costs imposed by the proposed rule, even though it has just 25 employees.

The Commission is unpersuaded that it should retract its certification that the rule will not have a significant economic impact on a substantial number of small entities in response to these comments. In the Commission's view, they overestimate the costs that will be experienced in industries with disproportionately high numbers of women employees. Consider the example discussed above in which a business employs 25 employees, 20 of whom are capable of becoming pregnant. To generate a lower bound estimate of the number of expected non-zero-cost accommodations per year in the example, the Commission calculates as follows: $20 \times 0.071 \times 0.32 \times 0.506 = 0.22$ individuals per year are likely to need a non-zero-cost pregnancy-related reasonable accommodation, roughly equivalent to one individual every 5 years.[358] To generate an upper bound estimate: $20 \times 0.071 \times 0.71 \times 0.506 = 0.52$ individuals per year are likely to need a non-zero-cost pregnancy-related accommodation, roughly equivalent to one individual every 2 years. As discussed above, these costs are not expected to be high—the expected annual cost per accommodation is estimated to be $60 per year. Thus, rather than imposing "continuous" high costs, businesses like the one in the example should only expect to provide one relatively low-cost accommodation every 2 to 5 years.[359] Additionally, even

---

[353] 42 U.S.C. 2000e(k).

[354] 88 FR 54764.

[355] *See generally Walters* v. *Metro. Educ. Enters., Inc.,* 519 U.S. 202 (1997).

[356] 88 FR 54759.

[357] 76 FR 16977, 16994 (Mar. 25, 2011).

---

[358] The estimate was calculated by multiplying the number of individuals in the business who are capable of becoming pregnant (20) by (a) 7.1 percent, to account for the fact that only some individuals who are capable of becoming pregnant will actually become pregnant in a given year; (b) 32 percent, to account for the fact that only some pregnant individuals will need accommodation; and (c) 50.6 percent, to account for the fact that only some needed accommodations will have a cost. For a detailed discussion of these calculations, see the *Costs* section in the Final Regulatory Impact Analysis below.

[359] Further, the Commission has been given no reason to believe that the example offered in the comment and discussed here is representative of any real industry. The percentage of employees capable of becoming pregnant in the example is 20 ÷ 25 = 80 percent—roughly 2.5 times as high as the 33 percent national average. Additionally, the business in the example had only 25 employees. The comment failed to provide any data establishing the existence of any industry that has a "substantial" number of entities that have so few employees and that employs women at such a disproportionately high rate. The example is of an entity in the education industry. The Small Business Administration does not define the meaning of "small entity" for any of the education-related industries in terms of a number of employees. *See* 13 CFR 121.210. It defines "small entity" in the elementary and secondary school industry to be an entity that has $20 million or less
Continued

if a substantial number of small entities in a particular industry were to face "continuous" costs as a result of the rule—as demonstrated by the calculations above, a highly unlikely occurrence—it would not follow that such costs would be "economically significant."

For the reasons discussed above, the Commission has determined that the comments it received regarding occupational segregation do not require it to retract its certification that the rule will not have a significant economic impact on a substantial number of small entities, or to revise its justification for certifying.

## Final Economic Analysis

*Executive Orders 12866 (Regulatory Planning and Review), 13563 (Improving Regulation and Regulatory Review), and 14094 (Modernizing Regulatory Review)*

### Introduction

The final rule has been drafted and reviewed in accordance with Executive Order (E.O.) 12866. The rule and the Interpretive Guidance are intended to add to the predictability and consistency of executive enforcement of the PWFA and to provide covered entities and employees with information regarding their rights and responsibilities. The rule is required pursuant to 42 U.S.C. 2000gg–5. The Final Regulatory Impact Analysis estimates the cost of the rule to be between $466.71 million and $484.71 million in the first year, and between $14.82 and $32.82 million annually thereafter. It estimates that the benefits will be significant. While those benefits cannot be fully quantified and monetized, the Commission concludes that, consistent with E.O. 13563, the benefits (qualitative and quantitative) will justify the costs. The Commission notes that the rule and underlying statute create many important benefits that, in the words of E.O. 13563, stem from "values that are difficult or impossible to quantify" including "equity, human dignity, fairness and distributive impacts." Additionally, because the rule provides employees who are affected by pregnancy, childbirth, or related medical conditions with reasonable accommodations that enable them to continue working, the benefits of the rule include increased productivity. These benefits cannot be quantified at this time, however.

in annual receipts, *id.*, but the Commission was unable to determine the percentage of elementary or secondary schools with $20 million or less in annual receipts that have 25 or fewer employees.

## Summary

As detailed in the Final Regulatory Impact Analysis (FRIA) section below, the final rule and underlying statute are expected to provide numerous unquantifiable benefits to qualified employees and applicants with known limitations related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions, especially in States that currently do not have laws substantially similar to the PWFA. It will also benefit covered entities, the U.S. economy, and society as a whole. These unquantifiable benefits include improved maternal and infant health; improved economic security for pregnant employees; increased equity, human dignity, and fairness; improved clarity of enforcement standards and efficiencies in litigation; and decreased costs related to employee turnover for covered entities.

The quantitative section in the FRIA below provides estimates of the two main expected costs associated with the rule and underlying statute: (a) annual costs associated with providing reasonable accommodations to qualified applicants and employees with known limitations related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions by employers in States that do not currently have such a requirement, and (b) one-time administrative costs for covered entities, which include becoming familiar with the rule, posting new equal employment opportunity (EEO) posters,[360] and updating EEO policies and handbooks. The Commission expresses the quantifiable impacts in 2022 dollars and uses discount rates of 3 and 7 percent pursuant to OMB Circular A–4.

The analysis concludes that approximately 49.4 percent of the reasonable accommodations that will be required by the rule and underlying statute will have no cost to covered entities, and that the average annual cost for the remaining 50.6 percent of such accommodations is approximately $60 per year per accommodation. Taking into account that many entities covered by the PWFA are already required to provide such accommodations under State and local laws, the total impact on the U.S. economy to provide reasonable accommodations under the rule and underlying statute is estimated to be

[360] The Commission posted an updated poster on its website consistent with the PWFA's effective date of June 27, 2023. *See* EEOC, "Know Your Rights: Workplace Discrimination is Illegal" Poster, *https://www.eeoc.gov/poster* (last visited Mar. 25, 2024).

between $14.82 million and $32.82 million per year.

The estimated one-time costs associated with administrative tasks are quite low on a per-establishment basis—between $57.02 and $255.40, depending on the State and on the type of employer. Despite the low per-establishment cost, the proposed rule is a "significant regulatory action" under section 3(f)(1) of E.O. 12866, as amended by E.O. 14094, because the number of regulated entities—hence the number of entities expected to incur one-time administrative costs—is extremely large (including all public and private employers with 15 or more employees and the Federal Government). As a result, the Commission has concluded that the overall cost to the U.S. economy will be in excess of $200 million.[361]

## Final Regulatory Impact Analysis (FRIA)

### The Need for Regulatory Action

The PWFA and the final rule respond to the previously limited availability of accommodations for employees affected by pregnancy, childbirth, or related medical conditions under Federal law. Although Title VII (as amended by the Pregnancy Discrimination Act (PDA)) provided some protections for employees affected by pregnancy, childbirth or related medical conditions, court decisions regarding the ability of employees affected by pregnancy, childbirth, or related medical conditions to obtain workplace accommodations created "unworkable" standards that did not adequately protect pregnant employees.[362] Similarly, prior to the PWFA, some pregnant employees could obtain protections under the ADA, but these were limited.[363] Pregnant employees who could not obtain accommodations risked their economic security, which had harmful effects for

[361] The Congressional Budget Office (CBO) did not review the PWFA for intergovernmental or private-sector mandates because "[s]ection 4 of the Unfunded Mandates Reform Act excludes from the application of that act any legislative provision that would establish or enforce statutory rights prohibiting discrimination," and CBO "determined that the bill falls within that exclusion because it would extend protections against discrimination in the workplace based on sex to employees requesting reasonable accommodations for pregnancy, childbirth, or related medical conditions." H.R. Rep. No. 117–27, pt. 1, at 41.

[362] *Id.* at 14–16 (describing court rulings under Title VII and the Supreme Court's decision in *Young*, 575 U.S. 206); *see* 88 FR 54714–16.

[363] H.R. Rep. No. 117–27, pt. 1, at 19–21 (describing court decisions under the ADA that failed to find coverage for employees with pregnancy-related disabilities).

themselves and their families.[364] Furthermore, the loss of a job can affect a pregnant employee's economic security for decades, as they lose out on "retirement contributions . . . short-term disability benefits, seniority, pensions, social security contributions, life insurance, and more."[365] Additionally, the lack of workplace accommodations can harm the health of the employee and their pregnancy.[366] While numerous States have laws that provide for accommodations for pregnant employees, the lack of a national standard prior to passage of the PWFA meant that employees' rights varied depending on the State in which they lived, some of which left employees completely unprotected.[367]

The PWFA at 42 U.S.C. 2000gg–3(a) provides that "[n]ot later than 1 year after [the date of enactment of the Act], the Commission shall issue regulations in an accessible format in accordance with subchapter II of chapter 5 of title 5 [of the United States Code] to carry out this chapter. Such regulations shall provide examples of reasonable accommodations addressing known limitations related to pregnancy, childbirth, or related medical conditions."

Pursuant to 42 U.S.C. 2000gg–3(a), the EEOC is issuing this rule following the procedures codified at 5 U.S.C. 553(b).

*Baseline*

The PWFA is a new law that requires covered entities to provide reasonable accommodations to the known limitations related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions of qualified employees. As set out in the NPRM,[368] the PWFA seeks to fill gaps in the Federal and State legal landscape regarding protections for employees affected by pregnancy, childbirth, or related medical conditions.

Employees affected by pregnancy, childbirth, or related medical conditions have certain rights under existing civil rights laws, such as Title VII, the ADA, the Family and Medical Leave Act of

1993, 29 U.S.C. 2601 *et seq.* (FMLA), the Providing Urgent Maternal Protections for Nursing Mothers Act (PUMP Act), and various State and local laws.[369]

Under Title VII, an employee affected by pregnancy, childbirth, or related medical conditions may be able to obtain a workplace modification to allow them to continue to work.[370] Typically courts have only found in favor of such claims if the employee can identify another individual similar in their ability or inability to work who received such an accommodation, or if there is some direct evidence of disparate treatment (such as a biased comment or a policy that, on its face, excludes pregnant employees). However, there may not always be similarly situated employees. For this reason, some pregnant employees have not received simple, common-sense accommodations, such as a stool for a cashier [371] or bathroom breaks for a preschool teacher.[372] And even when the pregnant employee can identify other employees who are similar in their ability or inability to work, some courts still have not found a Title VII violation.[373]

Under the ADA, certain employees affected by pregnancy, childbirth, or related medical conditions may have the right to accommodations if they have an "actual" or "record of" ADA disability;

this standard does not include pregnancy itself but includes a pregnancy-related disability.[374]

Under the FMLA, covered employees can receive up to 12 weeks of job-protected unpaid leave for, among other things, a serious health condition, the birth of a child, and bonding with a newborn within 1 year of birth.[375] However, employees must work for an employer with 50 or more employees within 75 miles of their worksite and meet certain tenure requirements in order to be entitled to FMLA leave.[376] Survey data from 2018 show that only 56 percent of employees are eligible for FMLA leave.[377] Further, the FMLA only provides unpaid leave—it does not require reasonable accommodations that would allow employees to stay on the job and continue to be paid.

The PUMP Act requires employers who are covered by the Fair Labor Standards Act, 29 U.S.C. 201 *et seq.* (FLSA), to provide reasonable break time for an employee to express breast milk for their nursing child each time such employee has need to express milk for 1 year after the child's birth. The PUMP Act also requires employers to provide a place to pump at work, other than a bathroom, that is shielded from view and free from intrusion from coworkers and the public.[378]

As set out in Table 1, 30 States currently have laws similar to the PWFA that provide for accommodations for pregnant employees. In most States, again as set out in Table 1, the State laws cover the same employers that are covered by the PWFA. Employees in the remaining States and Federal Government employees have the rights set out in the Federal laws described above and, until the passage of the PWFA, did not have the protections of a law like the PWFA.

In addition to the protections provided by the above laws, the Federal Government provides 12 weeks of paid parental leave to eligible Federal employees upon the birth of a new child.[379]

---

[364] *Id.* at 22 ("When pregnant workers are not provided reasonable accommodations on the job, they are oftentimes forced to choose between economic security and their health or the health of their babies."); *id.* at 24 (noting that "families increasingly rely on pregnant workers' incomes.").

[365] *Id.* at 25.

[366] *Id.* at 22 ("According to the American College of Obstetricians and Gynecologists (ACOG), providing reasonable accommodations to pregnant workers is critical for the health of women and their children."); *id.* (describing how a lack of an accommodation led to a miscarriage for a worker).

[367] See *infra* Table 1 for a calculation of the number of employees who live in States without PWFA-analogue laws.

[368] 88 FR 54714–15.

[369] For a list of State laws, see *infra* Table 1. In addition, Federal laws regarding Federal funding such as Title IX of the Education Amendments of 1972, 20 U.S.C. 1681 *et seq.*, and the Workforce Innovation and Opportunity Act, 29 U.S.C. 3248(a)(2), provide protection from sex discrimination, including discrimination based on pregnancy, childbirth, or related medical conditions.

[370] As relevant here, Title VII protects employees from discrimination based on pregnancy, childbirth, or related medical conditions "with respect to . . . compensation, terms, conditions, or privileges of employment[ ] because of such individual's . . . sex." 42 U.S.C. 2000e–2(a)(1). Discrimination because of sex includes discrimination based on "pregnancy, childbirth, or related medical conditions." 42 U.S.C. 2000e(k). Title VII also provides that "women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work." *Id.*

[371] See, e.g., *Portillo* v. *IL Creations Inc.*, No. 1:17–cv–01083, 2019 WL 1440129, at *5 (D.D.C. Mar. 31, 2019).

[372] See, e.g., *Wadley* v. *Kiddie Acad. Int'l, Inc.*, No. 2:17–CV–05745, 2018 WL 3035785, at *4 (E.D. Pa. June 19, 2018).

[373] See, e.g., *Wal-Mart Stores E.*, 46 F.4th at 597–99 (concluding that the employer did not engage in discrimination when it failed to accommodate pregnant employees with light duty assignments, even though the employer provided light duty assignments for employees who were injured on the job); *but see, e.g., Legg*, 820 F.3d at 69, 75–77 (vacating judgment for the employer where officers injured on the job were entitled to light duty but pregnant employees were not).

[374] 42 U.S.C. 12102(2), (4); 29 CFR part 1630, appendix 1630(h); *Enforcement Guidance on Pregnancy Discrimination*, *supra* note 31, at (II).

[375] 29 U.S.C. 2612(a)(1); 29 CFR 825.120.

[376] 29 U.S.C. 2611(2)(A), (B).

[377] Scott Brown et al., *Employee and Worksite Perspectives of the Family and Medical Leave Act: Executive Summary for Results from the 2018 Surveys* 3 (2020), *https://www.dol.gov/sites/dolgov/files/OASP/evaluation/pdf/WHD_FMLA2018SurveyResults_ExecutiveSummary_Aug2020.pdf.*

[378] U.S. Dep't of Lab., *FLSA Protections to Pump at Work*, *https://www.dol.gov/agencies/whd/pump-at-work* (last visited Mar. 25, 2024).

[379] Federal Employee Paid Leave Act, Public Law 116–92, 133 Stat. 1198, 2304–09 (2019).

*Nonquantifiable Benefits*

The final rule and the underlying statute create many important benefits that stem from "values that are difficult or impossible to quantify," including "equity, human dignity, [and] fairness." [380] These benefits are the marginal increase in those values beyond the protections provided in the laws outlined above. The Commission has identified five primary benefits of the rule and underlying statute. The Commission did not quantify each of the following benefits that are expected to result from the PWFA and its implementing regulation, however, because it did not identify sufficient data to quantify these benefits. [381]

Improvements in Health for Pregnant Employees and Their Babies

Congress enacted the PWFA in large part to improve maternal and infant health outcomes. The legislative history emphasizes that the new law was needed because "[n]o worker should have to choose between their health, the health of their pregnancy, and the ability to earn a living." [382] Congress further concluded that "providing reasonable accommodations to pregnant workers is critical to the health of women and their children." [383] The need to improve health outcomes surrounding pregnancy is critical—as a recent report noted, "women in our country are dying at a higher rate from pregnancy-related causes than in any other developed nation." [384] Additionally, "Black women are more than three times as likely as White women to die from pregnancy-related causes, while American Indian/Alaska Native [women] are more than twice as likely," [385] and a recent study shows that negative health outcomes during pregnancy disproportionately affect Black women compared to White women regardless of wealth. [386]

Some studies have shown increased risk of miscarriage, [387] preterm birth, [388] low birth weight, urinary tract infections, fainting, and other health problems for pregnant employees because of workplace conditions. [389] Research also shows that certain workplace conditions, such as lengthy periods of standing or walking, or high risk of chemical exposure or noise, can result in complications for a pregnant employee and their baby; thus accommodations to alleviate those conditions improve health outcomes for pregnant employees and their children. [390]

Additionally, the provision of accommodations may improve pregnant employees' mental health, as even perceived pregnancy discrimination at work has been linked to increased stress and symptoms of postpartum depression. [391] Stress resulting from workplace discrimination and workplace conditions can increase risk of preterm birth or low birth weight, potentially resulting in serious health problems at birth that may cause long-term health and developmental consequences in children. [392] Such health challenges may result in additional health care costs; accordingly, reducing stress during pregnancy also may reduce health care costs. [393]

Moreover, employees who do not receive needed accommodations, and who quit their jobs as a result in order to maintain a healthy pregnancy, often lose employer-sponsored health insurance in addition to losing their incomes. [394] In a letter to Congress, a group of leading health care practitioner organizations explained that when a pregnant employee loses health insurance, "the impact on both mother and baby may be long-lasting and severe. One of the main predictors of a healthy pregnancy is early and consistent prenatal care. Loss of employment and health benefits impact family resources, threatening the ability to access vital health care when a woman needs it the most." [395]

[380] 76 FR 3821 (Jan. 21, 2011).

[381] Where relevant, the Commission requested additional data in the NPRM. *See* 88 FR 54749.

[382] H.R. Rep. No. 117–27, pt. 1, at 11.

[383] *Id.* at 11, 22.

[384] The White House, *White House Blueprint for Addressing the Maternal Health Crisis* 1 (2022), *https://www.whitehouse.gov/wp-content/uploads/2022/06/Maternal-Health-Blueprint.pdf.*

[385] *Id.* at 15.

[386] Kate Kennedy-Moulton et al., *Maternal and Infant Health Inequality: New Evidence from Linked Administrative Data* 5 (Nat'l Bureau of Econ. Rsch., Working Paper No. 30,693, 2022), *https://www.nber.org/system/files/working_papers/w30693/w30693.pdf* (finding that maternal and infant health vary with income, but infant and maternal health in Black families at the top of the income distribution is similar to or worse than that of White families at the bottom of the income distribution).

[387] H.R. Rep. No. 117–27, pt. 1, at 22; Am. Coll. of Obstetricians & Gynecologists, Comm. Opinion No. 733, *Employment Considerations During Pregnancy and the Postpartum Period* e119 [2018] [hereinafter *ACOG Committee Opinion*], *https://www.acog.org/-/media/project/acog/acogorg/clinical/files/committee-opinion/articles/2018/04/employment-considerations-during-pregnancy-and-the-postpartum-period.pdf* (discussing studies that showed an increased risk of miscarriage or stillbirth associated with night work, working more than 40 hours a week, or extensive lifting, but noting that "[i]t is difficult to draw definitive conclusions from these studies").

[388] H.R. Rep. No. 117–27, pt. 1, at 22; *ACOG Committee Opinion, supra* note 387, at e119–20 (discussing studies that found a "slight to modest risked increase" of preterm birth with some work conditions, but also noting that it is hard to know whether these results were due to "bias and confounding or to an actual effect").

[389] H.R. Rep. No. 117–27, pt. 1, at 22; *see also* Hackney et al., *supra* note 341, at 774, 781 (2021) (describing two studies that demonstrated that perceived pregnancy discrimination serves as a threat to women's resources which leads to increased postpartum depressive symptoms for mothers, decreased birth weight and gestational age, and increased doctors' visits for their babies, via mothers' stress); Renee Mehra et al., *"'Oh Gosh, Why Go?' Cause They Are Going to Look At Me and Not Hire": Intersectional Experiences of Black Women Navigating Employment During Pregnancy and Parenting,* BMC Pregnancy & Childbirth 2 (2023), *https://bmcpregnancychildbirth.biomedcentral.com/articles/10.1186/s12884-022-05268-9* (describing studies that found that policies that protect women in the workplace during pregnancy and the postpartum period are important for maternal and infant health outcomes); H.M. Salihu et al., *Pregnancy In the Workplace,* 62 Occupational Med. 88, 94 (2012), *https://academic.oup.com/occmed/article/62/2/88/1480061?login=false* (finding that while physically demanding jobs do not pose a substantial risk to fetal health, "[a] moderate temporary reduction in job physicality may promote improved maternal and foetal health"); *ACOG Committee Opinion, supra* note 387, at e117 (discussing modifications for physical work and how they could help the health of pregnant workers).

[390] *See generally* Francis et al., *supra* note 344 (describing ergonomic stressors and pregnancy outcomes); *see also Pregnant Workers Health Impact Assessment, supra* note 344, at 17–19, 23 (identifying workplace conditions that may impact the health of a pregnant worker and their child and basic accommodations to alleviate those conditions to improve health outcomes).

[391] Hackney et al., *supra* note 341, at 777, 781.

[392] *Id.* at 778, 781; March of Dimes, *Stress and Pregnancy, https://www.marchofdimes.org/find-support/topics/pregnancy/stress-and-pregnancy* (last visited Mar. 25, 2024); March of Dimes, *Long-Term Health Effects of Preterm Birth* (Oct. 2019), *https://www.marchofdimes.org/find-support/topics/birth/long-term-health-effects-premature-birth.*

[393] March of Dimes, *Premature Birth: The Financial Impact on Business* (2013), *https://onprem.marchofdimes.com/materials/premature-birth-the-financial-impact-on-business.pdf.*

[394] *Fighting for Fairness: Examining Legislation To Confront Workplace Discrimination, Joint Hearing Before the Subcomm. on Civ. Rts. & Hum. Servs. and the Subcomm. on Workforce Prots. of the H. Comm. on Educ. & Lab.,* 117th Cong. 153 (2021) [hereinafter *Fighting for Fairness*] (statement of Dina Bakst, Co-Founder & Co-President, A Better Balance) (describing employees who lose their income and, as a result, lose their health insurance, forcing them to delay or avoid critical prenatal or postnatal care).

[395] *Long Over Due: Exploring the Pregnant Workers Fairness Act (H.R. 2694), Hearing Before the Subcomm. on Civ. Rts. & Hum. Servs. of the H. Comm. on Educ. & Lab.,* 116th Cong. 142 (2019) [hereinafter *Long Over Due*] (including a letter from professional medical associations, including the American Academy of Family Physicians, the American Academy of Pediatrics, the American Public Health Association, the American College of Nurse-Midwives, the American College of Obstetricians and Gynecologists, the Association of Women's Health, Obstetric and Neonatal Nurses, the National Alliance to Advance Adolescent Health, and Physicians for Reproductive Health); *Fighting for Fairness, supra* note 394, at 30–31 (statement of Dina Bakst, Co-Founder and Co-President, A Better Balance) (discussing Julia

Finally, by helping pregnant employees avoid health risks to themselves and their pregnancies, the PWFA will help contribute to improved maternal and child health and lower health care costs nationally.

Improvements in Pregnant Employees' Economic Security

Access to reasonable accommodations at work will help employees with limitations related to pregnancy, childbirth, or related medical conditions to stay in the workforce, maintain their income, and provide for themselves and their families.[396] Based on anecdotal evidence, unavailability of accommodations often forces employees to take unpaid leave, quit their jobs, or seek jobs that are potentially less lucrative, threatening their economic security.[397] The lack of an accommodation may also have far-reaching economic effects. As the House Committee on Education and Labor Report for the PWFA stated, "Pregnant workers who are pushed out of the workplace might feel the effects for decades, losing out on everything from 401(k) or other retirement contributions to short-term disability benefits, seniority, pensions, social security contributions, life insurance, and more." [398] Provision of reasonable accommodations may also have economic benefits to society as a whole by keeping people attached to the labor force and lowering the likelihood of some employees being compelled to seek public assistance after they are forced to quit their jobs.[399]

Providing needed workplace accommodations to qualified applicants and employees with limitations related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions is another step toward ensuring women's continued and increased participation in the labor force.[400] Among other things, women's participation in the labor force is heavily impacted by pregnancy and the demands associated with raising young children.[401] The passage of the PDA in 1978, which prohibits employment discrimination based on pregnancy, childbirth, or related medical conditions and requires that women affected by pregnancy, childbirth, or related medical conditions be treated the same as other individuals similar in their ability or inability to work, increased the participation rate of pregnant women in the labor market.[402] As of 2021, over 66 percent of women in the United States who gave birth in the prior year were in the labor force,[403] up from about 57 percent in 2006.[404] Moreover, an increasing number of pregnant employees are working later into their pregnancies—over 65 percent of first-time mothers who worked during their pregnancy worked into the last month before their child's birth.[405]

By requiring reasonable accommodations for employees with limitations related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions, the PWFA and this rule will further support and enhance women's labor force participation, and, in turn, grow the U.S. economy.[406]

Non-Discrimination and Other Intrinsic Benefits

Providing accommodations to employees with limitations related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions also has important implications for equity, human dignity, and fairness.

First, by allowing pregnant employees to care for their health and the health of their pregnancies, the PWFA enhances human dignity. Employees will be able to prioritize their health and the health of their future children, giving their children the best possible start in life while also protecting their economic security. As one comment explained, the PWFA gives pregnant employees a strong sense of dignity and belonging in the workforce, and "the reasonable accommodation framework relieves individual employees of the burden of proving animus: of showing that an employer's inflexible imposition of workplace standards reflects sex stereotyping that flows from the invidious assumption that pregnant workers are not competent or committed workers." [407]

Second, the PWFA will diminish the incidence of sex discrimination against qualified employees, enable them to reach their full potential, reduce exclusion, and promote self-respect. The statute and the rule provide for reasonable accommodations to employees who would otherwise not receive them and thus could be forced to leave their jobs or the workforce because of their pregnancy, childbirth, or related medical conditions. Also, the statute and the rule require a covered entity to engage an employee in an interactive process, rather than simply assigning the employee an accommodation, which combats stereotypes about the capabilities of employees affected by pregnancy, childbirth, or related medical conditions. Finally, the statute and the rule protect employees against retaliation and coercion for using the protections of the statute. These protections against discrimination

Barton, a pregnant corrections officer who quit her job because she did not receive an accommodation and therefore lost her health insurance).

[396] The Commission is not able to monetize or quantify this benefit because, although anecdotal evidence establishes that lack of accommodation has led employees to quit their jobs, there are no data on how frequently this happens.

[397] *Long Over Due, supra* note 395, at 15 (statement of Kimberlie Michelle Durham) (describing losing her job because she needed an accommodation and explaining that her new job did not provide overtime or benefits); *id.* at 150–53 (letter from the ACLU) (describing the ACLU's legal representation of pregnant employees, many of whom were forced to take unpaid leave or lost their jobs).

[398] *See* H.R. Rep. No. 117–27, pt. 1, at 21–22, 25.

[399] *See Long Over Due, supra* note 395, at 15 (statement of Kimberlie Michelle Durham) (describing when she was forced to go on unpaid leave after she asked for an accommodation and, as a consequence, was unable to find new employment, moved back in with family, and was unable to find a job with benefits comparable to those offered by her EMT job, including health insurance; her child is on Medicaid); *id.* at 41 (statement of Dina Bakst, Co-Founder & Co-President, A Better Balance) (discussing a pregnant cashier who needed lifting restriction but was sent home and, without income, became homeless); *id.* at 46 (statement of Dina Bakst) (discussing an armored truck company employee who requested to

avoid heavy lifting at the end of pregnancy but was instead sent home; as a result, she lost health insurance and needed to rely on public benefits such as food stamps); *id.* at 70 (statement of Dina Bakst) (presenting stories from State legislatures that describe savings to government assistance programs stemming from the passage of PWFA-like laws in their States).

[400] *Id.; see also id.* at 25 (statement of Iris Wilbur, Vice President of Government Affairs & Public Policy, Greater Louisville, Inc., The Metro Chamber of Commerce) ("[T]he Act will help boost our country's workforce participation rate among women. In States like Kentucky, which ranks 44th in the nation for female labor participation, we know one contributor to this abysmal statistic is a pregnant worker who is forced out or quits a job due to a lack of reasonable workplace accommodations.").

[401] Catherine Doren, *Is Two Too Many? Parity and Mothers' Labor Force Exit*, 81 J. Marriage & Fam. 327, 341 (2019) (stating that "transition to motherhood is the primary turning point in women's labor force participation").

[402] Sankar Mukhopadhyay, *The Effects of the 1978 Pregnancy Discrimination Act on Female Labor Supply*, 53 Int'l Econ. Rev. 1133 (2012).

[403] U.S. Dep't of Com., Census Bureau, *Births in the Past Year and Labor Force Participation for Women Aged 16–50, by Education: 2006 to 2019* (2023) [hereinafter *Births in the Past Year and Labor Force Participation*], https://www.census.gov/data/tables/time-series/demo/fertility/his-cps.html (select "Historical Table 5"); *see also* Steven Ruggles et al., *IPUMS USA: Version 12.0* (2022), https://doi.org/10.18128/D010.V12.0.

[404] *Births in the Past Year and Labor Force Participation, supra* note 403.

[405] Lynda Laughlin, U.S. Dep't of Com., Census Bureau, *Maternity Leave and Employment Patterns of First-Time Mothers, 1961–2008* 6 (2011), https://www2.census.gov/library/publications/2011/demo/p70-128.pdf.

[406] H.R. Rep. No. 117–27, pt.1, at 24 ("Ensuring pregnant workers have reasonable accommodations helps ensure that pregnant workers remain healthy and earn an income when they need it the most.").

[407] Siegel, *supra* note 348, at 220–26.

promote human dignity and equity by enabling qualified employees to participate or continue to participate in the workforce.[408]

Third, because the PWFA applies to so many covered entities, it will improve equity in the workforce. Currently, employees affected by pregnancy, childbirth, or related medical conditions in higher paying jobs and non-physical jobs are much more likely to be able to control their schedules, take bathroom breaks, or eat, drink water, or telework when necessary.[409] These employees may not have to request accommodations from their employers to meet many of their pregnancy-related needs. Employees in low-wage jobs, however, are much less likely to be able to organize their schedules to allow them to take breaks that may be necessary due to pregnancy, childbirth, or related medical conditions.[410] Nearly one-third of Black and Latina workers are in low-wage jobs,[411] the types of jobs that are less likely to currently provide accommodations.[412] Therefore, the PWFA and this rule will improve equity in the workforce by ensuring that low-paid employees, including Black and Latina employees who may have a more difficult time securing voluntary accommodations, will have a right to them.

Fourth, providing reasonable accommodations to employees who would otherwise have been denied them yields third-party benefits that include diminishing stereotypes regarding employees who are experiencing pregnancy, childbirth, or related medical conditions;[413] promoting design, availability, and awareness of accommodations that can have benefits for the general public, including non-pregnant employees, and attitudinal benefits;[414] increasing understanding and fairness in the workplace;[415] and creating less discriminatory work environments that benefit employees, employers, and society.[416]

Clarity in Enforcement and Efficiencies in Litigation

Congress, in describing the goals of the PWFA, also focused on the clarity that the PWFA would bring to the question of when employers must provide accommodations for limitations related to pregnancy, childbirth, or related medical conditions: "The PWFA eliminates a lack of clarity in the current legal framework that has frustrated pregnant workers' legal rights to reasonable accommodations while providing clear guidance to both workers and employers."[417] By creating a national standard, the PWFA also may increase compliance with State laws requiring accommodations for pregnant employees,[418] as coming into compliance with the PWFA may increase employers' knowledge about these laws in general. In the short time that the PWFA has been in effect, one comment noted that dozens of employees had informed them of the "transformative effect" of the law, with employees who had previously been denied reasonable accommodations having them provided.[419] For example, an electrician's assistant reported that, following her request for a pregnancy-related accommodation, her employer attempted to place her on leave; but after advocating for herself under the PWFA, her employer exhibited increased flexibility and willingness to accommodate her.[420] An employee in telecommunications stated that, after her employer took months to respond to her request for a postpartum accommodation, she informed her employer of her rights under the PWFA, and her employer granted the accommodation request.[421] A tax specialist reported that she requested a pregnancy-related accommodation that her employer denied without explanation; after she educated her employer about the PWFA, her employer granted her request for an accommodation.[422]

By clarifying the rules regarding accommodations for pregnant employees, the PWFA and the rule will decrease the need for litigation

[408] See Salihu et al., supra note 389, at 94 (finding that "[w]omen who perceive employers and superiors as supportive are more likely to return to work after childbirth. This reduces the risk to employers regarding loss in skill and training. Similarly, businesses that plan for and proactively approach pregnancy in the workplace show lower rates of quitting and greater ease of shifting workloads in the event of a pregnancy, which increases productivity and decreases losses"); Long Over Due, supra note 395, at 15 (testimony of Kimberlie Michelle Durham) ("I wanted to work. I loved my job."). See also Salihu et al., supra note 389, at 93 (describing steps pregnant women take to combat the perception that they are a liability in the workforce and reinforce their role as "professionals"); Long Over Due, supra note 395, at 41 (statement of Dina Bakst, Co-Founder & Co-President, A Better Balance) (describing an employee who was denied an accommodation but who "desperately wanted to continue working"); Hackney et al., supra note 341, at 780 (explaining that managers may make incorrect assumptions about what pregnant employees want, such as assuming a reduced workload is beneficial, whereas pregnant employees might find this accommodation demeaning or discriminatory, and noting the importance of managers "hav[ing] an open dialogue with their employees about what types of support [are] needed and desired").

[409] Long Over Due, supra note 395, at 83 (statement of Rep. Barbara Lee) (describing her own pregnancy, which required bedrest, and contrasting her experience with the experience of employees in less flexible jobs).

[410] Fighting for Fairness, supra note 394, at 108 (statement of Fatima Goss Graves, President & CEO of the National Women's Law Center) ("[O]ver 40% of full-time workers in low-paid jobs report that their employers do not permit them to decide when to take breaks, and roughly half report having very little or no control over the scheduling of hours."). NWLC defines low-wage occupations as jobs that pay $11.50 per hour or less (the annual equivalent of about $23,920 per year ($11.50 × 2080 hours), which assumes a 40-hour workweek for 52 weeks). Morgan Harwood & Sarah David Heydemann, By the Numbers: Where Do Pregnant Women Work?, Nat'l Women's Law Ctr. 4 n.11 (Aug. 2019), https://nwlc.org/wp-content/uploads/2019/08/Pregnant-Workers-by-the-Numbers-v3-1.pdf.

[411] Fighting for Fairness, supra note 394, at 108.

[412] Id. at 204 (Letter from the National Partnership for Women & Families) (stating that women of color and immigrants are "disproportionately likely to work in jobs and industries where accommodations during pregnancy are not often provided (such as home health aides, food service workers, package handlers and cleaners)"); id. at 207–08 (Letter from Physicians for Reproductive Choice) ("The absence of legislation like the Pregnant Workers Fairness Act disproportionately impacts pregnant people with low-incomes and migrant workers who are more likely to work in arduous settings. These are the same communities that are also most at risk of experiencing increased maternal mortality.").

[413] See Salihu et al., supra note 389, at 93 (describing studies that have "substantiated the pervasiveness of negative perceptions of pregnant women" and the common belief that they serve as a liability in the workplace); id. at 94–95 (concluding that the issue of pregnancy in the workplace needs to be addressed proactively with an emphasis on combating stereotypes of pregnant women as incompetent or uncommitted).

[414] See Elizabeth F. Emens, Integrating Accommodation, 156 U. Pa. L. Rev. 839, 850–59 (2008) (describing a wide range of potential third-party benefits that may arise from workplace accommodations for individuals with disabilities, many of which are also relevant to accommodations for individuals protected by the PWFA).

[415] See id. at 883–96 (describing attitudinal third-party benefits that arise when co-workers work with individuals receiving accommodations in the workplace under the ADA, many of which are relevant to accommodations for individuals protected by the PWFA).

[416] See Long Over Due, supra note 395, at 3 (statement of Rep. Suzanne Bonamici) (describing the PWFA as "an opportunity for Congress to finally fulfill the promise of the Pregnancy Discrimination Act and take an important step towards workplace gender equity," among other benefits).

[417] H.R. Rep. No. 117–27, pt. 1, at 11, 31 ("By guaranteeing pregnant workers the right to reasonable accommodations in the workplace, the PWFA could also decrease employers' legal uncertainty."); see also Long Over Due, supra note 395, at 24 (statement of Iris Wilbur, Vice President of Government Affairs & Public Policy, Greater Louisville, Inc., The Metro Chamber of Commerce) ("For our members, uncertainty means dollars. A consistent and predictable legal landscape means a business-friendly environment. Before Kentucky's law was enacted this summer, our employers were forced to navigate a complex web of Federal laws and court decisions to figure out their obligations. And now this guidance is especially beneficial for the smaller companies we represent who cannot afford expensive legal advisors.").

[418] For a list of these laws, see infra Table 1.

[419] Comment EEOC–2023–0004–98298, A Better Balance, at 7 (Oct. 10, 2023).

[420] Id. at 88.

[421] Id. at 88–89.

[422] Id. at 89.

regarding accommodations under the PWFA. To the extent that litigation remains unavailable in certain circumstances, the PWFA and the rule are expected to eliminate the need to litigate whether the condition in question is a "disability" under the ADA, and to limit discovery and litigation costs that arise under Title VII regarding determining if there are valid comparators, thus streamlining the issues requiring judicial attention.[423]

Benefits for Covered Entities

Providing accommodations needed due to pregnancy, childbirth, or related medical conditions is also likely to provide benefits to covered entities. By providing accommodations to employees affected by pregnancy, childbirth, or related medical conditions and retaining them as employees, employers will save money by not having to obtain and train new employees. The Commission is not aware of any data regarding the need to obtain and train employees arising specifically from provision of reasonable accommodations for pregnancy, childbirth, or related medical conditions. Studies examining the relationship between employee retention and provision of reasonable accommodations for disabilities generally suggest that the benefits to covered entities may be significant. According to one study, 85 percent of employers that provided accommodations to individuals with disabilities reported that doing so enabled them to retain a valued employee; 53 percent reported an increase in that employee's productivity; 46 percent reported elimination of costs associated with training a new employee; 48 percent reported an increase in that employee's attendance; 33 percent noted that providing the accommodation increased diversity in the company; and 23 percent reported a decrease in workers' compensation or other costs. Employers also noted several indirect benefits: 30 percent noted an increase in company morale, and 21 percent noted an increase in overall company productivity.[424]

*Costs*

Covered Entities and the Existing Legal Landscape

Entities covered by the PWFA and the regulation include all employers covered by Title VII and the Government Employee Rights Act of 1991, 42 U.S.C. 2000e–16a–16c (GERA), including private and public sector employers with 15 or more employees, Federal agencies, employment agencies, and labor organizations.[425]

In addition to the legal protections described earlier in the preamble pertaining to Title VII, the ADA, and the FMLA, there are three other important legal considerations that impact the costs of accommodations under the PWFA and this regulation.

First, 30 States and 5 localities have laws substantially similar to the PWFA, requiring covered employers to provide reasonable accommodations to pregnant employees.[426] As a result, this rule will impose minimal, if any, additional costs on the covered entities in these States and localities.[427]

Second, when it enacted the PWFA, Congress also enacted the PUMP Act, which requires employers who are covered by the FLSA to provide reasonable break time for an employee to pump breast milk each time such employee has the need to express milk for up to 1 year after the child's birth. The PUMP Act also requires employers to provide a place to pump at work, other than a bathroom, that is shielded from view and free from intrusion from coworkers and the public.[428] As a result, the Commission anticipates that most employees will not need to seek reasonable accommodations regarding a time and place to pump at work under the PWFA because they will already be entitled to these under the PUMP Act.

Third, the Federal Government provides 12 weeks of paid parental leave to eligible Federal employees upon the birth of a new child.[429] As a result, these Federal employees may make fewer requests for leave as a reasonable accommodation under the PWFA as they are already guaranteed a certain amount of paid leave.

Estimate of the Number of Reasonable Accommodations That Will Be Provided as a Result of the Rule and Underlying Statute

As set out in Tables 1 and 2 and explained in detail below, the rule and underlying statute cover approximately 116.7 million employees of private establishments with 15 or more employees, 18.8 million State and local government employees, and 2.3 million Federal employees. Only a small percentage of these employees are expected to seek and be entitled to accommodations as a result of the rule and underlying statute.

Approximately 52 percent of private sector enterprises with 15 or more employees in the United States (1.4 million establishments), employing about 61.2 million employees (accounting for 52 percent of employment in those States), are currently subject to State or local laws that are substantially similar to the PWFA. The enactment of the PWFA and promulgation of the rule, therefore, should not result in additional accommodation-related costs for these employers. Subtracting 61.2 million employees from the total number of covered employees employed by private sector enterprises (116.7 million) yields a total of approximately 55.5 million employees of private sector establishments who will be covered by the rule and underlying statute, and who are not also covered by State or local laws that are substantially similar to the PWFA. Tables 1 and 2 display

---

[423] *See* H.R. Report No. 117–27, pt. 1, at 14–17 (describing the need to find comparators under Title VII and the difficulties it has caused pregnant employees seeking accommodations); *id.* at 17–21 (describing the protections available for pregnant employees under the ADA and the fact that frequently even pregnancies with severe complications are found by courts not to be "disabilities").

[424] *See Costs and Benefits of Accommodation, supra* note 209.

[425] *See* 42 U.S.C. 2000gg(2)(A). The PWFA also applies to employers covered by the Congressional Accountability Act of 1995 (42 U.S.C. 2000gg(2)(B)(ii)). The proposed regulation does not apply to employers covered under the Congressional Accountability Act, as the Commission does not have the authority to enforce the PWFA with respect to employees covered by the Act.

[426] *See infra* Table 1; *see also* U.S. Dep't of Lab., *Employment Protections for Workers Who Are Pregnant or Nursing, https://www.dol.gov/agencies/wb/pregnant-nursing-employment-protections* (last visited Mar. 25, 2024).

[427] The PWFA analogues in Alaska, North Carolina, and Texas only cover certain public employers. The laws in Louisiana and Minnesota apply to employers larger than the PWFA threshold of 15 or more employees (25 or more employees in Louisiana; 21 or more employees in Minnesota). As explained below, the analysis takes these differences into account.

[428] U.S. Dep't of Lab., *FLSA Protections to Pump at Work, https://www.dol.gov/agencies/whd/pump-at-work* (last visited Mar. 25, 2024).

[429] Federal Employee Paid Leave Act, 133 Stat. at 2304–05.

each State's share of the total national number of private sector establishments that have 15 or more employees and thus will be subject to the PWFA, and the percentage of employees in the State employed by such establishments. States with laws substantially similar to the PWFA are in Table 1; States without such a law are in Table 2.

BILLING CODE 6570-01-P

### Table 1: Share of Employers with 15 or More Employees in States Already Subject to Local Pregnancy Accommodation Laws Similar to the PWFA[430]

| State | Statute | Threshold[432] | Share in U.S. Total[431] | |
|---|---|---|---|---|
| | | | **Establishments** | **Employment** |
| California | Cal. Gov't Code sec. 12945(a)(3) | 5 | 10.6% | 11.6% |
| Colorado | Colo. Rev. Stat. sec. 24-34-402.3 | 5 | 1.9% | 1.8% |
| Connecticut | Conn. Gen. Stat. sec. 46a-60(b)(7)(A)–(K) | 3 | 1.2% | 1.2% |
| Delaware | Del. Code Ann. Tit. 19, sec. 711(a)(3)(b)–(f) | 4 | 0.4% | 0.3% |
| District of Columbia | D.C. Code sec. 32-1231.02 | 1 | 0.4% | 0.4% |
| Hawaii | Haw. Code R. sec. 12-46-107 | 1 | 0.4% | 0.4% |
| Illinois | 775 Ill. Comp. Stat. sec. 5/2-102(I)–(J) | 1 | 3.9% | 4.2% |
| Kentucky | Ky. Rev. Stat. sec. 344.040 | 15 | 1.4% | 1.3% |
| Louisiana[433] | La. Rev. Stat. sec. 23:341ff–342 | 25 | 1.3% | 1.2% |

[430] U.S. Dep't of Com., Census Bureau, *The Number of Firms and Establishments, Employment, and Annual Payroll by State, Industry, and Enterprise Employment Size: 2020* (2020) [hereinafter *Firms and Establishments Data by State*], https://www.census.gov/data/tables/2020/econ/susb/2020-susb-annual.html (select "U.S. & States, NAICS, Detailed Employment Sizes").

Percentages in the Table reflect filtering by size and summing by State.

[431] This number is limited to enterprises with 15 or more employees.

[432] This denotes the minimum number of employees that an employer must have to be covered by the State law.

[433] These numbers only account for enterprises with at least 25 employees because Louisiana's pregnancy accommodation law applies to employers with 25 or more employees. *See* La. Rev. Stat. Ann. sec. 23:341 (2021).

| Maine | Me. Stat. tit. 5, sec. 4572-A | 1 | 0.5% | 0.4% |
|---|---|---|---|---|
| Maryland | Md. Code, State Gov't sec. 20- 609 | 15 | 1.9% | 1.8% |
| Massachusetts | Mass. Gen. Laws ch. 151B, sec. 4(1E)(a) | 6 | 2.3% | 2.6% |
| Minnesota[434] | Minn. Stat. sec. 181.939 | 21 | 1.7% | 2.0% |
| Nebraska | Neb. Rev. Stat. sec. 48-1102(11), 1102(18) | 15 | 0.7% | 0.6% |
| Nevada | Nev. Rev. Stat. sec. 613.438 | 15 | 0.9% | 1.0% |
| New Jersey | N.J. Stat. Ann. Sec. 10:5-3.1 | 1 | 2.6% | 2.8% |
| New Mexico | N.M. Code R. sec. 9.1.1.7(HH)(2) | 4 | 0.6% | 0.5% |
| New York | N.Y. Exec. Law sec. 292(21-e), (21-f); sec. 296(3) | 4 | 5.2% | 6.3% |
| North Dakota | N.D. Cent. Code Ann. Sec. 14-02.4-03 | 1 | 0.3% | 0.3% |
| Oregon | Or. Rev. Stat. sec. 659A.029 | 6 | 1.4% | 1.2% |
| Pennsylvania[435] | Phila. Code sec. 9-1128 | 1 (Philadelphia) | 0.4% | 0.5% |
| Rhode Island | R.I. Gen. Laws sec. 28-5-7.4(a)(1)–(3) | 4 | 0.3% | 0.3% |
| South Carolina | S.C. Code Ann. Sec. 1-13-80(A)(4) | 15 | 1.6% | 1.5% |
| Tennessee | Tenn. Code. Ann. Sec. 50-10-103 | 15 | 2.2% | 2.1% |
| Utah | Utah Code sec. 34A-5-106(1)(g) | 15 | 0.9% | 1.1% |
| Vermont | Vt. Stat. Ann. Tit. 21, sec. 495k(a)(1) | 1 | 0.2% | 0.2% |
| Virginia | Va. Code sec. 2.2-3909 | 5 | 2.8% | 2.6% |
| Washington | Wash. Rev. Code sec. 43.10.005(2) | 15 | 2.3% | 2.2% |
| West Virginia | W. Va. Code sec. 5-11B-2 | 12 | 0.6% | 0.4% |
| **Total[436]** | | | **51%** | **52%** |
| **Total (in millions)** | | | **1.4** | **61.2** |

[434] These numbers only account for enterprises with at least 25 employees because Minnesota's pregnancy accommodation law applies to employers with 21 or more employees. Minn. Stat. sec. 181.940, 181.9414, 181.9436 (2014). Data on enterprises with 21 to 24 employees are not available.

[435] Pennsylvania does not have a State-wide pregnancy accommodation law, but Philadelphia does. See Phila. Code sec. 9–1128 (2014).

Philadelphia accounts for approximately 9 percent of Pennsylvania establishments and approximately 12 percent of individuals employed in Pennsylvania. See U.S. Dep't of Comm., Census Bureau, The Number of Firms and Establishments, Employment, and Annual Payroll by Congressional District, Industry, and Enterprise Employment Size: 2019 (2019), https://www.census.gov/data/tables/2019/econ/susb/2019-susb-annual.html (select "State by Congressional District, NAICS Sectors").

The calculation is based on the total number of establishments and total employment in Pennsylvania and in Philadelphia County and the shares of employment in each.

[436] This total does not include Alaska, North Carolina, and Texas, where the pregnancy accommodation laws only apply to certain public employees.

**Table 2: Share of Total U.S. Employer Establishments with 15 or More Employees in States That Will Be Impacted by PWFA[437]**

| State | Share in U.S. Total[438] | |
|---|---|---|
| | **Establishments** | **Employment** |
| Alabama | 1.5% | 1.3% |
| Alaska[439] | 0.2% | 0.2% |
| Arizona | 2.0% | 2.0% |
| Arkansas | 0.9% | 0.8% |
| Florida | 6.0% | 6.8% |
| Georgia | 3.1% | 3.1% |
| Idaho | 0.6% | 0.4% |
| Indiana | 2.2% | 2.1% |
| Iowa | 1.1% | 1.0% |
| Kansas | 1.0% | 0.9% |
| Louisiana[440] | 0.2% | 0.1% |
| Michigan | 2.9% | 3.0% |
| Minnesota[441] | 0.3% | 0.1% |
| Mississippi | 0.9% | 0.7% |
| Missouri | 2.1% | 1.9% |
| Montana | 0.4% | 0.2% |
| New Hampshire | 0.5% | 0.5% |
| North Carolina[442] | 3.2% | 3.0% |
| Ohio | 3.8% | 3.8% |
| Oklahoma | 1.2% | 1.0% |
| Pennsylvania[443] | 3.8% | 3.7% |
| South Dakota | 0.3% | 0.3% |
| Texas[444] | 8.5% | 8.5% |
| Wisconsin | 2.0% | 2.0% |
| Wyoming | 0.2% | 0.1% |
| **Total** | **49%** | **48%** |
| **Total (in millions)** | **1.3** | **55.5** |

Similarly, approximately 11.5 million State and local government employees are covered by laws that are substantially similar to the PWFA.[445]

Subtracting this number from the total number of covered State and local government employees (18.8 million) yields a total of 7.3 million State and local government employees who will be covered by the rule and underlying statute and who are not already covered by State or local laws substantially similar to the PWFA.

[437] *Firms and Establishments Data by State, supra* note 430. Percentages in the table reflect filtering by size and summing by State.

[438] This number is limited to enterprises with 15 or more employees.

[439] Alaska's statute, codified at Alaska Stat. sec. 39.20.520 (1992), covers public employers only.

[440] These numbers only include enterprises with 15–24 employees because Louisiana's pregnancy accommodation law applies to employers with 25 or more employees. La. Rev. Stat. Ann. sec. 23:341 (2021).

[441] These numbers only include enterprises with 15–24 employees because Minnesota's pregnancy accommodation law applies to employers with 21 or more employees. Minn. Stat. sec. 181.940, 181.9414, 181.9436 (2014). Data on enterprises with 15–20 employees are not available.

[442] North Carolina Executive Order No. 82 (2018) covers public employers only.

[443] *See supra* note 435.

[444] The Texas statute, codified at Tex. Loc. Gov't Code sec. 180.004 (2001), covers local public employers only.

[445] U.S. Dep't of Com., Census Bureau, *2021 ASPEP Datasets & Tables* (2021) [hereinafter *ASPEP Datasets*], *https://www.census.gov/data/datasets/2021/econ/apes/annual-apes.html.* The calculation is based on data from the "State Government Employment & Payroll Data" and the "Local Government Employment & Payroll" files, in the "Government Function" column.

Finally, there are 2.3 million Federal employees. The Federal Government does not currently require accommodations for pregnant employees; thus, the PWFA provides a new right for these employees.[446]

Again, however, not all employees who are now covered by the PWFA will seek and be entitled to accommodations as a result of the rule and underlying statute; only a small percentage will become pregnant and need accommodations in a given year.

To estimate the number of individuals who will be entitled to a pregnancy-related accommodation, and who will receive one as a result of the PWFA and its implementing regulations, the Commission first estimates the proportion of newly covered employees who are capable of becoming pregnant. In 2021, women of reproductive age (aged 16–50 years) comprised approximately 33 percent of U.S. employees.[447] On the basis of this finding, the Commission adopts 33

percent as its estimate of the percentage of employees who are capable of becoming pregnant.

The Commission next estimates the proportion of individuals capable of becoming pregnant who will actually become pregnant in a given year. Research shows that approximately 4.7 percent of individuals who are capable of becoming pregnant gave birth to at least one child during the previous year.[448] This figure must be adjusted upward to account for the fact that not all individuals who become pregnant give birth—some pregnant individuals have miscarriages, stillbirths, or abortions. Research shows that, between 2015 and 2019, live births in the United States accounted for 67 percent of all pregnancies among women aged 15–44 years on average.[449] Assuming that the ratio of live births to total pregnancies among women of reproductive age in the labor force is the same as among all 15–44 years old women, the

Commission estimates that the percentage of individuals capable of becoming pregnant who will actually become pregnant in given year is 0.047 ÷ 0.67 = 0.071 (rounded up), or 7.1 percent. The Commission thus adopts 7.1 percent as its estimate of the percentage of individuals capable of becoming pregnant within a population who will actually become pregnant in a given year.

Applying these percentages to the numbers above yields totals (rounded to the nearest 1,000) of, in a given year, 1.3 million private sector employees (55,500,000 × 0.33 × 0.071), 171,000 State and local government employees (7,300,000 × 0.33 × 0.071), and 54,000 Federal employees (2,300,000 × 0.33 × 0.071) who are both newly eligible for reasonable accommodations under the rule and underlying statute, and who may be expected to become pregnant in a given year. Tables 3, 4, and 5 display these calculations.

**Table 3: Computation of Expected Number of Pregnant Women Eligible for PWFA Accommodations at Private Employers**

| | |
|---|---|
| Total employment in establishments covered under PWFA (*i.e.*, those with 15 or more employees) | 116.7 million |
| Total employment in establishments covered under PWFA, with existing PWFA-type accommodations under State/local laws (from Table 1) | 61.2 million |
| Total employment in establishments covered under PWFA, without existing PWFA-type accommodations under State/local laws (from Table 2) | 55.5 million |
| Share of 16-50 years old women | 33% |
| Total number of women employees newly eligible for accommodations under PWFA (33% of 55.5 million) | 18.3 million |
| Expected share of women employees to be pregnant in a year | 7.1% |
| Expected number of pregnant employees newly eligible for accommodations under PWFA (7.1% of 18.3 million) | 1.3 million |

---

[446] As noted above, however, most Federal employees are entitled to 12 weeks of paid parental leave during the 12-month period following birth of a child (or other qualifying event) under the FEPLA.

*See* Federal Employee Paid Leave Act, 133 Stat. at 2304–05. Individuals eligible for such leave may be less likely to need leave as a reasonable accommodation under the PWFA.

[447] *See* Ruggles et al., *supra* note 403.
[448] *Id.*
[449] Rossen et al., *supra* note 317, at 9 tbl. A.

**Table 4 Computation of Expected Number of Pregnant Women Eligible for PWFA Accommodations in State and Local Government Employment[450]**

| | |
|---|---|
| Total State and local government employment | 18.8 million |
| Total State and local government employment in States with existing PWFA-type accommodations under State/local laws[451] | 11.5 million |
| Total State and local government employment in States without existing PWFA-type accommodations under State/local laws[452] | 7.3 million |
| Share of 16-50 years old women | 33% |
| Total number of State and local government women employees newly eligible for accommodations under PWFA (33% of 7.3 million) | 2.41 million |
| Expected share of women employees to be pregnant in a year | 7.1% |
| Expected number of pregnant State and local government employees newly eligible for accommodations under PWFA (7.1% of 2.41 million) | 171,000 |

**Table 5: Computation of Expected Number of Pregnant Women Eligible for PWFA Accommodations in Federal Government Employment**

| | |
|---|---|
| Total Federal Government civilian employment[453] | 2.3 million |
| Share of 16-50 years old women | 33% |
| Total number of women Federal Government employees newly eligible for accommodations under PWFA | 0.76 million |
| Expected share of women employees to be pregnant in a year | 7.1% |
| Expected number of pregnant Federal Government employees newly eligible for accommodations under PWFA (7.1% of 0.76 million) | 54,000 |

BILLING CODE 6570-01-C

The sum of the expected number of pregnant women eligible for PWFA accommodations in the private sector (1.3 million), State and local government (171,000), and Federal Government (54,000) is 1.525 million.

The Commission next estimates the proportion of pregnant individuals in the workplace who may need a pregnancy-related reasonable accommodation and who will receive such accommodation as a result of the rule and the underlying statute. Data regarding the number of pregnant employees needing some type of accommodation are limited. One survey indicated that 71 percent of pregnant employees experience a pregnancy-related limitation that requires extra breaks, such as bathroom breaks; 61 percent experience a limitation that requires a change in schedule or more time off, for example, to see prenatal care providers; 53 percent experience a limitation that requires a change in duties, such as less lifting or more sitting; and 40 percent experience a limitation that requires some other type of workplace adjustment.[454]

The research establishes that 71 percent of pregnant individuals surveyed needed the most common type of pregnancy-related reasonable accommodation: additional breaks. The Commission assumes for purposes of the final economic impact analysis that the pregnant individuals in the study who needed one of the more unusual accommodations are a subset of the 71 percent who need additional breaks. The Commission thus adopts 71 percent as its upper bound estimate of the percentage of pregnant employees who will need a pregnancy-related accommodation under the rule.[455] Applying the 71 percent estimate yields upper bound estimates (rounded to the nearest 1,000) of 923,000 private sector employees (71 percent of 1,300,000), 121,000 State and local government employees (71 percent of 171,000), and 38,000 Federal sector employees (71 percent of 54,000), for a total 1,082,000 employees, who will need a reasonable accommodation and who will receive one as a result of the PWFA and the rule in a given year.

In setting its lower bound estimate, the Commission observes that not every individual who is newly entitled to a pregnancy-related accommodation under the PWFA and the rule, and who receives such an accommodation, will receive it as a result of the rule. Some of these individuals will already be entitled to receive pregnancy-related accommodations under other authorities, independently of the PWFA and its implementing regulations—some will already be entitled to them under the ADA, others will be entitled to them under Title VII, and yet others will be

[450] The calculation is based on data as described in *ASPEP Datasets, supra* note 445.

[451] This number includes 12 percent of State and local government employment in Pennsylvania to account for Philadelphia's PWFA-type law, excludes local government employment in North Carolina because the existing law only applies to State employees, and excludes State government employment in Texas because the existing law only applies to local governments.

[452] This number includes State and local government employment in Pennsylvania not accounted for by Philadelphia, includes local government employment in North Carolina because the existing law only applies to State employees, and includes State government employment in Texas because the existing law only applies to local governments.

[453] U.S. Dep't of Com., Bureau of Econ. Analysis, *Full-Time and Part-Time Employees by Industry, https://apps.bea.gov/iTable/?reqid=19&step=2&isuri=1&1921=survey&eyJhcHBpZC16MTksInN0ZXBzIjpbMSwyLDNdLCJkYXRhIjpbWyJDYXRlZ29yaWVzIiwiU3VydmV5Il0sWyJOSVBBX1RhYmxxX0xpc3QiLCIxOTMiXV19* (last updated Sept. 29, 2023).

[454] Declercq et al., *supra* note 319, at 36. As explained in the preamble, the Commission is maintaining this as the high bound of employees who may need an accommodation because this is the percentage of employees who needed the simplest accommodation (*e.g.,* breaks to use the bathroom).

[455] The Commission asserts that this estimate is almost certainly too high because, although 71 percent of the pregnant individuals participating in the research needed a reasonable accommodation, not all such individuals needed the PWFA to obtain such accommodation. As explained above, many individuals who need pregnancy-related accommodations may already be entitled to them under the ADA, Title VII, or formal or informal employer policies.

entitled to them under formal or informal employer policies.[456] Therefore, costs arising from pregnancy-related accommodations cannot always be attributed to the rule and the underlying statute, even where the employee in question was not previously covered under a State law analogous to the PWFA.

To generate its lower bound estimate, the Commission reduces its upper bound estimate of 71 percent to reflect the fact that some of those individuals would receive their requested accommodation independently of the rule. According to the study cited above,[457] 42 percent of the individuals who needed additional breaks due to a pregnancy-related limitation did not receive them because they were never requested, and 3 percent did not receive them because the employer denied their request. Thus, $0.71 \times 0.45 = 0.32$, or 32 percent, of pregnant individuals surveyed needed, but did not receive the requested accommodation. On the basis of this research, the Commission adopts 32 percent as its lower bound estimate of the percentage of pregnant employees who will need a reasonable accommodation under the PWFA and its implementing regulations. Applying this percentage yields lower bound estimates (rounded to the nearest 1,000) of approximately 416,000 private sector employees (32 percent of 1,300,000); 55,000 State and local government employees (32 percent of 171,000); and 17,000 Federal sector employees (32 percent of 54,000), for a total of 488,000 employees who will need, and be newly entitled to, reasonable accommodations under the rule and underlying statute in a given year.

Cost of Accommodation

Accommodations that allow pregnant employees to continue to perform their job duties, thereby allowing them to receive continued pay and benefits, include additional rest or bathroom breaks, use of a stool or chair, a change in duties to avoid strenuous physical activities, and schedule changes to attend prenatal appointments.[458] Some of these accommodations, especially additional rest or bathroom breaks and provision of a stool or chair, are expected to impose minimal or no additional costs on the employer. Certain other types of accommodations, such as allowing the employee to avoid heavy lifting or exposure to certain types of chemicals, may be easy to provide in some jobs but more difficult to provide in others, necessitating temporary restructuring of responsibilities or transferring to a different position.

The Commission was unable to find any data on the average cost of reasonable accommodations related specifically to pregnancy, childbirth, or related medical conditions. The Commission has therefore relied on the available data on the cost of accommodations for individuals with disabilities for purposes of this analysis.

A survey conducted by the Job Accommodation Network (JAN) indicates that most workplace accommodations for individuals with disabilities are low-cost.[459] Of the employers participating in this survey between 2019 and 2022, 49.4 percent reported that they provided an accommodation needed because of a disability that did not cost anything to implement. The Commission believes that the percentage of no-cost accommodations is likely to be higher for accommodations related specifically to pregnancy, childbirth, or related medical conditions, because many will be simple and no-cost like access to water, stools, or more frequent bathroom breaks, and because the vast majority will be temporary. Nevertheless, because the Commission is unable to locate any data on the percentage of accommodations needed because of pregnancy-related conditions that have

no cost, the Commission conservatively assumes for purposes of this analysis that the percentages are the same.

The same research showed that the median one-time cost of providing a non-zero-cost accommodation was $300. Only 7.2 percent of employers reported that they provided an accommodation that resulted in ongoing annual costs. Because pregnancy is a temporary condition, the ongoing costs incurred by 7.2 percent of employers are unlikely to be applicable to pregnancy-related accommodations, and the Commission adopts $300 as the median one-time cost for employers that incurred a cost (50.6 percent of employers). Again, although the Commission believes that the average cost is likely lower for accommodations needed specifically for pregnancy, childbirth, or related medical conditions, it will use the data for the purposes of this analysis.

Because non-zero-cost accommodations generally involve durable goods such as additional stools, infrastructure for telework, and machines to help with lifting, and because these goods generally have a useful life of 5 years, the Commission will assume that the annual cost of providing these accommodations is approximately $60 per year per accommodation.[460]

Using these cost estimates, and applying them to the upper and lower bound estimates for the number of additional accommodations that will likely be required by the rule and underlying statute, the estimated annual costs (rounded to the nearest 1,000) for private employers is between $12.60 million and $28.02 million; the estimated annual costs for State and local governments is between $1.68 million and $3.66 million, and the estimated annual costs for the Federal Government is between $540,000 and $1.14 million. See Tables 6, 7, and 8.

**BILLING CODE 6570-01-P**

Table 6: **Estimated Reasonable Accommodation Costs to Private Employers with 15 or More Employees**

| Cost of accommodation | Lower Bound (32%) | Upper Bound (71%) |
|---|---|---|
| Number of women needing accommodation | 416,000 | 923,000 |
| Number of non-zero-cost accommodations (50.6%) | 210,000 | 467,000 |
| Annual cost of accommodation | $12.60 million | $28.02 million |

---

[456] Additionally, some workplace modifications, such as providing personal protective equipment, and protecting employees from exposures to hazardous chemicals, may already be required by Federal or State workplace health and safety laws, regardless of whether the employee is pregnant.

[457] See Declercq et al., supra note 319, at 36. We note that this study was conducted prior to many

PWFA-type laws being enacted. Because the data are being used to estimate the number of requests that will occur in States and localities that do not already have PWFA-type laws, EEOC believes it is appropriate to rely on this survey.

[458] Id.; see also Long Over Due, supra note 395, at 79 (statement of Dina Bakst, Co-Founder & Co-

President, A Better Balance) (describing potential accommodations).

[459] Costs and Benefits of Accommodation, supra note 209.

[460] The Commission made a similar assumption of a 5-year life for accommodations in its cost analysis of the amendments to the ADA. 76 FR 16977, 16994 (Mar. 25, 2011).

**Table 7: Estimated Reasonable Accommodation Costs to State and Local Government Employers**

| Cost of accommodation | Lower Bound (32%) | Upper Bound (71%) |
|---|---|---|
| Number of women needing accommodation | 55,000 | 121,000 |
| Number of non-zero-cost accommodations (50.6%) | 28,000 | 61,000 |
| Annual cost of accommodation | $1.68 million | $3.66 million |

**Table 8: Estimated Reasonable Accommodation Costs to the Federal Government**

| Cost of accommodation | Lower Bound (32%) | Upper Bound (71%) |
|---|---|---|
| Number of women needing accommodation | 17,000 | 38,000 |
| Number of non-zero-cost accommodations (50.6%) | 9,000 | 19,000 |
| Annual cost of accommodation | $540,000 | $1.14 million |

**Table 9: One-Time Administrative Costs**

| | Number of Establishments (a) | Time for Rule Familiarization (b) | Equal Opportunity Officer Fully-Loaded Wage (c) | Rule Familiarization Cost (a) × (b) × (c) |
|---|---|---|---|---|
| Private employers in States with existing PWFA-type laws | 1.4 million | 0.75 hours | $113.51 | $119.19 million |
| Private employers in States without existing PWFA-type laws | 1.3 million | 2.25 hours | $113.51 | $332.03 million |
| Public employers in States with existing PWFA-laws | 3,255[461] | 0.75 hours | $76.03 | $186,000 |
| Public employers in States without existing PWFA-type laws | 2,533[462] | 2.25 hours | $76.03 | $433,000 |
| Federal Government | 209[463] | 2.25 hours | $103.76[464] | $49,000 |
| **Total** | | | | $451.89 million |

BILLING CODE 6570–01–C

Thus, the overall economic cost on the U.S. economy of providing reasonable accommodations pursuant to the rule and underlying statute is estimated to be between $14.82 million and $32.82 million annually.

---

[461] This is based on the distinct number of States and local government filers of the 2021 EEO–4 survey where available, and the 2021 Annual Survey of Public Employment & Payroll (ASPEP) when not available.

[462] *Id.*

[463] *See* EEOC, *Department of Agency List with Second Level Reporting Components, https://* www.eeoc.gov/federal-sector/management-directive/department-or-agency-list-second-level-reporting-components (last visited Mar. 25, 2024).

[464] As described above, a GS–14, Step 5 salary is $63.21 per hour. *See* U.S. Off. of Pers. Mgmt., *Salary Table 2023-RUS* (Jan. 2023), *https://* www.opm.gov/policy-data-oversight/pay-leave/salaries-wages/salary-tables/pdf/2023/RUS_h.pdf. This is then adjusted for average hourly benefits for Federal employees. *See* Cong. Budget Off., *Comparing the Compensation of Federal and Private-Sector Employees, 2011 to 2015,* at 14 (Apr. 25, 2017), *https://www.cbo.gov/system/files/115th-congress-2017-2018/reports/52637-federalprivatepay.pdf* (reporting that the average benefits for Federal employees range from $21.30 per hour to $29.80 per hour). This analysis uses the high estimate of $29.80 to compute the total hourly compensation at $93.01 ($63.21 + $29.80). The Commission was unable to find data on overhead costs for the Federal Government. The Commission assumed the rate to be the same as in the private sector (17 percent), *see supra* note 467, totaling $10.75 ($63.21 × 0.17) per hour. This resulted in a fully-loaded hourly compensation rate of $103.76 (%63.21 + 29.80 + 10.75).

The costs in Tables 6, 7, and 8 likely overestimate the costs to covered entities in at least six respects:

• The estimated one-time cost of $300 per non-zero-cost accommodation is based on costs of accommodations for individuals with disabilities generally, not only those related to pregnancy, among the JAN survey respondents. The Commission believes that the average cost of accommodations related to pregnancy, childbirth, or related medical conditions is less than the average cost of disability-related accommodations because many of the reasonable accommodations requested under the PWFA will be simple and inexpensive to provide, and the vast majority will be temporary.

• The sample obtained in the JAN study may not be representative of all employers, because employers who consult with JAN are likely to be facing more difficult and costly accommodation issues than employers overall.[465]

• The estimate does not account for the fact that some employees who will be entitled to reasonable accommodations under the PWFA and the rule are independently entitled to accommodations under the ADA or Title VII, to break time and a private place to pump at work under the PUMP Act, and, in some cases, leave under the FMLA or the Federal Employees Paid Leave Act.[466]

• The estimate does not account for the fact that some employers voluntarily provide accommodations to employees affected by pregnancy, childbirth, or related medical conditions and may not incur new costs.

• This analysis does not account for the fact that not all employees who seek accommodations will meet the definition of "qualified," and an employer may decline to provide a reasonable accommodation if doing so creates an undue hardship.

The Commission did not include costs related to processing requests for accommodation in its estimate because it expects these costs to be extremely low. Employers that are covered by State or local laws substantially similar to the PWFA already have these procedures in place. The Commission assumes that employers not covered by such State or local laws, and the Federal Government, will adapt existing procedures for providing accommodations under Title VII and the ADA and for providing leave under the FMLA.

### One-Time Administrative Costs for Covered Entities

Administrative costs, which include rule familiarization, posting new EEO posters, and updating EEO policies and handbooks, represent additional, one-time direct costs to covered entities.

It is estimated that in States that do not already have laws substantially similar to the PWFA, compliance activities for a covered entity would take an average of 135 minutes, or 2.25 hours, by an Equal Opportunity Officer who is paid a fully-loaded wage of $113.51 per hour[467] ($76.03 for a State or local government employee).[468] In

States with already existing laws similar to the PWFA, an Equal Opportunity Officer will take an average of 45 minutes for compliance activities. For the Federal Government, which does not have an existing PWFA, it is estimated that compliance activities would take an average of 135 minutes by an Equal Opportunity Officer at a GS 14–5 salary.[469] These calculations are displayed in Table 9.

### Totals and Discount Rates

Total costs for providing reasonable accommodations in each year are estimated by multiplying the number of non-zero accommodations in Tables 6–8 above by the upfront cost of $300. Because these are assumed to be durable accommodations, we assume that an employer that acquires an accommodation in a given year will reuse the accommodation throughout its useful life. Throughout the document, we assume a useful life of 5 years, which amounts to an average annual cost of $60. To more accurately reflect the present value of these upfront expenses, EEOC annualizes the total costs.

Adding the annualized cost of providing reasonable accommodations, assuming a useful life of 5 years (between $14.82 million and $32.82 million), to the estimated administrative costs in year 1 ($451.89 million) yields estimated total costs of between $466.71 million and $484.71 million in the first year, and between $14.82 million and $32.82 million annually thereafter.

Table 10 provides the analysis of discount rates at 3% and 7%, as required by OMB Circular A–4, for the lower and upper bound costs of providing accommodations. Table 11 provides that information for the one-time administrative costs.

**BILLING CODE 6570–01–P**

---

[465] JAN provides free assistance regarding workplace accommodation issues. *See generally* Job Accommodation Network, *https://askjan.org/* (last visited Mar. 25, 2024).

[466] Brown et al., *supra* note 377, at 6 (finding that about 56 percent of U.S. employees were eligible for FMLA in 2018, and 25 percent of the FMLA leave taken in the prior 12 months accounted for the arrival of a new child).

[467] The Commission anticipates that the bulk of the workload under this rule would be performed by employees in occupations similar to those associated with the Standard Occupational Classification (SOC) code of SOC 11–3121 (Human Resources Managers). According to the U.S. Bureau of Labor Statistics, the mean hourly wage rate for Human Resources Managers in May 2022 was $70.07. *See* U.S. Dep't of Lab.. Bureau of Lab. Stat., *Employment of Human Resources Managers, by State, May 2022* (2022), *https://www.bls.gov/oes/ current/oes113121.htm#st.* For this analysis, the Commission used a fringe benefits rate of 45 percent and an overhead rate of 17 percent, resulting in a fully-loaded hourly compensation rate for Human Resources Managers of $113.51 ($70.07 + ($70.07 × 0.45) + ($70.07 × 0.17)).

[468] U.S. Dep't of Lab., Bureau of Lab. Stat., *Employer Costs for Employee Compensation for State and Local Government Workers by Occupational and Industry Group* (Mar. 17, 2023), *https://www.bls.gov/news.release/archives/ecec_ 03172023.pdf.* Total employer compensation costs for State and local government averaged $57.60 per hour worked (see Table 3 row 1, column 1 of the cited document). Average compensation ranged from $68.57 in management, professional, and related occupations (row 3) to $40.05 in sales and office occupation (row 7). This analysis uses the high estimate of $68.57 per hour worked, which includes average wage and salary cost of $43.87 per hour (row 3, column 3) and average benefit costs of $24.70 per hour (row 3, column 5). The

Commission was not able to find data on overhead costs for State and local governments. The Commission assumed the rate to be the same as in the private sector (17 percent), *see supra* note 467, totaling $7.46 ($43.87 × 0.17) per hour. This resulted in a fully-loaded hourly compensation rate of $76.03 ($43.87 + $24.70 + $7.46).

[469] In 2023, a GS–14, Step 5 salary is $63.21 per hour. *See* U.S. Off. of Pers. Mgmt., *Salary Table 2023–RUS* (Jan. 2023), *https://www.opm.gov/policy-data-oversight/pay-leave/salaries-wages/salary-tables/pdf/2023/RUS_h.pdf.*

**Table 10: Annualized Reasonable Accommodation Costs (in $ millions) at 0% (Undiscounted), 3% and 7% Discount Rates[470]**

| | Private - All | Federal Government | State and Local Government | Total |
|---|---|---|---|---|
| **Lower Bound** | | | | |
| Estimated total reasonable accommodation costs | **$63.0** | **$2.7** | **$8.4** | **$74.1** |
| **Assuming useful life of accommodations to be 5 years** | | | | |
| Annualized, 0% discount rate, 5 years | $12.60 | $0.54 | $1.68 | $14.82 |
| Annualized, 3% discount rate, 5 years | $13.36 | $0.57 | $1.78 | $15.71 |
| Annualized, 7% discount rate, 5 years | $14.36 | $0.62 | $1.91 | $16.89 |
| | | | | |
| **Assuming useful life of accommodations to be 10 years** | | | | |
| Annualized, 0% discount rate, 10 years | $6.30 | $0.27 | $0.84 | $7.41 |
| Annualized, 3% discount rate, 10 years | $7.17 | $0.31 | $0.96 | $8.43 |
| Annualized, 7% discount rate, 10 years | $8.38 | $0.36 | $1.12 | $9.86 |
| **Upper Bound** | | | | |
| Estimated total reasonable accommodation costs | **$140.1** | **$5.7** | **$18.3** | **$164.1** |
| **Assuming useful life of accommodations to be 5 years** | | | | |
| Annualized, 0% discount rate, 5 years | $28.02 | $1.14 | $3.66 | $32.82 |
| Annualized, 3% discount rate, 5 years | $29.70 | $1.21 | $3.88 | $34.79 |
| Annualized, 7% discount rate, 5 years | $31.93 | $1.30 | $4.17 | $37.40 |
| | | | | |
| **Assuming useful life of accommodations to be 10 years** | | | | |
| Annualized, 0% discount rate, 10 years | $14.01 | $0.57 | $1.83 | $16.41 |
| Annualized, 3% discount rate, 10 years | $15.95 | $0.65 | $2.08 | $18.68 |
| Annualized, 7% discount rate, 10 years | $18.64 | $0.76 | $2.44 | $21.84 |

**Table 11: Annualized Administrative Costs**

| | Estimated administrative costs (in $ millions) | | | |
|---|---|---|---|---|
| Year | Private–All | Federal Government | State and Local Government | Total |
| 1 | $451.22 | $0.049 | $0.619 | $451.89 |
| 2 | $0 | $0 | $0 | $0 |
| 3 | $0 | $0 | $0 | $0 |
| 4 | $0 | $0 | $0 | $0 |
| 5 | $0 | $0 | $0 | $0 |
| 6 | $0 | $0 | $0 | $0 |
| 7 | $0 | $0 | $0 | $0 |
| 8 | $0 | $0 | $0 | $0 |
| 9 | $0 | $0 | $0 | $0 |
| 10 | $0 | $0 | $0 | $0 |
| Annualized, 3% discount rate, 10 years | $51.36 | $0.006 | $0.07 | $51.44 |
| Annualized, 7% discount rate, 10 years | $60.04 | $0.007 | $0.08 | $60.13 |
| | | | | |
| Total, 3% discount rate, 10 years (in $ millions) | $438.08 | $0.05 | $0.60 | $438.73 |
| Total, 7% discount rate, 10 years (in $ millions) | $421.70 | $0.05 | $0.58 | $422.33 |

BILLING CODE 6570-01-C

## Time Horizon of Analysis

Neither the PWFA nor the rule contains a sunset provision.

The cost analysis assumes a one-time administrative cost for employers, and the amount of time varies depending on whether the employer is in a State with or without its own version of the PWFA.

The cost and benefit analysis calculates the annual cost of accommodations per pregnant employee who may need them. Because different employees enter the labor market every year and may become pregnant, or an employee who was pregnant may become pregnant again, the Commission does not believe that the need for accommodations or the costs or benefits will substantially change over time.

## Range of Regulatory Alternatives

The range of alternatives available to the Commission consistent with the Executive Order is narrow:

• Because 42 U.S.C. 2000gg–3(a) requires the Commission to issue regulations, the Commission could not consider non-regulatory alternatives.

• Because 42 U.S.C. 2000gg determines coverage, the Commission could not consider exemptions based on firm size or geography.

• Because 42 U.S.C. 2000gg–2 provides how the statute will be enforced, the Commission could not consider alternative methods of enforcement, such as market-oriented approaches, performance standards, default rules, monitoring by other agencies, or reporting.

• Because section 109 of the PWFA states when the law will go into effect, the Commission could not consider alternative compliance dates.[471]

Further, because the PWFA is a Federal law that intentionally sets a national standard, the Commission could not consider deferring to State or local regulations. The one exception to this is that 42 U.S.C 2000gg–5(a)(1) provides that nothing in the PWFA invalidates or limits rights under Federal, State, or local laws that provide equal or greater protection for individuals affected by pregnancy, childbirth, or related medical conditions. The rule includes this language. Thus, the rule does not preempt State or local regulations that provide equal or greater protection relative to the PWFA.

The Commission considered two regulatory alternatives, discussed below. The Commission does not believe that either alternative would decrease the costs for covered entities.

## Definition of "In the Near Future"

The statute at 42 U.S.C. 2000gg(6) defines a "qualified" employee to include employees whose inability to perform one or more essential functions of the job is temporary, who will be able to perform the essential functions "in the near future," and whose inability to perform essential function(s) can be reasonably accommodated without undue hardship.

The final rule defines "in the near future" to mean "generally within 40 weeks" for pregnancy only. The Commission considered, but rejected, shorter periods such as 6 months or less[472] for several reasons. First, pregnancy generally lasts 40 weeks; a rule that an employee is only "qualified" if they are able to perform all the essential functions of the job within 6 months of the function(s) being temporarily suspended could classify many employees who need a temporary suspension of an essential function(s) for a longer period as "unqualified" and therefore ineligible for reasonable accommodations. The Commission believes that this outcome would frustrate the purpose of the statute, which is to enable employees who need temporary accommodations related to pregnancy, childbirth, or related medical conditions to continue working.

Second, defining "in the near future" to mean "generally 40 weeks" for pregnancy does not mean that the employer will be required to actually provide a reasonable accommodation for that length of time. The definition of "in the near future" is one step in the definition of "qualified"; even if an employee can meet this part of the definition, an employer still may refuse to provide an accommodation if the employer cannot reasonably accommodate the temporary suspension of the essential function or if doing so would impose "undue hardship" (defined as significant difficulty or expense, relative to the employer's overall resources). Additionally, not all employees who need an essential function(s) suspended will need it suspended for 40 weeks. It is the Commission's hope that setting a single

standard for the meaning of "in the near future" for pregnancy will benefit both employers and employees by reducing litigation over the meaning of the term and placing the focus on the central issue of whether the accommodation would impose an undue hardship.

If the definition of "qualified" is "generally 40 weeks" rather than "less than 6 months," more pregnant employees will be able to meet the definition of qualified. It is not possible to estimate how many. The Commission anticipates that there will be little or no additional cost to covered entities because it is the act of providing an accommodation—not classifying an individual as meeting part of the definition of qualified—that imposes actual costs on the employer. A covered entity can still argue that the accommodation would impose an undue hardship. Further, even if it provides the accommodation, the covered entity is likely to experience cost savings from not having to recruit, hire, or train a new employee.

The Commission also considered not defining the term "in the near future," but determined that doing so would harm employers by increasing uncertainty and harm employees by failing to ensure equal treatment.

## Predictable Assessments

In the section defining "undue hardship," the rule lists four job modifications often sought by pregnant employees that, in virtually all cases, will be found to be reasonable accommodations that do not impose undue hardship: (1) carrying or keeping water near and drinking, as needed; (2) allowing additional restroom breaks, as needed; (3) allowing sitting for those whose work requires standing and standing for those whose work requires sitting, as needed; and (4) allowing breaks to eat and drink, as needed.

As explained in the NPRM, these accommodations are repeatedly discussed in the PWFA's legislative history as common sense, low-cost accommodations that most pregnant employees will need.[473] To increase

---

[470] Exec. Off. of the President, Off. of Mgmt. & Budget, *Circular A–4* (Sept. 17, 2003), *https://obamawhitehouse.archives.gov/omb/circulars_a004_a-4/* (addressing discount rates).

[471] 136 Stat. 6089.

[472] H.R. Rep. No. 117–27, pt. 1, at 28 (citing *Robert*, 691 F.3d at 1218). Although it does not define "in the near future," *Robert* cites to *Epps*, 353 F.3d at 593, which found that under the ADA, a request for leave that would last 6 months was too long to be "in the near future" to qualify as a possible reasonable accommodation.

[473] See H.R. Rep.117–27, pt. 1, at 11, 22, 29, 113; *Fighting for Fairness, supra* note 394, at 4 (statement of Rep. Suzanne Bonamici); *Long Over Due, supra* note 395, at 7 (statement of Rep. Jerrold Nadler), 25 (statement of Iris Wilbur, Vice President of Government Affairs & Public Policy, Greater Louisville, Inc., The Metro Chamber of Commerce), 83 (statement of Rep. Barbara Lee). *See also* 168 Cong. Rec. H10,527 (daily ed. Dec. 23, 2022) (statement of Rep. Jerrold Nadler); 168 Cong. Rec. S10,081 (daily ed. Dec. 22, 2022) (statement of Sen. Robert P. Casey, Jr.); 168 Cong. Rec. S7,079 (daily ed. Dec. 8, 2022) (statement of Sen. Robert P. Casey, Jr.); 168 Cong. Rec. H2,324 (daily ed. May 14, 2021) (statement of Rep. Suzanne Bonamici).

**29180** **Federal Register** / Vol. 89, No. 77 / Friday, April 19, 2024 / Rules and Regulations

efficiency and to decrease the time that it takes for employees to receive these accommodations, the Commission has determined that these modifications will in virtually all cases be determined to be reasonable accommodations that do not impose an undue hardship.

As an alternative to providing that these simple, common-sense modifications will virtually always be determined to be reasonable accommodations that do not impose undue hardship, the Commission considered taking the position that such modifications would always be reasonable accommodations and never impose undue hardship. The Commission decided against this approach because some employers may encounter circumstances that would lead to a determination that these modifications are not reasonable accommodations and/or would impose an undue hardship.

The Commission also considered the option of not including information regarding "predictable assessments" in the rule. The Commission determined that providing this information will be helpful to the public because doing so explains to covered entities and employees how the Commission intends to enforce the PWFA, potentially increases voluntary compliance, and increases certainty for covered entities, which will decrease costs.

The Commission does not anticipate that the rule's "predictable assessments" section would increase costs for covered entities. The examples given are low- to no-cost accommodations, and under the rule, the employer may still claim that these modifications would impose an undue hardship.

*Uncertainty in Benefits, Costs, and Net Benefits*

The Commission has based its estimates of the costs and benefits of the rule on the best data available to it at the current time. Nevertheless, these estimates are somewhat uncertain in several respects.

The data used to estimate the cost of providing accommodations as required by the PWFA come entirely from research on the cost of accommodations for individuals with disabilities; the Commission is not aware of any data concerning the cost of accommodations that relate specifically to pregnancy, childbirth, or related medical conditions. The reliance on ADA data has likely resulted in an inflated cost estimate. As discussed above, the Commission believes that the percentage of accommodations that do

not cost anything to implement is likely to be higher for accommodations related specifically to pregnancy, childbirth, or related medical conditions than for accommodations needed because of a disability. Additionally, in some cases, an individual who is entitled to an accommodation under the PWFA may be entitled to it under another law or policy. For example, although leave often may be needed for recovery from childbirth, Bureau of Labor Statistics data show that 88 percent of employees already have access to some unpaid family leave independent of the PWFA, either through the FMLA or otherwise.[474] Therefore, with respect to these individuals, any costs attributable to or benefits accruing from the PWFA for leave related to childbirth would be limited to the short period of time during which such leave is required due to childbirth but unavailable from those other sources.

*Conclusion*

As detailed above, the estimated annual cost of providing accommodations required by the rule and underlying statute—but not independently required by a State or local law substantially similar to the PWFA—is estimated to be up to $28.02 million for private employers, up to $3.66 million for State and local governments, and up to $1.14 million for the Federal Government. In addition, employers are expected to face one-time costs associated with complying with the rule and underlying statute. These are estimated to be $451.22 million for private employers ($119.19 million for private employers in States with existing PWFA-type laws + $332.03 million for private employers in States without existing PWFA-type laws), $619,000 for State and local governments ($186,000 for public employers in States with existing PWFA-type laws + $433,000 for public employers in States without existing PWFA-type laws), and $49,000 for the Federal Government.

These figures are almost certainly overestimates of the costs imposed by the rule, in part because some of the accommodations required by the rule and underlying statute are already required under the ADA and Title VII and some employers voluntarily provide accommodations. Due to a lack of data, however, the Commission was unable to account for this overlap in the above analysis.

The Commission has nevertheless determined that the benefits of the rule and underlying statute justify its costs.[475] The annual costs associated with the main requirement of the rule—to give reasonable accommodations to individuals who need them because of pregnancy, childbirth, or related medical conditions—are not significant under section 3(f)(1) of E.O. 12866. And although the aggregate one-time compliance costs are in excess of $200 million, and therefore significant, the estimated cost on a per-establishment basis is low—between $57.02 and $255.40, depending on whether or not the State in which the entity is located has a law substantially similar to the PWFA and on the type of employer.

The benefits of the rule and underlying statute to employees affected by pregnancy, childbirth, or related medical conditions, however, are significant, including improved health, improved economic security, and increased equity, human dignity, and fairness. The number of individuals who may experience such benefits is relatively large—the number of employees who will be newly entitled to reasonable accommodations for pregnancy and may need them is estimated to be between approximately 488,000 and 1.082 million per year. This number does not include the children, family members, and members of society at large who also will potentially enjoy some of the benefits listed above.

The Commission further concludes that the rule is tailored to impose the least burden on society consistent with achieving the regulatory objectives, and that the agency has selected the approach that maximizes net benefits. The range of alternatives available to the Commission was extremely limited. The alternatives that were consistent with the PWFA's statutory language would not, in the Commission's opinion, reduce costs to employers.

**Regulatory Flexibility Act and Executive Order 13272 (Proper Consideration of Small Entities in Agency Rulemaking)**

The Regulatory Flexibility Act (RFA), 5 U.S.C. 601–612, requires the Commission to evaluate the economic impact of this rule on small entities. The RFA defines small entities to include small businesses, small organizations, including not-for-profit organizations, and small governmental jurisdictions. The Commission must determine whether the rule would impose a significant economic impact on a

---

[474] U.S. Dep't of Labor, Bureau of Lab. Stat., *Access to Paid and Unpaid Family Leave in 2018* (Feb. 27, 2019), *https://www.bls.gov/opub/ted/2019/access-to-paid-and-unpaid-family-leave-in-2018.htm.*

[475] 76 FR 3821 (Jan. 21, 2011).

substantial number of such small entities.

When an agency issues a rulemaking proposal, the RFA requires the agency to "prepare and make available for public comment an initial regulatory flexibility analysis" which will "describe the impact of the rule on small entities."[476] Section 605 of the RFA allows an agency to certify a rule, in lieu of preparing an analysis, if the rulemaking is not expected to have a significant economic impact on a substantial number of small entities. For the reasons outlined below, the Chair of the Commission hereby certifies that this rule will not have a significant economic impact on a substantial number of small entities.

Small businesses range in size, based on the industry, between 1 to 1,500 employees;[477] the PWFA and the rule

apply to all employers in the United States with 15 or more employees. Thus, for purposes of the RFA, the Commission has determined that the regulation will have an economic impact on a substantial number of small entities.[478]

However, the Commission has determined that the economic impact on entities affected by the PWFA and the rule will not be "significant."

As detailed in the FRIA above, the impact on small entities in States and localities that have laws substantially similar to the PWFA will be limited to a one-time administrative cost of approximately $85.13 in the first year for small private employers (0.75 hours × $113.51 hourly wage), and $57.02 for small State or local government employers (0.75 hours × $76.03 hourly wage). Since these entities are already

required to provide accommodations consistent with the PWFA, they will face no additional costs for accommodations.

Small entities that are not already subject to State or local laws substantially similar to the PWFA will face a one-time administrative cost of approximately $255.40 for private employers (2.25 hours × $113.51 hourly wage) and $171.07 for State or local government employers (2.25 hours × $76.03 hourly wage), plus annual costs associated with providing reasonable accommodations consistent with the rule and underlying statute. To calculate the cost of providing such accommodations, the Commission has constructed cost estimates for a range of small business sizes.

**Table 12: Annual Costs for Reasonable Accommodations for Small Businesses Based on Size**

| Number of Employees | 33% Women Aged 16-50 | 7.1% Pregnant In a Given Year | Needing Accommodations: 32% (Lower Bound Estimate) – 71% (Upper Bound Estimate) | 50.6% Non-Zero-Cost Accommodations: Lower Bound Estimate – Higher Bound Estimate (Rounded Up) | Total Expected Cost: Lower Bound Estimate – Higher Bound Estimate |
|---|---|---|---|---|---|
| 15 | 4.95 | 0.351 | 0.112 – 0.249 | 1 | $60 |
| 50 | 16.5 | 1.172 | 0.375 – 0.832 | 1 | $60 |
| 100 | 33 | 2.34 | 0.749 – 1.66 | 1 | $60 |
| 150 | 49.5 | 3.515 | 1.124 – 2.496 | 1 – 2 | $60 – $120 |
| 200 | 66 | 4.686 | 1.5 – 3.327 | 1 – 2 | $60 – $120 |
| 250 | 82.5 | 5.858 | 1.875 – 4.159 | 1 – 3 | $60 – $180 |
| 500 | 165 | 11.715 | 3.749 – 8.318 | 2 – 5 | $120 – $300 |
| 750 | 247.5 | 17.573 | 5.623 – 12.477 | 3 – 7 | $180 – $420 |
| 1000 | 330 | 23.43 | 7.498 – 16.635 | 4 – 9 | $240 – $540 |
| 1250 | 412.5 | 29.288 | 9.372 – 20.794 | 5 – 11 | $300 – $660 |
| 1500 | 495 | 35.145 | 11.246 – 24.953 | 6 – 13 | $360 – $780 |

Using the amounts for a small entity with 500 employees as an example, the calculation was conducted as follows:

• Based on data outlined in the FRIA above, the Commission estimates that approximately 33 percent, or 165, of these employees are women of reproductive age (aged 16–50 years),[479] and that approximately 7.1 percent of these, or 11.715 employees, will give birth to at least one child during a given year.

• The Commission again adopts 71 percent as its upper bound estimate and 32 percent as its lower bound estimate of the percentage of pregnant employees who will need a reasonable accommodation related to pregnancy.

• Thus, the Commission estimates that between 3.749 (32 percent of 11.715) and 8.318 (71 percent of 11.715) employees of a small entity with 500 employees will require annually a reasonable accommodation under the PWFA.

• The Commission further assumes, based on data regarding the average cost of reasonable accommodations for individuals with disabilities presented in the FRIA above, that 50.6 percent of the required accommodations will have a non-zero cost.

• This yields lower and upper estimates of the number of non-zero-cost accommodations of 1.9 (50.6 percent of 3.749) and 4.21 (50.6 percent of 8.318), respectively. Rounding up these numbers, the Commission estimates that

---

[476] 5 U.S.C. 603(a).

[477] U.S. Small Bus. Admin., *Table of Size Standards* (Mar. 17, 2023), *https://www.sba.gov/document/support-table-size-standards.*

[478] For example, there are over 1 million businesses with between 20 and 500 employees. *See* U.S. Dep't of Com., Census Bureau, *Small*

*Business Week: April 30–May 6, 2023* (Apr. 30, 2023), *https://www.census.gov/newsroom/stories/small-business-week.html.*

[479] The Commission acknowledges that there may be industries in which the representation rate for individuals capable of giving birth is higher than 33 percent. The Commission has determined, however, that these differences are not large enough to affect

the decision to certify that the final rule will not have a significant economic impact on a substantial number of small entities. For a discussion in the response to comments received, see *supra, Summary of the Commission's Certification That the Rule Will Not Have a Significant Economic Impact on a Substantial Number of Small Entities* in the preamble.

a small entity with 500 employees will be required to provide between 2 and 5 additional non-zero-cost accommodations per year as a result of the rule and underlying statute. Multiplying by an average cost of $60 per year for each accommodation, the estimated total cost for accommodations required under the PWFA per small entity with 500 employees is between $120 and $300.

Thus, the annual cost of providing reasonable accommodations for entities not already subject to State or local laws substantially similar to the PWFA is estimated to be between $60 (lower bound estimate, for entities with 15 employees) and $780 (upper bound estimate, for entities with 1,500 employees).

The costs detailed above are not likely to constitute a "significant" economic impact for many small entities, if any. Further, the Commission notes that all businesses in the United States with 15 or more employees already must comply with Title VII and the ADA, both of which could, in certain circumstances, require accommodations for employees affected by pregnancy, childbirth, or related medical conditions. Further, Title VII, the ADA, and State laws requiring accommodations for pregnancy apply to all industries; given that, the Commission does not believe that the PWFA will have a greater effect in any industry.

Accordingly, the Chair of the Commission hereby certifies that this rule will not have a significant economic impact on a substantial number of small entities.

**Paperwork Reduction Act**

The Paperwork Reduction Act of 1995, 44 U.S.C. 3501 *et seq.* (PRA), requires the EEOC to consider the impact of information collection burdens imposed on the public. The PRA typically requires an agency to provide notice and seek public comments on any "collection of information" contained in a rule.[480]

The Commission has determined that there is no new requirement for information collection associated with this rule.

Consequently, this rule does not require review by the Office of Management and Budget under the authority of the PRA.

**Executive Order 13132 (Federalism)**

The Commission has reviewed this rule in accordance with Executive Order 13132 regarding federalism and has determined that it does not have

"federalism implications." The statute at 42 U.S.C. 2000gg(2) provides that the PWFA applies to employers as that term is defined in Title VII. States and local governments are subject to Title VII, including its prohibition on sex discrimination, which includes discrimination based on pregnancy, childbirth, or related medical conditions. The statute at 42 U.S.C. 2000gg–4 provides that a State will not be immune under the 11th Amendment to actions brought under the PWFA in a court of competent jurisdiction and that in any action against a State for a violation of the PWFA, remedies, including remedies both at law and in equity, are available for such violation to the same extent that they are available against any other public or private entity. The rule does not limit or expand these statutory definitions. Additionally, the regulation will not have substantial direct effects "on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government."

**Unfunded Mandates Reform Act of 1995**

Section 202(a) of the Unfunded Mandates Reform Act of 1995 (UMRA) requires that the Commission determine whether a regulation proposes a Federal mandate that may result in the expenditure by State, local, or tribal governments, in the aggregate, or by the private sector, of $100 million or more in a single year (adjusted annually for inflation). However, 2 U.S.C. 1503 excludes from UMRA's ambit any provision in a final regulation that, among other things, enforces constitutional rights of individuals or establishes or enforces any statutory rights that prohibit discrimination on the basis of race, color, religion, sex, national origin, age, handicap, or disability; thus, UMRA does not apply to the PWFA.[481]

**Plain Language**

The Commission has attempted to draft this final rule in plain language.

**Assessment of Federal Regulations and Policies on Families**

The undersigned hereby certifies that the rule will not adversely affect the well-being of families, as discussed under section 654 of the Treasury and General Government Appropriations Act of 1999. To the contrary, by providing reasonable accommodation to employees with known limitations related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions, absent undue hardship, the rule will have a positive effect on the economic well-being and security of families.

**Executive Order 13175 (Indian Tribal Governments)**

This rule does not have tribal implications under Executive Order 13175 that require a tribal summary impact statement. The rule will not have substantial direct effects on one or more Indian tribes, on the relationship between the Federal Government and Indian tribes, or on the distribution of power and responsibilities between the Federal Government and Indian tribes. The definition of "covered entity" in the PWFA follows that of Title VII; Title VII exempts "a corporation wholly owned by an Indian tribe."[482]

**Executive Order 12988 (Civil Justice Reform)**

This rule was drafted and reviewed in accordance with Executive Order 12988 and will not unduly burden the Federal court system. The rule was: (1) reviewed to eliminate drafting errors and ambiguities; (2) written to minimize litigation; and (3) written to provide a clear legal standard for affected conduct and to promote burden reduction.

**List of Subjects in 29 CFR Part 1636**

Administrative practice and procedure, Equal employment opportunity, Reasonable accommodation, Pregnancy.

For the Commission.

**Charlotte A. Burrows,**

*Chair.*

■ For the reasons set forth in the preamble, the EEOC amends 29 CFR chapter XIV by adding part 1636 to read as follows:

**PART 1636—PREGNANT WORKERS FAIRNESS ACT**

Sec.
1636.1   Purpose.
1636.2   Definitions—general.
1636.3   Definitions—specific to the PWFA.

---

[480] *See* 44 U.S.C. 3506(c)(2)(B); 5 CFR 1320.8.

[481] H.R. Report No. 117–27, pt. 1, at 41 (containing a report by the Congressional Budget Office stating that the PWFA was not reviewed "for intergovernmental or private-sector mandates" because it falls within the exception to the Unfunded Mandates Reform Act as it "would extend protections against discrimination in the workplace based on sex to employees requesting reasonable accommodation for pregnancy, childbirth, or related medical conditions").

[482] 42 U.S.C. 2000e(b).

1636.4    Nondiscrimination with regard to reasonable accommodations related to pregnancy.
1636.5    Remedies and enforcement.
1636.6    Waiver of State immunity.
1636.7    Relationship to other laws.
1636.8    Severability.
Appendix A to Part 1636—Interpretive Guidance on the Pregnant Workers Fairness Act

**Authority:** 42 U.S.C. 2000gg *et seq.*

**§ 1636.1  Purpose.**

(a) The purpose of this part is to implement the Pregnant Workers Fairness Act, 42 U.S.C. 2000gg *et seq.* (PWFA).

(b) The PWFA:

(1) Requires a covered entity to make reasonable accommodation to the known limitations of a qualified employee related to pregnancy, childbirth, or related medical conditions, absent undue hardship;

(2) Prohibits a covered entity from requiring a qualified employee to accept an accommodation, other than a reasonable accommodation arrived at through the interactive process;

(3) Prohibits the denial of employment opportunities based on the need of the covered entity to make reasonable accommodation to the known limitations related to the pregnancy, childbirth, or related medical conditions of a qualified employee;

(4) Prohibits a covered entity from requiring a qualified employee to take leave if another reasonable accommodation can be provided to the known limitations related to the pregnancy, childbirth, or related medical conditions of the employee;

(5) Prohibits a covered entity from taking adverse actions in terms, conditions, or privileges of employment against a qualified employee on account of the employee requesting or using a reasonable accommodation for known limitations related to pregnancy, childbirth, or related medical conditions;

(6) Prohibits discrimination against an employee for opposing unlawful discrimination under the PWFA or participating in a proceeding under the PWFA;

(7) Prohibits coercion of individuals in the exercise of their rights under the PWFA; and

(8) Provides remedies for individuals whose rights under the PWFA are violated.

**§ 1636.2  Definitions—general.**

(a) *Commission* means the Equal Employment Opportunity Commission established by section 705 of the Civil Rights Act of 1964, 42 U.S.C. 2000e–4.

(b) *Covered entity* means *respondent* as defined in section 701(n) of the Civil Rights Act of 1964, 42 U.S.C. 2000e(n), and includes:

(1) *Employer,* which is a person engaged in an industry affecting commerce who has 15 or more employees, as defined in section 701(b) of the Civil Rights Act of 1964, 42 U.S.C. 2000e(b);

(2) *Employing office,* as defined in section 101 of the Congressional Accountability Act of 1995, 2 U.S.C. 1301, and 3 U.S.C. 411(c);

(3) An entity employing a State employee (or the employee of a political subdivision of a State) described in section 304(a) of the Government Employee Rights Act of 1991, 42 U.S.C. 2000e–16c(a); and

(4) An entity to which section 717(a) of the Civil Rights Act of 1964, 42 U.S.C. 2000e–16(a), applies.

(c) *Employee* means:

(1) An employee (including an applicant), as defined in section 701(f) of the Civil Rights Act of 1964, 42 U.S.C. 2000e(f);

(2) [Reserved]

(3) A covered employee (including an applicant), as defined in 3 U.S.C. 411(c);

(4) A State employee (including an applicant) (or the employee or applicant of a political subdivision of a State) described in section 304(a) of the Government Employee Rights Act of 1991, 42 U.S.C. 2000e–16c(a); and

(5) An employee (including an applicant) to which section 717(a) of the Civil Rights Act of 1964, 42 U.S.C. 2000e–16(a), applies.

(d) *Person* means person as defined by section 701(a) of the Civil Rights Act of 1964, 42 U.S.C. 2000e(a).

**§ 1636.3  Definitions—specific to the PWFA.**

(a) *Known limitation. Known limitation* means a physical or mental condition related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions that the employee or the employee's representative has communicated to the covered entity, whether or not such condition meets the definition of disability specified in section 3 of the Americans with Disabilities Act of 1990, 42 U.S.C. 12102.

(1) *Known,* in terms of limitation, means the employee or the employee's representative has communicated the limitation to the employer.

(2) *Limitation* means a physical or mental condition related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions, of the specific employee in question. "Physical or mental condition" is an impediment or problem that may be modest, minor, and/or episodic. The physical or mental condition may be that an employee affected by pregnancy, childbirth, or related medical conditions has a need or a problem related to maintaining their health or the health of the pregnancy. The definition also includes when an employee is seeking health care related to pregnancy, childbirth, or a related medical condition itself. The physical or mental condition can be a limitation whether or not such condition meets the definition of disability specified in section 3 of the Americans with Disabilities Act of 1990, 42 U.S.C. 12102.

(b) *Pregnancy, childbirth, or related medical conditions.* "Pregnancy" and "childbirth" refer to the pregnancy or childbirth of the specific employee in question and include, but are not limited to, current pregnancy; past pregnancy; potential or intended pregnancy (which can include infertility, fertility treatment, and the use of contraception); labor; and childbirth (including vaginal and cesarean delivery). "Related medical conditions" are medical conditions relating to the pregnancy or childbirth of the specific employee in question. The following are examples of conditions that are, or may be, "related medical conditions": termination of pregnancy, including via miscarriage, stillbirth, or abortion; ectopic pregnancy; preterm labor; pelvic prolapse; nerve injuries; cesarean or perineal wound infection; maternal cardiometabolic disease; gestational diabetes; preeclampsia; HELLP (hemolysis, elevated liver enzymes and low platelets) syndrome; hyperemesis gravidarum; anemia; endometriosis; sciatica; lumbar lordosis; carpal tunnel syndrome; chronic migraines; dehydration; hemorrhoids; nausea or vomiting; edema of the legs, ankles, feet, or fingers; high blood pressure; infection; antenatal (during pregnancy) anxiety, depression, or psychosis; postpartum depression, anxiety, or psychosis; frequent urination; incontinence; loss of balance; vision changes; varicose veins; changes in hormone levels; vaginal bleeding; menstruation; and lactation and conditions related to lactation, such as low milk supply, engorgement, plugged ducts, mastitis, or fungal infections. This list is non-exhaustive.

(c) *Employee's representative. Employee's representative* means a family member, friend, union representative, health care provider, or other representative of the employee.

(d) *Communicated to the employer. Communicated to the employer,* with

respect to a known limitation, means an employee or the employee's representative has made the employer aware of the limitation by communicating with a supervisor, a manager, someone who has supervisory authority for the employee or who regularly directs the employee's tasks (or the equivalent for an applicant), human resources personnel, or another appropriate official, or by following the steps in the covered entity's policy to request an accommodation.

(1) The communication may be made orally, in writing, or by another effective means.

(2) The communication need not be in writing, be in a specific format, use specific words, or be on a specific form in order for it to be considered "communicated to the employer."

(e) *Consideration of mitigating measures.* (1) The determination of whether an employee has a limitation shall be made without regard to the ameliorative effects of mitigating measures.

(2) The non-ameliorative effects of mitigating measures, such as negative side effects of medication or burdens associated with following a particular treatment regimen, may be considered when determining whether an employee has a limitation.

(f) *Qualified employee. Qualified employee* with respect to an employee with a known limitation under the PWFA means:

(1) An employee who, with or without reasonable accommodation, can perform the essential functions of the employment position. With respect to leave as an accommodation, the relevant inquiry is whether the employee is reasonably expected to be able to perform the essential functions, with or without a reasonable accommodation, at the end of the leave, if time off is granted, or if the employee is qualified as set out in paragraph (f)(2) of this section after returning from leave.

(2) Additionally, an employee shall be considered qualified if they cannot perform one or more essential functions if:

(i) Any inability to perform an essential function(s) is for a temporary period, where "temporary" means lasting for a limited time, not permanent, and may extend beyond "in the near future";

(ii) The essential function(s) could be performed in the near future. This determination is made on a case-by-case basis. If the employee is pregnant, it is presumed that the employee could perform the essential function(s) in the near future because they could perform the essential function(s) within

generally 40 weeks of its suspension; and

(iii) The inability to perform the essential function(s) can be reasonably accommodated. This may be accomplished by temporary suspension of the essential function(s) and the employee performing the remaining functions of their position or, depending on the position, other arrangements, including, but not limited to: the employee performing the remaining functions of their position and other functions assigned by the covered entity; the employee performing the functions of a different job to which the covered entity temporarily transfers or assigns the employee; or the employee being assigned to light duty or modified duty or participating in the covered entity's light or modified duty program.

(g) *Essential functions. Essential functions* mean the fundamental job duties of the employment position the employee with a known limitation under the PWFA holds or desires. The term "essential functions" does not include the marginal functions of the position.

(1) A job function may be considered essential for any of several reasons, including but not limited to the following:

(i) The function may be essential because the reason the position exists is to perform that function;

(ii) The function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed; and/or

(iii) The function may be highly specialized so that the incumbent in the position is hired for their expertise or ability to perform the particular function.

(2) Evidence of whether a particular function is essential includes, but is not limited to:

(i) The employer's judgment as to which functions are essential;

(ii) Written job descriptions prepared before advertising or interviewing applicants for the job;

(iii) The amount of time that would be spent on the job performing the function during the time the requested accommodation will be in effect;

(iv) The consequences of not requiring the incumbent to perform the function;

(v) The terms of a collective bargaining agreement;

(vi) The work experience of past incumbents in the job; and/or

(vii) The current work experience of incumbents in similar jobs.

(h) *Reasonable accommodation—generally.* (1) With respect to an employee or applicant with a known

limitation under the PWFA, reasonable accommodation includes:

(i) Modifications or adjustments to a job application process that enable a qualified applicant with a known limitation under the PWFA to be considered for the position such qualified applicant desires;

(ii) Modifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable a qualified employee with a known limitation under the PWFA to perform the essential functions of that position;

(iii) Modifications or adjustments that enable a covered entity's employee with a known limitation under the PWFA to enjoy equal benefits and privileges of employment as are enjoyed by its other similarly situated employees without known limitations; or

(iv) Temporary suspension of essential function(s) and/or modifications or adjustments that permit the temporary suspension of essential function(s).

(2) To request a reasonable accommodation, the employee or the employee's representative need only communicate to the covered entity that the employee needs an adjustment or change at work due to their limitation (a physical or mental condition related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions).

(i) The communication may be made to any of the individuals in paragraph (d) of this section. The provisions of paragraphs (d)(1) and (2) of this section, which define what it means to communicate a limitation to a covered entity, apply to communications under this paragraph (h)(2).

(ii) An employee's request does not have to identify a medical condition, whether from paragraph (b) of this section or otherwise, or use medical terms.

(3) To determine the appropriate reasonable accommodation, it may be necessary for the covered entity to initiate an informal, interactive process as explained in paragraph (k) of this section.

(i) *Reasonable accommodation—examples.* Reasonable accommodation may include, but is not limited to:

(1) Making existing facilities used by employees readily accessible to and usable by employees with known limitations under the PWFA;

(2) Job restructuring; part-time or modified work schedules; reassignment to a vacant position; breaks for use of the restroom, drinking, eating, and/or resting; acquisition or modification of

equipment, uniforms, or devices, including devices that assist with lifting or carrying for jobs that involve lifting or carrying; modifying the work environment; providing seating for jobs that require standing, or allowing standing for jobs that require sitting; appropriate adjustment or modifications of examinations or policies; permitting the use of paid leave (whether accrued, as part of a short-term disability program, or any other employer benefit) or providing unpaid leave for reasons including, but not limited to, recovery from childbirth, miscarriage, stillbirth, or medical conditions related to pregnancy or childbirth, or to attend health care appointments or receive health care treatment related to pregnancy, childbirth, or related medical conditions; placement in the covered entity's light or modified duty program or assignment to light duty or modified work; telework, remote work, or change of work site; adjustments to allow an employee to work without increased pain or increased risk to the employee's health or the health of the pregnancy; temporarily suspending one or more essential functions of the position; providing a reserved parking space if the employee is otherwise entitled to use employer-provided parking; and other similar accommodations for employees with known limitations under the PWFA.

(3) The reasonable accommodation of leave includes, but is not limited to, the examples in paragraphs (i)(3)(i) through (iii) of this section.

(i) The ability to use paid leave (whether accrued, short-term disability, or another employer benefit) or unpaid leave, including, but not limited to, leave during pregnancy; to recover from childbirth, miscarriage, stillbirth, or other related medical conditions; and to attend health care appointments or receive health care treatments related to pregnancy, childbirth, or related medical conditions;

(ii) The ability to use paid leave (whether accrued, short-term disability, or another employer benefit) or unpaid leave for a known limitation under the PWFA; and

(iii) The ability to choose whether to use paid leave (whether accrued, short-term disability or another employer benefit) or unpaid leave to the extent that the covered entity allows employees using leave for reasons not related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions to choose between the use of paid leave and unpaid leave.

(4) Reasonable accommodation related to lactation includes, but is not limited to:

(i) Breaks, a space for lactation, and other related modifications as required under the Providing Urgent Maternal Protections for Nursing Mothers Act (PUMP Act) (Pub. L. 117–328, Div. KK, 136 Stat. 4459, 6093 (2022)), if not otherwise provided under the PUMP Act;

(ii) Accommodations related to pumping, such as, but not limited to, ensuring that the area for lactation is in reasonable proximity to the employee's usual work area; that it is a place other than a bathroom; that it is shielded from view and free from intrusion; that it is regularly cleaned; that it has electricity, appropriate seating, and a surface sufficient to place a breast pump; and that it is in reasonable proximity to a sink, running water, and a refrigerator for storing milk;

(iii) Accommodations related to nursing during work hours (where the regular location of the employee's workplace makes nursing during work hours a possibility because the child is in close proximity); and

(iv) Other reasonable accommodations, including those listed in paragraphs (i)(1) through (3) of this section.

(5) The temporary suspension of one or more essential functions of the position in question, as defined in paragraph (g) of this section, is a reasonable accommodation if an employee with a known limitation under the PWFA is unable to perform one or more essential functions with or without a reasonable accommodation and the conditions set forth in paragraph (f)(2) of this section are met.

(j) *Undue hardship*—(1) *In general.* Undue hardship means, with respect to the provision of an accommodation, significant difficulty or expense incurred by a covered entity, when considered in light of the factors set forth in paragraph (j)(2) of this section.

(2) *Factors to be considered.* In determining whether an accommodation would impose an undue hardship on a covered entity, factors to be considered, with no one factor to be dispositive, include:

(i) The nature and net cost of the accommodation needed under the PWFA;

(ii) The overall financial resources of the facility or facilities involved in the provision of the reasonable accommodation, the number of persons employed at such facility, and the effect on expenses and resources;

(iii) The overall financial resources of the covered entity, the overall size of the business of the covered entity with respect to the number of its employees,

and the number, type, and location of its facilities;

(iv) The type of operation or operations of the covered entity, including the composition, structure, and functions of the workforce of such entity, and the geographic separateness and administrative or fiscal relationship of the facility or facilities in question to the covered entity; and

(v) The impact of the accommodation upon the operation of the facility, including the impact on the ability of other employees to perform their duties and the impact on the facility's ability to conduct business.

(3) *Temporary suspension of an essential function(s).* If an employee with a known limitation under the PWFA meets the definition of "qualified employee" under paragraph (f)(2) of this section and needs one or more essential functions of the relevant position to be temporarily suspended, the covered entity must provide the accommodation unless doing so would impose an undue hardship on the covered entity when considered in light of the factors provided in paragraphs (j)(2)(i) through (v) of this section as well as the following additional factors where they are relevant and with no one factor to be dispositive:

(i) The length of time that the employee will be unable to perform the essential function(s);

(ii) Whether, through the factors listed in paragraph (f)(2)(iii) of this section or otherwise, there is work for the employee to accomplish;

(iii) The nature of the essential function(s), including its frequency;

(iv) Whether the covered entity has provided other employees in similar positions who are unable to perform the essential function(s) of their position with temporary suspensions of the essential function(s);

(v) If necessary, whether there are other employees, temporary employees, or third parties who can perform or be hired to perform the essential function(s); and

(vi) Whether the essential function(s) can be postponed or remain unperformed for any length of time and, if so, for how long.

(4) *Predictable assessments.* The individualized assessment of whether a modification listed in paragraphs (j)(4)(i) through (iv) of this section is a reasonable accommodation that would cause undue hardship will, in virtually all cases, result in a determination that the four modifications are reasonable accommodations that will not impose an undue hardship under the PWFA when they are requested as workplace accommodations by an employee who is

pregnant. Therefore, with respect to these modifications, the individualized assessment should be particularly simple and straightforward:

(i) Allowing an employee to carry or keep water near and drink, as needed;

(ii) Allowing an employee to take additional restroom breaks, as needed;

(iii) Allowing an employee whose work requires standing to sit and whose work requires sitting to stand, as needed; and

(iv) Allowing an employee to take breaks to eat and drink, as needed.

(k) *Interactive process. Interactive process* means an informal, interactive process between the covered entity and the employee seeking an accommodation under the PWFA. This process should identify the known limitation under the PWFA and the adjustment or change at work that is needed due to the limitation, if either of these is not clear from the request, and potential reasonable accommodations. There are no rigid steps that must be followed.

(l) *Limits on supporting documentation.* (1) A covered entity is not required to seek supporting documentation. A covered entity may seek supporting documentation from an employee who requests an accommodation under the PWFA only when it is reasonable under the circumstances for the covered entity to determine whether the employee has a physical or mental condition related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions (a limitation) and needs an adjustment or change at work due to the limitation. The following situations are examples of when it is not reasonable under the circumstances to seek supporting documentation:

(i) When the physical or mental condition related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions (a limitation), and the adjustment or change at work needed due to the limitation are obvious and the employee provides self-confirmation as defined in paragraph (l)(4) of this section;

(ii) When the employer already has sufficient information to determine whether the employee has a physical or mental condition related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions (a limitation) and needs an adjustment or change at work due to the limitation;

(iii) When the employee is pregnant and seeks one of the modifications listed in paragraphs (j)(4)(i) through (iv) of this section due to a physical or mental condition related to, affected by, or arising out of pregnancy (a limitation)

and the employee provides self-confirmation as defined in paragraph (l)(4) of this section;

(iv) When the reasonable accommodation is related to a time and/or place to pump at work, other modifications related to pumping at work, or a time to nurse during work hours (where the regular location of the employee's workplace makes nursing during work hours a possibility because the child is in close proximity), and the employee provides self-confirmation, as defined in paragraph (l)(4) of this section; or

(v) When the requested accommodation is available to employees without known limitations under the PWFA pursuant to a covered entity's policies or practices without submitting supporting documentation.

(2) When it is reasonable under the circumstances, based on paragraph (l)(1) of this section, to seek supporting documentation, the covered entity is limited to seeking reasonable documentation.

(i) *Reasonable documentation* means the minimum that is sufficient to:

(A) Confirm the physical or mental condition (*i.e.*, an impediment or problem that may be modest, minor, and/or episodic; a need or a problem related to maintaining the employee's health or the health of the pregnancy; or an employee seeking health care related to pregnancy, childbirth, or a related medical condition itself) whether or not such condition meets the definition of disability specified in section 3 of the Americans with Disabilities Act of 1990, 42 U.S.C. 12102;

(B) Confirm that the physical or mental condition is related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions (together with paragraph (l)(2)(i)(A) of this section, "a limitation"); and

(C) Describe the adjustment or change at work that is needed due to the limitation.

(ii) Covered entities may not require that supporting documentation be submitted on a specific form.

(3) When it is reasonable under the circumstances, based on paragraph (l)(1) of this section, to seek supporting documentation, a covered entity may require that the reasonable documentation comes from a health care provider, which may include, but is not limited to: doctors, midwives, nurses, nurse practitioners, physical therapists, lactation consultants, doulas, occupational therapists, vocational rehabilitation specialists, therapists, industrial hygienists, licensed mental health professionals, psychologists, or psychiatrists. The health care provider

may be a telehealth provider. The covered entity may not require that the health care provider submitting documentation be the provider treating the condition at issue. The covered entity may not require that the employee seeking the accommodation be examined by a health care provider selected by the covered entity.

(4) *Self-confirmation* means a simple statement where the employee confirms, for purposes of paragraph (l)(1)(i), (iii), or (iv) of this section, the physical or mental condition related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions (a limitation), and the adjustment or change at work needed due to the limitation. The statement can be made in any manner and can be made as part of the request for reasonable accommodation under paragraph (h)(2) of this section. A covered entity may not require that the statement be in a specific format, use specific words, or be on a specific form.

### §1636.4   Nondiscrimination with regard to reasonable accommodations related to pregnancy.

(a) It is an unlawful employment practice for a covered entity not to make reasonable accommodations to the known limitations related to the pregnancy, childbirth, or related medical conditions of a qualified employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity.

(1) An unnecessary delay in providing a reasonable accommodation to the known limitations related to the pregnancy, childbirth, or related medical conditions of a qualified employee may result in a violation of the PWFA, 42 U.S.C. 2000gg–1(1), even if the covered entity eventually provides the reasonable accommodation. In determining whether there has been an unnecessary delay, factors to be considered, with no one factor to be dispositive, include:

(i) The reason for the delay;

(ii) The length of the delay;

(iii) The length of time that the accommodation is needed. If the accommodation is needed for a short time, unnecessary delay in providing it may effectively mean failure to provide the accommodation;

(iv) How much the employee and the covered entity each contributed to the delay;

(v) Whether the covered entity was engaged in actions related to the reasonable accommodation request during the delay;

(vi) Whether the accommodation was or would be simple or complex to provide. There are certain accommodations, set forth in § 1636.3(j)(4), that are common and easy to provide. Delay in providing these accommodations will virtually always result in a finding of unnecessary delay; and

(vii) Whether the covered entity offered the employee an interim reasonable accommodation during the interactive process or while waiting for the covered entity's response. For the purposes of this factor, the interim reasonable accommodation should be one that allows the employee to continue working. Leave will not be considered an interim reasonable accommodation supporting this factor, unless the employee selects or requests leave as an interim reasonable accommodation.

(2) An employee with known limitations related to pregnancy, childbirth, or related medical conditions is not required to accept an accommodation. However, if such employee rejects a reasonable accommodation that is necessary to enable the employee to perform an essential function(s) of the position held or desired or to apply for the position, or rejects the temporary suspension of an essential function(s) if the employee is qualified under § 1636.3(f)(2), and, as a result of that rejection, cannot perform an essential function(s) of the position, or cannot apply, the employee will not be considered "qualified."

(3) A covered entity cannot justify failing to provide a reasonable accommodation or the unnecessary delay in providing a reasonable accommodation to a qualified employee with known limitations related to pregnancy, childbirth, or related medical conditions based on the employee failing to provide supporting documentation, unless:

(i) The covered entity seeks the supporting documentation;

(ii) Seeking the supporting documentation is reasonable under the circumstances as set out in § 1636.3(l)(1);

(iii) The supporting documentation is "reasonable documentation" as defined in § 1636.3(l)(2); and

(iv) The covered entity provides the employee sufficient time to obtain and provide the supporting documentation.

(4) When choosing among effective accommodations, the covered entity must choose an accommodation that provides the qualified employee with known limitations related to pregnancy, childbirth, or related medical conditions equal employment opportunity to attain

the same level of performance, or to enjoy the same level of benefits and privileges as are available to the average employee without a known limitation who is similarly situated. The similarly situated average employee without a known limitation may include the employee requesting an accommodation at a time prior to communicating the limitation.

(b) It is an unlawful employment practice for a covered entity to require a qualified employee affected by pregnancy, childbirth, or related medical conditions to accept an accommodation other than any reasonable accommodation arrived at through the interactive process referred to in 42 U.S.C. 2000gg(7) and described in § 1636.3(k).

(c) It is an unlawful employment practice for a covered entity to deny employment opportunities to a qualified employee if such denial is based on the need, or potential need, of the covered entity to make reasonable accommodations to the known limitations related to the pregnancy, childbirth, or related medical conditions of the qualified employee.

(d) It is an unlawful employment practice for a covered entity:

(1) To require a qualified employee to take leave, whether paid or unpaid, if another reasonable accommodation can be provided to the known limitations related to the pregnancy, childbirth, or related medical conditions of the qualified employee that does not result in an undue hardship for the covered entity; but

(2) Nothing in paragraph (d)(1) of this section prohibits leave as a reasonable accommodation if that is the reasonable accommodation requested or selected by the employee, or if it is the only reasonable accommodation that does not cause an undue hardship.

(e) It is an unlawful employment practice for a covered entity:

(1) To take adverse action in terms, conditions, or privileges of employment against a qualified employee on account of the employee requesting or using a reasonable accommodation to the known limitations related to the pregnancy, childbirth, or related medical conditions of the employee.

(2) Nothing in paragraph (e)(1) of this section limits the rights available under 42 U.S.C. 2000gg–2(f).

### § 1636.5   Remedies and enforcement.

(a) *Employees covered by Title VII of the Civil Rights Act of 1964*—(1) *In general.* The powers, remedies, and procedures provided in sections 705, 706, 707, 709, 710, and 711 of the Civil Rights Act of 1964, 42 U.S.C. 2000e–4

*et seq.,* to the Commission, the Attorney General, or any person alleging a violation of Title VII of such Act, 42 U.S.C. 2000e *et seq.,* shall be the powers, remedies, and procedures the PWFA provides to the Commission, the Attorney General, or any person, respectively, alleging an unlawful employment practice in violation of the PWFA against an employee described in 42 U.S.C. 2000gg(3)(A), except as provided in paragraphs (a)(2) and (3) of this section.

(2) *Costs and fees.* The powers, remedies, and procedures provided in subsections (b) and (c) of section 722 of the Revised Statutes, 42 U.S.C. 1988, shall be the powers, remedies, and procedures the PWFA provides to the Commission, the Attorney General, or any person alleging such practice.

(3) *Damages.* The powers, remedies, and procedures provided in section 1977A of the Revised Statutes, 42 U.S.C. 1981a, including the limitations contained in subsection (b)(3) of such section 1977A, shall be the powers, remedies, and procedures the PWFA provides to the Commission, the Attorney General, or any person alleging such practice (not an employment practice specifically excluded from coverage under section 1977A(a)(1) of the Revised Statutes, 42 U.S.C. 1981a(a)(1)).

(b) [Reserved]

(c) *Employees covered by Chapter 5 of Title 3, United States Code*—(1) *In general.* The powers, remedies, and procedures provided in chapter 5 of title 3, United States Code, to the President, the Commission, the Merit Systems Protection Board, or any person alleging a violation of section 411(a)(1) of such title shall be the powers, remedies, and procedures this section provides to the President, the Commission, the Board, or any person, respectively, alleging an unlawful employment practice in violation of this section against an employee described in 42 U.S.C. 2000gg(3)(C), except as provided in paragraphs (c)(2) and (3) of this section.

(2) *Costs and fees.* The powers, remedies, and procedures provided in subsections (b) and (c) of section 722 of the Revised Statutes, 42 U.S.C. 1988, shall be the powers, remedies, and procedures this section provides to the President, the Commission, the Board, or any person alleging such practice.

(3) *Damages.* The powers, remedies, and procedures provided in section 1977A of the Revised Statutes, 42 U.S.C. 1981a, including the limitations contained in subsection (b)(3) of such section 1977A, shall be the powers, remedies, and procedures this section provides to the President, the

Commission, the Board, or any person alleging such practice (not an employment practice specifically excluded from coverage under section 1977A(a)(1) of the Revised Statutes, 42 U.S.C. 1981a(a)(1)).

(d) *Employees covered by Government Employee Rights Act of 1991*—(1) *In general.* The powers, remedies, and procedures provided in sections 302 and 304 of the Government Employee Rights Act of 1991, 42 U.S.C. 2000e–16b and 2000e–16c, to the Commission or any person alleging a violation of section 302(a)(1) of such Act, 42 U.S.C. 2000e–16b(a)(1), shall be the powers, remedies, and procedures the PWFA provides to the Commission or any person, respectively, alleging an unlawful employment practice in violation of the PWFA against an employee described in 42 U.S.C. 2000gg(3)(D), except as provided in paragraphs (d)(2) and (3) of this section.

(2) *Costs and fees.* The powers, remedies, and procedures provided in subsections (b) and (c) of section 722 of the Revised Statutes, 42 U.S.C. 1988, shall be the powers, remedies, and procedures the PWFA provides to the Commission or any person alleging such practice.

(3) *Damages.* The powers, remedies, and procedures provided in section 1977A of the Revised Statutes, 42 U.S.C. 1981a, including the limitations contained in subsection (b)(3) of such section 1977A, shall be the powers, remedies, and procedures the PWFA provides to the Commission or any person alleging such practice (not an employment practice specifically excluded from coverage under section 1977A(a)(1) of the Revised Statutes, 42 U.S.C. 1981a(a)(1)).

(e) *Employees covered by Section 717 of the Civil Rights Act of 1964*—(1) *In general.* The powers, remedies, and procedures provided in section 717 of the Civil Rights Act of 1964, 42 U.S.C. 2000e–16, to the Commission, the Attorney General, the Librarian of Congress, or any person alleging a violation of that section shall be the powers, remedies, and procedures the PWFA provides to the Commission, the Attorney General, the Librarian of Congress, or any person, respectively, alleging an unlawful employment practice in violation of the PWFA against an employee described in 42 U.S.C. 2000gg(3)(E), except as provided in paragraphs (e)(2) and (3) of this section.

(2) *Costs and fees.* The powers, remedies, and procedures provided in subsections (b) and (c) of section 722 of the Revised Statutes, 42 U.S.C. 1988, shall be the powers, remedies, and

procedures the PWFA provides to the Commission, the Attorney General, the Librarian of Congress, or any person alleging such practice.

(3) *Damages.* The powers, remedies, and procedures provided in section 1977A of the Revised Statutes, 42 U.S.C. 1981a, including the limitations contained in subsection (b)(3) of such section 1977A, shall be the powers, remedies, and procedures the PWFA provides to the Commission, the Attorney General, the Librarian of Congress, or any person alleging such practice (not an employment practice specifically excluded from coverage under section 1977A(a)(1) of the Revised Statutes, 42 U.S.C. 1981a(a)(1)).

(f) *Prohibition against retaliation*—(1) *Prohibition against retaliation.* No person shall discriminate against any employee because such employee has opposed any act or practice made unlawful by the PWFA or because such employee made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the PWFA.

(i) An employee need not be a qualified employee with a known limitation under the PWFA to bring an action under this paragraph (f)(1).

(ii) A request for reasonable accommodation for a known limitation under the PWFA constitutes protected activity under this paragraph (f)(1).

(iii) An employee does not actually have to be deterred from exercising or enjoying rights under the PWFA in order for the retaliation to be actionable.

(2) *Prohibition against coercion.* It shall be unlawful to coerce, intimidate, threaten, harass, or interfere with any individual in the exercise or enjoyment of, or on account of such individual having exercised or enjoyed, or on account of such individual having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by the PWFA.

(i) An individual need not be a qualified employee with a known limitation under the PWFA to bring an action under this paragraph (f)(2).

(ii) An individual does not actually have to be deterred from exercising or enjoying rights under the PWFA for the coercion, intimidation, threats, harassment, or interference to be actionable.

(3) *Remedy.* The remedies and procedures otherwise provided for under this section shall be available to aggrieved individuals with respect to violations of this section regarding retaliation or coercion.

(g) *Limitation on monetary damages.* Notwithstanding paragraphs (a)(3), (c)(3), (d)(3), and (e)(3) of this section,

if an unlawful employment practice involves the provision of a reasonable accommodation pursuant to the PWFA or this part, damages may not be awarded under section 1977A of the Revised Statutes, 42 U.S.C. 1981a, if the covered entity demonstrates good faith efforts, in consultation with the qualified employee with known limitations related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions who has informed the covered entity that accommodation is needed, to identify and make a reasonable accommodation that would provide such employee with an equally effective opportunity and would not cause an undue hardship on the operation of the business of the covered entity.

### § 1636.6   Waiver of State immunity.

A State shall not be immune under the 11th Amendment to the Constitution from an action in a Federal or State court of competent jurisdiction for a violation of the PWFA. In any action against a State for a violation of the PWFA, remedies (including remedies both at law and in equity) are available for such a violation to the same extent such remedies are available for such a violation in an action against any public or private entity other than a State.

### § 1636.7   Relationship to other laws.

(a) *In general.* (1) The PWFA and this part do not invalidate or limit the powers, remedies, and procedures under any Federal law, State law, or the law of any political subdivision of any State or jurisdiction that provides greater or equal protection for individuals affected by pregnancy, childbirth, or related medical conditions.

(2) The PWFA and this part do not require an employer-sponsored health plan to pay for or cover any particular item, procedure, or treatment, or affect any right or remedy available under any other Federal, State, or local law with respect to any such payment or coverage requirement.

(b) *Rule of construction.* The PWFA and this part are subject to the applicability to religious employment set forth in section 702(a) of the Civil Rights Act of 1964, 42 U.S.C. 2000e–1(a).

(1) Nothing in 42 U.S.C. 2000gg–5(b) or this part should be interpreted to limit a covered entity's rights under the U.S. Constitution.

(2) Nothing in 42 U.S.C. 2000gg–5(b) or this part should be interpreted to limit an employee's rights under other civil rights statutes.

**§ 1636.8 Severability.**

(a) The Commission intends that, if any provision of the PWFA or the application of that provision to particular persons or circumstances is held invalid or found to be unconstitutional, the remainder of the statute and the application of that provision to other persons or circumstances shall not be affected.

(b) The Commission intends that, if any provision of this part that uses the same language as the statute, or the application of that provision to particular persons or circumstances, is held invalid or found to be unconstitutional, the remainder of this part and the application of that provision to other persons or circumstances shall not be affected.

(c) The Commission intends that, if any provision of this part or the interpretive guidance in appendix A to this part that provides additional guidance to implement the PWFA, including examples of reasonable accommodations, or the application of that provision to particular persons or circumstances, is held invalid or found to be unconstitutional, the remainder of this part or the interpretive guidance and the application of that provision to other persons or circumstances shall not be affected.

## Appendix A to Part 1636—Interpretive Guidance on the Pregnant Workers Fairness Act

### I. Introduction

1. The Pregnant Workers Fairness Act (PWFA) requires a covered entity to provide reasonable accommodations to a qualified employee's known limitation related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions, absent undue hardship on the operation of the business of the covered entity. Although employees affected by pregnancy, childbirth, or related medical conditions have current rights under existing civil rights laws, including Title VII of the Civil Rights Act of 1964 (Title VII), as amended by the Pregnancy Discrimination Act of 1978 (PDA), 42 U.S.C. 2000e *et seq.*, and the Americans with Disabilities Act of 1990 (ADA), as amended by the ADA Amendments Act of 2008 (ADAAA or Amendments Act), 42 U.S.C. 12111 *et seq.*,[1] Congress determined that the legal protections offered by these two statutes, particularly as interpreted by the courts, were "insufficient to ensure that pregnant workers receive the accommodations they need." [2]

[1] References to the ADA throughout this part and the Interpretive Guidance in this appendix are intended to apply equally to the Rehabilitation Act of 1973, as all nondiscrimination standards under title I of the ADA also apply to Federal agencies under section 501 of the ADA. *See* 29 U.S.C. 791(f).

[2] H.R. Rep. No. 117–27, pt. 1, at 12 (2021).

2. The PWFA, at 42 U.S.C. 2000gg–3, directs the U.S. Equal Employment Opportunity Commission (EEOC or Commission) to promulgate regulations to implement the PWFA.

3. This Interpretive Guidance addresses the major provisions of the PWFA and its regulation and explains the major concepts pertaining to nondiscrimination with respect to reasonable accommodations for known limitations (physical or mental conditions related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions) under the statute. The Interpretive Guidance represents the Commission's interpretation of the issues addressed within it, and the Commission will be guided by the regulation and the Interpretive Guidance when enforcing the PWFA.

### II. General Information and Terms Used in the Regulation and Interpretive Guidance

1. The PWFA at 42 U.S.C. 2000gg(3) uses the term "employee (including an applicant)" in its definition of "employee." [3] Thus, throughout the statute, the final regulation, and this Interpretive Guidance, the term "employee" should be understood to include "applicant" where relevant. Because the PWFA relies on Title VII for its definition of "employee," that term also includes "former employee," where relevant.[4] The PWFA defines "covered entity" using the definition of "employer" from different statutes, including Title VII.[5] Thus "covered entities" under the PWFA include public or private employers with 15 or more employees, unions, employment agencies, and the Federal Government.[6] In the regulation and this Interpretive Guidance, the Commission uses the terms "covered entity" and "employer" interchangeably.

2. This Interpretive Guidance contains many examples to illustrate situations under the PWFA. The examples do not, and are not intended to, cover every limitation or possible accommodation under the PWFA. Depending on the facts in the examples, the same facts could lead to claims also being brought under other statutes that the Commission enforces, such as Title VII and the ADA. Moreover, the situations in specific examples could implicate other Federal laws, including, but not limited to, the Family and Medical Leave Act of 1993, 29 U.S.C. 2601 *et seq.* (FMLA); the Occupational Safety and Health Act, 29 U.S.C. 651 *et seq.* (OSH Act); and the Providing Urgent Maternal Protections for Nursing Mothers Act (PUMP Act) (Pub. L. 117–328, Div. KK, 136 Stat.

[3] 42 U.S.C. 2000gg(3).

[4] *Robinson* v. *Shell Oil Co.*, 519 U.S. 337, 346 (1997).

[5] 42 U.S.C. 2000gg(2)(A), (B)(i), (B)(iii), (B)(iv). The other statutes are the Congressional Accountability Act of 1995 and 3 U.S.C. 411(c).

[6] The statute at 42 U.S.C. 2000gg(2) provides that the term "covered entity" has the meaning given the term "respondent" under 42 U.S.C. 2000e(n) and includes employers as defined in 42 U.S.C. 2000e(b), 2000e–16c(a), and 2000e–16(a). The statute at 42 U.S.C. 2000gg–5(b) provides as a rule of construction that the chapter is subject to the applicability to religious employment set forth in 42 U.S.C. 2000e–1(a) [section 702(a) of the Civil Rights Act of 1964].

4459, 6093 (2022)).[7] Finally, although some examples state that the described actions "would violate" the PWFA, additional facts not described in the examples could change that determination.[8]

### III. 1636. Definitions—Specific to the PWFA

*1636.3(a) Known Limitation*

1. Section 1636.3(a) reiterates the definition of "known limitation" from 42 U.S.C. 2000gg(4) of the PWFA and then provides definitions for the operative terms.

*1636.3(a)(1) Known*

2. Paragraph (a)(1) adopts the definition of "known" from the PWFA and thus defines it to mean that the employee, or the employee's representative, has communicated the limitation to the covered entity.[9]

*1636.3(a)(2) Limitation*

3. Paragraph (a)(2) adopts the definition of "limitation" from the PWFA and thus defines it to mean a physical or mental condition related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions.[10] The limitation must be of the specific employee in question. The "physical or mental condition" that is the limitation may be a modest, minor, and/or episodic impediment or problem. The definition encompasses when an employee affected by pregnancy, childbirth, or related medical conditions has a need or a problem related to maintaining their health or the health of the pregnancy.[11]

4. The definition of "limitation" also includes when an employee is seeking health care related to the pregnancy, childbirth, or a related medical condition itself. Under the ADA, when an individual has an actual or a record of a disability, employers often may be required to provide the reasonable accommodation of leave so that an employee

[7] To the extent that an accommodation in an example is required under another law, like the OSH Act, the example should not be read to suggest that such a requirement is not applicable.

[8] In this part and the Interpretive Guidance, the Commission uses the terms "leave" and "time off" and intends those terms to cover leave however it is identified by the specific employer. Additionally, in this part and the Interpretive Guidance, the Commission uses the term "light duty," programs, or other programs providing modified duties, can vary depending on the employer material. *See* EEOC, *Enforcement Guidance: Workers' Compensation and the ADA*, text preceding Question 27 (1996) [hereinafter *Enforcement Guidance: Workers' Compensation*], *https://www.eeoc.gov/laws/guidance/enforcement-guidance-workers-compensation-and-ada.* The Commission intends "light duty" to include the types of programs included in Questions 27 and 28 of the *Enforcement Guidance: Workers' Compensation* and any other policy. practice, or system that a covered entity has for accommodating employees, including when one or more essential functions of a position are temporarily excused.

[9] 42 U.S.C. 2000gg(4).

[10] *Id.*

[11] In § 1636.3(a)(2) and the Interpretive Guidance, the Commission uses the phrase "maintaining their health or the health of the pregnancy." This includes avoiding risk to the employee's health or to the health of the pregnancy.

**29190**      **Federal Register** / Vol. 89, No. 77 / Friday, April 19, 2024 / Rules and Regulations

can obtain medical treatment.[12] Similarly, under the PWFA, an employee may require a reasonable accommodation of leave to attend health care appointments or receive treatment for or recover from their pregnancy, childbirth, or related medical conditions.[13] In passing the PWFA, Congress sought, in part, to help pregnant employees maintain their health.[14] Thus, the PWFA covers situations when an employee requests an accommodation in order to maintain their health or the health of their pregnancy and avoid negative consequences, and when an employee seeks health care for their pregnancy, childbirth, or related medical conditions. Practically, allowing for accommodations to maintain health and attend medical appointments may decrease the need for a more extensive

accommodation because the employee may be able to avoid more serious complications.

5. The physical or mental condition (the limitation) required to trigger the obligation to provide a reasonable accommodation under the PWFA does not need to meet the definition of a "disability" under the ADA.[15] In other words, an employee need not have an impairment that substantially limits a major life activity to be entitled to a reasonable accommodation under the PWFA, nor does an employee need to have an "impairment" as defined in the regulation implementing the ADA.[16] The PWFA can cover physical or mental conditions that also are covered under the ADA. In these situations, an individual may be entitled to an accommodation under the ADA as well as the PWFA.

6. The PWFA does not create a right to reasonable accommodation based on an individual's association with someone else who may have a PWFA-covered limitation. Nor is a qualified employee entitled to accommodation because they have a physical or mental condition related to, affected by, or arising out of someone else's pregnancy, childbirth, or related medical conditions. For example, a spouse experiencing anxiety due to a partner's pregnancy is not covered by the PWFA. Time for bonding or time for childcare also is not covered by the PWFA.

7. Whether an employee has a "physical or mental condition related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions" shall be construed broadly to the maximum extent permitted by the PWFA.

Related to, Affected by, or Arising Out of

8. The PWFA's use of the inclusive terms "related to, affected by, or arising out of"[17] means that pregnancy, childbirth, or related medical conditions do not need to be the sole, the original, or a substantial cause of the physical or mental condition at issue for the physical or mental condition to be "related to, affected by, or arising out of" pregnancy, childbirth, or related medical conditions.

9. Whether a physical or mental condition is related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions will be apparent in the majority of cases. Pregnancy and childbirth cause systemic changes that not only create new physical and mental conditions but also can exacerbate preexisting conditions and can cause additional pain or risk.[18] Thus, a

connection between an employee's physical or mental condition and their pregnancy, childbirth, or related medical conditions will be readily ascertained when an employee is currently pregnant or the employee is experiencing or has just experienced childbirth.

10. For example, if an employee is pregnant and as a result has pain when standing for long periods of time, the employee's physical or mental condition (pain when standing for a protracted period) is related to, affected by, or arising out of the employee's pregnancy. An employee who is pregnant and because of the pregnancy cannot lift more than 20 pounds has a physical condition related to, affected by, or arising out of pregnancy, because lifting is associated with low back pain and musculoskeletal disorders that may be exacerbated by physical changes associated with pregnancy.[19] An employee who is pregnant and seeks time off for prenatal health care appointments is attending medical appointments related to, affected by, or arising out of pregnancy. An employee who requests an accommodation to attend therapy appointments for postpartum depression has a medical condition related to pregnancy or childbirth (postpartum depression) and is obtaining health care related to, affected by, or arising out of a related medical condition. A pregnant employee who is seeking an accommodation to limit exposure to secondhand smoke to protect the health of their pregnancy has a physical or mental condition (trying to maintain the employee's health or the health of their pregnancy, or to address increased sensitivity to secondhand smoke) related to, affected by, or arising out of pregnancy. A lactating employee who seeks an accommodation to take breaks to eat has a related medical condition (lactation) and a physical condition related to, affected by, or arising out of it (increased nutritional needs). A pregnant employee seeking time off in order to have an amniocentesis procedure is attending a medical appointment related to, affected by, or arising out of pregnancy. An employee who requests leave for in vitro fertilization (IVF) treatment for the purpose to get pregnant has a limitation, either related to potential or intended pregnancy or a medical condition related to pregnancy (difficulty in becoming pregnant or infertility), and is seeking health care related to, affected by, or arising out of it. An employee whose pregnancy is causing fatigue has a physical condition (fatigue) related to, affected by, or arising out of pregnancy. An employee whose pregnancy is causing back pain has a physical condition (back pain) related to, affected by, or arising out of pregnancy. This is not by any means a complete list of physical or mental

---

[12] EEOC, *Enforcement Guidance on Reasonable Accommodation and Undue Hardship under the ADA*, at text after n.49 (2002) [hereinafter *Enforcement Guidance on Reasonable Accommodation*], http://www.eeoc.gov/laws/guidance/enforcement-guidance-reasonable-accommodation-and-undue-hardship-under-ada.

[13] See, e.g., U.S. Dep't of Health & Hum. Servs., Off. of Women's Health, *Prenatal Care*, https://www.womenshealth.gov/a-z-topics/prenatal-care (last updated Feb. 22, 2021) (stating that during pregnancy usually visits are once a month until week 28, twice a month from weeks 28–36 and once a week from week 36 to birth); Am. Coll. of Obstetricians & Gynecologists, Comm. Opinion No. 736, *Optimizing Postpartum Care* (reaff'd 2021), https://www.acog.org/clinical/clinical-guidance/committee-opinion/articles/2018/05/optimizing-postpartum-care (stating the importance of regular postpartum care); and Opinion No. 826, *Protecting and Expanding Medicaid to Improve Women's Health* (2021), https://www.acog.org/clinical/clinical-guidance/committee-opinion/articles/2021/06/protecting-and-expanding-medicaid-to-improve-womens-health (encouraging the expansion of Medicaid to improve postpartum care).

[14] See Markup of the Paycheck Fairness Act; Pregnant Workers Fairness Act; Workplace Violence Prevention for Health Care and Social Service Workers Act, YouTube (2021), at 54:46 (statement of Rep. Kathy E. Manning) (stating that a goal of the PWFA is to help pregnant workers "deliver healthy babies while maintaining their jobs"); at 21:50 (statement of Rep. Robert C. Scott) ("[W]ithout [these] basic protections, too many workers are forced to choose between a healthy pregnancy and their paychecks."); at 1:35:01 (statement of Rep. Lucy McBath) ("[N]o mother should ever have to choose between the health of herself/themselves and their child or a paycheck."); and at 1:37:38 (statement of Rep. Suzanne Bonamici) ("[P]regnant workers should not have to choose between a healthy pregnancy and a paycheck."), https://www.youtube.com/watch?v=p6Ie2S9sTxs; see also H.R. Rep. No. 117–27, pt. 1, at 12 (workers whose pregnancy-related impairments substantially limit a major life activity are covered by the ADA; "this standard leaves women with less serious pregnancy-related impairments and who need accommodations, without legal recourse"); id. at 22–23 (accommodations are frequently needed by, and should be provided to, people with healthy pregnancies); id. at 23 (example of an "uneventful pregnancy" in which a woman needed more bathroom breaks); id. at 14–21 (outlining the gaps created by court interpretations of Title VII and the ADA that the PWFA is intended to fill so that pregnant workers can receive reasonable accommodations); id. at 56 (noting that a "minor limitation" can be covered because it presumably requires only minor accommodations).

[15] 42 U.S.C. 2000gg(4).

[16] See 29 CFR 1630.2(h).

[17] The statute at 42 U.S.C. 2000gg(4) defines the term "known limitation" as a physical or mental condition related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions. Most of the prohibited acts in the statute, however, use the phrase "known limitations related to the pregnancy, childbirth, or related medical conditions." See 42 U.S.C. 2000gg–1(1), (3)–(5). Thus, the Commission will define "related to, affected by, or arising out of" as one phrase and will not attempt to define each of the parts of it separately.

[18] See, e.g., Danforth's Obstetrics & Gynecology 286 (Ronald S. Gibbs et al. eds., 10th ed. 2008) ("Normal pregnancy entails many physiologic changes . . . ."); Clinical Anesthesia 1138 (Paul G. Barash et al. eds., 6th ed. 2009) ("During pregnancy,

there are major alterations in nearly every maternal organ system.")

[19] Am. Coll. of Obstetricians & Gynecologists, Comm. Opinion No. 733, *Employment Considerations During Pregnancy and the Postpartum Period* (reaff'd 2023), https://www.acog.org/clinical/clinical-guidance/committee-opinion/articles/2018/04/employment-considerations-during-pregnancy-and-the-postpartum-period.

conditions related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions, but rather a discussion of examples to illustrate application of the legal rule.

11. The Commission recognizes that some physical or mental conditions (which can be "limitations" as defined by the PWFA [20]), including some of those in the examples in paragraph 10 of this section, may occur even if they are not related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions (*e.g.*, attending medical appointments, increased nutritional needs, constraints on lifting). The Commission anticipates that confirming whether a physical or mental condition is related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions usually will be straightforward and can be accomplished through the interactive process. If a physical or mental condition is not covered by the PWFA, it may be that the physical or mental condition constitutes a disability that is covered by the ADA.

12. There may be situations where a physical or mental condition begins as something that is related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions, and, once the pregnancy, childbirth, or related medical conditions resolve, the physical or mental condition remains, evolves, or worsens. To confirm whether the employee's physical or mental condition is still related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions, the employer and the employee can engage in the interactive process.

13. There will be situations where an individual with a physical or mental condition that is no longer related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions has an "actual" or "record of" disability under the ADA. In those situations, an individual may seek an accommodation under the ADA and the reasonable accommodation process would follow the ADA. [21]

14. Finally, there may be situations where the pregnancy, childbirth, or related medical conditions exacerbate existing conditions that may be disabilities under the ADA. In those situations, an employee can seek an accommodation under the PWFA or the ADA, or both statutes.

*1636.3(b) Pregnancy, Childbirth, or Related Medical Conditions*

15. The PWFA uses the term "pregnancy, childbirth, or related medical conditions," which appears in Title VII's definition of "sex." [22] Because Congress chose to write the PWFA using the same language as Title VII, § 1636.3(b) gives the term "pregnancy,

[20] 42 U.S.C. 2000gg(4) (providing that a "known limitation" is a physical or mental condition related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions that the employee or employee's representative has communicated to the employer).

[21] *See, e.g.,* 29 CFR 1630.2(o)(3); 29 CFR part 1630, appendix, 1630.2(o)(3) and 1630.9.

[22] *See* 42 U.S.C. 2000e(k).

childbirth, or related medical conditions" the same meaning as under Title VII. [23]

16. The non-exhaustive list of examples in § 1636.3(b) for the definition of "pregnancy" and "childbirth" includes current pregnancy, past pregnancy, potential or intended pregnancy (which can include infertility, fertility treatments, and the use of contraception), and labor and childbirth (including vaginal delivery and cesarean section). [24]

[23] *See, e.g.,* Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc., 576 U.S. 519, 536 (2015) ("If a word or phrase has been . . . given a uniform interpretation by inferior courts . . . , a later version of that act perpetuating the wording is presumed to carry forward that interpretation.") (omissions in original) (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 322 (2012)); Bragdon v. Abbott, 524 U.S. 624, 645 (1998) ("When administrative and judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its administrative and judicial interpretations as well."); Lorillard v. Pons, 434 U.S. 575, 581 (1978) ("[W]here, as here, Congress adopts a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law, at least insofar as it affects the new statute."); Hall v. U.S. Dep't of Agric., 984 F.3d 825, 840 (9th Cir. 2020) ("Congress is presumed to be aware of an agency's interpretation of a statute. We most commonly apply that presumption when an agency's interpretation of a statute has been officially published and consistently followed. If Congress thereafter reenacts the same language, we conclude that it has adopted the agency's interpretation.") (internal citations and quotation marks omitted); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 323 (2012) ("[W]hen a statute uses the very same terminology as an earlier statute—especially in the very same field, such as securities law or civil-rights law—it is reasonable to believe that the terminology bears a consistent meaning."); H.R. Rep. No. 117–27, pt. 1, at 11–17 (discussing the history of the passage of the PDA; explaining that, due to court decisions, the PDA did not fulfill its promise to protect pregnant employees; and that the PWFA was intended to rectify this problem and protect the same employees covered by the PDA).

[24] EEOC, *Enforcement Guidance on Pregnancy Discrimination and Related Issues,* (I)(A) (2015) [hereinafter *Enforcement Guidance on Pregnancy Discrimination*], https://www.eeoc.gov/laws/guidance/enforcement-guidance-pregnancy-discrimination-and-related-issues (providing that the phrase "pregnancy, childbirth, or related medical conditions" includes current pregnancy, past pregnancy, potential or intended pregnancy, infertility treatment, use of contraception, lactation, breastfeeding, and the decision to have or not have an abortion, among other conditions); see, e.g., Kocak v. Cmty. Health Partners of Ohio, Inc., 400 F.3d 466, 470 (6th Cir. 2005) (reasoning that the plaintiff "cannot be refused employment on the basis of her potential pregnancy"); Piraino v. Int'l Orientation Res., Inc., 84 F.3d 270, 274 (7th Cir. 1996) (rejecting "surprising claim" by the defendant that no pregnancy discrimination can be shown where the challenged action occurred after the birth of the plaintiff's baby); Pacourek v. Inland Steel Co., 858 F. Supp. 1393, 1397, 1402–04 (N.D. Ill. 1994) (observing that the PDA gives a woman "the right . . . to be financially and legally protected before, during, and after her pregnancy" and stating "[a]s a general matter, a woman's medical condition rendering her unable to become pregnant naturally is a medical condition related to pregnancy and childbirth for purposes of the Pregnancy

17. "Related medical conditions" are medical conditions that relate to pregnancy or childbirth. [25] To be a related medical condition, the medical condition need not be caused solely, originally, or substantially by pregnancy or childbirth.

18. There are some medical conditions where the relation to pregnancy will be readily apparent. They can include, but are not limited to, lactation (including breastfeeding and pumping), miscarriage, stillbirth, having or choosing not to have an abortion, preeclampsia, gestational diabetes, and HELLP (hemolysis, elevated liver enzymes and low platelets) syndrome. [26]

Discrimination Act") (internal citations and quotation marks omitted); Donaldson v. Am. Banco Corp., Inc., 945 F. Supp. 1456, 1464 (D. Colo. 1996) ("It would make little sense to prohibit an employer from hiring a woman during her pregnancy but permit the employer to terminate her the day after delivery if the reason for termination was that the woman became pregnant in the first place. The plain language of the statute does not require it, and common sense precludes it."); Neessen v. Arona Corp., 708 F. Supp. 2d 841, 851 (N.D. Iowa 2010) (finding the plaintiff covered by the PDA where the defendant allegedly refused to hire her because she had recently been pregnant and given birth); EEOC, *Commission Decision on Coverage of Contraception,* at (I)(A) (Dec. 14, 2000), https://www.eeoc.gov/commission-decision-coverage-contraception ("The PDA's prohibition on discrimination against women based on their ability to become pregnant thus necessarily includes a prohibition on discrimination related to a woman's use of contraceptives."); Cooley v. DaimlerChrysler Corp., 281 F. Supp. 2d 979, 984–85 (E.D. Mo. 2003) (determining that, although the defendant employer's policy was facially neutral, denying a prescription medication that allows an employee to control their potential to become pregnant is "necessarily a sex-based exclusion" that violates Title VII, as amended by the PDA, because only people who have the capacity to become pregnant use prescription contraceptives, and the exclusion of prescription contraceptives may treat medication needed for a sex-specific condition less favorably than medication necessary for other medical conditions); Erickson v. Bartell Drug Co., 141 F. Supp. 2d 1266, 1271–72 (W.D. Wash. 2001) (determining that the selective exclusion of prescription contraceptives from an employer's generally comprehensive prescription drug plan violated the PDA because only people who have the capacity to become pregnant use prescription contraceptives).

[25] *Enforcement Guidance on Pregnancy Discrimination, supra* note 24, at (I)(A)(4).

[26] *Id.; see also* Hicks v. City of Tuscaloosa, 870 F.3d 1253, 1259–60 (11th Cir. 2017) (finding lactation and breastfeeding covered under the PDA, and asserting that "[t]he PDA would be rendered a nullity if women were protected during a pregnancy but then could be readily terminated for breastfeeding—an important pregnancy-related 'physiological process'") (internal citation omitted); EEOC v. Houston Funding II, Ltd., 717 F.3d 425, 428 (5th Cir. 2013) (holding that "lactation is a related medical condition of pregnancy for purposes of the PDA"); Doe v. C.A.R.S. Prot. Plus, Inc., 527 F.3d 358, 364 (3d Cir. 2008) (holding that the PDA prohibits an employer from discriminating against a female employee because she has exercised her right to have an abortion); Turic v. Holland Hosp., Inc., 85 F.3d 1211, 1214 (6th Cir. 1996) (finding the termination of the employment of a pregnant employee because she contemplated having an abortion violated the PDA); Carney v. Martin Luther Home, Inc., 824 F.2d 643, 648 (8th Cir. 1987) (referencing the PDA's legislative history
Continued

Pregnancy causes systemic changes that can create new medical conditions and risks and can exacerbate preexisting conditions and the risks posed by such conditions.[27] Thus, the fact that a medical condition is related to pregnancy will usually be evident when the medical condition develops, is exacerbated, or poses a new risk during an employee's current pregnancy. Additionally, the relation will be apparent in many cases where the medical condition develops, is exacerbated, or poses a new risk during an employee's childbirth or during the employee's postpartum period.

19. However, simply because a condition is listed as one that may be a related medical condition does not mean it necessarily meets the definition of "related medical conditions" for the purposes of the PWFA. To be a related medical condition for the PWFA, the employee's medical condition must relate to pregnancy or childbirth. If an employee has a condition but, in their situation, it does not relate to pregnancy or childbirth, the condition is not covered under the PWFA. For example, if an employee who gave birth 2 weeks ago is vomiting because of food poisoning, that medical condition is not related to pregnancy or childbirth and the employee is not eligible on that basis for a PWFA reasonable accommodation.

20. Related medical conditions may include conditions that existed before pregnancy or childbirth and for which an individual may already receive an ADA reasonable accommodation. Pregnancy or childbirth may exacerbate the condition, such that additional or different accommodations are needed. For example, an employee who received extra breaks to eat or drink due to Type 2 diabetes before pregnancy (an ADA reasonable accommodation) may need additional accommodations during pregnancy to monitor and manage the diabetes more closely to avoid or minimize adverse health consequences to the employee or the pregnancy. As another example, an employee may have had high blood pressure that could be managed with medication prior to pregnancy, but once the employee is pregnant, the high blood pressure may pose

a risk to the employee or their pregnancy such that the employee needs bed rest. In these situations, an employee could request a continued or an additional accommodation under the ADA and/or an accommodation under the PWFA.

21. The Commission emphasizes that the list of "pregnancy, childbirth or related medical conditions" in § 1636.3(b) is non-exhaustive; to receive an accommodation a qualified employee does not have to specify a condition on this list or use medical terms to describe a condition.

22. When an employer has received a request for an accommodation under the PWFA, the employer and employee can engage in the interactive process, if necessary, in order to confirm whether a medical condition is related to pregnancy or childbirth.

*1636.3(c) Employee's Representative*

23. The limitation may be communicated to the covered entity by the employee or the employee's representative. The term "employee's representative" encompasses any representative of the employee, including a family member, friend, union representative, health care provider, or other representative. In most instances, the Commission expects that the representative will have the employee's permission before communicating the limitation to the covered entity, but there may be some situations, for example if the employee is incapacitated, where that is not the case. Once the covered entity is made aware of the limitation, the representative's participation in any aspect of the reasonable accommodation process is at the discretion of the employee, and the employee may decide not to have the representative participate at any time. In most instances, the Commission expects that the covered entity will engage directly with the employee, even where the employee's representative began the process, but acknowledges that in some situations, for example, when the employee is incapacitated or the representative is the employee's attorney, the covered entity will need to continue to engage with the representative rather than the employee.

*1636.3(d) Communicated to the Employer and 1636.3(h)(2) How To Request a Reasonable Accommodation*

24. Section 1636.3(d) and (h)(2) sets out how an employee informs a covered entity of their limitation in order to make it "known" and how an employee requests a reasonable accommodation. In practice, the Commission expects that these actions—communicating the limitation to the employer and requesting a reasonable accommodation—will take place at the same time.

25. Informing the employer of the limitation and requesting a reasonable accommodation should not be complicated or difficult. The covered entity must permit an employee to do both through various avenues and means, as set forth in § 1636.3(d). Given that many accommodations requested under the PWFA will be straightforward—like additional bathroom breaks or access to water—the Commission emphasizes the importance of

employees being able to obtain accommodations by communicating with the employer representative(s) with whom they would normally consult if they had questions or concerns about work matters. Employees should not be made to wait for a reasonable accommodation, especially one that is simple and imposes negligible cost or is temporary, because they spoke to the "wrong" supervisor. The individuals to whom an employee can communicate to seek accommodation include persons with supervisory authority for or who regularly direct the employee's work (or the equivalent for the applicant) and human resources personnel. Depending on the situation, employees also may communicate with other appropriate officials such as an agent of the employer (*e.g.*, a search firm, staffing agency, or third-party benefits administrator).

26. Section 1636.3(d)(1) and (2) explains that the communication informing the covered entity of the limitation does not need to be in writing, be in a specific format, use specific words, or be on a specific form in order for it to be considered "communicated to the employer."

27. Just as the communication informing the covered entity of the limitation does not need to be in writing or use specific phrases, the same is true for the request for a reasonable accommodation. Employees may inform the employer of the limitation and request an accommodation in a conversation or may use another mode of communication to inform the employer.[28] A covered entity may choose to confirm a request in writing or may ask the employee to fill out a form or otherwise confirm the request in writing. However, the covered entity cannot ignore or close an initial request that satisfies § 1636.3(h)(2) if the employee does not complete such confirmation procedures, because that initial request is sufficient to place the employer on notice.[29] If a form is used, the form should be a simple one that does not deter the employee from pursuing the request and does not delay the provision of an accommodation. Additionally, although employees are not required to communicate limitations or request reasonable accommodations in writing, an employee may choose email or other written means to submit a request for an accommodation, which can promote clarity and create a record of their request. Finally, the request for accommodation does not need to be in the form of a "request," *i.e.*, an employee does not need to "ask" but may provide a statement of their need for an accommodation.

28. The requirement that no specific words or phrases are necessary to communicate a limitation or request a reasonable accommodation includes not needing to specifically identify whether a condition is "pregnancy, childbirth, or related medical conditions" or whether it is a "physical or mental condition." The statutory definition of "limitation" uses the words "condition"

---

and noting commentator agreement that "[b]y broadly defining pregnancy discrimination, Congress clearly intended to extend protection beyond the simple fact of an employee's pregnancy to include 'related medical conditions' such as nausea or potential miscarriage") (internal citations and quotation marks omitted); *Ducharme* v. *Crescent City Déjà Vu, LLC,* 406 F. Supp. 3d 548, 556 (E.D. La. 2019) (finding that "abortion is encompassed within the statutory text prohibiting adverse employment actions 'because of or on the basis of pregnancy, childbirth, or related medical conditions' "); 29 CFR part 1604, appendix, Questions 34–37 (1979) (addressing coverage of abortion under the PDA); H.R. Rep. No. 95–1786, at 4 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 4749, 4766 ("Because the bill applies to all situations in which women are 'affected by pregnancy, childbirth, and related medical conditions,' its basic language covers decisions by women who chose to terminate their pregnancies. Thus, no employer may, for example, fire or refuse to hire a woman simply because she has exercised her right to have an abortion.").

[27] *See supra* note 18.

[28] *See Enforcement Guidance on Reasonable Accommodation, supra* note 12, at Questions 1–3 (addressing requests for accommodation under the ADA).

[29] *See id.*

and "related" twice ("known limitation" means a physical or mental condition related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions.[30] Under § 1636.3(d), "physical or mental conditions" are impediments or problems affecting an employee that may be modest or minor.[31] A "physical or mental condition" includes when an employee affected by pregnancy, childbirth, or related medical conditions has a need or a problem related to maintaining their health or the health of the pregnancy; or is seeking health care related to pregnancy, childbirth, or a related medical condition itself.[32] "Related medical conditions" are conditions related to the pregnancy or childbirth of the specific employee in question.

29. Many, but not all, conditions related to pregnancy and childbirth can be both a "limitation" and a "related medical condition." For example, hyperemesis gravidarum experienced during pregnancy is a "condition" that could be classified as either a "limitation" (nausea and vomiting that arises out of pregnancy), or a "related medical condition" (a condition that is related to pregnancy); similarly, incontinence could be a "limitation" (for example, when someone who is pregnant becomes less able to comfortably hold urine and thus requires more frequent bathroom breaks), or a "related medical condition" (for example, when the medical condition of incontinence arises out of or is exacerbated as a result of pregnancy or childbirth).[33] Either way, such needs can be a reason for a reasonable accommodation under the PWFA.

30. Because the statute uses the same term ("condition") to define both "limitation" and "related medical conditions" and because some "conditions" can be both a "limitation" and a "related medical condition," an employee does not have to identify whether a particular condition is a "limitation" or a "related medical condition" when requesting a reasonable accommodation. For example, where an employee is experiencing nausea and vomiting in connection with a pregnancy, the employee need not determine whether this is a "limitation" or a "related medical condition" in order to request an accommodation under the PWFA. Similarly, there is no need for the employer to make such a determination before granting an accommodation under the PWFA.

31. Finally, PWFA limitations also may be ADA disabilities.[34] Therefore, an employee is not required to identify the statute under which they are requesting a reasonable accommodation. Doing so would require that employees seeking accommodations use specific words or phrases, which § 1636.3(d) prohibits.

*1636.3(e) Consideration of Mitigating Measures*

32. There may be steps that an employee can take to mitigate, or lessen, the effects of a known limitation such as taking medication, getting extra rest, or using a reasonable accommodation. Paragraph (e) of § 1636.3 explains that the ameliorative, or positive, effects of "mitigating measures," as that term is defined in the ADA,[35] shall not be considered when determining whether the employee has a limitation under the PWFA. By contrast, the detrimental or non-ameliorative effects of mitigating measures, such as negative side effects of medication, the burden of following a particular treatment regimen, and complications that arise from surgery, may be considered when determining whether an employee has a limitation under the PWFA.[36] Both the positive and negative effects of mitigating measures may be considered when determining what accommodation an employee may need.

*1636.3(f) Qualified Employee*

33. An employee must meet the definition of "qualified" in the PWFA in one of two ways.[37] Paragraph (f) of § 1636.3 reiterates the statutory language that "qualified employee" means an employee who, with or without reasonable accommodation, can perform the essential functions of the position.[38] Additionally, following the statute, § 1636.3(f) also states that an employee shall be considered qualified if: (1) any inability to perform an essential function(s) is for a temporary period; (2) the essential function(s) could be performed in the near future; and (3) the inability to perform the essential function(s) can be reasonably accommodated.[39]

34. For both definitions of qualified, the determination of whether an employee with a known limitation is qualified should be based on the capabilities of the employee at the time of the relevant employment decision.[40] The determination of qualified should not be based on speculation that the employee may become unable in the future to perform certain tasks, may cause increased health insurance premiums or workers' compensation costs, or may require leave.[41]

*1636.3(f)(1) Qualified Employee—With or Without Reasonable Accommodation*

35. The first way that an employee can be "qualified" under 42 U.S.C. 2000gg(6) is if they can perform the essential functions of their job with or without reasonable accommodation, which is the same language

as in the ADA and is interpreted accordingly. "Reasonable" has the same meaning as under the ADA on this topic—an accommodation that "seems reasonable on its face, *i.e.*, ordinarily or in the run of cases," "feasible," or "plausible."[42] Many employees will meet this part of the PWFA definition of qualified. For example, a pregnant cashier who needs a stool to perform the job will be qualified with the reasonable accommodation of a stool. A teacher recovering from childbirth who needs additional bathroom breaks will be qualified with a reasonable accommodation that allows such breaks.

"Qualified" for the Reasonable Accommodation of Leave

36. When determining whether an employee who needs leave as a reasonable accommodation meets the definition of "qualified," the relevant inquiry is whether the employee would be able to perform the essential functions of the position, with or without reasonable accommodation (or, if not, if the inability to perform the essential function(s) is for a temporary period, the essential function(s) could be performed in the near future, and the inability to perform the essential function(s) could be reasonably accommodated), with the benefit of a period of leave (*e.g.*, intermittent leave, part-time work, or a period of leave or time off). Thus, an employee who needs some form of leave to recover from a known limitation related to pregnancy, childbirth, or related medical conditions can readily meet the definition of "qualified" under the first part of the PWFA definition because it is reasonable to conclude that once they return from the period of leave (or during the time they are working if it is intermittent leave), they will be able to perform the essential functions of the job, with or without additional reasonable accommodations, or will be "qualified" under the second part of the PWFA definition.[43]

*1636.3(f)(2) Qualified Employee—Temporary Suspension of an Essential Function(s)*

37. The PWFA provides that an employee can meet the definition of "qualified" even if they cannot perform one or more essential functions of the position in question with or without a reasonable accommodation, provided three conditions are met: (1) the inability to perform an essential function(s) is for a temporary period; (2) the essential function(s) could be performed in the near future; and (3) the inability to perform the

---

[30] 42 U.S.C. 2000gg(4); 29 CFR 1636.3(a)(2).

[31] 29 CFR 1636.3(a)(2).

[32] *Id.*

[33] By contrast, normal weight gain during pregnancy that necessitates a larger uniform would be a "limitation" but not a "related medical condition."

[34] 42 U.S.C. 2000gg(4); see also *infra* in the Interpretive Guidance in section *1636.7(a)(1)* under *The PWFA and the ADA.*

[35] See 42 U.S.C. 12102(4)(E).

[36] See 29 CFR 1630.2(j)(1)(vi) and (j)(4)(ii); see also 29 CFR part 1630, appendix, 1630.2(j)(1)(vi).

[37] The PWFA does not address prerequisites for a position. Whether an employee is qualified for the position in question is determined based on whether the employee can perform the essential functions of the position, with or without a reasonable accommodation, or based on the second part of the PWFA's definition of "qualified." 42 U.S.C. 2000gg(6).

[38] 42 U.S.C. 2000gg(6).

[39] 42 U.S.C. 2000gg(6)(A)–(C).

[40] See 29 CFR part 1630, appendix, 1630.2(m).

[41] See 29 CFR part 1630, appendix, 1630.2(m).

[42] *US Airways, Inc.* v. *Barnett*, 535 U.S. 391, 401–02 (2002); *see, e.g., Shapiro* v. *Twp. of Lakewood*, 292 F.3d 356, 360 (3d Cir. 2002) (citing the definition from *Barnett*); *Osborne* v. *Baxter Healthcare Corp.*, 798 F.3d 1260, 1267 (10th Cir. 2015) (citing the definition from *Barnett*); *EEOC* v. *United Airlines, Inc.*, 693 F.3d 760, 762 (7th Cir. 2012) (citing the definition from *Barnett*); *see also Enforcement Guidance on Reasonable Accommodation, supra* note 12, at text accompanying nn.8–9 (citing the definition from *Barnett*).

[43] If the employee will not be able to perform all of the essential functions at the end of the leave period, with or without accommodation, the employee may still be qualified under the second part of the PWFA definition of qualified employee. 42 U.S.C. 2000gg(6).

essential function(s) can be reasonably accommodated.[44]

38. Based on the overall structure and wording of the statute, the second part of the definition of "qualified" is relevant only when an employee cannot perform one or more essential functions of the job in question, even with a reasonable accommodation, due to a known limitation under the PWFA. It is not relevant in any other circumstance. If the employee can perform the essential functions of the position with or without a reasonable accommodation, the first definition of "qualified" applies (i.e., able to do the job with or without a reasonable accommodation). For example, if a pregnant employee requests additional restroom breaks, they are qualified if they can perform the essential functions of the job with the reasonable accommodation of additional restroom breaks, and, if so, there is no need to reach the second part of the definition of "qualified," i.e., to apply definitions of "temporary" or "in the near future," or to determine whether the inability to perform an essential function(s) can be reasonably accommodated (as no such inability exists).

39. By contrast, some examples of situations where the second part of the definition of "qualified" may be relevant include: (1) a pregnant construction worker is told by their health care provider to avoid lifting more than 20 pounds during the second through ninth months of pregnancy, an essential function of the worker's job requires lifting more than 20 pounds, and there is not a reasonable accommodation that will allow the employee to perform that function without lifting more than 20 pounds; and (2) a pregnant police officer is unable because of their pregnancy to perform patrol duties during the third through ninth months of pregnancy, patrol duties are an essential function of the job, and there is not a reasonable accommodation that will allow the employee to perform the patrol duties.

40. This definition is solely concerned with determining whether an individual is "qualified." An employer must still defend the failure to provide the reasonable accommodation based on undue hardship.

*1636.3(f)(2)(i) Temporary*

41. "Temporary" means that the need to suspend one or more essential functions is "lasting for a limited time,[45] not permanent,

and may extend beyond 'in the near future.'"[1] How long it may take before the essential function(s) can be performed is further limited by the definition of "in the near future."

*1636.3(f)(2)(ii) In the Near Future*

42. An employee can be qualified under the exception in 42 U.S.C. 2000gg(6)(A)–(C) if they could perform the essential function(s) "in the near future." In explaining the inclusion of this additional definition of "qualified," the House Report analogized the suspension of an essential function under the PWFA to cases under the ADA regarding leave; "in the near future" is a term some courts have used in the context of determining whether an employee can perform the essential functions of the job with a reasonable accommodation of leave and, therefore, is qualified under the ADA.[46] These ADA leave cases provide some helpful guideposts to interpret this term in the PWFA. Under the ADA, courts have concluded that an employee who needs indefinite leave (that is, leave for a period of time that they cannot reasonably estimate under the circumstances) cannot perform essential job functions "in the near future."[47] Similarly, the Commission concludes that a need under the PWFA to indefinitely suspend an essential function(s) cannot reasonably be considered to meet the standard of an employee who could perform the essential function(s) "in the near future."[48]

43. Pregnancy is a temporary condition with an ascertainable end date; the request to temporarily suspend an essential function(s) due to a current pregnancy will never be

indefinite and will not be more than generally 40 weeks. Thus, for a current pregnancy, § 1636.3(f) defines "in the near future" to mean generally 40 weeks from the start of the temporary suspension of an essential function(s). To define "in the near future" as less than generally 40 weeks—i.e., the duration of a full-term pregnancy—would run counter to a central purpose of the PWFA of keeping pregnant employees in the workforce even when pregnancy, childbirth, or related medical conditions necessitate the reasonable accommodation of temporarily suspending the performance of one or more essential functions of a job.[49]

44. The Commission emphasizes that the definition in § 1636.3(f)(2)(ii) does not mean that the essential function(s) always must be suspended for 40 weeks, or that if an employee seeks the temporary suspension of an essential function(s) for 40 weeks the employer must automatically grant it. The actual length of the temporary suspension of the essential function(s) will depend upon what the employee requires, and the covered entity always has available the defense that it would create an undue hardship. However, the mere fact that the temporary suspension of one or more essential functions is needed for any time period up to and including generally 40 weeks for a pregnant employee will not, on its own, render an employee unqualified under the PWFA.

45. For conditions other than a current pregnancy, the Commission is not setting a specific length of time for "in the near future" because, unlike a current pregnancy, there is not a consistent measure of how long these diverse conditions generally can last, and thus, what "in the near future" might mean in different instances.

46. The Commission notes that beyond an agreement that an indefinite amount of time does not meet the standard of "in the near future," how long a period of leave may be under the ADA and still be a reasonable accommodation (thus, allowing the individual to remain qualified) varies.[50] The

---

[44] 42 U.S.C. 2000gg(6); *see* H.R. Rep. No. 117–27, pt. 1, at 27 ("[T]he temporary inability to perform essential functions due to pregnancy, childbirth, or related medical conditions does not render a worker 'unqualified.' . . . [T]here may be a need for a pregnant worker to temporarily perform other tasks or otherwise be excused from performing essential functions before fully returning to her position once she is able.").

[45] *Temporary, Merriam-Webster.com, https:// www.merriam-webster.com/dictionary/temporary* (last visited Mar. 13, 2024) (defining "temporary" as "lasting for a limited time"). This definition is consistent with logic in the House Report, which states that "the temporary inability to perform essential functions due to pregnancy, childbirth, or related medical conditions does not render a worker 'unqualified'" and cites to *Robert* v. *Board of County Commissioners of Brown County,* 691 F.3d 1211, 1218 (10th Cir. 2012). *See* H.R. Rep. No. 117–27, pt. 1, at 27, n.109.

[46] H.R. Rep. No. 117–27, pt. 1, at 27–28. As explained *infra,* this definition of "qualified" at 42 U.S.C. 2000gg(6)(A)–(C) is not used to determine "qualified" for the purposes of leave under the PWFA.

[47] *See, e.g., Herrmann* v. *Salt Lake City Corp.,* 21 F.4th 666, 676–77 (10th Cir. 2021); *Cisneros* v. *Wilson,* 226 F.3d 1113, 1129 (10th Cir. 2000), *overruled on other grounds by Bd. of Trs. of Univ. of Ala.* v. *Garrett,* 531 U.S. 356 (2001). The Commission cites these ADA cases because they use the term "in the near future" in a related context (employees are "qualified" for leave under the ADA because the leave will allow them to return to work and perform essential functions "in the near future"). The Commission emphasizes its position, as discussed below, that under both the PWFA and the ADA, leave provided as an accommodation does not constitute a suspension of an essential function. Thus, under the PWFA, in determining whether an essential function could be performed "in the near future," the period of time during which an employee may be on leave is not included in the assessment. Likewise, in determining whether an individual is qualified for leave as a reasonable accommodation under the PWFA, the statutory term "in the near future" is not relevant.

[48] However, the Commission notes that the employee's inability to pinpoint the exact date when they expect to be able to perform the essential functions of the position, or their ability to provide only an estimated range of dates, does not make the temporary suspension of the essential function(s) "indefinite" or mean that they cannot perform the job's essential functions "in the near future." The fact that an exact date is not necessary is supported by the language in the statute, which requires that the essential function(s) "could" be performed in the near future. 42 U.S.C. 2000gg(6)(B).

[49] *See* H.R. Rep. No. 117–27, pt. 1, at 5 ("When pregnant workers do not have access to reasonable workplace accommodations, they are often forced to choose between their financial security and a healthy pregnancy. Ensuring that pregnant workers have access to reasonable accommodations will promote the economic well-being of working mothers and their families and promote healthy pregnancies."); *id.* at 22 ("When pregnant workers are not provided reasonable accommodations on the job, they are oftentimes forced to choose between economic security and their health or the health of their babies."); *id.* at 24 ("Ensuring pregnant workers have reasonable accommodations helps ensure that pregnant workers remain healthy and earn an income when they need it the most."); *id.* at 33 ("The PWFA is about ensuring that pregnant workers can stay safe and healthy on the job by being provided reasonable accommodations for pregnancy, childbirth, or related medical conditions . . . . The PWFA is one crucial step needed to reduce the disparities pregnant workers face by ensuring that pregnant women, and especially pregnant women of color, can remain safe and healthy at work.").

[50] *See, e.g., Robert,* 691 F.3d at 1218 (citing a case in which a 6-month leave request was too long to be a reasonable accommodation but declining to address whether, in the instant case, a further exemption following the 6-month temporary

Commission believes, however, that depending on the facts of a case, leave cases that allow for a longer period are more relevant to the determination of "in the near future" under the PWFA for three reasons. First, what constitutes "in the near future" may differ depending on factors, including but not limited to, the known limitation and the employee's position. For example, an employee whose essential job functions require lifting only during the summer months would remain qualified even if unable to lift during a 7-month period over the fall, winter, and spring months because the employee could perform the essential function "in the near future" (in this case, as soon as the employee was required to perform that function). Second, the determination of whether the employee could resume the essential functions of their position in the near future is only one step in the definition of qualified; standing alone, it does not require the employer to provide an accommodation. If the temporary suspension cannot be reasonably accommodated, or if the temporary suspension causes an undue hardship, the employer is not required to provide it.[51]

accommodation at issue would exceed "reasonable durational bounds") (citing *Epps* v. *City of Pine Lawn,* 353 F.3d 588, 593 (8th Cir. 2003)); *see also Blanchet* v. *Charter Commc'ns, LLC,* 27 F.4th 1221, 1225–26, 1230–31 (6th Cir. 2022) (determining that a pregnant employee who developed postpartum depression and requested a 5-month leave after her initial return date, and was fired after requesting an additional 60 days of leave could still be "qualified," as additional leave could have been a reasonable accommodation); *Cleveland* v. *Fed. Express Corp.,* 83 F. App'x 74, 76–81 (6th Cir. 2003) (declining "to adopt a bright-line rule defining a maximum duration of leave that can constitute a reasonable accommodation" and determining that a 6-month medical leave for a pregnant employee with systemic lupus could be a reasonable accommodation); *Garcia-Ayala* v. *Lederle Parenterals, Inc.,* 212 F.3d 638, 641–42, 646–49 (1st Cir. 2000) (reversing the district court's finding that a secretary was not a "qualified individual" under the ADA because additional weeks of unpaid leave could be a reasonable accommodation, even though she had already taken over year of medical leave for breast cancer treatment, and rejecting per se rules as to when additional medical leave is unreasonable); *Nunes* v. *Wal-Mart Stores, Inc.,* 164 F.3d 1243, 1245–1247 (9th Cir. 1999) (opining that, because extending leave to 9 months to treat a fainting disorder could be a reasonable accommodation, an employee's inability to work during that period of leave did not automatically render her unqualified); *Cayetano* v. *Fed. Express Corp.,* No. 1:19–CV–10619, 2022 WL 2467735, at *1–*2, *4–*7 (S.D.N.Y. July 6, 2022) (determining that an employee who underwent shoulder surgery could be "qualified" because 6 months of leave is not per se unreasonable as a matter of law); *Durrant* v. *Chemical/Chase Bank/Manhattan Bank, N.A.,* 81 F. Supp. 2d 518, 519, 521–22 (S.D.N.Y. 2000) (concluding that an employee who was on leave for nearly 1 year due to a leg injury and extended her leave to treat a psychiatric condition could be "qualified" under the ADA with the accommodation of additional leave of reasonable duration).

[51] The Commission is aware of and disagrees with ADA cases that held, for example, that 2 to 3 months of leave following a 12-week FMLA period was presumptively unreasonable as an accommodation. *See, e.g., Severson* v. *Heartland Woodcraft, Inc.,* 872 F.3d 476, 481 (7th Cir. 2017). In any event, such cases have no bearing on the

Third, as detailed in the notice of proposed rulemaking (NPRM), especially in the first year after giving birth, employees may experience serious health issues related to their pregnancy that may prevent them from performing the essential functions of their positions.[52] Accommodating these situations and allowing employees to stay employed are among the key purposes of the PWFA.

47. Further, the Commission recognizes that employees may need an essential function(s) temporarily suspended because of a current pregnancy; take leave to recover from childbirth; and, upon returning to work, need the same essential function(s) or a different one temporarily suspended due to the same or a different physical or mental condition related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions. In keeping with the requirement that the determination of whether an individual is qualified under the PWFA should be made at the time of the employment decision,[53] the determination of "in the near future" should be made when the employee asks for each accommodation that requires the suspension of one or more essential functions. Thus, an employee who is 3 months pregnant and who is seeking an accommodation of the temporary suspension of an essential function(s) due to a limitation related to pregnancy will meet the definition of "in the near future" because the inability to perform the essential function(s) will end in less than 40 weeks. When the employee returns to work from leave after childbirth, if the employee needs an essential function temporarily suspended for a reason related to pregnancy, childbirth, or related medical conditions, there should be a new determination made as to whether the employee is qualified under § 1636.3(f)(2). In other words, there is a new calculation of "in the near future" with the new employment decision that involves the temporary suspension of an essential function(s).[54]

48. Determining "in the near future" in the definition of "qualified" when the employment decision is made is necessary because it would often be difficult, if not impossible, for a pregnant employee to predict what their limitations (if any) will be when returning to work after pregnancy. While pregnant, they may not know whether and, if so, for how long, they will have a known limitation or need an accommodation. They also may not know whether an accommodation after returning to work will

determination of "in the near future" under the definition of "qualified" for the PWFA because this definition expressly contemplates temporarily suspending one or more essential functions.

[52] 88 FR 54724–25; *see, e.g.,* Susanna Trost et al., U.S. Dep't of Health & Hum. Servs., Ctrs. for Disease Control & Prevention. *Pregnancy-Related Deaths: Data from Maternal Mortality Review Committees in 36 U.S. States, 2017–2019* (2022), *https://www.cdc.gov/reproductivehealth/maternal-mortality/erase-mm/data-mmrc.html* (stating that 53% of pregnancy-related deaths occurred from one week to one year after delivery, and 30% occurred one- and one-half months to one year postpartum).

[53] *See* 29 CFR part 1630, appendix, 1630.2(m).

[54] There is a new calculation regardless of whether the employee seeks to temporarily suspend the same essential function that was suspended during pregnancy or a different one.

require the temporary suspension of an essential function(s), and, if so, for how long. All of these questions may be relevant under the PWFA's second definition of "qualified."

49. Leave as a reasonable accommodation (*e.g.,* for recovery from pregnancy, childbirth, or related medical conditions or any other purpose) does not count as time when an essential function(s) is suspended and, thus, is not relevant for the second part of the definition of "qualified" (§ 1636.3(f)(2)). If an individual needs leave as a reasonable accommodation under the PWFA or, indeed, any reasonable accommodation other than the temporary suspension of an essential function(s), only the first part of the definition of "qualified" is relevant (§ 1636.3(f)(1)). In the case of leave, the question would be whether the employee, after returning from the requested period of leave, would be able to perform the essential functions of the position with or without reasonable accommodation (or, if not, if the inability to perform the essential function(s) is for a temporary period, the essential function(s) could be performed in the near future, and the inability to perform the essential function(s) can be reasonably accommodated). Furthermore, for some employees, leave to recover from childbirth will not require a reasonable accommodation because they have a right to leave under Federal, State, or local law or under an employer's policy.[55]

*1636.3(f)(2)(iii) Can Be Reasonably Accommodated*

50. The second part of the PWFA's definition of "qualified" further requires that the suspension "can be reasonably accommodated."[56] For some positions, this may mean that one or more essential functions are temporarily suspended, with or without assigning the essential function(s) to someone else, and the employee continues to perform the remaining functions of the job. For other positions, some of the essential function(s) may be temporarily suspended, with or without assigning the essential function(s) to someone else, and the employee may be given other tasks to replace them. In other situations, one or more essential functions may be temporarily suspended, with or without giving the essential function(s) to someone else, and the employee may perform the functions of a different job to which the employer temporarily transfers or moves them, or the employee may participate in the employer's light or modified duty program.[57]

51. Examples Regarding § 1636.3(f)(2):
*Example #1/Definition of "Qualified":* One month into pregnancy, Akira, an employee in

[55] For additional information on how leave should be addressed under the PWFA, *see infra* in the Interpretive Guidance in section *1636.3(h)* under *Particular Matters Regarding Leave as a Reasonable Accommodation.*

[56] 42 U.S.C. 2000gg(6)(C).

[57] *See* H.R. Rep. No. 117–27, pt. 1, at 27 ("[T]he temporary inability to perform essential functions due to pregnancy, childbirth, or related medical conditions does not render a worker 'unqualified.' . . . [T]here may be a need for a pregnant worker to temporarily perform other tasks or otherwise be excused from performing essential functions before fully returning to her position once she is able.").

a paint manufacturing plant, is told by her health care provider that she should avoid certain chemicals for the remainder of the pregnancy. One of several essential functions of the job involves regular exposure to these chemicals. Akira talks to her supervisor, explains her limitation, and asks that she be allowed to continue to perform her other tasks that do not require exposure to the chemicals.

1. Known limitation and request for accommodation: Akira's need to avoid exposure to chemicals is a physical or mental condition related to, affected by, or arising out pregnancy, childbirth, or related medical conditions; Akira needs an adjustment or change at work due to the limitation; and Akira has communicated this information to her employer.

2. Qualified: If modifications that would allow Akira to continue to perform the essential functions of her position (such as enclosing the chemicals, providing a local exhaust vent, or providing additional personal protective gear) are not effective or cause an undue hardship, Akira can still be qualified under the definition that allows for a temporary suspension of an essential function(s).

a. Akira's inability to perform the essential function(s) is temporary.

b. Akira can perform the essential function(s) of her job in the near future because she is pregnant and needs an essential function(s) suspended for less than 40 weeks.

c. Akira's inability to perform the essential function(s) may be reasonably accommodated. The employer can suspend the essential function(s) that requires her to work with the chemicals, while allowing her to do the remainder of her job.

*Example #2/Definition of "Qualified":* Two months into a pregnancy, Lydia, a delivery driver, is told by her health care provider that she should adhere to clinical guidelines for lifting during pregnancy, which means she should not continue to lift 30–40 pounds, which she routinely did at work when moving packages as part of the job. She discusses the limitation with her employer. The employer is unable to provide Lydia with assistance in lifting packages, and Lydia requests placement in the employer's light duty program, which is used for drivers who have on-the-job injuries.

1. Known limitation and request for accommodation: Lydia's lifting restriction is a physical or mental condition related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions; she needs an adjustment or change at work due to the limitation; and she has communicated this information to the employer.

2. Qualified: Lydia needs the temporary suspension of an essential function(s).

a. Lydia's inability to perform the essential function(s) is temporary.

b. Lydia can perform the essential function(s) of her job in the near future because Lydia is pregnant and needs an essential function(s) suspended for less than 40 weeks.

c. Lydia's need to temporarily suspend an essential function(s) may be reasonably accommodated through the existing light duty program.

*Example #3/Definition of "Qualified":* Olga's position as a carpenter involves lifting heavy wood that weighs more than 20 pounds. Upon returning to work after giving birth, Olga tells her supervisor that she has a lifting restriction of 10 pounds due to her cesarean delivery. The restriction is for 8 weeks. The employer does not have an established light duty program but does have other design or administrative duties that Olga can perform.

1. Known limitation and request for accommodation: Olga's lifting restriction is a physical or mental condition related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions; she needs an adjustment or change at work due to the limitation; and she has communicated this information to the employer.

2. Qualified: Olga needs the temporary suspension of an essential function(s).

a. Olga's inability to perform the essential function(s) is temporary.

b. Olga can perform the essential function(s) of her job in the near future because she needs the essential function(s) suspended for 8 weeks.[58]

c. Olga's need to temporarily suspend an essential function(s) of her job may be reasonably accommodated by temporarily suspending the essential function(s) and temporarily assigning Olga to design or administrative duties.

*Example #4/Definition of "Qualified":* One of the essential functions of Elena's position as a park ranger involves patrolling the park. Park rangers also answer questions for guests, sell merchandise, and explain artifacts and maps. Due to her postpartum depression, Elena is experiencing an inability to sleep, severe anxiety, and fatigue. Her anti-depressant medication also is causing dizziness and blurred vision, which make it difficult to drive. Elena seeks the temporary suspension of the essential function of patrolling the park for 12 weeks.

1. Known limitation and request for accommodation: Elena's inability to sleep, anxiety, fatigue, dizziness, and blurred vision are physical or mental conditions related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions; she needs an adjustment or change at work due to the limitation; and she has communicated this information to the employer.

2. Qualified: Elena needs the temporary suspension of an essential function(s).

a. Elena's inability to perform the essential function(s) is temporary.

b. Elena can perform the essential function(s) of her job in the near future because she needs an essential function(s) suspended for 12 weeks.[59]

c. Elena's need to temporarily suspend an essential function(s) of her job may be reasonably accommodated by temporarily suspending the essential function(s) and temporarily assigning Elena to duties such as answering questions and selling merchandise at the visitor's center.

*Example #5/Definition of "Qualified":* Tamara's position at a retail establishment involves working as a cashier and folding and putting away clothing. In her final trimester of pregnancy, Tamara develops carpal tunnel syndrome that makes gripping objects and buttoning clothing difficult. Tamara seeks the temporary suspension of the essential functions of folding and putting away clothing. The employer provides the accommodation and temporarily assigns Tamara to greeting and assisting customers, tasks that cashiers are normally assigned to on a rotating basis. When she returns to work after she gives birth, Tamara continues to experience carpal tunnel symptoms, which her doctor believes will cease in approximately 16 weeks.

1. Known limitation and request for accommodation: Tamara's inability to grip objects and button clothing are physical or mental conditions related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions; she needs an adjustment or change at work due to the limitation; and she has communicated this information to the employer.

2. Qualified: Tamara needs the temporary suspension of an essential function(s).

a. Tamara's inability to perform the essential function(s) is temporary.

b. Tamara can perform the essential functions of her job in the near future because she needs an essential function(s) suspended for 16 weeks.[60]

c. Tamara's need to temporarily suspend an essential function(s) of her job may be reasonably accommodated by temporarily suspending the essential function(s) and temporarily assigning Tamara to duties such as greeting and assisting customers.

### 1636.3(g) Essential Functions

52. Section 1636.3(g) adopts the Commission's definition of "essential functions" contained in the regulation implementing the ADA.[61] Thus, in determining whether something is an essential function, the first consideration is whether employees in the position actually are required to perform the function. This consideration will generally include one or more of the factors listed in § 1636.3(g)(1), although this list is non-exhaustive. Relevant evidence as to whether a particular function

---

[58] *See Cehrs* v. *Ne. Ohio Alzheimer's Rsch. Ctr.,* 155 F.3d 775, 781–783 (6th Cir. 1998) (determining that an employee suffering from severe psoriasis who was on an 8-week leave of absence and requested an additional 1-month leave could be "otherwise qualified" under the ADA).

[59] *See Criado* v. *IBM Corp.,* 145 F.3d 437, 443–43 (1st Cir. 1998) (concluding that an employee with severe anxiety and depression who was on leave for approximately 6 weeks and requested an extension of temporary leave was "qualified" under the ADA); *Durrant,* 81 F. Supp. 2d at 519, 521–22 (concluding that an employee who was on leave for

nearly 11 months due to a leg injury and extended her leave to treat a psychiatric condition could be "qualified" under the ADA); *Powers* v. *Polygram Holding,* 40 F. Supp. 2d 195, 199 (S.D.N.Y. 1999) (determining that an employee experiencing bipolar disorder who requested a total of 17 weeks of leave could be "qualified" under the ADA).

[60] *See Rascon* v. *U.S. W. Commc'ns, Inc.,* 143 F.3d 1324, 1333 (10th Cir. 1998) (agreeing that an employee diagnosed with post-traumatic stress disorder who requested a 4-month leave for a treatment program was a "qualified" individual under the ADA), *abrogated on other grounds by New Hampshire* v. *Maine,* 532 U.S. 742 (2001).

[61] *See* 29 CFR 1630.2(n).

is essential includes, but is not limited to, information from the employer (such as the position description) and information from incumbents (including the employee requesting the accommodation) about what they actually do on the job.[62] This includes whether employees in the position actually will be required to perform the function during the time for which an accommodation is expected to be needed. The list of factors in § 1636.3(g)(2) is not exhaustive, and other relevant evidence also may be presented. No single factor is dispositive, and greater weight will not be granted to the types of evidence included on the list than to the types of evidence not listed.[63]

### 1636.3(h) Reasonable Accommodation—Generally

#### 1636.3(h)(1) Definition of Reasonable Accommodation

53. The statute at 42 U.S.C. 2000gg(7) states that the term "reasonable accommodation" has the meaning given to it in section 101 of the ADA[64] and shall be construed as it is construed under the ADA and the Commission's regulation implementing the PWFA. Thus, under the PWFA, as under the ADA, the obligation to make reasonable accommodation is a form of non-discrimination and is therefore best understood as a means by which barriers to the equal employment opportunity are removed or alleviated.[65] A modification or adjustment is reasonable if it "seems reasonable on its face, i.e., ordinarily or in the run of cases"; this means it is "reasonable" if it appears to be "feasible" or "plausible."[66] An accommodation also must be effective in meeting the qualified employee's needs, meaning it removes a work-related barrier and provides the employee with equal employment opportunity.[67]

54. Under the PWFA, "reasonable accommodation" has the same definition as under the ADA, with the exceptions noted in items (1) through (3) of this paragraph.[68] Therefore, like the ADA, reasonable accommodation under the PWFA includes: (1) modifications or adjustments to the job application process that enable a qualified applicant with a known limitation to be considered for the position; (2) modifications or adjustments to the work environment, or to the manner or circumstances under which the position is preformed to allow a qualified employee with a known limitation to perform the essential functions of the job; and (3) modifications or adjustments that enable an employee with a known limitation to enjoy equal benefits and privileges of employment

as are enjoyed by its other similarly situated employees without known limitations.[69]

55. Because the PWFA also provides for reasonable accommodations when a qualified employee temporarily cannot perform one or more essential functions of a position but can meet the requirements of 42 U.S.C. 2000gg(6)(A)–(C), reasonable accommodations under the PWFA also include modifications or adjustments that allow a qualified employee with a known limitation to temporarily suspend one or more essential functions of the position. This can be either through the essential function(s) being suspended or through the essential function(s) being suspended and the employee doing other work as set out in § 1636.3(f)(2)(iii).

#### 1636.3(h)(2) How To Request a Reasonable Accommodation

56. To request a reasonable accommodation, the employee (or the employee's representative) must communicate to the employer that they need an adjustment or change at work due to their known limitation (a physical or mental condition related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions). Section 1636.3(d) applies to communications to request a reasonable accommodation. An employee may use plain language and need not mention the PWFA. An employee does not have to use the phrases "reasonable accommodation," "limitation," "known limitation," "qualified," or "essential function"; use any medical terminology; provide a specific medical condition; use any other specific words or phrases; or put the

explanation of the need for accommodation in the form of a request.

57. In these examples, the employee is communicating both their limitation and that they need an adjustment or change at work due to the limitation. The Commission expects that in the vast majority of cases these two communications will happen at the same time. All of these are examples of requests for reasonable accommodations under the PWFA.

*Example #6:* A pregnant employee tells her supervisor, "I'm having trouble getting to work at my scheduled starting time because of morning sickness."

*Example #7:* An employee who gave birth 3 months ago tells the person who assigns her work at the employment agency, "I need an hour off once a week for treatments to help with my back problem that started during my pregnancy."

*Example #8:* An employee tells a human resources specialist that they are worried about continuing to lift heavy boxes because they are concerned that it will harm their pregnancy.

*Example #9:* At the employee's request, an employee's spouse requests light duty for the employee because the employee has a lifting restriction related to pregnancy; the employee's spouse uses the employer's established process for requesting a reasonable accommodation.

*Example #10:* An employee tells a manager of her need for more frequent bathroom breaks, explains that the breaks are needed because the employee is pregnant, but does not complete the employer's online form for requesting an accommodation.

*Example #11:* An employee tells a supervisor that she needs time off to recover from childbirth.

### Alleviating Increased Pain or Risk to Health Due to the Known Limitation

58. One reason an employee may seek a reasonable accommodation is to alleviate increased pain or risk to health that is attributable to the physical or mental condition related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions that has been communicated to the employer (the known limitation).[70] When dealing with requests for accommodation concerning the alleviation of increased pain or risk to health associated with a known limitation, the goal is to provide an accommodation that allows the qualified employee to alleviate the identified pain or risk to health.

59. Examples Regarding Alleviating Pain or Risk to Health Due to the Known Limitation:

*Example #12/Alleviating Pain or Risk to Health:* Celia is a factory worker whose job requires her to regularly move boxes that weigh 50 pounds. Prior to her pregnancy, Celia occasionally felt pain in her knee when she walked for extended periods of time. When Celia returns to work after giving birth,

---

[62] *See* 29 CFR 1630.2(n); 29 CFR part 1630, appendix, 1630.2(n).

[63] *See* 29 CFR part 1630, appendix, 1630.2(n).

[64] *See* 42 U.S.C. 12111(9).

[65] *See* 29 CFR part 1630, appendix 1630.9.

[66] *See Enforcement Guidance on Reasonable Accommodation, supra* note 12, at General Principles (quoting *Barnett,* 535 U.S. at 403–06).

[67] *See Enforcement Guidance on Reasonable Accommodation, supra* note 12, at General Principles & Question 9; 29 CFR part 1630, appendix, 1630.9.

[68] *See* 42 U.S.C. 2000gg(7).

[69] *See* 29 CFR 1630.2(o)(1)(i) through (iii). The requirement for employers to provide reasonable accommodations when requested that provide for equal benefits and privileges encompasses the requirement that an accommodation should provide the individual with an equal employment opportunity. 29 CFR part 1630, appendix, 1630.9. This requirement stems from the ADA's prohibition on discrimination in "terms, conditions, and privileges of employment." 42 U.S.C. 12112(a). The PWFA prohibits adverse action in the terms, conditions, or privileges of employment against a qualified employee for using or requesting an accommodation and Title VII—which applies to employees affected by pregnancy, childbirth, or related medical conditions—prohibits discrimination in the terms, conditions, or privileges of employment. *See* 42 U.S.C. 2000e–2(a)(1). Based on the text of the PWFA, Title VII, and the requirement under the PWFA that reasonable accommodation has the same definition as in the ADA, the same requirement applies. Thus, a reasonable accommodation under the PWFA includes a change to allow employees affected by pregnancy, childbirth, or related medical conditions nondiscrimination in the terms, conditions, or privileges of employment or, in shorthand, to enjoy equal benefits and privileges. *See also* EEOC, *Compliance Manual Section 613 Terms, Conditions, and Privileges of Employment,* 613.1(a) (1982) [hereinafter *Compliance Manual on Terms, Conditions, and Privileges of Employment*], *https://www.eeoc.gov/laws/guidance/cm-613-terms-conditions-and-privileges-employment* (providing that "terms, conditions, and privileges of employment" are "to be read in the broadest possible terms" and "a distinction is rarely made between terms of employment, conditions of employment, or privileges of employment").

[70] Depending on the facts of the case, the accommodation sought will allow an applicant to apply for the position, or an employee to perform the essential functions of the job, to enjoy equal benefits and privileges of employment, or to temporarily suspend an essential function(s) of the job.

which was by cesarean section, Celia requests that she limit tasks to those that do not require moving boxes of more than 30 pounds for 3 months because heavier lifting could increase the risk to her health and her continued recovery from childbirth. Under the PWFA, the employer is required to provide the requested accommodation (or another reasonable accommodation) absent undue hardship. However, under the PWFA, the employer would not be required to provide an accommodation for Celia's knee pain unless it was related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions. The employer also may have accommodation responsibilities regarding Celia's knee pain and lifting restrictions under the ADA.

*Example #13/Alleviating Pain or Risk to Health:* Emily is a candidate for a police officer position. The application process takes place over several months and has multiple steps, one of which is a physical agility test. By the time it is Emily's turn to take the test, she is 7 months pregnant. To avoid risk to her health and the health of her pregnancy, Emily asks that the test be postponed and that her application be kept active so that once she has recovered from childbirth, she can resume the application process and not have to re-apply. Under the PWFA, the employer is required to provide the requested accommodation (or another reasonable accommodation) absent undue hardship.

*Example #14/Alleviating Pain or Risk to Health:* Jackie's position at a fabrication plant involves working with certain chemicals, which Jackie thinks is the reason she has a nagging cough and chapped skin on her hands. For the one year when she is nursing, Jackie seeks the accommodation of a temporary suspension of an essential function—working with the chemicals—because of the risk that the chemicals will contaminate the milk she produces. The employer provides the accommodation. After Jackie stops nursing, she no longer has any known limitations. Thus, under the PWFA, she can be assigned to work with the chemicals again even if she would prefer not to do that work, because the PWFA requires an employer to provide an accommodation only if it is needed due to a physical or mental condition related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions. Jackie's employer may have accommodation responsibilities under the ADA.

*Example #15/Alleviating Pain or Risk to Health:* Margaret is a retail worker who is pregnant. Because of her pregnancy, Margaret feels pain in her back and legs when she has to move stacks of clothing from one area to the other, one of the essential functions of her position. She can still manage to move the clothes, but, because of the pain, she requests a cart to use when she is moving the garments. Under the PWFA, the employer is required to provide the requested accommodation (or another reasonable accommodation) absent undue hardship.

*Example #16/Alleviating Pain or Risk to Health:* Lourdes is pregnant and works outdoors as a farmworker. The conditions where she works expose her to certain

chemicals and the conditions can be slippery. Because of her pregnancy, Lourdes has a problem with her balance and is more likely to slip and fall, and she needs to avoid exposure to the chemicals that she is normally exposed to at work. She seeks the accommodation of working indoors, which will allow her to avoid the conditions that could lead her to slip and fall and will allow her to avoid exposure to the chemicals. There is indoor work, which Lourdes is occasionally assigned to perform, available at the farm, as well as work that does not involve chemicals. Under the PWFA, the employer is required to provide the requested accommodation (or another reasonable accommodation) absent undue hardship.

*Example #17/Alleviating Pain or Risk to Health:* Avery works as an administrative assistant and is pregnant. Avery normally works in the office and commutes by driving and public transportation. Due to pregnancy, Avery is experiencing sciatica; commuting is painful because it requires Avery to sit and stand in one position for an extended period of time. Avery seeks the accommodation of teleworking or changing the start and end time of the workday in order to commute during less crowded times and reduce the commute time and thereby reduce the pain. Under the PWFA, the employer is required to provide the requested accommodation (or another reasonable accommodation) absent undue hardship.

*Example #18/Alleviating Pain or Risk to Health:* Arya is pregnant and works in a warehouse. When it is hot outside, the temperature in the warehouse increases to a level that creates a risk to Arya and her pregnancy.[71] Arya seeks an accommodation of a portable cooling device to reduce the risk to her health and the health of her pregnancy because of the heat in her workplace. Under the PWFA, the employer is required to provide the requested accommodation (or another reasonable accommodation) absent undue hardship.

*Example #19/Alleviating Pain or Risk to Health:* Talia is a nurse and is pregnant. The community where she lives is experiencing a surge in cases of a contagious respiratory viral disease that has been shown to increase the risk of negative outcomes for pregnancy. To reduce her risk and the risk to her pregnancy, Talia requests additional protective gear and to not be assigned to patients exhibiting symptoms of this virus. Under the PWFA, the employer is required to provide the requested accommodation (or another reasonable accommodation) absent undue hardship.

Particular Matters Regarding Leave as a Reasonable Accommodation

60. Under the PWFA, leave may be a reasonable accommodation.[72] If an employee requests leave as an accommodation or if

there is no other reasonable accommodation that does not cause an undue hardship, the covered entity should evaluate whether to offer leave as a reasonable accommodation under the PWFA. This is the case even if the covered entity does not offer leave as an employee benefit,[73] the employee is not eligible for leave under the employer's leave policy, or the employee has exhausted the leave the covered entity provides as a benefit (including leave exhausted under a workers' compensation program, the FMLA, or similar State or local laws).[74]

61. The Commission recognizes that there may be situations where an employer provides a reasonable accommodation to a qualified pregnant employee (*e.g.,* a stool, additional breaks, or temporary suspension of one or more essential functions) under the PWFA, and then the employee requests leave as a reasonable accommodation (*e.g.,* to recover from childbirth). In these situations, the covered entity should consider the request for the reasonable accommodation of leave to recover from childbirth in the same manner that it would any other request for leave as a reasonable accommodation. This requires first considering whether the employee will be able to perform the essential functions of the position with or without a reasonable accommodation after the period of leave, or, if not, whether, after the period of leave, the employee will meet the definition of "qualified" under § 1636.3(f)(2).[75]

62. A qualified employee with a known limitation who is granted leave as a reasonable accommodation under the PWFA is entitled to return to their same position unless the employer demonstrates that holding open the position would impose an undue hardship.[76] When the employee is

---

[71] U.S. Dep't of Health & Hum. Servs., Ctrs. for Disease Control & Prevention, *Heat and Pregnant Women* (Aug. 25, 2022), *https://www.cdc.gov/ disasters/extremeheat/heat_and_pregnant_ women.html.*

[72] H.R. Rep. No. 117–27, pt. 1, at 29 (noting that "leave is one possible accommodation under the PWFA, including time off to recover from delivery").

[73] *See Enforcement Guidance on Reasonable Accommodation, supra* note 12, at text preceding Question 17 (explaining that if an employee with a disability needs 15 days of leave and an employer only provides 10 days of paid leave, the employer should allow the employee to use 10 days of paid leave and 5 days of unpaid leave). The Commission has stated in a technical assistance document regarding leave and the ADA that an employer should consider providing unpaid leave to an employee with a disability as a reasonable accommodation even when the employer does not offer leave as an employee benefit. *See* EEOC, *Employer-Provided Leave and the Americans with Disabilities Act,* at text above Example 4 (2016) [hereinafter *Technical Assistance on Employer-Provided Leave*], *https://www.eeoc.gov/laws/ guidance/employer-provided-leave-and-americans-disabilities-act.*

[74] *See supra* note 73. If an employee has a right to leave under the FMLA, an employer policy, or a State or local law, the employee is entitled to leave regardless of whether they request leave as a reasonable accommodation. An employee who needs leave beyond what they are entitled to under those laws or policies may request a reasonable accommodation.

[75] These considerations are relevant only if the leave is needed as a reasonable accommodation. The covered entity should first consider if there is a leave program that covers the need for leave to recover from childbirth and for which the employee is eligible. If there is a leave program that covers the request, the covered entity may not need to assess the employee's ability to perform essential functions upon return from leave under the PWFA.

[76] *See Enforcement Guidance on Reasonable Accommodation, supra* note 12, at Question 18. As

ready to return to work, the employer must allow the individual to return to the same position (assuming that there was no undue hardship in holding it open) if the employee is still qualified (i.e., the employee can perform the essential functions of the position with or without reasonable accommodation under § 1636.3(f)(1) or if the employee meets the definition of "qualified" under § 1636.3(f)(2)).[77]

63. Under the PWFA, an employer does not have to provide a reasonable accommodation if it causes an undue hardship—a significant difficulty or expense. Thus, if an employer can demonstrate that the impact of the leave requested as a reasonable accommodation poses an undue hardship under the factors set out in § 1636.3(j)(2)—for example, because of the impact of its length, frequency, or unpredictable nature, or because of another factor that causes significant difficulty or expense—it does not have to provide the requested leave under the PWFA.

64. Employees must be permitted to choose whether to use paid leave (whether accrued, as part of a short-term disability program, or as part of any other employee benefit) or unpaid leave to the same extent that the covered entity allows employees to choose between these types of leave when they are using leave for reasons unrelated to pregnancy, childbirth, or related medical conditions.[78] Similarly, an employer must continue an employee's health insurance benefits during their leave period to the extent that it does so for other employees in a similar leave status, such as paid or unpaid leave. An employer is not required to provide additional paid leave under the PWFA beyond the amount provided to similarly situated employees.[79]

**Ensuring That Employees Are Not Penalized for Using Reasonable Accommodations**

65. Generally, covered entities are not required to lower production standards for qualified employees receiving accommodations under the PWFA.[80] However, for example, when the reasonable accommodation is leave, the employee may not be able to meet a production standard during the period of leave or, depending on the length of the leave, meet that standard for

under the ADA, if an employer cannot hold a position open during the entire leave period without incurring undue hardship, the employer should consider whether it has a vacant, equivalent position for which the employee is qualified and to which the employee can be reassigned to continue their leave for a specific period of time and then, at the conclusion of the leave, can be returned to this new position.

[77] See id.

[78] A failure to allow an employee affected by pregnancy, childbirth, or related medical conditions to use paid or unpaid leave to the same extent that the covered entity allows employees using leave for reasons unrelated to pregnancy, childbirth, or related medical conditions to do so or a failure to continue health care insurance for an employee affected by pregnancy, childbirth, or related medical conditions to the same extent that a covered entity does for other employees may be a violation of Title VII as well.

[79] See Enforcement Guidance on Reasonable Accommodation, supra note 12, at text after n.48.

[80] See id. at text accompanying n.14.

a defined period of time (e.g., the production standard measures production in 1 year and the employee was on leave for 4 months). Thus, if the reasonable accommodation is leave, the production standard may need to be prorated to account for the reduced amount of time the qualified employee worked.[81]

66. In addition, covered entities making reasonable accommodations must ensure that their ordinary workplace policies or practices—including, but not limited to, attendance policies, productivity quotas, and requirements for mandatory overtime—do not operate to penalize qualified employees for utilizing PWFA accommodations.[82] When a reasonable accommodation involves a pause in work—such as a break, a part-time or other reduced work schedule, or leave— a qualified employee cannot be penalized, or threatened with a penalty, for failing to perform work during that non-work period, including through actions like the assessment of penalty points for time off or discipline for failing to meet a production quota. For example, if a call center employee with a known limitation requests and is granted 2 hours of unpaid leave in the afternoon for rest, the employee's required number of calls may need to be reduced proportionally. Alternatively, the accommodation could allow for the qualified employee to make up the time at a different time during the day so that the employee's production standards and pay would not be reduced, as long as this would not make the accommodation ineffective.

67. Similarly, policies that monitor employees for time on task (whether through automated means or otherwise) and penalize them for being off task may need to be modified to avoid imposing penalties for non-work periods that the qualified employee was granted as a reasonable accommodation. This includes situations in which hours worked or time on task are used to measure traits like "productivity," "focus," "availability," or "contributions." For example, if, as a reasonable accommodation, a qualified employee is excused from working overtime, and "availability" or "contribution" is measured by an employee's overtime hours, a qualified employee should not be penalized in those categories.

68. If an accommodation under the PWFA involves the temporary suspension of an essential function(s) of the position, a covered entity may not penalize a qualified employee for not performing the essential function(s) that has been temporarily suspended. So, for example, a covered entity must not penalize a qualified employee for not meeting a production standard related to the performance of the essential function(s) that has been temporarily suspended.

69. Penalizing an employee in these situations could render the accommodation ineffective, thus making the covered entity liable for failing to make reasonable accommodation.[83] It also may be an adverse

[81] See id. at Question 19.

[82] See id.

[83] See Enforcement Guidance on Reasonable Accommodation, supra note 12, at Question 19; see

action in the terms, conditions, or privileges of employment or retaliation.[84]

70. The following examples illustrate situations where penalizing an employee may violate 42 U.S.C. 2000gg–1(1) (failing to make reasonable accommodation absent undue hardship), (5) (prohibiting employers from taking adverse action against an employee on account of the employee using a reasonable accommodation), and/or section 2000gg–2(f) (prohibiting retaliation).

Example #20/Not Penalizing Employees: Arisa works in a fulfillment center that tracks employee productivity using personal tracking devices that monitor an employee's time on task and how long it takes an employee to complete a task. If the technology determines that an employee is spending insufficient time on task or taking too long to complete a task, the employee receives a warning, which can escalate to a reprimand and further discipline. Arisa is pregnant and, as a reasonable accommodation, is permitted to take bathroom breaks as necessary. Because the wearable technology determines that due to the approved additional bathroom breaks Arisa is spending insufficient time on task, Arisa receives a warning.

Example #21/Not Penalizing Employees: Hanh works in a call center that has a "no-fault" attendance policy where employees accrue penalty points for all absences and late arrivals, regardless of the reason for the lateness or absence. The policy allows for discipline or termination when an employee accrues enough points within a certain time period. Hanh gave birth and has had some complications that involve heavy vaginal bleeding for which she occasionally needs time off, and she also needs to attend related medical appointments. She sought, and her employer provided, the reasonable accommodations of being able to arrive up to 1 hour late on certain days with time to attend medical appointments. Despite the reasonable accommodations, because of the no-fault policy, Hanh accrues penalty points under the policy, subjecting her to possible discipline or termination.

Example #22/Not Penalizing Employees: Afefa, a customer service agent who is pregnant, requests two additional 10-minute rest breaks and additional bathroom breaks, as needed, during the workday. The employer determines that these breaks would not pose an undue hardship and grants the request. Because of the additional breaks, Afefa responds to three fewer calls during a shift. Afefa's supervisor gives her a lower performance rating because of her decrease in productivity.

Personal Use

71. The obligation to provide reasonable accommodation under the PWFA, like that under the ADA, does not extend to the provision of adjustments or modifications that are primarily for the personal benefit of the qualified employee with a known limitation. However, adjustments or modifications that might otherwise be considered personal may be required as

also 42 U.S.C. 2000gg–1(1) and the regulations in this part.

[84] 42 U.S.C. 2000gg–1(5); 42 U.S.C. 2000gg–2(f).

reasonable accommodations "where such items are specifically designed or required to meet job-related rather than personal needs." [85]

72. For example, if a warehouse employee is pregnant and is having difficulty sleeping, the PWFA would not require as a reasonable accommodation for the employer to provide a pregnancy pillow to help with sleeping because that is strictly for an employee's personal use. However, allowing the employee some flexibility in start times for the workday may be a reasonable accommodation because it modifies an employment-related policy. In a different context, if the employee who is having trouble sleeping works at a job that involves sleeping between shifts on-site, such as a job as a firefighter, sailor, emergency responder, health care worker, or truck driver, a pregnancy pillow may be a reasonable accommodation because the employee is having difficulty sleeping because of the pregnancy, the employer is providing pillows for all employees required to sleep on-site, and the employee needs a modification of the pillows provided.

All Services and Programs

73. Under the PWFA, as under the ADA, the obligation to make reasonable accommodations applies to all services and programs provided in connection with employment and to all non-work facilities provided or maintained by an employer for use by its employees, so that employees with known limitations can enjoy equal benefits and privileges of employment. [86] Accordingly, the obligation to provide reasonable accommodations, barring undue hardship, includes providing access to employer-sponsored placement or counseling services, such as employee assistance programs, to employer-provided cafeterias, lounges, gymnasiums, auditoriums, transportation, and to similar facilities, services, or programs. [87] This includes situations where an employee is traveling for work and may need, for example, accommodations at a different work site or during travel.

Interim Reasonable Accommodations

74. An interim reasonable accommodation can be used when there is a delay in providing the reasonable accommodation. For example, an interim reasonable accommodation may be sought when: there is a sudden onset of a known limitation under the PWFA, sometimes as an emergency, including one that makes it unsafe, risky, or dangerous to continue performing the normal tasks of the job; while the interactive process is ongoing, such as when an employer is waiting for the arrival of ordered equipment; or when the employee is waiting for the employer's decision on the accommodation request.

75. Providing an interim reasonable accommodation is a best practice under the PWFA and may help limit a covered entity's exposure to liability under 42 U.S.C. 2000gg–1(1) (§ 1636.4(a)(1)), or 42 U.S.C. 2000gg–2(f) (§ 1636.5(f)).

76. For example, consider a situation where an employee lets their supervisor know that they are pregnant and need to avoid working with certain chemicals in the workplace. Given the chemicals and the fact that the employee is pregnant, the employee needs the change immediately. In this situation, the best practice is to provide the employee with an interim reasonable accommodation that meets the employee's needs or limitations and allows the employee to perform tasks for the benefit of the employer while the employer determines its response. This is the best possible situation for both the employer and the employee, and the one that the Commission strongly encourages. In addition, this type of interim reasonable accommodation could help mitigate a claim of delay by the employee. [88] The shortcomings and risks of two other approaches an employer might take are addressed in the following scenarios.

• Require the employee to continue to work with the chemicals while the employer determines its response. In this situation, the employee would be forced to work outside of their restrictions. In addition to placing the employee in a situation that the PWFA was enacted to prevent—choosing between their health and the health of their pregnancy on one hand and a paycheck on the other—the covered entity may be risking liability under 42 U.S.C. 2000gg–1(1) (if there is an unnecessary delay in providing the accommodation), and/or State and Federal workplace health and safety laws.

• Require the employee to take leave while the employer determines its response. In this situation, the employee is not exposed to the chemicals, so the risk is mitigated. However, depending on the facts, this option can have a severely detrimental effect on the employee—either because the leave is unpaid or because the employee is forced to use their paid leave. Meanwhile, the employee is unable to perform tasks for the employer.

77. Moreover, depending on the facts, requiring an employee to take unpaid leave or use their leave after they ask for an accommodation and are awaiting a response could lead to a violation of 42 U.S.C. 2000gg–2(f). For example, if the employee is put on unpaid leave, even though there is paid work that the employer reasonably could have given the employee, the employer's decision could be retaliatory because it might well dissuade a reasonable person from engaging in protected activity, such as asking for an accommodation under the PWFA. If the employer's actions were challenged, the employer would have to produce a legitimate, non-discriminatory reason for its actions. The employee could then show that the real reason for the action was retaliation. [89] Because the claim would arise under 42 U.S.C. 2000gg–2(f), the employee

would not have to show that they are qualified under 42 U.S.C. 2000gg(6), and the employer would not have recourse to an undue hardship defense.

78. The possible connection between requiring leave as an interim reasonable accommodation and a potential violation of 42 U.S.C. 2000gg–2(f) is in keeping with the purposes of the PWFA. The PWFA recognizes that historically employees with limitations related to pregnancy, childbirth, or related medical conditions have been required to take leave to their detriment. Thus, 42 U.S.C. 2000gg–1(4) limits the use of leave as a reasonable accommodation, prohibiting employers from requiring qualified employees with known limitations to take leave as a reasonable accommodation where there is another reasonable accommodation that will allow them to remain at work that does not result in an undue hardship.

79. Examples Regarding Interim Reasonable Accommodations:

*Example #23/Interim Reasonable Accommodation:* Alicia is pregnant and works in a fulfillment center. Her job involves regularly moving boxes that weigh 15 to 20 pounds. On her Saturday shift, she informs her supervisor, Michelle, that she is pregnant and that she is worried about lifting these packages while she is pregnant. Michelle recognizes that Alicia is requesting a reasonable accommodation under the PWFA. While Michelle tells Alicia that she needs to wait until Monday to consult with human resources on the next steps, Michelle also immediately offers Alicia a cart to help move the boxes and assigns her to a line that has lighter packages. On Monday, Michelle tells Alicia that she will be provided with a hoist to help Alicia lift packages, but it will take a few days before it is installed. In the meantime, Alicia can continue to use the cart and work the lighter line. Once the hoist arrives, Alicia is able to use it while working on her usual line. If there were an unnecessary delay in providing the reasonable accommodation, and if Alicia were to challenge the delay as constituting a failure to make an accommodation, the employer could argue that the interim reasonable accommodation mitigates its liability.

*Example #24/Interim Reasonable Accommodation:* Nour is pregnant, and she drives a delivery van. Her employer uses vans that do not have air conditioning. It is summer and the temperature is over 100 degrees. Nour tells her supervisor she is pregnant and needs a change at work because of the risk to her health and the health of her pregnancy because of the excessive heat. Her supervisor orders equipment that will help Nour, such as a personal cooling vest or neck fan. While waiting for the equipment to be delivered, the employer does not have other possible work that Nour can do. In this situation, the employer could tell Nour that she may take leave while waiting for the equipment to arrive.

*Example #25/Interim Reasonable Accommodation:* The scenario is the same as described in Example #24, but there is office work that Nour could perform while waiting for the equipment. Further, there is evidence

---

[85] *See* 29 CFR part 1630, appendix, 1630.9.

[86] *See id.*

[87] *See id.*

[88] Section 1636.4(a)(1)(vii).

[89] *See* EEOC, *Enforcement Guidance on Retaliation and Related Issues*, (II)(C)(1)–(3) (discussing causation standard and evidence of causation), (4) (discussing facts that would defeat a claim of retaliation), and (III) (discussing ADA interference claims) (2016) [hereinafter *Enforcement Guidance on Retaliation*], *https://www.eeoc.gov/laws/guidance/enforcement-guidance-retaliation-and-related-issues.*

that the supervisor and others at the covered entity discussed the idea of giving Nour office work but decided against it because then "every woman is going to come in here and demand it." In this situation, failing to provide Nour the opportunity to work in the office could be a violation of 42 U.S.C. 2000gg–2(f).

80. Covered entities that do not provide interim reasonable accommodations are reminded that an unnecessary delay in making a reasonable accommodation, including in responding to the initial request, in the interactive process, or in providing the accommodation may result in a violation of the PWFA if the delay constitutes an unlawful failure to make reasonable accommodation, as set forth in 42 U.S.C. 2000gg–1(1) (§ 1636.4(a)(1)).

*1636.3(i) Reasonable Accommodation—Examples*

81. The definition of "reasonable accommodation" in § 1636.3(h)(1) tracks the meaning of the term from the ADA statute, regulation, and EEOC guidance documents.[90] The PWFA, at 42 U.S.C. 2000gg–3, directs the Commission to issue regulations providing examples of reasonable accommodations addressing known limitations related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions. The Commission notes that a qualified employee may need more than one of these accommodations at the same time, as a pregnancy progresses, or before, during, or after pregnancy. This list of possible reasonable accommodations is non-exhaustive.[91]

• Frequent breaks. The Commission has long construed the ADA to require additional breaks as a reasonable accommodation, absent undue hardship.[92] Under the PWFA, for example, a pregnant employee might need more frequent breaks due to shortness of breath; an employee recovering from childbirth might need more frequent restroom breaks or breaks due to fatigue; an employee who is nursing during work hours, where the regular location of the employee's workplace makes nursing during work hours a possibility because the child is in close proximity (for example, if the employee normally works from home and the child is there or the child is at a nearby or onsite day care center), may need additional breaks to nurse during the workday;[93] or an employee

who is lactating might need more frequent breaks for water, for food, or to pump.[94]

• Sitting/Standing. The Commission has recognized the provision of seating for jobs that require standing and standing for those that require sitting as potential reasonable accommodations under the ADA.[95] Under the PWFA, reasonable accommodation of these needs might include, but is not limited to, policy modifications and the provision of equipment, such as seating, a sit/stand desk, or anti-fatigue floor matting, among other possibilities.

• Schedule changes, part-time work, and paid and unpaid leave. Permitting the use of paid leave (whether accrued, as part of a short-term disability program, or as part of any other employee benefit) or providing unpaid leave is a potential reasonable accommodation under the ADA.[96] Additionally, leave for medical treatment can be a reasonable accommodation.[97] By way of example, under the PWFA an employee could need a schedule change to attend a round of IVF appointments to get pregnant; a part-time schedule to address fatigue during pregnancy; or unpaid leave for recovery from childbirth, medical treatment, postpartum treatment or recuperation related to a cesarean section, episiotomy, infection, depression, thyroiditis, or preeclampsia.

• Telework. Telework (or "remote work" or "work from home") has been recognized by the Commission as a potential reasonable accommodation under the ADA.[98] Under the PWFA, telework could be used to accommodate, for example, a period of bed rest, a mobility impairment, or a need to avoid heightened health risk, such as from a communicable disease.

• Parking. Providing a reserved parking space if the employee is otherwise entitled to use employer-provided parking may be a reasonable accommodation to assist an employee who is experiencing fatigue or limited mobility related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions.

• Light duty. Assignment to light duty or placement in a light duty program has been recognized by the Commission as a potential

reasonable accommodation, even if the employer's light duty positions are normally reserved for those injured on-the-job and the person seeking a light duty position as an accommodation does not have an on-the-job injury.[99]

• Making existing facilities accessible or modifying the work environment.[100] Examples of reasonable accommodations might include allowing access to an elevator not normally used by employees; moving the employee's workspace closer to a bathroom; providing a fan to regulate temperature; moving a pregnant or lactating employee to a different workspace to avoid exposure to chemical fumes; changing the assigned worksite of the employee; or modifying the work space by providing local exhaust ventilation or providing enhanced personal protective equipment and training to reduce exposure to chemical hazards.[101] As noted in the regulation, this also may include modifications of the work environment to allow an employee to pump breast milk at work.[102]

---

[90] *See* 42 U.S.C. 12111(9); 29 CFR 1630.2(o); *Enforcement Guidance on Reasonable Accommodation, supra* note 12.

[91] *See, e.g.,* H.R. Rep. No. 117–27, pt. 1, at 29 (stating that "[t]he Job Accommodation Network (JAN), an ADA technical assistance center . . . lists numerous potential accommodations . . . including more than 20 suggested accommodations just for lifting restrictions related to pregnancy").

[92] *Enforcement Guidance on Reasonable Accommodation, supra* note 12, at Question 22; *see also* H.R. Rep. 117–27, pt. 1, at 22; 168 Cong. Rec. S7,048 (daily ed. Dec. 8, 2022) (statement of Sen. Robert P. Casey, Jr.); 168 Cong. Rec. S10,081 (daily ed. Dec. 22, 2022) (statement of Sen. Robert P. Casey, Jr.).

[93] The Commission cautions that this provision is intended to address situations where the employee and child are in close proximity in the normal course of business. It is not intended to state that

there is a right to create proximity to nurse because of an employee's preference. Of course, there may be limitations that would allow an employee to request as a reasonable accommodation the creation of proximity (*e.g.,* a limitation that made pumping difficult or unworkable).

[94] Breaks may be paid or unpaid depending on the employer's normal policies and other applicable laws. Breaks may exceed the number that an employer normally provides because reasonable accommodations may require an employer to alter its policies, barring undue hardship.

[95] *Enforcement Guidance on Reasonable Accommodation, supra* note 12, at General Principles, Example B; *see also* H.R. Rep. No. 117–27, pt. 1, at 11, 22, 29.

[96] 29 CFR part 1630, appendix, 1630.2(o); *see also Technical Assistance on Employer-Provided Leave, supra* note 73. Additionally, an employer prohibiting an employee from using accrued leave for pregnancy, childbirth, or related medical conditions while allowing other employees to use leave for similar reasons also may violate Title VII.

[97] 29 CFR part 1630, appendix, 1630.2(o).

[98] *See, e.g., Enforcement Guidance on Reasonable Accommodation, supra* note 12, at Question 34.

[99] *See Enforcement Guidance: Workers' Compensation, supra* note 8, at Question 28; *see also* 168 Cong. Rec. S7,048 (daily ed. Dec. 8, 2022) (statement of Sen. Robert P. Casey, Jr.) ("What are other types of reasonable accommodations that pregnant workers might request? Light duty is a common example."); *id.* at S7,049 (statement of Sen. Patty Murray) (noting that workers need accommodations because "their doctors say they need to avoid heavy lifting"); H.R. Rep. 117–27, pt. 1, at 14–17 (discussing *Young v. United Parcel Serv., Inc.,* 575 U.S. 206 (2015), a case involving light duty for pregnant employees).

[100] *See* 42 U.S.C. 12111(9); 29 CFR 1630.2(o)(1)(ii) and (o)(2)(i).

[101] *See, e.g.,* U.S. Dep't of Lab., Occupational Health & Safety Admin., *Recommended Practices for Safety and Health Programs, https:// www.osha.gov/safety-management/hazard-prevention* (last visited Mar. 18, 2024).

[102] On December 29, 2022, President Biden signed the Providing Urgent Maternal Protections for Nursing Mothers Act (PUMP Act) (Pub. L. 117–328, Div. KK, 136 Stat. 4459, 6093). The law extended coverage of the Fair Labor Standards Act of 1938, as amended (FLSA), 29 U.S.C. 201 *et seq.,* protections for nursing employees to apply to most employees. The FLSA provides most employees with the right to break time and a place to pump breast milk at work for a year following the child's birth. 29 U.S.C. 218d; U.S. Dep't of Lab., *Field Assistance Bulletin No. 2023–02: Enforcement of Protections for Employees to Pump Breast Milk at Work* (May 17, 2023), *https://www.dol.gov/sites/ dolgov/files/WHD/fab/2023-2.pdf*; U.S. Dep't of Lab., *Fact Sheet #73: FLSA Protections for Employees to Pump Breast Milk at Work* (Jan. 2023), *https://www.dol.gov/agencies/whd/fact-sheets/73-flsa-break-time-nursing-mothers.* Employees who are not covered by the PUMP Act or employees who seek to pump longer than 1 year may seek reasonable accommodations regarding pumping under the PWFA. Further, whether or not employees are covered by the PUMP Act, employees may seek under the PWFA any reasonable accommodations needed for lactation, including things not necessarily required by the PUMP Act such as access to a sink, a refrigerator, and electricity. *See, e.g.,* U.S. Dep't of Lab., *Notice on Reasonable Break Time for Nursing Mothers,* 75 FR 80073, 80075–76 (Dec. 21, 2010) (discussing space requirements and noting factors such as the location of the area for pumping compared to the employee's workspace, the availability of a sink and running water, the location of a refrigerator to store

Continued

• Job restructuring.[103] Job restructuring might involve, for example, removing a marginal function (any nonessential job function) that requires a pregnant employee to climb a ladder or occasionally retrieve boxes from a supply closet, or providing assistance with manual labor.[104]

• Temporarily suspending one or more essential function(s). For some positions, this may mean that one or more essential function(s) are temporarily suspended, and the employee continues to perform the remaining functions of the job. For others, the essential function(s) will be temporarily suspended, and the employee may be assigned other tasks. For still others, the essential function(s) will be temporarily suspended, and the employee may perform the functions of a different job to which the employer temporarily transfers or assigns them. For yet others, the essential function(s) will be temporarily suspended, and the employee will participate in the employer's light or modified duty program.

• Acquiring or modifying equipment, uniforms, or devices.[105] Examples of reasonable accommodations might include providing uniforms and equipment, including safety equipment, that account for changes in body size during and after pregnancy, including during lactation; providing devices to assist with mobility, lifting, carrying, reaching, and bending; or providing an ergonomic keyboard to accommodate pregnancy-related hand swelling or tendonitis.

• Adjusting or modifying examinations or policies.[106] Examples of reasonable accommodations include allowing employees with a known limitations to postpone examinations that require physical exertion. Adjustments to policies also could include increasing the time or frequency of breaks to eat or drink or to use the restroom.

82. Pursuant to 42 U.S.C. 2000gg–3, the following are further examples of types of reasonable accommodations and how they can be analyzed.[107]

milk, and electricity may affect the amount of break time needed). The PUMP Act is enforced by the Department of Labor, not the EEOC.

[103] *See* 42 U.S.C. 12111(9)(B); 29 CFR 1630.2(o)(2)(ii).

[104] *See* H.R. Rep. No. 117–27, pt. 1, at 29.

[105] *See* 42 U.S.C. 12111(9)(B); 29 CFR 1630.2(o)(2)(ii); *see also* H.R. Rep. No. 117–27, pt. 1, at 28.

[106] *See* 42 U.S.C. 12111(9)(B); 29 CFR 1630.2(o)(2)(ii); *see also* H.R. Rep. No. 117–27, pt. 1, at 28.

[107] As with all the examples in this Interpretive Guidance, these examples are illustrative only and are not intended to suggest that these are the only conditions under which an employee may receive a reasonable accommodation, or that the reasonable accommodations sought or given in the examples are the only ones that should be selected in similar situations.

For further examples, see the Job Accommodation Network (JAN), which provides free assistance regarding workplace accommodation issues. *See generally* Job Accommodation Network [hereinafter JAN], *https://askjan.org/* (last visited Mar. 25, 2024). Covered entities and employees also may seek additional information from the National Institute for Occupational Safety and Health (NIOSH). *See* U.S. Dep't of Health & Hum. Servs., Ctrs. for Disease Control & Prevention, Nat'l Inst. for

*Example #26/Telework:* Gabriela, a billing specialist in a doctor's office, experiences nausea and vomiting beginning in her first trimester of pregnancy. Because the nausea makes commuting extremely difficult, Gabriela makes a verbal request to her manager stating she has nausea and vomiting due to her pregnancy and requests that she be permitted to work from home for the next 2 months so that she can avoid the difficulty of commuting. The billing work can be done from her home or in the office.

1. Known limitation and request for reasonable accommodation: Gabriela's nausea and vomiting is a physical or mental condition related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions; Gabriela needs an adjustment or change at work due to the limitation; Gabriela has communicated the information to the employer.

2. Qualified: Gabriela can perform the essential functions of the job with the reasonable accommodation of telework.

3. The employer must grant the accommodation (or another reasonable accommodation) absent undue hardship.

*Example #27/Temporary Suspension of an Essential Function:* Nisha, a nurse assistant working in a large elder care facility, is advised in the fourth month of her pregnancy to stop lifting more than 25 pounds for the remainder of the pregnancy. One of the essential functions of the job is to assist patients in dressing, bathing, and moving from and to their beds, tasks that typically require lifting more than 25 pounds. Nisha sends an email to human resources asking that she not be required to lift more than 25 pounds for the remainder of her pregnancy and requesting a place in the established light duty program under which employees who are hurt on the job take on different duties while coworkers take on their temporarily suspended duties.

1. Known limitation and request for reasonable accommodation: Nisha's lifting restriction is a physical or mental condition related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions; Nisha needs an adjustment or change at work due to the limitation; Nisha has communicated that information to the employer.

2. Qualified: Nisha is asking for the temporary suspension of an essential function. The suspension is temporary, and Nisha can perform the essential functions of the job "in the near future" (generally within 40 weeks). It appears that the inability to perform the function can be reasonably accommodated through its temporary suspension and Nisha's placement in the light duty program.

3. The employer must grant the reasonable accommodation of temporarily suspending the essential function (or another reasonable accommodation) absent undue hardship. As part of the temporary suspension, the employer may assign Nisha to the light duty program.

Occupational Safety & Health, *Reproductive Health and The Workplace, https://www.cdc.gov/niosh/topics/repro/default.html* (last reviewed May 1, 2023).

*Example #28:* The scenario is the same as described in Example #27 of this appendix, except that the employer establishes that the light duty program is limited to 10 slots and all 10 slots are filled for the next 6 months. In these circumstances, the employer should consider other possible reasonable accommodations, such as the temporary suspension of an essential function without assigning Nisha to the light duty program, or job restructuring outside of the established light duty program. If such accommodations cannot be provided without undue hardship, then the employer should consider providing a temporary reassignment to a vacant position for which Nisha is qualified, with or without reasonable accommodation. For example, if the employer has a vacant position that does not require lifting patients which Nisha could perform with or without a reasonable accommodation, the employer must offer her the temporary reassignment as a reasonable accommodation, absent undue hardship.

*Example #29/Temporary Suspension of Essential Function(s):* Fatima's position as a farmworker usually involves working outdoors in the field although there also is indoor work such as sorting produce. After she returns from giving birth, Fatima develops postpartum thyroiditis, which has made her extremely sensitive to heat, and has contributed to muscle weakness and fatigue. She seeks the accommodation of a 7-month temporary suspension of the essential function of working outdoors in hot weather.

1. Known limitation and request for reasonable accommodation: Fatima's sensitivity to heat, muscle weakness, and fatigue are physical or mental conditions related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions; Fatima needs an adjustment or change at work due to the limitation; Fatima has communicated this information to the employer.

2. Qualified: Fatima is asking for the temporary suspension of an essential function. The suspension is temporary, and Fatima could perform the essential functions of the job in the near future (7 months). It appears that the inability to perform the essential function can be reasonably accommodated by temporarily assigning Fatima indoor work, such as sorting produce.

3. The employer must grant the accommodation of temporarily suspending the essential function (or another reasonable accommodation) absent undue hardship.

*Example #30/Assistance with Performing an Essential Function:* Mei, a warehouse worker, uses her employer's online accommodation portal to ask for a dolly to assist her for 3 months in moving items that are bulky, in order to accommodate lifting and carrying restrictions due to her cesarean section.

1. Known limitation and request for reasonable accommodation: Mei's lifting and carrying restrictions are physical or mental conditions related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions; Mei needs an adjustment or change at work due to the limitation; Mei has communicated this information to the employer.

2. Qualified: Mei can perform the essential functions of the job with the reasonable accommodation of a dolly.

3. The employer must grant the accommodation (or another reasonable accommodation) absent undue hardship.

*Example #31/Appropriate Uniform and Safety Gear:* Ava is a police officer and is pregnant. They ask their union representative for help getting a larger size uniform and larger size bullet proof vest in order to cover their growing pregnancy. The union representative asks management for an appropriately-sized uniform and vest for Ava.

1. Known limitation and request for reasonable accommodation: Ava's inability to wear the standard uniform and safety gear is a physical or mental condition related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions; Ava needs an adjustment or change at work due to the limitation; Ava's representative has communicated this information to the employer.

2. Qualified: Ava can perform the essential functions of the job with the reasonable accommodation of appropriate gear.

3. The employer must grant the accommodation (or another reasonable accommodation) absent undue hardship.

*Example #32/Temporary Suspension of Essential Function(s):* Darina is a police officer and is 3 months pregnant. She talks to human resources about being taken off of patrol and put on light duty for the remainder of her pregnancy to avoid physical altercations and the need to physically subdue suspects, which may harm her pregnancy. The department has an established light duty program that it uses for officers with injuries that occurred on the job.

1. Known limitation and request for reasonable accommodation: Darina's inability to perform certain patrol duties is a physical or mental condition related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions; Darina needs an adjustment or change at work due to the limitation; Darina has communicated this information to the employer.

2. Qualified: The suspension of the essential functions of patrol duties is temporary, and Darina can perform the essential functions of the job in the near future (within generally 40 weeks). It appears that the temporary suspension of the essential functions can be accommodated through the light duty program.

3. The employer must grant the accommodation (or another reasonable accommodation) absent undue hardship.

*Example #33/Temporary Suspension of Essential Function(s):* Rory works in a fulfillment center where she is usually assigned to a line that requires moving 20-pound packages. After returning from work after giving birth, Rory lets her supervisor know that she has a lifting restriction of 10 pounds due to sciatica during her pregnancy that continues postpartum. The restriction is for 6 months. The employer does not have an established light duty program. There are other lines in the warehouse that do not require lifting more than 10 pounds.

1. Known limitation and request for reasonable accommodation: Rory's lifting restriction is a physical or mental condition related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions; Rory needs an adjustment or change at work due to the limitation; Rory has communicated this information to the employer.

2. Qualified: The suspension of the essential function of lifting packages that weigh up to 10 pounds is temporary, and Rory can perform the essential function in the near future (6 months). It appears that the temporary suspension of the essential function could be accommodated by temporarily assigning her to a different line.

3. The employer must grant the accommodation (or another reasonable accommodation) absent undue hardship.

*Example #34/Unpaid Leave:* Tallah, a newly hired cashier at a small bookstore, has a miscarriage in the third month of pregnancy and asks a supervisor for 10 days of leave to recover. As a new employee, Tallah has only earned 2 days of paid leave, she is not covered by the FMLA, and the employer does not have a company policy regarding the provision of unpaid leave. Nevertheless, Tallah is covered by the PWFA.

1. Known limitation and request for reasonable accommodation: Tallah's need for time for recovery is a physical or mental condition related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions; Tallah needs an adjustment or change at work due to the limitation; Tallah has communicated this information to the employer.

2. Qualified: After the reasonable accommodation of leave, Tallah will be able to perform the essential functions of the job with or without accommodation.

3. The employer must grant the accommodation of unpaid leave (or another reasonable accommodation) absent an undue hardship.

*Example #35/Unpaid Leave for Prenatal Appointments:* Margot started working at a retail store shortly after she became pregnant. She has an uncomplicated pregnancy. Because she has not worked at the store very long, she has earned very little leave and is not covered by the FMLA. In her fifth month of pregnancy, she asks her supervisor for the reasonable accommodation of unpaid time off beyond the leave she has earned to attend her regularly scheduled prenatal appointments.

1. Known limitation and request for reasonable accommodation: Margot's need to attend health care appointments is a physical or mental condition related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions; Margot needs an adjustment or change at work due to the limitation; Margot has communicated the information to the employer.

2. Qualified: Margot can perform the essential functions of the job with the reasonable accommodation of leave to attend health care appointments.

3. The employer must grant the accommodation of unpaid time off (or another reasonable accommodation) absent undue hardship.

*Example #36/Unpaid Leave for Recovery from Childbirth:* Sofia, a custodian, is pregnant and will need 6 to 8 weeks of leave to recover from childbirth. Sofia is nervous about asking for leave, so Sofia asks her mother, who knows the owner, to do it for her. The employer has a sick leave policy, but no policy for longer periods of leave. Sofia is not eligible for FMLA leave because her employer is not covered by the FMLA.

1. Known limitation and request for reasonable accommodation: Sofia's need to recover from childbirth is a physical or mental condition related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions; Sofia needs an adjustment or change at work due to the limitation; Sofia's representative has communicated this information to the employer.

2. Qualified: After the reasonable accommodation of leave, Sofia will be able to perform the essential functions of the job with or without reasonable accommodation.

3. The employer must grant the accommodation of unpaid leave (or another reasonable accommodation) absent undue hardship.

*Example #37/Unpaid Leave for Medical Appointments:* Taylor, a newly hired member of the waitstaff, requests time off to attend therapy appointments for postpartum depression. As a new employee, Taylor has not yet accrued sick or personal leave and is not covered by the FMLA. Taylor asks her manager if there is some way that she can take time off.

1. Known limitation and request for reasonable accommodation: Taylor's need to attend health care appointments is a physical or mental condition related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions; Taylor needs an adjustment or change at work due to the limitation; Taylor has communicated this information to the employer.

2. Qualified: Taylor can perform the essential functions of the job with a reasonable accommodation of time off to attend the health care appointments.

3. The employer must grant the accommodation (or another reasonable accommodation) absent an undue hardship.

*Example #38/Unpaid Leave:* Claudine is 6 months pregnant and asks for leave so that she can attend her regular check-ups. The clinic where Claudine gets her health care is an hour drive away, the clinic frequently gets delayed, and Claudine has to wait for her appointment. Depending on the time of day, between commuting to the appointment, waiting for the appointment, and seeing her provider, Claudine may miss all or most of an assigned day at work. Claudine's employer is not covered by the FMLA, and Claudine does not have any sick leave left. Claudine asks human resources for time off as a reasonable accommodation so she can attend her medical appointments.

1. Known limitation and request for reasonable accommodation: Claudine's need to attend health care appointments is a physical or mental condition related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions; Claudine needs an adjustment or change at work due to the limitation; Claudine has communicated that information to the employer.

2. Qualified: Claudine can perform the essential functions of the job with a reasonable accommodation of time off to attend health care appointments.

3. The employer must grant the accommodation (or another reasonable accommodation) absent undue hardship.

*Example #39/Telework:* Raim, a social worker, is pregnant. As her third trimester starts, she is feeling more fatigue and needs more rest. She asks her supervisor if she can telework and see clients virtually so she can lie down and take rest breaks between client appointments.

1. Known limitation and request for reasonable accommodation: Raim's fatigue is a physical or mental condition related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions; Raim needs an adjustment or change at work due to the limitation; Raim has communicated that information to the employer.

2. Qualified: Assuming the appointments can be conducted virtually, Raim can perform the essential functions of the job with the reasonable accommodation of working virtually. If there are certain appointments that must be done in person, the reasonable accommodation could be a few days of telework a week and then other accommodations that would give Raim time to rest, such as assigning Raim in-person appointments at times when traffic will be light so that they are easy to get to, or setting up Raim's assignments so that on the days when she has in-person appointments she has breaks between them. Or the reasonable accommodation can be the temporary suspension of the essential function of in-person appointments.

3. The employer must grant the accommodation (or another reasonable accommodation) absent undue hardship.

*Example #40/Temporary Workspace/ Possible Temporary Suspension of Essential Function(s):* Brooke, a research assistant who is in her first trimester of pregnancy, asks the lead researcher in the laboratory for a temporary workspace that would allow her to work in a well-ventilated area because her work involves hazardous chemicals that her health care provider has told her to avoid. There are several research projects she can work on that do not involve exposure to hazardous chemicals.

1. Known limitation and request for reasonable accommodation: Brooke's need to avoid the chemicals related to maintaining her health or the health of her pregnancy is a physical or mental condition related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions; Brooke needs an adjustment or change at work due to the limitation; Brooke has communicated this information to the employer.

2. Qualified: If working with hazardous chemicals is an essential function of the job, Brooke may be able to perform that function with the accommodation of a well-ventilated work area, a chemical fume hood, local exhaust ventilation, and/or personal protective equipment such as chemical-resistant gloves, a lab coat, and a powered air-purifying respirator. If providing these

modifications would be an undue hardship or would not be effective, Brooke can still be qualified with the temporary suspension of the essential function of working with the hazardous chemicals because Brooke's inability to work with hazardous chemicals is temporary, and Brooke can perform the essential functions of the job in the near future (within generally 40 weeks). Her need to avoid exposure to hazardous chemicals also can be accommodated by allowing her to focus on the other research projects.

3. The employer must grant the accommodation (or another reasonable accommodation), absent undue hardship. If the employer cannot accommodate Brooke in a way that allows Brooke to continue to perform the essential function(s) of the position, the employer should consider providing alternative reasonable accommodations, including temporarily suspending one or more essential functions, absent undue hardship.

*Example #41/Temporary Transfer to Different Location:* Katherine, a budget analyst who has cancer also is pregnant, which creates complications for her cancer treatment. She asks her manager for a temporary transfer so that she can work out of an office in a larger city that has a medical center that can address her medical needs due to the combination of cancer and pregnancy. Katherine is able to do all her essential functions for the original office from the employer's other location and can continue to work full-time while obtaining treatment.

1. Known limitation and request for reasonable accommodation: Katherine's need for treatment at a particular medical facility related to maintaining her health or the health of the pregnancy is a physical or mental condition related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions; Katherine needs an adjustment or change at work due to the limitation; Katherine has communicated that information to the employer.

2. Qualified: Katherine is able to perform the essential functions of the job and work full-time with the reasonable accommodation of a temporary transfer to a different location.

3. The employer must grant the accommodation (or another reasonable accommodation) absent undue hardship. A reasonable accommodation can include a workplace change to facilitate medical treatment, including accommodations such as leave, a schedule change, or a temporary transfer to a different work location needed in order to obtain treatment.

*Example #42/Pumping Breast Milk:* Salma gave birth 13 months ago and wants to be able to pump breast milk at work. Salma works for an employment agency that sends her to different jobs for a day or week at a time. Salma asks the person at the agency who makes her assignments to ensure she will be able to take breaks and have a space to pump breast milk at work at her various assignments.

1. Known limitation and request for reasonable accommodation: Salma's need to express breast milk is a physical or mental condition related to, affected by, or arising out pregnancy, childbirth, or related medical

conditions; Salma needs an adjustment or change at work due to the limitation; Salma has communicated this information to the employer.

2. Qualified: Salma is able to perform the essential functions of the jobs to which she is assigned with the reasonable accommodation of being assigned to workplaces where she can pump at work.

3. The agency must grant the accommodation (or another reasonable accommodation) absent undue hardship.

*Example #43/Commuting:* Jayde is a retail clerk who gave birth 2 months ago. Because of childbirth, Jayde is experiencing urinary incontinence, constipation, and hemorrhoids. Jayde normally commutes by driving 45 minutes; because of the limitations due to childbirth, it is painful for Jayde to sit in one position for an extended period, and Jayde may need a bathroom during the commute. Jayde requests the reasonable accommodation of working at a different, closer store for 2 months. The commute to this other store is only 10 minutes.

1. Known limitation and request for reasonable accommodation: Jayde's urinary incontinence, constipation, and hemorrhoids are physical or mental conditions related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions; Jayde needs an adjustment or change at work due to the limitation; Jayde has communicated this information to the employer.

2. Qualified: Jayde can perform the essential functions of the job with the reasonable accommodation of a temporary assignment to a different location.

3. The employer must grant the accommodation (or another reasonable accommodation) absent undue hardship.

*Example #44/Medications Affected by Pregnancy:* Riya is a data analyst who is pregnant, and her health care provider recommended that she stop taking her current ADHD medication and switch to another medication. As Riya is adjusting to her new medication, she finds it more difficult to concentrate and asks for more frequent breaks, a quiet place to work, and for her tasks to be divided up into smaller duties.

1. Known limitation and request for reasonable accommodation: Riya's difficulty concentrating due to her change in medication is a physical or mental condition related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions; Riya needs an adjustment or change at work due to the limitation; Riya has provided this information to the employer.

2. Qualified: Riya can perform the essential functions of the job with the reasonable accommodation of more frequent breaks, a quiet place to work, and division of her tasks into smaller duties.

3. The employer must grant the accommodation (or another reasonable accommodation) absent undue hardship.

### 1636.3(j) Undue Hardship

### 1636.3(j)(1) Undue Hardship—In General

83. The PWFA provides that "undue hardship" shall be construed under the

PWFA as it is under the ADA and as set forth in this part.[108] This part, at § 1636.3(j)(1), reiterates the definition of undue hardship provided in the ADA statute and regulation, which explains that undue hardship means significant difficulty or expense incurred by a covered entity.[109] Because the definition of undue hardship under the PWFA follows the ADA, under the PWFA the term "undue hardship" means significant difficulty or expense in, or resulting from, the provision of the accommodation. The "undue hardship" provision takes into account the financial realities of the particular employer or other covered entity. However, the concept of undue hardship is not limited to financial difficulty. "Undue hardship" refers to any accommodation that would be unduly costly, extensive, substantial, or disruptive, or that would fundamentally alter the nature or operation of the business.[110]

84. As under the ADA, if an employer asserts undue hardship based on cost, then there will be a determination made regarding whose financial resources should be considered.[111] Further, in determining whether an accommodation causes an undue hardship an employer cannot simply assert that a needed accommodation will cause it undue hardship and thereupon be relieved of the duty to provide accommodation. Rather, an employer will have to present evidence and demonstrate that the accommodation will, in fact, cause it undue hardship. Whether a particular accommodation will impose an undue hardship for a particular employer is determined on a case-by-case basis. Consequently, an accommodation that poses an undue hardship for one employer at a particular time may not pose an undue hardship for another employer, or even for the same employer at another time.[112]

85. As the Commission has stated under the ADA, "[u]ndue hardship must be based on an individualized assessment of current circumstances that show that a specific reasonable accommodation would cause significant difficulty or expense." [113]

86. Additionally, an employer cannot demonstrate undue hardship based on employees', clients', or customers' fears or prejudices toward the employee's pregnancy, childbirth, or related medical conditions, nor can an employer demonstrate undue hardship based on the possibility that the provision of an accommodation would negatively impact the morale of its other employees.[114] Employers, however, may be

able to show undue hardship where the provision of an accommodation would be unduly disruptive to other employees' ability to work.

87. Consistent with the ADA, a covered entity asserting that a reasonable accommodation will cause an undue hardship must offer other reasonable accommodations that it can provide, absent undue hardship.[115] Additionally, if the employer can provide only part of the reasonable accommodation absent undue hardship—for example, the employer can provide 6 weeks of leave absent undue hardship but the 8 weeks that the employee is seeking would cause undue hardship—the employer must provide the reasonable accommodation up to the point of undue hardship. Thus, in the example, the employer would have to provide 6 weeks of leave and then consider whether there are other reasonable accommodations it could provide for the remaining 2 weeks that would not cause an undue hardship.

*1636.3(j)(2) Undue Hardship Factors*

88. Section 1636.3(j)(2) sets out factors to be considered when determining whether a particular accommodation would impose an undue hardship on the covered entity using the factors from the ADA regulation.[116]

89. Examples Regarding Undue Hardship:

*Example #45/Undue Hardship:* Patricia, a convenience store clerk, requests that she be allowed to switch from full-time to part-time work for the last 3 months of her pregnancy due to extreme fatigue. The store assigns two clerks per shift. If Patricia's hours are reduced, the other clerk's workload will increase significantly beyond his ability to handle his responsibilities. The store determines that such an arrangement will result in inadequate coverage to serve customers in a timely manner, keep the shelves stocked, and maintain store security. It also would be infeasible for the store to hire a temporary worker on short notice at this time. Based on these facts, the employer likely can show undue hardship based on the significant disruption to its operations and, therefore, can refuse to reduce Patricia's hours. The employer, however, must offer other reasonable accommodations, such as providing a stool and allowing rest breaks throughout the shift, assuming they do not cause undue hardship.

*Example #46/Undue Hardship:* Shirin, a dental hygienist who is undergoing IVF treatments, needs to attend medical appointments for the IVF treatment near her house every other day and is fatigued. She asks her supervisor if the essential function of seeing patients can be temporarily suspended, so that she does not see patients 3 days a week and instead can work from

home on those days assisting with billing and insurance claims, work for which she is qualified. Temporarily suspending the essential function of seeing patients and allowing Shirin to work at home may be an undue hardship for the employer because there is only one other hygienist and there is not enough work for Shirin to do remotely. However, the employer must offer other reasonable accommodations, such as a schedule that would allow Shirin breaks between patients, part-time work, permitting her to work from home for 1 or 2 days, or a reduced schedule, assuming they do not cause undue hardship.

*Example #47/Undue Hardship:* Cynthia, an office manager working in a large building, has asthma that she controls with medication. Because of her pregnancy, her asthma becomes worse, and she requests a ban on airborne irritants and chemicals (*e.g.*, fragrances, sprays, cleaning products) in the building. The employer could potentially show that ensuring a workplace completely free of any scents or irritants would impose a significant financial and administrative burden on it, as a ban would be difficult to enforce and encompass a wide variety of hygiene and cleaning products. Nevertheless, the employer must offer alternative accommodations, such as providing an air purifier, minimizing the use of irritants in her vicinity, or allowing her to telework, assuming they do not cause undue hardship.

*1636.3(j)(3) Undue Hardship—Temporary Suspension of an Essential Function(s)*

90. In certain circumstances, the PWFA requires an employer to accommodate an employee's temporary inability to perform one or more essential functions. Therefore, § 1636.3(j)(3) provides additional factors that may be considered when determining whether the temporary suspension of one or more essential functions causes an undue hardship. These additional factors include: the length of time that the employee will be unable to perform the essential function(s); whether, through the methods listed in § 1636.3(f)(2)(iii) (describing potential reasonable accommodations related to the temporary suspension of essential function(s)) or otherwise, there is work for the employee to accomplish; [117] the nature of the essential function(s), including its frequency; whether the covered entity has provided other employees in similar positions who are unable to perform essential function(s) of their positions with temporary suspensions of those function(s) and other duties; if necessary, whether or not there are other employees, temporary employees, or third parties who can perform or be temporarily hired to perform the essential function(s) in question; and whether the essential function(s) can be postponed or remain unperformed for any length of time and, if so, for how long.

91. As with other reasonable accommodations, if the covered entity can establish that accommodating an employee's temporary suspension of an essential function(s) would impose an undue hardship

---

[108] 42 U.S.C. 2000gg(7).

[109] 42 U.S.C. 12111(10)(A); 29 CFR 1630.2(p); *see Enforcement Guidance on Reasonable Accommodation, supra* note 12, at text after n.112.

[110] *See* 29 CFR part 1630, appendix, 1630.2(p). The ADA defines "undue hardship" at 42 U.S.C. 12111(10).

[111] 29 CFR part 1630, appendix, 1630.2(p).

[112] *See* 29 CFR part 1630, appendix, 1630.15(d).

[113] *See Enforcement Guidance on Reasonable Accommodation, supra* note 12, at text accompanying n.113.

[114] *See* 29 CFR part 1630, appendix, 1630.15(d) (explaining that under the ADA an employer cannot show undue hardship based on employees' fears or prejudices toward the individual's disability or by showing that the provision of the accommodation has a negative impact on the morale of its other

employees but not on the ability of these employees to perform their jobs); *Enforcement Guidance on Reasonable Accommodation, supra* note 12, at text surrounding n.117; *cf. Groff* v. *DeJoy,* 600 U.S. 447, 472 (2023) (providing that, under the Title VII undue hardship standard, an employer may not justify refusal to accommodate based on other employees' bias or hostility).

[115] *See Enforcement Guidance on Reasonable Accommodation, supra* note 12, at text after n.116.

[116] *See* 29 CFR 1630.2(p).

[117] The employer is not required to make up work for an employee.

if extended beyond a certain period of time, the covered entity would only be required to provide that accommodation for the period of time that it does not impose an undue hardship. For example, consider the situation where an employee seeks to have an essential function suspended for 6 months. The employer can go without the function being accomplished for 4 months, but after that, it will create an undue hardship. The employer must accommodate the employee's inability to perform the essential function for 4 months and then consider whether there are other reasonable accommodations that it can provide, absent undue hardship, for the remaining time.

92. Section 1636.3(j)(3)(iv) is intended to account for situations where the covered entity has provided a similar accommodation to other employees. If the covered entity has temporarily suspended essential functions for other employees in similar positions before, it would tend to demonstrate that the accommodation is not an undue hardship. The reverse, however, is not true. A covered entity's failure to temporarily suspend an essential function(s) in the past does not tend to demonstrate that the accommodation creates an undue hardship because reasonable accommodation can include changing workplace procedures or rules.

*1636.3(j)(4) Undue Hardship—Predictable Assessments* [118]

93. The Commission has identified a limited number of simple modifications that will, in virtually all cases, be found to be reasonable accommodations that do not impose an undue hardship when requested by a qualified employee due to pregnancy.

94. These modifications are: (1) allowing an employee to carry or keep water near and drink, as needed; (2) allowing an employee to take additional restroom breaks, as needed; (3) allowing an employee whose work requires standing to sit and whose work requires sitting to stand, as needed; and (4) allowing an employee to take breaks to eat and drink, as needed.[119] These accommodations are low cost and unlikely to affect the overall financial resources of the covered entity, the operations of the facility, or the ability of the facility to conduct

business.[120] By identifying these predictable assessments, the Commission seeks to improve how quickly employees will be able to receive certain simple, common accommodations for pregnancy under the PWFA and thereby reduce litigation.

95. The Commission emphasizes that the predictable assessments provision does not alter the meaning of the term "reasonable accommodation" or "undue hardship." Employers should still conduct an individualized assessment when one of these accommodations is requested by a pregnant employee to determine if the requested accommodation causes an undue hardship, and employers may still bring forward facts to demonstrate that the proposed accommodation imposes an undue hardship for its business under its own particular circumstances. Instead, the provision informs covered entities that the individualized assessment of whether one of the straightforward and simple modifications listed in paragraphs (j)(4)(i) through (iv) is a reasonable accommodation that would cause undue hardship will, in virtually all cases, result in a determination that the four modifications are reasonable accommodations that will not impose an undue hardship under the PWFA when they are requested as workplace accommodations by an employee who is pregnant.

96. Examples Regarding Predictable Assessments:

*Example #48/Predictable Assessments:* Amara, a quality inspector for a manufacturing company, experiences painful swelling in her legs, ankles, and feet during the final 3 months of her pregnancy. Her job requires standing for long periods of time, although it can be performed sitting as well. Amara asks the person who assigns her daily work for a stool to sit on while she performs her job. Amara's swelling in her legs and ankles is a physical or mental condition related to, affected by, or arising out of pregnancy. Amara's request is for a modification that will virtually always be a reasonable accommodation that does not impose an undue hardship. The employer argues that it has never provided a stool to any other worker who complained of difficulty standing, but points to nothing that suggests that this modification is not reasonable or that it would impose an undue hardship on the operation of the employer's business. The employer has not established that providing Amara a stool imposes an undue hardship.

*Example #49/Predictable Assessments:* Jazmin, a pregnant teacher who typically is only able to use the bathroom when her class is at lunch, requests additional bathroom breaks during her sixth month of pregnancy. Jazmin's need for additional bathroom breaks is a physical or mental condition related to, affected by, or arising out of pregnancy. The employer argues that finding an adult to watch over the Jazmin's class when she needs to take a bathroom break imposes an undue hardship. However, there are several

teachers in nearby classrooms, aides in some classes, and an administrative assistant in the front office, any of whom, with a few minutes' notice, would be able to provide supervision either by standing in the hallway between classes or sitting in Jazmin's classroom to allow Jazmin a break to use bathroom. The employer has not established that providing Jazmin with additional bathroom breaks imposes an undue hardship.

*Example #50/Predictable Assessments:* Addison, a clerk responsible for receiving and filing construction plans for development proposals, needs to maintain a regular intake of water throughout the day to maintain a healthy pregnancy. They ask their manager if an exception can be made to the office policy prohibiting liquids at workstations. Addison's need to maintain a regular intake of water is a physical or mental condition related to, affected by, or arising out of pregnancy. Here, although the manager decides against allowing Addison to bring water into their workstation, he proposes that a table be placed just outside the workstation and gives permission for Addison to access water placed on the table as needed. The employer has satisfied its obligation to provide a reasonable accommodation.

Undue Hardship—Consideration of Prior or Future Accommodations

97. An employer may consider the current impact of past and current cumulative costs or burdens of accommodations that have already been granted to other employees or the same employee, when considering whether a new request for the same or a similar accommodation imposes an undue hardship. For example, where an employer is already allowing two of the three employees who are able to open the store to arrive after opening time on certain days, it could pose an undue hardship to grant the accommodation of a delayed arrival time to the third employee on those same days.

98. The fact that an employer has provided the same or similar accommodations in the past may indicate that the accommodation can be provided without causing an undue hardship. Additionally, even if an employer previously failed to provide an employee a similar type of accommodation, if the employer intends to assert that providing the accommodation to another employee would pose an undue hardship, the employer should engage in the interactive process with the employee regarding the currently requested accommodation and determine whether the same conditions that previously imposed an undue hardship still exist. Ultimately, whether a particular accommodation will impose an undue hardship for an employer is determined on a case-by-case basis.

99. While an employer may consider the impact of prior accommodations granted to the employee currently seeking an accommodation, the mere fact that an employee previously received an accommodation or, indeed, several accommodations, does not establish that it would impose an undue hardship on the employer to grant a new accommodation.

100. Thus, for example, the fact that an employer already has provided an employee with an accommodation, such as the

---

[118] The term "predictable assessments" also is seen in the ADA regulations, where it applies to establishing coverage. In the ADA, "predictable assessments" are impairments that will "in virtually all cases" be considered a disability covered by the ADA. 29 CFR 1630.2(j)(3). As used in this PWFA rule, however, the term relates to accommodations, not limitations or disabilities.

[119] The first and fourth categories of predictable assessments are related but separate. The first category of accommodations addresses an employee's ability to carry water on the employee's person while they perform their job duties, or their ability to have water nearby while working, without requiring the employee to take a break to access and drink it. The fourth category of accommodations addresses an employee's ability to take additional, short breaks in performing work (either at the employee's work location or a break location) to eat and drink (including beverages that are not water). Additionally, depending on the worksite, any employee may be able to eat or drink at the work location without taking a break.

[120] As explained in the NPRM, the Commission identified these modifications based on the legislative history of the PWFA and analogous State laws. 88 FR 54734.

temporary suspension of an essential function due to their pregnancy, does not establish that providing this accommodation due to a post-pregnancy limitation would be an undue hardship. Instead, the employer would have to provide evidence showing that continuing the temporary suspension would impose an undue hardship. This showing could include, for example, evidence demonstrating why and how the cumulative impact of having already provided the accommodation during pregnancy makes the current impact of providing it post-pregnancy rise to the level of significant difficulty or expense.

101. A covered entity cannot demonstrate that a reasonable accommodation imposes an undue hardship based on the possibility—whether speculative or near certain—that it will have to provide the accommodation to other employees in the future.[121] Relatedly, a covered entity that receives numerous requests for the same or similar accommodations at the same time (for example, parking spaces closer to the factory) cannot fail to provide all of them simply because processing the volume of current or anticipated requests is, or would be, burdensome or because it cannot grant all of them. Rather, the covered entity must evaluate and provide reasonable accommodations on a case-by-case basis unless, or until, doing so imposes an undue hardship.

102. Finally, for the purposes of an employer asserting undue hardship based on the impact of prior or future accommodations, as with any assertion of an undue hardship, "[g]eneralized conclusions will not suffice to support a claim of undue hardship. Instead, undue hardship must be based on an individualized assessment of current circumstances that show that a specific reasonable accommodation would cause significant difficulty or expense."[122]

Undue Hardship and Safety

103. An employer's contention that the accommodation an employee requests would cause a safety risk to co-workers or clients will be assessed under the PWFA's undue hardship standard. For example, consider a qualified pregnant employee in a busy fulfillment center that has narrow aisles between the shelves of products. The employee asks for the reasonable accommodation of a cart to use while they are walking through the aisles filling orders. The employer's assertion that the aisles are too narrow and its concern for the safety of other workers being bumped by the cart could be raised as a defense based on undue hardship, specifically § 1636.3(j)(2)(v), but the employer will have to demonstrate that the accommodation would actually pose an undue hardship.

104. If a particular reasonable accommodation causes an undue hardship because of safety, just as with any other situation where an employer cannot provide the requested accommodation, the employer must provide an alternative reasonable accommodation, if there is one available that

does not impose an undue hardship. Importantly, assertions by employers that employees create a safety risk merely by being pregnant (as opposed to a safety risk that stems from an accommodation for a pregnancy-related limitation) should be addressed under Title VII's bona fide occupational qualification (BFOQ) standard and not under the PWFA.[123]

*1636.3(k) Interactive Process*

105. The PWFA states that the interactive process will typically be used to determine an appropriate reasonable accommodation.[124] Section 1636.3(k) largely adopts the explanation of the interactive process in the regulation implementing the ADA.[125] Section 1636.3(k) defines the interactive process as an informal, interactive process and states that the process should identify the known limitation and the adjustment or change at work that is needed due to the limitation, if either of these are not clear from the request, as well as potential reasonable accommodations.

106. There are no rigid steps that must be followed when engaging in the interactive process under the PWFA, and information provided by the employee does not need to be in any specific format, include specific words, or be on a specific form.

107. In many instances, the appropriate reasonable accommodation may be obvious to either or both the employer and the employee with the known limitation so that the interactive process can be a brief discussion. The request and granting of the accommodation can occur in a single informal conversation or short email exchange.[126]

108. Examples Regarding the Interactive Process:

*Example #51/Interactive Process:* Marge works at an assembly plant. She is 5 weeks pregnant. She knows that staying hydrated is important during pregnancy. She texts her supervisor that she is pregnant and that she needs to carry water with her and use the bathroom more frequently. Her supervisor explains how Marge can call for a substitute when she needs a break, and Marge uses that system when she needs to drink water or go to the bathroom.

*Example #52/Interactive Process:* Launa is a customer service representative. She is 6 weeks pregnant. Some mornings she has morning sickness. She has found that eating small amounts during the morning helps to control it. Launa uses the company's internal message system to tell her supervisor that she is pregnant and either needs to take breaks to eat or needs to eat in her cubicle, and that she may need a break if she is feeling nauseous. Her supervisor agrees.

109. In some instances, for example to determine an appropriate reasonable accommodation, the employer and employee may engage further in the interactive process. The process is not composed of rigid steps but is an opportunity for the covered entity and employee to participate in a dialogue to quickly identify a reasonable accommodation that enables the employee to address their limitation through a reasonable accommodation that does not pose an undue hardship. The interactive process also may provide an opportunity for the covered entity and the employee to discuss how different accommodations will provide the employee with equal employment opportunity and what accommodation the employee prefers.[127]

110. While the interactive process is an informal exchange of information, there are still certain rules that apply. The ADA restrictions on when employers are permitted to ask disability-related questions and require medical examinations apply to all such inquiries or examinations, whether employers make them of people with or without disabilities, including questions that an employer asks during the interactive process under the PWFA.[128] For example, an employer who requires an employee who requests an accommodation due to a pregnancy-related limitation to fill out a form identifying their physical and mental impairments would have difficulty demonstrating that this disability-related inquiry is job-related and consistent with business necessity, as required by the ADA.[129] Further, if a covered entity has sufficient information from the employee to determine whether they have a PWFA limitation and need an adjustment or change at work due to the limitation, requiring the

---

[121] *See Enforcement Guidance on Reasonable Accommodation, supra* note 12, at n.113.

[122] *See id.,* text at n.113.

---

[123] *See, e.g., UAW* v. *Johnson Controls,* 499 U.S. 187, 211 (1991) (striking down the employer's fetal protection policy that limited the opportunities of women); *Everts* v. *Sushi Brokers LLC,* 247 F. Supp. 3d 1075, 1082–83 (D. Ariz. 2017) (relying on *Johnson Controls* and denying BFOQ defense in a case regarding a pregnant employee at a restaurant server, noting that, "[u]nlike cases involving prisoners and dangers to customers where a BFOQ defense might be colorable, the present situation is exactly the type of case that Title VII guards against"); *EEOC* v. *New Prime, Inc.,* 42 F. Supp. 3d 1201, 1213–14 (W.D. Mo. 2014) (relying on *Johnson Controls* and denying a policy allegedly in place for the "privacy" and "safety" of women employees was a BFOQ); *Enforcement Guidance on Pregnancy Discrimination, supra* note 24, at (I)(B)(1)(c).

[124] 42 U.S.C. 2000gg(7).

[125] *See* 29 CFR 1630.2(o)(3).

[126] 42 U.S.C. 2000gg–1(2) (§ 1636.4(b)) prohibits a covered entity from requiring a qualified employee with a PWFA limitation to accept an accommodation other than any reasonable accommodation arrived at through the interactive process.

---

[127] During the interactive process, especially if it is lengthened due to, for example, equipment being ordered or the employee waiting for information from or an appointment with a health care provider, the employer should determine how to address the employee's needs while the interactive process is ongoing. *See, e.g., Enforcement Guidance on Reasonable Accommodation, supra* note 12, at n.89 (discussing a situation when the employee is waiting for reassignment). The Commission has discussed a similar situation with regard to postponing an employee's evaluation pending the employee receiving a requested reasonable accommodation. EEOC, *Technical Assistance on Applying Performance and Conduct Standards to Employees with Disabilities,* Examples 8 & 11 (2008) *https://www.eeoc.gov/laws/guidance/applying-performance-and-conduct-standards-employees-disabilities. See also supra* in the Interpretive Guidance in section *1636.3(h)* under *Interim Reasonable Accommodations.*

[128] *See* 42 U.S.C. 12112(d); 29 CFR 1630.13, 1630.14.

[129] 42 U.S.C. 12112(d)(4)(A); 29 CFR 1630.14(c).

employee to provide additional information could be a violation of the PWFA's anti-retaliation provision (42 U.S.C. 2000gg–2(f)) (§ 1636.5(f)) or the PWFA's prohibition on taking adverse action in response to a request for reasonable accommodation (42 U.S.C. 2000gg–1(5)) (§ 1636.4(e)). If an employer decides to seek supporting documentation in response to a request for a PWFA reasonable accommodation, the restrictions limiting supporting documentation set forth in § 1636.3(l) apply. Finally, any medical information obtained during the interactive process under the PWFA must be maintained on separate forms and in separate medical files and be treated as a confidential medical record, in accordance with the ADA's rules on the confidentiality of medical information, as explained in section *1636.7(a)(1)* of this appendix under *Prohibition on Disability-Related Inquiries and Medical Examinations and Protection of Medical Information.* Of particular relevance to the PWFA, the fact that an employee is pregnant, has recently been pregnant, or has a medical condition related to pregnancy or childbirth is medical information. Similarly, disclosing that an employee is receiving or has requested an accommodation under the PWFA or has limitations for which they requested or are receiving a reasonable accommodation under the PWFA, usually amounts to a disclosure that the employee is pregnant, has recently been pregnant, or has a related medical condition.

Recommendations for an Interactive Process

111. Appropriate reasonable accommodations are best determined through a flexible interactive process that includes both the employer and the employee with the known limitation. Employers and employees may use some of the steps noted in paragraph 112 of this section, if warranted, to address requests for reasonable accommodations under the PWFA, but the Commission emphasizes that, as under the ADA, a covered entity and an employee do not have to complete all or even some of these steps. The Commission expects that typically a simple conversation will be sufficient for employers to obtain all the information needed to determine the appropriate reasonable accommodation. As with the ADA, a covered entity should respond expeditiously to a request for reasonable accommodation and act promptly to provide the reasonable accommodation.[130]

112. If an employer has not obtained enough information to determine the appropriate reasonable accommodation through the initial request or a simple conversation or email exchange, the flexible interactive process may continue. For example, when an employee with a known limitation has requested a reasonable accommodation regarding the performance of the essential functions of the job, the covered entity, using a problem-solving approach, may, as needed:

a. Analyze the particular job involved and determine its purpose and essential functions;

b. Consult with the employee with a known limitation to ascertain what kind of accommodation is necessary given the known limitation;

c. In consultation with the employee with the known limitation, identify potential accommodations and assess the effectiveness each would have in enabling the employee to perform the essential functions of the position. If the employee's limitation means that they are temporarily unable to perform one or more essential functions of the position, the parties also must consider whether suspending the performance of one or more essential functions may be a part of the reasonable accommodation if the known limitation is temporary and the employee could perform the essential function(s) in the near future; and

d. Consider the preference of the employee to be accommodated and select and implement the accommodation that is most appropriate for both the employee and the covered entity.[131]

113. Steps (b) to (d) outlined in paragraph 112 of this section can be adapted and applied to requests for reasonable accommodations related to the application process and to benefits and privileges of employment. In those situations, in step (c), the consideration should be how to enable the applicant with a known limitation to be considered for the position in question or how to provide an employee with a known limitation with the ability to enjoy equal benefits and privileges of employment.

114. In some instances, neither the employee requesting the accommodation nor the covered entity may be able to readily identify an appropriate accommodation. For example, an applicant needing an accommodation may not know enough about the equipment used by the covered entity or the exact nature of the work site to suggest an appropriate accommodation. Likewise, the covered entity may not know enough about an employee's known limitation and its effect on the performance of the job to suggest an appropriate accommodation. In these situations, the steps in paragraph 112 of this section may be helpful as part of the employer's reasonable effort to identify the appropriate reasonable accommodation. In addition, parties may consult outside resources such as State or local entities, non-profit organizations, or the Job Accommodation Network (JAN) for ideas regarding potential reasonable accommodations.[132]

Engaging in the Interactive Process

115. A covered entity's failure to engage in the interactive process, in and of itself, is not

a violation of the PWFA, just as it is not a violation of the ADA. However, a covered entity's failure to initiate or participate in the interactive process with the employee after receiving a request for reasonable accommodation could result in liability if the employee does not receive a reasonable accommodation even though one is available that would not have posed an undue hardship.[133] Relatedly, an employee's unilateral withdrawal from or refusal to participate in the interactive process can constitute sufficient grounds for failing to provide the reasonable accommodation.[134]

116. In situations where employers are permitted to seek supporting documentation, because employees may experience difficulty obtaining appointments with health care providers, especially early in pregnancy, the covered entity should be aware that it may take time for the employee to find a health care provider and produce documentation. Delay caused by the difficulty an employee faces in obtaining information from a health care provider in these circumstances should not be considered a withdrawal from or refusal to participate in the interactive process. If there is such a delay, an employer should consider providing an interim reasonable accommodation.

117. As set out in Example #53 of this appendix, if an employee requests an accommodation but then is unable to engage in the interactive process because of an emergency, an employer should not penalize the employee but rather should wait and restart the interactive process once the employee returns.

*Example #53/Interruption of Interactive Process:* Beryl is a quality control inspector at a labware manufacturing plant. She is in the early stage of pregnancy, and Beryl's employer does not know that she is pregnant. In the middle of her shift, Beryl suddenly experiences cramping and bleeding. She tells her supervisor that she thinks she is having a miscarriage and needs to leave. The next afternoon, Beryl's partner calls the supervisor and explains that Beryl will be resting at home for the next 24 hours. Following time at home, Beryl returns to the workplace and follows up with her supervisor regarding her emergency departure.

The bleeding and cramping Beryl experienced is a physical or mental condition related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions, and Beryl identified an adjustment or change needed at work (leave). Thus, Beryl made a request for a reasonable accommodation under the PWFA, and it serves to start the PWFA interactive process.

The employer received Beryl's request, but the interactive process was interrupted by the emergency situation that required immediate action. The interactive process resumed when Beryl's partner spoke with the supervisor and provided further information regarding Beryl's condition. When Beryl spoke with her supervisor upon her return, she reengaged in the interactive process. Through this continued conversation, the

---

[130] *See Enforcement Guidance on Reasonable Accommodation, supra* note 12, at Question 10. Following the steps laid out for the interactive process is not a defense to liability if the employer fails to provide a reasonable accommodation that it could have provided absent undue hardship.

[131] *See* 29 CFR part 1630, appendix, 1630.9.

[132] *See* JAN, *supra* note 107. *See also* U.S. Dep't of Lab., Occupational Safety & Health Admin., *Ergonomics–Solutions to Control Hazards, https://www.osha.gov/ergonomics/control-hazards* (last visited Apr. 3, 2024); U.S. Dep't of Health & Hum. Servs., Ctrs. for Disease Control & Prevention, Nat'l Inst. for Occupational Safety & Health, *Reproductive Health and The Workplace, https://www.cdc.gov/niosh/topics/repro/* (last reviewed May 1, 2023).

[133] *See Enforcement Guidance on Reasonable Accommodation, supra* note 12, at Question 6.

[134] *See id.*

employer was able to gather sufficient information to determine that Beryl had a limitation under the PWFA and was entitled to a reasonable accommodation. The employer must grant Beryl leave for the time she took out because of her miscarriage unless it can establish that doing so would be an undue hardship. Moreover, if the employer is one that automatically assigns points or penalizes employees for unexcused absences, Beryl should not be penalized for using the leave because she was entitled to the accommodation of leave.[135]

*1636.3(l) Limits on Supporting Documentation*

118. A covered entity is not required to seek supporting documentation from an employee who requests an accommodation under the PWFA. If a covered entity decides to seek supporting documentation, the covered entity is permitted to do so only when reasonable under the circumstances to determine whether the employee has a physical or mental condition related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions (a limitation) and needs an adjustment or change at work due to the limitation. When seeking documentation is reasonable, the employer is limited to seeking documentation that itself is reasonable.

119. The restrictions on a covered entity seeking supporting documentation are enforceable through different parts of the PWFA. As set out in § 1636.4(a)(3), as part of 42 U.S.C. 2000gg–1(1), a covered entity may not fail to provide a reasonable accommodation based on the employee's failure to provide supporting documentation if the covered entity's request for supporting documentation violates the standards set out in § 1636.3(l). Moreover, as discussed in section *1636.5(f)* of this appendix under *Possible Violations of 42 U.S.C. 2000gg–2(f) (§ 1636.5(f)) Based on Seeking Supporting Documentation During the Reasonable Accommodation Process and Disclosure of Medical Information,* a covered entity may violate the PWFA's retaliation provisions by seeking documentation or information in circumstances beyond those that are

permitted under § 1636.3(l). This is the case whether or not the employee provides the documentation or information sought by the employer and whether or not the employer grants the accommodation.

120. In addition to the PWFA regulation, covered entities are reminded that the ADA's limitations on disability-related inquiries and medical exams apply to all ADA-covered employers.[136] These ADA limitations protect all of the covered entity's employees whether they have disabilities or not and whether they are seeking an ADA reasonable accommodation or not. Thus, employers responding to reasonable accommodation requests under the PWFA should be mindful of the ADA's limitations on the employer's ability to make disability-related inquiries or require medical exams in response to these requests.[137] For example, separate from requirements imposed by the PWFA and § 1636.3(l), a covered entity may not ask an employee who requests an accommodation under the PWFA if the employee has asked for other reasonable accommodations in the past or whether the employee has preexisting conditions, because these questions are disability-related inquiries, *i.e.,* questions that are likely to elicit disability-related information, and they are not job-related and consistent with business necessity in these circumstances. Further, an employer may not require that an employee seeking an accommodation under the PWFA complete specific forms that ask for information regarding "impairments" or "major life activities." These are disability-related inquiries and, because they are not job-related and consistent with business necessity in these circumstances, they would violate the ADA.

121. The Commission notes that pregnant employees may experience limitations and, therefore, require accommodations, before they have had any pregnancy-related medical appointments. Pregnant employees also may experience difficulty obtaining an immediate appointment with a health care provider early in a pregnancy or finding a health care provider at all. The Commission encourages employers who choose to seek supporting documentation, when that is permitted under § 1636.3(l), to consider the best practice of granting interim reasonable accommodations if an employee indicates that they have tried to obtain documentation and it will be provided at a later date.

*1636.3(l)(1) Seeking Supporting Documentation Only When Reasonable Under the Circumstances*

122. The Commission expects that most PWFA interactive processes will consist of simple exchanges of information between employees and employers, such as brief conversations or emails, and that many of

these will be concluded very shortly after the employee with a known limitation requests a reasonable accommodation, without any requests for further information. Once an employer has determined an appropriate reasonable accommodation, such as through these types of simple communications, no further interactive process is necessary.

123. The PWFA does not require employers to seek supporting documentation from employees requesting accommodations. Under the PWFA, a covered entity may seek supporting documentation only if it is reasonable under the circumstances for the covered entity to determine whether the employee has a physical or mental condition related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions (a limitation) and needs an adjustment or change at work due to the limitation.

124. Under § 1636.3(l), situations when it would be reasonable under the circumstances for a covered entity to seek supporting documentation include, for example, if a pregnant employee asks for the temporary suspension of an essential function(s) that involves climbing ladders due to dizziness and the danger of falling, then the employer may, but is not required to, seek reasonable documentation, which is the minimum that is sufficient to confirm the physical or mental condition—*i.e.,* dizziness and increased risk related to falling; confirm that the physical or mental condition is related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions (together "a limitation"); and describe the adjustment or change at work needed due to the limitation—*i.e.,* how high the employee may climb, the types of actions the employee should avoid, and how long the modification will be needed. As another example, if an employee requests an accommodation for a known limitation but has only a vague idea of what type of accommodation would be effective and the employer also does not know of a potential accommodation, it would be reasonable under the circumstances for the employer to seek supporting documentation describing the adjustment or change at work needed due to the limitation to help identify the needed accommodation. The employer also may consult resources such as JAN.[138]

125. Section 1636.3(l) provides five examples of when it would not be reasonable under the circumstances for the employer to seek supporting documentation.

*1636.3(l)(1)(i)—Obvious*

126. Under the PWFA, it is not reasonable under the circumstances for an employer to seek supporting documentation when the physical or mental condition related to, affected by, or arising out of the pregnancy, childbirth, or related medical conditions (the limitation) and the adjustment or change at work that is needed due to the limitation are obvious.

127. In practice, the Commission expects this example will usually apply when the

---

[135] There also may be other types of situations where the employer is on notice of the need for accommodation but then the interactive process is interrupted. *See, e.g., King v. Steward Trumbull Mem'l Hosp., Inc.,* 30 F.4th 551, 568 (6th Cir. 2022) ("Anti-discrimination laws sometimes require employers to accommodate unexpected circumstances. Sudden illnesses and episodic flare-ups are, by nature, difficult to plan for and can be quite disruptive to those who fall ill and those around them. But that does not mean that accommodating a sudden flare-up will cause undue hardship merely because handling these situations requires more flexibility.")

Some workplace attendance policies explicitly provide for unexpected absences by, for example, not penalizing workers who experience an emergency health situation. *See Enforcement Guidance on Reasonable Accommodation, supra* note 12, at text accompanying n.74. Providing this type of leave to some workers but not to workers affected by pregnancy, childbirth, or related medical conditions could be a violation of Title VII. Finally, if the worker does not qualify for coverage under the PWFA, there may be other laws, like the ADA or the FMLA, that would apply.

[136] The PWFA and title I of the ADA apply to the same entities. Therefore, all entities covered by title I of the ADA also are covered by the PWFA.

[137] For further discussion of this topic, *see infra* section *1636.7(a)(1)* of this appendix under *Prohibition on Disability-Related Inquiries and Medical Examinations and Protection of Medical Information.*

[138] *See* JAN, *supra* note 107.

employee is obviously pregnant.[139] Whether someone is "obviously" pregnant can depend on a number of factors, and not everyone who is pregnant looks the same, but there is a large subset of pregnant workers who most individuals would agree are "obviously" pregnant, *i.e.*, the pregnancy is showing and onlookers easily notice by looking. To limit problems that can arise in some instances when employers attempt to determine if someone is pregnant by looking at them, the regulation requires the employee to confirm the limitation and the adjustment or change at work needed due to the limitation through self-confirmation as defined in § 1636.3(l)(4). This may happen in the same conversation where the employee requests an accommodation.

128. Thus, for example, when an obviously pregnant employee confirms they are pregnant and asks for a different size uniform or related safety gear, the limitation and the adjustment or change at work needed due to the limitation are obvious, and the employer may not seek supporting documentation. In situations where some information is obvious and other information is not, the employer may seek supporting documentation relevant only to the non-obvious issue. Thus, if an obviously pregnant employee requests the reasonable accommodation of leave related to childbirth and recovery and confirms that they are pregnant, it may be reasonable under the circumstances for the employer to seek supporting documentation about the length of leave for recovery, but it would not be reasonable to seek supporting documentation regarding the limitation. Of course, the employer does not have to seek supporting documentation and can simply engage the employee in a discussion about how much leave the employee will need and when they will need it.

*1636.3(l)(1)(ii)—Known*

129. The second example of when it would not be reasonable to seek supporting documentation is when the employer already has sufficient information to determine that the employee has a PWFA limitation and the adjustment or change at work needed due to the limitation. For example, if an employee already provided documentation stating that because of their recent cesarean section they should not lift over 20 pounds for 2 months, the employer may not seek further supporting documentation during those 2 months because the employer already has sufficient information.[140]

130. This principle also applies to episodic conditions. If an employer already has sufficient information to determine that the employee has a PWFA limitation that is episodic (*e.g.*, migraines that are related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions), and the adjustment or change at work needed periodically due to the limitation (breaks or time off), the employer cannot seek additional or new supporting documentation every time the condition arises.

*1636.3(l)(1)(iii)—Predictable Assessments*

131. The third example of when it is not reasonable under the circumstances for an employer to seek supporting documentation is based on the common types of pregnancy modifications sought under the PWFA. Specifically, it is not reasonable under the circumstances for an employer to seek supporting documentation when an employee, at any time during their pregnancy, seeks one of the following modifications, due to their pregnancy: (1) carrying or keeping water near for drinking, as needed; (2) taking additional restroom breaks, as needed; (3) sitting, for those whose work requires standing, and standing, for those whose work requires sitting, as needed; and (4) taking breaks to eat and drink, as needed. In these situations, an employee must provide self-confirmation as defined in § 1636.3(l)(4). Example #10 of this appendix shows how this can be part of the request for an accommodation. It is not reasonable to seek supporting documentation when an employee is pregnant, seeks one of the four listed modifications, and provides self-confirmation as defined in paragraph (l)(4) because these are a small set of commonly sought modifications that are widely known to be needed during an uncomplicated pregnancy.

*1636.3(l)(1)(iv)—Lactation*

132. The fourth example of when it is not reasonable under the circumstances to seek supporting documentation concerns lactation and pumping at work or nursing during work hours. Specifically, it is not reasonable under the circumstances to seek supporting documentation when the reasonable accommodation is related to a time and/or place to pump or any other modification related to pumping at work,[141] and the employee has provided a self-confirmation as set out in § 1636.3(l)(4). Likewise, it is not reasonable under the circumstances to seek supporting documentation when the reasonable accommodation is related to time to nurse during work hours when the regular location of the employee's workplace makes nursing during work hours a possibility because the child is in close proximity and the employee has provided self-confirmation as set out in paragraph (l)(4).[142]

133. It is not reasonable to seek supporting documentation regarding pumping or nursing at work because lactation beginning around or shortly after birth is an obvious fact. Additionally, and pragmatically, health care providers may not be able to provide supporting documentation about the details of how a specific employee is managing nursing or pumping, as this is not something necessarily discussed with a health care provider. This example does not, however, apply to all reasonable accommodations related to lactation; thus, this example would not apply if a lactating employee requested full-time remote work due to a condition that makes pumping difficult.

*1636.3(l)(1)(v)—Employer's Own Policies or Practices*

134. The fifth example of when it would not be reasonable under the circumstances for a covered entity to seek supporting documentation relates to an employer's own policies or practices. If the requested accommodation is one that is available to employees without known limitations pursuant to the covered entity's policies or practices without submitting supporting documentation, then it is not reasonable for the employer to seek supporting documentation from an employee seeking a similar accommodation under the PWFA. For example, if an employer has a policy or practice of requiring supporting documentation only for the use of leave for 3 or more consecutive days, it would not be reasonable to ask someone who is using the same type of leave due to a known limitation under the PWFA to submit supporting documentation when they request leave for 2 or fewer days.[143]

*1636.3(l)(2) Reasonable Documentation*

135. Under the PWFA, reasonable accommodations are available for physical or mental conditions related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions. When it is reasonable under the circumstances for the covered entity to seek supporting documentation, the covered entity is limited to seeking documentation that is itself reasonable. When it is reasonable under the circumstances for the covered entity to seek supporting documentation, the covered entity may require that the supporting documentation come from a health care provider.

136. Confirming the physical or mental condition requires only a simple statement that the physical or mental condition meets the first part of the definition of "limitation" at § 1636.3(a)(2), (*i.e.*, the physical or mental condition is: an impediment or problem, including ones that are modest, minor, or episodic; a need or a problem related to maintaining the health of the employee or the pregnancy, or that the employee is seeking

---

[139] "Obvious" means that the condition is apparent without being mentioned. In terms of pregnancy itself, this may depend on physical appearance, *i.e.*, whether the pregnancy is "showing." This is a concept that the Commission has used previously regarding pregnancy discrimination. *Enforcement Guidance on Pregnancy Discrimination, supra* note 24, at (I)(A)(1)(a) (discussing the "obviousness" of pregnancy and a discrimination claim).

[140] This example does not mean that when it is otherwise reasonable in the circumstances to seek supporting documentation, an employer is prohibited from doing so because the employee has simply stated that they have a limitation and need an adjustment or change at work due to the limitation. However, the employer also is not required to seek documentation and can accept the employee's statement.

[141] *See supra* note 102 for discussion of the PUMP Act and the types of accommodations that may be requested with regard to pumping.

[142] "Nursing during work hours" could include, for example, when an employee who always teleworks from home and has their child at home takes a break to nurse the child, or when an employee takes a break to travel to a nearby daycare center to nurse.

[143] Conversely, if regular employer policies or practices would require documentation when the PWFA would not, or would require more documentation than the PWFA would allow in a situation where the employee is requesting an accommodation under the PWFA, the PWFA's restrictions on supporting documentation would apply.

health care related to the pregnancy, childbirth, or a related medical condition itself.[144] The physical or mental condition can be a PWFA limitation whether or not such condition is an impairment or a disability under the ADA.[145] Some examples of physical or mental conditions that could be limitations are that the employee: has a back injury; has swollen ankles; is experiencing vomiting; has a lifting restriction; is experiencing fatigue; should not be exposed to a certain chemical; should avoid working in the heat; needs to avoid certain physical tasks such as walking, running, or physical confrontation because of increased risk; needs to attend a health care appointment; or needs to recover from a health care procedure. Because the physical or mental condition can be something like fatigue or vomiting, there is no need for the statement to contain a medical diagnosis. Thus, documentation is sufficient under § 1636.3(l)(2) even if it does not contain a medical diagnosis, as long as it has a simple statement of the physical or mental condition.

137. The supporting documentation should confirm that the physical or mental condition is related to, affected by, or arising out of, pregnancy, childbirth, or related medical conditions. The supporting documentation need not state that the pregnancy, childbirth, or related medical conditions are the sole, the original, or a substantial cause of the physical or mental condition at issue because the statute only requires that the physical or mental condition be "related to, affected by, or arising out of" pregnancy, childbirth, or related medical conditions.[146] If relevant, the documentation should include confirmation that the "related medical condition" is related to pregnancy or childbirth.

138. The employer also may seek reasonable documentation to describe the adjustment or change at work that is needed due to the limitation and an estimate of the expected duration of the need for the adjustment or change. This may be, for example: no heavy lifting for approximately 4 months; cannot stand for more than 30 minutes at a time until the end of the pregnancy; the maximum amount of weight involved in the lifting restriction and the approximate length of the restriction; the approximate number and length of breaks; the kind of support or equipment needed and for approximately how long; a change in the type of protective equipment or ventilation needed and for approximately how long it will be needed; the need to limit movement and be allowed to lie down when necessary and for approximately how long the employee will need to limit movement; a change in work location and the approximate length of time of the change; a period of leave expected to be needed for recovery or to attend health care appointments; or the essential function(s) that should be temporarily suspended and for how long.

139. Where the supporting documentation meets the standards described in this section,

it is sufficient to determine whether the employee has a physical or mental condition related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions (a limitation) and needs an adjustment or change at work due to the limitation. Accordingly, a covered entity that has received sufficient documentation but fails to provide an accommodation based on the failure to provide sufficient documentation, or continues to seek additional documentation or information, risks liability under 42 U.S.C. 2000gg–1(1) (§ 1636.4(a)(3)) and/or 42 U.S.C. 2000gg–2(f) (§ 1636.5(f)).

140. Examples Regarding Documentation:[147]

*Example #54/Reasonable Documentation:* Amelia recently returns to work after giving birth and recovery from childbirth. Amelia requests that she not be required to lift more than 30 pounds due to a back injury arising out of her pregnancy. Amelia's employer can use the interactive process to identify Amelia's limitation and what accommodation will address her limitation. Amelia's employer may, but is not required to, seek supporting documentation; in this situation, the employer decides to seek supporting documentation from Amelia. At Amelia's request, her obstetrician emails the human resources department, explaining that Amelia's recent pregnancy has caused a back injury and that she should avoid lifting more than 30 pounds for approximately the next 3 months. This is sufficient documentation to confirm that Amelia has a limitation—a physical or mental condition (a back injury, which is an impediment or problem) related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions— and to describe an adjustment or change at work that is needed due to the limitation (avoid lifting more than 30 pounds for approximately the next three months). Because this is sufficient documentation, the covered entity failing to provide Amelia an accommodation based on a lack of documentation may violate 42 U.S.C. 2000gg–1(1) (§ 1636.4(a)(3)), and the covered entity trying to obtain additional documentation or information related to Amelia's request for a reasonable accommodation may violate 42 U.S.C. 2000gg–2(f) (§ 1636.5(f)).

*Example #55 Reasonable Documentation:* Rachna is 6 months pregnant and has just learned that she has preeclampsia. She requires limited activity and bed rest for the remainder of her pregnancy to limit the risks to her health and the health of her pregnancy. Rachna's employer can use the interactive process to identify Rachna's limitation and what accommodation will address her limitation. Rachna's employer may, but is not required to, seek supporting documentation; in this situation, the employer decides to seek supporting documentation from Rachna. Rachna provides her employer with a note from her midwife saying that, because of risks related to her health and the health of

her pregnancy, Rachna needs to limit activities that involve sitting or standing, needs bed rest as much as possible, and should not commute to work for the remaining 3 months of her pregnancy. This is sufficient documentation to confirm that Rachna has a limitation—a physical or mental condition (maintaining the health of the employee or the employee's pregnancy) related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions—and to describe the change at work that is needed (limiting activities involving sitting and standing, lying down as much as possible, and not commuting for the remainder of her pregnancy). Because this is sufficient documentation, the covered entity failing to provide Rachna an accommodation based on a lack of documentation may violate 42 U.S.C. 2000gg–1(1) (§ 1636.4(a)(3)), and the covered entity trying to obtain additional documentation or information related to her request for a reasonable accommodation may violate 42 U.S.C. 2000gg–2(f) (§ 1636.5(f)).

141. Because a covered entity is limited to the minimum supporting documentation necessary, a covered entity may not require that a pregnancy be confirmed through a specific test or method. Moreover, such a requirement could implicate the ADA's provisions that medical examinations only are permitted when they are job-related and consistent with business necessity.[148]

142. Additionally, covered entities may not require that supporting documentation be submitted on a specific form, but only that documentation meets the requirements of § 1636.3(l)(2). If covered entities offer an optional form for employees to use in submitting supporting documentation, the covered entities may wish to review preexisting forms they have for reasonable accommodations or leave to ensure their compliance with the PWFA. For example, the PWFA does not require that an employee have a "serious health condition" and the statute does not use the term "major life activity," so employer forms or other employer communications seeking supporting documentation for PWFA-related reasonable accommodations should not use this terminology.

*1636.3(l)(3) Limitations on a Covered Entity Seeking Supporting Documentation From a Health Care Provider*

143. When it is reasonable under the circumstances for the covered entity to seek supporting documentation, a covered entity may require that the supporting documentation comes from a health care provider. The regulation contains a non-exhaustive list of possible health care providers that is based on the non-exhaustive list provided in the Commission's ADA policy guidance.[149]

144. The covered entity may not require that the health care provider who is submitting documentation be the provider treating the employee for the condition at issue, as long as the health care provider is able to confirm the physical or mental

---

[144] Section 1636.3(a)(2).

[145] 42 U.S.C. 2000gg(4); *see* 29 CFR 1630.3(h).

[146] 42 U.S.C. 2000gg(4); *see supra* in section *1636.3(a)(2)* of this appendix under *Related to, Affected by, or Arising Out of.*

[147] The conditions described in these examples also may be disabilities under the ADA and therefore may entitle the employee to an accommodation under the ADA, regardless of whether they are entitled to one under the PWFA.

[148] 42 U.S.C. 12112(d)(4)(A).

[149] *See Enforcement Guidance on Reasonable Accommodation, supra* note 12, at Question 6.

condition; confirm that the physical or mental condition is related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions (together "a limitation"); and describe the adjustment or change at work that is needed due to the limitation. The covered entity may not require that an employee be examined by a health care provider of the covered entity's choosing.

*1636.3(l)(4) Self-Confirmation of Pregnancy or Lactation*

145. For the purposes of supporting documentation under the PWFA, self-confirmation is a simple statement in which the employee confirms, as set forth in § 1636.3(l)(1)(i), (iii) and (iv), the limitation and adjustment or change that is needed at work due to the limitation. The self-confirmation statement can be made in any manner and can be made as part of the request for reasonable accommodation under § 1636.3(h)(2). For example, self-confirmation may be spoken, it may be recorded or live, or it may be written on paper or electronically, such as in an email or text. Self-confirmation does not need to use any particular words or format, does not need to be written on a form, does not need to be a particular length, does not need to be notarized or otherwise verified, and does not need to be accompanied by documentary or physical evidence. In many instances, the self-confirmation will be part of what the employee communicates when they start the reasonable accommodation process. Example #10 of this appendix, where an employee tells a manager of her need for more frequent bathroom breaks and explains that the breaks are needed because the employee is pregnant, is an example of self-confirmation of pregnancy.

Interaction Between the PWFA and the ADA

146. Employers covered by the PWFA also are covered by the ADA.[150] The ADA's statutory text includes express restrictions on when a covered entity may require medical exams and make disability-related inquiries.[151] These restrictions apply to all the interactions between covered entities and their employees, regardless of whether an individual has a disability. Thus, for example, if an employee is requesting a reasonable accommodation under the PWFA, the ADA's restrictions apply and prevent an employer from seeking the employee's entire medical record or asking the employee if they have received accommodations in the past because these inquiries are likely to elicit information about a disability and are not job-related and consistent with business necessity in these circumstances. Independent of these ADA restrictions, § 1636.3(l)(2) also prohibits seeking this type of documentation under the PWFA because it goes beyond the definition of reasonable documentation. Finally, depending on the facts, seeking such information could violate 42 U.S.C. 2000gg–2(f).

147. The ADA provides for the confidentiality of medical information,

subject to limited disclosure rules.[152] These rules apply to medical information in the employer's possession, including information obtained by an employer from disability-related inquiries or medical exams, or information obtained as part of the reasonable accommodation process.[153] That an employee is pregnant, has recently been pregnant, or has a medical condition related to pregnancy or childbirth is medical information. The ADA requires that employers keep such information confidential and only disclose it within the confines of the ADA's limited disclosure rules. Similarly, disclosing that an employee is receiving or has requested a reasonable accommodation under the PWFA usually amounts to a disclosure that the employee is pregnant, has recently been pregnant, or has a related medical condition and thus must be treated as confidential medical information as well. This is explained further in section *1636.7(a)(1)* of this appendix under *Prohibition on Disability-Related Inquiries and Medical Examinations and Protection of Medical Information.*

148. If there is a situation where an employee requests an accommodation and both the PWFA and the ADA could apply, the employer should apply the provision that it would be less demanding for the employee to satisfy. For example, assume a pregnant employee has diabetes that is exacerbated by the pregnancy and needs breaks to eat or

drink. Under the PWFA, the covered entity cannot seek supporting documentation (as set forth in § 1636.3(l)(1)(iii)) and this is the provision that the employer should apply.

**IV. 1636.4   Nondiscrimination With Regard to Reasonable Accommodations Related to Pregnancy**

*1636.4(a) Failing To Provide Reasonable Accommodation*

1. The statute at 42 U.S.C. 2000gg–1(1) prohibits a covered entity from not making a reasonable accommodation for a qualified employee with a known limitation related to pregnancy, childbirth, or related medical conditions unless the covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of its business. This provision of the PWFA uses the same language as the ADA, and the rule likewise uses the language from the corresponding ADA regulation.[154] Because 42 U.S.C. 2000gg–1(1) uses the same operative language as the ADA, it should be interpreted in a similar manner.

2. This section is violated when a covered entity fails to make reasonable accommodation to a qualified employee with a known limitation, absent undue hardship.[155] However, a covered entity does not violate 42 U.S.C. 2000gg–1(1) merely by refusing to engage in the interactive process; for a violation, there also must have been a reasonable accommodation that the employer could have provided absent undue hardship.

*1636.4(a)(1) Unnecessary Delay in Providing a Reasonable Accommodation*

3. An unnecessary delay in providing a reasonable accommodation to the known limitations related to pregnancy, childbirth, or related medical conditions of a qualified employee may result in a violation of the PWFA if the delay constitutes a failure to provide a reasonable accommodation. This can be true even if the reasonable accommodation is eventually provided, when the delay was unnecessary. Unnecessary delay that can be actionable under this section can occur at any time during the accommodation process including, but not limited to, responding to the initial request, during the interactive process, or in implementing the accommodation once the request is approved. Delay by a third-party administrator acting on behalf of the covered entity is attributable to the covered entity.

---

[150] 42 U.S.C 12111(5) (ADA); 42 U.S.C. 2000gg(2) (PWFA).

[151] 42 U.S.C. 12112(d), 12112(d)(4)(A).

[152] 42 U.S.C. 12112(d)(3)(B); 29 CFR 1630.14(b)(1), (c)(1), (d)(4); EEOC, *Enforcement Guidance on Disability-Related Inquiries and Medical Examinations of Employees Under the ADA,* at text accompanying nn.9–10 (2000) [hereinafter *Enforcement Guidance on Disability-Related Inquiries], http://www.eeoc.gov/laws/guidance/enforcement-guidance-disability-related-inquiries-and-medical-examinations-employees* ("The ADA requires employers to treat any medical information obtained from a disability-related inquiry or medical examination . . . as well as any medical information voluntarily disclosed by an employee, as a confidential medical record. Employers may share such information only in limited circumstances with supervisors, managers, first aid and safety personnel, and government officials investigating compliance with the ADA."); EEOC, *Enforcement Guidance: Preemployment Disability-Related Questions and Medical Examinations,* at text accompanying n.6 (1995) [hereinafter *Enforcement Guidance: Preemployment Disability-Related Questions], https://www.eeoc.gov/laws/guidance/enforcement-guidance-preemployment-disability-related-questions-and-medical. https://www.eeoc.gov/laws/guidance/enforcement-guidance-preemployment-disability-related-questions-and-medical* ("Medical information must be kept confidential."). In addition, Federal agencies are covered by the Privacy Act of 1974, as amended, 5 U.S.C. 552a, and many Federal agencies maintain equal employment opportunity records subject to a Privacy Act System of Records Notice.

[153] *See Enforcement Guidance on Disability-Related Inquiries, supra* note 152, at General Principles ("The ADA requires employers to treat any medical information obtained from a disability-related inquiry or medical examination (including medical information from voluntary health or wellness programs), as well as any medical information voluntarily disclosed by an employee, as a confidential medical record.") and text after n.12 ("[T]he ADA's restrictions on inquiries and examinations apply to all employees, not just those with disabilities.").

[154] *See* 42 U.S.C. 12112(b)(5)(A); 29 CFR 1630.9(a).

[155] The regulation in § 1636.4, following the language in the statute, uses the phrase "known limitations related to pregnancy, childbirth, or related medical conditions." 42 U.S.C. 2000gg–1(1), (3)–(5). Given the definition in the statute of "known limitation" (42 U.S.C. 2000gg(4)), the phrase "known limitations related to pregnancy, childbirth, or related medical conditions" in § 1636.4 and 42 U.S.C. 2000gg–1 should be understood to mean that the known limitations are related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions or that "known limitations" mean physical or mental conditions related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions.

4. Section 1636.4(a)(1) sets out the factors that are used when determining whether a delay in the provision of a reasonable accommodation violates the PWFA. Section 1636.4(a)(1) sets out the factors already identified in the ADA guidance [156] and adds three additional factors, described in paragraphs 5, 6, and 7 of this section.

5. First, whether providing the accommodation was simple or complex is a factor to be considered. Under the PWFA, there are certain modifications, set forth in § 1636.3(j)(4), that will virtually always be found to be reasonable accommodations that do not impose an undue hardship: (1) allowing a pregnant employee to carry or keep water near and drink, as needed; (2) allowing a pregnant employee to take additional restroom breaks, as needed; (3) allowing a pregnant employee whose work requires standing to sit and whose work requires sitting to stand, as needed; and (4) allowing a pregnant employee to take breaks to eat and drink, as needed. If there is delay in providing these accommodations to a qualified employee with a known limitation, it will virtually always be found to be unnecessary because of the presumption that these modifications will be reasonable accommodations that do not impose an undue hardship.

6. Second, whether the covered entity offered the employee an interim reasonable accommodation during the interactive process is a factor to be considered. The offer of an interim reasonable accommodation can be made at any time following the request for accommodation. The provision of an interim accommodation will decrease the likelihood that an unnecessary delay will be found. Under this factor, the interim reasonable accommodation should be one that enables the employee to keep working as much as possible; the provision of leave will not be considered as a factor that can excuse delay, unless the employee selects, or requests, leave as an interim reasonable accommodation.[157]

7. Third, the length of time for which the employee will need the reasonable accommodation is another factor to be considered. Given that limitations related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions are frequently temporary, an unnecessary delay in providing an accommodation may mean that the period necessitating the accommodation could pass without action simply because of the delay.

*1636.4(a)(2) Refusing an Accommodation*

8. An employee with a known limitation is not required to accept a reasonable accommodation. However, if the rejection of the reasonable accommodation results in the employee being unable to perform the essential functions of the job, the employee is not qualified. This provision mirrors the

language from a similar provision in the ADA regulation,[158] with the inclusion of employees who are qualified under § 1636.3(f)(2).

*1636.4(a)(3) Covered Entity Failing To Provide a Reasonable Accommodation Due to Lack of Supporting Documentation*

9. A covered entity cannot defend the failure to provide an accommodation based on the lack of supporting documentation if: the covered entity did not seek supporting documentation; seeking supporting documentation was not reasonable under the circumstances as defined in § 1636.3(l)(1); the covered entity sought documentation beyond that which is reasonable as defined in § 1636.3(l)(2); or the covered entity did not provide the employee sufficient time to obtain and provide the supporting documentation sought.

*1636.4(a)(4) Choosing Among Possible Accommodations*

10. The covered entity must provide an effective accommodation, *i.e.,* one that meets the employee's needs or limitations. If there is more than one effective accommodation, the employee's preference should be given primary consideration.[159] However, the employer providing the accommodation has the ultimate discretion to choose among effective reasonable accommodations.[160] The employer may choose, for example, the less expensive accommodation, the accommodation that is easier for it to provide, or, generally, the accommodation that imposes the least hardship.[161] In the situation where the employer is choosing among effective reasonable accommodations and does not provide the accommodation that is the employee's preferred accommodation, the employer does not have to show that it is an undue hardship to provide the employee's preferred accommodation.

11. A covered entity's "ultimate discretion" in choosing a reasonable accommodation is limited by certain other considerations. First, 42 U.S.C. 2000gg–1 (§ 1636.4(a)(4)) requires that the accommodation must provide the qualified employee with a known limitation with equal employment opportunity.[162] By this, the Commission means an opportunity to attain the same level of performance, experience the same level of benefits, or otherwise enjoy the same terms, conditions, and privileges of employment as are available to the average similarly situated employee without a known limitation, which includes the individual who needs the accommodation when they are without the known limitation.[163] This may be shown by

evidence of the opportunities that would have been available to the employee seeking the accommodation had they not identified a known limitation or sought an accommodation, or other evidence that tends to demonstrate that the accommodation provided to the employee did not provide equal employment opportunity. Depending on the facts, selecting the accommodation that does not provide equal opportunity could violate 42 U.S.C. 2000gg–1(1), 2000gg–1(5), or 2000gg–2(f).[164]

12. Second, 42 U.S.C. 2000gg–1(2) prohibits a covered entity from requiring a qualified employee affected by pregnancy, childbirth, or related medical conditions to accept an accommodation other than any reasonable accommodation arrived at through the interactive process.

13. Third, 42 U.S.C. 2000gg–1(4) prohibits a covered entity from requiring a qualified employee with a known limitation to take leave, whether paid or unpaid, if there is a reasonable accommodation that will allow the employee to continue to work, absent undue hardship.

14. Fourth, 42 U.S.C. 2000gg–1(5) prohibits a covered entity from taking adverse action in terms, conditions, or privileges of employment against a qualified employee on account of the employee requesting or using a reasonable accommodation to the known limitations related to the pregnancy, childbirth, or related medical conditions of the employee.

15. Fifth, 42 U.S.C. 2000gg–2(f) prohibits retaliation and coercion by covered entities.

16. These limitations to the "ultimate discretion" of a covered entity to choose among effective accommodations are described in the discussions of §§ 1636.4(b), (d), and (e) and 1636.5(f).

17. Example Regarding Failing To Provide Equal Employment Opportunity:

*Example #56/Failing To Provide Equal Employment Opportunity:* Yasmin's job requires her to travel to meet with clients. Because of her pregnancy, she is not able to travel for 3 months. She asks that she be allowed to conduct her client meetings via

---

[156] *See* Enforcement Guidance on Reasonable Accommodation, *supra* note 12, at Question 10 & n.38. The *Enforcement Guidance* notes that these are "relevant factors" but not that these are the only factors.

[157] The restriction on using leave as an interim accommodation is based on 42 U.S.C. 2000gg–1(4) and 2000gg–2(f).

[158] *See* 29 CFR 1630.9(d).

[159] *See* 29 CFR part 1630, appendix, 1630.9.

[160] *Id.*

[161] *Id.*

[162] *See also* Enforcement Guidance on Reasonable Accommodation, *supra* note 12, at Question 9, Example B.

[163] *See* 29 CFR part 1630, appendix, 1630.9; 29 CFR part 1630, appendix, 1630.2(o) (explaining that reassignment should be to a position with equivalent pay, status, etc., if the individual is qualified, and if the position is vacant within a

reasonable amount of time); *see also* Enforcement Guidance on Reasonable Accommodation, *supra* note 12, at text following n.80 ("However, if both the employer and the employee voluntarily agree that transfer is preferable to remaining in the current position with some form of reasonable accommodation, then the employer may transfer the employee."); *cf.* EEOC, *Compliance Manual on Religious Discrimination,* (12–IV)(A)(3) (2021) [hereinafter *Compliance Manual on Religious Discrimination*], *https://www.eeoc.gov/laws/guidance/section-12-religious-discrimination* (stating that in the context of a religious accommodation, an accommodation would not be reasonable "if it requires the employee to accept a reduction in pay rate or some other loss of a benefit or privilege of employment and there is an alternative accommodation that does not do so"); EEOC, *Enforcement Guidance: Unlawful Disparate Treatment of Workers With Caregiving Responsibilities,* Example 5 (2007), *https://www.eeoc.gov/laws/guidance/enforcement-guidance-unlawful-disparate-treatment-workers-caregiving-responsibilities* (explaining how a worker can be a comparator for themselves).

[164] Depending on the facts, this could be a violation of Title VII's prohibition on sex discrimination as well.

video conferencing. Although this accommodation would allow her to perform her essential job functions and would not impose an undue hardship, her employer reassigns her to smaller, local accounts. Being assigned only to these accounts is not an effective accommodation because it limits Yasmin's opportunity to compete for promotions and bonuses as she had in the past. This could be a violation of 42 U.S.C. 2000gg–1(1), because Yasmin is denied an equal opportunity to compete for promotions; thus, her employer has failed to provide her a reasonable accommodation. The employer's actions also could violate 42 U.S.C. 2000gg–1(5) and 2000gg–2(f), or Title VII's prohibition against pregnancy discrimination.

### 1636.4(b) Requiring a Qualified Employee To Accept an Accommodation

18. The statute at 42 U.S.C. 2000gg–1(2) prohibits a covered entity from requiring a qualified employee to accept an accommodation other than any reasonable accommodation arrived at through the interactive process. Pursuant to this provision in the PWFA and § 1636.4(b), a covered entity cannot require a qualified employee to accept an accommodation such as light duty or a temporary transfer, or delay of an examination that is part of the application process, without engaging in the interactive process, even if the covered entity's motivation is concern for the employee's health or pregnancy.

19. The statute at 42 U.S.C. 2000gg–1(2) does not require that the employee have a limitation, known or not; thus, a violation of 42 U.S.C. 2000gg–1(2) could occur if a covered entity believes that a qualified employee is pregnant and decides, without engaging in the interactive process with the employee, that the employee needs a particular accommodation, and unilaterally requires the employee to accept the accommodation, even though the employee has not requested it and can perform the essential functions of the job without it. For example, this provision could be violated if an employment agency, without discussing the situation with the candidate, decides that a candidate recovering from a miscarriage needs an accommodation in the form of not being sent to certain jobs that the agency views as too physical. Similarly, a violation could result if an employer decides to excuse a qualified pregnant employee from overtime as an accommodation without the employee seeking an accommodation and the employer and the employee engaging in the interactive process.[165]

20. Additionally, a violation could occur if a covered entity receives a request for a reasonable accommodation and unilaterally imposes an accommodation that was not requested by the qualified employee without engaging in the interactive process.

21. Example Regarding Requiring an Employee To Accept an Accommodation:

*Example #57/Requiring an Employee To Accept an Accommodation:* Kia, a restaurant

server, is pregnant. She asks for additional breaks during her shifts as her pregnancy progresses because she feels tired, and her feet are swelling. Her employer, without engaging in the interactive process with Kia, directs Kia to take host shifts for the remainder of her pregnancy, because it allows her to sit for long periods. The employer has violated 42 U.S.C. 2000gg–1(2) (§ 1636.4(b)), because it required Kia to accept an accommodation other than one arrived at through the interactive process, even if Kia's earnings did not decrease and her terms, conditions, and privileges of employment were not harmed.

Moreover, if the host shift does not provide Kia with equal terms, conditions, and privileges of employment (*e.g.,* Kia's wages decrease or Kia no longer can earn tips), the covered entity also may have violated 42 U.S.C. 2000gg–1(1) (requiring reasonable accommodation absent undue hardship); 2000gg–1(5) (prohibiting adverse action in terms, conditions, or privileges of employment); and/or 2000gg–2(f) (prohibiting retaliation) (§§ 1636.4(a) and (e) and 1636.5(f)).

22. Finally, this provision also could be violated if a covered entity has a rule that requires all qualified pregnant employees to stop a certain function—such as traveling— automatically, without any evidence that the particular employee is unable to perform that function.

### 1636.4(c) Denying Opportunities to Qualified Employees

23. The statute at 42 U.S.C. 2000gg–1(3) prohibits a covered entity from denying employment opportunities to a qualified employee with a known limitation if the denial is based on the need of the covered entity to make reasonable accommodations to the known limitations related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions of the qualified employee. Thus, an employee's known limitation and need for a reasonable accommodation cannot be part of the covered entity's decision regarding hiring, discharge, promotion, or other employment decisions, unless the reasonable accommodation would impose an undue hardship on the covered entity.

24. This provision in the PWFA uses language similar to that of the ADA, and § 1636.4(c) likewise uses language similar to the corresponding ADA regulation.[166] Section 1636.4(c) encompasses situations where the covered entity's decision is based on the future possibility that a reasonable accommodation will be needed, *i.e.,* 42 U.S.C. 2000gg–1(3) prohibits a covered entity from making a decision based on its belief that an employee may need a reasonable accommodation in the future regardless of whether the employee has asked for one or not. Thus, under § 1636.4(c), this prohibition would include situations where a covered entity refuses to hire a pregnant applicant because the covered entity believes that the applicant will need leave to recover from childbirth, regardless of whether the covered

entity knows the exact amount of leave the applicant will require, or whether the applicant has mentioned the need for leave as a reasonable accommodation to the covered entity.

### 1636.4(d) Requiring a Qualified Employee To Take Leave

25. A covered entity may not require a qualified employee to take leave, whether paid or unpaid, if another reasonable accommodation can be provided to the employee's known limitations related to pregnancy, childbirth, or related medical conditions absent undue hardship.

26. This provision does not prohibit a covered entity from offering leave as a reasonable accommodation if leave is the reasonable accommodation requested or selected by the qualified employee, or if it is the only reasonable accommodation that does not cause an undue hardship. As provided in § 1636.3(i)(3), both paid leave (accrued, short-term disability, or another employer benefit) and unpaid leave are potential reasonable accommodations under the PWFA.

### 1636.4(e) Adverse Action on Account of Requesting or Using a Reasonable Accommodation

27. The PWFA contains overlapping provisions that protect employees, applicants, and former employees seeking or using reasonable accommodations. Importantly, nothing in the PWFA limits which provision an employee may use to protect their rights.

28. One of these provisions is 42 U.S.C. 2000gg–1(5), which prohibits adverse action in the terms, conditions, or privileges of employment against a qualified employee on account of the employee requesting or using a reasonable accommodation to the known limitations related to the pregnancy, childbirth, or related medical conditions of the employee.

29. The protections provided by 42 U.S.C. 2000gg–1(5) are likely to have significant overlap with 42 U.S.C. 2000gg–2(f), which prohibits retaliation. However, the PWFA's anti-retaliation provisions apply to a broader group of individuals and actions than 42 U.S.C. 2000gg–1(5) does.

30. "Terms, conditions, or privileges of employment" is a term from Title VII, and the Commission has interpreted it to encompass a wide range of activities or practices that occur in the workplace including, but not limited to: discriminatory work environment or atmosphere; duration of work (such as the length of an employment contract, hours of work, or attendance); work rules; job assignments and duties; and job advancement (such as training, support, and performance evaluations).[167] In addition, for the purposes of 42 U.S.C. 2000gg–1(5), "terms, conditions, or privileges of employment" can include hiring, discharge, or compensation.

---

[165] These actions also could violate Title VII's prohibition of disparate treatment based on sex. *See Enforcement Guidance on Pregnancy Discrimination, supra* note 24, at (I)(B)(1).

[166] *See* 42 U.S.C. 12112(b)(5)(B); 29 CFR 1630.9(b).

[167] 42 U.S.C. 2000e–2(a)(1); *Compliance Manual on Terms, Conditions, and Privileges of Employment, supra* note 69, at 613.1(a) (stating that the language is to be read in the broadest possible terms and providing a list of examples).

31. This provision prohibits a covered entity from taking a harmful action against a qualified employee. For example, this provision prohibits a covered entity from penalizing an employee for having requested or used an accommodation that the covered entity had granted previously.

32. Examples Regarding Adverse Action in Terms, Conditions, or Privileges of Employment:

*Example #58/Adverse Action in Terms, Conditions, or Privileges of Employment:* Nava took leave to recover from childbirth as a reasonable accommodation under the PWFA, and, as a result, failed to meet the sales quota for that quarter, which led to a negative performance appraisal. The negative appraisal could be a violation of 42 U.S.C. 2000gg–1(5) because Nava received it due to the use of a reasonable accommodation. If an employee receives the reasonable accommodation of leave, a production standard, such as a sales quota, may need to be prorated to account for the reduced amount of time the employee works.[168]

33. Also, an employer may violate this provision if there is more than one reasonable accommodation that does not impose an undue hardship and the employer, after the interactive process, chooses the accommodation that causes an adverse action with respect to the terms, conditions, or privileges of employment, despite the existence of an alternative accommodation that would not do so.

*Example #59/Adverse Action in Terms, Conditions, or Privileges of Employment:* Ivy asks for additional bathroom breaks during the workday because of pregnancy, including during overtime shifts. After talking to Ivy, Ivy's supervisor decides Ivy should simply not work overtime, because during the overtime shift there are fewer employees and the supervisor does not want to bother figuring out coverage for Ivy's bathroom breaks, although it would not be an undue hardship to do so. As a result, Ivy is not assigned overtime and loses earnings. The employer's actions could violate 42 U.S.C. 2000gg–1(5) because Ivy suffered the adverse action of not being assigned to overtime and losing wages because she used a reasonable accommodation.

*Example #60/Adverse Action in Terms, Conditions, or Privileges of Employment:* Leah asks for telework due to morning sickness. Through the interactive process, it is determined that either telework or a later schedule combined with an hour rest break in the afternoon would allow Leah to perform the essential functions of her job without imposing an undue hardship. Although Leah prefers telework, the employer would rather Leah be in the office. It would not be a violation of 42 U.S.C. 2000gg–1(5) to offer Leah the schedule change/rest break, instead of telework, as a reasonable accommodation.

34. The facts set out in Examples #58 and #59 of this appendix also could violate 42 U.S.C. 2000gg–1(1) and 2000gg–2(f).

## V. 1636.5 Remedies and Enforcement

1. In crafting the PWFA remedies and enforcement section, Congress recognized the advisability of using the existing mechanisms for redress of other forms of employment discrimination. The regulation at § 1636.5(a), (c), (d), and (e) follows the language of the statute.

### 1636.5(a) Remedies and Enforcement Under Title VII

2. The enforcement mechanisms, procedures, and remedies available to employees and others covered by Title VII apply to the PWFA.[169] Thus, employees covered by section 706 of Title VII may file charges alleging violations of the PWFA with the Commission, and the Commission will investigate them using the same process as set out in Title VII.[170] Similarly, the Commission will use the same rules to determine the time limits for filing a charge; if the State or locality in which the charge has been filed has a law prohibiting sex discrimination, pregnancy discrimination, or specifically providing accommodations for pregnancy, childbirth, or related medical conditions, the deadline to file a charge will be 300 days.[171]

### 1636.5(e) Remedies and Enforcement Under Section 717 of the Civil Rights Act of 1964

3. The applicable procedures and available remedies for employees covered by section 717 of the Civil Rights Act of 1964, 42 U.S.C. 2000e–16, apply under the PWFA. Employees covered by section 717 of Title VII may file complaints with the relevant Federal agency which will investigate them, and the Commission will process appeals using the same process as set out in Title VII for Federal employees. Thus, the Commission's implementing regulations found at 29 CFR part 1614 (Federal sector equal employment opportunity) apply to the PWFA as well.

## Damages

4. As with other Federal employment discrimination laws, the PWFA provides for recovery of pecuniary and non-pecuniary damages, including compensatory and punitive damages. The statute's adoption by reference of section 1977A of the Revised Statutes of the United States, 42 U.S.C. 1981a, also imports the limitations on the recovery of compensatory damages and punitive damages generally applicable in employment discrimination cases, depending on the size of the employer. Punitive damages are not available in actions against a government, government agency, or political subdivision. This part lays out these requirements involving damages in separate paragraphs under § 1636.5(a) through (e).

---

[168] *See Enforcement Guidance on Reasonable Accommodation, supra* note 12, at Question 19.

[169] 42 U.S.C. 2000gg–2(a), (d), (e).

[170] *See* 29 CFR part 1601.

[171] *See EEOC* v. *Dolgencorp, LLC,* 899 F.3d 428, 433–34 (6th Cir. 2018) (applying the 300-day time limit to a charge alleging failure to provide a reasonable accommodation under the ADA filed in Tennessee where the state statute prohibited discrimination against individuals with disabilities but did not provide for reasonable accommodations, noting, "[t]he relevant question is whether the state agency has the power to entertain the claimant's disability discrimination claim, not whether state law recognizes the same theories of discrimination as federal law").

### 1636.5(f) Prohibition Against Retaliation

5. The anti-retaliation provisions of the PWFA should be interpreted broadly, like those of Title VII and the ADA, to effectuate Congress' broad remedial purpose in enacting these laws.[172] The protections of these provisions extend beyond qualified employees with known limitations and cover activity that may not yet have occurred, such as a circumstance in which a covered entity threatens an employee with termination if they file a charge or requires an employee to sign an agreement that prohibits such individual from filing a charge with the Commission.[173]

### 1636.5(f)(1) Prohibition Against Retaliation

6. The types of conduct prohibited, the standard for determining what constitutes retaliatory conduct, and the individuals protected under the PWFA are the same as they are under Title VII.[174] Accordingly, this provision prohibits discrimination against employees who engage in protected activity, which includes "'participating'' in an EEO process or 'opposing' discrimination.'' [175] Title VII's anti-retaliation provision is broad and protects an employee from conduct, whether related to employment or not, that a reasonable person would have found "materially adverse,'' meaning that the action "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'' [176] Additionally, Title VII's anti-retaliation provision protects employees, applicants, and former employees.[177] The same interpretations apply to the PWFA's anti-retaliation provision.[178]

---

[172] *See Enforcement Guidance on Retaliation and Related Issues, supra* note 89, at (II)(A)(1) (describing the broad protection of the participation clause); *id.* at (II)(A)(2), (2)(a) (describing the broad protection of the opposition clause).

[173] *See* EEOC, *Enforcement Guidance on Non-Waivable Employee Rights under EEOC Enforced Statutes,* (II) (1997), *https://www.eeoc.gov/laws/ guidance/enforcement-guidance-non-waivable-employee-rights-under-eeoc-enforced-statutes* ("[P]romises not to file a charge or participate in an EEOC proceeding are null and void as a matter of public policy. Agreements extracting such promises from employees may also amount to separate and discrete violations of the anti-retaliation provisions of the civil rights statutes.'').

[174] *See* 42 U.S.C. 2000gg–2(f)(1) (using the same language as 42 U.S.C. 2000e–3(a)).

[175] *See Enforcement Guidance on Retaliation, supra* note 89, at (II)(A); *see also id.* at (II)(A)(1), (2) (describing protected activity under Title VII's anti-retaliation clause).

[176] *Burlington N. & Santa Fe Ry. Co.* v. *White,* 548 U.S. 53, 68 (2006) (internal citations and quotation marks omitted).

[177] *See* 42 U.S.C. 2000e–3(a). The statute at 42 U.S.C. 2000gg–2(f)(1) applies to an "employee'' which 42 U.S.C. 2000gg(3) defines to include applicants. The statute at 42 U.S.C. 2000gg(3) relies on the Title VII definition of employee, which includes former employees, where relevant. *See also Robinson* v. *Shell Oil Co.,* 519 U.S. 337, 346 (1997) (finding former employees are protected under Title VII's anti-retaliation provision).

[178] All retaliatory conduct under Title VII (and the ADA), including retaliation that takes the form of harassment, is evaluated under the legal standard for retaliation. *See Enforcement Guidance on Retaliation, supra* note 89, at (II)(B)(3).

7. Section 1636.5(f) contains three other provisions based on the statutory language and established anti-retaliation concepts under Title VII and the ADA.

8. First, 42 U.S.C. 2000gg–2(f)(1) protects "any individual," not only "a qualified employee with a known limitation"; therefore, an employee, applicant, or former employee need not establish that they have a known limitation or are qualified (as those terms are defined in the PWFA) to bring a claim under 42 U.S.C. 2000gg–2(f)(1).[179]

9. Second, a request for a reasonable accommodation under the PWFA constitutes protected activity, and therefore retaliation for such a request is prohibited.[180]

10. Third, an employee, applicant, or former employee does not have to be actually deterred from exercising or enjoying rights under this section for the retaliation to be actionable.[181]

### 1636.5(f)(2) Prohibition Against Coercion

11. The PWFA's anti-coercion provision uses the same language as the ADA's interference provision, with one minor variation in the title of the section.[182] The scope of the PWFA anti-coercion provision is broader than the anti-retaliation provision; it reaches those instances "when conduct does not meet the 'materially adverse' standard required for retaliation."[183] Following the language of 42 U.S.C. 2000gg–2(f)(2) and consistent with the ADA's analogous interference provision, § 1636.5(f)(2) protects individuals, not qualified employees with a known limitation under the PWFA. Thus, the individual need not be an employee, applicant, or former employee and need not establish that they have a known limitation or that they are qualified (as those terms are defined in the PWFA) to bring a claim for coercion under the PWFA.[184]

12. The purpose of this provision is to ensure that employees are free to avail themselves of the protections of the statute. Thus, consistent with the ADA regulation for the analogous provision, § 1636.5(f)(2) includes "harass" in the list of prohibitions; the inclusion is intended to characterize the type of adverse treatment that may in some circumstances violate the coercion provision.[185] Section 1636.5(f)(2) also states

that an individual does not actually have to be deterred from exercising or enjoying rights under this section for the coercion to be actionable.[186]

13. Importantly the coercion provision does not apply to any and all conduct or statements that an individual finds intimidating; it only prohibits conduct that is reasonably likely to interfere with the exercise or enjoyment of PWFA rights.[187]

Some examples of coercion include:

• coercing an individual to relinquish or forgo an accommodation to which they are otherwise entitled;

• intimidating an applicant from requesting an accommodation for the application process by indicating that such a request will result in the applicant not being hired;

• issuing a policy or requirement that purports to limit an employee's rights to invoke PWFA protections (e.g., a fixed leave policy that states "no exceptions will be made for any reason");

• interfering with a former employee's right to file a PWFA lawsuit against a former employer by stating that a negative job reference will be given to prospective employers if the suit is filed; and

• subjecting an employee to unwarranted discipline, demotion, or other adverse treatment because they assisted a coworker in requesting a reasonable accommodation.[188]

Possible Violations of 42 U.S.C. 2000gg–2(f) (§ 1636.5(f)) Based on Seeking Supporting Documentation During the Reasonable Accommodation Process and Disclosure of Medical Information

14. Seeking documentation or information that goes beyond the parameters laid out in § 1636.3(l) when an employee requests a reasonable accommodation under the PWFA may violate 42 U.S.C. 2000gg–2(f) (§ 1636.5(f)) because seeking such information or documentation might well dissuade a reasonable person from engaging in protected activity, such as requesting a reasonable accommodation, or might constitute coercion. Circumstances under which going beyond the parameters of § 1636.3(l) may violate 42 U.S.C. 2000gg–2(f) (§ 1636.5(f)) include:

• Seeking supporting documentation or information in response to an employee's request for reasonable accommodation when it is not reasonable under the circumstances for the covered entity to determine whether the employee has a physical or mental condition related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions (a limitation) and needs an adjustment or change at work due to the

limitation, whether or not the employee provides the documentation or information and whether or not the employer grants the accommodation.

• Continued efforts to obtain more information or supporting documentation when sufficient information or supporting documentation has already been provided to allow the employer to determine whether the employee has a physical or mental condition related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions (a limitation) and the adjustment or change at work that is needed due to the limitation, whether or not the employee provides the documentation or information and whether or not the employer grants the accommodation.[189]

15. Disclosing medical information, threatening to disclose medical information, or requiring an employee to share their medical information other than in the limited situations set out in section 1636.7(a)(1) of this appendix under Prohibition on Disability-Related Inquiries and Medical Examinations and Protection of Medical Information also may violate 42 U.S.C. 2000gg–2(f) (§ 1636.5(f)) because such actions might well dissuade a reasonable person from engaging in protected activity, such as requesting a reasonable accommodation, or might constitute coercion.[190]

16. Actions that the courts or the Commission have previously determined may be retaliation or interference under Title VII or the ADA may violate the retaliation and coercion provisions of the PWFA as well. Depending on the facts, a covered entity's retaliation for activity protected under the PWFA also may violate 42 U.S.C. 2000gg–1(1) (because these actions may make the accommodation ineffective) or 2000gg–1(5) (prohibiting adverse actions) (§ 1636.4(a) and (e)).

17. The following examples could violate 42 U.S.C. 2000gg–2(f) and also may violate 42 U.S.C. 2000gg–1(1), (5) or other laws.

*Example #61/Retaliatory Performance Appraisal:* Perrin requests a stool to sit on

---

[179] See Enforcement Guidance on Retaliation, supra note 89, at (II)(A)(3).

[180] See id. at (II)(A)(2)(e) and Example 10.

[181] See id. at (II)(B)(1), (2) (stating that the retaliation "standard can be satisfied even if the individual was not in fact deterred" and that "[i]f the employer's action would be reasonably likely to deter protected activity, it can be challenged as retaliation even if it falls short of its goal").

[182] The ADA uses the phrase "Interference, coercion, or intimidation" to preface the prohibition against interference (42 U.S.C. 12203(b)), whereas the PWFA uses "Prohibition against coercion" (42 U.S.C. 2000gg–2(f)(2)). The language of the prohibitions is otherwise identical.

[183] See Enforcement Guidance on Retaliation, supra note 89, at (III).

[184] See id.

[185] See 29 CFR 1630.12(b); see also Enforcement Guidance on Retaliation, supra note 89, at text accompanying n.177 (stating, with regard to the ADA, that "[t]he statute, regulations, and court decisions have not separately defined the terms 'coerce,' 'intimidate,' 'threaten,' and 'interfere.'

Rather, as a group, these terms have been interpreted to include at least certain types of actions which, whether or not they rise to the level of unlawful retaliation, are nevertheless actionable as interference.").

[186] See Enforcement Guidance on Retaliation, supra note 89, at (II)(B)(1), (2) (noting that actions can be challenged as retaliatory even if the person was not deterred from engaging in protected activity).

[187] See id at (III) (discussing the ADA's interference provision).

[188] See id.

[189] This is based on a similar policy adopted under the ADA. See Enforcement Guidance on Disability-Related Inquiries, supra note 152, at Question 11 ("[W]hen an employee provides sufficient evidence of the existence of a disability and the need for reasonable accommodation, continued efforts by the employer to require that the individual provide more documentation and/or submit to a medical examination could be considered retaliation."). The Commission notes that if the covered entity can show that it had a good faith belief that the submitted documentation was insufficient and thus sought additional documentation, its actions would not be retaliatory because they would lack the requisite intent.

[190] As described in detail infra in section 1636.7(a)(1) of this appendix under Prohibition on Disability-Related Inquiries and Medical Examinations and Protection of Medical Information, the ADA's rules on medical confidentiality apply to medical information obtained under the PWFA and allow for disclosure of such information only in specific, limited circumstances. See 42 U.S.C. 12112(d)(3); 29 CFR 1630.14; Enforcement Guidance on Disability-Related Inquiries, supra note 152, at text accompanying nn.9–10; Enforcement Guidance: Preemployment Disability-Related Questions, supra note 152, at text accompanying n.6.

due to her pregnancy which makes standing difficult. Lucy, Perrin's supervisor, denies Perrin's request. The corporate human resources department instructs Lucy to grant the request because there is no undue hardship. Angry about being told to provide the reasonable accommodation, Lucy thereafter gives Perrin an unjustified poor performance rating and denies Perrin's request to attend training that Lucy approves for Perrin's coworkers.

*Example #62/Retaliatory Surveillance:* Marisol files an EEOC charge after Cyrus, her supervisor, refuses to provide her with the reasonable accommodation of help with lifting following her cesarean section. Marisol also alleges that after she requested the accommodation, Cyrus asked two coworkers to: conduct surveillance on Marisol, including watching her at work; note with whom she associated in the workplace; suggest to other employees that they should avoid her; and report her breaks to Cyrus, who said he kept a record of this information "just in case."

*Example #63/Seeking Supporting Documentation Beyond § 1636.3(l):* Mara provides her employer with a note from her health care provider explaining that she is pregnant and will need the functions of her position that require her to be around certain chemicals to be temporarily suspended. Mara's supervisor requires that Mara confirm the pregnancy through an ultrasound, even though the employer already has sufficient information to determine whether Mara has a physical or mental condition related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions (a limitation) and needs an adjustment or change at work due to the limitation.

*Example #64/Dissuaded from Requesting an Accommodation:* During an interview at an employment agency, Arden tells the human resources staffer, Stanley, that Arden is dealing with complications from their recent childbirth and may need time off for doctor's appointments during their first few weeks at work. Stanley counsels Arden that needing leave so soon after starting will be a "black mark" on their application and that it would be a waste of time for the employment agency to try to find work for Arden.

*Example #65/Threatening Future Employment:* Merritt, who gets jobs through an employment agency, is fired after requesting an accommodation under the PWFA. The employment agency refuses to refer Merritt to other employers, telling Merritt that the agency only refers workers who will not cause any trouble.

*Example #66/Disciplined for Assisting Other Employees:* Jessie, a factory union steward, ensures that workers know about their rights under the PWFA and encourages employees with known limitations to ask for reasonable accommodations. Jessie helps employees navigate the reasonable accommodation process and provides suggestions of possible reasonable accommodations. Factory supervisors, annoyed by the number of PWFA reasonable accommodation requests, write up Jessie for trivial timekeeping violations and other actions that had not been deemed worthy of

discipline prior to Jessie assisting other employees with their PWFA accommodation requests.

*Example #67/Negative Reference:* While she was pregnant, Laila requested and received the reasonable accommodation of a temporary suspension of the essential function of moving heavy boxes and placement in the light duty program. After giving birth, Laila tells her employer that she has decided to resign and stay home for a year. Her employer responds that if Laila follows through and resigns now, the employer will have no choice but to give her a negative reference because Laila demanded an accommodation but did not have the loyalty to come back after having her baby.

*Example #68/Seeking Supporting Documentation Beyond § 1636.3(l):* Robbie, a retail worker, is pregnant. Her job requires her to stand at a cash register. Because of her pregnancy, Robbie has difficulty standing for long periods of time. Robbie explains the situation to the manager, who requires Robbie to produce a signed doctor's note saying that Robbie is pregnant and needs to sit. Because Robbie is pregnant and has requested one of the simple modifications that will virtually always be found to be a reasonable accommodation that does not impose an undue hardship, and she has confirmed the limitation and her need for the modification due to the limitation, the manager is not permitted to seek supporting documentation, as set forth in § 1636.3(l)(1)(iii).

*Example #69/Disciplined Through Workplace Policy:* Tina gave birth and started a new job. She is experiencing urinary incontinence related to, affected by, or arising out of childbirth and needs time to attend a medical appointment. Her new employer has a policy that employees cannot be absent during the first 90 days of work. Tina requests and is given the reasonable accommodation of time to attend her medical appointment, but then is issued a disciplinary write-up for missing work during her first 90 days.

*Example #70/Retaliatory Failure to Provide Interim Reasonable Accommodation:* Dominique is lactating and, based on the recommendation of her health care provider, requests additional safety gear and protection to reduce the risk that chemicals she works with will contaminate her breast milk. The equipment has to be ordered, and the employer puts Dominique on unpaid leave while waiting for the equipment, although there is available work that Dominique could perform that would not require her to be around the chemicals while she waits for the additional safety gear. Additionally, her supervisor tells human resources staff that he is tired of accommodating Dominique because she asked for accommodations during her pregnancy as well and there has to be an end to her requests.

*Example #71/Retaliation for Requesting Safety Information:* Wynne is pregnant and is in a probationary period as a janitor. She asks her supervisor for safety information about the cleaning products that she handles as part of her job and explains it is to help her determine if she needs to ask for a reasonable accommodation regarding exposure to the

chemicals. Her supervisor tells her not to worry and warns her that trying to get this kind of information will mark her as a troublemaker. During her first review near the end of the probationary period, the supervisor notes that, for an entry-level janitor, Wynne asks many questions and behaves like a troublemaker. The supervisor terminates Wynne even though she was performing satisfactorily.

*Example #72/Seeking Supporting Documentation Beyond § 1636.3(l):* An employer adopts a policy requiring everyone who requests a reasonable accommodation to provide medical documentation in support of the request. Cora, a production worker who is 8 months pregnant, requests additional bathroom breaks. The employer applies the policy to her, refusing to provide the accommodation until she submits supporting documentation, even though under § 1636.3(l)(1)(iii) the employer is not permitted to seek documentation in this situation.

*Example #73/Seeking Supporting Documentation Beyond § 1636.3(l) and Failure to Provide Accommodation:* An employer adopts a policy requiring everyone who requests a reasonable accommodation to provide supporting documentation. Fourteen months after giving birth, Alex wants to continue to pump at work, which is beyond the length of time the PUMP Act requires. She explains her request to her supervisor and asks that she have breaks to pump and that the room provided have a chair, a table, access to electricity and running water. Alex's employer refuses to grant the accommodations unless Alex provides supporting documentation from her health care provider. Alex cannot provide the information, so she stops pumping. In addition to potentially violating 42 U.S.C 2000gg–2(f), the employer cannot use the lack of supporting documentation as a defense to the failure to provide the accommodations because seeking documentation was not reasonable under the circumstances as set forth in § 1636.3(l)(1)(iv) and thus these actions may violate 42 U.S.C 2000gg–1(1) (§ 1636.4(a)(3)).

*Example #74/Retaliatory Waiver of Rights:* An employer adopts a policy under which an employee who files a claim with the EEOC or another outside agency automatically waives their right to have a complaint processed through the employer's internal complaint procedure. Rebecca submitted an internal complaint to her supervisor after her request for a reasonable accommodation was denied and, a month later, filed a charge with the EEOC. The employer notified her that it would stop investigating her internal complaint until the EEOC matter was resolved, but that she would be free to pursue the internal resolution of her complaint if she withdrew her EEOC charge. The employer's policy is retaliatory because it adversely affects the employee by stripping her of an employment privilege for filing a charge with the EEOC.

*Example #75/Disclosure of Medical Information:* Caroline requested and received an accommodation under the PWFA in the form of a lifting restriction due to a back injury related to her pregnancy. Caroline's

accommodation was granted early in her third trimester. Two weeks after her accommodation went into effect, during a team meeting, Caroline's supervisor went around the table describing each team members' duties, sighing as she explained that Caroline had a back injury due to pregnancy that prevented her from lifting and that Caroline's injury was the reason that other team members had extra duties. At each biweekly team meeting for the next two months, Caroline's supervisor noted that team members continued to be assigned extra duties because of Caroline's back injury. In addition to potential violation 42 U.S.C 2000gg–2(f), this disclosure of medical information violates the ADA's confidentiality rules, as it does not fit within any of the five disclosure exceptions.

*Example #76/Retaliatory Harassment:* Benita requested and received an accommodation under the PWFA in the form of a one-hour delayed start time due to morning sickness related to her pregnancy. Benita's coworkers are aware that she is receiving the accommodation due to a condition related to her pregnancy. A few days after Benita's accommodation is granted, her coworkers start to make unwelcome, critical comments about her "late" arrivals on a frequent basis, including that other pregnant individuals were able to start work on time during their pregnancies, that being able to "work during pregnancy is mind over matter," and calling her "lazy" and a "slacker." The coworkers schedule meetings that begin a half hour before Benita arrives in the office and complain to Benita's supervisor that she arrives late to those meetings. Because she cannot attend the meetings, Benita falls behind on her work.

*1636.5(g) Limitation on Monetary Damages*

18. The PWFA at 42 U.S.C. 2000gg–2(g), using the language of the Civil Rights Act of 1991, 42 U.S.C. 1981a(a)(3), provides a limitation on damages based on a "good faith effort" to provide a reasonable accommodation. The covered entity bears the burden of proof for this affirmative defense. This limitation on damages applies to violations of 42 U.S.C. 2000gg–1(1) (§ 1636.4(a)) only. It does not apply to any other provisions of the PWFA.

**VI. 1636.7 Relationship to Other Laws**

*1636.7(a)(1) Relationship to Other Laws in General*

1. The PWFA does not limit the rights of individuals affected by pregnancy, childbirth, or related medical conditions under a Federal, State, or local law that provides greater or equal protection. It is equally true that a Federal, State, or local law that provides less protection for individuals affected by pregnancy, childbirth, or related medical conditions than the PWFA does not limit the rights provided by the PWFA.

2. Federal laws, including, but not limited to, Title VII, the ADA, the FMLA, the Rehabilitation Act, the PUMP Act, and Title IX of the Education Amendments of 1972, 20 U.S.C. 1681 *et seq.*, provide protections for employees affected by pregnancy, childbirth, or related medical conditions. Numerous States and localities also have laws that

provide accommodations for pregnant employees.[191] All of the protections for employees affected by pregnancy, childbirth, or related medical conditions in these laws are unaffected by the PWFA. If these laws provide greater protections than the PWFA, the greater protections will apply. For example, the State of Washington's Healthy Starts Act provides that certain accommodations, including lifting restrictions of 17 pounds or more, cannot be the subject of an undue hardship defense.[192] If an employee in Washington is seeking a lifting restriction as a reasonable accommodation for a pregnancy-related reason under the Healthy Starts Act, an employer in Washington cannot argue that a lifting restriction of 20 pounds is an undue hardship, even though that defense could be raised if the claim were brought under the PWFA.

3. Section 1636.7(a) also applies to Federal or State occupational health and safety laws and collective bargaining agreements (CBAs). Thus, nothing in the PWFA limits an employee's rights under laws such as the OSH Act or under a CBA if either of those provide protection greater than or equal to that of the PWFA.

The PWFA and Title VII

4. The PWFA uses many terms and definitions from Title VII, and conduct that is the subject of PWFA claims also may give rise to claims under Title VII. For example, a qualified pregnant employee who sought leave for recovery from childbirth and was terminated may have a claim under both Title VII for sex discrimination and the PWFA for failure to accommodate, adverse employment action, or retaliation.[193]

5. Under Title VII, employees affected by pregnancy, childbirth, or related medical conditions may be able to receive accommodations if they can identify a comparator similar in their ability or inability to work.[194] Under the PWFA, qualified employees with physical or mental conditions related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions are entitled to reasonable accommodations (absent undue hardship) whether or not other employees have those accommodations and whether or not the affected employees are similar in their ability or inability to work as employees not so affected. Additionally, if the covered entity offers a neutral reason or policy to explain why qualified employees affected by pregnancy, childbirth, or related medical conditions cannot access a specific benefit, the qualified employee with a known limitation under the PWFA still may ask for a waiver of that policy as a reasonable accommodation. Under the PWFA, the employer must grant the waiver, or another reasonable accommodation, absent undue hardship. If, for example, an employer denies

a qualified pregnant employee's request to join its light duty program as a reasonable accommodation because the program is for employees with on-the-job injuries, it may be a reasonable accommodation for the employer's light duty program policy to be waived. Finally, employers in this situation should remember that if there are others to whom the benefit is extended, the Supreme Court stated in *Young* v. *UPS* that "[the employer's] reason [for refusing to accommodate a pregnant employee] normally cannot consist simply of a claim that it is more expensive or less convenient to add pregnant women to the category of those . . . whom the employer accommodates."[195] Thus, if the undue hardship defense of the employer under the PWFA is based solely on cost or convenience, that defense could, under certain fact patterns, nonetheless lead to liability under Title VII.

6. Finally, nothing in the PWFA, this part, or this Interpretive Guidance should be interpreted to reduce or limit any protections provided by Title VII.

The PWFA and the ADA

7. The PWFA uses many terms and definitions from the ADA. Conduct that is the subject of PWFA claims also may give rise to claims under the ADA. For example, an employee with postpartum depression seeking a reasonable accommodation to attend treatment whose employer fails to provide the accommodation may have a claim under both the PWFA and the ADA (and possibly also Title VII). Similarly, an employee who has a physical or mental condition related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions may have both a known limitation under the PWFA and a disability under the ADA (where the physical or mental condition substantially limits a major life activity, including a major bodily function— in other words, the individual would have an "actual" ADA disability).[196] In such case, the employee may be entitled to accommodation, absent undue hardship, under both the PWFA and the ADA.

8. While it will depend on the specific facts, if an employee could be covered under either the PWFA or the ADA, a covered entity's analysis, in most cases, should begin with the PWFA because the definition of "known limitation" under the PWFA covers situations when the ADA does not apply.[197]

9. Requests for accommodation under the PWFA may be indistinguishable from requests for accommodation under the ADA and there will be situations in which both statutes apply. In one instance, the PWFA known limitation also may be an ADA disability. In another, employees with existing disabilities may seek ADA coverage for those, while also invoking the PWFA to address limitations related to pregnancy, childbirth, or related medical conditions interacting with an existing disability. In these situations, employees with disabilities may require additional or different accommodations and are entitled to them,

---

[191] U.S. Dep't of Lab., Women's Bureau, *Employment Protections for Workers Who Are Pregnant or Nursing, www.dol.gov/agencies/wb/ pregnant-nursing-employment-protections* (last visited Mar. 25, 2024).

[192] Wash. Rev. Code 43.10.005(1)(d).

[193] *See* 42 U.S.C. 2000gg–1(1), (5); 2000gg–2(f).

[194] 42 U.S.C. 2000e(k).

[195] 575 U.S. at 229.

[196] 42 U.S.C. 12102(1); 29 CFR 1630.2(g).

[197] 42 U.S.C. 2000gg(4).

absent undue hardship, under the PWFA and/or the ADA.

10. There also will be situations where an employee with a disability who has an accommodation under the ADA seeks and is granted an accommodation under the PWFA. For example, an employee who uses an adaptive keyboard as an ADA reasonable accommodation temporarily may be assigned to a new position as part of an accommodation under the PWFA because an essential function of their original position has been temporarily suspended. In this situation, the employer must continue to provide the adaptive keyboard as an ADA reasonable accommodation if it is necessary for the employee to perform the essential functions of the new position.

11. Because an individual may be covered by both the ADA and the PWFA, and the PWFA provides at 42 U.S.C. 2000gg–5(a)(1) that nothing in the statute shall be construed to invalidate or limit the powers, remedies, and procedures under any Federal law that provides greater or equal protection for individuals affected by pregnancy, childbirth, or related medical conditions, a covered entity must apply the law that provides the worker the most protection.

12. Examples Regarding Disability and Pregnancy:

*Example #77/Disability and Pregnancy:* Roxy is an accountant who has developed gestational hypertension and preeclampsia late in her pregnancy, causing damage to her kidneys. As a result, Roxy needs leave for periodic medical appointments to protect her own health and the health of her pregnancy. Because Roxy's condition is both a physical or mental condition related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions and a condition that substantially limits one of her major bodily functions (kidney function), it qualifies as both a limitation under the PWFA and a disability under the ADA. Absent undue hardship, the employer must provide Roxy with the accommodation she requires due to her pregnancy (under the PWFA) and her disability (under the ADA). Of course, one effective accommodation may be sufficient to satisfy requirements under both statutes in this instance.

*Example #78/Disability and Pregnancy:* Farah is a nurse who has diabetes, and her employer has provided her with the accommodation of breaks to eat small meals throughout the day and breaks to check her insulin levels. When Farah becomes pregnant, she experiences morning sickness that makes it difficult for her to eat in the morning. As a result, she needs more breaks for eating later in the day and occasionally needs a break to rest while at work. Absent undue hardship, the employer must provide Farah with the additional accommodations she requires due to her pregnancy under the PWFA.

13. In cases where both the ADA and PWFA apply, if an employer fails to provide an accommodation the employee could potentially file a claim for failure to accommodate under both the ADA and the PWFA. They also could file a separate ADA claim if they experienced disparate treatment based on a disability.

Prohibition on Disability-Related Inquiries and Medical Examinations and Protection of Medical Information

14. Important protections from the ADA that apply to all covered employees continue to apply when employees are seeking accommodations under the PWFA. First, the rules limiting the ability of covered entities to make disability-related inquiries or require medical exams in the ADA apply to all disability-related inquiries and medical exams including those made in the context of requests for PWFA accommodation.[198] For example, a covered entity may not ask an employee who is seeking an accommodation under the PWFA whether the employee has asked for other accommodations in the past or has preexisting conditions because these questions are likely to elicit information about a disability and are not job-related and consistent with business necessity in this context. Similarly, an employer's response to an employee's request for accommodation under the PWFA that requires the employee to complete a release permitting the employer to obtain the employee's complete medical records would not be job-related or consistent with business necessity.

15. Second, under the ADA, covered entities are required to keep medical information of all applicants, employees, and former employees (whether or not those individuals have disabilities) confidential, with limited exceptions.[199] The Commission has repeatedly stated that the requirement applies to all medical information in the employer's possession, whether obtained through inquiries pursuant to the ADA or otherwise.[200] Thus, this protection applies to medical information obtained under the PWFA, including medical information provided voluntarily and medical information provided as part of the reasonable accommodation process. Moreover, as a practical matter, in many circumstances under the PWFA, the medical

[198] *See* 42 U.S.C. 12112(d); 29 CFR 1630.13, 1630.14.

[199] 42 U.S.C. 12112(d)(3)(B); 29 CFR 1630.14(b)(1)(i) through (iii), (c)(1), (d)(4); *Enforcement Guidance on Disability-Related Inquiries, supra* note 152, at text accompanying nn.9–10 ("The ADA requires employers to treat any medical information obtained from a disability-related inquiry or medical examination . . ., as well as any medical information voluntarily disclosed by an employee, as a confidential medical record. Employers may share such information only in limited circumstances with supervisors, managers, first aid and safety personnel, and government officials investigating compliance with the ADA.") and text after n.12 ("[T]he ADA's restrictions on inquiries and examinations apply to all employees, not just those with disabilities."); *Enforcement Guidance: Preemployment Disability-Related Questions, supra* note 152, at text accompanying n.6 ("Medical information must be kept confidential.").

[200] *See supra* note 199. This policy also appears in numerous EEOC technical assistance documents. *See, e.g.,* EEOC, *Visual Disabilities in the Workplace and the Americans with Disabilities Act,* at text preceding n.43 (2023), *https://www.eeoc.gov/laws/guidance/visual-disabilities-workplace-and-americans-disabilities-act#q8* ("With limited exceptions, an employer must keep confidential any medical information it learns about an applicant or employee.").

information obtained by an employer may involve a condition that could be a disability; rather than an employer attempting to parse out whether to keep certain information confidential or not, all medical information should be kept confidential.[201] Therefore, medical information obtained under the PWFA is subject to the ADA requirement that information regarding the medical condition or history of any employee be collected and maintained on separate forms and in separate medical files and be treated as a confidential medical record.[202]

16. That an employee is pregnant, has recently been pregnant, or has a medical condition related to pregnancy or childbirth is medical information. The ADA requires that employers keep such information confidential and only disclose it within the confines of the limited disclosure rules described in paragraphs 17 and 18 of this section. Similarly, disclosing that an employee is receiving or has requested an accommodation under the PWFA, or has limitations for which they requested or are receiving a reasonable accommodation under the PWFA, usually amounts to a disclosure that the employee is pregnant, has recently been pregnant, or has a related medical condition.

17. As set forth at 29 CFR 1630.14, under the ADA, medical information must be collected and maintained on separate forms and in separate medical files and be treated as a confidential medical record, except that:

(i) Supervisors and managers may be informed regarding necessary restrictions on the work or duties of the employee and necessary accommodations;

(ii) First aid and safety personnel may be informed, when appropriate, if the disability might require emergency treatment; and

(iii) Government officials investigating compliance with the ADA shall be provided relevant information on request.

18. In addition to what is stated in the ADA regulation: covered entities (iv) may disclose the medical information to State workers' compensation offices, State second injury funds, or workers' compensation insurance carriers in accordance with State workers' compensation laws; and (v) may use the medical information for insurance purposes.[203] All these disclosure exceptions apply to medical information obtained under the PWFA. Disclosing medical information in any circumstances, other than those set forth in these five recognized disclosure exceptions, violates the ADA's confidentiality rule.

19. In addition, as explained in section *1636.5(f)* of this appendix under *Possible Violations of 42 U.S.C. 2000gg–2(f)*

[201] Requests for accommodation under the PWFA also may overlap with FMLA issues, and the FMLA requires medical information to be kept confidential as well. 29 CFR 825.500(g).

[202] 42 U.S.C. 12112(d)(3)(B); 29 CFR 1630.14(b)(1), (c)(1), and (d)(4)(i); *see Enforcement Guidance: Preemployment Disability-Related Questions, supra* note 152, at text accompanying the question "Can medical information be kept in an employee's regular personnel file?"

[203] *See Enforcement Guidance: Preemployment Disability-Related Questions, supra* note 152, at text accompanying the heading "Confidentiality."

*(§ 1636.5(f)) Based on Seeking Supporting Documentation During the Reasonable Accommodation Process and Disclosure of Medical Information,* disclosing medical information, threatening to disclose medical information, or requiring an employee to share their medical information other than in the limited situations set out in paragraphs 17 and 18 of this section also may violate 42 U.S.C. 2000gg–2(f) (§ 1636.5(f)).[204] Given the protections for confidential medical information under the ADA and the potential of violating 42 U.S.C. 2000gg–2(f), if a covered entity is under an obligation to disclose medical information received under the PWFA in any circumstances other than those provided in this Interpretive Guidance, before doing so it should inform the individual to whom the information relates of its intent to disclose the information; identify the specific reason for the disclosure; and provide sufficient time for the individual to object.

20. Finally, nothing in the PWFA, this part, or this Interpretive Guidance should be interpreted to reduce or limit any protections provided by the ADA.

*1636.7(a)(2) Limitations Related to Employer-Sponsored Health Plans*

21. The statute at 42 U.S.C. 2000gg–5(a)(2) states that nothing in the PWFA shall be

construed to require an employer-sponsored health plan to pay for or cover any item, procedure, or treatment and, further, that nothing in the PWFA shall be construed to affect any right or remedy available under any other Federal, State, or local law with respect to any such payment or coverage requirement. For example, nothing in the PWFA requires, or forbids, an employer to pay for health insurance benefits for an abortion.

*1636.7(b) Rule of Construction*

22. The statute at 42 U.S.C. 2000gg–5(b) provides a "rule of construction" stating that the PWFA is "subject to the applicability to religious employment" set forth in section 702(a) of the Civil Rights Act of 1964, 42 U.S.C. 2000e–1(a). The relevant portion of section 702(a) provides that Title VII shall not apply to a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities.[205] Section 1636.7(b) reiterates the PWFA statutory language and adds that nothing in 42 U.S.C. 2000g–5(b) or this part should be interpreted to limit the rights of a covered entity under the U.S. Constitution or the rights of an employee under other civil rights statutes. As with assertions of section 702(a) of the Civil Rights Act of 1964 in Title VII matters, when 42 U.S.C. 2000gg–5(b) is asserted by a respondent employer, the Commission will consider the application of the provision on a case-by-case basis.[206]

**VII. 1636.8   Severability**

1. The PWFA at 42 U.S.C. 2000gg–6 contains a severability provision regarding the statute. Section 1636.8 repeats the statutory provision and also addresses the Commission's intent regarding the severability of the Commission's regulations in this part and this Interpretive Guidance.

2. Following Congress' rule for the statute, in places where this part uses the same language as the statute, if any of those identical regulatory provisions, or the application of those provisions to particular persons or circumstances, is held invalid or found to be unconstitutional, the remainder of this part and the application of that provision of this part to other persons or circumstances shall not be affected.

3. In other places, where this part or this Interpretive Guidance provide additional guidance to carry out the PWFA, including examples of reasonable accommodations, following Congress' intent regarding the severability of the provisions of the statute, it is the Commission's intent that if any of those regulatory provisions or the Interpretive Guidance or the application of those provisions or the Interpretive Guidance to particular persons or circumstances is held invalid or found to be unconstitutional, the remainder of this part or the Interpretive Guidance and the application of that provision of this part or the Interpretive Guidance to other persons or circumstances shall not be affected.

[FR Doc. 2024–07527 Filed 4–15–24; 11:15 am]

**BILLING CODE 6570–01–P**

---

[204] *See, e.g., Haire* v. *Farm & Fleet of Rice Lake, Inc.,* No. 2:21–CV–10967, 2022 WL 128815, at *8– *9 (E.D. Mich. Jan. 12, 2022) (disclosing personal and confidential information about an employee's medical condition and mental health episodes to her coworkers could constitute retaliation under Title VII); *Holtrey* v. *Collier Cnty. Bd. of Cnty. Comm'rs,* No. 2:16–CV–00034, 2017 WL 119649, at *3 (M.D. Fla. Jan. 12, 2017) (determining that an employer's disclosure of its employee's confidential medical information about his genito-urinary system to his coworkers and subordinates could constitute retaliation under FMLA, relying on Title VII's definition of "materially adverse action").

[205] The PWFA makes no mention of section 703(e)(2) of the Civil Rights Act of 1964, which provides a second statutory exemption for religious educational institutions in certain circumstances.

[206] The case-by-case analysis of religious defenses asserted in response to a charge under the PWFA

is consistent with the Commission's framework evaluating similar defenses under other statutes the Commission enforces. *See Compliance Manual on Religious Discrimination, supra* note 163, at (12– I)(C).

# Exhibit B

Tennessee *et al.*, *Comment Letter on Regulations to Implement the Pregnant Workers Fairness Act* (Oct. 10, 2023)

**STATE OF TENNESSEE**

# Office of the Attorney General



**Jonathan Skrmetti**
**Attorney General and Reporter**

P.O. Box 20207
Nashville, TN 37202
Telephone: (615) 741-3491
Facsimile: (615) 741-2009

October 10, 2023

**SUBMITTED ELECTRONICALLY**
**VIA REGULATIONS.GOV**

Mr. Raymond Windmiller
Executive Officer, Executive Secretariat
U.S. Equal Employment Opportunity Commission
131 M Street NE
Washington, DC 20507

**Re:** **Regulations to Implement the Pregnant Workers Fairness Act, RIN 3046-AB30**

Dear Mr. Windmiller:

The State of Tennessee, joined by 19 co-signing States, appreciates the opportunity to comment on the Equal Employment Opportunity Commission's proposed rule to implement the Pregnant Workers Fairness Act (PWFA), Pub. L. 117-328 (2022), 136 Stat. 6084. *See* EEOC, *Regulations to Implement the Pregnant Workers Fairness Act*, 88 Fed. Reg. 54,714 (Aug. 11, 2023). A broad, bipartisan coalition passed that law with a laudable goal: Protecting pregnant workers and their babies by directing that women receive workplace accommodations for "pregnancy, childbirth, or related medical conditions." 136 Stat. at 6085. Congress directed EEOC to adopt a rule effectuating the Act's protections for the wellbeing of pregnant women who work outside the home, their unborn children, and their families.

Now, in a perverse plot twist, three unelected EEOC members have proposed hijacking the Act's *pro-pregnancy* provisions to require employers to accommodate *abortions*. If finalized, EEOC's rule would require the State of Tennessee and other covered employers to devote resources—including by providing extra leave time and potentially paying for travel—to assist their workers' decisions to terminate fetal life. This federal abortion-accommodation mandate defies States' duly enacted abortion prohibitions and commitment to the "preservation of prenatal life at all stages of development." *Dobbs v. Jackson*, 142 S. Ct. 2228, 2284 (2022).

State of Tennessee Comments
EEOC-2023-0004
Page 2 of 11

Congress has *never* required the Nation's private employers—let alone the States themselves—to carry out pro-abortion policy, and plainly did not take that novel step by passing an Act that *protects* pregnancy. In nonetheless distorting the PWFA to push its abortion agenda, EEOC commits a series of statutory, constitutional, and administrative-law fouls that would render the proposed rule invalid:

*First,* EEOC's proposal contravenes the Commission's statutory authority. The PWFA's text, structure, history, and purpose foreclose the conclusion that it protects abortions. And other federal laws confirm EEOC lacks the power to enshrine an employment-law requirement to subsidize abortions. At a minimum, the major-questions doctrine means EEOC must point to clear congressional authorization for its controversial abortion-accommodation regime. EEOC cannot do so, which precludes its novel effort to cram down federal abortion policy on the Nation's employers.

*Second,* EEOC's proposal suffers serious constitutional flaws. Federalism limits preclude EEOC from commandeering States into proactively promoting abortions that are illegal under state law. EEOC's rule also flouts the First Amendment as applied to employers who wish to promote life or whose religious beliefs bar them from aiding abortions. Worse still, EEOC Commissioners' unlawful insulation from presidential removal gives them cover to pursue this problematic policy without the public accountability the U.S. Constitution demands.

*Third,* EEOC's proposal is arbitrary and capricious. Among other flaws, EEOC's accounting of the rule's costs focuses solely on those employees who need accommodations to safely continue working while pregnant. EEOC entirely fails to consider *any* costs associated with accommodating the untold thousands of abortions covered employees would seek annually, thus omitting a significant category of costs employers would shoulder. EEOC's fuzzy math does not pass muster under the Administrative Procedure Act (APA), which requires agencies to adequately assess its regulations' downsides.

The undersigned States detail each of these problems below. We hope this analysis—as well as the tens of thousands of other opposing comments—will cause EEOC to abandon its unlawful effort to transform a bipartisan victory for pregnancy protection into a novel and controversial abortion-accommodation regime.

## I.   EEOC's Abortion-Accommodation Rule Lacks Statutory Authority

As an administrative agency, EEOC "literally has no power to act … unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). The upshot: Agencies can only act "within the bounds" of their statutory authority when promulgating rules. *Utility Air Regul. Grp. v. EPA*, 573 U.S. 302, 321 (2014); *see* 5 U.S.C. § 706(2)(C). This principle forecloses the proposed rule because the PWFA does not vest EEOC with authority to require employer accommodations for abortions. If any doubt remained that EEOC lacks its asserted abortion-accommodation power, the major-questions doctrine and constitutional problems with EEOC's interpretation counsel against EEOC's unprecedented proposal.

## A.    EEOC's Interpretation Contravenes the Pregnant Workers Fairness Act

The "'traditional tools' of statutory interpretation" confirm that EEOC's abortion-accommodation power is "contrary to the clear meaning of" the PWFA. *Arangure v. Whitaker*, 911 F.3d 333, 336 (6th Cir. 2018) (quoting *Chevron USA, Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 n.9 (1984)).  Start with the Act's text, which in relevant part requires employers to accommodate any "known limitation[s] … related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions." *See* PWFA § 102(4), 136 Stat. at 6084.  EEOC seeks to define the term "related medical conditions" to mean "having … an abortion." 88 Fed. Reg. at 54,721.  The term "condition," in this context, means a "state of health or physical fitness" or "illness or other medical problem." *New Oxford Am. Dictionary* 362 (3d. ed. 2010).  Yet abortion is neither a medical state of being nor an illness or medical problem—each of which connotes a medical status with a continuing state. Abortion is instead a voluntary, time-limited medical procedure.

Other portions of the provision likewise foreclose EEOC's attempt to read "abortion" into the statute.  The PWFA requires employers to accommodate "known limitations" associated with pregnancy, childbirth, and related conditions.  "Limitation," here, means "a condition of limited ability," *New Oxford Am. Dictionary* 1014—again referring to a continuing health circumstance.  Further, under the *ejusdem generis* canon, the general term "or related medical conditions" is best read to cover only those concepts akin to the specific terms it follows—*i.e.*, "pregnancy" and "childbirth." *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 199 (2012).  Both of those terms, in turn, refer to conditions arising from *being* pregnant or *having* a child.  It turns the statute upside down to cover abortion, which *terminates* pregnancy and unborn children's lives.  The Act's title provides yet another "useful clue" that EEOC is wrong by referencing "Pregnant Workers"—a category that by definition excludes workers who end their pregnancies via abortion. *Dubin v. United States*, 143 S. Ct. 1557, 1567 (2023).

EEOC's interpretation likewise makes a hash of the federal statutory prohibitions on abortion funding, including those Congress passed alongside the PWFA.  As EEOC's rule acknowledges, providing workplace accommodations has undoubted costs in the form of employee productivity, leave time, and resources. *See, e.g.*, 88 Fed. Reg. at 54,754-60.  In approximately one dozen provisions Congress passed at the same time as the PWFA, Congress barred appropriated monies and federal entities from supporting, requiring, performing, or facilitating abortions.[1]  One such provision prohibits funds from flowing to global-health organizations "to motivate or coerce any person to practice abortions."  136 Stat. at 4986.  Another specifies that no appropriated funds for federal employees' health plans "shall be available to pay for an abortion." *Id.* at 4699.  Title X of the Public Health Service Act—which funds grants for certain types of family planning services—likewise commands that "[n]one of the funds appropriated under this subchapter shall be used in programs where abortion is a method of family planning." 42 U.S.C. § 300a-6.  Congress's myriad prohibitions on federal abortion funding belie EEOC's view that it has carte blanche to require States to indirectly fund abortions by administrative fiat.

---

[1] *See* Pub. L. 117-328 (2022), 136 Stat. at 4541, 4699, 4710, 4723, 4857, 4880, 4908, 4985-86, 4990, 5014, 5020, 5077.

State of Tennessee Comments
EEOC-2023-0004
Page 4 of 11

The PWFA's purpose and history provide "extra icing on a cake already frosted" by the statutory text and structure. *Van Buren v. United States*, 141 S. Ct. 1648, 1661 (2021) (citation omitted). In the lead up to the Act's passage, Congress confronted evidence suggesting that "more than 80 percent of first-time mothers work until their final month of pregnancy," and concluded that "pregnant workers may need reasonable accommodations to protect the health of both mother and baby." H.R. Rep. No. 117-27, at 11 (2021). To protect women's ability to pursue both motherhood and continued employment, a bipartisan majority of Congress—supported by pro-life groups like the U.S. Conference of Catholic Bishops—passed the Act without referencing abortion.

The statute's omission of abortion was no oversight, but reflects the sponsors' express representations that covering abortion was off the table. A lead proponent of the bill, Senator Bob Casey (D), rejected EEOC's current position on the Senate floor:

> [U]nder the Pregnant Workers Fairness Act, the [EEOC] could not—could not—issue any regulation that requires abortion leave, nor does the act permit the EEOC to require employers to provide abortions in violation of State law. 191 Cong. Rec. S7050 (daily ed. Dec. 8, 2022).

Senator Steve Daines (R) later endorsed that statement:

> Senator Casey's statement reflects the intent of Congress in advancing the [PWFA] today. This legislation should not be misconstrued by the EEOC or Federal courts to impose abortion-related mandates on employers, or otherwise to promote abortions, contrary to the intent of Congress. *Id.* at S10081 (daily ed. Dec. 22, 2022).

It is difficult to imagine clearer legislative history against EEOC's position. It is thus no surprise that EEOC's new interpretation has drawn criticism from Congress and beyond. As Senator Bill Cassidy (R), a chief sponsor of the law, put it, EEOC's "decision to disregard the legislative process to inject a political abortion agenda is illegal and deeply concerning." Senate HELP Committee, *Ranking Member Cassidy Blasts Biden Administration for Illegally Injecting Abortion Politics into Enforcement of Bipartisan PWFA Law* (Aug. 8, 2023), https://tinyurl.com/3u466n6m. EEOC's proposed rule acknowledges none of this history.

Nor are EEOC's two cited circuit cases—which read Title VII's sex-discrimination provisions to outlaw discriminating against women who have abortions—nearly enough to support its strained reading. *See* 88 Fed. Reg. at 54,721. For one thing, EEOC's precedents do not address imposing an affirmative duty to accommodate abortions, which presents novel interpretive and constitutional problems. For another, the Supreme Court has recently advised it is "unlikely … that a smattering of lower court opinions could ever represent the sort of judicial consensus so broad and unquestioned that we must presume Congress knew of and endorsed it." *BP p.l.c. v. Mayor & City Council of Baltimore*, 141 S. Ct. 1532, 1541 (2021) (citation omitted). That is true as ever here, where the legislative history shows Congress knew how to expressly reference particular standards from Title VII for use in the PWFA and declined to do so in the provision at issue. Regardless, EEOC cannot "ignore clear statutory language on the ground that other courts have done so," and here the "text and structure of the statute are to the contrary" of EEOC's reading. *Id.* (citation omitted).

## B.    EEOC's Interpretation Cannot Overcome the Major-Questions Doctrine and Constitutional Avoidance Principles

Even were the PWFA ambiguous, EEOC still could not use it to smuggle novel abortion-accommodation requirements into employment law nationwide. At the outset, EEOC's interpretation runs afoul of the major-questions doctrine, which requires "clear congressional authorization" before an agency may decide an issue of great "economic and political significance." *West Virginia v. EPA*, 142 S. Ct. 2587, 2608-09 (2022). This principle reflects the commonsense presumption that Congress "does not… hide elephants in mouseholes" when delegating agency authority. *Whitman v. Am. Trucking Ass'n, Inc.*, 531 U.S. 457, 468 (2001). Here, abortion is not simply a question of major "political significance"—it is arguably *the* defining political issue of our time with "profound moral" implications. *Cf. Dobbs*, 142 S. Ct. at 2241, 2285 (*Roe* "sparked a national controversy that has embittered our political culture for a half century"). In order to exercise its "unprecedented" authority to require employers and States to affirmatively accommodate abortions, EEOC therefore must point to "'clear congressional authorization' for the power it claims," not just a "colorable textual basis." *West Virginia*, 142 S. Ct. at 2609. EEOC cannot do so.

The acute federalism and constitutional concerns EEOC's interpretation raises also cut against its reading. As *Dobbs* makes clear, abortion is an issue "the Constitution leaves for the people," working through their elected representatives at the local, State, and federal levels. 142 S. Ct. at 2265; *see also id.* at 2284 (the "Constitution does not prohibit the citizens of each State from regulating or prohibiting abortion"). States have broad prerogative to regulate abortion pursuant to their inherent police powers. Yet EEOC's rule—proposed without the safeguards of bicameralism and presentment—injects the agency into a politically and morally significant matter within the States' domain by mandating abortion accommodations. The Supreme Court's "precedents require Congress to enact exceedingly clear language if it wishes to significantly alter the balance between federal and state power" in this manner. *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2489 (2021) (*per curiam*). Again, EEOC points to no plausible authority for the abortion-accommodation mandate, let alone clear authorization. On top of all that, EEOC's construction of the Act uniquely "raise[s] serious constitutional problems" under the First and Tenth Amendments. *Infra* p. 6-7. The constitutional-avoidance canon "takes precedence" over any interpretive deference EEOC might claim and further cuts against EEOC's interpretation. *Arangure*, 911 F.3d at 339-40.[2]

---

[2] EEOC has not invoked *Chevron* as a basis for its interpretation, and for good reason. There have been widespread critiques of *Chevron*'s validity, *see, e.g.*, *Pereira v. Sessions*, 138 S. Ct. 2105, 2120-21 (2018) (Kennedy, J., concurring); *Michigan v. EPA*, 576 U.S. 743, 760-64 (2015) (Thomas, J., concurring); *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 109-10 (2015) (Scalia, J., concurring in the judgment); *Gutierrez-Brizuela v. Lynch*, 834 F.3d 1142, 1149-58 (10th Cir. 2016) (Gorsuch, J., concurring); Brett M. Kavanaugh, *Fixing Statutory Interpretation*, 129 Harv. L. Rev. 2118, 2150-54 (2016), and the Supreme Court has granted cert to expressly address "[w]hether the Court should overrule *Chevron*." Pet. for Writ of Cert. i, *Loper Bright Enters. v. Raimondo* (U.S. No. 22-451) (cert. granted May 1, 2023).

State of Tennessee Comments
EEOC-2023-0004
Page 6 of 11

## II.   EEOC's Abortion-Accommodation Rule Violates the Constitution

Agency rules cannot be "contrary to constitutional right [or] power." 5 U.S.C. § 706(2)(B). Here, at least three categories of constitutional violations pervade EEOC's proposal. *First*, EEOC's rule exceeds the agency's power to regulate States. *Second*, EEOC's rule improperly dictates abortion-related speech and action contrary to the First Amendment's protections for speech and religious exercise. *Third*, EEOC's putatively independent structure—in which Commissioners are insulated from at-will presidential removal—violates the separation of powers.

### A.   The Rule Exceeds Federalism Limits on Regulating States

"[O]ur Constitution establishes a system of dual sovereignty between the States and the Federal Government." *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991). Reflecting this "fundamental principle," *id.*, the Tenth Amendment to the U.S. Constitution provides that "the powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people," U.S. Const. amend. X. This directive reflects that the States "retained 'a residuary and inviolable sovereignty'" in areas outside the "discrete, enumerated" powers the Constitution confers on Congress. *Printz v. United States*, 521 U.S. 898, 919 (1997) (citation omitted).

From this structure flows critical limits on the federal government's ability to regulate States. Relevant here, though Congress "has the authority under the Constitution to pass laws requiring or prohibiting certain acts, it lacks the power directly to compel the States to require or prohibit those acts." *New York v. United States*, 505 U.S. 144, 166 (1992). Put simply, the federal government "may not conscript state governments as its agents," *Murphy v. NCAA*, 138 S. Ct. 1461, 1477 (2018), including by "dictat[ing] what a state legislature may and may not do," *id.* And while Congress may sometimes regulate the States as employers, it cannot do so in a way "that is destructive of state sovereignty." *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 554 (1985). These rules help "reduce[] the risk of tyranny and abuse" by government officials, "promote[] political accountability" by ensuring voters "know who to credit or blame" for regulations, and "prevent[] Congress from shifting the costs of regulation to the States." *Murphy*, 138 S. Ct. at 1477.

EEOC's rule transgresses these federalism limits by strongarming States to promote and implement a federal preference for abortions made illegal by state law. EEOC's rule would coopt state resources like employee time and require States to adopt gap-filling measures so that important governmental work can be done while workers procure abortions. Plainly, the result of EEOC's accommodation mandate is a requirement of indirect funding by States and their taxpayers of abortions that States prohibit. EEOC's rule thus denigrates States' interest in fetal life and duly enacted abortion prohibitions, contrary to the federalism limits on the EEOC's ability to "conscript state governments" as unwilling agents in EEOC's pro-abortion agenda. *Murphy*, 138 S. Ct. at 1477.

### B.   The Rule Contravenes First Amendment Protections for Speech and Religion

EEOC's abortion-accommodation mandate also runs afoul of First Amendment protections for freedom of speech and religion. It is a basic freedom-of-speech rule that the "government may not compel a person to speak its own preferred messages." *303 Creative LLC v. Elenis*, 143 S. Ct. 2298, 2312 (2023). Nor can the federal government "burden" a private employer's "religious exercise by

State of Tennessee Comments
EEOC-2023-0004
Page 7 of 11

putting it to the choice" of following federal law or "approving" behavior "inconsistent with its beliefs," particularly where—as here—the governing law does not generally apply to all employers. *Fulton v. City of Phila.*, 141 S. Ct. 1868, 1876 (2021).

As applied here, these constitutional protections mean that employers may engage in speech promoting fetal life over abortion, including by funding and encouraging the use of programs that provide support to pregnant women and their families.  *See* Office of Governor Bill Lee, *Gov. Lee Launches Tennessee Strong Families Grant Program* (Sept. 13, 2023), https://tinyurl.com/9e8kebvb.  Yet certain portions of EEOC's proposed rule would bar any "interference" relating to a worker's seeking out an abortion accommodation.  88 Fed. Reg. at 54,792.  To the extent these proposed EEOC provisions would prevent employers from promoting or encouraging a worker to seek out pro-life resources and instead require pro-abortion speech, that regulation would violate the First Amendment.

Similar legal flaws infect rules requiring employers to accommodate abortion contrary to their sincerely held religious beliefs:  Whether under the First Amendment or the Religious Freedom Restoration Act (RFRA), 42 U.S.C. § 2000bb *et seq.*, such a mandate would impermissibly violate employers' free-exercise rights.  *See Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 720-21 (2014).  Though EEOC's rule acknowledges that religious organizations might be exempt from the rule's scope, the First Amendment's protections sweep further and include all religious employers, even if privately held, as well as employees.  *Id.*  EEOC's misguided statement that RFRA does not apply in suits between private parties is no response.  The First Amendment's limits also would govern EEOC's rule, which is not generally applicable due to its exemptions for small employers.  *Cf. Fulton*, 141 S. Ct. at 1881-82.  To ensure employers' (and employees') free speech and religious liberty are appropriately safeguarded, EEOC should clarify that its rule would not impinge on the employers' right to engage in pro-life speech and conduct.

### C.      The Rule Is Invalid Because EEOC Is Unconstitutionally Structured

Article II of the Constitution vests "'the executive Power'—all of it"—in the President.  *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2191 (2020) (quoting U.S. Const. art. II, § 1).  As a corollary, the Constitution demands that the President maintain the ability "to remove those who assist him in carrying out his duties." *Id.* (quoting *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 513-14 (2010)).  This requirement of at-will removal applies to all "multimember expert agencies" that "wield substantial executive power." *Id.* at 2199-200 (citing *Humphrey's Ex'r v. United States*, 295 U.S. 602 (1935)).  Put simply, if "an agency does important work," Article II demands that the agency's leaders be removeable at will by the President—full stop. *Collins v. Yellen*, 141 S. Ct. 1761, 1784 (2021).

EEOC's putative status as an "independent federal agency" violates these Article II commands.[3]  Courts and the EEOC itself have interpreted the agency's governing statute—which provides for five-year terms for Commissioners, 42 U.S.C. § 2000e-4(a)—as allowing removal only

---

[3] Dep't of Labor, *Equal Employment Opportunity*, https://www.dol.gov/general/topic/discrimination (last accessed Sept. 19, 2023).

State of Tennessee Comments
EEOC-2023-0004
Page 8 of 11

for cause.[4] Yet the Commission wields an array of "quintessentially executive power[s]," including the authority to issue binding regulations and pursue enforcement actions in federal court on behalf of the United States. *Cf. Seila Law*, 140 S. Ct. at 2200; *see also Collins*, 141 S. Ct. at 1785-86. EEOC's structure thus violates the Constitution, which in turn renders the agency's rules unlawful and would require a court to set aside the rule "as void." *Seila Law*, 140 S. Ct. at 2196; *see also Axon Enter., Inc. v. FTC*, 598 U.S. 175, 191 (2023) (being subjected to "unconstitutionally insulated" agency decisionmaker is "here-and-now injury").

EEOC's separation-of-powers foul is no mere technicality, but instead hinders the Constitution's central means for promoting "requisite responsibility … in the Executive Department" for enforcing federal laws. *Free Enter. Fund*, 561 U.S. at 492 (citation omitted). Our constitutional system ensures "the ultimate authority resides in the people alone," Jonathan Skrmetti, *Why We Must Fight to Preserve the Constitution*, The Tennessean (Sept. 15, 2023), https://tinyurl.com/ycjx7wwu, including by requiring that the executive officials who "wield significant authority … remain[] subject to the ongoing supervision and control of the elected President," *Seila Law*, 140 S. Ct. at 2203. Yet armed with protection from at-will removal, independent agency heads can push the bounds of the law knowing that the President is "powerless to intervene" in most cases. *Id.* The President, in turn, can "escape responsibility" for problematic agency policies by citing agencies' independence from his control. *Free Enter. Fund*, 561 U.S. at 498.[5] The U.S. Constitution does not countenance the "diffusion of accountability" attending EEOC's independent-agency structure. *Id.*

## III.   EEOC's Abortion-Accommodation Rule Is Arbitrary and Capricious

The APA's arbitrary-and-capricious standard requires agency decisionmaking to be "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). Agency analysis cannot "run[] counter to the evidence before the agency," must show a "rational connection between the facts found and the choice made," and needs to "consider" all "important aspects[] of the problem" the agency is addressing. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quotation omitted). EEOC's proposal violates these baseline APA rules in several respects.

*First*, EEOC has entirely failed to consider several important aspects of the regulatory problem. EEOC has not addressed the federalism concerns associated with forcing States to

---

[4] Inferring for-cause protection from a term-of-years provision is dubious as a matter of modern-day statutory interpretation, given that Congress expressly vested other agency heads with for-cause removal protections. *See, e.g., Calcutt v. FDIC*, 37 F.4th 293, 337-39 (6th Cir. 2022) (Murphy, J., dissenting), *rev'd on other grounds by* 143 S. Ct. 1317 (2023); *PHH Corp. v. CFPB*, 881 F.3d 75, 173 n.1 (D.C. Cir. 2018) (*en banc*) (Kavanaugh, J., dissenting) (citing Kirti Datla & Richard L. Revesz, *Deconstructing Independent Agencies (and Executive Agencies)*, 98 Cornell L. Rev. 769, 834-35 (2013); *Note, The SEC Is Not an Independent Agency*, 126 Harv. L. Rev. 781, 801 (2013)).

[5] *Compare, e.g.,* Maegan Vazquez, *Biden Not in Favor of Ban on Gas Stoves, White House Says*, CNN Politics (Jan. 11, 2023), https://tinyurl.com/3euytvme ("The President does not support banning gas stoves—and the Consumer Product Safety Commission, *which is independent*, is not banning gas stoves." (emphasis added)), *with* Consumer Product Safety Commission, *Request for Information on Chronic Hazards Associated with Gas Ranges and Proposed Solutions*, 88 Fed. Reg. 14,150 (Mar. 7, 2023).

accommodate abortions that are illegal under state law. Nor has it assessed the impact of First Amendment precedents—including the Supreme Court's decisions in *303 Creative LLC v. Elenis*, 143 S. Ct. 2290 (2023), and *Fulton v. City of Philadelphia, Penn.*, 141 S. Ct. 1868 (2021)—on its proposal to mandate abortion accommodations and limit any speech that "interferes" with women's seeking abortions. EEOC must grapple with these considerations before finalizing the rule and justify the legality of its proposal in light of the serious constitutional issues it presents.

*Second*, EEOC does not even claim to consider *any* costs associated with implementing the abortion-accommodation mandate. In calculating the rule's purported costs, EEOC only addresses the expenses associated with providing accommodations to pregnant women who choose to *continue* their pregnancies. As a result, EEOC generates the number of annually affected pregnant women using the percentage of women who "gave birth to at least one child the previous year." 88 Fed. Reg. at 54,757. EEOC further disclaims that its rule will have any meaningful costs in the many states, like Tennessee, that already protect pregnant workers. *Id.* at 54,755. *Nowhere* does EEOC attempt to quantify the costs associated with extending pregnancy-accommodation provisions to the great number of women who obtain abortions annually—a figure researchers have estimated at 860,000 per year. *E.g.*, Br. of *Amici Curiae* Am. College of Obstetricians & Gynecologists *et al.* 9, *Dobbs*, 142 S. Ct. 2228.

Even accounting for a fraction of this figure would produce immense new costs that EEOC has unlawfully ignored. It is bad enough that EEOC seeks to impose an improper mandate that departs from the bipartisan law Congress passed and the President signed. But the APA at a minimum requires EEOC to be transparent about the tremendous compliance costs its abortion-accommodation regime will impose—including on scores of the Nation's private employers, the States, and their taxpayers. The APA requires EEOC to incorporate this new category of costs into its rulemaking, as well as offer a supplemental comment period so that the public can fully vet this missing aspect of EEOC's current proposed rule. *Cf. Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 236 (D.C. Cir. 2008).

\* \* \*

The undersigned States thank EEOC for its consideration of these concerns. We ask EEOC to abandon pursuit of an abortion-accommodation rule that would coopt the States whose citizens have rejected pro-abortion policies through the democratic process. Tennessee and the other co-signing States are prepared to pursue legal action should EEOC fail to heed its statutory, constitutional, and APA bounds.

State of Tennessee Comments
EEOC-2023-0004
Page 10 of 11

Sincerely,


Jonathan Skrmetti
Tennessee Attorney General & Reporter


Steve Marshall
Alabama Attorney General


Treg Taylor
Alaska Attorney General


Tim Griffin
Arkansas Attorney General


Ashley Moody
Florida Attorney General


Chris Carr
Georgia Attorney General


Todd Rokita
Indiana Attorney General


Brenna Bird
Iowa Attorney General


Kris Kobach
Kansas Attorney General


Jeff Landry
Louisiana Attorney General


Lynn Fitch
Mississippi Attorney General


Andrew Bailey
Missouri Attorney General


Austin Knudsen
Montana Attorney General


Mike Hilgers
Nebraska Attorney General

State of Tennessee Comments
EEOC-2023-0004
Page 11 of 11

Drew Wrigley
North Dakota Attorney General

Alan Wilson
South Carolina Attorney General

Dave Yost
Ohio Attorney General

Marty Jackley
South Dakota Attorney General

Genter Drummond
Oklahoma Attorney General

Sean Reyes
Utah Attorney General

# Exhibit C

Letter from U.S. Department of Justice, Office of Legislative Affairs, to the Honorable Robert C. Scott, Chairman, Committee on Education & Labor (May 3, 2021)



**U.S. Department of Justice**

Office of Legislative Affairs

_Office of the Assistant Attorney General_                _Washington, D.C. 20530_

The Honorable Robert C. Scott
Chairman
Committee on Education and Labor
U.S. House of Representatives
Washington DC, 20515

Dear Mr. Chairman,

This letter provides the views and recommendations of the Department of Justice ("Department") on H.R. 1065, the Pregnant Workers Fairness Act. The Department has constitutional concerns, which are outlined below.

The bill, the Pregnant Workers Fairness Act, offered as an amendment in the nature of a substitute to H.R. 1065, seeks to ensure that employers reasonably accommodate employees experiencing limitations relating to pregnancy, childbirth or related conditions. Our comment involves just one aspect of the bill: its abrogation of state sovereign immunity in connection with private lawsuits against states for failing to make such accommodations or taking other prohibited pregnancy-related actions. Because Congress's authority to abrogate state sovereign immunity is limited, we are concerned that H.R. 1065 as currently drafted is vulnerable to constitutional challenge. Congress can mitigate this significant litigation risk by making changes to the bill, for example by more clearly delineating the right that it seeks to protect and building a robust legislative record to demonstrate the need for this protection with respect to state governmental employers.

Under H.R. 1065, it would be an unlawful employment practice for covered entities, which include state employers, to refuse to "make reasonable accommodations to the known limitations related to pregnancy, child-birth, or related medical conditions of a qualified employee," unless they can show that "the accommodation would impose an undue hardship." H.R. 1065, § 2(1); _see also id._ § 5(2)(B)(i), (iii) (defining "covered entity" to include "an employer" under Title VII of the Civil Rights Act of 1964, which includes state employers, as well as "an entity employing a State employee described in section 304(a) of the Government Employee Rights Act of 1991"). H.R. 1065 would also prohibit covered entities from taking a range of actions relating to these known limitations, such as requiring an employee affected by such conditions to take leave. _Id._ §§ 2(3)–(4); _see also id._ § 2(2) (an employee cannot be required to accept an accommodation other than the one negotiated under the bill's provisions). The bill

The Honorable Robert C. Scott
Page 2

would then create a cause of action against covered entities, including state employers, for engaging in the unlawful employment practices defined in the Act. *Id.* §§ 3(a)(1), 3(d)(1). It would also provide for monetary damages, *id.* §§ 3(a)(3), 3(d)(3), and include a provision explicitly abrogating state sovereign immunity, *id.* § 6.

As a general matter, Congress lacks authority under Article I to abrogate states' immunity from suit in state and federal courts. *See Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 364 (2001); *Alden v. Maine*, 527 U.S. 706, 741–54 (1999); *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 72–73 (1996). Congress may, however, abrogate states' sovereign immunity pursuant to its enforcement power under Section 5 of the Fourteenth Amendment. *United States v. Georgia*, 546 U.S. 151, 158–59 (2006); *Tennessee v. Lane*, 541 U.S. 509, 518 (2004). Such legislation must exhibit "'congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end.'" *Nevada Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 728 (2003) (quoting *City of Boerne v. Flores*, 521 U.S. 507, 520 (1997)).

In *Hibbs*, the Court upheld the abrogation of state sovereign immunity for violations of the family leave provisions of the Family and Medical Leave Act, concluding that they were a congruent and proportional response to "the States' record of unconstitutional participation in, and fostering of, gender-based discrimination in the administration of leave benefits." *Id.* at 735. In so doing, the Court emphasized that gender discrimination triggers heightened scrutiny, making it "easier for Congress to show a pattern of state constitutional violations." *Id.* As part of the evidence of this pattern of gender discrimination, the Court pointed to discrimination in maternity and paternity leave policies, as well as childcare leave. *Id.* at 729–31. Notably, the family leave provisions at issue were not limited to prohibiting gender discrimination in leave policies but rather provided "an across-the-board, routine employment benefit for all eligible employees." *Id.* at 737. In upholding the provisions nonetheless, the Court explained that the gender-neutral framing was important to counter the sex stereotypes that underlay discriminatory leave policies:

> Stereotypes about women's domestic roles are reinforced by parallel stereotypes presuming a lack of domestic responsibilities for men. Because employers continued to regard the family as the woman's domain, they often denied men similar accommodations or discouraged them from taking leave. These mutually reinforcing stereotypes created a self-fulfilling cycle of discrimination that forced women to continue to assume the role of primary family caregiver, and fostered employers' stereotypical views about women's commitment to work and their value as employees. *Id.* at 736.

On the other hand, in *Garrett* the Supreme Court rejected the ADA's abrogation of sovereign immunity for suits based on a state employer's failure to make "reasonable accommodations" for disability. 531 U.S. at 360–61. The Court emphasized that distinctions based on disability do not trigger heightened scrutiny so long as they are rational, making it

The Honorable Robert C. Scott
Page 3

difficult to show a pattern of unconstitutional discrimination on the basis of disability. *Id.* at 367.
Moreover, even assuming a record showing such a pattern, the Court held that a statutory
requirement that employers make any "reasonable accommodation" for a disabled employee
lacked congruence and proportionality because the additional economic cost of a reasonable
accommodation was a rational basis for refusing to undertake it. *Id.* at 372.

H.R. 1065's requirement that employers make reasonable accommodations for pregnancy-
related limitations is very similar to the ADA prohibition at issue in *Garrett*. A critical
difference, however, is that H.R. 1065 plainly seeks to remedy gender discrimination, with its
focus on limitations relating to pregnancy and childbirth, rather than disability discrimination. As
a result, H.R. 1065's abrogation of state sovereign immunity stands a better chance of being
found constitutional. Even so, subsequent to *Hibbs* the Court rejected Congress's abrogation of
state sovereign immunity for the self-care leave provisions of the FMLA, concluding that the
"well-documented pattern of sex-based discrimination in family-leave policies" found in *Hibbs*
was lacking with respect to self-care leave. *Coleman v. Ct. of Appeals of Maryland*, 566 U.S. 30,
36-37 (2012) (plurality opinion). The Court also noted that nearly all states offered sick leave
and that "Congress did not document any pattern of States excluding pregnancy-related illnesses
from sick-leave or disability-leave policies." *Id.* at 39. *Coleman* emphasized that "States may not
be subject to suits for damages based on violations of a comprehensive statute unless Congress
has identified a specific pattern of constitutional violations by state employers." *Id.* at 42.

Also, relevant to assessing the constitutionality of H.R. 1065's abrogation of state sovereign
immunity is that the Supreme Court held many decades ago that discrimination against pregnant
employees is not in itself gender discrimination. In examining a state disability program's refusal
to pay disability benefits on account of a "normal pregnancy" under the Equal Protection Clause,
the Court concluded that the "program does not exclude anyone from benefit eligibility because
of gender but merely removes one physical condition—pregnancy—from the list of compensable
disabilities" and represented not a "sex-based classification" but instead a distinction "between
pregnant women and nonpregnant persons." *Geduldig v. Aiello*, 417 U.S. 484, 496 n.20 (1974).
The Court accordingly conceived of the employer's refusal as based solely on physical disability,
subjected it to mere rational-basis review, and upheld it against constitutional challenge. *See id.*
at 495-45; *see also General Elec. Co. v. Gilbert*, 429 U.S. 125, 135 (1976) ("[E]xclusion of
pregnancy from a disability-benefits plan providing general coverage is not a gender-based
discrimination at all."), *superseded by statute*.

Notably, however, more recent statements of the Court suggest recognition that distinctions
by state employers based upon pregnancy and women's perceived roles as mothers are often a
form of impermissible gender discrimination. *See Coleman*, 566 U.S. at 39 (emphasizing that
existing leave policies likely covered pregnancy-related illnesses in rejecting a pattern of
constitutional violations that self-care leave would address); *Hibbs*, 538 U.S. at 729–31
(identifying gender distinctions with respect to maternity and paternity leave as reinforcing sex
stereotypes); *cf. Bostock v. Clayton Cty*, 140 S. Ct. 1731, 1739 (2020) (assuming that "sex" in
Title VII means at a minimum "biological distinctions between male and female"); *id.* at 1761
n.16 (2020) (dissenting opinion) (describing pregnancy as "biologically tied to sex").

The Honorable Robert C. Scott
Page 4

These decisions suggest that, although H.R. 1065's abrogation of state sovereign immunity raises substantial litigation risk, there are also important ways in which Congress can bolster H.R. 1065's constitutionality, including:

- Clearly identifying the right against gender discrimination that H.R. 1065 is seeking to protect. *See Garrett*, 531 U.S. at 365 (emphasizing the need to "identify with some precision the scope of the constitutional right at issue").

- Providing legislative findings documenting the relationship between employers' refusal to offer reasonable accommodations for limitations associated with pregnancy, childbirth, or related conditions and gender discrimination. *See id.* at 370–71 (stating that if "Congress truly understood this information as reflecting a pattern of unconstitutional behavior by the States, one would expect some mention of that conclusion in the Act's legislative findings").

- Developing a legislative record demonstrating gender discrimination by states in granting disability accommodations, particularly discrimination relating to pregnancy, childbirth, and related conditions, and identifying how stereotypes respecting women's roles contributes to employers' refusals to accommodate known limitations related to pregnancy and childbirth. *See Coleman*, 566 U.S. at 42 (plurality opinion); *Hibbs*, 538 U.S. at 736, 738.

- Explaining why existing protections, such as in the Pregnancy Discrimination Act, are not sufficient to protect women against such discrimination and why the additional measures in H.R. 1065 are therefore needed. *See Coleman*, 566 U.S. at 39 (plurality opinion); *Hibbs*, 538 U.S. at 737–38; *see also Young v. United Parcel Serv.*, 135 S. Ct. 1338, 1344 (2015) (concluding that the Pregnancy Discrimination Act "requires courts to consider the extent to which an employer's policy treats pregnant workers less favorably than it treats nonpregnant workers similar in their ability or inability to work").

Thank you for the opportunity to present our views. We hope this information is helpful. Please do not hesitate to contact this office if we may provide additional assistance regarding this or any other matter. The Office of Management and Budget has advised us that from the perspective of the Administration's program, there is no objection to submission of this letter.

Sincerely,

JOSEPH   Digitally signed by
JOSEPH GAETA
GAETA   Date: 2021.05.03
17:15:37 -04'00'

Joe Gaeta
Deputy Assistant Attorney General

# Exhibit D

Andrea R. Lucas, Commissioner, Equal Employment Opportunity Commission, *Statement re: Vote on Final Rule to Implement the Pregnant Workers Fairness Act* (Apr. 15, 2024)

.



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Washington, D.C.  20507**

Commissioner
Andrea R. Lucas

## STATEMENT

To:     Charlotte A. Burrows
        Chair

        Jocelyn Samuels
        Vice Chair

        Keith R. Sonderling
        Commissioner

        Kalpana Kotagal
        Commissioner

CC:     Raymond Windmiller
        Executive Secretariat

From:   Andrea R. Lucas
        Commissioner

Date:   April 3, 2024

Re:     Statement re: Vote on Final Rule to Implement the Pregnant Workers Fairness Act

---

This statement addresses my vote to disapprove the Commission's final rule implementing the Pregnant Workers Fairness Act ("PWFA"), enacted as part of the Consolidated Appropriations Act ("CAA").  *See* Pub. L. 117-328, Div. II, 136 Stat. 4459, 6084-89, 42 U.S.C. §§ 2000gg-2000gg-6.

I support elements of the final rule.  However, I am unable to approve it because it purports to broaden the scope of the statute in ways that, in my view, cannot reasonably be reconciled with the text.  At a high level, the rule fundamentally errs in conflating pregnancy and childbirth accommodation with accommodation of the female sex, that is, female biology and reproduction. The Commission extends the new accommodation requirements to reach virtually every condition, circumstance, or procedure that relates to any aspect of the female reproductive system.  And the results are paradoxical.  Worse, the Commission chose not to structure the final rule in a manner that realistically allows for severability of its objectionable provisions from its reasonable and rational components.

The PWFA was a tremendous, bipartisan legislative achievement.  Pregnant women in the workplace deserve regulations that implement the Act's provisions in a clear and reliable way.  It

is unfortunate that the elements of the final rule serving this purpose are inextricably tied to a needlessly expansive foundation that does not.  I cannot support the Commission's final product.

## I.   COMPLIANCE WITH THE INJUNCTION ENTERED BY THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS AND THE CONSTITUTIONAL VULNERABILITY OF THE PWFA

Before turning to the final rule itself, preliminary collateral business demands attention. On February 27, 2024, the United States District Court for the Northern District of Texas permanently enjoined the Commission, and each commissioner, from enforcing the PWFA, or any implementing regulations, against the state of Texas, or any division or agency of the government of Texas.  *See Texas v. Garland*, No. 5:23-CV-034-H, 2024 WL 967838 (N.D. Tex. Feb. 27, 2024) ("Order").  An observer might reasonably ask whether voting to approve a regulation that, on its face, applies to the state of Texas violates that injunction and places the Commission, me as a commissioner, or both, at odds with the Order and the court.  After careful analysis, I have concluded that a vote on whether to promulgate the Commission's final rule does not violate the injunction.

On the constitutional question presented, the court held that the Quorum Clause contains a physical presence requirement.  Order at **39-41.  On December 23, 2022, the House of Representatives conducted a roll call vote on final passage of the CAA, with 225 yeas, 201 nays, 1 present, and 4 not voting.  *Id.* at *5 (citations omitted).  Of the 431 members who voted, 226 did so by proxy, with absent members having certified, pursuant to House rules and regulations, that they were "unable to physically attend" the vote pursuant to the chamber's proxy rules and procedures; 205 members voted in person.  *Id.* (citations omitted).  The parties agreed that 218 members constitutes a quorum in the House, that is a majority of the 435 total seats—though the House also considers the quorum requirement satisfied by a majority of seated members, the whole "number of the House" (in this case 216 since the House had 431 members).  *Id.* & n.5.  Either way, a quorum of members was not physically present, which, so the court held, violated the Quorum Clause.  *Id.* at *39.  Accordingly, the CAA—and with it the PWFA—was not constitutionally enacted.

The district court entered an injunction, but voting on the question whether to promulgate the PWFA final rule does not violate its terms.  The Order enjoins the Commission or any commissioner from *enforcing* the PWFA or *enforcing* "any implementing regulations thereto" against the state of Texas; it says nothing about promulgating regulations.  *Id.* at *52.  In my view, enforcement includes accepting and investigating charges, issuing cause determinations and right to sue letters, filing actions, and the like—but simply promulgating rules is not, by itself, enforcement.  *Id.*  In fact, the district court's very mention of "any implementing regulations," at a time before the Commission had yet to promulgate the final rule, appears to presume that the court expected the agency to issue regulations.  Provided that we take no action to enforce this final rule against Texas, or any division or agency of the government of Texas, merely voting whether to approve and issue the final rule does not run afoul of the Order.

Of course, the constitutional vulnerability of the PWFA is a question for the courts.  Even if it is not resolved in the Texas case, the question will arise in others.  Indeed, until it is

conclusively answered—by the Supreme Court or unanimous consensus of circuits—defendants to PWFA actions will continue to raise it as a defense, increasing the likelihood of an appropriate vehicle for consideration of the constitutional question. When it reaches the Supreme Court, the stakes will be higher and the odds longer than comfort would prefer. The Commission's decision to issue a final rule considerably more expansive and decisively more partisan than the statute itself effectively gambles the fate of the PWFA on the government's success on the merits of the constitutional question. I would not make that wager. The choices made by a partisan majority of the Commission in the final rule all but extinguish the prospect of future bipartisanship in Congress if it becomes necessary to reenact the PWFA—and pregnant women in the workforce will be the ones who lose.

## II. THE PWFA IS AN IMPORTANT STEP FORWARD FOR *PREGNANT* WOMEN IN THE WORKFORCE

On its face, the Pregnant Workers Fairness Act of 2022 is a focused, measured, and balanced extension of the Americans with Disabilities Act, which continues to apply to and protect pregnant employees with disabilities related to their pregnancies. Specifically, the PWFA extends the reasonable accommodation requirement of the ADA to "known limitations," a lower threshold than "disabilities," for pregnant and postpartum women in the workplace. The primary implication is obvious: covered employers must reasonably accommodate the limitations of pregnancy and childbirth that may not qualify as a disability, absent undue hardship. Congress balanced the expansion of this affirmative requirement by focusing it in two ways. First, the PWFA's accommodation requirement applies only to workers who are pregnant or who have recently given birth. Second, it covers only those limitations that are part of a worker's particular pregnancy and childbirth, as well as medical conditions caused or exacerbated by the worker's specific pregnancy and childbirth.

For pregnant women in the workplace, the PWFA ostensibly requires employers in many workplaces to offer the sort of minor assistance that should be expected from common decency and good manners, but sadly, sometimes is denied: water, a place to sit, fitting attire, increased access to the bathroom, and the like. By requiring these measures, Congress sought to help more women remain in the workplace longer during pregnancy, while they are still both able (aided by small adjustments) and willing to perform their jobs.

As a working mother of two young daughters, one born during my time at the Commission, I strongly supported the bill as it made its way through Congress. Since its enactment, I have continued to advocate the law's goal to facilitate pregnant and recently postpartum women's ability to remain in, and return to, their jobs when this end may be accomplished or aided by modest workplace accommodations. Indeed, this variation of the ADA paradigm garnered widespread support from both houses of Congress and the White House.

Even beyond the particulars of the statute itself, I encourage employers creatively and proactively to accommodate women, mothers, and caregivers in their employ. When modest adjustments and flexibility make the difference, employers often reap numerous benefits from doing so, even where the PWFA may not *require* such efforts. Often, a simple solution or thoughtful flexibility costs employers less and benefits employees more in the end. Many

employers have long recognized this reality and have facilitated the work of their pregnant employees in mutually beneficial ways. At least to some degree, other employers must do likewise. Regardless, all employers should do more to help workers when small steps can achieve significant benefits and savings for both workers and employers.

I was optimistic that the Commission's final rule would follow the example of the underlying statute itself. Our path forward seemed clear: reasonably interpret and clarify the requirements of a brief and focused statute, and in so doing place it within the broader panoply of federal accommodation law; explain how the PWFA must—as well as how it may not—be applied in the main and in light of the ADA; and clarify core rights and limits of employees and employers, outlining the appropriate analytic framework, again buttressed by helpful examples. Such a rule would ensure robust application of the PWFA, withstand challenge, and potentially endure for decades. But the Commission took a different approach.

## III.   THE FINAL RULE IS BASED ON AN INTERPRETATION OF STATUTORY TERMS STRETCHED BEYOND THEIR ORDINARY MEANING AND FOR WHICH THE COMMISSION FAILS TO OFFER A REASONABLE EXPLANATION

After a careful review of the PWFA, the public comments received in response to the Commission's Notice of Proposed Rulemaking (NPRM), and the text of the final rule and ancillary documents, I cannot agree with the Commission's interpretation of the phrase "pregnancy, childbirth, or related medical conditions." Misalignment on such a foundational and core component of the final rule that is not severable requires that I part ways with the agency on this rulemaking.

### A.   The Commission Imports Title VII Discrimination Policy into Accommodation Law

Congress used the same phrase—"pregnancy, childbirth, or related medical conditions"—in the PWFA as Congress previously had used in the Pregnancy Discrimination Act of 1978, 42 U.S.C. § 2000e(k), when it amended Title VII's definition of "sex" for purposes of what constituted "sex" discrimination.[1] Based on that overlap in phrasing, the Commission claims in the Preamble to the final rule and the rule's Interpretive Guidance that the final rule "gives the term 'pregnancy, childbirth, or related medical conditions' the *same meaning* as under Title VII." Interpretative Guidance, "Section 1636.3(b) Pregnancy, Childbirth, or Related Medical Conditions" (emphasis added). In doing so, the Commission imports into the PWFA the Commission's 2015 gloss on the PDA as well as what the Commission misleadingly calls "Title VII's longstanding

---

[1] Congress enacted the PDA in response to *General Elec. Co. v. Gilbert*, 429 U.S. 125 (1976). There, the Court held that discrimination on the basis of pregnancy was not sex discrimination for purposes of Title VII. The PDA amended Title VII to clarify that the terms "because of sex" and "on the basis of sex" included, without limitation, "because of or on the basis of pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e(k). The PDA makes clear that pregnancy discrimination in its various forms constitutes sex discrimination under Title VII.

definition of "pregnancy, childbirth, or related medical conditions"[2] or, more amorphously, "the meaning given that phrase by the courts and the Commission for over 40 years." Preamble. The Commission claims this outcome is justified by three canons of statutory interpretation—the prior-construction canon, related statutes canon, and presumption of legislative acquiescence canon—or at least its *characterizations* of those canons. *See* Preamble n. 66.

The Commission describes the prior-construction canon as providing that "when administrative and judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its administrative and judicial interpretations as well." Preamble, "Response to Comments Regarding the Commission's Proposed Definition of "Pregnancy, Childbirth, or Related Medical Conditions" as Reflected in Statutory Text" (quoting *Bragdon v. Abbott*, 524 U.S. 624, 645 (1998)). Similarly, in describing the related statutes canon, the final rule notes that statutes ought not to be interpreted "in isolation, but rather in the context of the body of law of which they are a part," so that "statutes addressing the same subject matter generally should be read as if they are one law." *Id.* Finally, the Commission offers the presumption of legislative acquiescence (sometimes also called congressional ratification), arguing that when a statute is adopted after "certain judicial and administrative interpretations," the statute's repetitive language may reasonably be said to "acquiesce," or even ratify, those interpretations. *Id.*

Pointing to these interpretative canons, the Commission claims that the use of the same phrase in the PWFA and Title VII is proof positive that Congress sought to imbue into the PWFA the administrative and judicial gloss of Title VII's prohibition of sex discrimination. As discussed further in Part III.B of this Statement, the Commission errs from the very start by skipping straight to these interpretative canons instead of first resolving whether any textual ambiguity exists such that it is appropriate to consider whether these canons could resolve that ambiguity. But even assuming *arguendo* that the text in question is ambiguous, the Commission also fails to defend these canons' applicability. The Commission simply invokes its preferred canons of statutory interpretative as if an incantation, without any real attempt—much less reasoned explanation—to show that their application is justified in the instant case. However, to use the prior-construction canon to apply the meaning of a phrase from one statute to the next, a sufficiently "settled" meaning of the phrase in question must in fact exist. This is an unavoidable predicate. The Commission repeatedly asserts that it "gave the phrase 'pregnancy, childbirth, or related medical conditions' the *same meaning* under the PWFA as under Title VII." Preamble, "1636.3(b) Pregnancy, Childbirth, or Related Medical Conditions" (emphasis added). But Congress cannot

---

[2] Unfortunately, no such statutory definition exists. The text of Title VII does not, in fact, define "pregnancy, childbirth, or related conditions." Rather, as noted in the prior footnote, Title VII—via the PDA—defined the protected basis of "sex" enumerated in Title VII as including "pregnancy, childbirth, or related conditions;" the statute does not define that phrase. Perhaps the Commission majority in fact means to refer to the judicial and administrative gloss of the undefined statutory phrase. But a gloss, of course, is not on the same footing as a statutory definition, and conflating the two does the Commission no favors here. And in fact, any gloss put on this statutory phrase—or any other in Title VII—does not even carry the weight of a regulation, much less a statutory definition, as Congress did not grant the Commission authority to issue substantive regulations under Title VII. *See* 42 U.S.C. § 2000e-12(a) (granting the Commission the authority only to issue "suitable *procedural* regulations" to carry out Title VII) (emphasis added); *see, e.g.*, *General Elec. Co. v. Gilbert*, 429 U.S. 125, 141 (1976).

be presumed to have given the "same meaning" in both statutes—or to have acquiesced or ratified a prior meaning—if a sufficient consensus does not exist for a term or phrase from a former statute. This is a high bar to meet. As recently clarified by the Supreme Court, it is "unlikely … that a smattering of lower court opinions could ever represent the sort of judicial consensus so broad and unquestioned that we must presume Congress knew of and endorsed it." *BP P.L.C. v. Mayor & City Council of Baltimore*, 593 U.S. 230, 244 (2021) (cleaned up and citation omitted). The Commission cannot meet this bar. In the Preamble and Interpretative Guidance for the final rule, at no point does the Commission demonstrate *any* judicial consensus exists either directly following or adopting the interpretations reached by our non-binding, sub-regulatory 2015 pregnancy discrimination guidance document, or reaching parallel conclusions to our guidance. Instead, the agency essentially points to the existence of our guidance document and includes citations to a "smattering of lower court opinions" (largely predating that guidance) for each component of the agency's interpretation of the phrase in question. But the Commission never articulates why or how this handful of opinions represents a sufficient consensus. In fact, often where it summarizes the state of the caselaw at all, it does the exact *opposite*: admitting that a "limited number of Federal courts" "have addressed the issue" of whether various conditions "falls within the Title VII definition of 'related medical conditions'" and relying only on a "majority" of these limited sets of cases instead of any judicial consensus. Preamble, "Comments and Response to Comments Regarding Coverage of Specific Conditions—Menstruation;" *see also id.*, "Comments and Response to Comments Regarding Coverage of Specific Conditions—Menstruation" (discussing, and attempting to distinguish, conflicting decisions); *id.*, "Comments and Response to Comments Regarding Coverage of Specific Conditions—Contraception" (same).

Nor does the agency even attempt to show how our 2015 pregnancy discrimination guidance meets the Commission's framing of an administrative consensus. The Commission cites *Hall v. U.S. Department of Agriculture*, which argues "Congress is presumed to be aware of an agency's interpretation of a statute. We most commonly apply that presumption when an agency's interpretation of a statute has been officially published and consistently followed." 984 F.3d 825, 840 (9th Cir. 2020). But while there is no question that the Commission's 2015 pregnancy discrimination guidance has been "officially published," at no point does the Commission argue, much less show, that our guidance has been "consistently followed." Unfortunate, but unsurprising, given the Commission only cites one or two cases postdating our PDA guidance.

In short, the thin support marshalled by the Commission is not sufficient to show a "settled consensus" such that Congress should be presumed to have known of and endorsed it. "And it certainly cannot do so where, as here, the text and structure of the statute are to the contrary," *BP P.L.C.*, 593 U.S. at 244 (cleaned up and citation omitted), as discussed further in Part III.B of this Statement.

Having purported to bridge the PDA and the PWFA through an excerpted common phrase, the Commission then shoves broad concepts of unlawful pregnancy discrimination under Title VII into the PWFA, an accommodation statute designed to allow pregnant women to remain at work. As a result, any subject deemed by the Commission in 2015 or by any supportive federal court over the past 40 years (regardless of the precedential weight of the courts' opinions or the existence of any judicial consensus, or the lack thereof for both) to be sufficiently related to the notion or concept of the female sex or female reproductive biology for purposes of defining sex

discrimination under Title VII, may now likewise be subject to the accommodation requirement of the PWFA under the final rule. Consistent with this interpretation, the final rule expansively defines the term "pregnancy" as "includ[ing], but . . . not limited to, current pregnancy; past pregnancy; potential or intended pregnancy (which can include infertility, fertility treatment, and the use of contraception)," Final Rule, § 1636.3(b)—in essence, the final rule redefines the common and unambiguous term "pregnancy" as the "capacity for pregnancy." Indeed, the Preamble refers to the "capacity to become pregnant" or "childbearing capacity" at least *eighteen* times.[3] And likewise, the final rule defines "related medical conditions" as "medical conditions relating to pregnancy or childbirth of the specific employee in question," *id.*, keeping in mind that the "pregnancy" to which these conditions must relate is not the ordinary meaning of "pregnancy" but rather the expansive definition given by the rule to that term. Thus, the final rule opens the door to requiring accommodations potentially extending to a myriad of conditions ranging from infertility to menstruation to hormone issues to menopause.[4] This is how the Commission paradoxically interprets a statute requiring employers to accommodate a worker's pregnancy and childbirth into a provision that also requires accommodation of a worker's inability to become pregnant.

Having imported its 2015 discrimination guidance into the PWFA—along with the holdings of a smattering of courts—by isolating the phrase "pregnancy, childbirth, and related medical conditions" from the surrounding statutory language of the PWFA, the Commission then returns to that surrounding language. With the statute's scope expanded, the Commission only then recognizes the definite article "the" that proceeds "pregnancy, childbirth, and related medical conditions" in the PWFA. At this point, the final rule purports to apply the definite article to limit the phrase it just expanded concomitant to its pregnancy discrimination guidance to the conditions and related limitations actually suffered or experienced by a particular worker. Specifically, the final rule requires that the pregnancy or childbirth to be accommodated must be "of the specific employee in question" and that "related medical conditions must be related to *the* pregnancy or childbirth of *the specific employee* in question." Preamble (Response to Comments Regarding the List of Conditions Included in the Regulation as Examples of "Pregnancy, Childbirth, or Related Medical Conditions") (emphases added). Relatedly, the Commission "chang[ed] the language in § 1636.3(b) so that the list [of related medical conditions] is now explained as conditions that 'are, or may be,' 'related medical conditions,'" and emphasizes in the Preamble that "[i]n each case, a determination that a medical condition is related to pregnancy or childbirth is fact-specific and

---

[3] *See, e.g.*, Preamble, "Comments and Response to Comments Regarding Coverage of Specific Conditions—Infertility and Fertility Treatments" ("Thus, depending upon the facts of the case, including whether the infertility treatments are sought by an *employee with the capacity to become pregnant* for the purpose of becoming pregnant, accommodations for an employee due to physical or mental conditions related to, affected by, or arising out of infertility or fertility treatments may be provided under the PWFA, absent undue hardship.") (emphasis added); Preamble, "Comments and Response to Comments Regarding Coverage of Specific Conditions—Infertility and Fertility Treatments;" Preamble, "Comments and Response to Comments Regarding Coverage of Specific Conditions—Menstruation."

[4] As a result of the Commission's decision to cover infertility and other conditions that do not, in fact, relate to a particular pregnancy, the final rule imposes a more onerous and invasive administrative and documentation requirement that differs considerably from the proposed rule. On this and other points there is little and less to distinguish the ADA and the PWFA. Had Congress intended this result, a few words inserted into the ADA would have sufficed.

7

contingent on whether the medical condition at issue is related to *the* pregnancy or childbirth of *the specific employee* in question." *Id.* (emphases added). The Commission made these allegedly "clarifying" changes in response to commentators arguing that "the language in the NPRM explaining the term 'related medical conditions' could require accommodations for any physical or mental condition that has any real, perceived, or potential connection to—or impact on—an individual's pregnancy, fertility, or reproductive system." *Id.* (summarizing comments).

The Commission wants its cake and to eat it too. But the adage holds true—that cannot be done. The final rule's "limit" or "clarification" is illusory and futile, given the Commission's continued insistence on a definition of "pregnancy" that is so broad as to conflate the term with the female sex. If the Commission had adopted the ordinary meaning of "pregnancy," this limitation *might* work, and rightly constrain "medical conditions" to only those occurrences of such medical conditions related to "the" actual pregnancy or childbirth of a specific employee or applicant in question. But this solution unfortunately becomes untenable under the final rule's expansive definition of pregnancy. Given the rule's expansive definition of "pregnancy," the obligation to accommodate any "medical condition" "related to the pregnancy or childbirth of the specific employee in question" actually means the obligation to accommodate any medical condition related to "the" current pregnancy, past pregnancy (at any point in the past), potential or intended pregnancy (at any point in the future), infertility, fertility treatment, or use of contraception by "the specific employee in question." Once the nexus for a "related medical condition" only need be a speculative future pregnancy, any prior pregnancy no matter how long past, or, in essence, the worker's female sex and the corresponding capacity for pregnancy, there is almost no bounds on what "condition" any female employee or applicant could attempt to point to.

For example, the heavy periods of a 14 year-old, part-time fast-food worker who hopes to get pregnant when she's 30? Under the final rule's definitions, arguably a medical condition related to the potential pregnancy of the specific employee in question. The intermittent, short-term monthly depression a worker experiences from each negative pregnancy test while she's trying to conceive? Or the increased stress a worker experiences from commuting to the office that she fears will decrease her overall health and eventually contribute to challenges getting pregnant a decade later? Both arguably medical conditions related to intended pregnancy of the respective, specific employee in question. The dehydration and corresponding need for additional water breaks experienced by a mom who still is breast-feeding and pumping for her three-year old? Or the increased weight gained and never lost from a long-past pregnancy, such that the worker is overweight but not obese, and she would feel more comfortable performing her duties with a stool? Each of these is possibly a medical condition related to the past pregnancy of the respective, specific employee in question. The fatigue or headaches as a side effect of birth control experienced by a worker at any time during her decades-long lifetime period of fertility (from teens to middle-age)? Arguably a medical condition related to use of contraception by the specific employee in question. None of this is to belittle any of these situations, simply to illustrate how expansive is even the Commission's "limited" and "clarified" definition of which employees and conditions possibly are covered.

For the agency to offer a reasonable, and not an arbitrary and capricious definition of "pregnancy, childbirth, and related medical conditions," it is not sufficient for our final rule to

open the door to a potentially vast universe of accommodation obligations—and then simply hope that this problem practically will be solved by the imposition of more onerous documentation requirements, the good intent of future female employees or applicants, or employers pointing to undue hardship to cabin on the back-end the scope of required accommodations.

In the end, the final rule cobbles together its statutory interpretation in stages: first excising and isolating a common phrase, then using it to import discrimination policy guidance, then returning the newly defined phrase to consider the surrounding text for the first time, and only then in an attempt to make its approach workable. It accomplishes this by selective, cursory, and unsupported applications of canons consonant with its objectives. And while it may take points for creativity, the Commission never explains why its Rube Goldberg contrivance interprets the PWFA in a better, even more credible, way when compared to a basic reading of the language of section 2000gg-1 as a whole. Whatever the Commission's motivation for this approach, it fails basic requirements of statutory interpretation and necessitates a final rule running hundreds of pages to address its implications.[5]

### B.   The PWFA Does Not Require the Commission's PDA Guidance to Interpret or Apply Its Provisions

In my view, the most defensible interpretation of the PWFA, including "pregnancy, childbirth, and related medical conditions," is not nearly as complicated as the Commission maintains. But my disagreement with the Commission begins with its chosen canons of construction.

While the final rule starts with expected meaning and the stabilizing canons of its choosing, in my view it ought to have begun with the ordinary meaning of the statute's language. This supremacy of the text is also the primary semantic canon, the paramount and "fundamental rule" of statutory interpretation. SCALIA & GARNER, READING LAW, at 56-8, 69. The ordinary meaning canon states that statutory words should be given their plain or common meanings, unless the context indicates that the words bear a technical or other sense. *Id.* at 69-70; *Southwest Airlines Co. v. Saxon*, 596 U.S. 450, 455 (2022) (statutory language interpreted "according to its ordinary, contemporary, common meaning," which is discerned by reading words "in their context, not in isolation") (citations omitted and cleaned up). One must look at two aspects of the text: the meaning of the words in their ordinary sense and the context in which they are used. This allows one to determine meaning. If the words are, or the phrase is, ambiguous, this first step often points to other appropriate tools to arrive at the best interpretation of the text. Here, in my view, one need not go further than the ordinary meaning canon here. But if one does, other canons lend support to the ordinary meaning, including those that command us to interpret the text as a whole and take titles and headings into account.

---

[5] Unfortunately, the Commission did not lay out the final rule in a way that encourages the severability it summarily declares. As my office outlined these deficiencies early in the rulemaking process, I will not repeat them here. Regardless, the problems with the final rule's approach to severability remain. As a result, I am unable to support the final rule on account of its positive aspects, as they cannot realistically be excised and salvaged.

The Commission skips the first step—are the words "the pregnancy, childbirth, or related medical conditions of a qualified employee" ambiguous? Presumably the Commission thinks so, or considers it obvious, judging by its silence and immediate recourse to tools of statutory interpretation. Without any analysis of the text, or even a discussion explaining that it deems the text ambiguous, the Commission begins with three canons of its choosing, derived from its observation that the phrase "pregnancy, childbirth, and related medical conditions" in the PWFA also appears in Title VII.

However, "pregnancy" is an unambiguous, commonly-understood term for which no agency interpretation is warranted beyond that of its ordinary meaning.[6] Under its ordinary meaning, "pregnancy" means the state of being pregnant, the period in which a child develops inside a woman's body. *See, e.g.*, Pregnancy, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/pregnancy (defining pregnancy as "the quality of being pregnant"; "the condition of being pregnant"; "an instance of being pregnant"); Pregnant, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/pregnant (first definition, "containing a developing embryo, fetus, or unborn offspring within the body"); NIH, National Institute of Child Health and Human Development (defining pregnancy as "the term used to describe the period in which a fetus develops inside a woman's womb or uterus"), available at https://www.nichd.nih.gov/health/topics/pregnancy/conditioninfo; *c.f.* 45 CFR § 46.202 (defining pregnancy as "encompass[ing] the period of time from implantation until delivery. A woman shall be assumed to be pregnant if she exhibits any of the pertinent presumptive signs of pregnancy, such as missed menses, until the results of a pregnancy test are negative or until delivery.") (Department of Health and Human Services regulations regarding "Protections for Pregnant Women, Human Fetuses and Neonates Involved in Research"). Contrary to the agency's unwarranted interpretation of this unambiguous term, "the pregnancy" does not mean past pregnancy, potential or intended pregnancy, infertility, fertility treatments, or use of birth control.

Turning to "related medical conditions," the first question is to what "related medical conditions" must relate. Read in context with "the pregnancy[] [and] childbirth . . . of a qualified employee"—and where "the pregnancy" and "childbirth" are given their ordinary meaning, discussed above—"related medical conditions" must mean "medical conditions" related to "*the* pregnancy" or *the* childbirth of a qualified worker. Not "medical conditions" related any biological occurrence connected to the female reproductive system (the biological system which enables females, in general, to have the capacity to become pregnant). That is, "related medical conditions" are conditions related to an actual current pregnancy of the worker, the worker's childbirth, or a pregnancy or childbirth that recently has ended and the worker is in the postpartum period.

The second question in defining "related medical conditions": what is a "condition"? The Oxford English Dictionary defines "condition" as a "state of health," sometimes "a malady or

---

[6] The same is true of the word "childbirth." However, the final rule's definition of "childbirth" essentially adopts—without specifying that it is doing so—the ordinary meaning of that term: "labor; and childbirth (including vaginal and cesarean delivery)." Final Rule, § 1636.3(b); *see, e.g.*, Childbirth, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/childbirth ("the act or process of giving birth to a baby").

sickness," which aligns with its every day and colloquial use.[7] Likewise, Merriam-Webster relevantly defines "condition" as a "state of being," "a usually defective state of health," or "a state of physical fitness or readiness for use."[8] And similarly, the New Oxford American Dictionary defines "condition" as a "state of health or physical fitness" or "illness or other medical problem."[9] Thus, in my view, the PWFA requires accommodations of medical conditions—states of health or illness—that are created or aggravated by pregnancy and childbirth.[10]

Based on the ordinary meaning of the term "condition," and contrary to the final rule's definition, a medical "condition" is not the same as medical "procedures." Of course, medical procedures sometimes seek to remedy medical conditions, but conditions and procedures are not one and the same. Much as it did in its rule implementing the ADAAA, the final rule helpfully lists many such conditions related to pregnancy that are common, at least to varying degrees, to most pregnant women. And this is helpful to confirm the PWFA's application in common situations. But due to importing the Commission's 2015 pregnancy discrimination guidance into the definition of "related medical conditions," the final rule goes further, sweeping in various medical procedures, treatments, and issues that are not *conditions* in any credible sense of the word. The PWFA itself is simply silent on these matters.[11] Indeed, by focusing an employer's accommodation obligation on pregnancy, childbirth, and resulting medical conditions that are experienced by a pregnant worker, the PWFA obviates the need for definitive lists, discussion,

---

[7] *See* "Condition, *N.*, Sense II.9.e." OXFORD ENGLISH DICTIONARY, Oxford Univ. Press, Dec. 2023, https://doi.org/10.1093/OED/2972535253.

[8] Condition, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/condition.

[9] New Oxford Am. Dictionary 362 (3d. ed. 2010).

[10] At one point in the Preamble, the Commission implies that using the ordinary meaning of "the pregnancy, childbirth, or related medical conditions" would exclude qualified employees who have had miscarriages. *See* Preamble, "Response to Comments Regarding the Commission's Proposed Definition of 'Pregnancy, Childbirth, or Related Medical Conditions' as Reflected in Statutory Text." Not so. Even if a miscarriage did not fit within the ordinary meaning of "pregnancy" or "childbirth," it clearly is a "medical condition" related to a particular pregnancy of a specific worker. A miscarriage is a "medical problem" or "defective state of health" involving the failure and spontaneous termination of a particular pregnancy.

[11] Of course, medicines or procedures may be necessary to treat or care for a medical condition related to pregnancy or childbirth. For example, non-stress test monitoring or additional, frequent ultrasounds are procedures that might be necessary to care for a pregnancy-related medical condition like gestational diabetes or placenta previa. Here, the employer may be obligated to accommodate limitations stemming from the underlying health condition—limitations which may include the need to take off work for the procedures treating the medical condition in question—but that obligation does not attach directly to the certain medical procedures, treatments, or medicines themselves that may be used to treat that condition.

The PWFA makes clear that its accommodation requirement is triggered by, and is tied inexorably to, a medical *condition* related to—in that it was created or aggravated by—a pregnancy or a childbirth. The statute does not speak to specific treatments, medications, or medical procedures, much less reasonably support the final rule's incorporation of the Commission's chosen favorites. The PWFA does require employers to accommodate the known limitations of their workers from being pregnant and undergoing childbirth, as well as the medical conditions related to being pregnant and undergoing childbirth. The final rule attempts to transform the PWFA into an omnibus female reproduction disability statute. It is not such a statute.

explanation, and line-drawing with respect to every conceivable eventuality. If a medical condition is caused or made worse by the pregnancy or the childbirth of a qualified worker, the employer must accommodate that *condition*, absent undue hardship.

As discussed above, the ordinary meaning canon is sufficient to resolve the definition of "the pregnancy, childbirth, and related medical conditions of a qualified employee." That said, it is true that a subset of this statutory text—"pregnancy, childbirth, and related medical conditions— also appears in the PDA.[12] *See id.* § 2000e(k). Assuming *arguendo* that a prior construction of that phrase with a sufficiently robust consensus existed (which I dispute, as outlined in Part III.A of this Statement), such repetition of language could indicate shared or similar meaning, but only if the surrounding language and context suggests Congress used the phrase to the same end. *See infra* note 16 (cases on context and "the"); *BP P.L.C.*, 593 U.S. at 244. But the language in context does not indicate identical meaning. Rather, both the broader context of each statutory scheme as well as the words surrounding the shared phrase—specifically the definite article "the" and the phrase "of a qualified employee"—show that the PDA and PWFA use "pregnancy, childbirth, and related medical conditions" in materially distinct and different ways.[13]

---

[12] All but one of the remaining subsections contain "known limitations related to *the* pregnancy, childbirth, or related medical conditions of the qualified employee." 42 U.S.C. §§ 2000gg-1(1), (3)-(5) (emphasis added). The other prohibits an employer from requiring "a qualified employee affected by pregnancy, childbirth, or related medical conditions to accept an accommodation other than any reasonable accommodation arrived at through the interactive process referred to in section 2000gg(7) of this title." *Id.* § 2000gg-1(2). This section applies in a context where an employer is already in the process of considering, identifying, or providing a reasonable accommodation under another provision in section 2000gg-1, or has already done so. This provision bars employers from, among other things, pressing a separate less-than-accommodation outside this process—a *de facto* lesser informal accommodation.

[13] In general, there is a basic and logical, but significant, distinction between antidiscrimination and accommodation requirements. And indeed, the Commission elsewhere acknowledges and emphasizes this distinction. In its "What You Should Know About the Pregnant Workers Fairness Act" guidance, the Commission explained, "The PWFA applies only to accommodations. Existing laws that the EEOC enforces make it illegal to fire or otherwise discriminate against workers on the basis of pregnancy, childbirth, or related medical conditions." *See* WYSK, available at https://www.eeoc.gov/wysk/what-you-should-know-about-pregnant-workers-fairness-act (accessed April 3, 2024). Antidiscrimination and accommodation provisions in federal law address different problems in different ways. The duty not to discriminate on designated protected bases is a negative one and is applied to cover not only explicit violations but also the myriad of considerations that serve as proxies for such bases. Moreover, the prohibition of unlawful discrimination is not balanced against the burden or cost to the employer. The fact that clients or customers request or prefer discriminatory practice does not justify or excuse noncompliance with Title VII. *See, e.g.*, EEOC, Section 15 Race and Color Discrimination, available at https://www.eeoc.gov/laws/guidance/section-15-race-and-color-discrimination ("Title VII also does not permit racially motivated decisions driven by business concerns – for example, concerns about the effect on employee relations, or the negative reaction of clients or customers.").

In contrast, the duty to accommodate is positive and requires the employer to treat a particular employee or applicant more favorably than others. *See EEOC v. Abercrombie & Fitch*, 575 U.S. 768, 775 (2015) ("Title VII does not demand mere neutrality with regard to religious practices—that they be treated no worse than other practices. Rather, it gives them favored treatment, affirmatively obligating employers not "to fail or refuse to hire or discharge any individual ... because of such individual's" "religious

In the PDA, Congress amended the definition section of Title VII to clarify the scope of discrimination based on the protected characteristic of "sex." The context of the PDA's use of "pregnancy, childbirth, and related medical conditions" therefore shows that it uses the phrase differently from the PWFA—to define "sex discrimination," not to specify physical limitations to be accommodated. The PDA provides that "[t]he terms 'because of sex' or 'on the basis of sex' include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes…" 42 U.S.C. § 2000e(k) (emphasis added). There is no definite article limiting the phrase to a particular employee. And by the phrase "pregnancy, childbirth, or related medical conditions" following the words "include, but are not limited to," the PDA's text indicates the phrase is illustrative of a form of sex discrimination but that such sex discrimination is not limited to the enumerated terms. The PDA therefore is broad, using *pregnancy*, *childbirth*, and *related medical conditions* in ways that encompass the literal, abstract, and conceptual to both define and illustrate unlawful discrimination based on the female sex.[14] This is understandable. As acknowledged by the PDA, discrimination against the female sex (women) necessarily includes—among many other forms of sex discrimination against women—discrimination related to inherent (immutable) sex-based traits and sex-typical biological occurrences of adult human females, most notably related to the female reproductive system. Correspondingly, in providing its 2015 pregnancy discrimination guidance, the Commission

---

observance and practice"); *see also Hebrew v. Texas Department of Criminal Justice*, 80 F.4th 717, 721 (5th Cir. 2023) ("Title VII imposes on employers both a negative duty not to discriminate and a positive duty to accommodate"). Moreover, accommodation is specific and focused, tailored to the effects of either a particular disability to facilitate the performance of a job or a particular religious observance or practice. Potential accommodations are also balanced against the inherent burdens and costs to employers; if they are too high, an employer is not obligated to provide them.

Although discrimination and accommodations provisions of Title VII and the ADA are enforced through the same cause of action available to redress violations of both statutes, these differences have led Congress separately to articulate accommodation requirements, even if under the broader framework of discrimination. 42 U.S.C §§ 2000e(j); 2000e-(2)(a)(1); 12111(9)-(10); 12112(a), (b)(5). Although the Commission's original interpretative rules regarding Title VII created a religious accommodation requirement from section 703, *see* 31 Fed. Reg. 8370 (June 15, 1966); 32 Fed. Reg. 10298 (July 13, 1967), since the 1972 amendments to Title VII, antidiscrimination and accommodation requirements are delineated separately. Ultimately, neither the PDA nor Title VII includes a pregnancy or sex accommodation requirement. Not surprisingly, the PWFA does not contain a pregnancy discrimination provision, which is already contained in Title VII.

[14] An example might illustrate. Consider two hiring scenarios. First, an employer engages in unlawful sex discrimination under Title VII when it refuses to hire an applicant who it knows is pregnant, either because she is pregnant or, motivated by that fact, out of its desire to avoid long absences attending to maternity leave. Second, an employer likewise engages in unlawful sex discrimination when it refuses to hire a newly married female college graduate applicant who is not pregnant because the employer predicts that she is more likely than other applicants to become pregnant in the near future. By proscribing pregnancy discrimination, Title VII thus prohibits employer actions made because of, or motivated by, both the pregnancy of a specific worker or applicant as well as general pregnancy and childbirth assumptions and stereotypes in the abstract that it applies to said worker or applicant. Put another way, the PDA ensures Title VII covers the tangible, but also extends beyond it, where that which relates to pregnancy motivates employment decisions as a proxy for sex.

interpreted the scope of *sex* discrimination against women. In addressing birth control, the capacity to become pregnant (potential pregnancy), historic (past) pregnancy, infertility treatment, etc. in our pregnancy discrimination guidance, the agency's interpretation is that discrimination on each of these bases constitutes "a form of *sex* discrimination" against women.[15] And indeed, the PDA did not amend Title VII's unlawful employment practices provision to add a separate protected basis of pregnancy in addition to race, sex, color, etc., but rather added to Title VII's definition section that the "terms 'because of sex' or 'on the basis of sex' include, but are not limited to because of or on the basis of pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e(k). The protected class is "women."

In contrast, to start, in the *Pregnant Workers* Fairness Act, the protected class is "pregnant workers" and postpartum workers. SCALIA & GARNER, READING LAW, at 221-4 (Title and Headings Canon). This protected class is necessarily smaller than the female sex or all female workers. While the capacity to become pregnant is solely a female trait, not all women are or ever will be pregnant or give birth. The text of the statute indicates that the protected class is not "women," and in turn, the scope of the accommodation requirement is not so broad as to require accommodation of any physical or mental conditions related to, affected by, or arising out of the female reproductive system. This is the Pregnant Workers Fairness Act after all, not the Female Workers Fairness Act or the Female Reproductive System Accommodation Act.

To this end, in the PWFA, Congress set out a requirement to "make reasonable accommodations to the known limitations related to the pregnancy, childbirth, or related medical conditions of a qualified employee." 42 U.S.C. § 2000gg-1(1). Congress' use of "the" before "pregnancy, childbirth, and related medical conditions" and addition of the reference to "a qualified employee" to articulate the accommodation requirement carries important ramifications for its meaning. First and foremost, it clarifies that the preceding accommodation requirement applies to the limitations of "the" specific pregnancy and childbirth of each pregnant employee, as well as the medical conditions caused or exacerbated by each particular pregnancy and childbirth.[16]

---

[15] EEOC Pregnancy Discrimination Guidance (2015), available at https://www.eeoc.gov/laws/guidance/enforcement-guidance-pregnancy-discrimination-and-related-issues; *see, e.g., id.* (concluding that "an inference of unlawful *sex* discrimination" can arise from some discrimination based on "infertility treatment" where such treatments are "intrinsically tied to a woman's childbearing capacity") (emphasis added); *id.* ("employment decisions based on a female employee's use of contraceptives may constitute unlawful discrimination *based on gender*") (emphasis added).

[16] In addition to the meanings of words, context and grammar are important when construing statutes, including use of the definite article "the". *See, e.g., Slack Technologies, LLC v. Pirani*, 598 U.S. 759, 766-67 (2023) ("[C]ontext provides several clues. For one thing, the statute imposes liability for false statements or misleading omissions in 'the registration statement.' Not just a registration statement or any registration statement. The statute uses the definite article to reference the particular registration statement alleged to be misleading, and in this way seems to suggest the plaintiff must 'acquir[e] such security' under that document's terms.") (citations omitted and cleaned up); *Nielson v. Preap*, 586 U.S. ___, 139 S. Ct. 954, 965 (2019) ("Our reading is confirmed by Congress's use of the definite article in 'when the alien is released.' Because '[w]ords are to be given the meaning that proper grammar and usage would assign them,' the rules of grammar govern statutory interpretation "unless they contradict legislative intent or purpose". Here grammar and usage establish that 'the' is 'a function word ... indicat[ing] that a following noun or noun equivalent is definite or has been previously specified by context.") (cleaned up and citations omitted);.

In other words, the PWFA requires accommodation of tangible and concrete (and also often common and basic) limitations—namely, those caused or exacerbated by *the* pregnancy, *the* childbirth, or *the* medical conditions (related to the forementioned specific, actual pregnancy or childbirth) that are actually experienced by the pregnant employee.  In so doing, this focuses the PWFA's accommodation requirement on the actual and the practical limitations of a particular pregnancy and childbirth of each individual pregnant worker, as well as the medical conditions caused or exacerbated by the same that the worker is experiencing.  And in turn, contrary to the interpretation advanced in the Commission's final rule, this is another reason—on top of the ordinary meaning canon—to exclude from the statute's scope the obligation to accommodate long-past pregnancies (historic pregnancies); speculative future, contemplated, intended, or merely possibly pregnancies; or the female reproductive system in general, that is, the biological system which gives women, typically, the "capacity to become pregnant."

Likewise, as a result of the PWFA's focus on a specific, actual pregnancy and childbirth of an individual worker, and particular medical conditions related to them, it also logically excludes medical conditions that are not explicitly tied to a particular pregnancy or childbirth.  Menstruation, infertility, menopause, and the like are not caused or exacerbated by a particular pregnancy or childbirth—but rather the functioning, or ill-functioning, of the female worker's underlying reproductive system—and so are not subject to accommodation under the PWFA.

Ultimately, my interpretation comfortably aligns with the PWFA's focus on what defines its accommodation obligation: pregnant workers' known limitations, the particular sources of those limitations, and the statute's sole focus on accommodation—not the Commission's 2015 guidance on pregnancy discrimination under Title VII nor a smattering of lower-court opinions addressing what reproductive health issues might fall within a penumbra of discrimination based on the female sex.  Employers are obligated to accommodate the known limitations of each pregnancy and childbirth, and medical ailments caused or exacerbated by the pregnancy or childbirth, of any of its employees, under familiar standards and for a limited time.  Such a system is amenable to simplified processes and less onerous documentation requirements for many common pregnancy accommodations, as the Commission offered in the proposed rule, but which the Commission unfortunately now has replaced to a significant degree in the final rule.

In short, my approach goes no further than the plain and ordinary meaning of the words in the statute read together as a whole.  In contrast, the Commission's house of cards requires carefully sequenced stages.  First, isolate and excise "pregnancy, childbirth, and related medical conditions" to identify a match with the PDA.  Second, import the Commission's Title VII discrimination guidance into the PWFA through that excised phrase.  Third, reinsert the phrase and then look to surrounding context and only then recognize the limitations of "the" and "of a qualified employee" that, for unexplained reasons, only apply after the expansion wrought by the first two steps.  None of these maneuvers are necessary or appropriate.[17]

---

[17] *See Food Marketing Institute v. Argus Leader Media*, 588 U.S. 427, 436 (2019) (the "proper starting point [of statutory interpretation] lies in a careful examination of the ordinary meaning and structure of the law itself.  Where, as here, that examination yields a clear answer, judges must stop") (citation omitted).

The texts of the PWFA and the PDA confirm that their shared language does not carry identical meaning. The ordinary meaning of the PWFA affords a clear, understandable, and foreseeable scope and application of its accommodation requirement. The Commission's contrary approach conflicts with basic statutory construction and, therefore, is far from a—let alone the most—reasonable or defensible construction of the PWFA.

## IV.    CONCLUSION

In the PWFA Congress attempted to fill a narrow accommodation gap between Title VII and the ADA. Minor, simple, temporary accommodations for pregnant workers—such as water, food, and a place to sit while working—would allow women to remain working further into their pregnancies, if they wish to do so. These often temporary and simple accommodations should not require the full apparatus of documentation attending disabilities under the ADA. The statute is simple, the Commission's task likewise.

But the Commission could not resist the temptation to "interpret" into the PWFA all the components it has long desired to complement its administrative gloss on Title VII and the ADA. And with some linguistic gymnastics and a simple sleight of hand, the new accommodation statute became considerably more complicated and controversial. Sadly, the cost was high. The final rule jettisoned some of the most desirable aspects of the proposed rule, including the streamlined administration of the most common and simple pregnancy accommodations.

The first step in this misguided and bloated regulatory morass is the Commission's interpretation of the phrase "pregnancy, childbirth, or related medical conditions." It is at this first step that we part ways. Accordingly, I vote to disapprove the final rule.[18]

---

[18] There are other aspects of the final rule with which I take issue, but none are necessary to address here, as the rule fails at the most basic and fundamental step—defining the scope of coverage via the definition of "the pregnancy, childbirth, and related medical conditions of a qualified employee."

16