**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**
**DELTA DIVISION**

_____

STATE OF TENNESSEE, *et al.*,

               Plaintiffs,

v.

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,

               Defendant.

_____

Civil Action No. 2:24-cv-84-DPM

**DEFENDANT'S MEMORANDUM IN OPPOSITION TO**
**PLAINTIFFS' MOTION FOR A § 705 STAY AND**
**PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................. 1

BACKGROUND ................................................................................. 2

I.  Legal Framework Prior to the PWFA ........................................... 2

    A.    Title VII and the Pregnancy Discrimination Act ........................... 2

    B.    The Americans with Disabilities Act and Family and Medical Leave Act ................................................................. 4

II.    The Pregnant Workers Fairness Act .......................................... 5

    A.    Statutory Framework ...................................................... 5

    B.    EEOC's Rulemaking Implementing the PWFA .......................... 7

III.    Procedural History ................................................................. 8

STANDARD OF REVIEW .................................................................. 9

SUMMARY OF ARGUMENT ............................................................. 9

ARGUMENT ................................................................................... 11

I.  This Court Lacks Jurisdiction Over Plaintiffs' Claims ............................. 11

    A.    Plaintiffs' Injuries, All Rooted in Providing Accommodations for "Illegal" Abortions, Are Highly Speculative ............................................................... 11

    B.    Each Theory of Injury Fails for Additional Reasons .................. 15

        1.    Plaintiffs' Compliance Costs Are Unproven ..................... 15

        2.    The Final Rule Does Not Infringe on State Sovereignty ........................................................ 16

        3.    Plaintiffs Have Not Proven a Messaging Injury ............... 17

C.    Plaintiffs Have Not Proven that Their Injuries Are Traceable to EEOC, Or Redressable By An Order Against EEOC ............. 19

D.    Plaintiffs' Claims Are Not Ripe Given Their Highly Fact-Specific and Contingent Nature ................................................. 21

II.   Plaintiffs Have Not Otherwise Shown a Likelihood of Success on Their Claims .................................................................................. 21

A.    The PWFA's Text Requires Accommodations for Abortion ....... 21

1.    Title VII's Text Encompasses Abortion, and Congress Used the Same Language in the PWFA ..................................................................... 22

2.    The PWFA Is Best Read, On Its Own, to Cover Abortion ........................................................................ 27

3.    Plaintiffs' Resort to Materials Outside the PWFA's Text Does Not Change the Analysis ................................ 30

B.    The Final Rule Is Consistent With Federalism ........................... 33

C.    Plaintiffs' First Amendment Challenges Fail ............................ 35

D.    The PWFA Validly Abrogates State Sovereign Immunity .......... 40

E.    The Economic Analysis is Reasonable ....................................... 44

III.  The Balance of the Equities Independently Forecloses Relief ...................................................................................................... 47

IV.   Any Remedy Should Be Limited to Proven Injuries ........................... 49

CONCLUSION ............................................................................................. 50

# TABLE OF AUTHORITIES

## CASES

*Abbott Labs. v. Gardner*,
387 U.S. 136 (1967) ................................................................. 21

*Advantage Media, L.L.C. v. City of Eden Prairie*,
456 F.3d 793 (8th Cir. 2006) ................................................ 19

*Air Transp. Ass'n of Am. v. FAA*,
169 F.3d 1 (D.C. Cir. 1999) ................................................. 45

*Alden v. Maine*,
527 U.S. 706 (1999) ............................................................... 20

*Alexander v. Gardner-Denver Co.*,
415 U.S. 36 (1974) ................................................................... 6

*Arkansas Times LP v. Waldrip*,
37 F.4th 1386 (8th Cir. 2022) .............................................. 38

*Bd. of Trustees of Univ. of Ala. v. Garrett*,
531 U.S. 356 (2001) ............................................................... 20

*Bragdon v. Abbott*,
524 U.S. 624 (1998) ............................................................... 25

*Burwell v. Hobby Lobby Stores, Inc.*,
573 U.S. 682 (2014) ............................................................... 48

*California v. EPA*,
72 F.4th 308 (D.C. Cir. 2023) .............................................. 34

*Cantwell v. State of Connecticut*,
310 U.S. 296 (1940) ............................................................... 37

*Citizens Tele. Co. of Minn. v. FCC*,
901 F.3d 991 (8th Cir. 2018) ................................................ 45

*City of Boerne v. Flores*,
  521 U.S. 507 (1997) .................................................................. 42

*City of Los Angeles v. Lyons*,
  461 U.S. 95 (1983) .................................................................... 14

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) ............................................................. 14, 15

*Corning Sav. & Loan Ass'n v. Fed. Home Loan Bank Bd.*,
  562 F. Supp. 279 (E.D. Ark. 1983) ........................................ 47

*DHS v. New York*,
  140 S. Ct. 599 (2020) ............................................................... 49

*Digital Recognition Network, Inc. v. Hutchinson*,
  803 F.3d 952 (8th Cir. 2015) .................................................. 19

*Dobbs v. Jackson Women's Health Org.*,
  597 U.S. 215 (2022) ............................................................. 12, 33

*Doe v. C.A.R.S. Prot. Plus, Inc.*,
  527 F.3d 358 (3d Cir. 2008) ................................................... 24

*Doe v. Virginia Dep't of State Police*,
  713 F.3d 745 (4th Cir. 2013) ............................................. 19, 20

*Ducharme v. Crescent City Dèjà Vu, L.L.C.*,
  406 F. Supp. 3d 548 (E.D. La. 2019) ..................................... 24

*Dunlap v. Liberty Nat. Prod., Inc.*,
  878 F.3d 794 (9th Cir. 2017) .................................................. 27

*Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*,
  878 F.3d 371 (D.C. Cir. 2017) ................................................ 14

*Estiverne v. La. State Bar Ass'n*,
  863 F.2d 371 (5th Cir. 1989) .................................................. 36

*FCC v. Prometheus Radio,
  Proj.*, 592 U.S. 414 (2021) ..................................................... 34

*Fitzpatrick v. Bitzer*,
    427 U.S. 445 (1976) ........................................................................ 41, 42

*FTC v. Standard Oil Co. of Cal.*,
    449 U.S. 232 (1980) ............................................................................... 48

*Garcia v. San Antonio Metro. Transit Auth.*,
    469 U.S. 528 (1985) ............................................................................... 33

*Gen. Elec. Co. v. Gilbert*,
    429 U.S. 125 (1976) ........................................................................... 3, 23

*George v. McDonough*,
    596 U.S. 740 (2022) ............................................................................... 23

*Gill v. Whitford*,
    585 U.S. 48 (2018) ................................................................................. 50

*Gray v. City of Valley Park*,
    567 F.3d 976 (8th Cir. 2009) ................................................................. 18

*Haaland v. Brackeen*,
    599 U.S. 255 (2023) ....................................................................11, 18, 37

*Harris v. McRae*,
    448 U.S. 297 (1980), *overruled on other grounds by*
    *Alleyne v. United States*, 570 U.S. 99 (2013) ...................................... 25, 37

*Harris v. United States*,
    536 U.S. 545 (2002) ............................................................................... 31

*Heart of Atlanta Motel, Inc. v. United States*,
    379 U.S. 241 (1964) ............................................................................... 33

*Hodel v. Va. Surface Min. & Reclamation Ass'n, Inc.*,
    452 U.S. 264 (1981) ............................................................................... 33

*In re Union Pac. R.R. Emp. Pracs. Litig.*,
    479 F.3d 936 (8th Cir. 2007) ....................................................... 24, 25, 28

*Iowa Utilities Bd. v. FCC*,
   109 F.3d 418 (8th Cir. 1996) ...................................................... 47

*Johanns v. Livestock Mktg. Ass'n*,
   544 U.S. 550 (2005) .................................................................. 36

*Keene Corp. v. United States*,
   508 U.S. 200 (1993) .................................................................. 32

*Kentucky v. EPA*,
   2023 WL 2733383, at (E.D. Ky. Mar. 31, 2023) ...................................... 16

*Krauel v. Iowa Methodist Med. Ctr.*,
   95 F.3d 674 (8th Cir. 1996) ........................................................ 25

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) .......................................................11, 14, 19

*Madsen v. Women's Health Ctr., Inc.*,
   512 U.S. 753 (1994) .................................................................. 50

*Maitland v. Univ. of Minnesota*,
   260 F.3d 959 (8th Cir. 2001) ...................................................... 43

*Manhattan Cmty. Access Corp. v. Halleck*,
   587 U.S. 802 (2019) .................................................................. 36

*Maryland v. King*,
   567 U.S. 1301 (2012) ................................................................ 48

*Michigan v. EPA*,
   576 U.S. 743 (2015) .................................................................. 45

*Morehouse Enters., LLC v. ATF*,
   78 F.4th 1011 (8th Cir. 2023) ................................................ 15, 16

*Morgan v. Fletcher*,
   518 F.2d 236 (5th Cir. 1975) ...................................................... 47

*Mountain States Legal Found. v. Glickman*,
   92 F.3d 1228 (D.C. Cir. 1996) .................................................... 39

*Munaf v. Geren*,
  553 U.S. 674 (2008) ................................................................... 9

*Murphy v. NCAA*,
  584 U.S. 453 (2018) ................................................................. 34

*NAACP v. Hunt*,
  891 F.2d 1555 (11th Cir. 1990) ............................................... 36

*Nat'l Conf. of Cath. Bishops v. Bell*,
  490 F. Supp. 734 (D.D.C. 1980), *aff'd sub nom.*
  *Nat'l Conf. of Cath. Bishops v. Bell*, 653 F.2d 535 (D.C. Cir. 1981)......... 24

*Nat'l Mining Ass'n v. United Steel Workers*,
  985 F.3d 1309 (11th Cir. 2021) ......................................... 44, 45

*Nat'l Truck Equip. Ass'n v. NHTSA*,
  711 F.3d 662 (6th Cir. 2013) ................................................... 45

*Nevada Dep't of Hum. Res. v. Hibbs*,
  538 U.S. 721 (2003) ..................................................... 41, 42, 43

*Newport News Shipbuilding & Dry Dock Co. v. EEOC*,
  462 U.S. 669 (1983) ................................................................. 3

*NLRB v. Bell Aerospace Co.*,
  416 U.S. 267 (1974) ............................................................... 35

*NLRB v. SW Gen., Inc.*,
  580 U.S. 288 (2017) ............................................................... 31

*Okruhlik v. Univ. of Arkansas*,
  255 F.3d 615 (8th Cir. 2001) ................................................... 41

*O'Shea v. Littleton*,
  414 U.S. 488 (1974) ............................................................... 14

*Pleasant Grove City v. Summum*,
  555 U.S. 460 (2009) ......................................................... 36, 37

*Rumsfeld v. Forum for Acad. & Institutional Rts. (FAIR), Inc.*,
　547 U.S. 47 (2006) ................................................................ 38

*Sampson v. Murray*,
　415 U.S. 61 (1974) ................................................................ 49

*Sch. of the Ozarks, Inc. v. Biden*,
　41 F.4th 992 (8th Cir. 2022) ........................................ 14, 16, 21

*Scripps-Howard Radio, Inc. v. FCC*,
　316 U.S. 4 (1942) .................................................................. 49

*Smith v. City of Jackson*,
　544 U.S. 228 (2005) .............................................................. 23

*Student Gov't Ass'n v. Board of Trs. of Univ. of Mass.*,
　868 F.2d 473 (1st Cir. 1989) .................................................. 36

*Summers v. Earth Island Inst.*,
　555 U.S. 488 (2009) .............................................................. 14

*Telescope Media Grp. v. Lucero*,
　936 F.3d 740 (8th Cir. 2019) ............................................ 38, 39

*Tennessee v. Lane*,
　541 U.S. 509 (2004) .......................................................... 40, 42

*Trump v. Hawaii*,
　585 U.S. 667 (2018) .............................................................. 49

*Turic v. Holland Hosp., Inc.*,
　85 F.3d 1211 (6th Cir. 1996) ................................................. 24

*Unborn Child Amend. Comm. v. Ward*,
　328 Ark. 454 (1997) .............................................................. 12

*United States v. Sanchez-Gomez*,
　584 U.S. 381 (2018) .............................................................. 14

*United States v. Texas*,
　599 U.S. 670 (2023) .............................................................. 18

*US Airways, Inc. v. Barnett,*
    535 U.S. 391 (2002) .................................................................. 26

*Valentine Properties Assocs., LP v. Dep't of Hous. & Urb. Dev.,*
    785 F. Supp. 2d 357 (S.D.N.Y. 2011),
    *aff'd*, 501 F. App'x 16 (2d Cir. 2012) ....................................... 34

*Walker v. Texas Division, Sons of Confederate Veterans, Incorporated,*
    576 U.S. 200 (2015) .................................................................. 36

*Watkins Inc. v. Lewis,*
    346 F.3d 841 (8th Cir. 2003) ........................................... 9, 14, 20

*West v. Gibson,*
    527 U.S. 212 (1999) .................................................................. 48

*West Virginia v. EPA,*
    597 U.S. 697 (2022) ............................................................ 32, 33

*Whitmore v. Arkansas,*
    495 U.S. 149 (1990) ............................................................ 14, 20

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ................................................................. 9, 47

*Young v. United Parcel Service, Inc.,*
    575 U.S. 206 (2015) ............................................................. 4, 10

**FEDERAL STATUTES**

5 U.S.C. § 611 ....................................................................... 4, 45

5 U.S.C. § 705 ........................................................................... 49

29 U.S.C. § 2612 .......................................................................... 4

29 U.S.C. § 2614 .......................................................................... 4

42 U.S.C. § 1981a ........................................................................ 6

42 U.S.C. § 2000e .................................................... 3, 22, 26, 28

42 U.S.C. § 2000e-2 ................................................................ 2

42 U.S.C. § 2000e-3 ............................................................ 5, 18

42 U.S.C. § 2000e-5 ............................................................ 6, 19

42 U.S.C. § 2000gg ........................................................ 5, 26, 28

42 U.S.C. § 2000gg-1 ................................................... 1, 5, 27, 30

42 U.S.C. § 2000gg-2 ................................................... 5, 6, 7, 19

42 U.S.C. § 2000gg-3 .............................................................. 7

42 U.S.C. § 2000gg–4 ......................................................... 6, 40

42 U.S.C. § 2000gg-5 ............................................................ 32

42 U.S.C. § 2000gg-6 ............................................................ 49

42 U.S.C. § 12102 ................................................................. 4

42 U.S.C. § 12112 ............................................................. 4, 26

42 U.S.C. § 12203 ............................................................ 5, 18

Consolidated Appropriations Act, 2023,
   Pub. L. No. 117-328, 136 Stat. 4459 (Dec. 29, 2022) ................................. 5

## STATE STATUTES

Ark. Code Ann. § 5-61-304 ....................................................... 17

Ark. Code Ann. § 21-4-206 ....................................................... 18

Tenn. Code Ann. § 8-50-802 ...................................................... 18

Tenn. Code Ann. § 39-15-213 ..................................................... 17

## REGULATIONS

29 C.F.R. part 1604 ........................................................... 7, 25

29 C.F.R. pt. 1630 ................................................................... 30

29 C.F.R. § 825.120 ................................................................. 4

29 C.F.R. § 1630.12 ................................................................. 8

29 C.F.R. § 1636.3 ................................................................. 28

*Implementation of the Pregnant Workers Fairness Act*,
   89 Fed. Reg. 29,096 (Apr. 19, 2024) .................................... *passim*

E.O. 12,866 § 10 ................................................................... 44

E.O. 13,563 § 7 ..................................................................... 44

E.O. 14,094 § 4 ..................................................................... 44

## OTHER AUTHORITIES

117 Cong. Rec. 2228 (2021) ........................................... 31, 41, 42

168 Cong. Rec. S7050 (daily ed. Dec. 8, 2022) ........................... 31

Cmt. EEOC-2023-0004-98384 (Oct. 10, 2023),
   https://perma.cc/MY6C-3PD7 ............................................. 31

EEOC, *Enforcement Guidance on Retaliation and Related Issues*
   (Aug. 25, 2016),
   https://perma.cc/8AM9-5FBQ .............................................. 8

H.R. Conf. Rep. No. 95-1786 ............................................... 23

H.R. Rep. No. 95-948 (1978). ....................................... 3, 23, 24

H.R. Rep. No. 117-27 (2021) ............................................ *passim*

## INTRODUCTION

The Pregnant Workers Fairness Act (PWFA) is an anti-discrimination statute that builds on Title VII and other laws to expand workplace protections for pregnant employees and employees with pregnancy- or childbirth-related conditions. Specifically, the PWFA requires that covered employers (including States) reasonably accommodate "known limitations related to the pregnancy, childbirth, or related medical conditions of a qualified employee," unless the accommodation "would impose an undue hardship." 42 U.S.C. § 2000gg-1(1).

The Equal Employment Opportunity Commission (EEOC) issued regulations to implement the PWFA, including discussing circumstances in which an accommodation may be appropriate. *See Implementation of the Pregnant Workers Fairness Act*, 89 Fed. Reg. 29,096 (Apr. 19, 2024) (hereafter "Final Rule"). As relevant here, EEOC explained that because Title VII's text has made clear for over four decades that Title VII protects employees who choose to have (or not to have) an abortion—and because Congress enacted the PWFA with identical language as Title VII, for the express purpose of expanding Title VII's protections—the PWFA must also be understood as protecting employees who choose to have (or not have) an abortion.

Plaintiffs here are seventeen States who challenge this portion of the Final Rule, specifically with respect to any duty "to provide accommodations for employee abortions that are illegal under state law." PI Br. (ECF No. 18)

at 1. But Plaintiffs' motion fails to demonstrate their entitlement to relief.

First, Plaintiffs lack standing: their injuries related to "illegal" abortions are speculative, and they have not proven that relief here would redress their purported injuries. Second, Plaintiffs' substantive claims lack merit. In relevant part, the PWFA's text is identical to Title VII's, which encompasses having (or not having) an abortion; so too, then, does the PWFA. As for Plaintiffs' other challenges, the Final Rule discusses each topic at length and reasonably explains and supports its conclusions. Finally, Plaintiffs fail to demonstrate irreparable harm, and enjoining any aspect of the Final Rule would frustrate EEOC's mission, cause confusion, and undermine the PWFA's purpose of protecting millions of workers. Plaintiffs' motion should be denied.

## BACKGROUND

As Plaintiffs acknowledge, prior to the PWFA, "federal law provided only limited support for pregnant workers," and Congress enacted the PWFA to fill this "gap." PI Br. at 2-3; *see also* H.R. Rep. No. 117-27, at 10-26 (2021). The PWFA is therefore best understood in light of the prior legal framework.

## I.   LEGAL FRAMEWORK PRIOR TO THE PWFA

### A.   Title VII and the Pregnancy Discrimination Act

Title VII of the Civil Rights Act of 1964 makes it unlawful for employers "to discriminate against any individual . . . because of such individual's race, color, religion, sex, or national origin[.]" 42 U.S.C. § 2000e-2(a)(1). Initially, the Supreme Court interpreted this prohibition not to include pregnancy

discrimination. *See Gen. Elec. Co. v. Gilbert*, 429 U.S. 125, 135 (1976).

Congress responded quickly, however, and in 1978 it enacted the Pregnancy Discrimination Act (PDA), which "unambiguously expressed its disapproval of both the holding and the reasoning of the Court in the *Gilbert* decision." *Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669, 678 (1983). Specifically, Congress amended Title VII's definitions to clarify that sex-based discrimination encompasses pregnancy discrimination:

> The terms "because of sex" or "on the basis of sex" include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work[.]

42 U.S.C. § 2000e(k). Congress understood that this provision's "basic language covers decisions by women who chose to terminate their pregnancies." H.R. Rep. No. 95-948, at 7 (1978). In response to concerns about requiring employers to pay for abortions, however, Congress added language making clear that such an obligation exists only in narrow circumstances:

> This subsection shall not require an employer to pay for health insurance benefits for abortion, except where the life of the mother would be endangered if the fetus were carried to term, or except where medical complications have arisen from an abortion[.]

42 U.S.C. § 2000e(k); *see* H.R. Rep. No. 95-948, at 7.

Even after the PDA, Title VII often does not require workplace

-3-

accommodations for pregnant employees; rather, they are entitled to accommodations only to the same extent as non-pregnant employees. *See Young v. United Parcel Service, Inc.*, 575 U.S. 206, 229 (2015). Leading up to the PWFA, Congress concluded that this framework "creates an oftentimes insurmountable hurdle" for pregnant employees. H.R. Rep. No. 117-27, at 16.

### B.   The Americans with Disabilities Act and Family and Medical Leave Act

In addition to Title VII, the Americans with Disabilities Act (ADA) and Family and Medical Leave Act of 1993 (FMLA) offer some protections for pregnant employees, but Congress found these statutes inadequate as well.

Title I of the ADA prohibits covered employers from "discriminat[ing] against a qualified individual on the basis of disability," 42 U.S.C. § 12112(a), which includes not making "reasonable accommodations to the known physical or mental limitations" of a qualified employee absent "undue hardship." *Id.* § 12112(b)(5)(A). But even after Congress enacted the ADA Amendments Act of 2008 to broaden the definition of "disability," *see* 42 U.S.C. § 12102(4)(A), courts continued to exclude many pregnancy-related conditions. *See* H.R. Rep. No. 117-27, at 19-21; PI Br. at 2.

Additionally, the FMLA provides eligible employees with up to 12 weeks of unpaid leave per year for certain family and medical reasons, *see* 29 U.S.C. §§ 2612(a)(1), 2614(a)(1), including for "incapacity due to pregnancy" and "prenatal care," 29 C.F.R. § 825.120(a)(4). As Plaintiffs note, however, the

FMLA "excludes many [employees] from its limited scope." PI Br. at 2; *see* 29 U.S.C. § 2611(2)(A), (B)(ii); *see also* 89 Fed. Reg. at 29,165 (noting 2018 data showed that 44% of employes are not eligible for FMLA leave).

## II.   THE PREGNANT WORKERS FAIRNESS ACT

### A.   Statutory Framework

Congress enacted the PWFA as part of the Consolidated Appropriations Act, 2023, *see* Pub. L. No. 117-328, div. II, 136 Stat. 4459, 6084-89 (Dec. 29, 2022), with an effective date of June 27, 2023, *see id.* § 109, 136 Stat. at 6089.

In general, the PWFA requires covered employers to "make reasonable accommodations to the known limitations related to the pregnancy, childbirth, or related medical conditions of a qualified employee, unless . . . the accommodation would impose an undue hardship on the operation of the business of such covered entity[.]" 42 U.S.C. § 2000gg-1(1). The PWFA borrows heavily from existing statutes. For example, Congress defined both "reasonable accommodation" and "undue hardship" by reference to the ADA. *See id.* § 2000gg(7). Congress also included an anti-retaliation provision that is the same as Title VII's, *compare id.* § 2000gg-2(f)(1) *with id.* § 2000e-3(a), and an anti-coercion provision like the ADA's, *compare id.* § 2000gg-2(f)(2) *with id.* § 12203(b). The PWFA's definition of employer is the same as Title VII's and includes States as employers. *See id.* § 2000gg(2)(B).

Congress also incorporated the same remedies and enforcement

procedures available under Title VII. *See id.* § 2000gg-2. An individual who believes their rights under the PWFA have been violated must file a Charge of Discrimination with EEOC, and EEOC must then notify the employer within ten days. *See id.* § 2000e-5(b). EEOC investigates the charge—including by soliciting a position statement from the employer—and then determines whether "reasonable cause" exists to believe discrimination occurred. 42 U.S.C. § 2000e-5(b). If not, the charge is dismissed, and the employee may file suit. If reasonable cause does exist, EEOC will attempt to conciliate the charge because, as with Title VII, Congress selected "[c]ooperation and voluntary compliance . . . as the preferred means for achieving" the PWFA's goals. *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 44 (1974). If conciliation fails, EEOC will either file suit against the employer or inform the charging party that conciliation has failed and they may bring suit. *Id.* The process is the same for State employers, except EEOC must refer the matter to the Department of Justice (DOJ) to make its own determination whether to file suit. *See id.*

If an individual brings a successful PWFA claim, the court may award the same injunctive relief as available under Title VII, *see* 42 U.S.C. § 2000gg-2(a)(1) (citing *id.* § 2000e-5(g)), as well as certain compensatory and punitive damages, *see id.* § 2000gg-2(a)(3) (citing *id.* § 1981a). The PWFA expressly abrogates States' sovereign immunity for damages liability. *Id.* § 2000gg-4. Damages may not be awarded, however, if the employer "demonstrates good

faith efforts, in consultation with the employee . . . , to identify and make a reasonable accommodation[.]" *Id.* § 2000gg-2(g).

## B.    EEOC's Rulemaking Implementing the PWFA

The PWFA directs that EEOC "shall issue regulations . . . to carry out this chapter," *id.* § 2000gg-3(a), which EEOC fulfilled through its Final Rule, codified at 29 C.F.R. pt. 1636 & App'x A. In its Final Rule, EEOC explained that because the PWFA uses the same statutory language as Title VII— "pregnancy, childbirth, or related medical conditions"—and because the PWFA was intended to fill a gap in the existing Title VII framework and protect the same workers, that language, as used in the PWFA, should have the same meaning as under Title VII. *See* 89 Fed. Reg. at 29,105-14. And because Title VII's language protects employees who choose to have (or not to have) an abortion, so too does the PWFA. *See id.* But the PWFA's application to abortion is narrow, as the Final Rule makes clear:

> [T]he PWFA is a workplace anti-discrimination law. It does not regulate the provision of abortion services or affect whether and under what circumstances an abortion should be permitted. The PWFA does not require any employee to have—or not to have— an abortion, does not require taxpayers to pay for any abortions, and does not compel health care providers to provide any abortions. The PWFA also cannot be used to require an employer-sponsored health plan to pay for or cover any particular item, procedure, or treatment, including an abortion. The PWFA does not require reasonable accommodations that would cause an employer to pay any travel-related expenses for an employee to obtain an abortion. Given these limitations, the type of accommodation that most likely will be sought under the PWFA

> regarding an abortion is time off to attend a medical appointment
> or for recovery. The PWFA, like the ADA, does not require that
> leave as an accommodation be paid leave, so leave will be unpaid
> unless the employer's policies provide otherwise.

89 Fed. Reg. at 29,104. The Final Rule also confirms that the PWFA covers both "employee[s] seeking an abortion" and "employees who choose not to have an abortion[.]" *Id.* at 29,111; *see also id.* at 29,112.

As for the PWFA's anti-retaliation and anti-coercion provisions, the Final Rule again borrows from the existing Title VII and ADA frameworks. *See* 89 Fed. Reg. at 29,148. For the anti-coercion provision, "the provision does not apply to any and all conduct or statements that an individual finds intimidating; it prohibits only conduct that is reasonably likely to interfere with the exercise or enjoyment of PWFA rights." *Id.*; *see also* 29 C.F.R. § 1630.12(b); EEOC, *Enforcement Guidance on Retaliation and Related Issues* (Aug. 25, 2016), https://perma.cc/8AM9-5FBQ. Finally, EEOC acknowledged that employers may have defenses available to PWFA charges—*e.g.*, undue hardship and also religious or constitutional defenses—and committed to evaluating those defenses on a case-by-case basis, *see* 89 Fed. Reg. at 29,146-55.

## III.  PROCEDURAL HISTORY

The Final Rule takes effect on June 18, 2024, *see* 89 Fed. Reg. at 29,096, though as noted the PWFA has been in effect since June 2023. Plaintiffs here filed suit on April 25, 2024, naming only EEOC as a Defendant. *See* ECF No. 1 ¶ 36. Plaintiffs have now filed a motion for preliminary relief, *see* ECF No. 17,

-8-

claiming injury as employers because the Final Rule will purportedly require them to provide "accommodations for women seeking abortions illegal under state law." PI Br. at 32. Their motion requests a broad preliminary injunction and a "[s]tay[] [of] the effective date of EEOC's Final Rule under 5 U.S.C. § 705, thus denying it legally operative effect," ECF No. 17 at 5.

## STANDARD OF REVIEW

"A preliminary injunction is an extraordinary and drastic remedy" that "is never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008). To obtain such relief, Plaintiffs "must establish that [they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that [the relief] is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The moving party "bears the burden of proving all" the relevant factors. *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003).

## SUMMARY OF ARGUMENT

Plaintiffs' motion should be denied for three independent reasons.

First, Plaintiffs have not established standing to bring their claims. Their claimed injuries—all rooted in providing accommodations for "abortions that are illegal under state law," PI Br. at 1—are entirely hypothetical. Plaintiffs have submitted no evidence that any State employee will actually seek, or has sought, an accommodation for such an abortion, or that any enforcement action

is imminent. Each theory of injury suffers from other factual defects as well, and Plaintiffs also have not demonstrated traceability or redressability. At a minimum, Plaintiffs' claims are highly abstract and therefore not yet ripe.

Second, Plaintiffs have not established a likelihood of success on the merits of their challenges. Plaintiffs fail to acknowledge that *the text of Title VII* confirms that abortion is covered, and Congress incorporated that same statutory text in the PWFA. Thus, the PWFA's protections likewise encompass abortions. As for their other challenges, the PWFA does not "commandeer" States or otherwise transgress the Tenth Amendment. Plaintiffs do not have any First Amendment rights to invoke, and in any event the Final Rule does not regulate speech. Plaintiffs devote a single paragraph to attacking the PWFA's abrogation of sovereign immunity, but they parse Congress's authority under the Fourteenth Amendment far too narrowly. And Plaintiffs' quibbles with the Final Rule's economic analysis likewise do not carry their burden of establishing that EEOC acted arbitrarily or capriciously.

Third, the balance of equities and public interest foreclose relief. Plaintiffs' claimed injuries do not rise to the level of irreparable harm and are far outweighed by the significant harms their requested relief would cause to the Government and millions of employees and employers. Finally, if the Court were inclined to enter relief, a stay of the Final Rule's effective date would not be legally or equitably justified.

## ARGUMENT

## I.   THIS COURT LACKS JURISDICTION OVER PLAINTIFFS' CLAIMS

"Article III requires a plaintiff to show that she has suffered an injury in fact that is fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Haaland v. Brackeen*, 599 U.S. 255, 291-92 (2023); *see Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). Plaintiffs have not carried their burden to establish each element here.

### A.   Plaintiffs' Injuries, All Rooted in Providing Accommodations for "Illegal" Abortions, Are Highly Speculative

Plaintiffs claim three injuries, all stemming from a duty to accommodate abortions that violate state law: (1) unrecoverable monetary costs; (2) infringement on the States' sovereignty; and (3) impairing the States' messaging with respect to abortion. *See* PI Br. at 32-34. The common premise for these injuries is that individual State employees will *actually seek* accommodations from the Plaintiff States for abortions that violate State law. If no employee ever seeks such an accommodation, the States will not suffer their claimed injuries; in other words, the injuries would be "conjectural or hypothetical" rather than "actual or imminent." *Lujan*, 504 U.S. at 560.

As an initial matter, EEOC understands Plaintiffs' references to "abortions illegal under state law," *e.g.*, PI Br. at 32, to mean only an abortion that actually violates the Plaintiff State's laws, *i.e.*, not an abortion that a woman obtained in another State where the abortion was legal, but which

would have been illegal if performed within a Plaintiff State. In their declarations, each Plaintiff State describes its abortion law as prohibiting only abortions *within the State*. *See* TN Decl. ¶ 4 ("I understand that Tennessee law currently generally prohibits the provision of abortions *within the State* unless the procedure relates to certain enumerated categories of medical conditions and diagnoses." (emphasis added)); *see also* AR Decl. ¶ 4; OK Decl. ¶ 4; SD Decl. ¶ 4; IN Decl. ¶ 4; WV Decl. ¶ 4; AL Decl. ¶ 5; ID Decl. ¶ 4. Plaintiffs do not identify any State laws purporting to apply to out-of-state abortions or making it illegal for a woman to obtain a lawful out-of-state abortion. Nor could they constitutionally penalize such conduct. *See, e.g.*, *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 346 (2022) (Kavanaugh, J., concurring). Thus, Plaintiffs' injuries and references to "illegal" abortions can only be understood as referring to illegal in-state abortions.[1]

Particularly on that understanding, the speculative nature of Plaintiffs'

---

[1] Idaho's declaration does reference purported costs stemming from "accommodat[ing] or provid[ing] leave to employees for elective abortions performed in other states[.]" ID Decl. ¶ 8. But Idaho does not contend that such out-of-state abortions violate any Idaho law, *id.* ¶ 4, and any such costs are therefore irrelevant to the theories of injury in Plaintiffs' Complaint and preliminary-injunction filing, all of which are tied to illegal abortions. Similarly, although the Complaint obliquely references State restrictions on funding abortions, ECF No. 1 ¶ 104, Plaintiffs do not identify any State law that actually prohibits an accommodation where an employee herself pays for the procedure and any necessary travel. *See* § I.B.2, *infra*; *see also, e.g.*, *Unborn Child Amend. Comm. v. Ward*, 328 Ark. 454, 465 (1997).

injuries is apparent. Plaintiffs' theory requires assuming that (1) a pregnant State employee will decide to have an abortion, but cannot lawfully obtain one under State law; (2) the employee will choose not to avail herself of lawful options for obtaining an abortion; (3) the employee will be able to identify a provider willing to engage in an illegal abortion, notwithstanding that the provider could be exposed to criminal liability in the State; (4) the employee will need a workplace accommodation because of the abortion; (5) the employee will be unable to use existing leave or other benefits to obtain that accommodation; and (6) the employee will thus seek a PWFA accommodation from her State employer expressly for that illegal abortion. *Cf.* TN Decl. ¶ 8 (Plaintiffs do not provide accommodations when it is "for the *express* purpose of obtaining an elective abortion that violates state law" (emphasis added)).

Additionally, there are still more contingencies before any enforcement action is filed: (7) the employee, after being denied an accommodation for the illegal abortion, will file a charge with EEOC; (8) EEOC will reject all of the employer's defenses, conclude that reasonable cause exists to believe discrimination occurred, fail to resolve the matter voluntarily, and refer the matter to DOJ; and (9) DOJ, who is not even a defendant here, will independently decide to bring suit against the State employer.

The Supreme Court has routinely rejected theories of injury that, like Plaintiffs' theories here, "rel[y] on a highly attenuated chain of possibilities[.]"

-13-

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013); *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009); *Whitmore v. Arkansas*, 495 U.S. 149, 157-60 (1990); *see also Sch. of the Ozarks, Inc. v. Biden*, 41 F.4th 992, 998-99 (8th Cir. 2022). That is particularly true when the theory requires assuming that individuals will engage in illegal conduct. *See O'Shea v. Littleton*, 414 U.S. 488, 497 (1974) (Article III is not "satisfied by general assertions" that "respondents will be prosecuted for violating valid criminal laws" because "[w]e assume that respondents will conduct their activities within the law"); *United States v. Sanchez-Gomez*, 584 U.S. 381, 391 (2018); *City of Los Angeles v. Lyons*, 461 U.S. 95, 108 (1983). Here, even if limited only to the first set of contingencies, it is wholly speculative that a State employee desiring an abortion will choose to seek out an illegal abortion (rather than pursue other lawful options), succeed in finding a provider willing to commit that illegal act, and then seek an accommodation for her illegal abortion.

Certainly Plaintiffs have not submitted evidence *proving* that their claimed injuries are actual or imminent, which is their burden at this stage. *See Watkins Inc.*, 346 F.3d at 844; *Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 377 (D.C. Cir. 2017). Plaintiffs' generalized statistics about their overall number of female employees, *e.g.*, TN Decl. ¶ 5, do not suffice to prove that the injury is "actual or imminent," *Lujan*, 504 U.S. at 560; *see Summers*, 555 U.S. at 497-99. Indeed, despite the PWFA

being in effect since June 2023 (and Title VII for decades more), Plaintiffs do not identify *any* employee who has sought an accommodation or leave for an illegal abortion, let alone filed an EEOC charge for the denial of such an accommodation. Similarly, EEOC's search identified no enforcement actions brought by EEOC involving an abortion that was illegal in the state in which it occurred. *See* Lager Decl. ¶ 5; Hudson Decl. ¶¶ 9-10 (discussing confidential charge data relating to Plaintiffs). The record here thus confirms that Plaintiffs' injury is not "certainly impending." *Clapper*, 568 U.S. at 410.

### B.    Each Theory of Injury Fails for Additional Reasons

#### 1.    Plaintiffs' Compliance Costs Are Unproven

Plaintiffs claim that EEOC's rule will "impose significant costs," such as "lost productivity" and "costs associated with training hundreds of human relations staff[.]" TN Decl. ¶ 9. But Plaintiffs "do not explain the economic harm in definite enough terms to show" that it is "actual and not theoretical." *Morehouse Enters., LLC v. ATF*, 78 F.4th 1011, 1018 (8th Cir. 2023).

Significantly, the PWFA imposes accommodation obligations on Plaintiffs regardless of the Final Rule. Plaintiffs have not attempted to quantify or distinguish between compliance costs attributable to the narrow part of the Final Rule they challenge, and compliance costs attributable to the statute or unchallenged portions of the Final Rule. Furthermore, the Plaintiff States already provide extensive leave benefits to their employees and employ human

resources professionals to administer those benefits. *See, e.g.*, TN Decl. ¶¶ 2, 6; AR Decl. ¶¶ 2, 6. Plaintiffs do not contend that their existing human resources staff is unable to implement the Final Rule consistent with their normal duties, which presumably includes administering numerous similar laws. Nor do Plaintiffs submit any meaningful evidence that accommodating the challenged "illegal" abortions will result in a net increase in tangible, monetary costs.

In short, Plaintiffs "do not try to quantify, or clearly explain, their generally alleged compliance costs." *Morehouse Enters.*, 78 F.4th at 1018. Absent proof of a net increase in costs or expenditures, Plaintiffs cannot claim injury simply from implementing the challenged portion of the Final Rule. *See, e.g.*, *Kentucky v. EPA*, 2023 WL 2733383, at *8-9 (E.D. Ky. Mar. 31, 2023).

### 2.    The Final Rule Does Not Infringe on State Sovereignty

Plaintiffs claim that the Final Rule "hamper[s] their duly enacted laws regulating abortion," PI Br. at 33, and point to state laws restricting abortions and public funding of abortions. *Id.* at 33 & n.13. But the Final Rule has no effect on these types of laws, and thus cannot possibly infringe on state sovereignty. *Cf. Sch. of the Ozarks*, 41 F.4th at 998 (rejecting a "theory of injury" that "is based on a misunderstanding" of the challenged action).

As the Final Rule makes clear, "the PWFA . . . does not regulate the provision of abortion services or affect whether and under what circumstances an abortion should be permitted." 89 Fed. Reg. at 29,104. Thus, the Final Rule

does not interfere with Plaintiffs' laws regulating abortion. Indeed, the two types of laws operate in different spheres: the PWFA provides pregnant women with a right to reasonable accommodations (absent undue hardship), whereas Plaintiffs' laws do not regulate pregnant women at all and instead impose liability on individuals who *perform* certain abortions. *See, e.g.*, Tenn. Code Ann. § 39-15-213(e); Ark. Code Ann. § 5-61-304(c)(1).

As for funding restrictions, the Final Rule again is unequivocal: "Nothing in the PWFA requires an employer to pay for an abortion[.]" 89 Fed. Reg. at 29,109. The PWFA also does not "require an employer-sponsored health plan to pay for or cover . . . abortion," or require "an employer to pay any travel-related expenses for an employee to obtain an abortion." *Id.* at 29,104. Even with respect to leave, "[t]he PWFA . . . does not require that leave as an accommodation be paid leave, so leave will be unpaid unless the employer's policies provide otherwise." *Id.* The Final Rule cannot possibly conflict with state laws prohibiting the use of public funds for abortions, therefore, given that it does not require employers to pay for abortions.

### 3.    Plaintiffs Have Not Proven a Messaging Injury

Lastly, Plaintiffs argue that the Final Rule "impairs each State's interest in protecting its messaging with respect to the damages caused by abortion." PI Br. at 34. But Plaintiffs do not identify any "messaging" they currently engage in, or imminently wish to engage in, that they now believe is proscribed

-17-

by the PWFA. *See Gray v. City of Valley Park*, 567 F.3d 976, 985 (8th Cir. 2009) (pre-enforcement standing requires the plaintiff to establish "an intention to engage in a course of conduct that is clearly proscribed by statute").

At most, Plaintiffs' declarants express concern about liability under the PWFA's anti-retaliation and anti-coercion provisions. *See, e.g.*, TN Decl. ¶ 11; AR Decl. ¶ 11. But the declarations provide no evidence that anti-abortion "messaging" of the type that would violate the PWFA is currently occurring (or is ever likely to occur) within state workplaces, especially given that Title VII and the ADA have similar provisions. *See* 42 U.S.C. §§ 2000e-3(a), 12203(b). The declarations likewise provide no evidence that a charge would be filed or an enforcement action brought on these grounds.

Nor can Plaintiffs rely on their state laws as the relevant "messaging." For one thing, despite their declarants' assertions, Plaintiffs' laws do not appear to restrict the use of leave for abortions. *See* Tenn. Code Ann. § 8-50-802; Ark. Code Ann. § 21-4-206. Thus, there is no "message" embodied within those laws at all. More fundamentally, accepting state laws as embodying abstract "messages," and holding that a conflict between those messages and federal policies constitutes Article III injury, would allow States to challenge virtually any federal policy with which they disagree. That is not the law. *See Brackeen*, 599 U.S. at 295; *United States v. Texas*, 599 U.S. 670, 680 n.3 (2023).

### C.   Plaintiffs Have Not Proven that Their Injuries Are Traceable to EEOC, Or Redressable By An Order Against EEOC

Even assuming injury-in-fact, Plaintiffs still lack standing because they have not established traceability or redressability for four reasons.

First, EEOC—the sole Defendant here—lacks authority to bring an enforcement action against the Plaintiff States; that can be done only by DOJ. *See* 42 U.S.C. §§ 2000gg-2(a)(1), 2000e-5(f)(1). Any injury therefore is not traceable to EEOC and cannot be redressed by the requested relief. *See Digital Recognition Network, Inc. v. Hutchinson*, 803 F.3d 952, 958 (8th Cir. 2015). And Plaintiffs cannot belatedly request that relief extend to agencies not named as defendants. *Cf. Lujan*, 504 U.S. at 568.

Second, any relief entered in this case would not bind private individuals who would remain free to pursue PWFA claims against Plaintiffs even if the United States were enjoined from doing so. The States will thus be exposed to their same claimed injuries regardless of any relief here. *See Digital Recognition Network*, 803 F.3d at 958; *cf. Brackeen*, 599 U.S. at 292-93.

Third, Plaintiffs also have not established that their injuries are necessarily attributable to the Final Rule (or the PWFA), as opposed to separate, unchallenged laws like Title VII. *See, e.g.*, *Advantage Media, L.L.C. v. City of Eden Prairie*, 456 F.3d 793, 801 (8th Cir. 2006) (no redressability where "unchallenged provisions" of same code would still prohibit plaintiff's desired conduct); *Doe v. Virginia Dep't of State Police*, 713 F.3d 745, 756 (4th

Cir. 2013). Plaintiffs offer extensive benefits (including unpaid leave even when the employee has exhausted other available leave), *see, e.g.*, TN Decl. ¶¶ 6-7. Title VII already compels them to offer those same benefits to employees affected by pregnancy, childbirth, or related medical conditions who are similar in their ability or inability to work, which would include needing leave regarding abortion—as Plaintiffs effectively concede. *See* PI Br. at 21 (acknowledging that Congress intended PDA to prevent discrimination based on having an abortion); Background, § I.A.

Fourth and finally, Plaintiffs lack standing to challenge the abrogation of State sovereign immunity in particular. The only defendant here is a Federal agency, and State sovereign immunity is irrelevant to the Federal Government's ability to bring a claim against Plaintiffs for money damages. *See Alden v. Maine*, 527 U.S. 706, 755 (1999) (state sovereign immunity does not extend to suits "by the Federal Government"). The abrogation provision is relevant only for suits filed by private individuals, but as noted, no private individuals can be bound by relief entered here. (And even absent abrogation, those private individuals can still seek injunctive relief against Plaintiffs, *see Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 374 n.9 (2001).) Because the United States need not rely on the abrogation provision, there is no injury attributable to that provision that is redressable through this suit.

**D.    Plaintiffs' Claims Are Not Ripe Given Their Highly Fact-Specific and Contingent Nature**

Even if Plaintiffs can overcome the above standing deficiencies, their claims still are not ripe. *See Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967). There is no hardship to declining review, given the abstract nature of Plaintiffs' claimed injuries and their ability to raise all of the same arguments as defenses, should an enforcement proceeding ever arise.

Plaintiffs' claims would also "benefit from further factual development[.]" *Sch. of the Ozarks*, 41 F.4th at 998. Awaiting a concrete setting would offer numerous potentially relevant facts: the specific accommodation being requested; the circumstances of the abortion, including whether it was medically indicated and whether all parties agreed it was an "illegal" abortion; the particulars of the employer's leave policies; the burdens on the employer of granting the accommodation, including any undue hardship; and the extent of any alleged conflict with the employer's speech or religion. Depending on those facts, courts may not need to decide Plaintiffs' claims, or at least the analysis would be substantially easier. Thus, Plaintiffs' claims are not yet ripe.

**II.    PLAINTIFFS HAVE NOT OTHERWISE SHOWN A LIKELIHOOD OF SUCCESS ON THEIR CLAIMS**

**A.    The PWFA's Text Requires Accommodations for Abortion**

Plaintiffs contend that the Final Rule's inclusion of abortion is unlawful. But Plaintiffs' argument ignores Title VII's text, which confirms that the phrase "pregnancy, childbirth, or related medical conditions" includes abortion. And

by using that identical language in the PWFA, Congress thus made clear that the PWFA covers abortion too. Moreover, the PWFA's own text also independently confirms this conclusion.

### 1. Title VII's Text Encompasses Abortion, and Congress Used the Same Language in the PWFA

Over four decades ago, Congress amended Title VII to clarify that "[t]he terms 'because of sex' or 'on the basis of sex' include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions[.]" 42 U.S.C. § 2000e(k). In that same subsection, Congress provided that "[t]his subsection shall not require an employer to pay for health insurance benefits for abortion, except where the life of the mother would be endangered if the fetus were carried to term, or except where medical complications have arisen from an abortion." *Id.*

That latter sentence confirms that abortion is included within the preceding statutory phrase "pregnancy, childbirth, or related medical conditions." Congress exempted employers from the obligation "to pay for health insurance benefits for abortion" in most circumstances, but expressly preserved that obligation "where the life of the mother would be endangered" or "where medical complications have arisen from an abortion." *Id.* There is no way to understand the requirement in the second half of § 2000e(k) *except* as confirming that the first half, and its use of the phrase "pregnancy, childbirth, or related medical conditions," includes abortion.

-22-

Thus, when Congress enacted the PWFA with the purpose of expanding Title VII's protections, and did so using the identical phrase of "pregnancy, childbirth, or related medical conditions," Congress intended that the identical statutory phrase in the PWFA have the same meaning as in Title VII. *See* 89 Fed. Reg. at 29,104-08; *see also George v. McDonough*, 596 U.S. 740, 746 (2022) ("Where Congress employs a term of art obviously transplanted from another legal source, it brings the old soil with it."); *Smith v. City of Jackson*, 544 U.S. 228, 233 (2005) ("[W]hen Congress uses the same language in two statutes having similar purposes . . . it is appropriate to presume that Congress intended that text to have the same meaning in both statutes.").

Plaintiffs wholly ignore that Title VII's text necessarily encompasses abortion, and instead portray the Final Rule as relying on Congress implicitly ratifying a "smattering of lower court opinions." PI Br. at 17-18. But far from it: lower courts are not the only reason the phrase "pregnancy, childbirth, or related medical conditions" includes abortion; Congress *itself* defined that phrase to include abortion when it enacted § 2000e(k) four-plus decades ago.

Congress's decision that § 2000e(k) should encompass abortions was not a passive, subconscious act; it was one of the express purposes of the PDA. *See* H.R. Conf. Rep. No. 95-1786 at 4; H.R. Rep. No. 95-948, at 7. Indeed, the Supreme Court's decision in *Gilbert* noted EEOC's view that Title VII extended to abortion, 429 U.S. at 140, and the PDA was specifically intended

-23-

to bring Title VII back into alignment with those guidelines:

> The EEOC guidelines . . . require employers to treat disabilities caused or contributed to by pregnancy, miscarriage, abortion, childbirth and recovery therefrom as all other temporary disabilities. It is the Committee's view that these guidelines rightly implemented the Title VII prohibition of sex discrimination[.]

H.R. Rep. 95-948, at 2. Plaintiffs' efforts to undermine the Final Rule's statutory analysis as a mere ratification argument is thus unpersuasive; it was Congress who defined Title VII to include abortions, and it was Congress who elected to use that same language in the PWFA.

In any event, Plaintiffs' argument is wrong on its own terms; the supposed "smattering" of lower court opinions spans across several circuit courts, as well as multiple district courts, all of which is wholly one-sided in favor of abortion coverage. *See Doe v. C.A.R.S. Prot. Plus, Inc.*, 527 F.3d 358, 364 (3d Cir. 2008); *Turic v. Holland Hosp., Inc.*, 85 F.3d 1211, 1214 (6th Cir. 1996); *see also In re Union Pac. R.R. Emp. Pracs. Litig.*, 479 F.3d 936, 942 (8th Cir. 2007) ("[A]bortion arguably would be 'related to' pregnancy . . . because abortion can only occur when a woman is pregnant."); *Ducharme v. Crescent City Dèjà Vu, L.L.C.*, 406 F. Supp. 3d 548, 556 (E.D. La. 2019); *Nat'l Conf. of Cath. Bishops v. Bell*, 490 F. Supp. 734, 736 (D.D.C. 1980), *aff'd sub nom. Nat'l Conf. of Cath. Bishops v. Smith*, 653 F.2d 535 n.2 (D.C. Cir. 1981).[2]

---

[2] Plaintiffs briefly assert that these cases rely on abortion being constitutionally protected, PI Br. at 19, but the cases interpreted a statute, and

Plaintiffs have not identified any case concluding that the PDA does not protect an employee who chooses to have (or not to have) an abortion. Instead, they rely on inapposite cases addressing sex discrimination as applied to exclusions of care that—unlike abortion—affect both genders equally. *See Krauel v. Iowa Methodist Med. Ctr.*, 95 F.3d 674, 680 (8th Cir. 1996) (dismissing challenge to exclusion of "benefits for treatment of fertility problems" that "applies to both female and male workers"); *In re Union Pac.*, 479 F.3d at 942 (dismissing challenge to policy denying insurance coverage for all contraception because policy was not "gender-specific" and distinguishing abortion). And these judicial decisions are on top of EEOC's own guidance, which has, for decades, defined the phrase "pregnancy, childbirth, or related medical conditions" to include abortion. *See* 29 C.F.R. part 1604, App'x, Questions 34-37 (1979); *cf. Bragdon v. Abbott*, 524 U.S. 624, 645 (1998).

Plaintiffs' sole attempt to grapple with Title VII's text is to argue that the PDA is broader than the PWFA because it "extends beyond 'medical conditions' to all women '*affected* by pregnancy.'" PI Br. at 19 (quoting 42 U.S.C. § 2000e(k)). This mangled reading ignores that the PDA expressly defines "because of" or "on the basis of sex" by reference to the same language

---

there is no "dynamic view of statutory interpretation, under which the text might mean one thing when enacted yet another if the prevailing view of the Constitution later changed." *Harris v. United States*, 536 U.S. 545, 556 (2002), *overruled on other grounds by Alleyne v. United States*, 570 U.S. 99 (2013).

as in the PWFA—"pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e(k). It thereafter references "women affected by pregnancy, childbirth, or related medical conditions" only in further clarifying the scope of that non-discrimination mandate. *Id.* And the language in the PWFA is just as—if not more—broad; it requires accommodations of any limitation "*related to, affected by, or arising out of* pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000gg(4) (emphasis added).

Finally, Plaintiffs claim that the statutes are distinct because the PDA is an anti-discrimination law, while the PWFA is an accommodation law. PI Br. at 20. But this argument is contrary to Plaintiffs' earlier admission that the PWFA was enacted to fill gaps in the PDA. *See id.* at 2-3; Background § I. Given the statutes' interrelatedness, it would be illogical for Congress to have intended for the coverage of "pregnancy, childbirth, or related medical conditions" to be narrower under the PWFA than the PDA, particularly where discrimination claims may arise under both statutes. *See* 89 Fed. Reg. at 29,108. In any event, Plaintiffs' purported difference does not suggest the statutory language should be interpreted differently. Accommodation law is a species of anti-discrimination law, *see, e.g.*, *US Airways, Inc. v. Barnett*, 535 U.S. 391, 396 (2002) (recognizing the ADA defines "discrimination" to include "not making reasonable accommodations" absent "undue hardship" (quoting 42 U.S.C. § 12112(b)(5)(A) (emphasis omitted)), as Congress itself understood

-26-

in characterizing the PWFA, *see* 42 U.S.C. § 2000gg-1 ("*Nondiscrimination with regard to reasonable accommodations related to pregnancy*" (emphasis added)). Plaintiffs' cases also do not establish that disparate treatment laws are accorded broader interpretations than accommodation laws; they merely recognize that the elements of each claim, and relevant facts, may differ.  *See, e.g., Dunlap v. Liberty Nat. Prod., Inc.*, 878 F.3d 794, 798 (9th Cir. 2017).

In sum, Plaintiffs fail to grapple with Title VII's plain meaning, which covers abortions. Congress's decision to use identical text in the PWFA therefore means that the PWFA likewise covers abortions.

### 2.    The PWFA Is Best Read, On Its Own, to Cover Abortion

Even absent the longstanding interpretation of "pregnancy, childbirth, or related medical conditions" from Title VII, the same conclusion obtains, as EEOC explained in the Final Rule. *See* 89 Fed. Reg. at 29,106-07. The PWFA requires reasonable accommodation of "known limitations related to . . . pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000gg-1(1). By including "childbirth" separately from "pregnancy," Congress made clear that it intended to cover "pregnancy" regardless of its outcome (whether live birth, miscarriage, abortion, or otherwise). And individuals in a position to choose whether to have an abortion are, definitionally, pregnant. Thus, if an employee is denied an accommodation because they are seeking an abortion, that employee has been denied an accommodation on account of their

pregnancy. *See In re Union Pac.*, 479 F.3d at 942 (recognizing that "abortion can only occur when a woman is pregnant"). Conditions stemming from an abortion procedure—such as cramping, or the need to rest—are "related medical conditions" to pregnancy, even by Plaintiffs' proffered definition. *See* PI Br. at 14-15 (defining "condition" as "state of health or physical fitness" or "illness or other medical problem").

Plaintiffs' contrary argument focuses almost exclusively on the word "condition," to argue that abortion is not a "related medical condition" or a "physical or mental condition" but rather a "procedure." *Id.* at 14-17. For the reasons above, Plaintiffs are incorrect that "pregnancy, childbirth, or related medical conditions" does not cover abortion. But even accepting Plaintiffs' framing *arguendo*, the statutory language still would cover abortion-related accommodations. The phrase "known limitation" means a "physical or mental condition related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions[.]" 42 U.S.C. § 2000gg(4). Plaintiffs' theory (again, addressing *arguendo*) provides no reason why the "known limitation" must be the abortion itself, as opposed to the physical condition(s) stemming from the abortion, such as cramping or being physically unavailable while obtaining health care. *See* 29 C.F.R. § 1636.3(a)(2) (known limitation "includes when an employee is seeking health care related to pregnancy, childbirth, or a related medical condition itself"). Even under Plaintiffs' framing, the PWFA would

not evaluate the "known limitation" at the procedure level, as the limitation would inform the type of accommodation needed: the accommodation for physical unavailability (*e.g.*, due to recovery or seeking health care) is typically leave, whereas the accommodation for cramping may be additional breaks.

Thus, Plaintiffs conflate "procedures" with the physical or mental conditions that constitute limitations. If a procedure that one can only get if one is pregnant, such as an abortion, leads to "physical or mental condition[s] related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions," those conditions are limitations subject to the PWFA regardless of how one thinks of the procedure itself. For this reason, Plaintiffs are incorrect in claiming an "elective abortion" can never involve a "medical condition." PI Br. at 16. Regardless of a woman's reason for having an abortion, she may experience limitations as a result of the procedure; those limitations plainly are *related to* and *arise out of* the condition of pregnancy.

Two additional features of the statutory scheme confirm that Plaintiffs' interpretation is incorrect. First, Plaintiffs' interpretation would exclude from the PWFA's scope regular check-ups during pregnancy, as well as other procedures that are not themselves "conditions," like amniocentesis, cesarean section, or ultrasound (which also may or may not be "elective"). That was not Congress's intent. *See* H.R. Rep. No. 117-27, at 29 (recognizing PWFA covers accommodations for "prenatal appointments"). Second, the PWFA was enacted

against the backdrop of the ADA's longstanding rule that "employers often may be required to provide the reasonable accommodation of leave so that an employee can obtain medical treatment." 89 Fed. Reg. at 29189-90; *see* 29 C.F.R. pt. 1630, App'x, § 1630.2(o). The PWFA, then, should treat obtaining health care in a similar manner.

Finally, Plaintiffs' invocation of the *ejusdem generis* canon is irrelevant, PI Br. at 17, because it ignores that Congress sought to broadly cover limitations with a nexus to pregnancy or childbirth. Indeed, each time Congress used the phrase "pregnancy, childbirth, or related medical condition," that phrase was preceded by expansive language. *See* 42 U.S.C. § 2000gg-1(1) (requiring accommodations for "the known limitations *related to* the pregnancy, childbirth, or related medical conditions of a qualified employee" (emphasis added)); *see also id.* § 2000gg-1(2) ("affected by"); *id.* § 2000gg(4) ("related to, affected by, or arising out of"). There can be no doubt that an abortion is "related to" and "aris[es] out of" pregnancy and involves an "employee affected by pregnancy."

### 3. Plaintiffs' Resort to Materials Outside the PWFA's Text Does Not Change the Analysis

Plaintiffs claim that the legislative history belies any intent to cover abortion. But their reliance on individual statements of congresspersons and comments received by EEOC is misplaced. "What Congress ultimately agrees on is the text that it enacts, not the preferences expressed by certain

-30-

legislators." *NLRB v. SW Gen., Inc.*, 580 U.S. 288, 306 (2017). And they offer especially little insight into congressional intent here, where many congressmembers held a contrary view (that abortion is covered), and the Minority Report to the PWFA recognized that the statute "could require [an] organization to comply with" a request for "time off to have an abortion procedure . . . as a reasonable accommodation of known limitations related to pregnancy, childbirth or related medical conditions." H. Rep. 117-27, at 60; *see, e.g.*, 117 Cong. Rec. 2228–29 (2021) (statement of Rep. Marjorie Taylor Greene declining to support PWFA because it covers abortions); *id.* at 2325 (statement of Rep. Julia Letlow expressing same); *see also* 89 Fed. Reg. at 29,110 n.92 (discussing supportive comments from numerous congresspersons). Plaintiffs' invocations of Senator Casey's floor statement ignores that, consistent with it, the Final Rule neither "requires abortion leave" in all circumstances nor "require[s] employers to provide abortions in violation of State law," 168 Cong. Rec. S7050 (daily ed. Dec. 8, 2022), and that his comment to the proposed rule supported EEOC's final position, *see* Cmt. EEOC-2023-0004-98384 (Oct. 10, 2023), https://perma.cc/MY6C-3PD7.

Nor do other federal restrictions on abortion indicate that Congress intended to exclude it from the PWFA. To the contrary, explicit restrictions on abortion in other provisions of the Consolidated Appropriations Act in which the PWFA was passed, *see* PI Br. at 22, confirm that when Congress wishes to

exclude abortion, it says so explicitly. *See Keene Corp. v. United States,* 508 U.S. 200, 208 (1993) ("Where Congress includes particular language in one section of a statute but omits it in another it is generally presumed that Congress acts intentionally[.]" (cleaned up)). And Congress did specify a limit on the PWFA's applicability to abortion: similar to the PDA, the PWFA does not "require an employer-sponsored health plan to pay for or cover" abortion. 42 U.S.C. § 2000gg-5(a)(2); *compare* 42 U.S.C. § 2000e(k).

Finally, Plaintiffs are wrong to invoke the major questions doctrine. *See* PI Br. at 24. That doctrine applies when an "agenc[y] assert[s] highly consequential power beyond what Congress could reasonably be understood to have granted." *West Virginia v. EPA*, 597 U.S. 697, 724 (2022). EEOC was not exercising its own discretion in deciding what conditions should be covered by the PWFA but enforcing "policy decisions" made by "Congress itself" in utilizing a term with an established plain meaning. *Id.* at 723, 735; *see* 89 Fed. Reg. at 29,106. Thus, this case presents an ordinary question of statutory interpretation. And even if agency decisionmaking were somehow implicated, it would still not present a major question. The doctrine applies in "extraordinary cases" implicating "decisions of vast economic and political significance." *EPA*, 597 U.S. at 716, 721. The Final Rule, by contrast, imposes general workplace protections against pregnancy discrimination that are neutral as to abortion. *See* 89 Fed. Reg. at 29,104, 29,157-58, n.326. Nor is

there anything "transformative" about the Final Rule, *EPA*, 597 U.S. at 724, given that it is an incremental expansion of other laws that have long protected employees who decide to have (or not have) an abortion. Plaintiffs are thus incorrect that the PWFA does not cover abortion-related accommodations.

**B.     The Final Rule Is Consistent With Federalism**

Plaintiffs briefly contend that the Final Rule violates the Tenth Amendment because, "although Congress may regulate the States as employers, it cannot do so in a way 'that is destructive of state sovereignty.'" PI Br. at 25 (quoting *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 554 (1985)). But as *Garcia* itself held, a law infringes on state sovereignty only if it transgresses Congress's powers under Article I or some other constitutional provision. *See* 469 U.S. at 550 ("[W]e have no license to employ freestanding conceptions of state sovereignty when measuring congressional authority under the Commerce Clause."); *see also Hodel v. Va. Surface Min. & Reclamation Ass'n, Inc.*, 452 U.S. 264, 291 (1981).

Here, Plaintiffs do not argue that the PWFA broaches the Commerce Clause's limits. Nor could they, given the Supreme Court's longstanding recognition that civil rights laws are well within Congress's authority. *See Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 250 (1964). And nothing about *Dobbs* removed Congress's ability to legislate regarding abortion through valid Article I legislation. *Cf. Dobbs*, 597 U.S. at 338

(Kavanaugh, J., concurring) ("The Constitution . . . leaves the issue for the people and their elected representatives to resolve through the democratic process in the States *or Congress*[.]" (emphasis added)).

Plaintiffs gesture vaguely at the Tenth Amendment's anticommandeering doctrine, PI Br. at 25, but the PWFA and the Final Rule do not "issue direct orders to the governments of the States," *Murphy v. NCAA*, 584 U.S. 453, 471 (2018). Instead, they operate like numerous other federal laws by "confer[ring] . . . federal rights on private actors," *id.* at 480, namely the right for qualifying employees to obtain reasonable accommodations. State employers (like most private employers) must comply with the PWFA in their capacity as such, but that does not equate to commandeering under the Tenth Amendment.

Finally, Plaintiffs contend that the Final Rule is arbitrary and capricious because of EEOC's assertion "that the Rule has no federalism implications." PI Br. at 28. To the extent Plaintiffs are disputing EEOC's compliance with Executive Order No. 13132, *see* 89 Fed. Reg. at 29,182, that Executive Order is not privately enforceable. *See California v. EPA*, 72 F.4th 308, 317-18 (D.C. Cir. 2023); *Valentine Properties Assocs., LP v. Dep't of Hous. & Urb. Dev.*, 785 F. Supp. 2d 357, 368 (S.D.N.Y. 2011), *aff'd*, 501 F. App'x 16 (2d Cir. 2012).

Assuming a more generic arbitrary-and-capricious claim, EEOC's discussion of this topic was "reasonable and reasonably explained." *FCC v. Prometheus Radio Proj.*, 592 U.S. 414, 423 (2021). Plaintiffs' comment

contained only a single conclusory sentence on this topic, ECF No. 1 at 186-87 ("EEOC has not addressed the federalism concerns associated with forcing States to accommodate abortions that are illegal under state law."), to which EEOC rationally responded by noting the lack of any conflict:

> The Commission does not agree . . . [that the rule] requires covered entities, including State and local governments, to violate State laws that limit access to abortion, nor does the rule transgress limits of federalism. The rule does not prescribe when, where, or under what circumstances an abortion can be obtained or what procedures may be used.

89 Fed. Reg. at 29,112. EEOC further supported its conclusion by noting that despite Title VII covering abortions "for nearly 45 years . . . comments on this topic did not point to a situation where a State was forced to violate its own laws." *Id.* at 29,113. But "[t]o the extent any such issues arise in connection with the PWFA," EEOC committed to "address[] [them] on a case-by-case basis . . . given the State- and fact-specific nature of these issues." *Id.* Adopting a case-by-case approach was perfectly reasonable, especially given that EEOC has used this same case-by-case approach for defenses under Title VII and the ADA for decades. *See id.* at 29,144-54; *see also NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 294 (1974) ("[T]he choice between rulemaking and adjudication lies in the first instance within the [agency's] discretion.").

## C. Plaintiffs' First Amendment Challenges Fail

Plaintiffs contend that the Final Rule "contradicts the First Amendment" by requiring employers "to speak in ways that advance procedures that state

law prohibits," and "assist women's . . . abortions, contrary to core religious liberty rights." PI Br. at 26-27, 29-30. This challenge fails on multiple fronts.

**a.** As an initial matter, Plaintiff States have no First Amendment rights to invoke. With respect to speech, multiple courts of appeals have held that governmental entities do not have First Amendment rights, and recent Supreme Court decisions further support that conclusion. *See, e.g.*, *NAACP v. Hunt*, 891 F.2d 1555, 1565 (11th Cir. 1990); *Student Gov't Ass'n v. Board of Trs. of Univ. of Mass.*, 868 F.2d 473, 481 (1st Cir. 1989); *Estiverne v. La. State Bar Ass'n*, 863 F.2d 371, 379 (5th Cir. 1989); *see also Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 804 (2019) ("The Free Speech Clause of the First Amendment constrains governmental actors and protects private actors."); *Pleasant Grove City v. Summum*, 555 U.S. 460, 467 (2009) (similar).

Plaintiffs cite *Walker v. Texas Division, Sons of Confederate Veterans, Incorporated*, 576 U.S. 200 (2015), as implicitly suggesting that States may engage in expressive conduct protected by the First Amendment. PI Br. at 27. But that case involved the distinct "government speech" doctrine. That doctrine operates as a shield, preventing private parties from bringing First Amendment challenges to the content of the government entity's own speech. *See Walker*, 576 U.S. at 207 ("When government speaks, it is not barred by the Free Speech Clause from determining the content of what it says."); *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 560 (2005) (describing "government

speech" as "not susceptible to First Amendment challenge"). That doctrine is not a sword providing governmental entities with affirmative rights under the First Amendment to invoke against other governmental entities. Plaintiffs cite no support for their novel proposition that it is.

As for Free Exercise, Plaintiffs cite nothing supporting their invocation of such rights. Granting Free Exercise rights to States would make little sense when the Clause has been incorporated against them. *See Cantwell v. State of Connecticut*, 310 U.S. 296, 303 (1940). Surely a State could not defeat a private individual's Free Exercise claim by invoking the State's *own* right to exercise religion, yet that is what Plaintiffs' approach would allow. And there is at least some tension with Plaintiffs' invocation of "core religious liberty rights" and the rule that even "government speech must comport with the Establishment Clause." *Summum*, 555 U.S. at 468. Perhaps recognizing these weaknesses, Plaintiffs point to the interests of "private employers" as well. PI Br. at 27. But Plaintiffs cannot bring claims "on behalf of [their] citizens because a State does not have standing as *parens patriae* to bring an action against the Federal Government." *Brackeen*, 599 U.S. at 294-95 (cleaned up); *cf. Harris v. McRae*, 448 U.S. 297, 321 (1980) (describing "the participation of individual members" as "essential" to "resolution of their free exercise claim").

**b.** Even if they had First Amendment rights, Plaintiffs' claims would still fail. The Final Rule "regulates conduct, not speech. It affects what [employers]

must *do* . . . not what they may or may not *say*." *Rumsfeld v. Forum for Acad. & Institutional Rts. (FAIR), Inc.*, 547 U.S. 47, 60 (2006); *see also id.* at 62 ("[I]t has never been deemed an abridgement of freedom of speech . . . to make a course of conduct illegal merely because the conduct was in part . . . carried out by means of language[.]"). Fundamentally, there is nothing communicative or "inherently expressive," *FAIR*, 547 U.S. at 66, about an employer granting an accommodation to an employee. *See Telescope Media Grp. v. Lucero*, 936 F.3d 740, 757 (8th Cir. 2019) (employment-discrimination and public-accommodation laws are generally constitutional "because the relevant laws target the *activities* of hiring employees and providing food, neither of which typically constitutes speech"). Much like in *FAIR*, "an observer would have no way of knowing [the employer] was expressing [approval or] disapproval of [the employee's actions] without accompanying explanatory speech." *Arkansas Times LP v. Waldrip*, 37 F.4th 1386, 1392 (8th Cir. 2022). Granting an employee an accommodation thus does not implicate the First Amendment.

Moreover, the Final Rule does not require any employer to express any view on abortion to anyone. Plaintiffs dramatize EEOC's Example #76, *see* 89 Fed. Reg. at 29,218, as requiring States to "police the pro-life speech of a pregnant employee's coworkers." PI Br. at 30. But Example 76 is a core example of regulation of conduct that incidentally includes speech, because it prohibits co-worker harassment and other retaliatory conduct (scheduling

meetings that begin prior to the employee's arrival in the office) that lead to supervisory complaints and the employee "fall[ing] behind on her work." 89 Fed. Reg. at 29,218. The regulated activity in Example #76 is not speech—it is retaliatory harassment, which fits under the rubric of "antidiscrimination laws that . . . target conduct." *Telescope Media Grp.*, 936 F.3d at 757. And when it comes to speech, the Final Rule makes clear that the anti-coercion "provision does not apply to any and all conduct or statements that an individual finds intimidating; it prohibits only conduct that is reasonably likely to interfere with the exercise or enjoyment of PWFA rights." 89 Fed. Reg. at 29,148. That is the exact same standard as the ADA, *see id.*, with which employers have complied for decades without First Amendment concerns. *See also id.* at 29,216 (providing additional examples of violations of the anti-coercion provision, highlighting the focus on conduct not speech).

**c.** Plaintiffs also contend that the Final Rule is arbitrary and capricious because it "does not resolve these First Amendment issues." PI Br. at 30. Without First Amendment rights to invoke, however, they are not within the zone of interests for this challenge. *See Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1232 (D.C. Cir. 1996). And if there is no substantive First Amendment defect, as discussed above, it is unclear what Plaintiffs think EEOC was obligated to "resolve." To the extent Plaintiffs are arguing that the Final Rule failed to adequately address First Amendment concerns, EEOC

extensively reviewed and responded to comments raising potential First Amendment concerns, *see* 89 Fed. Reg. at 29,144-53, including specifically with respect to the coercion provision. *Id.* at 29,148.[3] EEOC further committed to considering any First Amendment defenses on a case-by-case basis and sought to facilitate employers' abilities to raise such defenses. *Id.* at 29,147-48, 29,151-52. As discussed above, there is nothing irrational about that approach, especially for sensitive, fact-bound situations involving speech and religion.

### D.   The PWFA Validly Abrogates State Sovereign Immunity

Plaintiffs devote a single paragraph to arguing that "the Final Rule exceeds the federal government's power under Section 5 of the Fourteenth Amendment." PI Br. at 26. In fact, the Final Rule did not abrogate state sovereign immunity at all; that determination was made by Congress. *See* 42 U.S.C. § 2000gg–4. But even as to Congress, Plaintiffs' arguments fail. Congress has "broad power . . . to remedy and to deter violation of rights guaranteed by the Fourteenth Amendment," including by enacting "prophylactic legislation that proscribes facially constitutional conduct." *Tennessee v. Lane*, 541 U.S. 509, 518 (2004) (cleaned up). Congress properly invoked that authority here with respect to private claims for money damages.

---

[3] Plaintiffs suggest that EEOC has disclaimed only that "general statements" such as those found in "mission statements" or "employee handbooks" are likely to rise to the level of interference. PI Br. at 30. But those examples were given in response to comments that specifically raised questions about such materials. 89 Fed. Reg. at 29,148.

Importantly, Plaintiffs do not challenge the PWFA's abrogation of sovereign immunity generally—*i.e.*, with respect to PWFA violations unrelated to abortion. PI Br. at 26 (challenging the waiver "for failure to accommodate elective abortions"). And that is for good reason: the Supreme Court has twice upheld workplace discrimination and accommodation laws as valid Section 5 legislation. *See Fitzpatrick v. Bitzer*, 427 U.S. 445 (1976) (upholding Title VII's abrogation of state sovereign immunity for gender-based discrimination claims); *Nevada Dep't of Hum. Res. v. Hibbs*, 538 U.S. 721, 730 (2003) (upholding FMLA's abrogation for the family-care provision, because it seeks to remedy "invalid gender stereotypes in the employment context"); *see also Okruhlik v. Univ. of Arkansas*, 255 F.3d 615, 622-27 (8th Cir. 2001) (confirming that Title VII's amendments were still valid Section 5 legislation).

Just like the FMLA provision at issue in *Hibbs*, the PWFA also properly remedies unconstitutional sex discrimination by countering gender stereotypes, including stereotypes regarding pregnancy. In enacting the PWFA, Congress reiterated its recognition from over four decades ago that "[t]he assumption that women will become pregnant and leave the labor market is at the core of the sex stereotyping resulting in unfavorable disparate treatment of women in the workplace." H.R. Rep. 117-27, at 13. Congress received testimony about this continuing problem, *see* 117 Cong. Rec. 2331, 2338, including that "[i]n the 21st century, sex discrimination against pregnant

workers often takes the form of reliance on insidious gender role stereotyping concerning women's place in the home and in the workplace" and "such stereotypes—such as, that motherhood and employment are irreconcilable—force pregnant women to choose between having a child and having a job." *Id*. at 2338 (quotation omitted). Despite existing legal protections, these sex stereotypes continued to result in pregnant women being denied accommodations, H.R. Rep. No. 117-27, at 11, 27, including by "state employers [who] continue to participate in and foster unconstitutional sex discrimination, including gender-role stereotyping." 117 Cong. Rec. 2338; *see id.* at 2338-39 (discussing "[e]vidence of persistent discrimination by state actors against pregnant workers in need of accommodation"). Thus, Congress responded to this "difficult and intractable problem" by enacting the PWFA's targeted, incrementally greater protections for pregnancy-related accommodations, in an effort to further counteract "the pervasive presumption that women are mothers first, and workers second." *Hibbs*, 538 U.S. at 736-37.

Plaintiffs are unable to dispute this. *See* PI Br. at 26. Instead, they contend that they can excise a specific type of conduct from the general waiver of sovereign immunity—accommodations for elective abortions—and challenge the waiver only as to that conduct. In doing so, they argue that abortion is not entitled to heightened constitutional protection and implicates state interests. But the Supreme Court has repeatedly recognized that

"[l]egislation which deters or remedies constitutional violations can fall within the sweep of Congress' enforcement power[,] even if in the process it prohibits conduct which is not itself unconstitutional and intrudes into 'legislative spheres of autonomy previously reserved to the States.'" *City of Boerne v. Flores*, 521 U.S. 507, 518 (1997) (quoting *Fitzpatrick,* 427 U.S. at 445); *see Lane*, 541 U.S. at 518. Plaintiffs' myopic focus on the appropriateness of certain types of accommodations has also been rejected by this Circuit. *See Maitland v. Univ. of Minnesota*, 260 F.3d 959, 963, 965 & n.5 (8th Cir. 2001) (declining to individually "review . . . the 'proportionality and congruity' of remedies" where plaintiff claimed Congress improperly abrogated state immunity "with respect to Title VII sex-discrimination claims brought by men" but not women). Rather, this Court must consider whether the accommodation obligation, on the whole, appropriately serves the problem Congress sought to address. *See id.* And plainly it does, given that Plaintiffs do not dispute (and have therefore conceded) that the waiver is generally valid.

Even if an abortion-specific analysis were appropriate, the same conclusion results. Sex stereotyping regarding the proper role of women can infect employer determinations as to abortion-related accommodations just as readily as to other pregnancy-related accommodations. For example, an employer may take adverse action against a woman seeking time off for an abortion in reliance on a constitutionally impermissible view that her proper

role in society is to procreate. *Cf. Hibbs*, 538 U.S. at 729 (discussing "the many state laws limiting women's employment opportunities" based in part on a belief that "a woman is, and should remain, 'the center of home and family life'"). And as described, the abortion-related accommodation obligations are narrow and further offset by the undue hardship exception.

Just as the FMLA family-care provision was "narrowly targeted at the faultline between work and family—precisely where sex-based overgeneralization has been and remains strongest," *id*. at 738, the PWFA is likewise a targeted effort to counter sex stereotypes that still impede women's full participation in the workforce. Plaintiffs are thus unlikely to succeed on their challenge to the PWFA's abrogation of sovereign immunity.

### E.    The Economic Analysis is Reasonable

Plaintiffs wholly fail to identify the basis for their challenge to the Economic Analysis. The cases they cite involve judicial review under the Regulatory Flexibility Act, *see* PI Br. at 30-31, but Plaintiffs here challenge the Economic Analysis and, in any event, they cannot bring claims under the Regulatory Flexibility Act. *See* 5 U.S.C. § 611(a)(1) (limiting review to "a small entity . . . adversely affected"). As for the Economic Analysis, that was generated pursuant to Executive Order, *see* 89 Fed. Reg. at 29,155, and those Orders are likewise not enforceable by Plaintiffs. *See* E.O. 12,866 § 10; E.O. 13,563 § 7(d); E.O. 14,094 § 4(c); *Nat'l Mining Ass'n v. United Steel*

*Workers*, 985 F.3d 1309, 1326-27 (11th Cir. 2021); *Nat'l Truck Equip. Ass'n v. NHTSA,* 711 F.3d 662, 670 (6th Cir. 2013); *Air Transp. Ass'n of Am. v. FAA*, 169 F.3d 1, 8-9 (D.C. Cir. 1999). Plaintiffs also offer no explanation as to how EEOC's alleged calculation errors are so fundamental as to undermine the validity of the Final Rule (or a portion thereof).

In any event, even when an agency must consider costs, the APA does not require "a formal cost-benefit analysis," and it is "up to the Agency to decide (as always, within the limits of reasonable interpretation) how to account for cost." *Michigan v. EPA*, 576 U.S. 743, 759 (2015). Here, on each issue raised by Plaintiffs, EEOC made reasonable assumptions and explained the bases for them, fulfilling any obligations under the APA. *See Citizens Tele. Co. of Minn. v. FCC*, 901 F.3d 991, 1011 (8th Cir. 2018) (even if "[r]easonable minds could disagree with [agency's] cost-benefit analysis," it is "not arbitrary and capricious" where "there is nothing unreasonable about its conclusions").

First, Plaintiffs argue that the Economic Analysis did not consider any costs associated with abortion-related accommodations, and instead "merely considered 'simple and no-cost [accommodations].'" PI Br. at 31 (quoting 89 Fed. Reg. at 29,175). As EEOC explained, "[a]ccording to the best available data, the average cost of a non-zero-cost reasonable accommodation . . . is $300," and that data includes "costs associated with leave." 89 Fed. Reg. at 29,157. Plaintiffs do not identify any other costs associated with abortion

accommodations for which data was available but EEOC failed to consider.

Second, Plaintiffs claim that EEOC incorrectly excluded costs for States with PWFA-type statutes and ignored Tennessee's comment that some state laws do not permit abortion-related accommodations. PI Br. at 31. EEOC directly addressed that comment, concluding that Tennessee did not support its "statement with data or case law, and the Commission was unable to find any independent evidence of any such [state law] restriction." 89 Fed. Reg. at 29,159. Moreover, EEOC did acknowledge that there might be some daylight between state laws and the PWFA; it concluded that state laws were "substantially similar" and that "additional costs" would be "minimal." *Id.* at 29,169. Again, Plaintiffs point to no data that was available but ignored.

Third, Plaintiffs suggest EEOC failed to adequately account for "ongoing compliance costs" or "legal counsel." PI Br. at 31. But EEOC expressly accounted for compliance costs, such as rule familiarization and updating policies, including as to States with existing pregnancy-accommodation laws. *See* 89 Fed. Reg. at 29,177. It reasonably assessed those costs as one-time costs, given that "employers covered by the PWFA already are covered by Title VII and the ADA" and thus can use their "existing [compliance] procedures." *Id.* at 29,160. And EEOC reasonably determined that it "does not anticipate that covered entities will need legal advice," since "the PWFA and the regulation draw on well-established concepts and

-46-

procedures from Title VII and the ADA." *Id.* Plaintiffs assert that EEOC's conclusion is in tension with its case-by-case approach for resolving interactions with state law, *see* PI Br. at 31, but they ignore EEOC's primary conclusion that concerns about state-law interactions are unsubstantiated. *See* 89 Fed. Reg. at 29,113. Thus, the Economic Analysis was reasonable.

## III.   THE BALANCE OF THE EQUITIES INDEPENDENTLY FORECLOSES RELIEF

Plaintiff also cannot demonstrate the other requirements for preliminary relief. *See Winter*, 555 U.S. at 20. As discussed *supra* in Part I.A, all of Plaintiffs' claimed injuries are speculative at best. Even assuming they suffice for Article III, they fall far short of irreparable harm. "[M]onetary loss, even where substantial, does not, in and of itself, constitute irreparable harm." *Corning Sav. & Loan Ass'n v. Fed. Home Loan Bank Bd.*, 562 F. Supp. 279, 283 (E.D. Ark. 1983). And Plaintiffs have not shown that any future risk of harm to their sovereignty or messaging "is certain and great and of such imminence that there is a clear and present need for equitable relief." *Iowa Utilities Bd. v. FCC*, 109 F.3d 418, 425 (8th Cir. 1996). Even if Plaintiffs face enforcement actions, they can still avoid liability by raising their defenses in that proceeding—a possibility that forecloses irreparable injury. *See Morgan v. Fletcher*, 518 F.2d 236, 240 (5th Cir. 1975) ("The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable

harm."); *see also FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232, 244 (1980).

On the other side of the balance, entry of an injunction would severely harm both the Government and members of the public who require accommodations. "Any time a [government] is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (brackets omitted). And an injunction would interfere with Congress's judgment about how best to achieve the PWFA's purposes of "eliminat[ing] discrimination and promot[ing] women's health and economic security." H.R. Rep. No. 117-27, at 1. Those purposes are compelling governmental interests, *see Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 733 (2014), yet Plaintiffs seek to disable EEOC from pursuing them.

Enjoining the Final Rule, which contains information that assists both employers and employees in ensuring compliance with the PWFA, could additionally have *negative* effects on Plaintiffs (and employers within the Plaintiff States) by "forc[ing] into court matters that the EEOC might otherwise have resolved," and "preventing earlier resolution" of employees' charges, thereby "increas[ing] the burdens of both time and expense." *West v. Gibson*, 527 U.S. 212, 219 (1999). At a minimum, the requested relief will confuse and delay private individuals' efforts to pursue their rights under the PWFA. Plaintiffs certainly have not proven that the speculative benefits they might

-48-

gain from an injunction outweigh the certain, immediate harms it would cause to employees seeking to vindicate their rights under the PWFA.

## IV.   ANY REMEDY SHOULD BE LIMITED TO PROVEN INJURIES

To the extent the Court disagrees with the above, any remedy here must be appropriately limited, especially because the PWFA and the Final Rule both contain severability clauses. *See* 42 U.S.C. § 2000gg-6; 29 C.F.R. § 1636.8. Plaintiffs offer no analysis on this question, and instead assume that, pursuant to 5 U.S.C. § 705, this Court can "[s]tay[] the effective date of EEOC's Final Rule . . . thus denying it legally operative effect" for the world at large. PI Mot. at 5. But that raises all the problems of nationwide injunctions. *See DHS v. New York*, 140 S. Ct. 599, 599-601 (2020) (Gorsuch, J., concurring in the grant of stay); *Trump v. Hawaii*, 585 U.S. 667, 713-21 (2018) (Thomas, J., concurring).

Moreover, Section 705 (like other APA provisions) "was primarily intended to reflect existing law," not "to fashion new rules of intervention for District Courts." *Sampson v. Murray*, 415 U.S. 61, 68 n.15 (1974). By authorizing a stay only when "necessary and appropriate," Section 705 codified pre-APA equitable principles enabling reviewing courts to temporarily stay certain agency orders in special statutory review proceedings. *See Scripps-Howard Radio, Inc. v. FCC*, 316 U.S. 4, 16-17 (1942). Plaintiffs do not identify any pre-APA tradition of district courts issuing stays of agency *policies*.

Thus, Plaintiffs may seek preliminary equitable relief, but consistent

with principles of equity any remedy "must be tailored to redress the plaintiff's particular injury," *Gill v. Whitford*, 585 U.S. 48, 73 (2018), and "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994). That requires several limits here.

First, any relief should be awarded only to those Plaintiff States that have submitted evidence proving their injuries. At most that is the eight States that submitted declarations. *See* ECF Nos. 17-1 – 17-8. Second, relief should apply to those States in their capacities as employers, not to *all* PWFA-covered entities within those States, as Plaintiffs lack standing to seek relief on behalf of private entities. Third, the injunction should be limited to accommodations for abortions performed within each Plaintiff State that are illegal under that Plaintiff State's laws, because that is the only subset of abortions for which Plaintiffs claim injury. PI Br. at 32-34. Fourth, any injunction should be limited to EEOC, and not extend to other entities or persons not before this Court—such as DOJ and private individuals—who retain rights to enforce the PWFA. These limits describe the maximum relief theoretically available, but the proper approach would be to deny Plaintiffs' motion entirely.

## CONCLUSION

Plaintiffs' motion for preliminary relief should be denied.

Dated: May 17, 2024

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

EMILY B. NESTLER
Assistant Branch Director

DANIEL SCHWEI
Special Counsel

*/s/ Laura B. Bakst*
LAURA B. BAKST (D.C. Bar #1782054)
ALEXANDRA WIDAS (D.C. Bar #1645372)
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Tel: (202) 514-3183
Facsimile: (202) 616-8470
Email: laura.b.bakst@usdoj.gov

*Counsel for Defendant*