## IN THE UNITED STATES DISTRICT COURT FOR
## THE EASTERN DISTRICT OF ARKANSAS
## DELTA DIVISION

| | |
|---|---|
| STATES OF TENNESSEE, ARKANSAS, ALABAMA, FLORIDA, GEORGIA, IDAHO, INDIANA, IOWA, KANSAS, MISSOURI, NEBRASKA, NORTH DAKOTA, OKLAHOMA, SOUTH CAROLINA, SOUTH DAKOTA, UTAH, and WEST VIRGINIA,<br><br>*Plaintiffs*,<br><br>v.<br><br>EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,<br><br>*Defendant*. | **Civil No. 2:24-cv-84 DPM**<br>District Judge D. P. Marshall<br>Magistrate Judge Edie R. Ervin |

**Memorandum of Law for the States of New York, Arizona, California, Colorado, Connecticut, Delaware, Hawaiʻi, Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New Mexico, North Carolina, Oregon, Pennsylvania, Rhode Island, Vermont Washington, and Wisconsin, and the District of Columbia as Amici Curiae in Support of Defendant and in Opposition to Plaintiffs' Motion for Preliminary Relief**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .............................................................. ii

INTRODUCTION AND INTERESTS OF AMICI ..........................................1

ARGUMENT .........................................................................5

    I.   The Pregnant Workers Fairness Act Provides Critical
        Workplace Protections ......................................................5

    II.  The Commission Reasonably Interpreted the Pregnant
        Workers Fairness Act to Require Reasonable
        Accommodations for Abortion Care ..............................................9

    III. If the Motion Is Granted, Any Preliminary Relief Should Be
        Narrowly Tailored ..........................................................19

CONCLUSION .......................................................................22

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Bragdon v. Abbott,*
   524 U.S. 624 (1998) ...................................................................................16

*Califano v. Yamasaki,*
   442 U.S. 682 (1979) ...................................................................................19

*Colorado v. U.S. Env't Prot. Agency,*
   989 F.3d 874 (10th Cir. 2021) ....................................................................19

*Cook Cnty. v. Wolf,*
   962 F.3d 208 (7th Cir. 2020) .....................................................................20

*Doe v. C.A.R.S. Prot. Plus, Inc.,*
   527 F.3d 358 (3d Cir. 2008) ......................................................................16

*Ducharme v. Crescent City Déjà vu, LLC,*
   406 F. Supp. 3d 548 (E.D. La. 2019) .........................................................16

*EEOC v. Houston Funding II, Ltd.,*
   717 F.3d 425 (5th Cir. 2013) .....................................................................16

*Gregory v. Home Ins. Co.,*
   876 F.2d 602 (7th Cir. 1989) .....................................................................11

*Hall v. Nalco Co.,*
   534 F.3d 644 (7th Cir. 2008) .....................................................................17

*Hicks v. City of Tuscaloosa,*
   870 F.3d 1253 (11th Cir. 2017) ............................................................ 16-17

*Highwoods Props., Inc. v. Executive Risk Indem., Inc.,*
   407 F.3d 917 (8th Cir. 2005) .....................................................................11

*In re Union Pac. R..R Emp. Pracs. Litig.,*
   479 F.3d 936 (8th Cir. 2007) .....................................................................17

**Cases**                                                                 **Page(s)**

*International Union, United Auto., Aerospace & Agric. Implement*
  *Workers of Am. v. Johnson Controls, Inc.*,
  499 U.S. 187 (1991) ......................................................................17

*Kocak v. Community Health Partners of Ohio, Inc.*,
  400 F.3d 466 (6th Cir. 2005)...........................................................16

*Krauel v. Iowa Methodist Med. Ctr.*,
  95 F.3d 674 (8th Cir. 1996)..............................................................17

*Narragansett Indian Tribe v. Guilbert*,
  934 F.2d 4 (1st Cir. 1991) ...............................................................20

*Reilly v. Revlon, Inc.*,
  620 F. Supp. 2d 524 (S.D.N.Y. 2009)..............................................16

*Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*,
  576 U.S. 519 (2015) ........................................................................16

*Turic v. Holland Hospitality, Inc.*,
  85 F.3d 1211 (6th Cir. 1996)...........................................................16

*Young v. United Parcel Serv., Inc.*,
  575 U.S. 206 (2015) ..........................................................................8

**Laws**

*Federal*

Pub. L. No. 117-328, 136 Stat. 4459 (2022)........................................1

5 U.S.C. § 705 ......................................................................................4

42 U.S.C.
  § 2000gg-1(1) ....................................................................................8
  § 2000gg-3(a) .....................................................................................9
  § 2000gg(4) .......................................................................................11

**Laws**                                                                    **Page(s)**

*Federal*

42 U.S.C.
  § 12102(2)..................................................................................9
  § 12102(4)..................................................................................9

Family and Medical Leave Act, 29 U.S.C. § 2601 et. seq................................8

Pregnancy Discrimination Act, 42 U.S.C. § 2000e(k)................................8, 15

*State*

Ga. Code Ann. § 16-12-141(a)..........................................................14

**Regulations**

29 C.F.R.
  § 1630.2(h)................................................................................9
  § 1636.3(b)...............................................................................10
  § 1636.8 ..................................................................................20

Implementation of the Pregnant Workers Fairness Act,
  89 Fed. Reg. 29,096 (Apr. 19, 2024)...................................... 8, 10, 15, 18-19

Regulations to Implement the Pregnant Workers Fairness Act,
  88 Fed. Reg. 54,714 (Aug. 11, 2023)...........................................................10

**Miscellaneous Authorities**[*]

Am. Coll. of Obstetricians & Gynecologists, *ACOG Guide to
  Language and Abortion* (Sept. 2023), https://www.acog.org/-
  /media/project/acog/acogorg/files/pdfs/publications/abortion-
  language-guide.pdf ......................................................................13

---

[*]All websites last visited May 21, 2024.

iv

**Miscellaneous Authorities** **Page(s)**

Anjali Nambiar et al., Research Letter, *Maternal Morbidity and Fetal Outcomes Among Pregnant Women at 22 Weeks' Gestation or Less with Complications in 2 Texas Hospitals After Legislation on Abortion*, 227 Am. J. Obstetrics & Gynecology 648 (2022), https://www.ajog.org/action/showPdf?pii=S0002-9378%2822%2900536-1 ............................................................15

Ben Gitis et al., Bipartisan Pol'y Ctr., *1 in 5 Moms Experience Pregnancy Discrimination in the Wokplace* (Feb. 11, 2022), https://bipartisanpolicy.org/blog/bpc-morning-consult-pregnancy-discrimination/ ..............................................................................6

Bureau of Lab. Stat., U.S. Dep't of Lab., *Women in the Labor Force: A Databook* (Apr. 2023), https://www.bls.gov/opub/reports/womens-databook/2022/home.htm ......................................................................6

Daniel Grossman et al., ANSIRH, *Care Post-Roe*: *Documenting Cases of Poor-Quality Care Since the* Dobbs *Decision* (May 2023), https://www.ansirh.org/sites/default/files/2023-05/Care%20Post-Roe%20Preliminary%20Findings.pdf ...........................14

Ivette Gomez et al., KFF, *Abortions Later in Pregnancy in a Post-*Dobbs *Era* (Feb. 21, 2024), https://www.kff.org/womens-health-policy/issue-brief/abortions-later-in-pregnancy-in-a-post-dobbs-era/ ...............................................................................................14

Jasmine Tucker et al., Nat'l Women's Law Ctr., Fact Sheet, *Pregnant Workers Need Accommodations for Safe and Health Workplaces* (Oct. 2021), https://nwlc.org/wp-content/uploads/2021/11/Pregnant-Workers-by-the-Numbers-2021-v4.pdf ...................................................................................7

Jessica Mason & Katherine Gallagher Robbins, Nat'l P'ship for Women & Fams., Issue Br., *Discrimination While Pregnant* (Oct. 2022), https://nationalpartnership.org/report/discrimination-while-pregnant/ ...................................................................................5

v

**Miscellaneous Authorities**                                          **Page(s)**

Kate Kennedy-Moulton et al., *Maternal and Infant Health Inequality: New Evidence from Linked Administrative Data* (Nat'l Bureau of Econ. Rsch., Working Paper No. 30,693, 2022), https://www.nber.org/system/files/working_papers/w30693/w30693.pdf ................................................................................7

Kavitha Surana, *Doctors Warned Her Pregnancy Could Kill Her. Then Tennessee Outlawed Abortion.*, ProPublica (Mar. 14, 2023), https://www.propublica.org/article/tennessee-abortion-ban-doctors-ectopic-pregnancy .........................................................15

Lynda Laughlin, U.S. Census Bureau, *Maternity Leave and Employment Patterns of First-Time Mothers, 1961-2008* (Household Econ. Stud. No. 70-128, Oct. 2011), https://www2.census.gov/library/publications/2011/demo/p70-128.pdf ...............................................................................5

Mabel Felix et al., KFF, *A Review of Exceptions in State Abortion Bans: Implications for the Provision of Abortion Services* (May 18, 2023), https://www.kff.org/womens-health-policy/issue-brief/a-review-of-exceptions-in-state-abortions-bans-implications-for-the-provision-of-abortion-services/ ...............................14

Nancy L. Marshall & Allison J. Tracy, *After the Baby: Work-Family Conflict and Working Mothers' Psychological Health*, 58 Fam. Relations 380 (2009), https://onlinelibrary.wiley.com/doi/epdf/10.1111/j.1741-3729.2009.00560.x .......................................................5

National P'ship for Women & Fams., Fact Sheet, *The Pregnant Workers Fairness Act* 3 (Feb. 2021), https://nationalpartnership.org/wp-content/uploads/2023/02/fact-sheet-pwfa.pdf ....................................................5

**Miscellaneous Authorities**                                   **Page(s)**

Scott Brown et al., *Employee and Worksite Perspectives of the Family and Medical Leave Act: Executive Summary for Results from the 2018 Surveys* (2020), https://www.dol.gov/sites/dolgov/files/OASP/evaluation/pdf/WH D_FMLA2018SurveyResults_ExecutiveSummary_Aug2020.pdf..............9

U.S. Census Bureau, *Fertility of Women in the United States: 2016* (May 2017), https://www.census.gov/data/tables/2016/demo/fertility/ women-fertility.html#par_list_62 ...............................................5

U.S. Office of the President, *Blueprint for Addressing the Maternal Health Crisis* (2022), https://www.whitehouse.gov/wp-content/uploads/2022/06/Maternal-Health-Blueprint.pdf...........................7

Wage & Hour Div., U.S. Dep't of Lab., Fact Sheet No. 73, FLSA Protections for Employees to Pump Breast Milk at Work (Jan. 2023), https://www.dol.gov/agencies/whd/fact-sheets/73-flsa-break-time-nursing-mothers .........................................................9

## INTRODUCTION AND INTERESTS OF AMICI

Amici States of New York, Arizona, California, Colorado, Connecticut, Delaware, Hawaiʻi, Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New Mexico, North Carolina, Oregon, Pennsylvania, Rhode Island, Vermont, Washington, and Wisconsin, and the District of Columbia submit this brief in support of defendant Equal Employment Opportunity Commission's opposition to plaintiffs' motion for a stay of the effective date and a preliminary injunction against enforcement of the Commission's regulations implementing the Pregnant Workers Fairness Act of 2022 (PWFA).[1] The PWFA requires that employers provide pregnant and postpartum workers with reasonable accommodations to retain their employment and avoid health risks unless doing so would create an undue hardship to the employer. At Congress's direction, the Commission promulgated rules to implement the PWFA and provided interpretive guidance to employers.

Amici strongly support the urgent aims of the PWFA and the Commission's regulations. Nearly 57 percent of all women in the United States

---

[1] *See* Pub. L. No. 117-328, Div. II, 136 Stat. 4459, 6084 (2022) (codified at 42 U.S.C. § 2000gg–2000gg-6).

are part of the current labor force.[2] Approximately 85 percent of female workers will become pregnant at some point during their careers and most pregnant persons will work throughout their pregnancy. Moreover, nearly three-quarters of women will return to the workforce within months after giving birth. Supporting the ability of pregnant and postpartum workers to remain in the workforce through reasonable accommodations is critical to the nation's economy. Pregnant and postpartum employees fill important jobs in vital sectors and contribute to the public fisc by, among other things, purchasing goods and services and paying taxes. The economic contributions of pregnant and postpartum employees promote the long-term stability and well-being of families and communities, including millions of young children, disabled persons, and the elderly.

In this action, plaintiffs challenge one aspect of the Commission's implementing regulations—the requirement that employers provide reasonable accommodations to all persons whose pregnancies have terminated, whether by miscarriage, stillbirth, or abortion. Contrary to plaintiffs' arguments, the

---

[2] Although much of the available statistical data focuses on women's participation in the workforce, amici recognize that transgender and nonbinary individuals may also become pregnant and underscore that all pregnant persons are entitled to the protections of the PWFA and the Commission's regulations.

2

Commission was not required to interpret the statutory term "pregnancy, childbirth, or related medical conditions" to encompass conditions related only to viable pregnancies or live births. Courts and the Commission have long interpreted an identical term in the Pregnancy Discrimination Act to prohibit discrimination based on a range of pregnancy-related conditions, including a person's decision to terminate or not to terminate a pregnancy, and plaintiffs offer no persuasive reason to depart from that interpretation here.

In addition, plaintiffs grossly overstate the consequences of the Commission's rule. Nothing in the regulation requires employers to pay for any employee to have an abortion or to enable abortions that are illegal under state law. All the rule requires is for employers to reasonably accommodate workers whose pregnancies have terminated by abortion; such an accommodation is likely achieved in most instances by providing leave either to attend a medical appointment or for recovery. Plaintiffs do not contest that the PWFA requires comparable accommodations for a person whose pregnancy terminates by miscarriage or stillbirth and offer no statutory basis to distinguish between such individuals and a person whose pregnancy has terminated by abortion.

Finally, plaintiffs fail to justify the mismatch between the limited nature of their legal challenge and the broad relief sought in this motion. Although

3

plaintiffs challenge only a minor portion of a single regulatory definition, they ask this Court to stay the enforcement date of the entire rule under 5 U.S.C. § 705. Such a stay could apply nationwide, including in amici States. And although several of plaintiffs' legal arguments are premised on the PWFA's application to state employers, they appear to seek a preliminary injunction as to all employers without explaining why such relief is necessary to remedy the allegedly improper application to state employers. This sweeping preliminary relief could have the effect of depriving both employers and pregnant workers nationwide of the clarity and finality provided by the final rule's numerous provisions. If this Court determines that preliminary relief is warranted, it should tailor any such relief to be no greater than what is necessary to address plaintiffs' particular claims.

4

## ARGUMENT

### I. THE PREGNANT WORKERS FAIRNESS ACT PROVIDES CRITICAL WORKPLACE PROTECTIONS

According to the U.S. Bureau of Labor Statistics, nearly 77 million women are currently in the national labor force.[3] Approximately 85 percent of women in the workforce will experience pregnancy at some point during their careers.[4] Nearly 70 percent of pregnant employees work throughout their pregnancy, and most people who give birth return to the workforce within months after childbirth.[5]

Notwithstanding state and federal efforts to address the issue, workplace pregnancy discrimination continues to be pervasive and harmful. Thousands

---

[3] National P'ship for Women & Fams., Fact Sheet, *The Pregnant Workers Fairness Act* 3 (Feb. 2021) (citing Bureau of Lab. Stat., U.S. Dep't of Lab., *Labor Force Participation for Women Highest in the District of Columbia in 2022* (Mar. 7, 2023)). (For authorities available on the internet, full URLs appear in the Table of Authorities.)

[4] *See* Jessica Mason & Katherine Gallagher Robbins, Nat'l P'ship for Women & Fams., Issue Br., *Discrimination While Pregnant* (Oct. 2022); Nancy L. Marshall & Allison J. Tracy, *After the Baby: Work-Family Conflict and Working Mothers' Psychological Health*, 58 Fam. Relations 380 (2009); U.S. Census Bureau, *Fertility of Women in the United States: 2016*, tbl. 6 (May 2017).

[5] Lynda Laughlin, U.S. Census Bureau, *Maternity Leave and Employment Patterns of First-Time Mothers, 1961-2008* (Household Econ. Stud. No. 70-128, Oct. 2011).

5

of pregnant and postpartum persons struggle to obtain reasonable accommo-

dations that would allow them to maintain their jobs while safely managing

their pregnancies and childbirths. Many women have left or considered leaving

their jobs due to the lack of accommodation or fear of discrimination.[6] Indeed,

only 60 percent of women with children under the age of 3 are currently

employed, with the remainder either unemployed or out of the labor force

entirely.[7] By comparison, nearly 72 percent of women with children between

the ages of 6 and 17 are currently employed.[8]

Job loss due to pregnancy discrimination not only impoverishes

individual workers and their families when it happens, but it can affect their

economic security for decades, as workers lose access to various benefits such

as retirement contributions, disability benefits, seniority, pensions, social

security contributions, and life insurance at a time when they need these benefits

most. At the same time, pregnant workers who remain in their jobs and work

without reasonable accommodations face risks to their physical, mental, and

---

[6] Ben Gitis et al., Bipartisan Pol'y Ctr., *1 in 5 Moms Experience Pregnancy Discrimination in the Workplace* (Feb. 11, 2022).

[7] Bureau of Lab. Stat., U.S. Dep't of Lab., *Women in the Labor Force: A Databook*, tbl. 6 (Apr. 2023).

[8] *Id.*

emotional health, which can result in severe adverse medical impacts including death.

The consequences for workers forced to decide between keeping their jobs and protecting their health are acutely felt by low-income persons and workers of color. Nearly one in six pregnant workers work in low-paying jobs, with Black and Latinx pregnant workers disproportionately represented.[9] Low-paying jobs are more likely to be physically demanding and often have a higher need for accommodations.[10] Yet such jobs also offer far less flexibility in scheduling work shifts to accommodate pregnancy-related limitations, such as need for breaks, and are less likely to offer paid leave in connection with childbirth.[11] Due at least in part to these factors, poor workers and persons of color are much more likely to suffer negative health outcomes during pregnancy than white workers.[12]

---

[9] Jasmine Tucker et al., Nat'l Women's Law Ctr., Fact Sheet, *Pregnant Workers Need Accommodations for Safe and Health Workplaces* 4 (Oct. 2021).

[10] *Id.* at 3-4.

[11] *Id.* at 4.

[12] U.S. Office of the President, *Blueprint for Addressing the Maternal Health Crisis* 15 (2022); Kate Kennedy-Moulton et al., *Maternal and Infant Health Inequality: New Evidence from Linked Administrative Data* 5 (Nat'l Bureau of Econ. Rsch., Working Paper No. 30,693, 2022).

Enacted in 2022, the PWFA is a landmark civil rights statute that requires covered employers to provide pregnant and postpartum workers with "reasonable accommodations to the known limitations related to . . . pregnancy, childbirth, and related medical conditions" unless doing so would pose an undue hardship to the employer. *See* 42 U.S.C. § 2000gg-1(1). The statute also prohibits employers from retaliating against workers who request or use a reasonable accommodation and requires employers to engage in an interactive process to determine the appropriate accommodation. *Id.* § 2000gg-1(2)-(5).

The PWFA provides substantial protections beyond those provided by preexisting federal law and fills in many gaps left by inconsistent state law protections.[13] For example, the federal Pregnancy Discrimination Act, 42 U.S.C. § 2000e(k), requires employers to provide temporary accommodations to pregnant workers only if the worker can identify nonpregnant employees who are "similar in their ability or inability to work" and have already received accommodations. *See Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 229 (2015). The federal Family and Medical Leave Act, 29 U.S.C. § 2601 et. seq., requires employers to offer unpaid time off for pregnancy and childbirth, but

---

[13] For a table of relevant state law protections, see Implementation of the Pregnant Workers Fairness Act, 89 Fed. Reg. 29,096, 29,170-71 (Apr. 19, 2024).

8

millions of workers are statutorily ineligible for its protections and many others are simply unable to afford taking advantage of them.[14] The federal Americans with Disabilities Act requires employers to provide an accommodation to certain pregnant workers who have a disability related to the pregnancy, but the statute does not recognize pregnancy itself as a disability. *See* 42 U.S.C. § 12102(2), (4); 29 C.F.R. § 1630.2(h). Finally, various federal provisions require accommodations for lactating employees, but they provide specific and limited protections and do not apply equally across industries.[15]

## II. THE COMMISSION REASONABLY INTERPRETED THE PREGNANT WORKERS FAIRNESS ACT TO REQUIRE REASONABLE ACCOMMODATIONS FOR ABORTION CARE

In the PWFA, Congress directed the Commission to promulgate implementing regulations, including "examples of reasonable accommodations addressing known limitations related to pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000gg-3(a). In September 2023, the Commission issued a notice of proposed rulemaking addressing each of the

---

[14] Scott Brown et al., *Employee and Worksite Perspectives of the Family and Medical Leave Act: Executive Summary for Results from the 2018 Surveys* 3 (2020).

[15] *See* Wage & Hour Div., U.S. Dep't of Lab., Fact Sheet No. 73, FLSA Protections for Employees to Pump Breast Milk at Work (Jan. 2023).

relevant statutory terms and providing a nonexhaustive list of examples of reasonable accommodations for a variety of situations. *See* Regulations to Implement the Pregnant Workers Fairness Act, 88 Fed. Reg. 54,714 (Aug. 11, 2023). In April 2024, the Commission finalized the rule, which is scheduled to take effect on June 18, 2024. *See* Implementation of the Pregnant Workers Fairness Act, 89 Fed. Reg. 29,096 (Apr. 19, 2024) (codified at 29 C.F.R. pt. 1636).

In this lawsuit, plaintiffs challenge part of one definition contained in the rule—namely the Commission's explanation that the term "pregnancy, childbirth, or related medical conditions" includes, among other things, "termination of pregnancy, including via miscarriage, stillbirth, or abortion." 29 C.F.R. § 1636.3(b); *see also* 89 Fed. Reg. at 29,191 (portion of interpretive guidance discussing abortion as a "related medical condition"). Contrary to plaintiffs' argument (Pl. Mem. at 14-25), the Commission's interpretation is entirely consistent with the PWFA's text and purposes, as well as with decades of case law interpreting that same term in the context of the Pregnancy Discrimination Act.

First, plaintiffs ignore that, in requiring reasonable accommodations for "known limitations related to the pregnancy, childbirth, or related medical

10

conditions," the statutory text incorporates a definition of "limitations" as including any "physical or mental condition *related to, affected by, or arising out of pregnancy*," 42 U.S.C. § 2000gg(4) (emphasis added). An employee's limitation (i.e., the unavailability to work during usual hours) resulting from the need to attend medical appointments or physically recover from the termination of a pregnancy falls well within the plain language of this expansive statutory definition.

The Commission's definition is also consistent with the meaning of the term "related" as used in the term "related medical condition." As the Eighth Circuit has explained, the term "related" has a "common meaning[ ] sufficiently clear to be applied." *Highwoods Props., Inc. v. Executive Risk Indem., Inc.*, 407 F.3d 917, 924 (8th Cir. 2005). In *Highwoods Properties*, for example, the Court looked to the *Merriam-Webster Collegiate Dictionary*, which defines "related" as "connected by reason of an established or discoverable relation" and defines "relation" as "an aspect or quality (as resemblance) that connects two or more things or parts as being or belonging or working together or as being of the same kind" to conclude that two lawsuits involving communications to shareholders arising from the same merger are sufficiently "related" for purpose of insurance coverage. *Id; see also Gregory v. Home Ins. Co.*, 876

11

F.2d 602, 606 (7th Cir. 1989) ("[T]he common understanding of the word 'related' covers a very broad range of connections, both causal and logical"). As noted below (at 16-17), courts routinely interpret the meaning of "related" in the context of the Pregnancy Discrimination Act in accordance with this plain meaning.

Faced with the challenging task of explaining how the termination of a pregnancy is unrelated to that pregnancy, plaintiffs instead argue that an abortion is not a "condition" but rather a "procedure." (Pl. Mem. at 15). The PWFA's requirement to accommodate employees' "limitations" expressly incorporates any "physical or mental condition related to, affected by, or arising out of" pregnancy—which would plainly encompass limitations resulting from the need to obtain, as well as recover from, a range of medical procedures or treatments for either the condition of pregnancy or the related medical condition of pregnancy loss (whether through miscarriage, stillbirth, or termination). Indeed, plaintiffs do not contest that an employee is entitled to a reasonable accommodation in connection with a miscarriage or stillbirth but offer no statutory basis for treating persons whose pregnancies have terminated by abortion differently. In addition, plaintiffs fail to explain how the PWFA could possibly achieve its goals if employees cannot receive accommodations

12

for pregnancy- or childbirth-related procedures or medical treatments. For example, under plaintiffs' reading of the statute, an employee could not ask for a reasonable accommodation to facilitate attendance at a prenatal ultrasound appointment or gestational diabetes screening.

Alternatively, plaintiffs contend that an abortion is not a "medical" condition, to the extent it is "an elective procedure[ ] . . . for reasons unrelated to maternal health." *Id.* at 16. Plaintiffs also tout their restrictive abortion laws as recognizing the distinction between purportedly "elective abortions" and abortions deemed "medically necessary to prevent specified risks to the life or health of a pregnant woman." *Id.* at 16-17. However, plaintiffs offer no support for the extraordinary suggestion that Congress intended to limit the term "pregnancy, childbirth, or related medical conditions" by silent reference to stringent state abortion bans. Moreover, plaintiffs' disapproval of certain reasons for why an individual chooses to terminate a pregnancy does not transform an abortion into a nonmedical procedure.[16]

Additionally, plaintiffs fail to address the obvious fact that people often obtain abortions for medical reasons that do not qualify for the narrow health

---

[16] Am. Coll. of Obstetricians & Gynecologists, *ACOG Guide to Language and Abortion* (Sept. 2023).

13

exceptions offered by plaintiffs and similarly situated States. Indeed, six States, including plaintiffs Arkansas, Idaho, Oklahoma, and South Dakota, offer no express health exception at all.[17] And as for the States that do have health exceptions to abortion bans, most are defined extremely narrowly in a way that chills providers from offering abortion care in all but the most dangerous instances. For example, plaintiff Georgia allows an abortion only "to prevent the death of the pregnant woman or the *substantial and irreversible* physical impairment of a major bodily function." Ga. Code Ann. § 16-12-141(a)(3) (emphasis added). In addition, multiple States, including plaintiffs Tennessee, Georgia, Florida, Idaho, Iowa, and West Virginia, expressly prohibit abortion care based on considerations of mental and emotional health.[18]

As numerous widely reported stories have revealed, purported health exceptions to abortion bans fall far short of encompassing all of the medical reasons for why a person may choose to terminate a pregnancy.[19] For example,

---

[17] *See* Ivette Gomez et al., KFF, *Abortions Later in Pregnancy in a Post-Dobbs Era*, fig. 5 (Feb. 21, 2024).

[18] Mabel Felix et al., KFF, *A Review of Exceptions in State Abortion Bans: Implications for the Provision of Abortion Services* (May 18, 2023).

[19] Daniel Grossman et al., ANSIRH, *Care Post-Roe*: *Documenting Cases of Poor-Quality Care Since the* Dobbs *Decision* 7-9 (May 2023); Kavitha

*(continued on the next page)*

14

a recent study of maternal morbidity at two Texas hospitals evaluated pregnant patients who presented at a hospital with severe complications but received observation-only care until they developed an immediate threat to their life, their fetus no longer had cardiac activity, or they spontaneously went into labor. The rate of serious maternal morbidity for these Texas patients (57 percent) was nearly double the rate for patients with similar complications in other States who were able to immediately terminate their pregnancies (33 percent).[20]

Second, as the Commission recognized (*see* 89 Fed. Reg. at 29,099), Congress's use of the term "pregnancy, childbirth, or related medical conditions" in the PWFA mirrors the use of the same term in the Pregnancy Discrimination Act. *See* 42 U.S.C. § 2000e(k). Congress's "repetition of the same language in a new statute indicates, as a general matter, the intent to

---

Surana, *Doctors Warned Her Pregnancy Could Kill Her. Then Tennessee Outlawed Abortion*, ProPublica (Mar. 14, 2023) (identifying in "news articles, medical journal studies and lawsuits . . . at least 70 examples across 12 states of women with pregnancy complications who were denied abortion care or had the treatment delayed since Roe was overturned").

[20] Anjali Nambiar et al., Research Letter, *Maternal Morbidity and Fetal Outcomes Among Pregnant Women at 22 Weeks' Gestation or Less with Complications in 2 Texas Hospitals After Legislation on Abortion*, 227 Am. J. Obstetrics & Gynecology 648, 649 (2022).

15

incorporate its administrative and judicial interpretations as well." *Bragdon v. Abbott*, 524 U.S. 624, 645 (1998); *see also Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 536 (2015). This statutory-interpretation canon is especially salient here, where the PWFA was enacted to supplement the Pregnancy Discrimination Act's accommodation requirements.

Plaintiffs cannot dispute that the Pregnancy Discrimination Act's definition of "pregnancy, childbirth, or related medical condition" has long been interpreted to prohibit discrimination based on the decision to terminate (or not to terminate) a pregnancy. *See, e.g.*, *Doe v. C.A.R.S. Prot. Plus, Inc.*, 527 F.3d 358, 364 (3d Cir. 2008); *Turic v. Holland Hospitality, Inc.*, 85 F.3d 1211, 1214 (6th Cir. 1996); *Ducharme v. Crescent City Déjà vu, LLC*, 406 F. Supp. 3d 548, 556 (E.D. La. 2019), and a range of other conditions and medical treatments relating to pregnancy and childbirth, *Hicks v. City of Tuscaloosa*, 870 F.3d 1253, 1260 (11th Cir. 2017) (lactation); *EEOC v. Houston Funding II, Ltd.*, 717 F.3d 425, 428 (5th Cir. 2013) (same); *Kocak v. Community Health Partners of Ohio, Inc.*, 400 F.3d 466, 470 (6th Cir. 2005) (potential pregnancy); *Reilly v. Revlon, Inc.*, 620 F. Supp. 2d 524, 544 (S.D.N.Y. 2009) (potential pregnancy). This broad interpretation is consistent with the statutory text and purpose of the Pregnancy Discrimination Act, which was "to clarify that

16

the protections of Title VII "extend[] to the whole range of matters concerning the childbearing process," and "to include the[] physiological occurrences peculiar to women." *Hicks*, 870 F.3d at 1260 (quoting H.R. Rep. No. 95-948, at 5 (1978); S. Rep. No. 95-331, at 4 (1977)). *See also International Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Johnson Controls, Inc.*, 499 U.S. 187, 198–99 (1991) (discrimination based on capacity to become pregnant constituted prohibited discrimination based on sex and pregnancy under Title VII as amended by the PDA).

The only contrary authority cited by plaintiffs (Pl. Mem. at 18-19) does not deal with abortion at all, and instead held that the Pregnancy Discrimination Act does not apply to discrimination based on infertility or an employer's decision to exclude insurance coverage for contraception. *See, e.g.*, *Krauel v. Iowa Methodist Med. Ctr.*, 95 F.3d 674, 679 (8th Cir. 1996); *In re Union Pac. R..R Emp. Pracs. Litig.*, 479 F.3d 936, 942 (8th Cir. 2007). But those decisions turned on facts showing that the conditions in question were not necessarily sex-linked. Indeed, other courts have readily found discrimination based on fertility-related considerations. *See, e.g.*, *Hall v. Nalco Co.*, 534 F.3d 644, 649 (7th Cir. 2008) (employer's practice of terminating

17

employees who took leave for IVF treatment violated the Pregnancy Discrim-
ination Act). As the Commission appropriately explained in this rulemaking,
"whether infertility and fertility treatments are covered by the PWFA will be
based on the particular circumstances of the situation" because such conditions
may be experienced by individuals regardless of sex. 89 Fed. Reg. at 29,102.

Third, the Commission's inclusion of abortion in the definition of
"related medical condition" reasonably provides equal protection for all
employees whose pregnancies have terminated regardless of the reason for that
termination. See *supra* at 12-13. Indeed, plaintiffs fail to explain why the
requirement to accommodate abortion is so onerous given that employers have
to offer comparable (if not more extensive) accommodations to persons who
have lost a pregnancy due to miscarriage or stillbirth. *See id.* at 29,104
(explaining that "the type of accommodation that most likely will be sought
under the PWFA regarding an abortion is time off to attend a medical
appointment or for recovery").

Finally, plaintiffs greatly overstate the rule's practical effects. *See* Pl.
Mem. at 32-34. The regulation specifies that, consistent with the statutory text,
the PWFA does not require employers to pay for abortions or provide
healthcare benefits for abortion in violation of state law. *See* 89 Fed. Reg. at

18

29,104, 29,109. Likewise, "[t]he rule does not prescribe when, where, or under what circumstances an abortion can be obtained or what procedures may be used." *Id.* at 29,112. An employer is not required to provide paid leave to an employee obtaining an abortion, and any request for an accommodation under the PWFA is subject to applicable exceptions and defenses, including, for example, those based on undue hardship. *Id.* at 29,104-05. Plaintiffs fail to explain why these protections are insufficient to address their concerns, or why case-by-case adjudication is unlikely to remedy a future hypothetical conflict between the regulation and state law.

## III. IF THE MOTION IS GRANTED, ANY PRELIMINARY RELIEF SHOULD BE NARROWLY TAILORED.

A federal court's equitable powers are founded on the bedrock principle that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). The court's power to stay the effective date of agency action under the Section 705 of the Administrative Procedure Act is cabined by the same substantive factors and equitable principles governing preliminary injunctive relief. *See, e.g.*, *Colorado v. U.S. Env't Prot. Agency*,

19

989 F.3d 874, 883 (10th Cir. 2021); *Cook Cnty. v. Wolf*, 962 F.3d 208, 221 (7th Cir. 2020).

Careful consideration of the scope of injunctive relief is especially important in the preliminary injunction posture, where briefing often proceeds on an expedited basis and a court makes only a prediction of the likelihood of success on the merits. *See Narragansett Indian Tribe v. Guilbert*, 934 F.2d 4, 6 (1st Cir. 1991). In this case, plaintiffs' requested preliminary relief far exceeds the nature of the alleged violation.

First, plaintiffs offer no justification for seeking a stay of the effective date of the Commission's regulation in its entirety. Pl. Mot. for a § 705 Stay & Prelim. Inj. at 5 (May 3, 2024), ECF No. 17. Plaintiffs take no legal issue with the vast majority of the rule and emphatically laud the purposes of the PWFA. *See* Pl. Mem. at 2-3. The Commission's inclusion of abortion in a long list of "pregnancy, childbirth, and related medical conditions" in no way affects the validity of the remainder of the regulation, which contains a severability provision in any event. *See* 29 C.F.R. § 1636.8. Moreover, staying the effective date of the rule in its entirety to allow further litigation of plaintiffs' narrow legal challenge would substantially undermine the interests of persons not before the court, including millions of pregnant workers and their employers

who stand to benefit from the rest of the clear guidelines provided by the Commission's regulation.

Second, although plaintiffs' request for a preliminary injunction is limited to the provision of the rules requiring accommodation for abortion care, plaintiffs do not explain how a preliminary injunction prohibiting the federal government from enforcing the "abortion-accommodation mandate against the interests of Plaintiff States" (Pl. Mot. at 5) is warranted under the circumstances of this case and on this record. For example, plaintiffs' constitutional arguments and many of their arguments with respect to the equities (Pl. Mem. at 25-28, 32-33) focus on alleged injuries to the States as employers subject to regulation on the face of the PFWA. Plaintiffs fail to explain why a preliminary injunction against enforcement of the regulation as to nonstate employers would be warranted nevertheless. Accordingly, if the court determines that any preliminary relief is warranted (and it should not), it should carefully tailor such relief to reflect the specific claims at issue in this case rather than the plaintiffs' general displeasure with federal rulemaking.

21

## CONCLUSION

Plaintiffs' motion for preliminary relief should be denied, or in the alternative, any preliminary relief should be appropriately tailored to address the limited nature of plaintiffs' legal challenge.

Dated:    New York, New York
          May 20, 2024

                                        Respectfully submitted,

                                        LETITIA JAMES
                                          *Attorney General*
                                          *State of New York*

                                        ESTER MURDUKHAYEVA*
                                        *Deputy Solicitor General*

                                        Barbara D. Underwood
                                          *Solicitor General*
                                        Ester Murdukhayeva
                                          *Deputy Solicitor General*
                                        Galen Leigh Sherwin
                                          *Special Counsel for*
                                            *Reproductive Justice*
                                            *of Counsel*

                                        Office of the Attorney General
                                        28 Liberty Street
                                        New York, NY 10005
                                        (212) 416-6279
                                        Ester.Murdukhayeva@ag.ny.gov
                                        *Admission pro hac vice pending

                    (*Counsel listing continues on next page.*)

22

KRISTIN K. MAYES
 *Attorney General*
 *State of Arizona*
2005 N. Central Ave
Phoenix, AZ 85004

ROB BONTA
 *Attorney General*
 *State of California*
1300 I St.
Sacramento, CA 95814

PHILIP J. WEISER
 *Attorney General*
 *State of Colorado*
1300 Broadway, 10th Fl.
Denver, CO 80203

WILLIAM TONG
 *Attorney General*
 *State of Connecticut*
165 Capital Ave.
Hartford, CT 06106

KATHLEEN JENNINGS
 *Attorney General*
 *State of Delaware*
820 N. French St.
Wilmington, DE 19801

ANNE E. LOPEZ
 *Attorney General*
 *State of Hawai'i*
425 Queen St.
Honolulu, HI 96813

KWAME RAOUL
 *Attorney General*
 *State of Illinois*
115 S. LaSalle St.
Chicago, IL 60603

AARON M. FREY
 *Attorney General*
 *State of Maine*
6 State House Station
Augusta, ME 04333

ANTHONY G. BROWN
 *Attorney General*
 *State of Maryland*
200 Saint Paul Pl.
Baltimore, MD 21202

ANDREA JOY CAMPBELL
 *Attorney General*
 *Commonwealth of*
  *Massachusetts*
One Ashburton Pl.
Boston, MA 02108

DANA NESSEL
 *Attorney General*
 *State of Michigan*
P.O. Box 30212
Lansing, MI 48909

KEITH ELLISON
 *Attorney General*
 *State of Minnesota*
75 Rev. Dr. Martin Luther
  King Jr. Blvd.
St. Paul, MN 55155

*(Counsel listing continues on next page.)*

23

AARON D. FORD
 *Attorney General*
 *State of Nevada*
100 North Carson St.
Carson City, NV 89701

MATTHEW J. PLATKIN
 *Attorney General*
 *State of New Jersey*
25 Market St.
Trenton, NJ 08625

RAÚL TORREZ
 *Attorney General*
 *State of New Mexico*
P.O. Drawer 1508
Santa Fe, NM 87504

JOSHUA H. STEIN
 *Attorney General*
 *State of North Carolina*
114 W. Edenton St.
Raleigh, NC 27603

ELLEN F. ROSENBLUM
 *Attorney General*
 *State of Oregon*
1162 Court St. NE
Salem, OR 97301

MICHELLE A. HENRY
 *Attorney General*
 *Commonwealth of*
  *Pennsylvania*
Strawberry Sq., 16th Fl.
Harrisburg, PA 17120

PETER F. NERONHA
 *Attorney General*
 *State of Rhode Island*
150 S. Main St.
Providence, RI 02903

CHARITY R. CLARK
 *Attorney General*
 *State of Vermont*
109 State St.
Montpelier, VT 05609

ROBERT W. FERGUSON
 *Attorney General*
 *State of Washington*
P.O. Box 40100
Olympia, WA 98504

JOSHUA L. KAUL
 *Attorney General*
 *State of Wisconsin*
17 W. Main St.
Madison, WI 53703

BRIAN L. SCHWALB
 *Attorney General*
 *District of Columbia*
400 6th St., NW
Washington, D.C. 20001

24